**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE**

RICHARD A. TRIOLO

        CASE NO.: 3:18-cv-00919-MMH-JBT

    Plaintiff,

vs.

UNITED STATES OF AMERICA,

    Defendant.
_____/

## PLAINTIFF'S TRIAL BRIEF

Plaintiff, Richard A. Triolo, by and through his undersigned counsel hereby submits the Plaintiff's Trial Brief, and states as follows:

I.    Proposed Findings of Fact.

1.    This case involves a rear-end motor vehicle collision caused by a U.S. Postal Service employee who was distracted from her driving duties due to a cell phone which resulted in a hard impact and permanent injuries to the Plaintiff.  The Plaintiff has incurred $327,854.62 in past medical expenses; will incur between $658,000 to $926,000 in future medical expenses; missed 10 weeks of work; undergone a lumbar spine fusion; has had 14 interventional pain management procedures; takes daily doses of pain relievers; and suffers from a permanent disability that has materially altered his life all of which is due to distracted driving.

2.    On February 11, 2017, at approximately 1:08 p.m., the Plaintiff, Richard Triolo was driving a 2016 Ford Mustang in a southerly direction on Old St. Augustine Road in Jacksonville, Duval County, Florida.

1

3. At that time and place, Marsha Rentz was using her personal cell phone while simultaneously driving a van for the U.S. Postal Service directly behind Mr. Triolo.

4. Mr. Triolo brought his vehicle to a stop at the intersection of Old St. Augustine Road and Loretto Road due to the red signal light. Because of her cell phone, Ms. Rentz was distracted her from her driving duties, and drove the van into the back of Mr. Triolo's vehicle.

5. The impact was hard enough to cause Mr. Triolo's vehicle to surge forward, and his seat back to instantaneously recline.

6. Immediately after the impact, Mr. Triolo looked into his rearview mirror and saw Ms. Rentz in the driver's seat of the van with a shocked look of disbelief on her face and her cell phone being held in her hand along with steering wheel.

7. Both drivers moved their vehicles into a nearby parking lot.

8. Ms. Rentz asked Mr. Triolo if he was ok and he stated that he was not and that he was having discomfort in his back.

9. Mr. Triolo asked Ms. Rentz what happened and she replied: "my foot may have slipped off the brake". Mr. Triolo pointed to the damage on the vehicles and responded "mam, see that, that's not a foot slipping off the brake. Stay here, I'm going to call the police." Ms. Rentz stated that she needed to call her supervisor.

10. Mr. Triolo stayed at the accident scene for approximately 2 hours waiting for the police to arrive and for them to conclude their investigation and make a report.

11. While waiting for the police, Mr. Triolo called his brother, Brian Schmucker, who lives a few minutes away and asked him to meet him at the scene.

12. At the scene, Brian Schmucker observed that Mr. Triolo was bent forward leaning on his vehicle and holding his lower back and rubbing his neck. While they waited for the police,

he suggested to his brother that he go to the ER to get checked out.

13. Once the investigating officer released Mr. Triolo from the scene, Mr. Triolo drove directly to Baptist Medical Center South, and was checked into the Emergency Department at 2:56 p.m. [Pl's Ex. 2: BMC000002]

14. At the Emergency Department, Mr. Triolo reported to the doctor the following:

    a. he was a restrained driver

    b. he was rear ended by a mail truck at a "moderate speed"

    c. he was experiencing neck pain and lower back pain.

[Pl's Ex. 2: BMC00003]

15. The Emergency Department's general physical examination did not disclose any gross abnormalities. A CT exam was ordered for Mr. Triolo's neck but not for his low back. [Pl's Ex. 2: BMC000004] The CT exam of his neck did not reveal a fracture of any bones in his neck. [BMC000020] The Emergency Department doctor diagnosed Mr. Triolo with a cervical strain, prescribed the pain reliever Lortab [BMC000005], and provided Mr. Triolo with the following written warning:

> Strong forces may be involved in a car accident. It is important to watch for any new symptoms that might be a sign of a hidden injury. It is normal to feel sore and tight in your muscles the next day. However, a more severe pain should be reported.
>
> Get Prompt Medical Attention if any of the following occur: New or worsening neck, back, abdomen, arm or leg pain.

