1
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
2
JACKSONVILLE

3

CASE NO.:  3:18-CV-00919-MMH-JBT
4

5

RICHARD A. TRIOLO,
6
          Plaintiff,
7
v.
8
UNITED STATES OF AMERICA,
9
          Defendant.
10
_____/

11

12
DEPOSITION OF
MARSHA VICTORIA RENTZ
13

14
Taken on Behalf of the Plaintiff

15

16
DATE TAKEN:  June 10, 2019
TIME:        11:30 a.m. - 12:15 p.m.
17
PLACE:       Powers Reporting
             301 West Bay Street
18
             Suite 1418
             Jacksonville, Florida 32202
19

20

21

22
     Examination of the witness taken before:

23
          Jennifer R. Alligood,
     Court Reporter and Notary Public
24

25

A P P E A R A N C E S

BENJAMIN C. MOORE, Esquire

Kinney & Moore, PLLC
9191 RG Skinner Pkwy
Suite 703
Jacksonville, Florida 32256
Ben@jaxlitigation.com

Appearing on behalf of Richard A. Triolo.


RONNIE S. CARTER, Esquire

U.S. Department of Justice
United States Attorney's Office
300 North Hogan Street.
Suite 700
Jacksonville, Florida 32202
Ronnie.carter@usdoj.gov

Appearing on behalf of United States of America.

<u>I N D E X</u>

WITNESS:

**MARSHA VICTORIA RENTZ**

DIRECT EXAMINATION BY MR. MOORE . . . . . . . 4
CROSS EXAMINATION BY MS. CARTER . . . . . . . 38
REDIRECT EXAMINATION BY MR. MOORE . . . . . . 39
REDIRECT EXAMINATION BY MS. CARTER . . . . . 40

<u>E X H I B I T S</u>

FOR IDENTIFICATION

PLAINTIFF'S EXHIBIT NO. A . . . . . . . . . . 30
Motor Vehicle Accident Report
PLAINTIFF'S EXHIBIT NO. B . . . . . . . . . . 34
Vehicle Photograph
PLAINTIFF'S EXHIBIT NO. C . . . . . . . . . . 34
Vehicle Photograph
PLAINTIFF'S EXHIBIT NO. D . . . . . . . . . . 36
Vehicle Photograph

S T I P U L A T I O N

1

2          It was stipulated and agreed by and

3    between counsel for the representative parties and

4    the witness, that the reading and signing of the

5    deposition by the witness not be waived.

6                        - - -

7          **MARSHA VICTORIA RENTZ,**

8    having been produced and first duly sworn as a

9    witness, and having responded, "yes," to the oath

10   testified as follows:

11                  DIRECT EXAMINATION

12   BY MR. MOORE:

13       Q    Ms. Rentz, thanks for being here today.

14   I'm Ben Moore.  I represent the Plaintiff, Richard

15   Triolo, in this case against the United States and

16   the Post Office and I'm just going to ask you some

17   questions about the accident that occurred back in

18   February 2017.  It shouldn't take that long.

19          I know your -- the United States Attorney

20   went over some of the rules of the road for you, so

21   I know you're familiar with how to answer some of

22   the questions.  If you don't understand a question

23   just ask me to rephrase.  I'll be happy to do it.