[BMC000008]

16. Mr. Triolo was discharged from Emergency Department at 4:20 p.m. on February 11, 2017. [BMC000036]

17. Over the course of the next four days, Mr. Triolo continue to experience a

significant amount of pain in his low back and neck.

18. Five days after the rear-end collision, on February 16, 2017, Mr. Triolo presented to Michael McDaniels, DC at Jacksonville Sport & Spine in Orange Park complaining of neck and back pain. [Pl's Ex. 6: JSS000001] On the first visit, Dr. McDaniel's reported:

> In a lot of pain, waking up at night, sharp pains, can't sit for too long, can't stand for too long. Experiencing headaches constantly, dizzy, ringing in the ears, anxiety. The patient wasn't sure what day it was when asked during the interview. Right sided lower back pain, right lateral leg pain, he stated that other people at work are being asking why he is limping? Constant neck pain, tight feels the need to stretch it out all the time. Pain in between the shoulder blades. [JSS000010]

19. Dr. McDaniel's physical examination identified: reduced range of motion of the neck; reduced range of motion of the lumbar spine; altered gait; and sensory deficits of the S1 and L5 nerve roots. As well, Mr. Triolo failed several orthopedic tests performed to his lumbar spine. [Pl's Ex. 6: JSS000010 – JSS000011]

20. After taking a history and physical, Dr. McDaniel's working diagnosis included: sleep disturbance, muscle spams of the neck, muscle spasm of the piriformis, muscle spasm of the thoracic spine, sprain of the thoracic spine, lumbago-sciatica, cervical radiculopathy, post-traumatic headache, concussion, cervicobrachial syndrome and cervicalgia. [Pl's Ex. 6: JSS000011 – JSS000012]

21. Dr. McDaniels recommended continued chiropractic care for 2 to 4 weeks, and gave a permanent restriction to avoid aggravations/exacerbations and to lift no more than 15 lbs. [JSS000012]

22. Over the course of five (5) months following the collision, February 16, 2017 through July 20, 2017, Mr. Triolo was treated by Dr. McDaniels 14 times for the injuries to his neck and back. [Pl's Ex. 6: JSS000001 – JSS00057]

23.    At the request of Dr. McDaniels, Mr. Triolo was referred to a neurologist for further evaluation. [Pl's Ex. 13: UNC000002].

24.    On March 16, 2017, Mr. Triolo was seen by neurologist, Dr. Syed Asad at Universal Neurological Care. [UNC000002 – UNC000008]. Mr. Triolo advised Dr. Asad that since the rear end motor vehicle collision he has continued to experience neck and back pain, and that he felt that his legs feel like Jello. He described "sharp stabling pains radiating into the back of his right leg and buttocks." On a pain scale of 1 – 10, his neck was an 7-8, and his back was a 10, and that he had been tripping over his right foot. [UNC000002]. Dr. Asad performed a physical examination and diagnosed Mr. Triolo with the following: (i) lumbar radiculopathy; (ii) cervicalgia (neck pain); (iii) abnormal gait and mobility; (iv) impaired cognition; and (v) post-concussion syndrome. [UNC000005]

25.    Dr. Asad prescribed a muscle relaxer (Methocarbamol) and a pain cream (Lidocaine-Prilocaine). In addition, Dr. Asad ordered an MRI of his lumbar spine, a nerve conduction study (NCS), and an electromyography (EMG). [UNC000006 – UNC000007].

26.    The NCS and EMG were performed on May 10, 2017. The NCS was normal. However, the EMG identified radicular deficits at L5-S1 on the right side of Mr. Triolo's lumbar spine. [UNC000017]. The results of this diagnostic test are consistent with Mr. Triolo's description of his right sided back pain since the motor vehicle collision.

27.    A lumbar MRI was performed on April 4, 2017 at Baymeadows MRI. The reading radiologist identified the following:

      a. Bilateral spondylolysis at L5-S1;
      b. Degenerative spondylosis with disc dessication and disc space narrowing at L5-S1 with circumferential disc bulge resulting in bilateral foraminal stenosis in combination with anterior L5 subluxation encroaching upon the L5 nerve roots;

      c. disc dessication with disc space narrowing at T12-L1 with protruding posterior disc herniation indenting the anterior thecal sac with spinal canal narrowing and no cord impingement;
      d. annular bulge at L2-3 and L3-4 encroaching upon foramina with no spinal stenosis or nerve root impingement.