24   I'm not trying to trip you up.  I only want the

25   facts and what you remember and what you recall,

```
 1   okay.

 2       A    Okay.

 3       Q    And sometimes I may ask you to repeat or

 4   if -- just so we make sure the court reporter hears

 5   you and takes everything down properly and just

 6   speak up loud enough so she can hear you too.

 7            All right.  Go ahead and state your full

 8   name, please.

 9       A    Marsha Rentz.

10       Q    How do you spell Marsha?

11       A    M-a-r-s-h-a.

12       Q    And R-e-n-z?

13       A    R-e-n-t-z.

14       Q    Okay.  Do you have a middle name?

15       A    Victoria.

16            MR. MOORE:  Off the record.

17            (A brief recess from 11:33 a.m. - 11:33

18   a.m.)

19            MR. MOORE:  Back on the record.

20   BY MR. MOORE:

21       Q    What is your date of birth?

22       A    ████████, 1989.

23       Q    What's your current address?

24       A    ██████████████████, ████████████,

25   Jacksonville, Florida 32256.
```

```
 1         Q     All right.  And were you born and raised

 2   in Jacksonville?

 3         A     Yes.

 4         Q     Where did you go to high school?

 5         A     The Potter's House.

 6         Q     Potter's House?

 7         A     Yes.

 8         Q     And where are you currently employed?

 9         A     A place called Total Air Care.

10         Q     Total Air Care?

11         A     Uh-huh.

12         Q     What do you do for Total Air Care?

13         A     I'm accounts receivable and accounts

14   payable.

15         Q     And how long have you worked for them?

16         A     Not long, about a month.

17         Q     Where did you work prior to Total Air

18   Care?

19         A     Citibank.

20         Q     How long did you work for Citibank?

21         A     Almost two years.

22         Q     Was that the job you went to after the

23   Post Office job?

24         A     Yes.

25         Q     What did you do for Citibank?
```

```
1         A    I'm a Frye analyst.

2         Q    And I ask this to every witness, have you

3    been convicted of a felony?

4         A    No.

5         Q    Have you ever been sued before other

6    than -- have you ever been sued before?

7         A    No.  Well, not that I know of.

8         Q    And you're not being sued in this.

9              Have you ever been a plaintiff in a

10   lawsuit where you were injured and you sued someone

11   else?

12        A    No.

13        Q    And do you attend church in Jacksonville?

14        A    No, not at the moment.

15        Q    When were you first employed by the United

16   States Post Office?

17        A    September 2015.

18        Q    And what approximately was your last final

19   date of employment?

20        A    I want to say June or July 2017.  I'm not

21   sure of the day.

22        Q    Were you a mail truck driver the entire

23   time?

24        A    Yes.  Mail carrier, I think is the term.

25        Q    Mail carrier, sorry.  Okay.  Prior to
```

```
 1    September 2015 had you ever worked for the federal
 2    government in any capacity?
 3         A    No.
 4         Q    What's you highest level of education?
 5         A    I'm in the process of an associate's.
 6         Q    An AA degree?
 7         A    Yes.
 8         Q    Where do you attend college?
 9         A    Florida State College of Jacksonville.
10         Q    So you became a mail carrier in September
11    2015; correct?
12         A    Correct.
13         Q    Did you have pretty much the same route or
14    did your route change at all?
15         A    We do have different routes.
16         Q    Prior to this accident in February 2017
17    had you ever been involved in any type of motor
18    vehicle accident as a mail carrier driver?
19         A    No.
20         Q    So this was your only accident as a mail
21    carrier driver?
22         A    Correct.
23         Q    Prior to this accident in February 2017,
24    had you ever been involved in a motor vehicle
25    accident where you were the driver?
```

```
 1        A    I was like ten years ago.  I was in high

 2   school.

 3        Q    And has your driver's license ever been

 4   suspended?

 5        A    No.

 6        Q    Who was your direct supervisor in

 7   February of 2017 or your manager?

 8        A    Crystal.

 9        Q    Do you recall her last name?

10        A    No, unfortunately, I don't.

11        Q    Did you report to a particular office or

12   location?

13        A    As far as like.

14        Q    To Crystal.  Like, where did Crystal work?

15             MS. CARTER:  Your duties station.

16             THE WITNESS:  Oh, Mandarin station.

17             MR. MOORE:  Got it.

18   BY MR. MOORE:

19        Q    And that's where Crystal worked, I guess?

20        A    Yes.

21             MS. CARTER:  Could you, for the record,

22        ask her the address of the Mandarin station?

23             MR. MOORE:  Sure, yeah.  What is the

24        address of the --

25             MS. CARTER:  If you recall.
```

```
 1              MR. MOORE:  Mandarin station?

 2              THE WITNESS:  I believe its 4411 Sunbeam

 3      Road.

   BY MR. MOORE:

 4

 5      Q    All righty.  And was that your duty

 6  station the entire time you were employed with the

 7  USPS?

 8      A    Yes.

 9      Q    All right.  Around February of 2017, what

10  was your normal work week like?  Was it Monday

11  through Friday, Monday through Saturday?

12      A    Monday through Saturday.

13      Q    Do you have set hours, or was it when you

14  started to when you finished basically?

15      A    When you come in and when you finished up.

16      Q    On average how long per day did that

17  normally take?

18      A    I want to say between eight to nine hours.

19      Q    You were considered an independent

20  contractor?

21      A    Rural carrier.

22      Q    Rural carrier?

23      A    Yes.

24      Q    So you weren't considered like an actual

25  employee of the USPS?  If you don't know, that's
```

```
 1   okay.

 2              MS. CARTER:  Did you answer?

 3              THE WITNESS:  No, I didn't answer.  Well,

 4        from my understanding a rural carrier is a part

 5        of the USPS.

 6   BY MR. MOORE:

 7        Q    Okay.  All right.  When you -- did you

 8   have a -- would you maintain an incident log in your

 9   truck, like, if something -- like, for instance, if

10   you ran over something, ran over a curb or hit a

11   mailbox or somebody hit you or something, was there

12   like an incident log that you had to fill out?

13        A    No.

14        Q    Did you use or did you operate the same

15   mail carrier truck the entire time or did they give

16   you different trucks?

17        A    For different routes, we do have different

18   trucks.

19        Q    And that particular truck that you were

20   driving that day, do you know how long you had been

21   operating that truck?

22        A    I was just beginning the route.

23        Q    Okay.  So do you have any knowledge of the

24   prior history of that truck, whether that particular

25   truck had ever been in any accidents or fender
```

```
 1   benders or anything like that?

 2        A    No.

 3        Q    All right.  Do they make you -- again, I'm

 4   not familiar with mail carrier duties, but do

 5   they -- each day when you -- do you park the truck

 6   at the Mandarin Station?  Do you take it home with

 7   you?

 8        A    No, you have to bring it back to the

 9   station.

10        Q    Is there any type of inspection that

11   you're required to do at the end of every day or at

12   the end of the week to note the condition of the

13   vehicle?

14        A    We do.  In the morning we walk around the

15   truck to make sure nothing happened the previous day

16   and to make sure the lights are working and that it