[Pl's Ex. 3: BMRI000002]

28. On May 25, 2017, Mr. Triolo returned to Dr. Asad's office for further evaluation and review of diagnostic tests. With regard to his lumbar spine, Dr. Asad's chart note indicates that Mr. Triolo's condition included: (i) bulges and herniations; and (2) chronic potentials in muscles inervated by L5-S1 nerve root. Mr. Triolo was advised that he was to continue with chiropractic care and would be referred to a pain management physician and a surgeon for further evaluation. [UNC000024].

29. On July 11, 2017, Mr. Triolo was referred to Dr. Reynaldo Pardo of St. Josephs Interventional Pain Specialists. He reported low back pain radiating down into the glut to the hamstring and across the hip flexor, and that his pain on a scale of 1 – 10 ranged from 9 to 10. He also reported that he continued to have neck pain radiating down into the trap and around the scapula. [PL's Ex. 9SJIPS000003] During the initial visit, Dr. Pardo met with Mr. Triolo and recorded that he was experiencing "severe lower back pain referred to the right lower extremity and the right inguinal area. The pain extends down the posterior aspect of the right thigh down to knee level. These radicular symptoms did not go below his right knee." [SJIPS000009]

30. Dr. Pardo performed a physical examination which revealed tenderness in the cervical, thorasic and lumbar spine. With regard to the lumbar spine, Mr. Triolo suffered from reduced range of motion, pain extending into the right thigh, pain with extension and flexion, and sensory deficits at L4, L5, and S1. In addition, Dr. Pardo reviewed the lumbar MRI of April 4, 2017. [SJIPS000010]

31. Following the history and physical examination and review of the lumbar MRI, Dr. Pardo's initial diagnosis included: (i) driver injured in collision; (ii) low back pain; (iii) arthropathy of the lumbar facet joints; (iv) sprain of the cervical spine; (v) strain of the cervical muscle facia and tendon; (vi) spondylolisthesis of the lumbar spine; (vii) interverbal disc degeneration of the lumbar; (viii) spondylosis with myelophathy of the lumbar spine; (ix) spinal stenosis of the lumbar spine; (x) radiculopathy of the lumbar spine; and (xi) spondylolysis of the lumbosacral region. Dr. Pardo prescribed Acetaminophen/Hydrocodone, Diclofenac and Doxepin Hydrochloride. In addition to medication pain management, Dr. Pardo recommended proceeding with a lumbar epidural injection to address the chronic inflammatory component of Mr. Triolo's lumbar pain, and further consideration for a nerve block to address the facet arthropathy. [SJIS000010 – SJIS000011]

32. Since Mr. Triolo's initial visit on July 11, 2017 through present day, Dr. Pardo has continued to manage Mr. Triolo's palliative pain management care. In total, Dr. Pardo has seen Mr. Triolo in his office on 48 separate occasions over the course of the last three years. [SJIPS000001 to SJIPS000211].

33. Over the past three years, Dr. Pardo has performed fourteen (14) interventional procedures on Mr. Triolo's lumbar spine to help manage his severe symptomology. The procedures included:

| **Date**: | **Procedure**: |
|---|---|
| 7/11/2017 | Lumbar Epidural Steroid Injection [SJIPS000012] |
| 7/20/2017 | Medial Branch Block @ L2, L3, L4 L5 on R side [SJIPS000016] |
| 8/11/2017 | Transforaminal steroid injection @ L5, Right side [SJIPS000023] |
| 7/5/2018 | Transforaminal steroid injection @ L5, Left side [SJIPS000077] |
| 10/17/2018 | Medial Branch Block @ L2 L3 L4 L5, Left side |

| | |
|---|---|
| | [SJIPS000096] |
| 10/25/2018 | Medial Branch Block @ L2 L3 L4 L5, Left side [SJIPS000102] |
| 11/8/2018 | Radio Frequency Ablations @ L2, L3, L4 and L5 Left side [SJIPS000108] |
| 4/1/2019 | Radio Frequency Ablations @ L2, L3, L4, and L5 Right side [SJIPS000135] |
| 4/29/2019 | Radio Frequency Ablations @ L2, L3, L4 and L5 Left side [SJIPS000143] |
| 8/20/2019 | Transforaminal steroid injection @ L5, Left [SJIPS000162] |
| 9/25/2019 | Radiofrequency Ablations @ L2, L3 L4, and L5 Left side [SJIPS000170] |
| 10/24/2019 | Greater Trochanteric Bursal Corticosteroid and local anesthetic injection (left hip) [SJIPS000177] |
| 8/7/2020 | Transforaminal corticosteroid injection @ L4, Left side [SJIPS000203] |
| 9/14/2020 | Radio Frequency Ablations @ L2, L3, L4, and L5 Left side [SJIPS000210] |