17   cranks up.

18        Q    Okay.  All right.  Do you recall the day

19   of this accident in February of 2017?

20        A    Bits and pieces, yes.

21        Q    I believe it was February 11, 2017, do you

22   recall it being around 1 o'clock in the afternoon

23   that it occurred?

24        A    I remember it was in afternoon.  I'm not

25   sure of the time.
```

```
 1        Q    Okay.  Do you know what time you had

 2   started your mail route that morning?

 3        A    Yeah, that afternoon I was beginning the

 4   route.

 5        Q    Okay.  So you would have started in the

 6   afternoon?

 7        A    Yeah.

 8        Q    I see.  What time was your start time that

 9   day?

10        A    We came in at 8.

11        Q    8 a.m.?

12        A    Yes.

13        Q    So the accident occurred around 1 p.m.,

14   would it have been correct to say that you had been

15   delivering mail for approximately five hours at that

16   point?

17        A    No, I wasn't delivering mail.

18        Q    Okay.

19        A    In the morning we have to case our mail

20   and sort through and help others also case their

21   mail.  So for that five-hour period, I was at the

22   station and then I left out to go and do my route.

23        Q    Okay.  So you case and sort the mail for

24   the first half of the day and then the second half

25   of the day you actually do the delivery of it?
```

```
 1        A    Right.

 2        Q    And at the time -- in February, around

 3   February 11th, 2017, were you on any prescribed

 4   medication or anything like that?

 5        A    No.

 6        Q    And I'm assuming you had not consumed any

 7   alcohol that morning?

 8        A    That is correct.  No alcohol or anything.

 9        Q    All right.  So you had basically sorted

10   your mail that morning and you had essentially just

11   started your route then; is that correct?

12        A    Correct.

13        Q    And I believe this accident occurred

14   around Old St. Augustine and Loretto Road?

15        A    That is correct.

16        Q    That particular area where you were

17   driving, had that been your route for a while?

18        A    Yes.

19        Q    Approximately, how long?

20        A    Since the time I'd been there.  We do

21   different routes each day.

22        Q    I got it, okay.  Were you fairly familiar

23   with that route, driving that route?

24        A    Yes.

25        Q    Okay.  Describe what you recall happened
```

```
 1    up until the point of impact?
 2         A    We were at a red light.  The light turned
 3    green, never put my foot on the gas.  I did step off
 4    the brake but before I could put my foot back on the
 5    brake, it rolled into Mr. Triolo -- is that right?
 6         Q    Uh-huh.
 7         A    Triolo's vehicle and it hit -- rolled and
 8    hit his vehicle, we pulled over to the catholic
 9    school and I called my manager to let her know that
10    I was in an accident.  She told me she was on her
11    way, and that's pretty much it, really.  I did ask
12    Mr. Triolo was he okay while I was on the phone with
13    my manager.  He did say, yes, he was okay.  After
14    that I got back in my truck and sat down and waited
15    for my manager to come.
16         Q    Your manager was Crystal; correct?
17         A    My first manager that came, her name was
18    Jennette.
19         Q    I'm sorry?
20         A    Jennette is the first manager that came.
21         Q    Do you recall her last name?
22         A    No.
23         Q    What did you tell Jennette in relation to
24    how the accident occurred?
25              MS. CARTER:  Objection, hearsay.
```

```
 1              MR. MOORE:  You can go ahead and answer.
 2              THE WITNESS:  Same thing.  I rode into --
 3         my foot stepped off the brake and I rode into
 4         the vehicle.
 5   BY MR. MOORE:
 6         Q    All right.  How long was it from the point
 7   that you talked to Jennette to the point that she
 8   arrived on the scene?
 9         A    Between 10 and 15 minutes.
10         Q    How long was she present at the scene?
11         A    She was present until my manager, Crystal,
12   arrived.  After Crystal arrived, Crystal stayed on
13   the scene and I was taken back to the station.
14         Q    Did you Jennette take any photographs?
15         A    That I'm not sure of.
16         Q    All right.  Did Jennette fill out any
17   forms with you?
18         A    With me, no.
19         Q    Did you see her filling out forms?
20         A    I didn't.
21         Q    Do you know if Jennette talked to any one
22   at the scene other than you?
23              MS. CARTER:  Objection, calls for
24         speculation.
25              MR. MOORE:  You can go ahead and answer.
```

```
 1              THE WITNESS:  I'm not sure.
 2   BY MR. MOORE:
 3       Q    You didn't see her talking to Mr. Triolo?
 4       A    Yes, she asked him was he okay.
 5       Q    Did you hear what Mr. Triolo said?
 6       A    No, I didn't.
 7       Q    Okay.  So then Crystal arrived on the
 8   scene; correct?
 9       A    Correct.
10       Q    All right.  When Crystal arrived at the
11   scene, do you know whether she took any photos that
12   you observed?
13       A    She did.
14       Q    And did she have you fill out any forms?
15       A    Yeah, she had me fill out forms.
16       Q    And did you call Jennette with a cell
17   phone?
18       A    Yes.
19       Q    That was your personal cell phone?
20       A    Yes.
21       Q    Who was the carrier?
22       A    Of my cell phone?
23       Q    Yes, ma'am.
24       A    T-Mobile.
25              MR. MOORE:  Off the record.
```

```
 1              (A brief recess from 11:48 a.m. -
 2    11:48 a.m.)
 3              MR. MOORE:  Back on the record.
 4    BY MR. MOORE:
 5         Q    So the cell phone with T-Mobile was listed
 6    in your name?
 7         A    Correct.
 8         Q    Okay.  And immediately before the accident
 9    had you made any calls on that cell phone or made
10    any texts, let's say, within five minutes of the
11    accident?
12         A    No.
13         Q    So the first call you would have made
14    after the accident would have been to the manager at
15    the station; correct?
16         A    Correct.
17         Q    Do you recall when the last call before
18    the accident occurred?
19         A    No.
20         Q    All right.  How long had you been stopped
21    at the light before your foot came off the brake?
22         A    I don't remember.
23         Q    Were there any -- do you recall what kind
24    of vehicle Mr. Triolo was driving?
25         A    A Mustang, I believe.
```

```
 1        Q    Do you recall the color?

 2        A    No.

 3        Q    And do you recall whether there were any

 4   vehicles in front of him or whether he was the first

 5   at the traffic light?

 6        A    I believe he was the first one at the

 7   traffic light.

 8        Q    Do you recall whether there were any

 9   vehicles behind you?

10        A    No.

11        Q    All right.  At the point that you

12   initially stopped behind Mr. Triolo, do you know how

13   many car links you were behind him at the light?

14        A    No.

15        Q    Do you know how many feet you were behind

16   him at the light?

17        A    No.

18        Q    Do you have an estimate as to how far back

19   you would normally stop behind someone at a light?

20        A    I'm not understanding.  I'm sorry.

21        Q    When you stop at a light or you're

22   stopping behind a vehicle, when you are driving a

23   mail truck at least, on average, would you put a car

24   length between you and the vehicle, half a car

25   length, three feet?  Do you have any estimates?
```

```
 1        A    No.

 2        Q    From the point that your foot slipped off

 3   the brake to the point of impact to Mr. Triolo's