34. In addition to the interventional procedures, throughout the past three years Dr. Pardo has prescribed medications at different phases of his treatment to include:

   a. Percocet (pain reliever)

   b. Diclofenac (anti-inflammatory)

   c. Arymo ER (a/k/a Morphine)

   d. Doxepin (sleep)

[SJIPS0001 – SJIPS00211]

35. Due to the fractured bone of the pars interarticularis at L5 causing severe spondylolisthesis of L5-S1 and radicular symptoms, Dr. Pardo referred Mr. Triolo for a surgical evaluation.

36. On October 3, 2017, Mr. Triolo was seen by Dr. Constantine Toumbis of Orange Park Spine Institute for a surgical evaluation. [SJIPS00001] Based upon his examination and review of the lumbar MRI, Dr. Toumbis advised Mr. Triolo that he was a candidate for a fusion

at L5-S1.

37. Mr. Triolo did not take the recommendation lightly and was concerned because he knew someone that had a spine surgery and the outcome was not completely successful. Mr. Triolo decided to obtain a second opinion.

38. Mr. Triolo was referred to Dr. Raymond Topp of Topp Spine & Orthopaedics for a second surgical opinion.

39. On November 8, 2017, Mr. Triolo met the Dr. Topp. Mr. Triolo reported to Dr. Topp that he was in a rear-end motor vehicle collision in February 2017, and that since the collision he continuously suffers severe lumbar spine pain. Further, he had no prior accidents or treatment prior to the motor vehicle collision. [TOPP00001 – TOPP0006]

40. Following a history, physical examination and review of the lumbar MRI of April 4, 2017, Dr. Topp also recommended a fusion of L5-S1 to stabilize the spine. [TOPP000007]

41. At this point Mr. Triolo had seen two spine surgeons who both recommended that he have his back fused. However, he was not emotionally ready to commit to having a surgery on his spine.

42. Prior to the collision Mr. Triolo maintained a very active life. He worked full-time as a respiratory therapist, worked out on a regular basis, jogged, played recreational sports, took trips and had no physical limitations whatsoever. Prior to the February 11, 2017 collision, Mr. Triolo never experienced back or had any limitations whatsoever.

43. Following the collision, Mr. Triolo hoped that his symptoms would be alleviated through conservative treatment and without the need for surgery. As well, it continued to weigh heavily on him that he knew someone that had a spine surgery that was not successful.

44. After managing to get through the 2017 holidays, and in speaking with members

of his family, Mr. Triolo decided that his symptoms and disabilities were interfering with his life to such a high degree that he was feeling depressed. He came to the realization that the spine surgery was his only option.

45. Mr. Triolo reached out to Dr. Toubmis' office, to schedule a follow up, but learned that Dr. Toubmis was no longer seeing patients in Orange Park and had returned to his full-time practice in Crystal River, Florida.

46. On February 21, 2018, Mr. Triolo had a follow up appointment with Dr. Topp. After meeting with Dr. Topp and discussing the proposed surgery, Mr. Triolo agreed to proceed with the surgery. [TOPP000010]

47. On March 22, 2018, Dr. Topp performed a transforaminal lumbar interbody fusion of L5-S1 at Jacksonville Beach Surgery Center. The purpose of the surgery was to resolve the acute trauma from the February 11, 2017 motor vehicle collision which caused: (i) a fracture of the bone at L5 (spondylolysis); (ii) severe misalignment of the vertebrae at L5-S1 (spondylolisthesis); and (iii) pain symptoms shooting down his leg (radiculopathy). [TOPP000013].

48. The surgery was successful from the standpoint that Dr. Topp located the acutely fractured pars interarticularis, which had caused the spondylolisthesis and radiculopathy, and was able to fuse same with rods and screws. Further he was successful in harvesting bone from Mr. Triolo to mix with allograft material to allow for better osteointegration of the PEEK cage placed between the vertebrae at L5-S1. [TOPP000015 – TOPP00016].