 4   vehicle do you know how far your vehicle traveled?

 5        A    No.

 6        Q    Do you have any estimate?

 7        A    No.

 8        Q    Okay.

 9        A    I forgot.

10        Q    All right.  That's okay.  When your foot

11   slipped off the brake, do you recall what color the

12   light was?

13        A    Green.

14        Q    At any point when that light turned green

15   did you press on the accelerator?

16        A    No.

17        Q    That particular mail truck, prior to that

18   accident that day, do you recall what condition the

19   mail truck was in?

20        A    Good condition.

21        Q    Had it had any front impact damage, that

22   you can recall, prior to that accident?

23        A    No, not that I recall.

24        Q    Okay. when you were sitting there, how --

25   well, how long had you been stopped at that traffic
```

```
 1   light before the impact occurred?

 2        A    That I'm not sure of.

 3        Q    Was it less than a minute?

 4        A    I, honestly, am not sure.

 5        Q    And that was over by St. Joseph's

 6   Catholic; correct?

 7        A    I'm not sure of the name, but I do know

 8   there is a Catholic school there.

 9        Q    Okay.  When your foot slipped off the

10   brake, did you brace for impact?

11        A    No.

12        Q    Were you aware that it was about to impact

13   his vehicle?

14        A    Yes.

15        Q    Did you take any measures or did you take

16   any action to prepare for the impact to Mr. Triolo's

17   vehicle?

18        A    I was trying to press back down on the

19   brake.

20        Q    Where were your hands located at the time?

21        A    On the steering wheel.

22        Q    Upon impact what was the movement of your

23   body in your vehicle?

24        A    Just, like, a small, I would say, jerk.

25        Q    Which way did you jerk?
```

```
 1        A    Forward.
 2        Q    Did you have any whiplash in your head or
 3   neck?
 4        A    No.
 5        Q    Upon impact do you know how far
 6   Mr. Triolo's car was pushed forward?
 7        A    No.
 8        Q    Do you know whether there was any damage
 9   caused to rear the Mr. Triolo's vehicle?
10        A    When we pulled over, yes.
11        Q    Okay.  What was the damage to his vehicle
12   that you observed?
13        A    The bumper was bent.
14        Q    Any other damage that you observed?
15        A    No.
16        Q    What was the damage caused to the mail
17   truck?
18        A    It was just scrapes.  Like, white scrapes
19   on the front end.
20        Q    Was the front fender bent at all or the
21   front hood bent?
22        A    No.
23        Q    Okay.  After the impact, did you get out
24   of the vehicle to talk to Mr. Triolo?
25        A    Not right away, no.
```

```
 1        Q    All right.  After the impact, tell me what

 2   occurred.  Did you sit in the mail truck for a while

 3   or did you pull over to the side?

 4        A    We pulled over to side in the catholic

 5   school parking lot.

 6        Q    After the impact you pretty much

 7   immediately pulled over to the side; correct?

 8        A    Yes.

 9        Q    After you pulled over into the catholic

10   school parking lot, what happened?

11        A    I parked it.  Well, parked it, turned it

12   off, and called my manager.

13        Q    Okay.  Did you talk to Mr. Triolo and then

14   call your manager or did you call your manager

15   first?

16        A    I called my manager first.

17        Q    Did you basically follow him into the

18   parking lot or how did you both know to pull into

19   the parking lot?

20        A    He pulled over.  He was in front of me, so

21   he pulled over to the parking lot.

22        Q    I see.  After you talked to your manager,

23   did you talk to Mr. Triolo?

24        A    While I was phone with my manager I

25   actually did.
```

```
 1        Q      While you were on the phone with

 2   Mr. Triolo -- I mean, with your manager what did you

 3   discuss with Mr. Triolo?

 4        A      I just asked if he was okay.

 5        Q      Okay.  And that was all that was

 6   discussed?

 7        A      That was it.

 8        Q      What did he say to you?

 9        A      He said yes.

10        Q      And you were talking to Jennette at the

11   time?

12        A      Correct.

13        Q      Did Jennette tell you to ask him anything

14   else?

15        A      No.

16        Q      Did you have any other conversations with

17   Mr. Triolo at the scene of the accident?

18        A      No.

19        Q      After you talked to Mr. Triolo and hung up

20   with Jennette, what happened after that?

21        A      I went and sat back in the truck and

22   waited for Jennette to get there.

23        Q      Did you see Jennette talk to Mr. Triolo?

24        A      She did ask him was he okay.

25        Q      You testified earlier you didn't hear what
```

```
 1   he said; correct?

 2       A    Correct, no.

 3       Q    All right.  Did you call 911?  Did

 4   Mr. Triolo call 911?

 5       A    I'm not sure .

 6       Q    Did a police officer or a Duval County

 7   community officer show up?

 8       A    A police officer showed up.

 9       Q    Did you know if an ambulance showed up?

10       A    No ambulance.

11       Q    Did you ever hear Mr. Triolo ever having

12   any discussions with the police officer?

13       A    No.

14       Q    Did you overhear Mr. Triolo having any

15   discussions with anyone else other than Jennette?

16       A    When the police officer got there, I

17   was -- he separated us.  He had me sit on the steps

18   and Mr. Triolo was by his vehicle.

19       Q    All right.  Got it.  Was your story pretty

20   much the same with the police officer?

21       A    Yes.

22            MS. CARTER:  Objection, calls for

23       speculation.

24   BY MR. MOORE:

25       Q    Did you end up getting a ticket?
```

```
 1        A    No.

 2        Q    After that -- after the police officer

 3   showed up, how much longer were you on the scene?

 4        A    Not much longer.

 5        Q    Where did you go after that?

 6        A    I was taken back to the station.

 7        Q    Who took you back to the station?

 8        A    Jennette.

 9        Q    What did y'all do when you got back to the

10   station?

11        A    I clocked out.  No, I had to write down my

12   statement.  After I wrote my statement, I clocked

13   out and went home.

14        Q    All right.  Did you discuss the accident

15   with anyone else other than Jennette?

16        A    No.

17        Q    Were there any -- did your employer

18   reprimand you?  Did USPS reprimand you at all for

19   the accident?

20        A    Yes.

21        Q    When did that occur?

22        A    That day, I would say.

23        Q    Okay.  What was the reprimand?

24        A    I was suspended for seven days, and I had

25   to take a training.
```

```
 1        Q    Okay.  Why did they suspend you?

 2        A    Well, I never got suspended.  The union --

 3   I don't know -- opposed it, and I had to take a

 4   training.

 5        Q    So basically the USPS recommended a

 6   suspension and the union opposed it?

 7        A    Yes.

 8        Q    Do you know why the union opposed it?

 9        A    Not sure.

10        Q    And what kind of training did you have to

11   take?

12        A    Driver's training.

13        Q    Okay.  So you never had to undergo any

14   suspension?  You were never suspended from work;

15   correct?

16        A    No.

17        Q    I'm sorry?

18        A    No, I was not.

19        Q    Okay.  How long was the driver training?

20        A    It was actually an all-day training.

21        Q    Where did you take that?

22        A    At the station.

23        Q    Was it online or was it performed by a

24   USPS employee?

25        A    It was online.
```