49. The permanently placed rods and screws are readily visible from the live digital x-rays taken during the surgery. [TOPP000018] As well, they can be seen on the live digital x-

rays taken by Dr. Pardo during his interventional pain management procedures performed after the surgery. [SJIPS000211]

50. The PEEK cage, rods and screws will forever stay in Mr. Triolo's spine.

51. The permanently placed surgical hardware works to stabilize Mr. Triolo's lumbar spine. However, because two vertebrae are permanently fused together that previously articulated in a normal flexion, extension and lateral movements, Mr. Triolo will forever suffer reduced range of motion. As well, one of the known long-term side effects of an L5-S1 fusion is that it causes adjacent disks to become subject to additional loading and wear due to the inability for L5-S1 to articulate as previously designed.

52. As a result of the additional loading of the adjacent disk (L4-L5), the disk will be subject to abnormal wear leading to disk dessication and resulting foraminal stenosis and/or spondylolisthesis. Thus, at a minimum, Mr. Triolo will require one additional future surgery at a minimum of one more level.

53. Additionally, the lumbar fusion was designed to address only some of the neurological and orthopedic injuries to his lumbar spine. The surgery cannot address the injury to the nerves that had occurred nor the facet arthropathy.

54. In the two and a half years since the surgery, due to the severity of the lumbar pain and radicular symptoms that he has experienced bilaterally, Mr. Triolo has undergone 11 pain management procedures to address the facet arthropathy and the inflammatory components at L5-S1.

55. In the three years since the motor vehicle collision, Mr. Triolo has incurred substantial medical bills. Those include:

    a. Baptist Medical Center: $2,521.20

    b.  Baymeadows MRI:                         $1,300.00

    c.  Jacksonville Sport & Spine:          $6,046.00

    d.  Orange Park Spine:                   $1,600.00

    e.  Precision Imaging:                     $3,346.21

    f.  MBB Radiology:                         $223.00

    g.  Emergency Resources Group:    $683.00

    h.  Universal Neurological Care:     $1,310.00

    i.  Topp Spine & Orthopedics:        $71,466.00

    j.  Black Diamond Medical:          $19,000.00

    k.  Jax Beach Surgery Center:        $99,578.85

    l.  Triology Home Healthcare:       $450.00

    m. Omni Medical:                          $10,200.00

    n.  Advanced Diagnostics:            $95.79

    o.  Jax Beach Anesthesia:             $6,100.00

    p.  St. Joseph Interventional Pain Spec: $98,809.17

    q.  Select Physical Therapy:          $230.00

    r.  Walgreens (Out of Pocket):       $4,895.40

                                          Total: $327,854.62

56.     In addition to Mr. Triolo's past medical expenses, as a result of the motor vehicle collision, he has missed a total of 10 weeks of work. His average weekly wage is $936.86. His employer provided him with 2 weeks of paid time off for which Mr. Triolo is not seeking compensation. As well, prior to trial, Mr. Triolo received payments totaling 60% of his average

12

weekly wage for 6 of the 10 weeks, for which subrogation is not being claimed. The remaining 2 weeks were uncompensated.

57. Accordingly, Mr. Triolo's past lost wage damages are:

$$\begin{array}{cc} \$936.86 & \$936.86 \\ \underline{\times \quad 2} & \underline{\times \quad .40} \\ \mathbf{\$1{,}873.72} & (\$374.74 \ \times 6 \text{ weeks}) = \mathbf{\$2{,}248.46} \end{array}$$

Total Past Lost Wages: **$4,298.18**

58. Both Mr. Triolo's spine surgeon and pain management physician have concluded that he was permanently injured from the collision and will require ongoing medical care for the remainder of his life to manage his lumbar injuries.

59. Gil Spruance, a certified life care planner, prepared a Life Care Plan based on his review of the medical records, medical bills and interviews with Drs. Topp and Pardo.