1      Q    Okay.  And that was through the USPS;

2   correct?

3      A    Correct.

4      Q    Okay.  And do you know why the USPS was

5   recommending a seven-day suspension?

6      A    No.

7      Q    Did they explain it to you or give you

8   like a suspension letter or anything?

9      A    No.

10      Q    Do you believe that Mr. Triolo shared any

11   fault for this accident?

12      A    No, honestly.

13      Q    Is it your testimony that the sole cause

14   of the accident was due to your foot slipping off

15   the brake?

16      A    Yes.

17      Q    Did they -- the next day did you come back

18   to work and resume your normal mail carrier duties?

19      A    No.  I had to, as I stated, take a

20   training that Monday because I actually worked

21   Sunday.

22      Q    So you trained that Monday and then

23   started back to work the following day?

24      A    Yes.

25      Q    Your normal duties?

```
 1        A    Yes.

 2        Q    Okay.  So, I guess, union opposition was

 3   was pretty quick to it then; correct?

 4        A    Yes.

 5        Q    I guess, they find out pretty quickly and

 6   they make that decision.

 7             Do you know who made the decision to

 8   withhold the suspension and just implement training?

 9        A    No.

10        Q    And other than this particular incident,

11   had you ever gone through something like that before

12   where you had been recommended for suspension with

13   the USPS?

14        A    No.

15        Q    And after that, had you ever dealt with

16   any kind of recommended suspension?

17        A    No.

18        Q    Okay.  After this particular accident in

19   February 2017, were you involved in any other motor

20   vehicle accidents while driving for the USPS?

21        A    No.

22        Q    What made you decide to leave the USPS in

23   June or July of 2017?

24        A    A personal decision.

25        Q    Okay.  So you weren't asked to leave, it
```

```
 1   was just voluntary on your part?

 2       A    Correct.

 3       Q    And after this accident in February of

 4   2017, did you have any other accidents or fender

 5   benders while driving a U.S. mail truck?

 6       A    No.

 7       Q    Okay.  After this particular day of the

 8   accident, did you ever have any other further

 9   discussions with Mr. Triolo?

10       A    No.

11       Q    Okay.  You said you filled out some forms.

12   I believe that was with Cathy later on or was that

13   Jennette?

14            MS. CARTER:  I think it was Crystal.

15            THE WITNESS:  Oh, okay.  I was like Cathy.

16            MR. MOORE:  I'm bad at names.  Crystal.

17            THE WITNESS:  Yes, I had to fill out my

18       statement of what happened.

19            MR. MOORE:  Okay, got you.  Well, mark

20       this as Exhibit A.  I'll give you a copy of

21       this.

22            (Plaintiff's Exhibit No. A was marked for

23   identification.)

24   BY MR. MOORE:

25       Q    I'm basically just going to ask you about
```

```
1   this motor vehicle accident report which has been

2   marked as Plaintiff, Triolo's Exhibit A.  This

3   particular form, if you look at page two under

4   Section 52; is that your handwriting?

5        A    Yes.

6        Q    Now, is this form filled out entirely by

7   you or is only parts of it filled out by you?  And

8   the only reason I ask is because the handwriting in

9   Section 52 appears to be a little different then

10  some of the other but I'm not sure.

11       A    Yes, that's my handwriting.

12       Q    And then page three --

13            MS. CARTER:  I just want to make sure all

14       of the handwriting on this document is yours?

15            THE WITNESS:  Yes.

16  BY MR. MOORE:

17       Q    All right.  Page three, section -- it

18  looks like 71.  It looks like that's where you

19  signed, Marsha Rentz; is that correct?

20       A    Yes.

21       Q    And that would have been your signature.

22  And then at the bottom where it says Jennette the

23  supervisor, was that her signature?

24       A    Yes, that's her signature.

25       Q    Okay.  Got it.
```

```
 1              MS. CARTER:  Does that signature, her last
 2       name, ring a bell?  I can't read that.
 3              THE WITNESS:  It looks like an S-i, butI'm
 4       not sure.
 5  BY MR. MOORE:
 6       Q    Yeah, no problem.  The back of page one
 7  where it says -- I think it's hard to see where the
 8  line goes down it.  It says describe vehicle damage.
 9  It's, like, right there.  Indicates front bumper no
10  damage.  Was that something you remember writing or
11  was that something Jennette would have written?
12       A    That's my writing.  That was the front
13  bumper.  No damage to the post office vehicle.
14       Q    Were you referring to the scrapes and
15  things like that you mentioned earlier, what were
16  you referring to when you mentioned no damage?
17       A    There was no dings or the bumper wasn't
18  missing or anything like that.
19       Q    Okay, okay.  And that -- who drove the
20  USPS truck away?
21       A    I'm not sure.
22       Q    All right.  Did you ever see that
23  particular truck after that day?
24       A    Yes.
25       Q    Did you continue to drive that truck later
```

1    on?

2        A    If I did that route, yes.

3        Q    All right.  Next page, under Section 52,

4    to your statement, that was your handwriting

5    statement; is that correct?

6        A    Yes.

7        Q    And then the last page, it says -- it

8    looks like it is Bates stamped USPS0047, was that

9    your written statement as well?

10       A    Yes.

11       Q    Were you asked to give the last page --

12   the statement written on the last page is different

13   time than the other statement under Section 52 or

14   was it all in the same sitting that you wrote both

15   statements?

16       A    It was all in the same sitting when I

17   received all the paperwork.

18       Q    Got it.  Were you using this last page for

19   extra space?

20       A    Yes, because they told me to describe

21   everything that happened.

22       Q    I see.  I see, okay.  Got it.

23            And did you ever talk to Mr. Triolo's

24   brother when he came to the scene?