60. Based upon Mr. Triolo's injuries to his lumbar spine caused by the rear-end motor vehicle collision of February 11, 2017, the fusion of his lumbar spine at L5-S1, his past conservative care to include chiropractic care, pain management medications, interventional pain management procedures, and his responses to same, the predictable future medical costs are as follows:

### Annual Future Medical Costs

|  | Low Range |  | High Range |
|---|---|---|---|
| Office Visits (Pain Management) | $1,500 | - | $1,860 |
| Drug Screen (Monitor Medications) | $208 | - | $876 |
| X-Ray (Monitor lumbar) | $294 | - | $370 |
| Prescriptive Medication | $1,333.80 | - | $1,387.80 |

13

|  |  |  |  |
|---|---|---|---|
| Physical Therapy/Chiropractic | $5,280 | - | $6,720 |
| Radiofrequency Ablations | $6,034 | - | $15,142 |
| Total Annual: | $14,649.80 |  | $21,862 |

| One Time Future Medical Costs | Low Range | High Range |
|---|---|---|
| Lumbar Fusion Extension | $155,552 | $176,257 |

61.     Mr. Triolo is one month shy of his 46th birthday.

62.     According to Table 5 of the National Vital Statistics Report, Mr. Triolo has a remaining life expectancy of 34.3 years. Thus, the predictable cost of his future medical expenses over the remaining course of his life ranges from a low of $658,040.14 to a high of $926,123.60.

```
Annual Costs Low Range:                   $14,649.80
Life Expectancy:                        x      34.3
                                          $502,488.14
                                          +
Additional One Time Cost Low Range:        $155,552

Total Future Medicals Low Range:          $658,040.14
```
_____

```
Annual Costs High Range:                  $21,862
Life Expectancy:                        x    34.3
                                          $749,866.60
                                          +
Additional One Time Cost High:             $176,257

Total Future Medicals High Range:         $926,123.60
```

63.     The medical records for the 3 ½ years since the collision overwhelmingly document objective findings and subjective reports of the significant pain, discomfort, disability,

loss of sleep, and general changes and loss of enjoyment of life that Mr. Triolo has endured as a result of his injuries. The injuries to him are permanent and based on the past 3 ½ years of treatment there is overwhelming support to determine that he will continue to suffer in the future.

64. An award of $2.00 per hour to compensate Mr. Triolo for his non-economic damages both in the past and in the future is fair and reasonable.

65. Since the collision, 1,320 days have elapsed which equates to 31,680 hours. Accordingly, $63,360 is an appropriate award for past non-economic damages.

66. Mr. Triolo's future life expectancy is 34.3 years which equates to 300,468 hours. Accordingly, $600,936 is an appropriate award for future non-economic damages.

67. In defense of the case, the United States did not present the Court with any opposing expert testimony on any aspect of the Plaintiff's case.

II.        Conclusions of Law.

68. The Federal Tort Claims Act ("FTCA") waives the sovereign immunity of the United States in relation to "claims… for money damages… for personal injury or death caused by negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment…" 28 U.S.C. § 1346(b)(1).

69. This Court has subject matter jurisdiction as to the claims filed by the Plaintiff Richard Triolo in this matter. Plaintiff exhausted his administrative remedies in a timely manner by submitting a Form 95 claim for injury and damages pursuant to 28 U.S.C. § 2675.

70. After exhausting all administrative remedies against the United States, Plaintiff timely filed this lawsuit and brought a cause of action pursuant to the FTCA, 28 U.S.C. § 1346(b)

and § 2671 et seq.

71. Substantive law in the State of Florida applies as the claim arose in Florida. 28 U.S.C. § 2674.

72. A plaintiff bears the burden of proving by the greater weight of evidence each of the four elements of negligence: (i) duty of care; (ii) breach of the duty of care; (iii) causation; and (iv) damages. *Jeffries v. Amery Leasing, Inc.,* 698 So.2d 368, 370-71 (Fla. 5th DCA 1997); *Gonzalez v. United States*, No. 3:14-cv-419-J-34JBT, (M.D. Fla. 2017).

73. USPS employee Marsha Rentz negligently operated her motor vehicle and struck the rear of Plaintiff Triolo's vehicle.

74. Florida law requires the Court to apportion liability between the plaintiff and defendant if the Court determines that each party bears some responsibility for causing the crash. *Fla. Stat.* § 768.81. There is no evidence in this case that the Plaintiff was at fault for the crash, and therefore, apportionment between the parties is not warranted.

75. A finding of negligence on the part of the defendant does not establish a right to recovery by the Plaintiff unless the plaintiff can show causation and damages. *See*, *Gooding v. University Hospital Building, Inc.*, 445 So.2d 1015, 1018 (Fla. 1984).