25       A    No.

```
 1        Q    Were you still present when his brother
 2   still showed up to the scene?
 3        A    Yes.
 4        Q    Did you hear his brother speaking with
 5   him, with Mr. Triolo?
 6        A    I apologize.  I did speak with him.  He
 7   asked me was I okay.
 8        Q    You told him?
 9        A    Yes.
10        Q    Did he say anything else to you?
11        A    No.
12        Q    Did you overhear him talking with
13   Mr. Triolo?
14        A    No, he just went back over there.
15             MR. MOORE:  Okay.  This is a couple of
16        photos.  We're going to mark this as
17        Plaintiff's Exhibit B and I'll give you Exhibit
18        C here too.  It is a bigger picture.
19             (Plaintiff's Exhibit Nos. B and C were
20   marked for identification.)
21   BY MR. MOORE:
22        Q    Exhibits B and C, just for the record, are
23   photos produced by the United States in discovery.
24   Do you recognize this as the mail carrier truck that
25   you were driving the day of the accident?
```

```
 1        A    Yes.

 2        Q    Do you see -- in Exhibit B, do you see any

 3   scrape marks or paint marks or dents depicted in

 4   Exhibit B that occurred from this accident?

 5        A    Like certain?

 6        Q    Yes, ma'am, whatever you observed or what

 7   you recall?

 8        A    No.

 9        Q    Okay.  Do you know whether the white marks

10   on the front bumper, whether they occurred during

11   this accident?

12        A    Honestly, I don't.

13        Q    Was the condition of the front fender of

14   the mail truck -- was it in this condition before

15   the day of the accident or do you know?

16        A    I don't know.

17        Q    The same with accident C.  Looking at

18   Exhibit C, do you know whether the front fender was

19   in this condition before the day of the accident?

20        A    No, I don't.

21        Q    Okay.  Do you handle anything with the

22   repairs of the mail truck or is that somebody else?

23        A    Someone else.

24        MR. MOORE:  There is one more of the mail

25        truck.  This is Plaintiff's Exhibit D.
```

```
 1              (Plaintiff's Exhibit No. D was marked for

 2     identification.)

 3     BY MR. MOORE:

 4        Q    Again, looking at Exhibit D, this is a

 5     close-up photo kind of from a side angle of the mail

 6     truck, do you notice or observe any damage on the

 7     mail truck that was caused by that accident that you

 8     recollect from the day of the accident?

 9        A    No.

10        Q    And did you know one way or the other

11     whether any of those white marks on the front bumper

12     were caused by the accident?

13        A    That I'm not sure.

14        Q    Last question in relation this photo.  Do

15     you know whether the condition of this front end --

16     the front of the mail truck was in this condition

17     the day of the accident -- before the accident?

18        A    I don't remember.

19        Q    Did you take any of those photos or was

20     that Jennette or one of your managers?

21        A    My manager.

22             MS. CARTER:  Objection, speculation.

23     BY MR. MOORE:

24        Q    All right.  But you didn't take any photos

25     at the scene?
```

```
 1        A    No.

 2        Q    Did you take any photos with your cell

 3   phone that day?

 4        A    No.

 5        Q    All right, got you.  Obviously, I don't

 6   want to know any conversations you had with

 7   Ms. Carter in your capacity as an employee or

 8   independent contractor of the United States, but

 9   have you discussed this accident with anyone else

10   other than Jennette, Crystal, or Ms. Carter?

11        A    No.

12        Q    And did you after the accident, did you

13   ever call Mr. Triolo or talk to him on the phone at

14   all?

15        A    No.

16        Q    And after the accident days later, weeks

17   later, were you kept apprised if there was any

18   ongoing claim in relation to this claim?

19        A    No.

20        Q    And before today's accident -- I'm sorry,

21   before today's deposition, have you ever spoken to

22   anyone with the U.S. Attorneys Office on the phone

23   or the USPS about this accident?

24        A    Just to get in contact, a call, about the

25   deposition.
```

```
 1        Q    Okay, and that was it.  Did anyone from

 2   the USPS Claims Department ever call you to

 3   interview you after you had already left the USPS

 4   office?

 5        A    No.

 6        Q    Do you have any plans to move any time

 7   soon?

 8        A    Maybe in about a year or so.

 9             MR. MOORE:  All right.  I don't have any

10        further questions.

11             MS. CARTER:  I just have a couple.

12                    CROSS EXAMINATION

13   BY MS. CARTER:

14        Q    When Mr. Moore was asking you questions

15   about the actual impact -- I don't want to put words

16   in your mouth.  I thought I heard you say that your

17   truck rolled in the back of Mr. Triolo's --

18             MS. CARTER:  Triolo, is that how you

19        pronounce it?

20             MR. MOORE:  Triolo.

21   BY MS. CARTER:

22        Q    -- Triolo's car?

23        A    Yes.

24        Q    Can you describe how fast the truck was

25   rolling?  Was it less than five miles an hour?
```

```
 1        A    Yeah, it was -- it was --
 2             MR. MOORE:  Objection, leading.  But go
 3        ahead.
 4   BY MS. CARTER:
 5        Q    How fast was the truck rolling?
 6        A    Not fast at all.  I would say at five or
 7   less.  It was not rolling fast at all.
 8        Q    Did you suffer any injures in this
 9   accident?
10        A    No.
11             MS. CARTER:  That's it.
12             MR. MOORE:  I'm just going to follow-up on
13        Ms. Carter's questions.
14                   REDIRECT EXAMINATION
15   BY MR. MOORE:
16        Q    How would describe the impact itself?
17        A    Just like quick impact and that was it.
18        Q    Was it hard, light, soft, medium?
19        A    It was medium.
20             MS. CARTER:  I'm sorry, what did you say?
21             THE WITNESS:  It was medium.
22   BY MR. MOORE:
23        Q    Okay.  Did the mail truck have airbags, do
24   you know?
25        A    Not that I know of.
```

```
 1              MR. MOORE:  All right.  I don't have any

 2        further questions.

 3                    RECROSS EXAMINATION

 4   BY MS. CARTER:

 5        Q    I don't know what medium impact means.

 6   Can you tell me what you mean by that?

 7        A    When I say medium it wasn't like hard

 8   crash to where the back seat goes into the front

 9   seat or anything.  It was just basically a fender

10   bender and just hit the back of a car.

11        Q    Did your body jerk forward?

12        A    A little bit, yes.

13        Q    A little bit?

14        A    Uh-huh.

15              MS. CARTER:  Okay, thank you.

16              MR. MOORE:  I don't have any further

17        questions.  You can read -- if this deposition

18        is ordered you can elect to read it, come in

19        and review it or you can waive the reading if

20        you're fine with your testimony.

21              MS. CARTER:  So what I usually do is if it

22        is a transcribed, we get a copy, and I'll

23        provide it to you.  You can then review it to

24        make sure that your statement was transcribed

25        accurately.  So if that happens, we'll be in
```

1          touch.

2                (Witness excused.)

3                (Deposition concluded at 12:15 p.m.)

4                        - - -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA )

COUNTY OF DUVAL  )

       I, the undersigned authority, certify that
**MARSHA VICTORIA RENTZ** personally appeared before me
on  June 10th, 2019, and was duly sworn.


       WITNESS my hand and official seal this 8th day
of September, 2020.



                      /s/ *Jennifer R. Alligood*
                          Jennifer R. Alligood,
                          Notary Public - State of Florida
                          My Commission No. GG929174
                          Expires:  November 5, 2023

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF FLORIDA  )

 3    COUNTY OF DUVAL   )

 4

 5        I, Jennifer R. Alligood, Court Reporter and

 6    Notary Public in and for the State of Florida at

 7    Large, hereby certify that I was authorized to and

 8    did stenographically report the deposition of MARSHA

 9    VICTORIA RENTZ; that a review of the transcript was

10    requested; and that the foregoing transcript, pages

11    1 through 41, is a true record of my stenographic

12    notes.

13

14        I further certify that I am not a relative,

15    employee, attorney, or counsel of any of the

16    parties, nor am I a relative or employee of any of

17    the parties' attorney or counsel connected with the

18    action, nor am I financially interested in the

19    action.

20

21        DATED this 8th day of September, 2020.

22

23              /s/ Jennifer R. Alligood
                    Jennifer R. Alligood,
24                  Court Reporter & Notary Public

25
```

```
1              E R R A T A   S H E E T

2    STATE OF FLORIDA:
     COUNTY OF DUVAL:
3

4         I, MARSHA VICTORIA RENTZ the undersigned

5    deponent, have this date read the foregoing pages of

6    my deposition, numbered 1 through 41, and with the

7    suggestions noted below, if any, these constitute a

8    true and accurate transcription of my deposition

9    given on the 10th day of June, 2019, at the time and

10   place stated therein.

11

12   PAGE NUMBER    LINE NUMBER      SUGGESTION/REASON

13   _____     _____       _____

14   _____     _____       _____

15   _____     _____       _____

16   _____     _____       _____

17   _____     _____       _____

18   _____     _____       _____

19   _____     _____       _____

20   _____     _____       _____

21   _____     _____       _____

22

23              _____
                     MARSHA VICTORIA RENTZ
24

25
```

```
 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
 2                      JACKSONVILLE

 3          CASE NO.: 3:18-CV-00919-MMH-JBT

 4
      RICHARD A. TRIOLO
 5
               Plaintiffs,
 6
      vs.
 7
      UNITED STATES OF AMERICA,
 8
                Defendant.
 9    _____

10    IN RE: DEPOSITION OF MARSHA VICTORIA RENTZ
      TAKEN: June 10th, 2018
11    DATE SENT TO WITNESS:  September 8th, 2019
      TO:  MARSHA VICTORIA RENTZ
12

13

14         The referenced transcript has been completed
      and awaits reading and signing.

15         Please arrange to stop by our office at 301
      West Bay Street, Suite 1418, Jacksonville, Florida,
16    to read and sign the transcript.  Office hours are
      from 8:30 a.m. to 4 p.m. Monday through Friday.
17    Please call to set an appointment.  The phone number
      is 355-4077.  The transcript is 41 pages long, and
18    you should allow yourself sufficient time.