76. In relation to the issue of causation, the Florida Supreme Court has held: "[i]n the ordinary negligence context, a defendant is liable for injury produced or substantially produced in a natural and continuous sequence by his conduct, such that 'but for' such conduct, the injury would not have occurred." *Jones v. Utica Mutual Ins. Co.*, 463 So. 2d 1153 (Fla. 1985); *see also*, *Guinn v. Astrazeneca Pharms. LP*, 598 F. Supp. 2d 1239 (M.D. Fla. 2009).

77. Under Florida law, a plaintiff must prove by a preponderance of the evidence with reasonable medical probability, that the defendant's negligence was the proximate cause of the

plaintiff's injuries. *Boccio v. United States*, 8:09-cv-00475, 2010 U.S. Dist. Lexis 68541, *19-20 (M.D. Fla. 2010).

78. With respect to a treating physician, that physician may testify to "matters within the scope of observation, diagnosis, and treatment." Dr. Raymond Topp's and Dr. Reynaldo Pardo's opinion testimony regarding causation of injury and the injuries were based upon observations made during the course of their treatment of the Plaintiff, and a *Daubert* inquiry was therefore not required as relates to their testimony. *Bryan v. Whitfield*, No. 3:14-cv-341/MCR/EMT, 2015 WL 11109792, at *3 (N.D. Fla. July 15, 2015) ("Defendants' argument fails to recognize that a *Daubert* inquiry is unnecessary in instances where the plaintiff fails to identify a treating physician as a 'retained expert' pursuant to Fed. R. Civ. P. 26(a)(2)(B)….").

79. A fact-finder's decision to reject expert testimony "must be founded on some reasonable basis in the evidence." *See Boyles v. A&G Concrete Pools, Inc.*, 149 So. 3d 39, 48 (Fla. 4th DCA 2014) ("When medical evidence on permanence or causation is undisputed, unimpeached, or not otherwise subject to question based on other evidence presented at trial, the jury is not free to simply ignore or arbitrarily reject that evidence and render a verdict in conflict with it.").

80. The motor vehicle collision was the proximate cause of Plaintiff's injuries. The Court finds that the Plaintiff proved by the greater weight of the evidence that he sustained permanent injuries as a result of the accident.

81. Plaintiff Triolo is entitled to be awarded the amount of money that the greater weight of the evidence shows will fairly and adequately compensate him for his injuries, including such damages as Mr. Triolo is reasonably certain to incur in the future. *Fla. Stat. §* 627.737(2); *See generally Powers v. Johnson*, 562 So. 2d 367, 368-370 (Fla. 2d DCA 1990).

82. Plaintiff Triolo is entitled to recover an amount of money to compensate him for bodily injury sustained, past lost wages, past medical bills, past pain and suffering, present pain and suffering, physical impairment, mental anguish, and loss of capacity for the enjoyment of life. Fla. Std. Jury Instr. (Civ.) § 501.3; *See also Estate of McCall v. United States*, 134 So. 3d 894 (Fla. 2014).

83. Due to his permanent injuries, Plaintiff Triolo is entitled to recover future medical bills as well as non-economic damages for pain, suffering, mental anguish, and inconvenience. *Fla. Stat. § 627.737(2); See also Gonzalez v. United States*, No. 3:14-cv-419-J-34JBT, (M.D. Fla. 2017). Plaintiff Triolo has established through competent substantial evidence that future medical expenses will be incurred. *Kloster Cruise Ltd. V. Grubbs*, 762 So.2d 552, 556 (Fla. 3d DCA 2000); *see also DeAlmeida v. Graham*, 524 So.2d 666, 668 (Fla. 4th DCA 1987) ("Some direct evidence of anticipated future medical expense is essential to a recovery because the amount of past medical expenses incurred does not – at least by itself – provide a reasonable basis for a jury to compute future medical expenses.").

The Clerk shall enter judgment for Plaintiff Richard Triolo against the Defendant United State of America in the amount of $1,500,000.00 and shall close the file.

DONE AND ENTERED at Jacksonville, Florida, this ____ day of _____, 2020.

Marcia Morales Howard
United States District Judge

Copies to:

Attorneys for Plaintiff: Philip S. Kinney, Esquire and Benjamin C. Moore, Esquire
Attorneys for Defendant: Collette Cunningham, AUSA and Kyesha Mapp, AUSA