19         The original of this deposition has been
      forwarded to the ordering party and your errata,
20    once received, will be forwarded to all ordering
      parties as listed below.
21
           Thank you.
22
                       Jennifer Alligood
23
      CC:  Ronnie S. Carter, Esquire
24

25
```

Feb/16/2017 12:31:2~~PM   904-730-8163->904-359-2979                              1/16
Feb/16/2017 12:27:42 PM    USPS - Jacksonville, FL 904-730-8163                    1/16

| MOTOR VEHICLE ACCIDENT REPORT | Please read the Privacy Act statement on Page 3. | INSTRUCTIONS: Sections I through IX are filled out by the vehicle operator. Section X, item 72 thru 82c are filled out by the operator's supervisor. Sections XI thru XII are filled out by an accident investigator for bodily injury, fatality, and/or damage exceeding $500. |
|---|---|---|

### SECTION 1 - FEDERAL VEHICLE DATA

Driver's Name (Last, first, middle)
RENTZ, Marsha, Victoria

3. Date of Accident
02/11/2017

2. Department/Federal Agency Permanent Office Address
2411 Sunbeam Rd

4b. Work Telephone Number
(  )

5. Tag or Identification Number        6. Est. Repair Cost        7. Year of Vehicle        8. Make        9. Model        10. Seat Belts Used
$                                       1992                        GMC            Spotvan        ☑ Yes  ☐ No

Describe Vehicle Damage
FONT Bumper No Damage

### SECTION II - OTHER VEHICLE DATA (Use Section VIII if additional space is needed.)

Driver's Name (Last, first, middle)
TRIOLO, Richard, Anthony

13. Driver's License Number/State/Limitations

a. Driver's Work Address

14b. Work Telephone Number

a. Driver's Home Address
Middleburg, FL 32068

15b. Home Telephone Number
(031) 603-4803

Describe Vehicle Damage
Bumper Damage

17. Estimated Repair Cost
$

Year of Vehicle        19. Make of Vehicle        20. Model of Vehicle        21. Tag Number and State
2016                    FORD                        mustang                     EEQU38 FL

a. Driver's Insurance Company Name and Address
STATE FARM INSURANCE

22b. Policy Number
71D89378D759AYD

22c. Telephone Number
(  )

Vehicle Is:
☐ Co-Owned   ☐ Rental
☐ Leased     ☐ Privately Owned

24a. Owner's Name(s) (Last, first, middle)
SAME AS ABOVE

24b. Telephone Number
(  )

Owner's Address(es)

### SECTION III - KILLED OR INJURED (Use Section VIII if additional space is needed).

26. Name (Last, first, middle)
- N/A -

27. Sex
- N/A -

28. Date of Birth
- N/A -

29. Address
- N/A -

30. Mark "X" In Two Appropriate Boxes
☐ Killed   ☐ Driver     ☐ Passenger
☐ Injured  ☐ Helper     ☐ Pedestrian

31. In Which Vehicle
☐ Ped
☐ Other (2)
- N/A -

32. Location in Vehicle
- N/A -

33. First Aid Given By
- N/A -

34. Transported By
- N/A -

35. Transported To
- N/A -

36. Name (Last, First, Middle)
- N/A -

37. Sex
N/A

38. Date of Birth
N/A

39. Address
- N/A -

40. Mark "X" In Two Appropriate Boxes
☐ Killed   ☐ Driver     ☐ Passenger
☐ Injured  ☑ Helper     ☐ Pedestrian

41. In Which Vehicle
☐ Ped
☐ Other (2)
- N/A -

42. Location in Vehicle
N/A

43. First Aid Given By
N/A

44. Transported By
- N/A -

45. Transported To
- N/A -

a. Name of Street or Highway
- N/A -

b. Direction of Pedestrian (SW corner to NE corner, etc.)
From - N/A -    To - N/A -

Pedestrian

c. Describe What Pedestrian Was Doing At Time Of Accident (Crossing intersection with signal, against signal, diagonally, in roadway playing, walking, hitchhiking, etc.)
- N/A -

NSN 7540-00-531-4041
Previous editions not usable.

STANDARD FORM 91 - PAGE 1 (Rev. 2)
PRESCRIBED BY GSA - FPMR 101-38.5

PLAINTIFF'S EXHIBIT
A
10/6/19
USPS_0043
PENGAD 800-631-6989

T. Ex. A
Rentz

Feb/16/2017 12:31:?? ?M    904-730-8163 -> 904-359-2979    2/16
Feb/16/2017 12:27:42 PM    USPS - Jacksonville, FL 904-730-8163    2/16

## SECTION IV - ACCIDENT TIME AND LOCATION (Use Section VIII if additional space is needed).

**47. Date of Accident** ____

**47. Time of Accident** 1:00 ☐ AM ☐ PM

**48. Place of Accident** (Street address, city, state, ZIP code; Nearest landmark; Distance to nearest intersection; Kind of locality (industrial, business, residential, open country, etc); Road description).

### 50. INDICATE ON THIS DIAGRAM HOW THE ACCIDENT HAPPENED

Use one of these outlines to sketch the scene.
Write in street or highway names or numbers.

a. Number Federal vehicle as 1, other vehicles as 2, additional vehicles as 3, and show direction of travel with arrow.

Example: → ①  ② ←

b. Use solid line to show path before accident ——— ①②
and a broken line after the accident. - - - - ①②

c. Show pedestrian by: ———●○

d. Show railroad ┼┼┼┼┼┼

e. Place arrow in this circle to indicate NORTH: ○

### 51. Point of Impact (Check one for each vehicle)

| FED | 2 | AREA |
|-----|---|------|
| ☐ | ☐ | a. Front |
| ☐ | ☐ | b. R. Front |
| ☐ | ☐ | c. L Front |
| ☐ | ☑ | d. Rear |
| ☐ | ☐ | e. R. Rear |
| ☐ | ☐ | f. L Rear |
| ☐ | ☐ | g. R. Side |
| ☐ | ☐ | h. L Side |

**52. Describe What Happened** (Refer to vehicles as "Fed," "2," "3," etc. Please include information on posted speed limit, approximate speed of the vehicles, road conditions, weather conditions, driver visibility, condition of accident vehicles, traffic controls (warning light, stop signal, etc.), condition of light (daylight, dusk, night, dawn, artificial light, etc.), and driver actions (making U-turn, passing, stopped in traffic, etc.).

I was sitting at a red light (which turned green) waiting for the car in front of me to go. My foot slipped off the brake and I ran into the car in front of me. My foot never pressed the gas. We they pulled off to the side and I apologize

## SECTION V. WITNESS/PASSENGER (Witness must fill out SF-94, Statement of Witness) (Continue in Section VIII.)

| 53. Name (Last, first, middle) | 54. Work Telephone Number | 55. Home Telephone Number |
|---|---|---|
| A | 57. Home Address | |
| 58. Business Address | | |
| 59. Name (Last, first, middle) | 59. Work Telephone Number | 60. Home Telephone Number |
| B | 62. Home Address | |
| 61. Business Address | | |

## SECTION VI - PROPERTY DAMAGE (Use Section VIII if additional space is needed).

| 63a. Name of Owner   Triolo, Richard, Anthony | 63b. Office Telephone Number | 63c. Home Telephone Number (603) 11005 -4803 |
|---|---|---|
| 63. Business Address | 63e. Home Address | Middleburg FL |
| 64. Name of Insurance Company   State Farm Insurance | 64b. Telephone Number | 64c. Policy Number (WX93780159A |
| 65. Item Damaged   Tape | 66. Location of Damaged Item   Bumper | 67. Estimated Cost $ |

## SECTION VII - POLICE INFORMATION

| 68. Name of Police Officer   M.L. Chase | 68b. Badge Number   5594 | 68c. Telephone Number (904)630-0520 |
|---|---|---|
| 69. Precinct or Headquarters   Jacksonville Sheriffs Office | 70a. Person Charged With Accident | 70b. Violation(s) |

**SECTION VIII - EXTRA DETAILS**

Space for detailed answers. Indicate Section and Item Number for each answer. If more space is needed, continue items on plain bond paper.

**SECTION IX - FEDERAL DRIVER CERTIFICATION**

In compliance with the Privacy Act of 1974, solicitation of the information requested on this form is authorized by Title 40 U.S.C. Section 491. Disclosure of the information by a Federal employee is mandatory as the first step in the Government's investigation of a motor vehicle accident. The principal purposes for using this information is to provide necessary data for legal counsel in legal actions resulting from the accident and to provide accident information/ statistics in analyzing accident causes and developing methods of reducing accidents. Routing use of information may be by Federal, State, or local governments, or agencies, when relevant to civil, criminal, or regulatory investigations or prosecutions. An employee of a Federal agency who fails to report accurately a motor vehicle accident involving a Federal vehicle, or who refuses to cooperate in the investigation of an accident, may be subject to administrative sanctions.

I certify that the information on this form (Sections I thru VIII) is correct to the best of my knowledge and belief.

| 71. Name and Title of Driver | 71b. Driver's Signature and Date |
|---|---|
| Marsha Rentz (RCA) | Marsha Rentz    02/13/17 |

**SECTION IX - DETAILS OF TRIP DURING WHICH ACCIDENT OCCURRED**

| 72. Origin | 73. Destination |
|---|---|
| 8911 Sunbeam Rd, Jacksonville FL 32257 | 11755 Loretto Sq. Dr. Jacksonville FL 32257 |

74. Exact Purpose of Trip    to deliver mail

| 75. TRIP BEGAN | Date | Time (Circle One) | 76. ACCIDENT OCCURED | Date | Time (Circle One) |
|---|---|---|---|---|---|
| | 2/11/17 | 9:20 a.m. (p.m.) | | 2/11/17 | 1:00 a.m. (p.m.) |

| 77. Authority For The Trip Was Given To The Operator | 78. Was There Any Deviation From Direct Route |
|---|---|
| ☑ Orally    ☐ In Writing (Explain) | ☒ No    ☐ Yes (Explain) |

| 79. Was The Trip Made Within Established Working Hours | 80. Did The Operator, While Enroute, Engage In Any Activity Other Than That for Which The Trip Was Authorized |
|---|---|
| ☒ Yes    ☐ No (Explain) | ☒ No    ☐ Yes (Explain) |

**a. DID THIS ACCIDENT OCCUR WITHIN THE EMPLOYEE'S SCOPE OF DUTY**

| 81. COMPLETED BY DRIVER'S SUPERVISOR | ☑ Yes    ☐ No | b. Comments |
|---|---|---|

FEB 16 2017

| 82. Name And Title Of Supervisor | 82b. Supervisor's Signature And Date | 82c. Telephone Number |
|---|---|---|
| Renette Simmons supervisor | Renette Simmons    2/13/17 | (904) 733-9175 |

STANDARD FORM 91 - PAGE 3 (Rev. 2)

USPS_0045

## SECTION XI - ACCIDENT INVESTIGATION DATA

83. Did The Investigation Disclose Conflicting Information.  ☐ Yes  ☑ No  (If "Yes," explain below)

### 84. PERSONS INTERVIEWED

| NAME | DATE | NAME | DATE |
|---|---|---|---|
| | | c. | |
| | | d. | |

85. Additional Comments (Indicate section and item number for each comment.)

## SECTION XII - ATTACHMENTS

List All Attachments To This Report

## SECTION XIII - COMMENTS/APPROVALS

86. Reviewing Official's Comments

### 87. ACCIDENT INVESTIGATOR

a. Signature And Date    2/13/17

b. Name (First, middle, last)   Jeanette Marie Sippwin

c. Title   Supervisor

d. Office   Mandarin

e. Office Telephone Number   (904) 733-9175

### 88. ACCIDENT REVIEWING OFFICIAL

a. Signature And Date    FEB 16 2017

b. Name (First, middle, last)

c. Title

d. Office

e. Office Telephone Number

STANDARD FORM 91 - PAGE 4 (Rev. 2)

USPS_0046

Feb/16/2017 12:31: PM    904-730-8163->904-359-2979                    5/16
Feb/16/2017 12:27:42 PM         USPS - Jacksonville, FL 904-730-8163        5/16

I was sitting at the light on LORETTO
and Old St. Augustine. The light had turn
green and I was waiting for the car in
front of me to go. My foot slipped off
the brake and before I could place it back
on the brake, the truck hit the back of
the gentleman car (The front bumper of the
truck hit his back bumper.) We pulled off
to the side, I called the office at 1:03 pm and
spoke w/ Jeanette. When I got out of the truck
and I said are you ok, he said yes
and called his brother. His brother showed
up and asked was I
ok and I said yes.

02/11/17

FEB 16 2017
USPS

USPS_0047



π Ex. B



PLAINTIFF'S
EXHIBIT
B
Rentz



Pℓ Ex. C



PLAINTIFF'S
EXHIBIT
C₁
Rentz





