1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                    JACKSONVILLE DIVISION

 3
                CASE NO:  3:18-cv-919-J-34JBT
 4

 5   RICHARD A. TRIOLO,             Jacksonville, Florida

 6            Plaintiff,            Date:  September 22, 2020

 7   v.                            Time:  9:18 a.m. - 6:14 p.m.

 8   UNITED STATES OF AMERICA,      Courtroom:  10B

 9            Defendant.
     _____

10

11                        BENCH TRIAL
                          (Volume I)
12          BEFORE THE HONORABLE MARCIA MORALES HOWARD
                  UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20   OFFICIAL COURT REPORTER:

21   Cindy Packevicz Jarriel, RPR, FCRR
     221 N. Hogan Street, #128
22   Jacksonville, FL  32202
     Telephone:  904.301.6843
23   e-mail:  cindyrprfcrr@gmail.com

24       (Proceedings reported by stenography; transcript
     produced by computer.)
25
```

1

2                         A P P E A R A N C E S

3

4    COUNSEL FOR PLAINTIFF:

5    **PHILIP KINNEY, ESQ.**
     **BENJAMIN MOORE, ESQ.**
6    Kinney & Sasso, PLLC
     191 RG Skinner Parkway, Suite 703
7    Jacksonville, FL  32256-9678

8

9    COUNSEL FOR THE DEFENDANT:

10   **COLLETTE CUNNINGHAM, ESQ.**
     **KYESHA MAPP, ESQ.**
11   United States Attorney's Office
     300 North Hogan Street, Suite 700
12   Jacksonville, FL  32202

13

14

15

16

17

18

19

20

21

22

23

24

25

3

# T A B L E   O F   C O N T E N T S

Proceedings:

Plaintiff's Witnesses:

**Richard Triolo**
Direct Examination by Mr. Kinney..............Page 6


# E X H I B I T S

Received in Evidence                              Page

Plaintiff's Exhibits 7, 9, 14, 26, and 28......125
Defendant's Exhibit 39.........................147
Defendant's Exhibit 40.........................149
Plaintiff's Exhibit 15.........................189
Defendant's Exhibit 42.........................195
Defendant's Exhibit 25.........................241
Defendant's Exhibit 19.........................255
Defendant's Exhibit 32.........................276
Defendant's Exhibit 31.........................280


-  -  -

```
 1              P R O C E E D I N G S

 2   September 22, 2020                            9:18 a.m.

 3                         -  -  -

 4              COURT SECURITY OFFICER:  All rise.  The United States

 5   District Court, in and for the Middle District of Florida, is

 6   now in session.  The Honorable Marcia Morales Howard presiding.

 7              Please be seated.

 8              THE COURT:  This is Case No. 3:18-cv-919-J-34JBT,

 9   Richard A. Triolo versus the United States of America.

10              Counsel, beginning with the plaintiff, if you would

11   make your appearances for the record.

12              MR. KINNEY:  Philip Kinney and Ben Moore for Richard

13   Triolo.

14              THE COURT:  For the United States?

15              MS. CUNNINGHAM:  Good morning, Your Honor.  Collette

16   Cunningham and Kyesha Mapp for the United States.

17              THE COURT:  All right.  We're scheduled for a bench

18   trial.  If you're wondering who is sitting in the jury box,

19   those are interns that are interning with me for this semester.

20   They'll be your jurors if you want to talk to a jury.

21              We agreed that we would start directly with the

22   evidence.  I know that there was a motion filed.  I don't think

23   I need to rule on it at this time.  I can address it when that

24   evidence comes up.

25              Is there anything else that we need to address from
```

1   plaintiff's perspective before you call your first witness?

2            MR. KINNEY:  Not from the plaintiff, Your Honor.

3            THE COURT:  I'm sorry?

4            MR. KINNEY:  Not from the Plaintiff, Your Honor.

5            THE COURT:  Ms. Cunningham, anything from the United

6   States?

7            MS. CUNNINGHAM:  Not at this time, Your Honor.

8            There's some witness schedule issues that we can

9   address but doesn't have to be addressed right at this moment

10  unless the Court would like to.

11           THE COURT:  No, I did -- we were notified that you

12  had a witness that had a headache and a sore throat, I think it

13  was.

14           My recommendation or my recollection is that I

15  suggested that the witness get a COVID test, but that if we

16  didn't have a negative test, we could simply take that witness

17  in two weeks, if we had to.  That's the beauty of a bench

18  trial; we can proceed with everything else.

19           MS. CUNNINGHAM:  And I'll let the Court know that she

20  had a COVID test yesterday.  We do not yet have the results

21  back but we'll keep the Court updated on that.

22           THE COURT:  Okay.  All right.  Then with that, would

23  you -- the plaintiff call your first witness.

24           MR. KINNEY:  Thank you, Your Honor.

25           The plaintiff calls Richard Triolo.

```
 1              THE COURT:  All right.  Mr. Triolo, if you'll come
 2   forward.  I'll ask you to remain standing to be sworn.  And
 3   then while you're testifying, you'll remove your mask.
 4              COURTROOM DEPUTY:  Please raise your right hand.
 5              Do you solemnly swear that the testimony you're about
 6   to give before this Court will be the truth, the whole truth,
 7   and nothing but the truth, so help you God?
 8              THE WITNESS:  I do.
 9              COURTROOM DEPUTY:  You may have a seat.
10              If you could please state your name for the record
11   and spell your last name.
12              THE WITNESS:  Richard Anthony Triolo, T-r-i-o-l-o.
13              THE COURT:  Go ahead.
14              MR. KINNEY:  Thank you, Your Honor.
15        RICHARD ANTHONY TRIOLO, PLAINTIFF'S WITNESS, SWORN
16                       DIRECT EXAMINATION
17   BY MR. KINNEY:
18   Q    Mr. Triolo, as you know, we're here to talk about a motor
19   vehicle collision from February of 2017, but first I want to
20   talk about your background.
21              And so, first, go ahead and tell us your date of
22   birth.
23   A    October 19th, 1974.
24   Q    You'll have to keep your voice up a little bit more.  I
25   had a hard time hearing once the door was closed.
```

 1   A     October 19th, 1974.

 2              THE COURT:  All right.  Mr. Triolo, let me ask you

 3   this.  I'll ask you to pull your chair up to the microphone and

 4   if you'll adjust that microphone so that it's facing you.

 5              THE WITNESS:  Okay.

 6              THE COURT:  All right.  Go ahead.

 7              MR. KINNEY:  Does the paper towel come off the

 8   microphone or no?

 9              THE COURT:  That's the microphone cover that's there.

10   We switch them out for each witness.  It doesn't affect the

11   efficacy of the microphone but it does protect the witnesses.

12   BY MR. KINNEY:

13   Q    Mr. Triolo, I heard October 19th, 1974.  Did I get that

14   right?

15   A    Yes, you did.

16   Q    Okay.  And, sir, where were you born?

17   A    I was born in Long Island, New York.

18   Q    Okay.  Is that where you grew up or was that just your

19   place of birth and then moved on?

20   A    I grew up there.  Born and raised in Long Island.

21   Q    Brothers and sisters?

22   A    Yes, brothers and sisters.  I had three brothers from my

23   mother's first marriage.  I had a brother and a sister from my

24   father's first marriage.

25   Q    And did you live with your brothers and sisters the whole

1  time growing up, or did that family separate?

2  A    I grew up with my three brothers from my mother's first

3  marriage for a very brief period of time.

4         As far as my adolescence years, I didn't grow up with

5  my siblings.  I pretty much went to Florida every summer and

6  every other Christmas until I was 18, once my mom moved to

7  Florida and moved back to Florida, and I saw them every

8  Christmas as an adult.

9  Q    Are your folks still alive today?

10 A    No, they are not.

11 Q    Let's talk about -- a little bit about schooling.  And we

12 don't need to go all the way to being in elementary school.

13        Let's start with high school.  Did you go to high

14 school?

15 A    I did.

16 Q    Where did you go to high school?

17 A    I went to William Floyd High School in Mastic Beach, Long

18 Island.

19 Q    Sports, hobbies, what were some of your interests back

20 then?

21 A    Sports.  I was -- I was the epitome of a jock.

22 Q    What sports did you -- did you fall in love with?

23 A    I played football, basketball, baseball.  I wrestled when

24 I was in middle school as well.

25 Q    Did you join the school teams or was this

1   recreational-type leagues?

2   A    I was in the school teams.

3   Q    Anything that you sort of become specialized in and

4   excelled in?

5   A    Football.  Football was my sport of choice.  I excelled in

6   it, always excelled in it.  I was always team captain, always

7   best player on the field.

8   Q    How about the other sports, baseball, basketball?  Did you

9   get involved in those as well?

10  A    I mean, I excelled in them, but there was always, you

11  know, better players on those teams.

12  Q    Did you join the high school teams, though?

13  A    Yes, I did.

14  Q    And let's talk about your number-one love, football.

15       Did you play varsity?

16  A    I did.  I was actually on varsity at tenth grade.  We went

17  to a camp and -- JV and varsity went to a camp in New Jersey,

18  and by the end of camp, I was on varsity.

19  Q    Were you the starting quarterback, then?

20  A    No.  No, I was not.  I just -- I was on special teams at

21  that point.  I was fast and could tackle, so they just put me

22  on that.

23  Q    Did you eventually get to play quarterback?

24  A    I did, as a junior.  I was starting quarterback as senior

25  as well.

1    Q    How did the team do?

2    A    My junior league we were great.  We had the leading

3    offense in Division I that year.  My senior year, we weren't

4    because we had a lot of people graduate and we really didn't

5    have a lot of talent on that team that year.

6    Q    And as far as -- I guess you finished your high school

7    career playing all three sports?

8    A    I did.

9    Q    And you played football.  You were starting quarterback

10   your junior and senior year?

11   A    Yes.

12   Q    Okay.  And so let me ask you, football, pretty violent

13   sport, isn't it?

14   A    Yes.

15   Q    Did you ever miss a practice due to some type of injury?

16   A    No.

17   Q    Did you ever miss a game due to some type of injury?

18   A    No.

19   Q    What about the other sports that you were involved in,

20   baseball, basketball, ever suffer any injuries that caused you

21   to miss a practice or a game?

22   A    No.

23   Q    So after your senior season, did you get the opportunity

24   to jump to the college level and play in college?

25   A    No, I did not.  I had a lot of colleges recruiting me at

TRIOLO v USA                  September 22, 2020  Vol I- 11

1  that time, lookers, and just about a lot of Big Ten schools,
2  Tennessee, Ohio State, Michigan, Michigan State.  They were
3  sending me a lot of letters; Rutgers was at my games, every
4  home game, every away game, but I never got to the collegiate
5  level as my grades were horrible.
6  Q    So college -- college football wasn't in the cards, then?
7  A    No.
8  Q    All right.  So do you remember what year you finished high
9  school?
10 A    '93.
11 Q    Sorry.  Say again?
12 A    1993.
13 Q    1993.  Now, did you get the traditional high school
14 diploma?  Did you walk with cap and gown and get your high
15 school diploma that way?
16 A    I did not.
17 Q    All right.  And does that reference back to the horrible
18 grades?
19 A    Yes, it does.
20 Q    Were you somehow able to get a diploma?
21 A    I did.  I got my GED equivalency.
22 Q    Did you get it in 1993 when your high school class was
23 finishing up or did that come on later on?
24 A    That came on later on.
25 Q    Do you remember when you got your GED?

TRIOLO v USA                    September 22, 2020  Vol I- 12

```
1    A    I believe it was 1994.

2    Q    So no college in the plans.  Grades -- grades got in the

3    way.

4              What happened to you after high school?

5    A    I got into the workforce.  I picked up a job at UPS as a

6    preloader, just unloading trucks and bringing them to the mail

7    trucks where they were going for that address.

8    Q    Okay.  And, let's see, a preloader.  Tell us what a

9    preloader does.

10   A    The trailers back up to the back, and we unload them onto

11   the belts, and those conveyor belts go to different places, and

12   we pick them up.  Once they go to a different place, we pick

13   them up and bring them to the truck of where that address is.

14   Q    Physically, was that demanding work?

15   A    Sure, yes.

16   Q    How long were you at UPS?

17   A    Three, four years.

18   Q    I forgot to ask you, was that a full-time or a part-time

19   job at UPS?

20   A    That was a part-time job.  That was from 5:00 in the

21   morning to about 9:00 in the morning.

22   Q    Okay.  Were you trying to become a full-time employee or

23   were you happy with the part-time work?

24   A    Well, I wasn't happy with the part-time work.  I needed

25   more income, so I actually got a second job.
```

 1    Q    Okay.  What was your second position?

 2    A    I was a stock boy at -- it's called P.C. Richards & Son.

 3    It was like a Best Buy.  It was an electric department store.

 4    Q    A stock boy.  Did that require some -- is that a

 5    physically demanding job or was that not -- a pretty much a

 6    light-duty work?

 7    A    No, it's a demanding job as well.  Again, the same

 8    concept, the truck comes up; I pull out all the equipment, make

 9    sure it's on the list; I brought it to the back room and put it

10    in a, you know, orderly fashion.

11    Q    Was that -- the job at P.C. Richards, was that a full-time

12    or another part-time job?

13    A    That was a full-time job.  That was supposed to be 9:00 to

14    5:00, but they knew I worked at UPS so they were okay with me

15    getting in at 9:30.

16    Q    So how long did you stay working for P.C. Richards and

17    UPS?

18    A    About three, four years.

19    Q    Three, four years.  And throughout that entire time frame,

20    did you ever have to take any time off due to any type of

21    injuries whatsoever, any type of injuries whatsoever?

22    A    No.

23    Q    Did you feel like you had hurt your back or your neck

24    whatsoever doing that work, or during that time frame

25    whatsoever?

1   A    No.

2   Q    Did you ever seek medical treatment for neck or back

3   injuries through this period through P.C. Richards and the time

4   at UPS?

5   A    No.

6   Q    And I think that takes us up to 1998, after you would have

7   finished up your high school.  Is that -- is that about the

8   time frame?

9   A    Yes.

10  Q    Did you eventually leave UPS and P.C. Richards?

11  A    I did.

12  Q    Why is that?

13  A    Well, UPS, I would -- I wanted to be a driver; UPS has

14  great money benefits, but it would have been forever to get

15  that job.  You'd have to wait for somebody to retire.  UPS --

16  stock boy, I wanted to do something else.  I wanted to do

17  something -- something new, something, you know, more pleasing

18  to me.  I ended up getting into the fabrication field of

19  central air, HVAC systems.

20  Q    Tell us about that.

21  A    My stepbrother was in the industry already.  He went -- he

22  was working with somebody who merged with another gentleman.

23  He asked me if I wanted to get involved in the industry.  I

24  said sure, went in there and started up.

25  Q    What is fabrication?  What do you do as a fabricator in

1   the HVAC business?

2   A     So HVAC business has ductwork to deliver the air to supply

3   vents and return vents and whatnot.  My job was to bend up all

4   that tin to create a system.  Bend it up, put it all together,

5   and wait for the installation crews to pick it up and bring it

6   to the job.

7   Q     Did you have to go to, like, a trade school, or is that

8   more of like an on-the-job type training type of situation?

9   A     Yeah, that was on-the-job training.

10  Q     And how long did you stay -- do you remember the name of

11  the company?

12  A     I don't remember the name of the company.  I wasn't there

13  very long.

14  Q     Okay.  How long were you there?

15  A     I would say less than a year.

16  Q     Is it something you just didn't stay interested in?  What

17  happened?

18  A     It wasn't anything about not being interested.  The two --

19  the two owners of the company -- one was the existing

20  installing and fabrication, which I was in.  It was a very --

21  lot of tension in that -- with that job.  The two owners were

22  constantly bickering and yelling at each other.

23        I remember thinking, as a kid, it was like watching

24  Archie Bunker, you know, him and Meathead yelling at each

25  other.  Ridiculous.  It was like a daily thing.

1        My stepbrother was very close to the owner of the

2   company I was working for.  He was, you know, relaying a lot of

3   messages, and I just felt like that that company, they were

4   going to split up.  He was going to go out on his own, but I

5   was not sure if I was going to be hired on.  I know he would

6   have kept my stepbrother, but I didn't know if I was going to

7   be put on, so I was going to start looking in other areas for

8   work.

9   Q    Well, at the time that you were there, was it another job

10  that was kind of physically demanding?

11  A    Yes.

12  Q    Did it require you to lift heavy objects?

13  A    Yes.

14  Q    Was it something where, you know, you needed to take time

15  off from work from time to time because you felt like you had

16  been injured or hurt in any way whatsoever?

17  A    No.

18  Q    So the fabrication job comes to an end, and what happens

19  next in the -- in your working world?

20  A    I started looking into -- I wanted to stay in that

21  industry, and I found an ad, I called it.  They didn't want a

22  fabricator, which is fine, because I didn't want to be a

23  fabricator anymore.  It was for installations.  And I had an

24  interview and I was hired within that week.  I was working as

25  an installer for HVAC systems.

1    Q    Sorry, I didn't mean to cut you off.

2         Do you remember the name of that company that you

3    went to work for?

4    A    Master Cooling and Heating.

5    Q    And you told me a little bit about what the fabricators

6    do.  Tell us what the installers do.

7    A    So the installers, what we do is we take all that ductwork

8    and we install it.  And it's for -- basically to make sure the

9    efficiency of the system is working.  So we have to size up the

10   ductwork, make sure that the amount of airflow that's going in

11   is correct, and whether we have to make a right, make a left,

12   put the pieces in to make it all work and make it nice and

13   efficient.

14   Q    When I think of air-conditioning, my mind goes to a closet

15   in my house where there's big giant metal box and a big giant

16   fan outside.  Is that the type of work?

17   A    That's correct.

18   Q    And those items, they're pretty heavy; right?

19   A    Yes.

20   Q    And how long did you work for Master Cooling and -- I

21   don't remember the --

22   A    Master Cooling and Heating.

23   Q    How long did you work for those folks?

24   A    Seven years.

25   Q    Seven years.  And did you stay in installation the whole

1   time?

2   A    Yes.

3   Q    Throughout the seven years -- I think that takes us from

4   about 1998 or 1999, up to seven years to somewhere around 2006.

5         Throughout that whole time period, did you ever get

6   hurt on the job?

7   A    No.

8   Q    Did you ever have any neck strain or back pain whatsoever

9   during that period of time from -- all the way to the end of

10  your time with Master Cooling and Heating?

11  A    No.

12  Q    You agree that those things, they're pretty heavy.  How

13  would you deal with such heavy items?

14  A    Well, I had a crew of people, so we would always tag-team.

15  Everything was -- you always had somebody with you.  We never

16  lifted anything on our own.  We had hand trucks as well in the

17  vans.

18         At that time I was a foreman for the company.  In my

19  third year, I had become a foreman.  I was running my own job

20  so I had a crew of people and we would always knock it out

21  together.

22  Q    Mr. Triolo, you were pretty active in high school, it

23  sounds like.  You know, you kind of rose to the cream to the

24  top there in some football.

25         Did you continue on in the -- you know, sort of the

 1   adult leagues or, you know, sometimes employers have softball

 2   teams, that kind of thing.  Did you ever continue on with that,

 3   or high school ended and sports cut off for you?

 4   A    I was always in leagues.  I was indoor, outdoor, played

 5   football.  I was in basketball leagues.  And Master Cooling and

 6   Heating always had a softball team.  We were always playing

 7   softball.

 8   Q    And earlier I think my question was a little bit specific

 9   about did you ever get hurt on the job.  But what about these

10   adult leagues, you know, these -- the softball leagues or I

11   think you said flag football, any of those leagues.  Did you

12   ever get hurt at all?

13   A    Well, sure, I mean, you roll an ankle from time to time,

14   yes.

15   Q    What about a neck injury?  Did you ever suffer a neck

16   injury throughout that whole period of time?

17   A    No.

18   Q    Any type of back injury whatsoever?

19   A    No.

20   Q    So that took up us to approximately -- I think we got to

21   2006.  And I know you now live in Florida, so tell us about

22   this -- what happened after Master Cooling and Heating.  Where

23   did you go next?

24   A    So by that time I was doing a lot of side work, and things

25   were picking up, and I couldn't do the amount of side work and

1    the full-time job at the same time, so I -- you know, I made a
2    decision, took a risk, and went out on my own.
3            I started a company.  It was called Freeflow Heating
4    and Air Conditioning, and I had a gentleman who started
5    building, and I was doing a lot of jobs for him.  I actually
6    did jobs on his house.  And he led me to other contractors and
7    other builders and things looked good.  Things were going well.
8    Q    Did you stay right in the New York area or were you
9    specific to Long Island or --
10   A    Yes, I was.
11   Q    Okay.  And how long did you keep Freeflow in operation?
12   A    Four years.
13   Q    And was that always in New York?
14   A    Yes -- well, actually no.  That's not -- not actually.
15   My -- I had a friend who moved out to Montana and ended up
16   falling face first on some -- he built a house, flipped it, and
17   he kept doing that.  And before you know it, he had big
18   building companies doing work in Montana.
19           His wife came to visit.  She ended up connecting with
20   me and I got in touch with him and he flew me out to Montana
21   and wanted to show me a couple jobs that he had and put a bid
22   on them.
23           I really didn't want to move to Montana at that time.
24   Things were going well, but these jobs were big.  They were
25   going on for a good couple years.  I put a bid on them and

1   somehow they got approved, and I ended up moving to Montana and

2   helping out with getting these jobs going.  In the meantime, I

3   was a finish supervisor for his companies.

4   Q    So you make the move out to Montana.  Do you remember what

5   year you moved out to Montana?

6   A    It was 2007.

7   Q    2007.  I'm trying to just do the math in my head and I

8   can't do it, as far as your age at that time in 2007, so if you

9   can help me out.

10              How old were you at that point?

11  A    Mid 30s.

12  Q    Okay.  And so you're in your mid 30s.  Is this the first

13  time that you've moved out of the state of New York?

14  A    Yes.

15  Q    So you're out in Montana, and are you still in the

16  construction and the HVAC business?

17  A    I am.

18  Q    Okay.  Let me ask you, during that whole time that you

19  were still in New York but on your own, did you have any

20  problems with either your neck or your back whatsoever?

21  A    I did not.

22  Q    How long were you out in Montana?

23  A    A year.

24  Q    Did it only take a year to do that project that your

25  friend was -- had you bid on?

1   A    No.  They never came to fruition.  That whole housing

2   market deal kind of ended everything.  He had investors on both

3   those jobs, and we had one -- it was 44 acres.  We had logged

4   it and started to get it plotted when the -- his investor

5   actually showed up to the job unexpectedly and told him he was

6   pulling out.  He had saw the writing on the wall as far as what

7   was going to be happening.

8            So he started concentrating on the other job.  And

9   about two weeks after that, his investor actually came to his

10  house on that job and pulled out on that.  He tried to get some

11  hedge fund going and whatnot to try to keep the jobs going, but

12  they just never happened.

13  Q    Did that cause you to have to leave Montana, or did you

14  stay and try and find some work?

15  A    I had to leave Montana.  I called some contacts to see if

16  they had any work in New York, and a contact actually did.

17  Told me, you know, it's going to be close to getting to

18  mechanical, which means, you know, HVAC, plumbing, electrical.

19  If you get out here, you know, fast enough, I'll let you put in

20  a bid.

21           So I had to go.  At that point, it was snowing

22  30 inches every other day.  Can't go outside because it's below

23  zero and I had to start making money.

24  Q    So at that point -- so this is around 2008/2009 time

25  frame?

TRIOLO v USA                    September 22, 2020  Vol I- 23

1  A    Yes.

2  Q    You then go back to New York?

3  A    Yes.

4  Q    And how did it go for you there back in New York?

5  A    Well, I started to put in a bid on a house.  The bid came

6  out way too high.  He actually had somebody that was working

7  for him.  The good thing about the people I worked for, they

8  were very loyal.  So once you were with them, you were with

9  them.  I found out the bid was too high and I couldn't

10 understand why.

11        When I started talking to friends who were still, you

12 know, doing some side work, they were, hey, you know, you can't

13 bid it out that way anymore.  You really need to cut back your

14 profits.

15        But I never really picked up any jobs.  Things were

16 getting bad.  So I ended up going to back to Master Cooling and

17 Heating to see if they could use a foreman, and, you know, they

18 hired me on the spot.

19 Q    How long was your second term at Master Cooling and

20 Heating?

21 A    About a year, if that.

22 Q    Was that in the 2009 and 2010 time frame?

23 A    Yes.

24 Q    So you finished up at Master Cooling and Heating for

25 another year.  What are you doing next?

1   A    From then I bounced around, talked to companies on Long

2   Island.  And it was getting very cutthroat at that point in

3   time.  Things weren't -- things weren't the same anymore.  A

4   lot of people were doing hack jobs and ripping off people,

5   sending them to the same house for the same problem and

6   charging them each time.

7        It was getting -- it was getting bad, and I didn't

8   want to put my name on that.  It kind of burnt me out.  I was

9   getting sick of the whole industry at that point.

10  Q    Did you get out of the HVAC business then?

11  A    I did.

12  Q    Was that around 2010?

13  A    That was around 2010.  That's the same time my father had

14  passed.  He passed in July of 2010.

15  Q    Okay.  What did he pass of?

16  A    He passed of congestive heart failure and emphysema.

17  Chain-smoker, like a chimney.

18  Q    So after getting out of HVAC in 2010, where did you go to

19  work?

20  A    I actually picked up a job at Saks Fifth Avenue as a

21  plainclothes security, just catching people steal.

22       I needed something for some money.  Did not like the

23  job.  Every day I was walking around the store, knowing that I

24  needed to do something better than, you know, what I was doing

25  at the time.

1  Q    During the rest of the time that you were working in the

2  HVAC and the time that you were working as private security,

3  any problems with your neck or back whatsoever?

4  A    None.

5  Q    Did working at a private security and having to, I guess,

6  detain people, did you have to get into scuffles or fights or

7  tackle people to the ground or what's -- what happened?

8  A    No, it never -- it was never really like that.  Once a

9  person was caught, they knew they were caught.  There really

10 wasn't, you know, a lot of fighting involved.

11         I had a partner that would watch the cameras and we

12 would kind of both corner them and get them in a spot.  I never

13 got into, like, altercations with that job.

14 Q    How long did you stay with Saks Fifth Avenue?

15 A    Not long, a couple months.  Four, five months at the most.

16 Q    Did you find other work there?

17 A    I did not.  I did not.  At that time, you know, my

18 father's death took a toll on me.  I didn't like my job.  Got

19 out of that job thinking I was going to find something else to

20 do that was going to be more suited to me.  It was kind of like

21 a brick wall at that point.  I didn't really know which avenue

22 to go.  It was kind of like a bad time.

23 Q    Okay.  So what did you do next?

24 A    I was unemployed for a while.  And it was -- like I said,

25 it was bad.  Money wasn't coming in.  And my brothers actually

 1   got me a plane ticket to come to Florida for Christmas.  I
 2   hadn't been to Christmas in a couple years, with Montana and
 3   not having enough money to come back when I moved to New York.
 4   So they had brought me to Florida and ended up doing kind of
 5   like an intervention situation.  Sat me down and, you know,
 6   telling me that:  Hey, you need to get stuff together.  You
 7   need to start doing yourself with something.

 8          My brother Bruce, he's in the medical field, been in
 9   the medical field since '95.  He was in my ear a lot about the
10   medical field.  Always going to be there.  There's security
11   there.  You'll always have a job.

12          He wanted me to be a nurse at that point, but I
13   wasn't sure if I wanted to be a nurse.  Thinking about the
14   medical field, respiratory started sinking into my mind, and,
15   you know, I believe that my father's death pushed me.

16   Q    What time frame was it when your brother -- actually, were
17   your brothers living in Florida at the time?

18   A    They were, yes.

19   Q    Where in Florida, in the Jacksonville area?

20   A    In the Jacksonville area.  My brother Bruce lives in Clay
21   County; my brother Brian lives in -- I guess that's Duval,
22   Mandarin.

23   Q    So what time period did they fly you down and have this
24   intervention with you?

25   A    That was Christmas of 2011.

1    Q    Did you make any decisions then at that point?

2    A    I was thinking heavily on it.  I didn't make an exact

3    decision.  I lived in, you know, New York, made that move to

4    Montana, so that was like:  Am I going to do this again?  Move

5    and it not work out and I have to come back?

6           And there was so many things that were, you know, on

7    my mind.  I didn't really know what to do.  But things weren't

8    getting any better.  My brothers kept calling me, you know.

9    And at that particular time, I actually started looking into

10   some schools for -- in the medical field.  But in New York, you

11   have to go, like, two years, and then go on to the school from

12   there.  I needed something quick.

13          And my brother Bruce had already talked to me about a

14   number of schools that were kind of like accelerated programs,

15   where I could be done in just under two years and, you know, be

16   working.  So I made a decision.  Really wasn't much going on in

17   New York, hitting a brick wall.  I picked up and left.

18   Q    And did you relocate here to the Jacksonville area?

19   A    Yes.  I came to Jacksonville in -- I shacked up with my

20   brother in Clay County, in Middleburg.

21   Q    All right.  Do you remember what month you moved into the

22   Jacksonville area?

23   A    It was March of 2012.

24   Q    March of 2012.

25          So what was the plan at that point, then, once you

1    moved down here and picked up your life and come on to the

2    great state of Florida?

3    A    It was the start of the new career of going to be getting

4    into medical field.  I was going to start school and start this

5    new career.  That was the main focus.

6    Q    Did you select a school?

7    A    I did.  Concorde Career College was the school I chose.

8    And I chose that school because my brother had said that every

9    student that came in that he worked with, he felt they were the

10   most prepared.  So if there was a school he would want me to go

11   to, it would be that one, and that's why I chose that.

12   Q    And what program did you decide on?

13   A    Respiratory.

14   Q    What made you pick going to this respiratory program?

15   A    So both my parents had pulmonary and cardiac diseases.  My

16   mom had COPD at 44.  She never smoked a cigarette in her life.

17   She was married three times.  All of them chain.  So she

18   suffered from COPD.  She didn't need oxygen.  She was active.

19            My father, on the other hand, he was diagnosed with

20   COPD the year I moved back to Montana -- moved back from

21   Montana.  And it progressed very quickly.  He had a rough time

22   his last year of life.  Lots of pneumonias, lots of UTIs.  And,

23   you know, when you talk to doctors, they can talk to you all

24   they want, but you don't understand what you don't understand.

25            So I -- I think his death really pushed me into

1    respiratory.

2    Q    And once you were enrolled in the program and got going in

3    the studies, did that confirm your decision to go into a

4    respiratory therapist program?

5    A    Yes.  We got into -- at like 20 weeks, or whatever it was,

6    after prereqs, we got into the meat and potatoes of

7    respiratory, particularly the disease processes.  It was like

8    closure as I understood what was going on.

9    Q    How long is the respiratory therapist program at Concorde?

10   A    It was 18 months.

11   Q    During that 18-month period, do you have the opportunity

12   to visit the area hospitals and clinics?

13   A    Yes, yes, during clinical times.  The semesters were

14   ten-week -- ten-week semesters.  And in that ten weeks, I was

15   in hospital four days a week and then the Friday was classroom

16   time.

17           So the first clinical time I was at Baptist South.

18   My critical care rotation I was at Memorial.  That was great.

19   Seen a lot of open heart surgeries, pretty cool.

20           And my NICU rotation was at Shands.

21   Q    Were you able to complete the respiratory therapist

22   program at Concorde College?

23   A    Yes.  Yes, I did.

24   Q    Do you remember when you completed that program?

25   A    October of 2013.

TRIOLO v USA                    September 22, 2020  Vol I- 30

1  Q     And by completing the program, did that qualify you to go
2  to work in one of the hospital settings as a respiratory
3  therapist, or is there something else you have to do to attain
4  that?
5  A     Yeah.  You need the license first through the State of
6  Florida and through the respiratory -- as a respiratory
7  therapist and then be licensed in Florida as well.
8  Q     And were you able to take those exams?
9  A     I did.
10 Q     And did you pass them on the first attempt?
11 A     Yes.
12 Q     Okay.  And were you able to land employment as a
13 respiratory therapist?
14 A     Yeah, that wasn't an issue.  I had every respiratory
15 director's phone number in my -- in my phone.  At the end of
16 every clinical time, they all did the same thing, brought me
17 into their office, asked me if I wanted to work there,
18 exchanged numbers and told me to, you know, keep in touch as
19 far as where you are in your program, where you are in your
20 licensing.  Let us know when you're done with your license.
21 We'd like to have you on board.  That was the same speech at
22 the end of every clinical time.
23 Q     And so did you decide to sign on with one of them?
24 A     Yes.  Baptist Medical Center South.
25 Q     Why did you pick Baptist Medical Center South?

1    A    The people.  The people there were great.  I built a lot

2    of relationships in that ten weeks.  Nice clean hospital.

3    Everybody was always upbeat and nice, so I already had it in my

4    head I was going to go there.

5    Q    What are the job's responsibilities or give us a little

6    bit of understanding of what a respiratory therapist does

7    within a hospital setting.

8    A    Well, that's a lot.  So basically as a respiratory

9    therapist, we take care of people who have cardiac and

10   pulmonary issues.  Okay.  That's anybody with COPD, emphysema,

11   congestive heart failure to, you know, right- or left-valve

12   ejection fractions that are very low.

13            Respiratory, as far as the ED goes, we can bring

14   people back to life, you know, with the knowledge that we have.

15   From there we can manage them on a ventilator.  We can just do

16   a normal floor therapy, which is bringing pulmonary patients

17   their maintenance meds, the bronchodilators.

18            As far as procedural settings, we can do

19   bronchoscopies, just go into a lung and take a sample.  If

20   there's a nodule, we actually go in and get a biopsy of it.

21   Very in depth.

22   Q    You mentioned when you were talking about school that it

23   helped you get closure about your father's passing.

24            So now you're in the hospital setting, what are your

25   feelings about now working as a respiratory therapist?

1  A    I loved it.  It was great.  It was gratifying.  You know,

2  when you can bring somebody back to life, manage them on the

3  vent, and get them into the ICU, take care of them in the ICU.

4  You see their families on a day-to-day basis.  They start

5  knowing you by the first name.  That patient goes from

6  aggressive unit to a regular med-surg unit, and they're going

7  home.  Then there were a couple days you get, you know...

8  Q    Okay.  So October '13, you graduate.  You take your exams

9  and pass it.

10              When did you start working at Baptist South?

11  A    That was 2014, March.  I believe it was March 2014, yes.

12  Q    And as you sit here today, are you still a respiratory

13  therapist with Baptist South?

14  A    I am.

15  Q    Have you worked in other clinical or hospital settings

16  since then?

17  A    Yes.  I -- in -- in 2016, I believe, I also went into -- I

18  got a job, as needed, for Orange Park Medical Center.

19  Q    Was your plan to transition to Orange Park Medical Center

20  or was this just income supplementation?

21  A    Income -- just for the income supplementation of that.  So

22  I worked full time at Baptist Medical Center, and as of that

23  biweekly pay period, on average, I would work at Orange Park

24  two days a week.

25  Q    So you talked to us a little bit about some of the

1  diseases you guys addressed and kind of direct patient care.

2  What I'd like to know is, as a respiratory therapist covering

3  the hospitals at Orange Park or Baptist Medical Center, is it

4  physically demanding work?

5  A    No, it's not physically demanding, compared to being in

6  construction for, you know, 13 years and loading the docks at

7  UPS, no.

8  Q    At any time -- and I mean all the way up until yesterday

9  or today.  At any time during your work as a respiratory

10  therapist, did you ever have to -- did you ever get hurt on the

11  job?

12  A    No.

13  Q    Did you ever suffer any neck or back injuries on the job?

14  A    No.

15  Q    Okay.  Once -- once you came down to Florida, did you

16  continue to participate in the recreational, you know, the

17  softball, the flag football -- I know I'm missing one --

18  basketball?  Did you participate in any of those?

19  A    No.  I didn't know anybody, you know, to get into leagues

20  at that point.  But, you know, my focus was school.  I enrolled

21  in school within a month and, you know, in the next month I was

22  in school.  So I made that my focus.  I really didn't worry

23  about getting into leagues and whatnot.

24  Q    When you came down here, you didn't stay in sports.  Did

25  you do anything to stay physically healthy?

1  A    Yes.  My brother has a treadmill and some, you know, odds

2  and ends, dumbbells and medicine balls and whatnot, so I

3  continued to get my cardio in on the treadmill and simulate

4  some boot camp classed and whatnot.  That was about it.

5  Q    How many days a week at that point are you working out?

6  A    Probably three at that point.

7  Q    What about back up when you were in New York and that sort

8  of thing, were you a member of any gyms or anything like that?

9  A    Yes.  I was an L.A. Fitness member for quite a while.

10  Q    Were you like many in the population, you get a membership

11  and maybe you show up a couple times a year after January 1st,

12  or were you a more dedicated type of person?

13  A    I was dedicated.  I was in the gym just about every day.

14  Q    The whole time you're in your workouts and as a -- going

15  to the gyms, any problems whatsoever -- strike that.  I'm

16  tongue-tied.

17        Any problems whatsoever when you're doing your

18  workouts, either in L.A. Fitness or here in your brother's

19  garage, any problems whatsoever with neck or back?

20  A    No.

21  Q    When's the first time -- well, let me ask you.

22  Mr. Triolo, as you sit here right now, do you have any problems

23  with your neck?

24  A    No.

25  Q    Do you have any problems with your back?

1   A    Yes.

2   Q    Okay.  And when's the first time you had experienced a

3   problem with your back?

4   A    February 11th, 2017.

5   Q    Okay.  Let's talk about that day.

6        All right.  What happened that day that you started

7   to experience problems with your back?

8   A    I was rammed from behind at a traffic light.

9   Q    What kind of car were you driving?

10  A    I was driving a 2016 Ford Mustang.

11  Q    And do you remember what type of vehicle hit you?

12  A    It was a USPS mail truck.

13  Q    Mail truck.

14       Do you remember what time of day the collision

15  happened?

16  A    Yeah.  About 1:00 p.m. in the afternoon.

17  Q    Mr. Triolo, I have a blowup from the intersection.  Would

18  you -- do you remember the name of the intersection or the

19  streets that intersected where the collision happened?

20  A    Yeah.  Old St. Augustine Road at the intersection of

21  Loretto and Greenland.

22       MR. KINNEY:  Your Honor, I'd like to have the witness

23  step down, and I'd like to pull this over to this area and have

24  him diagram the intersection scene and describe what happened

25  at that intersection.  If I may proceed with that.

```
 1              THE COURT:  I'd rather him stay at a microphone for
 2    the court reporter's sake.  So...
 3              MR. KINNEY:  Okay.
 4              THE COURT:  Why don't you just bring it over here.
 5              Interns, if you-all want to see, so you can move.
 6              MR. KINNEY:  Can you see the board?
 7              THE COURT:  If you project it, he'll be able to point
 8    on the monitor and we'll be able to see where he's pointing.
 9              MR. KINNEY:  I don't have this in an electronic form.
10              THE COURT:  Okay.
11              MR. KINNEY:  May I proceed, Your Honor?
12              THE COURT:  Sure.  I'll let him step down briefly and
13    show us what you want to show us then we'll move on.
14              Go ahead, Mr. Triolo.
15              Mr. Kinney, if you'll inquire at a -- if you'll take
16    a microphone.
17              MR. KINNEY:  So -- my microphone?
18              THE COURT:  Yeah.
19    BY MR. KINNEY:
20    Q    Mr. Triolo, if you would, show the Court the intersection
21    where the accident happened.
22    A    It was at the intersection of Loretto and Greenland and
23    Old St. Augustine Road.
24    Q    You said you were driving a Mustang; correct?
25    A    That's correct.
```

```
 1    Q    And the other driver was driving a mail truck?

 2    A    That's correct.

 3    Q    Was this an old mail truck or was this a postal worker

 4    that appeared to be working?

 5              MS. CUNNINGHAM:  Objection, leading.  I've not

 6    objected to the background, but once we're moving forward I'd

 7    like to make that objection.

 8              THE COURT:  Okay.  Well, I don't think that

 9    particular question was leading, but perhaps another.

10              You can answer the question.

11              THE WITNESS:  What was the question again?

12    BY MR. KINNEY:

13    Q    Was this an old mail truck that somebody was driving

14    around personally or did this appear to be a mail truck that

15    was in service?

16    A    Oh, it was in service.

17    Q    I don't remember.  Approximately what time of day was the

18    accident?

19    A    1:00 p.m. in the afternoon.

20    Q    If you would, there's a Dry Erase marker.  Show the Court

21    where your vehicle was hit just prior to the impact.

22              If you'd draw, like, a rectangle.

23    A    Sure.  So I was heading south on Old St. Augustine Road --

24              THE COURT:  Here's the problem.  We can't hear him.

25              THE WITNESS:  Okay.  Sorry, Your Honor.
```

1        MR. KINNEY:  Yeah, you'll have to speak up.

2        THE WITNESS:  I was heading south on Old St.

3   Augustine Road.  And when I came to the traffic light, I was

4   approximately right here, three or four cars back at the

5   traffic light.

6   BY MR. KINNEY:

7   Q    Okay.  How long had you been at the traffic light before

8   the impact took place?

9   A    Five, ten seconds.

10  Q    Okay.  When you were struck, where was your vehicle

11  struck?

12  A    From behind.

13  Q    Okay.  And at the time of the impact, were you wearing

14  your seat belt?

15  A    Yes, I was.

16  Q    Okay.  What happened to your vehicle on impact?

17  A    My vehicle surged forward and my seat -- my seat back had

18  reclined.

19        THE COURT:  If he's not using the diagram, can I get

20  him back on --

21        MR. KINNEY:  I've got one more question that's going

22  to require this board.  I actually have two, but one comes up

23  later.

24  BY MR. KINNEY:

25  Q    Mr. Triolo, how far forward did your vehicle move?  Are

```
 1   you able to show us how far forward your vehicle moved?
 2   A    I'm not sure how far it moved.
 3   Q    Did your vehicle move forward?
 4   A    Yes.
 5   Q    Were there any vehicles in front of you at the time of the
 6   collision?
 7   A    Yes.
 8   Q    Do you know the space between your vehicle and the vehicle
 9   in front of you prior to the impact?
10   A    I'm not sure how much space was in between us, no.
11   Q    Did you have -- did your vehicle strike the vehicle in
12   front of you after the impact?
13   A    No.
14   Q    Okay.  I'm going to skip a little bit of detail because I
15   want to use this board and then I'll have you sit down.
16            After the intersection after the impact took place,
17   did you stay there and call the police?  Did you leave the
18   vehicles at the scene?
19   A    No, no.  Actually, we had pulled into a parking lot.  I
20   motioned to the driver to follow me and we had motioned into
21   the -- into a parking lot.
22   Q    Could you put a little asterisk or something where you
23   pulled into after the -- after the accident.
24   A    We were approximately right in this area here
25   (indicating).  1 and 2.
```

 1   Q    All right.  That's all I'm going to ask you on that board.
 2   You can return.
 3          All right.  Mr. Triolo, so at the point of impact,
 4   tell me what happened to you physically inside the vehicle.
 5   A    When I was hit, my backrest was totally reclined, which
 6   I -- I mean, everything was electrical, everything was power.
 7   So for that to recline, you know, I was a little amazed by
 8   that.  But immediately, once I got hit, I felt the twinge in my
 9   back, and I sat up into the seat, looking into the rearview
10   mirror, to see who and what hit me.
11   Q    What did you see when you looked into the rearview mirror?
12   A    I saw a driver holding a phone, like this, up into her
13   face, right hand on the steering wheel, and there was just a
14   look on her face like she just couldn't believe that actually
15   happened.
16   Q    If you could, demonstrate for the Court the position of
17   the hand holding the phone and the hand holding the steering
18   wheel and the proximity to her face when you initially saw the
19   driver in the rearview mirror.
20   A    So if this bottle of water is my phone, the phone was like
21   this, and she had her hand on her steering wheel like this, and
22   she was just -- had a look of disbelief that that just
23   happened.
24   Q    So the impact point and the seat reclining, the time frame
25   from when the impact happened and the seat reclining, what's

1    the time frame from when you see her on the -- in the rearview

2    mirror with a phone to her face and holding the steering wheel

3    with the other hand?

4    A    Seconds.  Within seconds.

5    Q    And, Mr. Triolo, what did that impact feel like to you?

6    A    It was hard.  I got -- it was -- it was very surprising.

7    I didn't see it coming.  I didn't hear it coming.  Just stopped

8    at a traffic light and just bam -- and the seats reclined.

9    Q    Had you ever been in an auto accident where somebody hit

10   you before or you hit them before?

11   A    Not where I've hit them or I hit them or they hit me, but

12   I've been in an auto accident before, yes.

13   Q    Okay.  Do you remember what year you were in an auto

14   accident previously?

15   A    2000, '99 -- I think it was 2000, because I think the year

16   had just passed, so, yeah, 2000.

17   Q    So that would be, what, in your late 20s?

18   A    Yes.  Late to mid 20s.

19   Q    All right.  Tell us about that accident, if you would.

20   How did that happen?

21   A    It was on Long Island.  I lived in a very -- on the

22   eastern end of Long Island.  Very rural, lots of horse-boarding

23   farms out there.  Heading to work on the highway.  It was

24   January.  So you can't tell, but I hit black ice.  And there's

25   no way of seeing black ice.  It looks exactly like the road.

1   It's not like regular ice where you can see it coming.  It's
2   black ice.  It matches the road.  You couldn't see it.
3          I hit a strip of black ice, and my truck kind of --
4   spinning out of control, and went off the side of the road and
5   it hit a fence.  It was a horse stable fence, just to keep the
6   horses within the property.  That fence broke through my window
7   and I put my hand up and it hit my arm, and I had a compound
8   fracture here and here.  Still got the scar from that piece
9   squeezing my arms from it.
10  Q    When you hit the black ice and the truck hit the fence,
11  and I guess a piece of fence hit your arm causing the fracture,
12  was the fracture -- which arm was it?
13  A    It was my left arm.
14  Q    Was the fracture to your left arm?  Was that the only
15  injury you had?
16  A    Yes.
17  Q    Did you have any other injuries from that accident to your
18  neck?
19  A    No.
20  Q    Did you have any injuries to your back?
21  A    No.
22  Q    What type of vehicle were you driving at that time?
23  A    I was driving a Dodge Dakota.
24  Q    What is a Dodge Dakota?
25  A    It's a pickup truck.

1   Q     Is it a big --

2   A     Like a midsize at that point.  The Ram was the biggest and

3   the Dakota was the midsize of that.

4   Q     All right.  So returning back to February 11th of 2017,

5   other than that one accident, any other accidents of any kind

6   whatsoever?  And I mean motorcycles, horseback riding, car

7   accidents, anything whatsoever, parachuting out of a plane,

8   anything whatsoever other than that time you got your hand

9   broke by the fence?

10  A     No.

11  Q     In the motor vehicle collision on February 11, 2017, was

12  there damage -- was there physical damage to the back of your

13  Mustang?

14  A     Yes.

15  Q     Was there physical damage to the front of the United

16  Parcel Service truck?

17  A     Yes.

18        THE COURT:  I'm sorry?  You said United Parcel

19  Service.  Do you mean to say --

20        MR. KINNEY:  United Postal Service.  Thank you.

21  BY MR. KINNEY:

22  Q     Was there damage to the United Postal Service truck?

23  A     Yes.

24  Q     Where was the damage to your vehicle?

25  A     In the rear.

1  Q    All right.  And where was the damage to the United Postal

2  Service?

3  A    The front.

4            MR. KINNEY:  All right.  I'm going to attempt to use

5  the technology now.

6            I'm bringing up Exhibit 34 in the binders.  We put

7  some binders up there for you, Judge.

8            THE COURT:  Well, let me say, if we had a jury, I'd

9  be asking you to show the exhibits to the witness and get them

10  admitted before you put them up on the screen, but since we

11  don't have a jury and in order to not have people walking

12  around the courtroom more than necessary, I'll let you go ahead

13  and do it this way.

14            MR. KINNEY:  Yes, Your Honor.  And, actually, when

15  you asked me if I had anything, I neglected to move in our

16  exhibits that were stipulated.  We have a whole host of

17  exhibits that are stipulated.

18            THE COURT:  You-all want to tell me what exhibits are

19  stipulated?

20            MR. KINNEY:  Yes, Your Honor.

21            THE COURT:  Just a moment.  Let me get your exhibit

22  list out.

23            MR. KINNEY:  I think there's a copy inside the binder

24  in the left hand.

25            THE COURT:  Is it different than what was filed?

 1            MR. KINNEY:  No.

 2            THE COURT:  Okay.  Then I've got it.

 3            All right.  So what exhibits are stipulated?

 4            MR. KINNEY:  The plaintiffs stipulated to are 1, 2,

 5    3, 4, 5, 6, 8, 10, 11, 12, 13, 15 to 25, 29, 30, 31.

 6            THE COURT:  Whoops, slow down.

 7            MR. KINNEY:  Sorry.  So 15 to 25.

 8            THE COURT:  29, 30, and 31?

 9            MR. KINNEY:  Yes.  32, and then 33 to 38.  As a

10    separate one, and I'll deal with them as we proceed through,

11    there's ones that were stipulated in part, objected to.  And so

12    I'll deal with those as we go through the testimony.

13            THE COURT:  All right.  Ms. Cunningham, was that

14    consistent with your understanding?

15            MS. CUNNINGHAM:  Yes, Your Honor.

16            The Court already ruled on some of the objections at

17    the status conference.  And I believe that the plaintiffs

18    actually corrected Exhibit 14 which addressed the objection,

19    but we can move through them as we go if necessary.

20            THE COURT:  All right.  Then go ahead with Exhibit

21    34.

22            MR. KINNEY:  Okay.  Is 14 stipulated or not

23    stipulated?  I missed the --

24            THE COURT:  You did not identify 14 as stipulated,

25    and I think -- so...

1              MR. KINNEY:  Okay.  I can deal with it during the

2       testimony.  Thank you.

3              THE COURT:  Go ahead.

4       BY MR. KINNEY:

5       Q    Mr. Triolo, these -- you're looking at Exhibit No. 34 of

6       plaintiff's exhibits, and if you look at the printing or the

7       paper -- the same type of paper that's in front of you, you'll

8       see in the bottom right-hand corner what we call, as lawyers,

9       Bates labeling.

10             What I'd actually ask you to pay attention to is the

11      last -- the numeric page number that comes at the end.

12             So if I say page 10, you'll know to look at page 10.

13             THE COURT:  Can you move in front of the microphone.

14      Thank you.

15      BY MR. KINNEY:

16      Q    Okay.  So if you could, tell us what page 1 is of Exhibit

17      34.

18      A    That is the rear of my vehicle.

19      Q    Do you see anything else in that -- any other vehicles in

20      that photograph?

21      A    Yes.  I see the vehicle that struck me.

22      Q    All right.  And is there -- can you see damage to the back

23      of your vehicle in this photograph?

24      A    I can.

25      Q    Okay.  I think you have the ability on your screen to draw

 1   circles and arrows and lines.  Will you show us where the
 2   damage is located.
 3   A     All back here (indicates).
 4   Q     You got to keep your voice up.  I'm sorry, I can't hear
 5   you.
 6   A     Around the license plate, you can see the paint of the
 7   mail truck.
 8   Q     Okay.
 9   A     And all down through the bumper, you can also see the
10   damage of the paint.  You can't really see the bumper almost
11   off in this picture, though.
12   Q     I'm going to scroll to the next photograph.  Let me rotate
13   it.
14          You're on page 2 of Exhibit 34.  Are you able to
15   identify the damage from this rear-end motor vehicle collision?
16   A     Yes.
17          How do you get the ink off?
18   Q     I have no idea.
19          COURTROOM DEPUTY:  See the green arrow up on the
20   corner?  If you click on that and then go to "clear."
21          THE WITNESS:  Great.  Thank you very much.
22   BY MR. KINNEY:
23   Q     Okay.  So if you could, show us where the damage is from
24   this rear-end motor vehicle collision.
25   A     It is -- all of this here is off and you can see some

1  touches down this side over here.

2  Q    Scroll forward.  If we look at something very similar.

3        All right.  Now we're on the right side of the -- or

4  the right rear side of your vehicle on page 5.

5        If you could, once again, tell us where the damage is

6  on -- on your vehicle.

7  A    Well, as you can see, the bumper is barely hanging on at

8  this point.

9  Q    Okay.  We're on page 7.

10  A    So here's -- this is my rear bumper.  As you can see, this

11  is -- all this in here is pushed in.  You see the paint from

12  the mail truck.  You can see paint from the mail truck here.

13  My license plate is damaged.  Paint marks up in here and all

14  through -- all throughout (indicates).

15  Q    Okay.  Apparently I need to go to the next-numbered

16  exhibit.  We're going to go to Exhibit No. 35.

17        There we go.

18        Okay.  What are we looking at, Mr. Triolo, on Exhibit

19  35, page 1?

20  A    That is the mail truck that struck me.

21  Q    Okay.  If you could, point out the damage to the truck

22  when you saw the truck after the collision.

23  A    Well, when I walked up to the truck and looked at it, I

24  could see that all this whole section here was caved in, kind

25  of like a half moon almost.  And I saw the paint from this

1    bumper here.  It's got those big old thick bumpers on those

2    mail trucks, and I noticed that the paint on my car was on

3    them.

4    Q    All right.  So you told us and showed us on the board the

5    area where you went to after the impact.

6              What happened after you leave the intersection and

7    head to that parking lot?

8    A    So we pulled in next to each other and I started getting

9    out of the car.  I'm guessing she saw how I was getting out of

10   the car at that point because I had to have a little -- I

11   had -- my back wasn't right.  There was something going on

12   there.  It was tight.  I was getting out, and she asked me if I

13   was okay.  I responded with:  No, I'm not okay at all.

14             And I asked her how she was doing.  She said:  I'm

15   just a little shook up.

16             I then asked her if she had been distracted from

17   being on the phone.  And there was like a hesitation.  She kind

18   of looked at me and I was the waiting for the answer, and she

19   said:  I think my foot slipped off the brake.

20   Q    Were you yelling or screaming at her?

21   A    Oh, no.  There was no yelling and screaming at all.  It

22   was cordial.

23   Q    What did you say -- did you say anything when she said to

24   you:  I think my foot slipped off the brake?

25   A    Well, yes.  Because at that time we were -- I was kind of

TRIOLO v USA                    September 22, 2020  Vol I- 50

```
 1   walking -- we were talking and walking to the back of my car,
 2   and I said:  Ma'am, that does not look like you were even on
 3   the brakes.
 4          So at that point I told her:  Just don't go anywhere,
 5   I'm going to call the cops.  And she said that she couldn't go
 6   anywhere because she needed to call her people as well.
 7   Q    Mr. Triolo, was it wet and rainy out that day?
 8   A    No.
 9   Q    Did you see anything that would cause her feet to be wet?
10   A    No, it was a beautiful day.
11   Q    You mentioned you called the police.  Did the police come
12   to the scene and write up a report?
13   A    Yes.
14   Q    Okay.  How long were you on the scene?
15   A    Two hours.
16   Q    Two hours.  What was going on during that two hours?
17   A    My back just started getting worse.  There was pain that
18   started going all the way up into my neck, and it was getting
19   worse by -- it was getting worse by the hour.
20   Q    By the way, was there any passengers in the mail truck?
21   A    No.
22   Q    Did you have any passengers in your vehicle?
23   A    No.
24   Q    Okay.  Were you able to -- well, during -- during the
25   time, the two hours that you're there, what are you doing?  Why
```

TRIOLO v USA                    September 22, 2020  Vol I- 51

1    is it taking two hours?

2    A    It took the sheriff forever to get there.  And after he

3    got there, it took forever to get the police report.  I don't

4    know what the holdup was but we were there for quite a while.

5    Q    Where were you going that day before the collision?

6    A    I was going to my brother's house on Julington Creek Road,

7    not even ten minutes away from the intersection.

8    Q    Distancewise -- well, ten minutes.

9         Did you let your brother know that you weren't going

10   to be there when you thought?

11   A    Yes.  After that conversation I had with the driver, I

12   called him and let him know what was happening.  I didn't think

13   I was going to be able to get over there and help him out that

14   day.

15   Q    Okay.  Did he -- did he come help you in any way?

16   A    Yes.  He actually came and -- came to the scene and -- to

17   see if I was all right.  Even though I told him, you know -- he

18   asked me if I was okay and I told him what happened.  He came

19   to the scene.  He stayed there the whole time.

20   Q    Okay.  How was your neck feeling at that point?

21   A    I had pain in my neck and I had pain in my back as well.

22   Q    And this accident, I think you told us, on February 11,

23   2017, at approximately 1:00 p.m. in the afternoon, Mr. Triolo,

24   was that the first time in your entire life that you had felt

25   any pain in your neck?

1   A    Yes.

2   Q    Was that the first time in your entire life that you felt

3   any pain in your back?

4   A    Yes.

5   Q    Was that the first -- prior to that motor vehicle

6   collision, had you ever sought medical treatment of any nature

7   for neck pain?

8   A    No.

9   Q    Had you ever sought medical treatment of any kind

10  whatsoever for back pain?

11  A    No.

12  Q    And you mentioned you were there for a couple hours.

13       Where did you go -- or once -- I assume the police

14  released you at some point to leave; right?

15  A    Yes.

16  Q    Where did you go right afterwards?

17  A    I went to Baptist Medical Center South.  It was a couple

18  miles away.  I went to the ED, emergency room.

19  Q    If you could, I would like you to pick up Exhibit No. --

20  give me one second.  If you could, I'd like you to pick up

21  Exhibit No. 2.

22       Do you have Exhibit No. 2 in front of you?

23  A    Yes.

24  Q    And these are the Baptist Medical Center South records.

25       And if you could, these have been Bates labeled as

1   well, and I'm just going to, again, point you to the numerical

2   page number.

3           If you could turn to page 2.  Tell me when you're

4   there.

5   A    I'm there.

6   Q    Okay.  What time does it indicate that you arrived at the

7   Emergency Department?

8   A    February 11, 1456.

9   Q    Are you familiar with military time?

10  A    Yes.

11  Q    For the rest of us, what's 1456 mean?

12  A    It's 2:56 in the afternoon.

13  Q    So is that approximately -- how long after the collision

14  did you report to the emergency room?

15  A    Three hours -- excuse me, two hours.

16  Q    Two hours?

17  A    Yes.

18  Q    And if you could, a little bit further down is a section

19  that says:  Addendum by Caro, Christina, D., MD; do you see

20  that?

21  A    Yes, I do.

22  Q    Okay.  And what time is that note that the doctor made in

23  the chart note?

24  A    4:22 p.m.

25  Q    And what was the doctor's chart note?

1   A    Neck exam was not completed.  The following is the neck

2   exam for the above examination:  Positive TTP to midline neck,

3   no crepitus or step-off, range of motion not assessed, collar

4   placed.

5   Q    Okay.  When you went to the emergency room, what did you

6   tell them was wrong with you?

7   A    Patient chief complaint states stopped at a stoplight.

8   Q    Well, Mr. Triolo, not -- not from the record.  What did

9   you indicate to the emergency department -- what was the reason

10  why you were there?

11  A    I was having neck and back pain from the motor vehicle

12  accident.

13  Q    And you started to read what they recorded as the chief

14  complaint.  If you could, tell me what the chief complaint that

15  was recorded in the emergency department.

16  A    Patient chief complaint states rear-ended at stoplight,

17  approximately 1310.  Chief complaint, back pain.

18  Q    Okay.  If you could, on page 3 --

19  A    I'm there.

20  Q    If you could on page 3, at the very top, could you read to

21  us the history that was taken in the emergency department, that

22  first paragraph.

23  A    Patient presents or the patient is a 43-year-old female

24  with no contributing past medical history who presented to the

25  ED after a motor vehicle collision which occurred two hours

1  ago.

2         Patient states he was a restrained driver at a

3  stoplight when a mail truck rear-ended his vehicle at a

4  moderate speed.  Patient denies hitting head, any loss of

5  consciousness, or any bleeding.  Patient was having positive

6  neck pain and lower back pain.

7  Q    So you read to us where you reported to them neck pain and

8  back pain within two hours after the motor vehicle collision,

9  but you also read to us:  Neck exam was not completed, on

10 page 2.

11        Do you know why an exam was not completed of your

12 neck?

13 A    I don't know why.  I can only say that, you know, in the

14 emergency room --

15 Q    Well, no, I don't want to get into that.  I know you have

16 experience in the emergency room.

17 A    Okay.

18 Q    Do you recall anyone doing -- at the Emergency Department,

19 when you went there on that day, anyone doing any type of

20 physical exam on your neck that day?

21 A    No.

22 Q    Okay.  What about your low back?

23 A    None.

24 Q    Okay.  I know since you've been through many

25 examinations -- for instance, we're going to talk about the

1   chiropractor in a little bit.  Do you recall going through a
2   physical examination with a chiropractor?
3   A    Yes.
4   Q    And was that of both your neck and your back?
5   A    Yes.
6   Q    Did any of that examination, anything like that, something
7   like that, take place in the emergency room?
8   A    No.
9   Q    What was done for you in the emergency room that day?
10  A    We did a cervical CT.
11  Q    What's a CT, if you know?
12  A    It's a CT scan as far as able to see bones, ligaments,
13  joints.
14  Q    Were you given a CT of your low back as well?
15  A    No.
16  Q    Were you given any other type of treatment or diagnostic
17  tests that day?
18  A    No.
19  Q    Were you admitted to the hospital for observation?
20  A    No.
21  Q    All right.  Were you -- do you recall approximately what
22  time you were discharged?
23           THE COURT:  Are you asking him to read from the
24  record or are you asking him if he recalls?
25           MR. KINNEY:  I'm just asking him if he has a memory

```
 1    of his discharge time, Your Honor.
 2              THE WITNESS:  Not offhand, no.
 3              MR. KINNEY:  Okay.
 4    BY MR. KINNEY:
 5    Q    All right.  Mr. Triolo, if you would, turn to page 36 of
 6    Exhibit 2.
 7    A    Okay.
 8    Q    If you look, there's a title that says "home medication."
 9    Do you see that?
10    A    Yes.
11    Q    Right above that is the patient status.  Do you see that?
12    A    Yes.
13    Q    Okay.  Does it indicate in that section what time you were
14    checked out of the Emergency Department on February 11, 2017?
15    A    Yes, it does.
16    Q    Okay.  What time did it indicate that you were checked
17    out?
18    A    4:20 p.m.
19    Q    So you were there for approximately two -- almost
20    two-and-a-half hours that day, and the whole time you were
21    there, you were given a CT exam and was -- of your neck.  Was
22    anything else given to you that day?
23    A    Yes.
24    Q    Okay.  What else?
25    A    I was given a couple days of pain meds and a collar.
```

TRIOLO v USA                    September 22, 2020  Vol I- 58

1   Q    Okay.  When you were discharged, did the doctor give you

2   any warnings or instructions?

3   A    Yes.

4   Q    Okay.  If you could, turn to page 8.

5   A    What was the page number?

6   Q    I'm sorry, page 8.

7   A    Okay.

8   Q    At the very top, there's a warning about motor vehicle

9   accidents.  Is this the instruction you were given -- part of

10  the instructions you were given?

11  A    Yes.

12  Q    If you could read that into the record.

13  A    Strong forces may be involved in a car accident.  It is

14  important to watch for any new symptoms that might be a sign of

15  a hidden injury.  It is normal to feel sore and tight in your

16  muscles the next day; however, more severe pain should be

17  reported.

18  Q    Mr. Triolo, when you -- well, let me get to that thought

19  in just a minute.

20            If you'd turn to the next page, there's a section

21  where it advises you to get prompt medical attention.  If you

22  could, where it says, "If any of the following occur," and on

23  the second one, it says, "New or worsening neck, back, abdomen,

24  arm or leg pain."  Did you see that?

25  A    Yes.

TRIOLO v USA                    September 22, 2020  Vol I- 59

1  Q    Number one, when you left the Emergency Room Department

2  that day, was your neck still hurting?

3  A    Yes.

4  Q    Was your back still hurting?

5  A    Yes.

6  Q    At any point in time for the next week, did it ever

7  subside?  Did it go away at all?

8  A    No.  It got worse.

9  Q    Okay.  And did you follow the Emergency Department's

10  instructions to do anything about it?

11  A    Yes, I did.

12  Q    What did you do?

13  A    I felt I needed to see somebody, so I wanted to get in

14  touch with a chiropractor.

15  Q    Okay.  If you would, I'd like to go to Exhibit 6.  You can

16  set Exhibit 2 to the side now.

17         Your Honor, were we supposed to remind you about the

18  time?  Was that part of our -- it's 10:30 now.  Was there a

19  break that we were supposed to remind you about?

20         THE COURT:  I --

21         MR. KINNEY:  I'm fine to keep going.

22         THE COURT:  Yeah, we can -- well, let's get till

23  10:45 and then we'll break.

24  BY MR. KINNEY:

25  Q    So we're on Exhibit 6.  If you could, I'm going to --

1  again, what the lawyers call the Bates labels in the lower

2  right-hand corner, let me know when you have Exhibit 6

3  available in front of you.

4  A    I have it.

5  Q    Exhibit 6, page 1, is this a document that a staff member

6  or doctor filled out, or is this something that you filled out?

7  A    That's my handwriting.  I filled that out.

8  Q    And what day did you fill out the welcome-to-our-office

9  intake form?

10  A    It was February 16, 2017.

11  Q    Okay.  So five days after the motor vehicle collision,

12  you're at -- what's the name, Jacksonville Sport & Spine?

13  A    That's correct.

14  Q    Do you remember the name of the doctor there?

15  A    Dr. McDaniels.

16  Q    Okay.  And if you could, there's a section here that says:

17  Please describe the primary health complaint you are

18  experiencing.

19            And, if you could, read what you wrote in there.

20  A    Upper neck pain, upper and lower back pain, shooting pain

21  into the lower right glute, into the lower right hamstring.

22  Q    All right.  And what about the level of pain at this

23  point?  Had it gotten worse, stayed the same, or gotten better

24  since the motor vehicle collision?

25  A    It was much worse.

TRIOLO v USA                    September 22, 2020  Vol I- 61

1   Q    Okay.  Right above where you wrote the description of why

2   you were there, do you see that name?

3   A    Yes.

4   Q    That's me, isn't it?

5   A    It is.

6   Q    Okay.  And I want to read to you why you wrote that in.

7           Most patients are referred to our office by a caring

8   family member or friend.  What brought you in contact to our

9   office?

10          All right.  Why did you write my name in?

11  A    I had a coworker by the name of Wendy Haggard.  She was

12  working with me at Baptist at that time.  She saw the damage to

13  my car.  She saw how I was walking, and she knew I was in a

14  great amount of pain.

15          She told me that she knew a good lawyer that could

16  probably help me in finding a chiropractor, because I told her

17  I wanted to see somebody.  I think I need to see a

18  chiropractor.  My back is pretty jacked up.

19          She was like:  I can help you with that.

20          Later on in the day, she came and gave me a couple of

21  names of some chiropractic offices.

22  Q    Why did you -- why did you pick this one?

23  A    This one is right near my house.  And I knew it was there

24  because I passed it every day.  There was a big, huge sign on

25  17, so it was pretty convenient.  So I went ahead and scheduled

TRIOLO v USA                    September 22, 2020  Vol I- 62

```
 1  an office visit and put your name because she got the contact
 2  from you.
 3  Q    Why did you see it every day?
 4  A    I drive past it going to work, the whole time going to
 5  school, going to work, and whenever I leave to go out
 6  somewhere, we have to take that road.  I pass it every day.
 7  Q    Mr. Triolo, on February 16, 2017, were you a client of
 8  mine?
 9  A    No, I was not.
10  Q    Do you recall when you became a client of mine?
11  A    A week later.
12  Q    All right.  I want to continue on on the intake form.
13  There is a section at the bottom, and it says:  Please put an
14  "X" next to any current condition and a "P" next to any past
15  condition.
16          And I don't see any Xs or Ps.  If you could, describe
17  to us what you did.
18  A    I pretty much checked all those as an X, so the current
19  condition.  Those are -- I was putting all current conditions.
20  I didn't put X and Ps, I just put checks, but they're supposed
21  to be X's.
22  Q    So if we see a check, we interpret that as an X?
23  A    Yes.
24  Q    Would you read off to us the troubling points or what the
25  areas of current conditions were.
```

 1   A    So hip pain, trouble concentrating, trouble sleeping, pain

 2   with coughing and sneezing, difficulty breathing, headaches.

 3   Q    Okay.  And in the past, had you -- let's talk about the

 4   headaches.  In the past, had you been a migraine headache or a

 5   headache sufferer?

 6   A    Yes, I've experienced headaches, yes.

 7   Q    Was this the same for what you had experienced in the

 8   past?

 9   A    No.  These -- these were totally different headaches.

10   These headaches from the past was, you know -- they were in the

11   back of the eyes.  This was different.  That was starting from,

12   you know, the neck -- from the neck pain, kind of started

13   radiating at that time kind of the right side, starting at the

14   neck and just kind of radiating over to the head, front of the

15   head.

16   Q    Okay.  You also noted that you were having trouble

17   concentrating.  Tell us what was going on there.

18   A    So my pain was getting worse by the day.  It was getting

19   harder to walk.  It was getting harder to stand.  And at that

20   point in time, you know, my job demands that.

21        And with the amount of pain that I was in, it was

22   hard to concentrate.  I was constantly thinking about what was

23   going on with my back and neck.

24   Q    You checkmarked that you were having pain with coughing

25   and sneezing.  Where was the pain when you coughed or sneezed?

 1   A    At that point in time, when I coughed it was more of the

 2   back.  You get that cough you get that kind of takes your

 3   breath away.  So I'm sneezing and then you get that pain where

 4   it takes your breath away.  And part of the difficulty

 5   breathing again with, you know, deep breaths kind of stopped me

 6   from taking a deep breath.

 7   Q    What about trouble sleeping?  Had you been somebody that

 8   suffered from sleep problems in the past?

 9   A    I had a central sleep apnea, but I took care of that once

10   I got my benefits through work, but that's -- that's about it,

11   though.  I slept through the night.

12   Q    What's your understanding of sleep apnea?

13   A    So I would stop breathe -- there's two different types of

14   sleep apnea, one where it gets obstructed by the pallet, by

15   your tongue, and then there's another sleep apnea where you

16   stop breathing.  The central sleep apnea was what I had.

17   Q    And do you recall when you -- did you go through a sleep

18   study?

19   A    I did.  I went through a sleep study.  I believe that

20   would probably be about 2015, once I got my benefits.

21   Q    Okay.  And so you -- did you have any problems after you

22   got your -- what did they do for your sleep apnea; what was the

23   fix?

24   A    I have a CPAP.  I sleep with a CPAP every night.

25   Q    Is that a breathing machine?

TRIOLO v USA                    September 22, 2020  Vol I- 65

1   A    Yes.  It basically pushes positive pressure into your --

2   you know, into your airway.  So if it's obstructed, it keeps

3   the airway open.  And if you stop breathing, you have that

4   positive pressure.  Because that was one of the things that was

5   happening with the long amounts of time that I wasn't

6   breathing, you know, if I had the headache or if I was tired,

7   that was the reason why.

8   Q    So after you get your CPAP machine, does the migraines and

9   the sleep problems go away?

10  A    They subside a lot, yes.

11  Q    So the issues that you wrote or checkmarked -- on

12  February 16, 2017, you checkmarked trouble sleeping.  Did that

13  have anything to do with your prior condition back in 2015?

14  A    No.  This -- this was because of the pain that I was

15  experiencing in my back.  I just -- it would wake me up in the

16  middle of the night.  I had to get up out of bed and go sit on

17  my recliner.  From there, I would lay on the floor.  It was

18  ridiculous.  I had no sleep.

19  Q    Mr. Triolo, we're six days post-accident -- excuse me,

20  five days post-accident.  You still worked for Baptist South at

21  this point?

22  A    Yes, I did.

23  Q    Were you still moonlighting over at Orange Park Medical

24  Center?

25  A    Yes, I was.

1   Q    Did you continue to work despite these conditions?

2   A    Yes.

3   Q    Why is that?

4   A    I wouldn't stop my job.  I love my job.  You know, I need

5   to pay bills like anybody else.

6   Q    Did the medications that the emergency room provided you,

7   did they help at all?

8   A    They helped a little bit.

9   Q    Did they completely relieve any of your symptoms?

10  A    No.

11  Q    And did you have any difficulties at work at this point?

12  A    Yes, yes.  It was quite a bit of difficulties I was

13  having.  We have to push computers on charting.  So I was

14  noticing a lot when I was pushing those, particularly making a

15  left-hand turn down a hallway to go see a patient, that I was

16  starting to get these shooting pains every time I made a left,

17  a shooting pain down to my glute and hamstring.

18       Best way to describe it was lose your breath and kind

19  of stopped short.  And then from there, it seemed like it was

20  aggravated.  So every time I took a step, it was like a little

21  shot, a little shot.  It didn't go away until, you know, I was

22  able to have -- I got some downtime, sit down and, you know,

23  crossed my legs and kind of do a little stretch.

24  Q    Okay.  The -- what about -- you mentioned on here or you

25  checkmarked hip problems.  Were you having any problems walking

TRIOLO v USA                    September 22, 2020  Vol I- 67

1  at all?

2  A    At that time?

3  Q    Yes.

4  A    Yes.

5  Q    Okay.

6  A    Yes.

7  Q    And did you notice anything about your walk or did anybody

8  else at work notice something about your walk?

9  A    I didn't notice it, but I was hearing a lot:  Why are you

10 limping; are you hurt?  Why are you limping?  I didn't even

11 notice that I was limping.

12 Q    If you could, turn to page 2.

13       This is not filled out by you; correct?

14 A    That's correct.

15 Q    All right.  Well, I'm still on Exhibit 6, page 2, and

16 there's a couple of notes that I want to read to you.

17       There's one, says:  Dizzy, ringing in the ears,

18 anxiety, sleep problems.

19       That's something the doctor wrote down; is that fair?

20 A    Yes.

21 Q    Okay.  I didn't see anything on the prior page about being

22 dizzy.  If you could tell me about that.

23 A    Those were just symptoms that were coming and going.  I

24 would feel dizzy after a while.  I would get the ringing in the

25 ears.  It was -- it wasn't something I experienced before.

1  So...

2  Q    Did you hit your head in the motor vehicle collision?

3  A    Yes, on the backrest.

4  Q    So you didn't hit your head going forward; is that

5  accurate?

6  A    That is accurate.

7  Q    Going backwards, towards the rear of the car or the

8  headrest, that's where you hit your head?

9  A    Yes.

10  Q    Okay.  And I didn't -- in the -- on the first page, I

11  didn't see this either.  It says:  Ringing in the ears.

12        Had you had tinnitus?  Had you been somebody that

13  suffered from ringing in the ears prior to the motor vehicle

14  collision?

15  A    No.

16  Q    When did you notice that your ears were ringing?

17  A    It was just -- it was during that time period after the

18  accident and when I saw Dr. McDaniels it had started.

19  Q    As you sit here today, are you still suffering from

20  ringing in the ear?

21  A    No.

22  Q    How long did you suffer from ringing in the ear?

23  A    I would -- if I had to guess, four, six months.

24  Q    Okay.  What's that like?

25  A    Annoying.  All of a sudden, it just comes -- kind of like

1   the dizziness, you know, with the walking, you're dizzy, you

2   get a ringing.  Sometimes it went in both; sometimes it started

3   one ear and went to the other.  It was annoying.

4   Q    Is this like a telephone ring or what type of ring was

5   this?

6               First let me ask you this:  Both ears, one ear?

7   A    It was both ears.  Sometimes it would start in one ear and

8   then go to the other.  Sometimes it was in both ears.

9   Q    Okay.  Was this like a telephone ring, dial tone, dog

10  whistle, a referee whistle?

11  A    Just a high-pitch constant sound.

12  Q    How -- would it be constant for that four or six months or

13  was it intermittent?

14  A    It was intermittent.  It would come and go.

15  Q    Was there a certain time of day that you would notice it?

16  A    No.

17  Q    Was there something that you would do that would cause it

18  to start up?

19  A    No.

20  Q    Were there noises, something -- anything that you could

21  attribute to that would all of a sudden start it?

22  A    No.

23  Q    If you turn to the next page styled at the top Pain

24  Disability Questionnaire, and there's a couple of these that I

25  want to go over with you.

TRIOLO v USA                    September 22, 2020  Vol I- **70**

```
 1          Are you on page 3 now?
 2   A    I am.
 3   Q    Okay.  Number 4 --
 4          THE COURT:  Yeah, Mr. Kinney, why don't -- so that I
 5   don't interrupt you in the middle of that document, why don't
 6   we go ahead and take about a ten-minute break and continue at 5
 7   minutes to 11:00.
 8          COURT SECURITY OFFICER:  All rise.
 9       (Recess taken at 10:44 a.m.)
10          COURT SECURITY OFFICER:  All rise.  This Honorable
11   Court is back in session.
12          Please be seated.
13          THE COURT:  You may continue.
14          MR. KINNEY:  Thank you, Your Honor.
15   BY MR. KINNEY:
16   Q    Mr. Triolo, we're on Exhibit 6, page 3.  I want to direct
17   your attention -- first of all, are you on page 3?
18   A    Yes, I am.
19   Q    I want to direct your attention to Question No. 4.:  Does
20   your pain affect your ability to sit or stand?
21          What number did you circle?
22   A    8.
23   Q    What was your understanding with the scale of 0 to 10?
24   A    0 being the least; 10 being the worst.
25   Q    Why did you -- for:  Does your pain affect your ability to
```

1  sit or stand, why did you circle an 8?

2  A    So I was working a lot at that time, and standing and

3  walking was -- that was brutal at that point.  My pain was

4  in -- it was in -- I was in bad shape, so I put an 8.

5  Q    Okay.  What did it feel like when you moved from a sitting

6  position to a standing position?

7  A    I was stiff, sore.  I had to walk a couple of feet to work

8  that out.  But then when I was on my feet, the more I was on my

9  feet, the more the pain started coming back.  I wasn't stiff

10  anymore, but I was in pain.

11  Q    Where was the pain located?  Physically show me where was

12  the pain located on you?

13  A    So I had neck pain at that point, and a lot of it was in

14  my right side.  So all this here, down to my trap, and it went

15  around the scapula.  And my back was pretty much -- this whole

16  side was always constantly in pain.

17        And then when I started walking, I would get the

18  shooting pain that would go down into the glutes, down into the

19  hamstring.

20  Q    Did it go down into the feet and toes or did it stop at

21  the hamstring?

22  A    So at that time, it stopped at the hamstring.  As things

23  kept progressing, it started getting down to the calf.

24  Q    With that pain radiating down, was that on the left side,

25  the right side, or was it bilateral?

1  A    At this time, it was right side.  So the bilateral was

2  back pain there, but the right side was where I was getting

3  those shooting pains.

4  Q    Another one I want to talk about is No. 7.

5        And the question to that is:  Does your pain affect

6  your ability to walk or run?

7        And you didn't circle "cannot walk," but you did

8  circle "run at all."

9        Why did you circle "run"?

10  A    I could hardly walk at that point.  There was no way I was

11  running.

12  Q    What number on the pain scale of 1 to 10 did you circle?

13  A    10.

14  Q    Okay.  So on February 11, 2017, it was your -- you were

15  informing this doctor that you couldn't run at all?

16  A    That's correct.

17  Q    Okay.  Had you been a runner up to this point?  Were you

18  jogging, doing the Gate River Run or Boston Marathon?  Were you

19  that type of runner?

20  A    No, I'm not that type of runner.  I was a treadmill runner

21  and I did Insanity's workouts, you know, body, glutes.  That

22  was my cardio.  It's treadmill and then Insanity workouts.

23  That's what I was doing.

24  Q    All right.  So from the time you moved down from New York

25  up until the day of the accident, how many times a week were

```
 1   you running?

 2   A    At that point, about three -- three times a week.

 3   Q    And that's always on a treadmill versus out on the street?

 4   A    That's correct.

 5   Q    Is there a reason why you chose to run on treadmills

 6   versus out in the street?

 7   A    I really don't like running out in the street.  I was

 8   really never a street runner, always in the gym, so treadmills

 9   and ellipticals were kind of more natural to me.  The only time

10   outside is when I play flag football.

11   Q    Is this the type of treadmill that you plug in and you set

12   the levels then you keep up with it?

13   A    That's correct.

14   Q    Okay.  What level would you set it on?

15   A    Five -- five miles an hour or five-and-a-half miles an

16   hour.  I always ran on an incline, 2 to 3 incline.

17   Q    Since the motor vehicle collision of February 11, 2017,

18   how many times have you been on a treadmill?

19   A    I don't have the answer to that, but dozens, I mean,

20   hundreds of times.  Through that whole time, I was -- I always

21   did -- when I worked out, I did strength training and I did

22   cardio in one day.  So it was an hour to two-hour workouts.

23   Q    I think you misinterpreted my question.

24   A    I'm sorry.

25   Q    So on February 11th, 2017, the motor vehicle collision
```

1   happened.  So from the crash forward, how many times have you
2   been on a treadmill?
3   A    Oh, I haven't been on a treadmill at that point after the
4   accident.  None, zero.
5   Q    Even after your surgery -- since the surgery that you had
6   in 2018, have you been on a treadmill?
7   A    No.
8   Q    Why is it that you haven't returned to going on a
9   treadmill?
10  A    So at this point in time, you know, running, I would feel,
11  would just aggravate everything.  So, you know, I don't want to
12  run.  I'm too nervous to run.
13  Q    Prior to the motor vehicle collision, after you moved down
14  here from New York, I think you mentioned that you worked out
15  in your brother's garage.  Did you -- I guess you mentioned no
16  recreational activities while you were in school.
17        What about when you get out of school and you're
18  working at Baptist South and moonlighting at Orange Park
19  Medical Center?  Did you eventually get into some sports, some
20  leagues, or did you do anything at that time?
21  A    Yes.  I played pickup basketball games with a buddy I met
22  of mine through Baptist.  I also -- I'm into golf.  A friend of
23  mine who I worked with, a big golfer, and got me into golf.  I
24  enjoyed it.  We golfed in that amount of time period, probably
25  played golf one day in our time period, pick a day and go out

1  and golf in.

2  Q    Prior to the motor vehicle collision, from the time you

3  start working at Baptist up to the day of the motor vehicle

4  collision, how many times a month were you playing golf?

5  A    Three.

6  Q    Okay.  Any pickup basketball games?  Were these just in

7  the driveway, you and him playing some one-on-one or playing

8  some Horse, that type of stuff?

9  A    Sometimes, but most of the times it was pickup games, a

10  bunch of guys, like four on four, three on four, four on four,

11  in the park, on a basketball court, full courts.

12  Q    Since the motor vehicle collision, how many times have you

13  played golf?

14  A    Zero.

15  Q    Okay.  Since the motor vehicle collision, how many times

16  have you played the pickup basketball games?

17  A    Zero.

18  Q    Number 14 -- if you could scroll down to No. 14.  It asks:

19  Do you now feel more depressed, tense, or anxious than before

20  your pain began?

21        And what did you circle?

22  A    A 10.

23  Q    Can you explain to us why you circled 10 to that question?

24  A    So at this point, my back was killing me.  I was

25  experiencing sharp pain when I would walk, and, you know, I

1  just got into this career where it demands you being on your

2  feet all the time.  We walk the hospital.  We're just not in

3  one certain area, you know.  If you have floor therapy, you're

4  all over the hospital.  I was starting to be concerned about my

5  job at this point.  I really didn't know if I was going to be

6  able to work 12-hour shifts at all.  It was starting to get to

7  me.

8  Q    The next page, page 4, there's an indication on here, the

9  title is loss of enjoyment, duties, under duress summary.

10          In pretty much every single instance, you noted

11  lifting, bending, sitting, walking, in every single category,

12  that they were -- caused increased pain and restricted

13  movement.

14          This -- you, again, filled this out on February 16,

15  2017.  Was this because of your neck, your back, or a

16  combination of both?

17  A    At this point, it was a combination of both.

18  Q    Was one issue more prominent than the other at this point

19  in time?

20  A    I would say the back was more prominent than the neck.

21  Q    Okay.  And do you recall meeting with Dr. McDaniels that

22  first day?

23  A    Yes.

24  Q    Do you recall whether he did a physical examination of

25  you?

1   A    Yes, he did.

2   Q    Did he do a physical examination of your neck?

3   A    Yes, he did.

4   Q    Did he also do a physical examination of your low back?

5   A    Yes.

6   Q    Did he make recommendations to you for treatment going

7   forward after this initial visit?

8   A    Yes, he did.

9   Q    Okay.  And did you continue to see him for a period of

10  time?

11  A    Yes.

12  Q    Okay.  And we have the records in evidence, and it

13  indicates that your last date was approximately six months

14  later, July 20th, 2017.

15       Did the treatment solve your problem?

16  A    No, it did not.

17  Q    Do you recall approximately how many times you went to see

18  Dr. McDaniels and his staff at Jacksonville Sport & Spine?

19  A    I can't remember offhand how many times it was.

20  Q    Okay.  The records indicate that it was around a dozen.

21  And I want to break it down from the neck and the back.

22       Did his treatment provide any type of relief for the

23  neck?

24  A    Minimal relief, yes.

25  Q    What about the back?  Did it provide any relief from your

1    back pain?

2    A    Very minimal.

3    Q    Okay.

4    A    Very minimal and very temporary, at best.

5    Q    What about the pain that was going down your right leg and

6    into your hamstring and calf?  Did it provide any relief for

7    that radiating pain?

8    A    That was one thing that never was, you know, ever

9    relieved.

10   Q    Did Dr. McDaniels refer you anywhere?

11   A    Yes, he did.

12   Q    Where did he refer you?

13   A    He referred me to a neurologist, Dr. Asad.

14   Q    What was your understanding of why you were being referred

15   to a neurologist?

16   A    Dr. McDaniels was concerned about that shooting pain that

17   was going down my leg.  He wanted to see if there was any nerve

18   damage, so he wanted me to see a neurologist.  That was my

19   understanding.

20   Q    If you would, I would like for you to pull out Exhibit No.

21   13.  These are the records for Universal Neurological Care.

22   And I think page 1 is just company graphics.

23           If you could tell me when you get to page 2 of

24   Exhibit 13.

25   A    Okay.

```
 1   Q    Do you recall meeting with the neurologist, Dr. Asad, on

 2   March 16, 2017?

 3   A    Yes.

 4   Q    And there's a section called HPI, history of present

 5   illness.  And, if you could, what did you indicate to him that

 6   you were there for?  What were the reasons why you were going

 7   to see Dr. Asad that you explained to him?

 8   A    You want me to read it or explain --

 9   Q    Well, there's a section that says:  Who was referred by

10   Dr. McDaniels.  Do you see that?

11        Then open, quote, "chiropractor," close quote.  So

12   the second line.

13   A    Yes.  Wait a minute.

14        "He reports chiropractor treatment," is that what

15   you --

16   Q    Let me make it easier.  Were you there for neck and back

17   pain?

18   A    Yes.

19   Q    Were you there for neck and back pain from the motor

20   vehicle collision on February 11, 2017?

21   A    Yes.

22   Q    Okay.  Did you advise Dr. Asad that you were wearing your

23   seat belt?

24   A    Yes, I did.

25   Q    Did you advise Dr. Asad that the airbags in front of you
```

1  didn't deploy?

2  A    Yes.

3  Q    Did you advise Dr. Asad that you felt your head jerk back

4  and forth and the back of the head -- and the back of the head

5  hit the headrest?

6         MS. CUNNINGHAM:  Excuse me.  Objection, Your Honor.

7  Leading.

8         If he wants the witness just to read what's in the

9  record, that's fine, but let's just make clear that that's what

10 we're doing.

11        THE COURT:  All right.  Well, why don't you ask him a

12 question.

13 BY MR. KINNEY:

14 Q    Mr. Triolo, did you advise Dr. Asad that you hit your head

15 on the back of the headrest?

16 A    Yes.

17 Q    Did you advise him that immediately after the accident,

18 you were experiencing tightness and spasms?

19 A    Yes, I did.

20 Q    And that the tightness and spasms -- did you advise him

21 that it was in your middle back?

22 A    Yes.

23 Q    Did you also advise Dr. Asad whether it was in your low

24 back or not?

25 A    Yes.

```
 1              MS. CUNNINGHAM:  Objection, Your Honor.  Leading as
 2    to what he advised the doctor.
 3              THE COURT:  Overruled.
 4              I mean, it is a little tedious doing it this way, but
 5    it isn't leading and it is his witness.  So...
 6              Go ahead.
 7    BY MR. KINNEY:
 8    Q    If you could, would you tell us -- actually, if you go
 9    down to the section where it says "neck pain," right under HPI.
10    A    Yes.
11    Q    Do you recall telling Dr. Asad that in your neck pain, it
12    felt like a 7 out of 10 -- or, excuse me, 7 to 8 out of 10?
13    A    That's correct.
14    Q    In the section for back pain --
15              THE COURT:  And I do think I want to make clear,
16    though, that you're asking him if he recalls things, but he's
17    actually reading the record, so, you know --
18              MR. KINNEY:  Yes, Your Honor.
19              THE COURT:  -- you might want to rephrase your
20    questions or maybe he's not reading the record.
21              MR. KINNEY:  Okay.
22    BY MR. KINNEY:
23    Q    There's a section in here that reports that you told
24    Dr. Asad that your legs felt like Jell-O.
25              What was going on that you reported to Dr. Asad that
```

TRIOLO v USA                    September 22, 2020  Vol I- 82

1   you said your legs felt like Jell-O?

2   A    So walking a lot and standing for long periods of time,

3   when I would get that shooting pain, my leg would buckle.  So

4   it felt weak.

5   Q    Which leg, right leg or left leg?

6   A    The right leg at that time.  So it would buckle and kind

7   of feel weak, and that's where the -- it just kind of felt like

8   Jell-O.  I didn't have the strength.

9   Q    Do you recall being given a balance test?

10  A    I do.

11  Q    Okay.  Do you recall whether you passed or failed the

12  balance test?

13  A    I failed that balance test miserably.

14  Q    And do you remember being given an EEG and a nerve

15  conduction study?

16  A    I do.

17  Q    Okay.  And were you told the results of the study?

18  A    Yes.

19  Q    Okay.  What were the results of the EMG?  I know earlier I

20  said EEG; I meant to say EMG.

21  A    That there was -- I had some nerve damage going on, that

22  there was something wrong.

23  Q    Okay.  Were you -- did you come to an understanding of

24  where that nerve of damage was on your body?

25  A    I believe it was the right leg.

1  Q    And were you given any prescription medication when you
2  met with Dr. Asad in March of 2017?
3  A    Yes.
4  Q    Okay.  Do you recall what medications you were given?
5  A    I was given some lidocaine cream, I was given a muscle
6  relaxer, and I believe he gave me some steroids as well.
7  Q    Okay.  Did any of those medications help you with your
8  neck pain at that point?
9  A    Very minimal, very minimal.
10  Q    What about the back pain?
11  A    No.
12  Q    What about the radiating pain into your right leg?
13  A    No.  It didn't seem like anything was helping that at all.
14  Q    Did Dr. Asad do any hands-on physical treatment for you?
15  A    Yes.  Oh, Dr. Asad, excuse me.  No, Dr. Asad did no
16  hands-on treatment at all.
17  Q    Did he do any type of injection-type therapy for you?
18  A    No, no injection therapy.
19  Q    All right.  What about -- what comes next in your course
20  of treatment?  Because you've been with the chiropractor until
21  July of 2017; records indicate you were -- saw a neurologist a
22  couple of times.
23        What comes next in your course of treatment?
24  A    So Dr. McDaniels felt that I needed some more care than he
25  could offer.  He felt that I could benefit with some pain

1   management.

2   Q    Did he refer you anywhere for pain management therapy?

3   A    Yes.  He referred me to Dr. Pardo at St. Joseph's.

4   Q    Okay.  If you would, I'd like you to grab Exhibit No. 9.

5        Could you flip over to page 9 of Exhibit No. 9.

6   A    Okay.

7   Q    At the top right -- I'm sorry, the top left side is

8   encounter date of July 11th, 2017.  Is that the first time you

9   had been to see Dr. Pardo?

10  A    That's correct.

11  Q    Now, if you could, turn back to page 3.

12  A    Okay.

13  Q    Similar to what I asked you before when we were talking

14  about the chiropractic intake record, I'll ask you, page 3

15  through page 8, are these all filled out by you?  Is this all

16  of your handwriting?

17  A    Yes.

18  Q    Okay.  So when you went to see Dr. Pardo at St. Joseph's

19  six months to the day after the motor vehicle collision, you

20  filled out this auto injury patient history form and you wrote

21  in a date of injury.  Do you see that?

22  A    Yes, I do.

23  Q    Okay.  Do you see something wrong with that date?

24  A    Yes, I do.

25  Q    Okay.  Tell us what date you wrote in and what date you

1    should have wrote in.

2    A    I wrote in February of -- 21st of 2017, but it should say

3    2011 -- I mean, the 11th of February, 2017.  Excuse me.

4    Q    Now you confused me.

5          What date should you have written in on the date of

6    the injury?

7    A    February 11, 2017, is what I should have wrote.

8    Q    And so what did you describe was the cause of your injury

9    in the section that says:  Please describe the events that

10   caused your injury.

11   A    I was rear-ended while at a traffic light.

12   Q    Okay.  And there's a section on here that asks you to list

13   your symptoms from the worst symptoms to the one that gives you

14   the less trouble.

15          Do you see that?

16   A    Yes.

17   Q    All right.  The number-one symptom that you were there

18   for, what did you indicate?

19   A    Lower back pain, radiates down into the glutes, to the

20   hamstring, and across the hip flexor.

21   Q    So you're there on July 11, 2017.  At any point in time,

22   had your pain that began on February 11, 2017, after the

23   collision, had it changed whatsoever in the quality and the

24   severity of it?

25   A    No.

TRIOLO v USA                  September 22, 2020  Vol I- 86

1    Q    And was it -- did it appear that the pain was traveling to

2    any new locations in your back or was it staying in the same

3    areas?

4    A    The only new pain that I was starting to feel at that time

5    was the -- it was starting to radiate across the hip flexor.

6    That was -- by the time I got to see Dr. Pardo, that was one of

7    the new symptoms that was happening.

8    Q    Okay.  And you rated your pain on the worst.  What did you

9    rate it?

10   A    9 and 10.

11   Q    Was it ever less than a 9 or 10?

12   A    No.  No, my back was -- my back was killing me when I --

13   when I saw Dr. Pardo.  My back was -- like I say, I was -- I

14   was really concerned at this point with how bad my back had

15   felt.  I never felt anything like this before.  It was all new

16   to me.  So I had a lot of concerns about my job and, you know,

17   activities as well.

18   Q    The next issue that you wrote down was what?

19   A    Neck pain, right-side upper neck pain, radiates down into

20   the trap around the scapula.

21   Q    And at its best, what was it on the pain scale?

22   A    5 or 6.

23   Q    And at its worst?

24   A    9 and 10.

25   Q    Had the neck pain changed at all?  Had your symptoms in

1    the neck changed at all since the beginning after the crash
2    until six months later when you are seen in Dr. Pardo's office?
3    A    No.
4    Q    And the third symptom that you were there for?
5    A    Headaches.
6    Q    What was the frequency of these headaches?
7    A    At that point in time, several a week.
8    Q    And at its worst, what was it?
9    A    9 and 10.
10   Q    Did there come a point in time when you could tell when
11   they would be coming on?
12   A    For the most part, I would -- I would be waking up with
13   them, along with the pain.  But, yes, you could feel it -- when
14   I did feel it coming, you could feel it, yes.  That was
15   primarily at work.
16   Q    All right.  If you could, turn to the next page, page 4.
17        What did you indicate makes your pain better?
18   A    Keeping -- makes my pain better?
19   Q    On page 4.
20   A    On page 4?
21   Q    Yes.  Bates label 4 at the bottom.
22   A    It says:  Therapy and sometimes stretching.  But it's all
23   temporary.
24   Q    Okay.  What therapy and what stretching were you referring
25   to?

TRIOLO v USA                    September 22, 2020  Vol I- 88

```
 1   A    Dr. McDaniels, some chiropractic.  We did chiropractic
 2   massage, adjustment.  We did some traction, but it's, you know,
 3   all temporary.  By the end of the day, I was still back to
 4   square one when I went to his office.
 5   Q    Was this in the neck or in the back or both?
 6   A    Both.
 7   Q    And what makes it worse?  What did you indicate then?
 8   A    Sometimes I feel like anything -- anything does.
 9   Q    The next section is four views of the human body, and it's
10   some dark-shaded areas.  Did you shade those in or did
11   Dr. Pardo or someone from the staff do that?
12   A    I shade those in.
13   Q    What do those areas represent?
14   A    All that shading area is where I was feeling all my pain.
15   Q    The -- I want to talk about the neck for a minute.
16        At some point in time, did your symptoms in your neck
17   go away?
18   A    Yes.
19   Q    Do you recall when?
20   A    I would say less than a year -- a year, little less than a
21   year.
22   Q    So less than a year after the accident?
23   A    Yes.
24   Q    Okay.  And was there some specific treatment that caused
25   it to go away or was it just -- do you know what caused it to
```

TRIOLO v USA                    September 22, 2020  Vol I- 89

1   go away?

2   A     No, I don't.

3   Q     Okay.  During that whole time, were you under the care of

4   Dr. Pardo, a pain management physician?

5   A     Yes.

6   Q     And were you also given the home exercise program during

7   that time?

8   A     Yes.

9   Q     And did you follow those?

10  A     Yes, I did.

11  Q     And did the pain just wake up in your neck one day and

12  just it wasn't there, like magic, or was it something that

13  slowly decreased over time?

14  A     It slowly decreased over time, yes.

15  Q     When you had your pain symptoms in your neck, did you have

16  also a reduced range of motion and flexion and extension and

17  motion?

18  A     Yes, I do.

19  Q     Okay.  As you sit here today, do you still suffer from

20  reduced range of motion?

21  A     In my neck?

22  Q     Yes, in your neck.

23  A     Excuse me.  No, not in my neck.

24  Q     At this point in time, are you seeking a recovery for any

25  type of permanent injury in your neck whatsoever?

1   A    No.

2   Q    Is the -- what you're seeking recovery for limited to the

3   temporary injury to your neck?

4   A    No.

5   Q    Okay.  Bad question.

6         What you're seeking for as far as your neck, is that

7   for that temporary injury?  In other words, you said it lasted

8   about a year.  Is that the recovery you're asking for the Court

9   to consider?

10  A    Yes.

11  Q    I know the way I said it was awkward, when you think about

12  your back.

13        The -- let's see.  If you could turn to page 8.  And

14  you indicated earlier that you filled out this form; correct?

15  A    That is correct.

16  Q    All right.  And so when you filled out this form, was

17  it -- did you fill out these forms before you got to the

18  office?  In other words, did they e-mail them to you or did you

19  fill them out in the waiting room on July 11th, 2017?

20  A    I filled them out on -- at the office.

21  Q    Okay.  There's a section on here that says "self," and

22  it's asking about certain conditions.  Do you see that?

23  A    Yes.

24  Q    And you checkmarked certain items; right?

25  A    Yes.

1  Q    Was this an indication of what you were experiencing that

2  day or symptoms that you're experiencing up to that time or

3  symptoms you experienced in the past?

4  A    These were all -- all these I was experiencing at that

5  time.

6  Q    Okay.  What's the first symptoms you were experiencing?

7  A    Insomnia.

8  Q    Okay.  What's going on -- what's your understanding of

9  what insomnia is?

10  A    Insomnia is when you're not sleeping.

11  Q    What were you getting to sleep at this time, six months

12  after the accident?

13  A    I was having a big issue sleeping.  I was in a lot of

14  pain.  Pain was either I couldn't be in bed or I was getting

15  up.  I couldn't sleep.

16  Q    Was it that you were waking up from sleep due to pain or

17  that you couldn't even get to sleep?

18  A    Both, at that point in time.

19  Q    Were you able to sleep in your bed?

20  A    I mean, I could start in my bed, but I would never be able

21  to stay in it.  I was getting up and I was going to the

22  recliner.  I needed to sit in a different position.  Sometimes

23  from there I was going to the floor.  I was not finishing my

24  nights in bed at all.

25  Q    All right.  You -- what's the next -- lightheadedness or

 1   dizziness.

 2          Were you still experiencing lightheaded and dizziness

 3   as of the day of your first visit, July 11th, 2017?

 4   A    From the first visit, yes, I was.

 5   Q    And how often were you experiencing lightheaded and

 6   dizziness?

 7   A    I mean, that would come and go.  It could be a couple

 8   times in a day.  It could be a couple times in a week.  It

 9   was -- it wasn't -- it wasn't very, okay, well, this would be

10   the time I would get dizzy.  It would just come and go.  I

11   never really took note as to, you know, when they were

12   happening.

13   Q    I notice you didn't checkmark depression, but you did

14   checkmark anxiety.  What's going on six months after the

15   accident that you're checkmarking panic attacks and anxiety?

16   A    So at this point, everything's different with me.  I'm not

17   working out.  I'm not running.  I am miserable at work because

18   I'm on my feet all the time.  It's getting bad.

19          I'm psychologically thinking about all these things.

20   It's kind of depressing.  I wasn't able to do everything that I

21   liked to do.  So I was very concerned.

22   Q    You also marked chest pain or angina.  Were you having

23   cardiac issues?

24   A    No, I wasn't having cardiac issues.  I believe that was

25   because of the anxiety that I was going through at that

1  particular time.

2  Q    How were your stress levels at this time?

3  A    Very high.  I had a lot on my mind as far as what was

4  going on.  This is nothing that I've ever experienced before.

5  I didn't know what was going on with me.  So...

6  Q    You put a question mark next to ulcer.  Why is that?

7  A    Question mark -- well, you know, with the anxiety and

8  everything, my stomach was always kind of acting up at that

9  point, you know, with the stress and anxiety, so I was having

10  some stomach cramping issues.

11  Q    We talked about the headaches and we talked about the

12  low-back pain.

13          And then the neck, glute, hamstrings, hip flexor, was

14  all of that on a daily basis?

15  A    Yes, it was.  Every day.

16  Q    Okay.  So you -- are you still a patient of Dr. Pardo's

17  today?

18  A    Yes, I am.

19  Q    Or St. Joseph's Interventional Pain Specialists; correct?

20  A    That's correct.

21  Q    And you began seeing Dr. Pardo on July 11th, 2017.

22          What type of treatments does Dr. Pardo offer?

23  A    He's offered epidurals.  He's done nerve blocks.  And

24  some, what we call, radiofrequency ablations.  And I'm on

25  some -- I'm on medication as well.

1   Q    Do you know how many injections that you've had?

2   A    I don't recall how many -- how many I've had.

3   Q    As far as the treatments, I want to ask you, do you recall

4   having epidural injections?

5   A    Yes.

6   Q    First of all, did you have any type of injection therapy

7   in your cervical spine, in your neck?

8   A    No.

9   Q    Has all of the treatment, the pain management or the --

10  strike that.

11        Has all of the interventional pain management

12  treatment, the injections, the radiofrequency ablations, has

13  all of that been to your low back and lumbar spine?

14  A    Yes.

15  Q    And, Mr. Triolo, candidly, has all of that helped you?

16  Has all of those injections produced relief for you?

17  A    Have all the injections?  Some better than others, yes.

18  Q    Okay.  That's what I want to talk about.

19        At times you've had epidural injections.  Do you

20  recall those?

21  A    Yes, I do.

22  Q    And do you recall whether they all helped?

23  A    The epidurals, some helped better than others.

24  Q    Okay.  You've had a bursa injection in your hip.  Did that

25  help?

1  A    Minimal, yes.  It helped, but it was temporary as well.

2  Q    All right.  And you also had radio -- I'm sorry, before we

3  get to radiofrequency ablations, the medial branch blocks, do

4  you recall those?

5  A    Yes, I do.

6  Q    What's your understanding of what a medial branch block

7  is?

8  A    My understanding was it was a diagnostic study to see if

9  the next procedure that -- what they had in mind for the next

10  procedure would work, would actually work.  So that's what it

11  was for.

12  Q    Okay.  Do you recall what the next procedure would be in

13  order to have the -- do you recall what the next procedure

14  would be if the medial branch block was successful?

15  A    Yes.  It's a radiofrequency ablation.

16  Q    And did you have successful medial branch blocks?

17  A    I did.

18  Q    Did you also have successful radiofrequency ablations?

19  A    I have.

20  Q    And were all of the radiofrequency ablations, were those

21  in your lower back?

22  A    That's correct.

23  Q    Were they on the left, the right, or bilateral?

24  A    Bilateral.

25  Q    Were they done -- bilaterally, was it done at the same

1  time, or they do one side on one day and another side on a
2  different day?
3  A    They weren't done bilaterally.  One side on one day and
4  then another side on another day.
5  Q    When you began to have your low-back pain and that
6  radiating pain and then got your medial branch block was
7  successful and then got the radiofrequency ablation, what did
8  the radiofrequency ablation do for you?
9  A    It helped the pain.  It cut it in half, immediately, at
10 least half.  It was nice.
11 Q    At that point in time -- I'm not talking about the
12 surgery; exclude the surgery from this question.  At that point
13 in time when you got that first radiofrequency ablation, was
14 that the best therapy, the best treatment that you had had
15 since the start of this on February 11, 2017?
16 A    Hundred percent, yes.
17 Q    Do you know how many radiofrequency ablations you've had?
18 A    I've had four -- four ablations.
19 Q    Have they all -- and I know there's a difference between
20 right and left, but have they all been at the same level?  In
21 other words, have they all been at the low back?
22 A    Yes.
23 Q    And the radiofrequency ablations, have there been any that
24 had no effect on the quality of your pain whatsoever?
25 A    Yes.

1  Q    How many of the -- you said four.  How many of the

2  radiofrequency ablations didn't work at all?

3  A    I believe it was two out of the four.

4  Q    Two out of the four?

5  A    Two out of the four.

6  Q    Okay.  And so was it on the left side or the right side,

7  if you recall?

8  A    It was the left.

9  Q    On the left side?

10 A    Yes.

11 Q    Okay.  When's the most recent radiofrequency ablation that

12 you've had?

13 A    Earlier this month, two weeks ago.  I believe it was

14 two weeks ago.

15 Q    And how did that procedure go?

16 A    It went very well.  Probably the best procedure yet.

17 Q    Okay.  And what does that radiofrequency do?  What pain is

18 it there to attack?

19 A    It's there to attack -- I believe it's the facet-joint

20 injury.

21 Q    Okay.  And where does that relief -- where does that

22 radiofrequency ablation relieve your symptoms?

23 A    So it relieves the whole disc area here, from the whole --

24 so if I'm on the left side, this whole region here and the

25 back.  That's constantly there.

```
 1              THE COURT:  I can't see what you're pointing at.
 2              THE WITNESS:  I'm sorry, Your Honor.  If I'm on the
 3   left side, it's this whole area here from the low back, just
 4   over the glute, all right, and also helps with the hip flexor
 5   region.
 6   BY MR. KINNEY:
 7   Q    Without that radiofrequency ablation, where is your pain
 8   level in that area you just showed the Court?  What's your pain
 9   level on that 1-to-10 scale?
10   A    8 daily.
11   Q    And with the radiofrequency ablation, what's it taken it
12   down to?
13   A    4.
14   Q    So do you find that acceptable enough, that reduction in
15   pain, to continue to do radiofrequency ablations?
16   A    I do.
17   Q    If Dr. Pardo recommends that you have at least one of
18   those procedures -- I know you've had four and it's been three
19   years here.  If Dr. Pardo recommends to you that you continue
20   to have at least one radiofrequency ablation every single year
21   for the rest of your life, do you intend to have those
22   procedures?
23   A    I do, yes.
24   Q    The injections and the radiofrequency ablations, is that
25   the only therapy that Dr. Pardo offers?
```

TRIOLO v USA                    September 22, 2020  Vol I- 99

1    A    No.  I also have -- I'm also on pain medication as well.

2    Q    Okay.  That's what I wanted to talk about.

3         Just give me one moment here.

4         Okay.  You mentioned earlier that when you went to

5    the neurologist that the medications that he gave you didn't

6    seem to help at all.

7         Do you recall that testimony?

8    A    Yes.

9    Q    Did Dr. Pardo just reissue the same type of pain reliever?

10   A    No.

11   Q    What type of pain relievers did Dr. Pardo put you on?

12   A    He offered some -- he gave me some Percocets and he also

13   offered doxepine, which is a sleep aid to help me sleep through

14   the night.

15   Q    Did the Percocet ever completely relieve your pain?

16   A    No.

17   Q    Now, with Percocet, there's some cautions for you because

18   of your work environment; right?

19   A    That's correct.

20   Q    All right.  What's your understanding of when you're

21   allowed to use your Percocet?

22   A    Every six hours or as needed.

23   Q    Okay.  But what about at work?

24   A    I can't use that at work.

25   Q    Okay.  What about when you get up -- first of all, what's

1   it like for you in the mornings?

2   A    The mornings are the worst time of the day.  The most --

3   most days I wake up because of the pain before my alarm.  You

4   know, I have good days and bad days like, you know, but

5   mornings are the worst.

6        I'm very tight, very sore, very achy.  I'm up at

7   4:00 in the morning every morning so I can stretch before my

8   hot shower.  That's pretty much how I start my day every day

9   since I have been cleared to start stretching.

10  Q    And if it's a workday, you know, when you get up in the

11  morning and you go through what you just described, do you take

12  a Percocet?

13  A    No.

14  Q    And why?

15  A    I -- I don't want to take -- I don't want to be on pain

16  meds at work.  Anything could happen.  That's my license.  I

17  don't want to lose my job.  I love what I do.

18  Q    And how long is a shift over as a respiratory therapist at

19  Baptist South?

20  A    Twelve hours.

21  Q    What time does the shift start in the mornings?

22  A    So I punch in 6:30 every morning, start my day at 7:00,

23  and we leave at 6:30, is about the earliest we can punch out,

24  and I'm home by 7:30.  Which I take a hot shower, I stretch,

25  and that's when I take my medication and get to sleep.

TRIOLO v USA                    September 22, 2020  Vol I-**101**

| | |
|---|---|
| 1 | Q    Are you still full time there? |
| 2 | A    Yes, I am. |
| 3 | Q    Okay.  And since the motor vehicle collision, have you |
| 4 | been full time at Baptist South? |
| 5 | A    Yes. |
| 6 | Q    Have you missed any time from work? |
| 7 | A    Yes. |
| 8 | Q    Okay.  We'll talk about that in a minute. |
| 9 |          So your day shift, you're working from 7:00 a.m., and |
| 10 | I believe you said, till 6:30? |
| 11 | A    It's 7:00 to 7:00.  It's a 7A-to-7P shift. |
| 12 | Q    So it's a twelve-hour shift? |
| 13 | A    That's correct. |
| 14 | Q    All right.  And you're committed to not taking any pain |
| 15 | medication before you take that -- start that shift? |
| 16 | A    That's correct. |
| 17 | Q    What about during the shift?  Do you take any Percocet |
| 18 | during the shift? |
| 19 | A    No. |
| 20 | Q    Okay.  Do you take anything to help you during your |
| 21 | shifts? |
| 22 | A    Yes. |
| 23 | Q    Okay.  What do you take? |
| 24 | A    800-milligram Ibuprofen. |
| 25 | Q    During an eight-hour shift -- I'm sorry, you're not eight |

TRIOLO v USA                 September 22, 2020  Vol I-**102**

1   hours.

2           During a twelve-hour shift, how often are you taking

3   800-milligram Ibuprofen?

4   A     Probably once a shift.

5   Q     And how many shifts a week are you working?

6   A     So it's seven -- it's a biweekly schedule, so seven days.

7   Q     And you live out in Middleburg; correct?

8   A     That's correct.

9           THE COURT:  I'm sorry, I didn't understand that.

10          THE WITNESS:  So I have a bilateral [verbatim]

11  schedule, Your Honor.

12          THE COURT:  You have to speak into the microphone.

13          THE WITNESS:  I have a two-week, biweekly schedule.

14  So in that two weeks, seven days.

15          THE COURT:  A total of seven days over the course of

16  the two weeks?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Okay.  Go ahead.

19  BY MR. KINNEY:

20  Q     Okay.  So on your days on -- we're still talking about

21  that -- you don't take any of the Percocet while you're on your

22  shift; you use the 800-milligram Ibuprofen.

23          Do you go home and immediately take a Percocet, or

24  how do you deal with taking this pain medication?

25  A     So when I go home, I stretch, I take a hot shower, and

TRIOLO v USA                    September 22, 2020  Vol I-**103**

1  that's when I take my Percocet.  So I kind of -- hopefully I

2  can get a better night's sleep.  I can sleep better through the

3  night if I try and take it after -- when it gets closer to bed.

4  When I feel like I'm going to bed, that's when I start taking

5  it.

6  Q    Mr. Triolo, since July 11th of 2017, have you continuously

7  used Percocet to assist you?

8  A    Yes.

9  Q    Okay.  Is it something that you feel you need?

10  A    Yes.

11  Q    Okay.  And since July 11, 2017, has there ever been a day

12  that you haven't taken a Percocet?

13  A    No.

14  Q    Has there ever been a time where you ran out of pills?

15  A    No.

16  Q    Have there been other -- has the quality of your pain

17  risen above what the Percocet helps so that you ask Dr. Pardo

18  for some more -- some different medication?

19  A    Yes, it has.

20  Q    All right.  And so tell me what's the other medication

21  that Dr. Pardo prescribed.

22  A    It was a twelve-hour morphine pill, slow-acting morphine

23  pill.

24  Q    Do you recall when you started taking morphine?

25  A    I don't recall exactly when.

TRIOLO v USA                    September 22, 2020  Vol I-**104**

1   Q    Do you recall how long you were on morphine?

2   A    Yes.  I was -- I was on it after -- after the surgery --

3   let's see.  I had my surgery in -- I was probably -- I took

4   myself off of it probably in late summer or early fall of 2019.

5   Q    So from the surgery until summer or fall?

6   A    Summer of 2019, yes.

7   Q    All right.  Were you -- were you warned about any

8   addictive qualities of having to take the morphine?

9   A    Yes, I was.

10  Q    And was it something that -- you know, when it was first

11  prescribed until, I guess you said, summer or fall of 2019,

12  were you taking morphine every single day?

13  A    Yes.

14  Q    Was it helping?

15  A    It was helping, yes.

16  Q    Okay.  Did it ever completely eliminate any of your

17  symptoms in your back?

18  A    No.

19  Q    Did it ever completely eliminate the radiating pain that

20  was going down into your legs?

21  A    No.

22  Q    What would it do for you?

23  A    It would just kind of, I guess, blunt the pain a little

24  bit, and it would make me very drowsy, very tunnel-visioned

25  just zombyish, really.

1    Q    What type of day -- did it have the same -- did you have

2    the same precautions that you took with the Percocet as far as

3    the morphine?

4    A    The same?  I would -- they're both narcotics, so I would

5    say yes.

6    Q    Okay.  What time of day would you take the morphine?

7    A    I wouldn't take it -- on my off days, I would take it in

8    the morning and then once at night.  Days that I worked, I

9    would take it at night.

10   Q    Did there come a time when you became concerned about

11   being on morphine?

12   A    Yes.

13   Q    Why did you -- why did you have that concern?

14   A    I had a cousin who had back surgery.  Didn't work out well

15   for him at all.  He ended up getting very addicted to his pills

16   and ended up getting -- taking street drugs and OD'ing on

17   heroin.

18            So I know what it's like for somebody who is in a lot

19   of pain to go the other route and I didn't want to be like

20   that.  So...

21   Q    Were you concerned by staying on that morphine that that's

22   the direction that you might go as well?

23   A    There was always a possibility, so I -- you know, I wanted

24   to make sure it didn't happen.

25   Q    What did you do to prevent that from happening?

1   A    I stopped -- I stopped taking it.

2   Q    So would you break the pill in half, break it in quarters,

3   wean it off a little bit at a time or what did you do?

4   A    No.  I just stopped cold turkey.

5   Q    What did that do to you?

6   A    I was getting withdrawals.  I was -- cold sweats.  I was

7   having stomach issues.  At night, I was getting -- called the

8   restless leg syndrome, constantly feel like you need to stretch

9   out your legs.  I was irritable.

10  Q    How long did it take you to detox your body from the

11  morphine?

12  A    A good month.

13  Q    If you would, Mr. Triolo, I want to talk about at a

14  certain point in time along your treatment path with Dr. Pardo,

15  you were recommended to go to see a surgeon.  Do you recall

16  that?

17  A    Yes, I do.

18  Q    Okay.  And do you know why you were asked to seek a

19  surgical evaluation?

20  A    I believe with all the procedures that was going on, it

21  was just recommended that I might need surgery.

22  Q    At that point in time, you had had some steroid injections

23  from Dr. Pardo.  Did those get rid of the pain in your back or

24  radiating pain in your legs?

25  A    No.

TRIOLO v USA                    September 22, 2020  Vol I-107

1   Q    And so did you agree to go meet with a surgeon and discuss
2   the issues?
3   A    Yes, I did.
4   Q    Do you remember being referred to a gentleman, a Dr. Dean
5   Toumbis?
6   A    Yes, I do.
7   Q    Where was that -- where was his practice?
8   A    That was in Orange Park.
9   Q    And did you understand -- what was your understanding of
10  what type of doctor Dr. Toumbis was?
11  A    He was a back surgeon, is my understanding.
12  Q    And when you met -- did you go meet with Dr. Toumbis?
13  A    Yes, I did.
14  Q    When you met with Dr. Toumbis -- we haven't talked about
15  this yet today, so let me ask you this.  Do you recall that you
16  had a lumbar, in other words, low-back MRI?
17  A    Yes.
18  Q    And do you recall whether -- do you remember having that
19  at Baymeadows MRI?
20  A    Yes, I do.
21  Q    And the record, Exhibit -- excuse me, Exhibit 3, the
22  record indicates that you had your lumbar MRI on April 4th of
23  2017 by Dr. Asad.
24        Did you bring the MRI report with you to Dr. Toumbis?
25  A    Yes, I did.

| | |
|---|---|
| 1 | Q    You did. |
| 2 |      Did you bring -- did they give you a disc to bring |
| 3 | with you to -- to meet with Dr. Toumbis with? |
| 4 | A    Yes, it was a disc. |
| 5 | Q    Okay.  And was it your understanding that that disc |
| 6 | contained the actual MRI film? |
| 7 | A    Yes. |
| 8 | Q    Did you actually meet with Dr. Toumbis or a physician's |
| 9 | assistant or somebody else? |
| 10 | A    I met with Dr. Toumbis. |
| 11 | Q    Okay.  Did you get any recommendation? |
| 12 | A    Yes.  Dr. Toumbis, after reviewing the MRI with me, |
| 13 | recommended that I would need surgery. |
| 14 | Q    Okay.  And -- |
| 15 |      THE COURT:  What day was the MRI? |
| 16 |      MR. KINNEY:  It's April 4th of 2017. |
| 17 |      THE COURT:  Okay.  Go ahead. |
| 18 | BY MR. KINNEY: |
| 19 | Q    So you meet with Dr. Toumbis and he recommends a back |
| 20 | surgery.  And you mentioned that you had -- you had a family |
| 21 | member with an unsuccessful back surgery. |
| 22 |      So at that point in time, were you committed to going |
| 23 | forward and having a back surgery? |
| 24 | A    No, I was not. |
| 25 | Q    Did Dr. Toumbis tell you what type of surgery you were in |

TRIOLO v USA                September 22, 2020  Vol I-109

1  need of?

2  A    Yes.  It was an L5-S1 fusion.

3  Q    Were you prepared to have your back fused?

4  A    No.  No, I wasn't.  Not only did I have a family member,

5  but I have a gentleman that lived across the street from me my

6  whole life; he had a back surgery and ended up having to leave

7  New York to go to a warmer climate.  I remember him moving.

8         So there's two people in my life right there.  I

9  didn't associate back surgeries with positive feedback.

10  Q    Okay.  So what did you want to do about this?  You got a

11  recommendation of your back fusion, and not -- not confident.

12  What did you do about that?

13  A    I wanted to get a second opinion.

14  Q    And did Dr. Pardo recommend or refer you to somebody else

15  for a second opinion?

16  A    Yes.  He referred me to Dr. Raymond Topp, Topp Spine.

17  Q    We're going to hear from him later today.  I don't

18  necessarily want to talk about the actual surgery.

19         When you first met with Dr. Topp, did you do the same

20  thing that you did with Dr. Toumbis?  Did you bring the report

21  and bring that CD of the MRI images with you from the lumbar

22  MRI?

23  A    Yes.

24  Q    And did you meet again with Dr. Topp or a staff member?

25  A    I met with Dr. Topp.

1    Q    Did he actually go through the films with you?

2    A    Yes.  He went through the films.  He asked me a bunch of

3    questions about my history.  He asked me about the day of the

4    accident, pain from the day of the accident until now, where

5    it's radiating, how I feel now on a day-to-day basis.  He also

6    did some assessments there as far as some standing and, you

7    know, flexing.

8    Q    How long did you meet with -- strike that.

9         How long did you meet with Dr. Topp?

10   A    Oh, we were there for quite a while.  Over an hour, easy.

11   Q    If you could, could you put your hand on Exhibit No. 11.

12   Just let me know when you're there and go to page 1.

13   A    I'm there.

14   Q    Actually, if you could flip to page 2.

15        Is this a document that you filled out or did your --

16   a staff member fill this out?

17   A    This is my handwriting.  I filled it out.

18   Q    Okay.  And what date did you meet with Dr. Topp?

19   A    It was 11-8-2017.

20   Q    Okay.  Was that approximately a month after you met with

21   Dr. Toumbis?

22   A    Yes.

23   Q    And what did you indicate to him had happened to you in

24   February of 2017?  Do you see where it says "reason" --

25   A    Yes.

1  Q    -- "for seeing the doctor today"?

2  A    So I wrote:  Motor vehicle accident on February 2017.  I

3  was stopped at a traffic light and was rear-ended.

4  Q    So after you meet with him and you go through the films

5  with him on November 8, 2017, did he make a recommendation?

6  A    Yes, he did.  He made the same recommendation as

7  Dr. Toumbis.

8  Q    And at that point in time, at the conclusion of that

9  consultation with Dr. Topp, were you prepared to have your back

10  fused?

11  A    Not right then and there.

12  Q    Why not?

13  A    I didn't -- I didn't associate back surgeries as anything

14  positive, just from what I experienced from other people.  So I

15  gave a good thought.  At this point, I had two reputable

16  surgeons saying that I needed the same surgery, so I was giving

17  it some thought.

18           And I went through the holidays and spoke to my

19  brothers a lot, and we discussed it and I thought about it and

20  I decided that, hey, you know, what's the alternative here as

21  far as maybe if I can get rid of some of the shooting pain.

22  And -- instead of living with it and, you know, being on pain

23  meds the rest of my life and it not being resolved and only get

24  worse?  Okay?

25  Q    This is November of 2017.  How old are you at this point?

TRIOLO v USA                    September 22, 2020  Vol I-**112**

1    A    43.

2    Q    And do you feel like an old man at this point?

3    A    Every day in the morning, I feel so old.  Yes.  Yeah, I

4    felt as -- older than I -- I never felt old.  I never saw

5    myself as old.  I'm always doing things, you know, playing

6    basketball with young 20-year-olds, and all kids younger than

7    me, doing fine.  This is the first time I've actually felt old.

8    Q    Did you eventually decide that you wanted to proceed with

9    the surgery?

10   A    I did.

11   Q    And did you reach out to Dr. Toumbis?

12   A    I didn't.

13   Q    So that was the first surgeon you met with; right?

14   A    That's correct.

15   Q    And did you go forward and have surgery with Dr. Toumbis?

16   A    No, I did not.

17   Q    Okay.  Why is that?

18   A    So what I found out was Dr. Toumbis was no longer -- had

19   his practice in Orange Park, Jacksonville and Orange Park.  His

20   practice was further south.

21   Q    Okay.  Do you recall where south?  I mean, are we talking

22   about St. Augustine or --

23   A    No, like Ocala south or Clear River or Crystal River or

24   some kind of thing.

25   Q    And so what -- the -- when you first saw Dr. Toumbis,

 1  where in relationship to your home was his practice?

 2  A    10, 15 minutes away.

 3  Q    Is that why you called him instead of going to the person

 4  that did the second opinion?

 5  A    That's correct.

 6  Q    And since Dr. Toumbis was down south somewhere, Ocala or

 7  Crystal River, what did you do next?

 8  A    I made a second appointment with Dr. Topp.

 9  Q    All right.  And did you meet with Dr. Topp on February --

10  excuse me, February 21, 2018?

11  A    Yes.

12  Q    When you walked into his office that day, were you

13  committed to having the surgery?

14  A    I wouldn't say totally committed.  I had a -- I had great

15  thought about it.  I was leaning towards it, but I wanted to

16  sit down and talk to him and talk about quality of life.

17  Q    How long was that meeting with Dr. Topp on February 21st

18  of 2018?

19  A    I would say a good hour or so.

20  Q    And what types of things did you discuss?

21  A    I discussed if I thought I was going to be able to be

22  active, if I was going to be able to do things that I was doing

23  before the accident, such as running, playing basketball,

24  playing golf, you know, stuff that -- if I was going to be

25  waking up in pain, if I was going to have range of motion, just

TRIOLO v USA                    September 22, 2020  Vol I-**114**

```
 1   everything I could think of to ask.
 2   Q    Did Dr. Topp make any guarantees to you?
 3   A    No, he did not.
 4   Q    Did he tell you whether or not there were any risks to
 5   having the surgery?
 6   A    Yes.
 7   Q    Do you recall what some of those risks may have been?
 8   A    Well, the biggest risk that I recall is that, you know,
 9   there might be a surgery later on in life.
10   Q    Okay.  At the conclusion of that meeting, did you make any
11   decisions?
12   A    Yes.
13   Q    And what was your decision?
14   A    That I was going to go ahead and have the surgery.
15   Q    So do you recall the date of the surgery?
16   A    It was March 22nd, 2018.
17   Q    Where did you have the surgery?
18   A    I had it in Jacksonville Beaches Surgical Center.
19   Q    All right.  And were you admitted -- I'm sorry, you said
20   surgery center.  Is that a place where you'd have the surgery
21   and stay overnight, or how does that work?
22   A    So I had the surgery and I went home that night.
23   Q    Do you know how long the surgery took?
24   A    I don't know the exact time, but it was a couple hours.
25   Q    What about work at this point?
```

1    A    So at this point, I wasn't working.  I was -- I was out of

2    work.

3    Q    Okay.  And did Dr. Topp tell you not to work or was this

4    something you decided not to do?

5    A    No.  Dr. Topp told me I was going to need some substantial

6    weeks off after surgery.

7    Q    Did he give you any type of recommendation as to the

8    amount of time you would take off after the surgery?

9    A    Yes, ten weeks.

10   Q    Prior to the surgery, had you taken any time off for any

11   type of treatment or anything like that?

12   A    No.

13   Q    So throughout the whole course of this, from February 11,

14   2017, all the way up to the day of the surgery on March 22,

15   2018, you continued to go to work for all your normal shifts?

16   A    Yes.

17   Q    And on March 22, 2018, you -- starting that day, were you

18   out ten weeks at work?

19   A    Yes, I was.

20   Q    I want to talk about that in just a moment, but when

21   you're discharged, where do you go?  After the surgery when

22   you're discharged, where do you go?

23   A    I go home.

24   Q    Did you drive yourself home?

25   A    No.  No, I was dating somebody at the time and she took me

TRIOLO v USA                    September 22, 2020  Vol I-**116**

1   to and from.

2   Q     And what was the -- was there an at-home nurse given to

3   you or are you just able to take care of yourself?

4   A     I was able to take care of myself, yes.  I did receive a

5   phone call from a nursing agency, checking up to see if I was

6   able to take care of myself, but there was no in-house nurse

7   that was there.

8   Q     After the surgery, were you immediately better and able

9   to, you know, run around like a spring chicken again --

10  A     No.

11  Q     -- like before the accident or --

12  A     No, not even a little bit.  I was -- I was the slowest

13  I've ever moved in my life with everything: sitting down,

14  standing up, walking very gingerly, very sore; very, very sore.

15  Just took my time with everything that I did.

16  Q     All right.

17  A     Making sure that feet were up in certain positions, yeah.

18  Q     You mentioned that you were out of work at Baptist South

19  for ten weeks?

20  A     That's correct.

21  Q     Okay.  So for ten weeks you're out of work, and do you

22  attribute that to the motor vehicle collision arising from

23  February 11, 2017?

24  A     Yes, I do.

25  Q     Do you know at that point in time what your average weekly

TRIOLO v USA                    September 22, 2020  Vol I-117

1   wage was?

2   A    Yes, I do.

3   Q    What was your average weekly wage at that point in time?

4   A    My average weekly wage was $936.86.

5   Q    Baptist South, did they afford you any paid time off, in

6   other words, vacation or sick time that they allowed you to use

7   for any period of time during that ten weeks?

8   A    Yes, the first two weeks.

9   Q    The first two weeks?

10          THE COURT:  I'm sorry?

11          THE WITNESS:  Yes, Your Honor, the first two weeks.

12  BY MR. KINNEY:

13  Q    So are you asking the Court to award you for those

14  two weeks' time that you've already been paid for through

15  Baptist South?

16  A    No.

17  Q    So let's talk about the other eight weeks.

18          Was there any time that you received payment for from

19  any other source other than Baptist South for the other

20  eight weeks?

21  A    Yes.

22  Q    Okay.  And how many weeks did you receive paid time for?

23  A    I received paid time for eight weeks.

24  Q    Okay.  So the entire ten weeks is covered?

25  A    No.  I'm sorry, two weeks of paid time off that I

1  accumulated, so eight weeks -- out of the eight weeks, I

2  received six weeks of disability pay.

3  Q    Okay.  So six weeks of disability pay.  And I've got my

4  calculator.  You're saying the average weekly wage is $936.86;

5  is that right?

6  A    That's correct.

7  Q    All right.  So that's $5,621.16.

8         So for the other -- the other source of payment for

9  six weeks, did they pay you $5,621.16?

10 A    No.

11 Q    Okay.  Did they pay you some portion of that?

12 A    So I was paid 60 percent of that.

13 Q    Okay.  So there's remaining 40 percent of the $5,621.16

14 that you were uncompensated for; is that accurate?

15 A    That's correct.

16 Q    And my trusty calculator indicates that it's $2,248.46.

17        Is that the amount that you're asking the Court to

18 award for that six-week period?

19 A    Yes.

20        THE COURT:  I'm sorry, can you repeat that number?

21        MR. KINNEY:  Your Honor, $2,248.46.

22 BY MR. KINNEY:

23 Q    Mr. Triolo, we said that there were ten weeks -- you said

24 there were ten weeks.  So two weeks Baptist South took care of.

25 Then there are six weeks that another source paid for at

 1   60 percent.

 2          What about the remaining two weeks?  Did anyone pay

 3   for that?

 4   A    I was not compensated for the two weeks, the last

 5   two weeks.

 6   Q    Okay.  So 936.86 times two weeks, and my calculator

 7   indicates it's $1,873.72.

 8          Are you asking the Court to award you that amount as

 9   additional past lost wages?

10   A    Yes.

11   Q    So the total amount of your past lost wages you're seeking

12   from the Court is $4,122.18, sir?

13   A    Yes.

14   Q    Mr. Triolo, you've incurred many medical expenses

15   throughout the last three years and nine months.  Are you aware

16   of that?

17   A    Yes, I am.

18   Q    And if you could, Mr. Triolo, I'm going to ask you to pull

19   out exhibits 15 to 32.

20          MR. KINNEY:  Is that me?

21          THE COURT:  Just my gremlins in my courtroom.

22          MR. KINNEY:  They must be as hungry as I am.

23          THE COURT:  We'll break at 12:30.

24   BY MR. KINNEY:

25   Q    Okay.  So 15 to 32.  What are the records that I've asked

TRIOLO v USA                 September 22, 2020  Vol I-120

```
 1    to you pull out?
 2              If you could, is 15 Advanced Diagnostic Group?
 3    A    Yes.
 4    Q    Okay.  And then is 32 the Walgreens pharmacy bills?
 5    A    Yes.  Yes, they are.
 6    Q    Now, before we came to court today, you and I met;
 7    correct?
 8    A    Yes.
 9    Q    And do you recall that I asked you to go through those
10    medical bills?
11    A    Yes, you did.
12    Q    And did you go through those medical bills?
13    A    Yes, I did.
14    Q    Sir, all of those medical bills, Exhibits 15 to 32, are
15    those all bills related to treatment for your injuries arising
16    from the February 11, 2017, motor vehicle collision?
17    A    Yes, they are.
18              THE COURT:  Mr. Kinney, I don't have 26, 27, and 28
19    as being admitted.
20              MR. KINNEY:  They're not yet, Your Honor.
21              THE COURT:  Okay.
22              MR. KINNEY:  Some are a portion and some are not.  So
23    what I'm going to do is going through the ones that are not
24    stipulated to.
25              THE COURT:  Okay.
```

1       MS. CUNNINGHAM:  Your Honor, I can probably help in

2   that regard.

3       The objections that were noted to the exhibits were

4   just for certain visits that were not put into discovery.  The

5   Court already ruled on that objection.  So with that sort of

6   noted, I don't have any objection to them being introduced.

7       THE COURT:  All right.  Then --

8       MR. KINNEY:  Your Honor, the plaintiff would ask to

9   admit, then, Exhibits No. 7, Exhibits No. 9, 26, and 28.

10   That's 7, 9, 14, 26, and 28.

11       MS. CUNNINGHAM:  And, Your Honor, before you rule on

12   that request, if I may add one item.  It does appear that this

13   version of Exhibit 26 has been altered, so I just do want it

14   noted that it's my understanding this copy is the complete copy

15   of the original bill, that's it's been edited to remove some

16   information.

17       THE COURT:  Yeah, it does appear that 26 is redacted.

18       MR. KINNEY:  Your Honor, if I can ask him a couple of

19   questions, I can clear that up right now.

20   BY MR. KINNEY:

21   Q    Mr. Triolo, if you would, turn to Exhibit 26.

22   A    Okay.

23   Q    And do you recall having an MRI on -- I believe it was

24   your left ankle; your left or right ankle?

25   A    It was the right ankle.

TRIOLO v USA                    September 22, 2020  Vol I-122

1    Q    It was the right ankle?

2    A    Yes.

3    Q    Mr. Triolo, are you seeking any compensation or asserting

4    any claim whatsoever that your right ankle was injured in this

5    motor vehicle collision of February 11, 2017?

6    A    No, I'm not.

7    Q    Okay.  And you had -- did you have an MRI at Precision

8    Imaging Center?

9    A    Yes, I did.

10   Q    And do you see on Exhibit 26, there's an area that's been

11   whited out?

12   A    Yes.

13   Q    And is that -- in that area, was that where the MRI ankle

14   charges were?

15   A    Yes.

16        MR. KINNEY:  So, Your Honor, what we did is we whited

17   out and redacted the MRI for his right ankle, and we put in the

18   balance as it reflects his -- see where it says "account total"

19   at the bottom, $3,346.21?  Either Mr. Moore or myself typed

20   that in.

21        THE COURT:  Are there two entries that are redacted

22   out?  So there's --

23        MR. KINNEY:  On mine, it's just one.  So it's between

24   the 8-30-18 and the 8-14-19.  There's one area that's shaded

25   out or whited out.

1           THE COURT:  And below that, 8-21-2019, there's not

2    something whited out there as well?

3           MR. KINNEY:  Below that?

4           THE COURT:  It looks like it on mine.

5           MR. KINNEY:  May I explain, Your Honor?

6           I believe it's the total -- what they do on Precision

7    is they total each MRI, and so if you see on that first entry,

8    4-25-18, it says charges 624.13, then in bold, right under

9    that, it says 624.13.  That was the total amount.

10          THE COURT:  Yeah, that's not what I'm talking about.

11   Below 8-21-2019, which is the last date that shows up, and then

12   there are the totals for that visit, under that line, there

13   appears to be another set of data that's redacted.

14          MR. KINNEY:  Yeah, I'm going to pull that up -- I'm

15   going to pull up the original on my computer now.

16          THE COURT:  So if you'll scroll that --

17   BY MR. KINNEY:

18   Q    Okay.  Mr. Triolo, can you see -- do you have it on your

19   screen?

20   A    Yes.

21          THE COURT:  What he's looking at is not in evidence,

22   so -- and it's not in the record anywhere.  So...

23          But, yeah, there's a set of data there that I was

24   asking about.

25   BY MR. KINNEY:

1   Q    Mr. Triolo, did you make a visit with Dr. Jacob Bellhouse?

2   A    I believe that who I saw was Dr. Emily Ernst --

3   Q    Okay.

4   A    -- is who I saw.

5   Q    Do you know who -- I'm sorry, that's correct.  Did you see

6   Dr. Emily Ernst?

7   A    Yes, I did.

8   Q    Was she the one that prescribed an MRI of your lower

9   extremity, your right lower extremity?

10  A    Yes.

11  Q    Was that for your ankle?

12  A    Yes.

13  Q    Do you have any complaints of right lower ankle in this

14  case from the motor vehicle collision?

15  A    No.

16       THE COURT:  Why don't we include as part of Exhibit

17  26, the original as well as your redacted, because I --

18  otherwise it's very confusing.

19       MR. KINNEY:  Yes, Your Honor.

20       THE COURT:  So I'll admit 16 subject to adding a

21  second page to Exhibit 16, which is the original unaltered

22  bill.

23       MR. KINNEY:  Yes, Your Honor.  And --

24       THE COURT:  I'm sorry, 26.  Sorry, Madam Deputy.

25       So subject to the Court's ruling previously, 7, 9,

TRIOLO v USA                    September 22, 2020  Vol I-125

1   14, 26, with the addition of the original unaltered, and 28 are

2   admitted.

3          Is that correct, Ms. Cunningham?

4          MS. CUNNINGHAM:  I believe so, Your Honor.

5          THE COURT:  All right.

6      (Plaintiff's Exhibits 7, 9, 14, 26, and 28 were admitted

7   in evidence.)

8          MR. KINNEY:  Did I miss one?  I thought it would be

9   7, 9, 14, 26, and 28.  Maybe I misheard.

10         THE COURT:  That's what I said.

11         MR. KINNEY:  You did.  Thank you.

12  BY MR. KINNEY:

13  Q    Okay.  Mr. Triolo, we were talking about, before we came

14  to trial, I asked you to review these medical records.  And did

15  you, in fact, do so?

16  A    Yes.

17  Q    Okay.  And all of these medical records -- excuse me,

18  medical bills that are entered into evidence, beginning at

19  Exhibit 15 and continuing through Exhibit 32, are these all for

20  treatment related to the injuries arising from the motor

21  vehicle collision of February 11, 2017?

22  A    Yes, they are.

23  Q    And are you asking the Court to award you the amount of

24  money on these bills for your past medical expenses?

25  A    Yes, I am.

```
 1              MR. KINNEY:  I don't know what I'm doing.  I don't
 2   know what's bothering that.
 3              THE COURT:  It's not your fault.
 4              We'll ask IT to come take a look at the equipment
 5   over the lunch break.
 6   BY MR. KINNEY:
 7   Q    We've talked about this a little bit, but I'd like for you
 8   to tell us from February 11, 2017, through -- through present
 9   day, what has been the changes in your life?  How has this
10   motor vehicle collision affected you?
11   A    My life has drastically been changed.  I was always
12   active.  Always -- I was always in the gym.  I was always
13   playing a sport.  I was always -- always active.  I'm not
14   active anymore.
15              I never had an issue as far as being able to be on my
16   feet for long hours and not -- and have an issue.  I never had
17   an issue as far as being able to sit down or walk for long
18   periods of time and have to get up.
19              Never had sleep issues.  I wake up at night in pain.
20   There's good days and bad days.  Rainy days are the absolute
21   worst.  There's nothing that I can do no matter -- pain meds
22   that I can take that are going to help me through rainy days.
23   That's just the way it is.  That's -- that's my life.
24   Q    Have you -- have you missed out on doing things with
25   friends or family because of your injury?
```

TRIOLO v USA                  September 22, 2020  Vol I-127

1   A    Yes.

2   Q    Can you give us some for instances.

3   A    I was -- the same female who brought me to and from

4   surgery, she had kids and she wanted to take them to Disney

5   Land, and I didn't go.  I just didn't feel like I was going to

6   be able to be on my feet that much.  So I just -- I let them go

7   and I stayed here in Jacksonville.

8   Q    Do you and your brothers have holiday gatherings?

9   A    Yes.

10  Q    What's something you would have done with your brothers at

11  these holiday gatherings prior to the motor vehicle collision?

12  A    We always shoot some hoops in the driveway.  That was one

13  of our biggest things.  Go out in the backyard, throw a

14  football around.  Things aren't -- those don't happen anymore.

15  We don't do that anymore.

16  Q    And, Mr. Triolo, have you suffered from depression?

17  A    Yes.

18  Q    Have you looked at yourself in the mirror and felt,

19  internally, you know -- not just your pain symptoms and

20  physical symptoms.  Have you felt internally a difference?

21           MS. CUNNINGHAM:  Objection.

22           THE COURT:  Sustained.

23  BY MR. KINNEY:

24  Q    Mr. Triolo, have you suffered from depression arising from

25  the motor vehicle collision?

TRIOLO v USA                    September 22, 2020  Vol I-**128**

1   A    Yes, I have.

2   Q    What are the things you've noticed?

3   A    So I have not been wanting to, you know, do as much as I

4   used to do.

5            It's a thing as far as if I do too much, you know,

6   how am I going to feel about it?  How am I going to feel

7   physically about it?  As far as like, you know, maybe getting

8   out and being active with friends.

9            You know, you get a couple calls:  Hey, can you come

10  out and play some ball?

11           And you're like:  No, I'm not going to be able to

12  come out and play ball.

13           It stinks, man.  You know, I'm sitting here, and I

14  would love to go play ball, love to go play some golf.  I would

15  love to go whack the crap out of a golf ball in the fairway.  I

16  just, you know, can't do those things anymore.

17  Q    Mr. Triolo, you had your back fixed?

18  A    Yes.

19  Q    Didn't that help?

20  A    It helped.

21  Q    What were the changes you noticed after you had your back

22  surgery?

23  A    The shooting pains -- the shooting pains, those subsided.

24  But as far as -- you know, on the right side, that subsided.

25  But what I noticed after surgery, and it was pretty quickly

1    within the first two weeks, I started feeling pain on the left

2    side.

3              So on the right side, before surgery, it was really

4    bothering me a lot.  And then after surgery, it kind of felt

5    like everything kind of shifted from right to left.

6              I started getting -- during the healing process, the

7    ten weeks, I started feeling a lot of cramping in my leg, like,

8    knots.  I constantly needed to rub them out.  The chronic pain

9    was just there.  The headache, throbbing.

10             And I spoke to Dr. Topp about it on my first visit

11   back from surgery.  And during that time, as things began to

12   heal, the left side started getting more and more, like,

13   aggravating and everything had shifted.

14             So now all of a sudden I'm having these pains in the

15   left side.  The right side feels much better, and now it's on

16   the left side, and, you know, the shooting pains from the glute

17   to the hamstring is starting.

18             And I'm just like:  What is going on here?  This

19   shouldn't be happening.  Why am I having pain on the left side

20   when I didn't have any -- as much pain on the left side as I

21   did on the right side?  Now it just kind of like shifted

22   itself.

23             That takes a toll out of you, because you're hoping

24   you can start, you know, getting back together, you know, the

25   way you were, and now you have all these issues.

TRIOLO v USA                    September 22, 2020  Vol I-**130**

1    Q    Setting aside that radiating pain down into either the

2    left leg or right leg, did the surgery resolve the low-back

3    pain, the low-back pain across your back?  Did that solve that

4    problem?

5    A    No.

6    Q    Okay.  Did it reduce the pain?  Did the fusion reduce the

7    pain in your low back?

8    A    I would say it reduced the pain, yes.

9    Q    Okay.  Did it take it from -- you have reports of 8, 9.

10   Did it take it down from 8, 9, down to, you know, something

11   significantly less, or can you describe it for us?

12   A    It would significantly -- it went from, like, a 9 or a 10,

13   and I was at, you know, a 6 or a 7, I would say.  The pain was

14   still there.  That pain was still there.  But all the other

15   symptoms that were kind of bothering me were resolved as far as

16   the shooting pain.

17   Q    Okay.  From the surgery, the shooting pain going down your

18   right leg, did that go away?

19   A    Yes.

20   Q    At some point you said you notified Dr. Pardo that you

21   were getting now shooting pain down into your left leg?

22   A    That's correct.

23   Q    And did you seek treatment from him for that?

24   A    Yes, I did.

25   Q    And did he do epidural injections for that?

TRIOLO v USA                    September 22, 2020  Vol I-**131**

1    A    Yes.

2    Q    Did that resolve those symptoms?

3    A    No.

4    Q    What about radiofrequency ablation?  Did that resolve --

5    the radiofrequency ablation resolve the radiating pain down

6    into your leg?

7    A    No.  It didn't resolve the radiating pain, no.

8    Q    And when I say "radiating pain," I'm talking about the leg

9    that's shooting down through your hip and your calf and the

10   hamstring --

11   A    Yes.

12   Q    -- or your thigh?

13   A    No.

14   Q    The ablations never got rid of that; correct?

15   A    Right.

16   Q    Did the ablations that you had, did that reduce the pain

17   that you had across your low back?

18   A    Yes.

19   Q    Is it -- strike this.

20        Did you have any follow-up visits with Dr. Topp after

21   the surgery?

22   A    Yes, I did.

23   Q    And why were you having follow-up visits with Dr. Topp?

24   A    He just wanted to see progression, and he also wanted to

25   make sure that the fusion had took, for lack of better words.

1   Q    And was the -- was the fusion working?

2   A    He said I had fused, yes.

3   Q    And what about the pain shifting from the right to the

4   left leg?

5   A    So I spoke to him about that, and he seemed to feel that

6   there was -- my nerves had been compressed for so long that I

7   needed to start stretching and kind of pulling my nerves to

8   home, is what he called it, get them back home, that they were

9   so compressed.

10          So he, at that time, after that visit and seeing the

11  MRI and everything was fused, he went ahead and said that I

12  could do -- start stretching, start some stretching exercises.

13  Q    Mr. Triolo, it's been three-and-a-half years.  Do you

14  still sleep in a recliner sometimes?

15  A    I sure do.

16  Q    And I'm not talking about just falling asleep to a

17  basketball game or a football game.  I mean out of necessity.

18  A    Yes, I do.

19  Q    How often do you have to go to the recliner to fall

20  asleep?

21  A    It's a couple times a month.

22  Q    Golf, did you ever get back into the golf?

23  A    No.

24  Q    Pickup basketball games, did you ever get back into that?

25  A    No.

1  Q    Are you back to working out in your brother's garage or in

2  a gym anywhere?

3  A    So Dr. Topp had went ahead and at another visit that we

4  had, he had cleared me to start doing some training, some very

5  light training, all about form, all about very light weight and

6  high rep type of things.

7          So I would say I tried to start getting back into it,

8  but it never stayed consistent because I would -- the pain was

9  just too great to be consistent.  I was down for a couple days,

10  maybe a week; I'd start again, same thing would happen.  It

11  always felt like I was kind of starting over.  And those days

12  where I had to stop, it wasn't pleasant, so I just kind of cut

13  it off.

14  Q    Mr. Triolo, does this -- do these injuries to your low

15  back, do they affect personal relationships?  And I don't mean

16  family; I mean personal adult relationships.

17  A    Yes.

18  Q    How so?

19  A    So you're irritable.  You have good and bad days, you

20  know, these rainy days.  I am irritable.  You don't want to be

21  around me.  I just want to be left alone.  I'm in pain, nothing

22  I can do.

23          You know, going out as far as socially, you're

24  standing a lot.  You go out, we want to stand and hang out.  I

25  can't stand for long amounts of time.  I do it at work because

1    I love my job.  You know, I don't want to be out socially and

2    be standing the whole time.  It affects -- you don't want to go

3    out and do things being up on your feet.  You do that enough

4    already.

5    Q    Since the motor vehicle collision, have you gone on any

6    cruises or, you know, vacations or that sort of thing?

7    A    Yes.

8    Q    Okay.  Where have you gone?

9    A    I was on a cruise.  I went to a cruise.

10   Q    Was this a family cruise or --

11   A    No, it was a couple friends.

12   Q    And a cruise, did they have excursions?

13   A    Yes.

14   Q    And what excursions did you do?

15   A    Oh, it was a boat ride to a zoo.  We just saw some

16   animals, and then from there, we went to a beach, and was

17   pretty much on the beach the rest of the day.

18   Q    What about zip-lining or riding wave runners or hiking up

19   a -- you know, something that was more physical than a boat

20   ride?

21   A    No.  I didn't do any hard excursions like that.  It was,

22   you know, pretty much peaceful.

23   Q    Were those types of excursions offered at the stops on the

24   cruise?

25   A    Oh, sure, yes.

| | | |
|---|---|---|
| 1 | Q | Why didn't you want to do any? |
| 2 | A | I wasn't going to do any of those.  I was good with those |
| 3 | | activities.  I didn't want to be hurt on my vacation. |
| 4 | Q | Mr. Triolo, who did you live with? |
| 5 | A | I live with my brother Bruce. |
| 6 | Q | Is that still in Middleburg? |
| 7 | A | Yes. |
| 8 | Q | And do y'all share the household chores? |
| 9 | A | It depends on what chores we're talking about, yes. |
| 10 | Q | Okay.  So let's talk about that. |
| 11 | | How do you divide them up? |
| 12 | A | So inside, we pretty much divide it up as far as, you |
| 13 | | know, cleaning, vacuuming, you know, mopping floors, you know, |
| 14 | | whatever.  But outside, it doesn't -- I pretty much take care |
| 15 | | of the yard. |
| 16 | | He's a night-shifter, so he works -- he works all |
| 17 | | night, comes home, sleeps most of the day.  So he's used to -- |
| 18 | | he's used to doing that so that he's off at nights.  I'll come |
| 19 | | home from work, and he'll be doing some cleaning, whatever. |
| 20 | Q | Okay.  Do y'all have a riding lawnmower or push lawnmower? |
| 21 | | What do you have? |
| 22 | A | We have a push lawnmower. |
| 23 | Q | Okay.  And who's the one that uses the push lawnmower? |
| 24 | A | Me. |
| 25 | Q | Are you able to do that? |

TRIOLO v USA                    September 22, 2020  Vol I-**136**

```
 1   A    I'm able to do it.

 2   Q    Do you have a big yard, little yard?

 3   A    Small yard.  Get it done within an hour.

 4   Q    Okay.  And do you pay a price for doing it?

 5   A    Every time.

 6   Q    Out of 52 weeks of the year, how many times do you mow it

 7   and how many times does he mow it?

 8   A    How many times does he mow it?  I can probably count on

 9   one hand how many times he mows it.

10   Q    Okay.

11   A    So I pretty much take care of the yard.  That's -- I'm

12   just anal when it comes to the yard.  He doesn't really care

13   about the yard.  It's really not his thing.

14   Q    Are you physically able to do it?

15   A    I can do it.  I do it.  So, yeah, physically able to do

16   it.  After it's all said and done, you know, I'm in a recliner

17   and stretching multiple times a day.

18   Q    What other type of yardwork or house chores do you do

19   around the house?

20   A    Besides the yardwork, just, you know, regular cleaning.

21   Some vacuuming, some dusting.

22   Q    And --

23   A    Laundry.

24   Q    And have you changed your -- changed or modified what you

25   do at work after the motor vehicle collision?
```

TRIOLO v USA                    September 22, 2020  Vol I-**137**

1    A     Yes, I did.

2    Q     Tell us about that.

3    A     So before surgery, I would always help the nurses slide

4    the patients up into bed.  I didn't mind it, something I could

5    do, something I could help them with.  I don't do that anymore.

6    It's one thing I do not do.  I totally took it out of things I

7    used to do.

8    Q     Mr. Triolo, you took the stand, I believe, around --

9    somewhere between 9:00 and 9:15, and it's getting to be 12:30.

10   A     Yes.

11   Q     What's going on with your back right this second?

12   A     I wish I could stand up.  That's what's going on.  I'm

13   just -- I'm a little uncomfortable.

14   Q     Okay.  Does sitting for long periods of time cause those

15   types of problems?

16   A     Yes.

17   Q     How long can you sit till you get to feeling

18   uncomfortable?

19   A     You know, I've never really sat and timed it, you know.

20   When I start feeling uncomfortable, I get up.

21   Q     Did you take any medication this morning?

22   A     No, I have not.

23   Q     Will you take medication this evening before you go to

24   bed?

25   A     Yes, I will.

1  Q    What will you take?

2  A    I will take a Percocet and a Doxepin.

3          MR. KINNEY:  All right, Your Honor.  That's all I

4  have.

5          THE COURT:  All right.

6          Why don't we take our lunch break.  It's about 12:30,

7  and we'll come back on the record at 1:30.

8          And, Ms. Cunningham, you can pick up your

9  cross-examination at that time.

10          You're not going to like what I have to say, but I'll

11  ask the two of you to stop by the CSOs and get a real mask.

12  Those aren't really effective.  The CSOs have masks that

13  they'll hand out.

14          All right.  We're in recess.

15          COURT SECURITY OFFICER:  All rise.

16      (Recess taken, 12:28 p.m. - 1:37 p.m.)

17          COURT SECURITY OFFICER:  All rise.  This Honorable

18  Court is back in session.  The Honorable Marcia Morales Howard

19  presiding.

20          Please be seated.

21          THE COURT:  You can remove your mask.

22          And, Ms. Cunningham, you can remove your mask while

23  you're inquiring of the witness.

24          MS. CUNNINGHAM:  Your Honor, before we get started

25  with the witness, just sort of a point of business.  I know

 1 | it's still the plaintiff's case.  There were a number of
 2 | stipulated exhibits on the defendant's list as well.  This may
 3 | move more smoothly --
 4 |         THE COURT:  Sure.  Give me a moment to get your
 5 | exhibit list out of my notebook.
 6 |         And do I have a set of your exhibits?
 7 |         MS. CUNNINGHAM:  You do, Your Honor.
 8 |         THE COURT:  No big notebooks.
 9 |         MS. CUNNINGHAM:  I'm doing my best to use
10 | plaintiff's, so we'll only look at those things in defendant's
11 | that we must.
12 |         THE COURT:  We're going to have to put on the
13 | Internet, on our preferences, no notebook over 3 inches.
14 |         MS. CUNNINGHAM:  I agree.  I don't like the large
15 | ones either.
16 |         THE COURT:  Well, they're just too hard for me to
17 | move around.
18 |         Okay.  So tell me what exhibits, Ms. Cunningham.
19 |         MS. CUNNINGHAM:  So on the notice of filing that
20 | plaintiff's filed, which is Document 68 --
21 |         THE COURT:  I'm sorry.  I apologize.  Somehow I ended
22 | up with -- in my notebook with two copies of plaintiff's
23 | exhibit lists rather than -- let me pull it out.
24 |         COURTROOM DEPUTY:  I have extra copies.
25 |         MS. CUNNINGHAM:  Yes, Your Honor.  The list without

```
 1   objections is in the front of each binder.

 2              THE COURT:  Hold on one second.

 3              MR. KINNEY:  I need to find my defendant's exhibit

 4   list.

 5              MS. CUNNINGHAM:  I might have an extra.

 6              THE COURT:  Is there an extra one in the notebook?

 7              MR. KINNEY:  Thank you very much.

 8              THE COURT:  All right.  Go ahead.

 9              MS. CUNNINGHAM:  Okay, Your Honor.  So there were a

10   series of exhibits that were stipulated in whole.  Those are

11   Exhibit Nos. 1, 2, 3, 4, 6, 7, 8, 9, 11, 17, 18, 21, 23, 24,

12   30, 33, 34, 35, 38, 46, 47, and 49.

13              MR. KINNEY:  So stipulated.

14              THE COURT:  Okay.

15              MS. CUNNINGHAM:  And then there were a number of

16   other exhibits stipulated up to certain pages, and the easiest

17   thing might be to handle this as we move along.

18              I'm sorry, Your Honor.  So there were a number of

19   exhibits there where they've stipulated to certain pages, but

20   not all the pages, and so I'm just not certain how the Court

21   would like to handle that.

22              THE COURT:  Oh, I'm sorry.  I didn't realize that you

23   were asking me; I thought you were proposing.

24              If the exhibit isn't stipulated -- are you only using

25   the parts that are stipulated to?
```

1          MS. CUNNINGHAM:  No, Your Honor.  There are certain

2    pages that I expect to be using that are in the

3    not-stipulated-to part, although I suspect that once we are in

4    the midst of the cross that some of those objections might be

5    withdrawn, but it may be hard to do that without going through

6    it.

7          THE COURT:  Yeah.  I think -- I think you'll just

8    have to lay your foundation and move the exhibit in at the

9    appropriate time.

10          MR. KINNEY:  Your Honor, all of my objections are as

11    to relevance, so it seems like that would be the right course

12    of action to hear it during the course of time.

13          We're not raising new objections not stated on the

14    exhibit list.

15          THE COURT:  All right.  So, Ms. Cunningham, you

16    can -- you're going to use this podium?

17          MS. CUNNINGHAM:  Yes, Your Honor.

18          THE COURT:  Okay.

19          MS. CUNNINGHAM:  And I'm sorry, Your Honor, there is

20    one more thing.  We do have folders with copies of the

21    demonstrative exhibits.  We're going to have them up on the

22    screen.  There's a few that I don't believe are objected to

23    that I can give the Court the hard copy if you'd like to have a

24    hard copy in front of you?

25          THE COURT:  Yeah, that would be helpful.

 1              MS. CUNNINGHAM:  Thank you.

 2              Your Honor, may I proceed?

 3              THE COURT:  You may.

 4                        CROSS-EXAMINATION

 5  BY MS. CUNNINGHAM:

 6  Q    Good afternoon, Mr. Triolo.

 7  A    Good afternoon.

 8  Q    So as you testified on direct, you are still working as a

 9  respiratory therapist in the hospital setting; correct?

10  A    Yes.

11  Q    And it's my understanding that you work at Baptist Medical

12  Center South on a full-time basis, and you are also still

13  working at Orange Park Medical Center on an as-needed basis; is

14  that correct?

15  A    Yes.  I do not work at Orange Park Medical Center anymore.

16  Q    Okay.  Is there somewhere other than Orange Park that

17  you're working now?

18  A    No.

19  Q    During the period of time between this accident and the

20  surgery, you worked at both hospitals; correct?

21  A    That's correct.

22  Q    So let's take a look at the physical requirements of your

23  job.

24              If we could pull up -- well, first of all, I'd like

25  you to take a look at some of the employment records that we

1    received from Baptist Medical Center South, the particular page

2    that I was going to ask you to look at will bring up

3    Defendant's Exhibit 39, page 38.

4            THE COURT:  39 is not in evidence yet, is it?

5            MS. CUNNINGHAM:  That's correct, Your Honor.

6            So if I may ask -- maybe pull up the document so that

7    I may ask him about it to lay the foundation for relevance.

8            THE COURT:  Because we don't have a jury, I will go

9    ahead and do it that way.

10           If was there was a jury here, obviously we would not

11   be displaying things not in evidence, but go ahead.

12           MS. CUNNINGHAM:  If we can go to page 38 of this

13   exhibit, please.

14   BY MS. CUNNINGHAM:

15   Q    All right.  Mr. Triolo, this document is contained within

16   the employment file that was produced to us in response to the

17   subpoena from Baptist Medical Center South.  And this document,

18   in particular, is a set of job specifications for a respiratory

19   therapist.

20           Do you see that?

21   A    I see the document.  I can't really read it too well.

22           MS. CUNNINGHAM:  Okay.  Well, we will blow up that

23   top half perhaps.

24   BY MS. CUNNINGHAM:

25   Q    All right.  So this indicates these are the specifications

1   for a respiratory therapist working in the hospital where you

2   work; correct?

3   A    Yes.

4   Q    All right.  And this is a document that if we turn to the

5   next page, page 39, that also lists the physical requirements

6   that are expected of the physical therapist -- pardon me,

7   respiratory therapists that work at Baptist Medical Center

8   South.

9          Do you see those requirements?

10  A    Yes.

11  Q    And I will tell you, sir, if you need anything in hard

12  copy, we do have hard copies available.  So please just let me

13  know.  Okay?

14  A    Okay.

15  Q    All right.  It is -- if we look at this document --

16         MS. CUNNINGHAM:  Your Honor, I'm sorry.  I'm just

17  trying to determine if there is still an objection or if the --

18         THE COURT:  Well, I think you need to move it into

19  evidence and if there's an objection, he'll object.

20         MS. CUNNINGHAM:  Thank you.

21         Your Honor, at this time I'd like to move the Baptist

22  Medical Center HR records for Mr. Triolo into evidence, please.

23         THE COURT:  Is there an objection to that?

24         MR. KINNEY:  Your Honor, so far I've looked at

25  page 38 and 39.  Your Honor, I'm objecting to pages 10 to 14 on

1    grounds of relevance, his Social Security card, the

2    identification cards, confidentiality agreements, e-mails

3    between him and -- I don't know who.  And pages 16 to 34 as

4    well on the grounds of relevance.

5              MS. CUNNINGHAM:  Well, Your Honor, this particular --

6              MR. KINNEY:  The two pages that were just discussed,

7    38 and 39, and I believe it goes on to page 41, plaintiff does

8    not object.

9              THE COURT:  Ms. Cunningham, do you want to address at

10   all the portions of the employment record that --

11             MS. CUNNINGHAM:  Yes, Your Honor.

12             These are -- typically for the purposes of providing

13   exhibits in -- particularly in the bench trials, we provide the

14   full set of subpoenaed records that came from the entity so

15   that it is clear as to where they came from, what authority

16   they came to us under.  The authenticity has already been

17   stipulated by the parties to all exhibits.  We do not have an

18   authenticity objection.

19             The relevance standard is a fairly low one to meet.

20   These are his employment records.  It's his employment file.

21   There are pages here with the job specifications.  There are

22   also pages with the specific hours that he worked for the pay

23   periods from the time of employment until the end of our

24   subpoena date.  And clearly the amount of hours he worked, when

25   he worked, and his job specifications are all relevant to this

1    action.

2           THE COURT:  All right.  So if there's no objection --

3    if there's no objection to the authenticity, then the only

4    objection is as to relevance.  Given the fact that it's a bench

5    trial, I'm going to overrule the objection.

6           If there's a specific item, Mr. Kinney, that you

7    think is prejudicial or specifically problematic, I could

8    address that, but...

9           MR. KINNEY:  Could we, Your Honor -- yes.  Could we

10   look at page 14?

11          Could we remove that -- agree to remove that from the

12   record?

13          THE COURT:  Yeah.  Ms. Cunningham, it's a picture of

14   his driver's license and his Social Security card, which we

15   would have to -- well, they are redacted already, but I don't

16   see any reason not to exclude that page, particularly because

17   it does have his full driver's license number.

18          MS. CUNNINGHAM:  I do not have a problem excluding

19   that, Your Honor.

20          So we can either provide a redacted version that just

21   fully redacts it or we can remove the page.  That's fine.

22          THE COURT:  Yes.  At the end of the trial, you're

23   both going to have to provide all of the exhibits on

24   electronic -- on a CD, because it's required -- the Court of

25   Appeals now requires everything electronically, so when you

1    provide that, you'll just delete page 14.

2                MS. CUNNINGHAM:  Okay.

3                THE COURT:  All right.  So Exhibit 39 is admitted

4    with the exception of page 14.

5                MS. CUNNINGHAM:  Thank you, Your Honor.

6           (Defendant's Exhibit 39 was admitted in evidence.)

7                MS. CUNNINGHAM:  And just -- I know we wouldn't go

8    about this this way if we were having a jury trial, but because

9    this is a bench trial, document -- Exhibit 40 are the

10   employment records from the Orange Park Medical Center, so it

11   really is the same -- it's the same series of issues.

12               There was a relevance objection.  There's no

13   authenticity objection.  There's the same types of records in

14   that exhibit, and I would move Exhibit 40 into evidence as

15   well.

16               THE COURT:  All right.  Is there any particular

17   objection to 40, other than it being overinclusive, relevance,

18   Mr. Kinney?

19               MR. KINNEY:  I'm just looking through it real quick.

20   I believe there is a similar problem with this one --

21               MS. CUNNINGHAM:  Anything specific?

22               MR. KINNEY:  -- on page 11.  Well, I objected to the

23   whole thing, but page 11 is the driver's license.

24               THE COURT:  Well, do you object to the entire thing

25   on relevance grounds?

1        MR. KINNEY:  I did.  I thought you were asking me for

2   specific pages.

3        Obviously it's the same ruling as the Baptist, but I

4   was trying to identify the specific page that would be

5   problematic.

6        THE COURT:  Yeah, I understand, but I want the

7   clarification of the record.

8        I understood that you had objections to certain pages

9   of the employment records on relevance.

10       You're objecting to the entire employment record on

11  relevance grounds?

12       MR. KINNEY:  As to Orange Park Medical Center, I did

13  object to the entire document, all 166 pages in here, yes.

14       THE COURT:  Well, that's certainly overruled, because

15  his -- there's no question that there are relevant documents in

16  his employment records in a case such as this.

17       If you had specific pages of -- I'll hear from you on

18  that, but I don't...

19       MR. KINNEY:  Yes, Your Honor.  Page 11.

20       THE COURT:  All right.  Page 11 is the driver's

21  license.  That needs to be removed.

22       MR. KINNEY:  That's the only problematic one that I

23  see.

24       THE COURT:  So we'll exclude page 11 of Exhibit 40,

25  otherwise I'll admit Exhibit 40 and address any -- if there's

TRIOLO v USA                    September 22, 2020  Vol I-149

1   anything that is genuinely irrelevant, the Court can disregard

2   it when I'm addressing the evidence.

3            Go ahead.

4            MS. CUNNINGHAM:  Thank you, Your Honor.

5        (Defendant's Exhibit 40 was admitted in evidence.)

6   BY MS. CUNNINGHAM:

7   Q    All right.  Mr. Triolo, if we go back to what is still on

8   the screen, Defendant's Exhibit 39, which outlines some of the

9   physical requirements of the job.

10           MS. CUNNINGHAM:  Ms. Sabino, I think to make it a

11  little bit easier to read, do you mind expanding just the

12  lifting requirements portion first, please.

13  BY MS. CUNNINGHAM:

14  Q    Okay.  Mr. Triolo, so under the requirements of your job,

15  you are having -- frequent lifting and carrying of all types is

16  listed here; correct?

17  A    I have listed here, yes.

18  Q    All right.  And pushing, pulling, and transferring up to

19  75 pounds is listed here?

20  A    Yes.

21  Q    If we look under the second half of the page, the physical

22  demands section, it distinguishes between occasional, constant,

23  and frequent tasks.

24           Do you see that?

25  A    I do.

TRIOLO v USA                    September 22, 2020  Vol I-150

1    Q    Okay.  And under the constant tasks, those include

2    standing; correct?

3    A    Yes.

4    Q    Walking?

5    A    Yes.

6    Q    Bending -- well, pardon me, bending is a frequent;

7    correct?

8    A    Yes.

9    Q    Horizontal reaching?

10   A    Yes.

11   Q    And if we turn to the next page just for completeness,

12   there's a set at the top of page 40 with some of the other

13   frequent requirements of your job, including eye, hand, foot

14   control; correct?

15   A    Yes.

16   Q    And repetitive motions; correct?

17   A    Yes.

18   Q    All right.  And if we take a look at Defendant's

19   Exhibit 40, these are the Orange Park Medical Center records.

20        MS. CUNNINGHAM:  If we, in particular, look at page

21   57.

22        And here, if we can expand the bottom part of this

23   document, the Physical Requirements section.  Thank you.

24        Okay.  Orange Park does this a little differently,

25   but it's the same general idea, you'll see.

TRIOLO v USA                    September 22, 2020  Vol I-151

 1  BY MS. CUNNINGHAM:

 2  Q    It shows very frequent standing, walking, and sitting;

 3  correct?

 4  A    Yes.

 5  Q    Frequent bending; correct?

 6  A    Yes.

 7  Q    Some squatting; correct?

 8  A    Yes.

 9        MS. CUNNINGHAM:  And if we turn to the next page,

10  which is page 58.

11        If we can expand that box, please.

12  BY MS. CUNNINGHAM:

13  Q    Here we have frequent reaching; correct?

14  A    Yes.

15  Q    And -- oh, pardon me.  That was very frequent reaching and

16  then frequent lifting, pushing, and pulling; correct?

17  A    Yes.

18  Q    So -- and thank you, Ms. Sabino, you can take that down.

19        This is not a job where you're sitting at a desk all

20  day; right?

21  A    That's correct.

22  Q    You're on your feet throughout your shift?

23  A    Yes, ma'am.

24  Q    You sit only briefly when charting or planning?

25  A    Yes.

TRIOLO v USA                    September 22, 2020  Vol I-152

1   Q    You're lifting 20- to 30-pound oxygen tanks?

2   A    Not all the time.

3   Q    Not all the time, but sometimes; correct?

4   A    We hardly need to lift.  We have devices where we can push

5   around our tanks.  So...

6   Q    All right.  You're not working under a -- like a modified

7   duty schedule for an accommodation; correct?

8   A    What do you mean by that?  What's that mean?

9   Q    So, in other words, you don't have disability

10  accommodation where you're working some kind of modified duty

11  in your job?

12  A    No, I'm not.

13  Q    All right.  Do you wear a back brace while you're working?

14  A    No.

15  Q    Have you ever worn a back brace while you're working?

16  A    Yes.

17  Q    All right.  What period of time did you wear one?

18  A    From when I went back to work, period of four -- four or

19  five months.

20  Q    And you wore it continuously while you were at work?

21  A    Yes.

22  Q    And you feel that you don't need it any longer?

23  A    No, I feel -- I don't need it any longer.

24           THE COURT:  Was that after your surgery, sir?

25           THE WITNESS:  Yes, Your Honor.

1  BY MS. CUNNINGHAM:

2  Q    All right.  So I would like to bring up two demonstrative

3  exhibits.  The first is Defendant's Exhibit 51.  We had marked

4  it as Defendant's Exhibit 51.

5          And this -- in the far right-hand side we have a

6  Bates number column.  It gives the Bates number in the record

7  that we were just looking at.  So the Baptist Medical Center

8  South records are Defendant's Exhibit 39.

9          Those underlying numbers come from that document.

10          If we can take a look at the top half of this page

11  first, please.

12      (Mr. Moore enters the courtroom.)

13  BY MS. CUNNINGHAM:

14  Q    So, Mr. Triolo, this is the period of time -- the pay

15  periods that followed your accident, which was on February 11

16  of 2017; correct?

17  A    Yes.

18  Q    All right.  So I think you may have alluded to this

19  earlier, but Baptist does their time records on a weekly basis

20  and Orange Park does them on a biweekly basis; is that correct?

21  A    Baptist also is biweekly.

22  Q    Okay.  So for whatever reason, the way it is in the

23  records, it breaks it down on a weekly basis.

24          So from this record, we see that you worked 47.93

25  hours in the week following the car accident.

 1          Do you see that?

 2   A    I do see it.

 3   Q    All right.  And you continued to work in the period of

 4   time in the weeks following the car accident, taking a little

 5   bit of time off.

 6          Do you see that?

 7   A    Yes.

 8          MS. CUNNINGHAM:  In the -- if we can go back to the

 9   larger record -- well, it might be easiest actually to just --

10   can it be brought up side by side, Ms. Sabino?

11          Let's bring up Defendant's Exhibit 52, which is also

12   a demonstrative exhibit.  And if it's okay to bring up side by

13   side -- it's fine to just bring it up on its own.

14          It's okay, Ms. Sabino, that's fine to just have it by

15   itself.

16          All right.  So let's take a look at this and do the

17   same thing.

18          Just expand the top part, please.

19   BY MS. CUNNINGHAM:

20   Q    Okay.  So during the time frame between your surgery --

21   pardon me, between the accident and your surgery, you were

22   working both jobs; correct?

23   A    Yes.

24   Q    And we see here that in addition to the hours that you

25   were working that we saw in Defendant's Exhibit 51, you were

1    working all these additional hours at the Orange Park Medical

2    Center; correct?

3    A    Yes.

4    Q    Now, I can tell you that I have gone through and looked at

5    these hours and tried to pair them up by pay period.  And by my

6    count, there are 19 pay periods between the accident and the

7    surgery where you worked 90 or more hours in a two-week period.

8              Does that sound right to you?

9    A    Maybe.

10   Q    Okay.  And by the records that we've been provided, there

11   were 13 of those pay periods where you worked 100 or more hours

12   in a two-week period.

13             Does that sound right to you?

14   A    Yes.

15   Q    We can take that down.  Thank you.

16             All right.  Mr. Triolo, you work with and under the

17   direction of doctors to treat patients; correct?

18   A    Yes.

19   Q    And to provide the best care to your patients, you need

20   them to provide you with an accurate medical history; correct?

21   A    Yes.

22   Q    And for them to have the best outcome, they need to follow

23   your advice; correct?

24   A    Not all the time.

25   Q    They may not always follow your advice, but you would like

1   them to follow it so that their outcome is as good as it can

2   be; is that fair?

3   A    Yes.

4   Q    And particularly because of that experience, you know that

5   you need to give your own providers an accurate medical

6   history; correct?

7   A    Yes.

8   Q    And similarly, you need to follow their advice; correct?

9   A    Yes.

10  Q    And you know how important it is for patients to engage in

11  the therapy that you're directing them to do when you're

12  treating patients; correct?

13  A    Yes.

14  Q    And when people do the recommended therapy, their chances

15  of recovery generally improve; would you agree?

16  A    Yes.

17  Q    All right.  Let's talk a little bit about the car

18  accident.

19       On direct examination, you alleged that your seat

20  back totally reclined.

21       Do you recall that testimony?

22  A    Yes, I do.

23  Q    And your seat was not broken in this accident; correct?

24  A    No.

25  Q    The only thing replaced after this accident was your

TRIOLO v USA                    September 22, 2020  Vol I-157

1  bumper cover and a reverse sensor; correct?

2  A    Yeah.  There was a bunch of things that were replaced in

3  the rear of the car.

4  Q    Okay.

5  A    A lot of electronics and the bumper, yes.

6  Q    Well, let's take a look at Defendant's Exhibit 3.  This is

7  one of the exhibits that was stipulated to.

8         And if we can go to page 12, please.

9         So, Mr. Triolo -- and, I'm sorry, let's go back to

10  page 1, just so we can situate ourself in the exhibit.

11         The insurance company -- State Farm is your car

12  insurance company; correct?

13  A    That's correct.

14  Q    And they submitted a claim to the United States Postal

15  Service for the property damage that was sustained by your

16  vehicle; correct?

17  A    Yes.

18  Q    Okay.  And you're aware that that claim was paid?

19  A    Yes.

20  Q    So if we turn to page 6 of this exhibit -- actually, we

21  can move forward to page 12.

22         So your vehicle was repaired at the AutoNation

23  Collision Center in Orange Park; correct?

24  A    Yes.

25  Q    And this is the -- I can tell you that this is the final

1  paid bill that was provided to the Postal Service for the claim

2  after the repairs had been done.

3          Does this look familiar to you?  Have you seen this

4  document before?

5  A    Yes.

6  Q    All right.  And so let's take a look -- this may be where

7  we are, but let's take a look at the top, at page 13 -- at the

8  top of page 13.

9          I'm sorry.  It's exhibit -- all right.  My apologies.

10          So we are at Defendant's Exhibit 3, page 13.

11          If we can expand the top part of this page, please.

12          Okay.  Mr. Triolo, so this indicates -- this is a

13  reflection of the things that were actually repaired and

14  replaced on your vehicle after the February 11, 2017, car

15  accident.  Do you see that?

16  A    Yes.

17  Q    Okay.  And this indicates that the bumper cover with

18  reverse sensors was replaced; correct?

19  A    That's correct.

20  Q    And the reverse sensor was replaced?

21  A    Yes.

22  Q    And there was a repair to the balance panel, which is that

23  protective accessory attached to the rear bumper; correct?

24  A    Yes.

25  Q    All right.  There was no damage to the frame of the

```
 1  vehicle; correct?

 2  A     None that I know of, no.

 3  Q     All right.  The seat wasn't repaired?

 4  A     The seat was not repaired.

 5  Q     And this was a new -- relatively new car; correct?

 6  A     At that point, it was four -- four or five months old.

 7  Q     Let's take a look at Plaintiff's Exhibit 34, which are the

 8  photographs that you took on the scene the day of the accident.

 9          All right.  We won't go over the ones that you've

10  already looked at with your attorney.  But you'll agree with me

11  that there's no pictures with the seat or the seat back in any

12  of the photos that you took; agreed?

13  A     Yes.

14  Q     If we look at page -- the photograph at page 9.  And if we

15  can bring the whole picture up.

16          Mr. Triolo, I might -- oh, there we go.  Okay.

17          We're trying to zoom out and for some reason it

18  zoomed in.

19          MS. CUNNINGHAM:  If you can, Ms. Sabino, if you can

20  just scroll all the way to the bottom, that will work also.

21          That will work.  Thank you.

22  BY MS. CUNNINGHAM:

23  Q     Is this your shadow in the picture?

24  A     Yes, it is.

25  Q     And it looks like there's a dog in the bottom right-hand
```

1    corner of the picture?

2    A    Yes.

3    Q    All right.  Do you know whose dog that is?

4    A    That's my dog.

5    Q    Okay.  Was that dog in the car with you at the time of the

6    accident?

7    A    Yes.

8    Q    Where was the dog in your vehicle at the time of the

9    accident?

10   A    Sleeping in the passenger's seat.

11   Q    Okay.  Did your -- was your dog in a crate or anything

12   like that?

13   A    No.  He was sleeping in the passenger's seat.

14   Q    Did your dog fall off the seat or anything like that when

15   the car accident occurred?

16   A    I'm not sure, to be honest with you.  I'm not sure if he

17   fell off the seat or not.  I was so focused on what had

18   happened.  I was very surprised that I even got hit from

19   behind.  So I wasn't looking at the dog when I was rammed from

20   behind.

21          MS. CUNNINGHAM:  All right.  We can take that down.

22   Thank you.

23   BY MS. CUNNINGHAM:

24   Q    All right.  Mr. Triolo, on direct you testified that your

25   vehicle surged forward after impact.  Do you recall that

TRIOLO v USA                    September 22, 2020  Vol I-**161**

1  testimony?

2  A    Yes.

3  Q    And I know your counsel asked if you had an estimate, but

4  do you have any sense of how far you surged forward?

5  A    I don't know.  I don't know how far I surged forward.

6  Q    Okay.  What was the distance between you and Ms. Rentz

7  when your vehicles came to a rest?

8  A    I couldn't tell you an exact measurement, an exact

9  distance.

10  Q    Do you know whether it was five car lengths, four car

11  lengths?

12  A    When it came to a rest after the accident?

13  Q    Yes, sir.

14  A    It wasn't four or five car lengths.  I don't think I would

15  be able to see her vehicle in the mirror if it was that far.

16  Q    All right.  So when you said your vehicle surged forward,

17  your distance was something less than -- than what, three car

18  lengths, less than two car lengths?

19  A    Certainly less than two car lengths.

20  Q    Now, you did not see Ms. Rentz prior to the accident;

21  correct?

22  A    No.

23  Q    And you did not thus see her on her cell phone prior to

24  the accident; correct?

25  A    Prior to, no.

TRIOLO v USA                    September 22, 2020  Vol I-162

1    Q    After the collision, when the --

2              MS. CUNNINGHAM:  Yes, Your Honor?

3              THE COURT:  Your question was correct, and so when he

4    says no, I don't know if he's saying, no, you're not correct,

5    or, no, he didn't see her.  If you could rephrase so we have a

6    clear record.

7              MS. CUNNINGHAM:  Yes, thank you.  My apologies, Your

8    Honor.

9    BY MS. CUNNINGHAM:

10   Q    Mr. Triolo, did you see Ms. Rentz prior to the accident?

11   A    No.

12   Q    Did you see her on her cell phone prior to the accident?

13   A    No.

14   Q    Once the vehicles were parked, two other individuals from

15   the Postal Service came to the scene; correct?

16   A    Yes.

17   Q    Did you talk to those individuals?

18   A    Yes.  I believe I spoke to somebody.  Somebody came and

19   spoke to me.

20   Q    Okay.  The somebody was somebody, it was your

21   understanding, from the Postal Service?

22   A    Yes.

23   Q    Did you report to them that your back wasn't feeling

24   right?

25   A    Whoever I reported to, the sheriff or the individual from

1  the Postal Service, I told them that my back was hurting and I

2  was going to be going to the emergency room after this.

3  Q    My question is very specific.  I want to find out what you

4  recall telling the Postal Service employees that were on the

5  scene.  Okay?

6  A    Okay.

7  Q    Did you tell any of the Postal Service employees who came

8  to the scene that your back was hurting?

9  A    Yes.

10  Q    Did you tell them that you were experiencing pain in your

11  neck?

12  A    Yes.

13  Q    Did you tell them that you had hit your head?

14  A    I don't believe that question was ever asked of me.

15  Q    Did you tell them that you were dazed?

16  A    I don't believe that question was asked of me at all.

17  Q    Well -- so I'm asking not only what they might have asked

18  of you, but also to find out what you yourself told them

19  regardless of whether there was a specific question about it.

20  A    I don't remember if I -- if I remember telling them if I

21  was dizzy or not.

22  Q    All right.  Do you remember whether you told them -- did

23  you tell them whether you were -- did you tell them that you

24  were confused?

25  A    I don't remember if I told them I was confused or not.

TRIOLO v USA                    September 22, 2020  Vol I-**164**

1  Q    Did you tell them that you were having spasms in your mid

2  or low back?

3  A    Yes.

4  Q    Did you tell them that you were having pain in your right

5  thigh?

6  A    I don't believe I told them I was having --

7  Q    Did you tell them that you were having pain in your leg?

8  A    I don't remember if I told them that or not.

9  Q    Did you tell them that you had pain in your foot?

10 A    I don't remember if I told them I had pain in my foot or

11 not.

12 Q    During this period of time that you were taking the

13 pictures, is it fair to say that you were bending down to be

14 able to get the shots that you wanted to get of the damage?

15 A    No.  I was standing upright.

16 Q    The entire time?

17 A    When I took those pictures, yes.  All those pictures were

18 standing upright.

19 Q    The accident occurred at approximately 1:00 p.m.; correct?

20 A    Yes.

21 Q    And you testified that you were at the accident scene for

22 approximately two hours waiting for the police to arrive?

23 A    About two hours, yes.

24 Q    All right.  You referenced on direct that you -- if I

25 understood you correctly, that at some point you saw the

1    traffic crash report from this accident.

2              Have you ever seen that document?

3    A    I believe, yes, I have.

4    Q    Okay.  That document reflects times for the officer to

5    arrive on the scene and depart the scene.

6              Do you think that looking at that document would

7    refresh your memory about those times?

8    A    Possibly.

9              MS. CUNNINGHAM:  All right.  If we can bring up I-5,

10   please, and we'll just look at the top part of the document.

11   BY MS. CUNNINGHAM:

12   Q    All right.  Mr. Triolo, this document is Bates No. USPS

13   0019, the Florida Traffic Crash Report, and I'm showing it to

14   refresh your recollection.

15             MR. KINNEY:  Your Honor, I have an objection.  It's

16   more than just relevance in this document.  And as we stated in

17   our objection, based on Florida Statute 316.066 where crash

18   reports cannot be used in civil proceedings.

19             THE COURT:  I think that deals with the

20   admissibility.

21             I think to the extent that it's just being used to

22   refresh his recollection, that's fine.

23             Now, it really should just be shown to him and not to

24   the rest of the courtroom, so why don't you please take it down

25   and walk it up to him.

1          MS. CUNNINGHAM:  Because of our COVID protocols, I

2    wasn't sure whether the Court wanted us walking anything to a

3    witness.  That's the only reason I was putting things on the

4    screen.

5          THE COURT:  Well -- but what we are requiring is --

6    and I realize that this is the first trial, but what we've

7    asked is that everybody be prepared to present evidence

8    electronically but you have to have hard copies available in

9    case the witness needs to see them.

10          MS. CUNNINGHAM:  Okay.  We do, Your Honor.  Just one

11    moment, please.

12          THE COURT:  Okay.

13          MR. KINNEY:  I have an extra copy.

14          May I approach and hand it to the witness?

15          THE COURT:  Sure.  Thank you.

16          All right.  He has a copy.  Thank you.

17          MS. CUNNINGHAM:  Thank you, Your Honor.

18          THE COURT:  And so the way this works is you take a

19    look at it, take a look at what she is asking you to look at,

20    and then you'll put the document down and you'll answer her

21    question.  Okay?

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Go ahead, Ms. --

24          MS. CUNNINGHAM:  Thank you, Your Honor.

25    BY MS. CUNNINGHAM:

1  Q    Mr. Triolo, at the top of this document, there is a time

2  reported, a time dispatched, a time on scene, and time cleared

3  scene.  Do you see those?

4  A    Yes.

5  Q    All right.  Does this refresh your recollection in any way

6  about what time the officer arrived and departed the scene?

7  A    He wrote down what he wrote down.  I can only go by what

8  he's saying.  I don't recall it being 12:00 -- time ordered,

9  time dispatched, time on scene, 1:25, so 25 minutes.  When he

10  said he was there at 1:25, it seemed a lot longer to me.

11  Q    Okay.  What about with respect to the time cleared scene?

12  Does that refresh your memory in any way?

13  A    1:48.  That sounds about right.  Because I didn't get to

14  Baptist Medical -- no, that can't be -- that can't be accurate.

15  Q    Okay.  And why can't it not -- why can't it be accurate?

16  A    I'm trying to remember what time I got to -- it was 2:56

17  when I got to the emergency room.  So how could he leave at --

18  clear the scene at ten to 2:00?

19  Q    I'm sorry, so --

20        MR. KINNEY:  Your Honor, I continue my objection to

21  Exhibit No. 5.  It's clearly not being used to refresh his

22  memory.

23        THE COURT:  I'm going to agree.  At this point that's

24  not what -- so let's move on.

25        MS. CUNNINGHAM:  I should say, just on the

1    admissibility point, that these type of things typically are

2    admissible.  It's my understanding that the statements are the

3    portion that's not admissible, but I can move on.

4            THE COURT:  Well, I didn't -- all right.  I'll --

5    I'll take a look at the statute later.  I am aware that under

6    the privilege and under the statute, the statements of the

7    witnesses are not available.

8            Whether there are other portions -- I'm sorry,

9    admissible, not available.  Whether other portions of it could

10   be, I didn't look at that independently, so I'll take a look at

11   that later, and if it turns out that I'm convinced by that,

12   I'll address it.

13           MS. CUNNINGHAM:  Okay.  Thank you, Your Honor.

14           It's my understanding that the observations of the

15   officers that are made independently of the parties are allowed

16   to come in, but...

17           THE COURT:  That's possible.  I haven't looked at it.

18           Mr. Kinney?

19           MR. KINNEY:  Your Honor, I was going to say that that

20   may not be the observations of the officers.  That may be

21   something that the dispatch recorded.  We don't know what the

22   officer would testify to as to the time on scene and time of

23   departure.  This could be an automated system.

24           THE COURT:  That's a different -- that's a different

25   objection, but I'll take a look at it.

1        Go ahead.

2            MS. CUNNINGHAM:  All right.  Thank you, Your Honor.

3    BY MS. CUNNINGHAM:

4    Q    Mr. Triolo, what's the -- the travel time between your

5    accident location and the ER that you visited is approximately

6    ten minutes; is that right?

7    A    Yes.

8    Q    All right.  And did you do anything else between leaving

9    the accident location and arriving at the Emergency Department?

10   A    No.

11   Q    You went straight there?

12   A    Yes, I did.

13   Q    You drove yourself to the hospital; correct?

14   A    Yes, I did.

15   Q    And you went by yourself; correct?

16   A    Yes, I did.

17   Q    All right.  Let's take a look at Plaintiff's Exhibit 2,

18   which contains the Emergency Department visit.

19            If we could go to BMC02, the second page of the

20   exhibit.

21            All right.  Mr. Triolo, this is the first page of the

22   Emergency Department record that you were asked to look at

23   earlier.

24            If we look at the next page, which is BMC3, you -- at

25   the top of the page, if we can enlarge that.

TRIOLO v USA                    September 22, 2020  Vol I-170

```
 1              That's fine.  Thank you.
 2              All right.  You reported that the vehicle hit you at
 3  moderate speed; correct?
 4  A    Yes.
 5  Q    That -- and you denied hitting your head, according to
 6  this record; correct?
 7  A    According to this record, yes.
 8  Q    You denied any loss of consciousness?
 9  A    Correct.
10  Q    And you denied any bleeding?
11  A    That's correct.
12  Q    The second paragraph indicates that you were having --
13  that you had moderate pain at onset; is that true?
14              Pardon me.  It was in the prior -- yes, that's fine.
15  Thank you.
16              All right.  The Emergency Department record reflects
17  that you had both moderate pain at onset and moderate pain at
18  the Emergency Department.
19              Would you agree that's what the record shows?
20  A    That's what the record shows, yes.
21  Q    You denied any kind of headache; correct?
22  A    Yes.
23  Q    And this note that we are reading is the note by
24  Dr. Christina Caro, who was the Emergency Department physician
25  who treated you that day; correct?
```

 1   A    Yes, she did.

 2   Q    Is Dr. Caro someone that you know?

 3   A    I know she's an emergency room doctor, yes.

 4   Q    All right.  But she works at Baptist in the same medical

 5   center where you work --

 6   A    Yes.

 7   Q    -- is that true?

 8        The bottom of this page, which is BMC3, shows the

 9   beginning of her physical examination.

10        And when you go to an Emergency Department, the

11   doctors and staff there typically do perform a physical

12   examination; correct?

13   A    They do -- they should do a quick examination, yes.

14   Q    If you look at the top of the next page, BMC4, this is the

15   record that reflects the physical part of the physical

16   examination that was done on you; isn't that true?

17   A    Yes.

18   Q    Okay.  And so the -- when you come to an Emergency

19   Department at Baptist or elsewhere and you've been in a car

20   accident, it's the responsibility of the providers there to

21   evaluate you to determine if you have a medical condition that

22   needs to be treated emergently; agreed?

23   A    Yes.

24   Q    And in this case, Dr. Caro examined you, as documented in

25   this note; agreed?

TRIOLO v USA                    September 22, 2020  Vol I-172

1   A    So, I mean, this is very -- this is a piece of paper for

2   every patient that comes in.  So as far as doing a complete,

3   you know, listening to my lungs, you know, doing all this

4   respiratory, chest wall, doing all the back, I mean, my neck,

5   there wasn't really a great amount of time spent doing a

6   thorough, you know, assessment on me.

7   Q    Well, let's take a look at the note that is written here.

8        When you're coming in, it is the obligation of that

9   Emergency Department physician to ensure that they're not

10  sending you home with a problem that requires emergent medical

11  attention; yes?

12  A    Yes.

13  Q    All right.  And part of their role is determining whether

14  there is something going on with a patient that requires

15  further exploration through imaging; correct?

16  A    Yes.

17  Q    So here, if we take a look particularly at the back and

18  musculoskeletal portion -- are you able to read those lines?

19  A    Yes.

20  Q    Would you please read for me the line about the back.

21  A    Says:  Normal range of motion, normal strength, normal

22  tenderness, normal swelling, no deformity.

23       Again, though, she didn't do a musculoskeletal

24  evaluation on me.

25  Q    Yes, sir.  I'm sorry, I think you might have read the

1   wrong line.

2          If we can start with the line about the back exam,

3   please.

4   A    Okay.  Nontender.  Normal range of motion.  Normal

5   alignment.  No step-offs.

6          Again, I don't remember the ED doing any type of

7   range of motion for her, you know, to put that down there.  She

8   didn't have me doing any type of flexing or bending over or,

9   you know, any type of evaluation.

10  Q    You agree that you reported back pain and that the doctor

11  was evaluating your complaints; agreed?

12  A    I gave her -- I let them know that I had neck and back

13  pain and I was in a motor vehicle accident.

14  Q    All right.  Let's look back at the prior page, which is --

15  two prior, BMC2, which is back to the first page of the note.

16          Let's look at the first section with the addendums.

17          Thank you.

18          So this was discussed with you on direct.  This neck

19  exam was not completed, and then goes on to describe the neck

20  exam that was done; agreed?

21  A    I mean, that's what it says.

22  Q    Okay.  In other words, here, neck exam was not completed

23  does not mean the physician did not perform the neck exam; it

24  means that the result of the exam wasn't written into the

25  record until she did this entry at 1622; agreed?

1   A    I'm not sure.

2   Q    All right.  You'd agree with me that this is a documented

3   neck exam?

4   A    It is documented.

5   Q    And the result of the physical examination that -- that

6   was done by the physician and the physician's interaction with

7   you led you to have a CT scan of your cervical spine; correct?

8   A    Yes, which is pretty much protocol in the hospital.  A

9   patient comes in from a rear-end motor vehicle accident, they

10  typically do a CT, cervical CT.

11  Q    And if you were having severe back pain at the Emergency

12  Department, and you wanted to advocate for yourself to also get

13  a lumbar CT, that's something that would have been done as

14  well; agreed?

15  A    I'm going by what the Emergency Room doctor at this point

16  feels I need.

17  Q    All right.  So you left this visit with a cervical collar;

18  is that correct?

19  A    Yes.

20  Q    All right.  Did you wear that collar?

21  A    I did.

22  Q    How long did you wear it?

23  A    I wore it, I believe, five days, maybe a week.

24  Q    Let's take a look at the discharge summary that you looked

25  at briefly earlier.  This is at BMC36.

1          It's the first page of the individualized patient

2   discharge instructions from the Emergency Department.  And I

3   won't review the parts that have already been reviewed.  But if

4   we look at the next page, which is BMC37, the -- if you can,

5   Ms. Sabino, expand just sort of the center of the page with the

6   medication and radiology section.

7          Okay.  Mr. Triolo, let's start with the top.  You

8   were given Lortab, eight tablets -- or given a prescription so

9   that you could get eight tablets of Lortab; correct?

10  A    That's correct.

11  Q    And the frequency there would mean that that's a two-day

12  supply?

13  A    That's correct.

14  Q    At the bottom there's an indication here that your blood

15  pressure was elevated during your visit.  Do you see that?

16  A    Yes.

17  Q    And you were directed to follow up with your primary care

18  provider to have your blood pressure reassessed.  Do you see

19  that?

20  A    Yes.

21  Q    Did you -- did you -- pardon me.  You did not follow up

22  with your primary care provider after this visit about that

23  issue, though, did you?

24  A    Well, from what I know about blood pressure, being in the

25  field, when you're in pain, your blood pressure is elevated.

1    But, no, I didn't follow up with my provider because I pretty

2    much knew why my blood pressure was up.

3                MS. CUNNINGHAM:  All right.  You can take that down.

4    BY MS. CUNNINGHAM:

5    Q    So if I understand your testimony from your direct

6    examination, rather than going to one of your existing

7    physicians, like an existing primary care doctor, you went to a

8    new chiropractor that you had not seen before; is that correct?

9    A    Yes.

10   Q    And why go to a chiropractor instead of going back to your

11   primary care department or primary care provider?

12   A    I don't know how my primary care provider would help me

13   with my neck and back being how I was feeling.  I felt if there

14   was anybody that would be able to help me at that time, it

15   would be a chiropractor.  That's the kind of help I needed.

16   Q    Had you treated with a chiropractor previously?

17   A    No.

18   Q    Is it your testimony that you had not spoken to Mr. Kinney

19   at the time you had your first appointment with Dr. McDaniels?

20   A    That's correct.

21   Q    Let's take a look at the chiropractic visit, Plaintiff's

22   Exhibit 6.  And we can just start with the first page.  Again,

23   I'll try not to review things that you've already discussed.

24                Here you indicate in the center -- what medications

25   are you taking and for what conditions?

1   A    The pain meds from -- it says the pain meds prescribed

2   from the ER and ibuprofen.

3   Q    All right.  So let's talk about this first part.

4        The -- were you still taking the pain meds from the

5   ER on February 16th?

6   A    I don't recall if I was or not.

7   Q    Exhibit 6, page 10.

8        All right.  The top part of this has a history of

9   accidents.  If we may just take a look at that.

10       This is -- this is a history that you provided to

11  Dr. McDaniels about the car accident; yes?

12  A    That's correct.

13  Q    And here you indicate that the traffic started to move

14  forward.  You tapped the brake and hit the horn.

15       Is that an accurate description of what happened?

16  A    No.

17  Q    Okay.  Do you know why Dr. McDaniels would have thought

18  that was what happened?

19  A    No.

20  Q    This indicates that the mail truck was traveling at

21  approximately 30 to 40 miles per hour.  Is that something that

22  you reported to Dr. McDaniels?

23  A    30, 40 miles per hour, I can't recall if I -- the exact

24  speed, but, I mean, she hit me hard, so it could be 30,

25  40 miles an hour.

1    Q    I'm asking if this is what you reported to Dr. McDaniels.

2    A    I don't recall if I gave that exact speed or not.

3    Q    All right.  And if we look at the last sentence.  The last

4    sentence states that the entire rear end of the truck has to be

5    replaced.  But we know that was not what happened here; agreed?

6    A    Yes.  It wasn't -- it was my car that needed -- rear end

7    of the car needed to be replaced.

8    Q    All right.  But even on your vehicle, we've already

9    discussed the fact there was no structural damage to the car.

10   A    Okay.  But the rear bumper needed to be replaced.

11   Q    Okay.  You would agree with me the rear bumper is not the

12   entire rear end of a car?

13   A    I would agree with that.

14   Q    So during this first visit, Dr. McDaniels recommended that

15   you come to see him three times a week for two to four weeks.

16        Let's actually take a look at the right page.  It's

17   JSS12.  And it is in that discussion section, Ms. Sabino, so

18   that part should be fine.  Thank you.

19        Yeah, this is a little difficult to read.  But do you

20   see the -- at the top of the discussion section, the third

21   paragraph area down, the visit recommendation consists of three

22   times per week for two to four weeks.

23        That's what his recommendation was; yes?

24   A    Okay.

25   Q    And the --

1        THE COURT:  I'm sorry, where are you?

2        MS. CUNNINGHAM:  Yes, Your Honor.  So discussion, it

3    says:  Treatment provided, prognosis good.  Then the next line

4    is Patient Instructions.

5        THE COURT:  I see it, okay.

6        MS. CUNNINGHAM:  Okay.

7    BY MS. CUNNINGHAM:

8    Q    But you never saw Dr. McDaniels three times a week ever

9    when you were treating with him, did you?

10   A    No.  I was -- I was working.  So I saw him -- as soon as I

11   had an off day I would see him.  I would schedule as soon as I

12   could.

13   Q    Now, at some point he changed his recommendations to be

14   less frequent.  He alternated back and forth between once a

15   week or twice a week.

16        Do you recall why those recommendations shifted?

17   A    Not offhand, no, I don't.

18   Q    So let's just take a look at the -- Dr. McDaniels' records

19   about how many times you did see him.  This is at JSS9.

20        Because these are hard to see, maybe, Ms. Sabino, you

21   can enlarge the bottom half of the chart first and we'll start

22   there.

23        So you had the initial evaluation with him on

24   February 16; is that right?

25   A    Yes.

TRIOLO v USA                September 22, 2020  Vol I-**180**

1   Q    And then you had your next evaluation with him on

2   February 22nd?

3   A    Yes.

4   Q    When was -- so you saw him twice in February, yes?

5           THE COURT:  February 22nd or --

6           THE WITNESS:  21st.

7           THE COURT:  -- February 21st?

8           MS. CUNNINGHAM:  I'm sorry, Your Honor,

9   February 21st.  Thank you.

10  BY MS. CUNNINGHAM:

11  Q    Okay.  You saw him four times in March; is that right?

12  A    Yes.

13  Q    You saw him twice in April?

14  A    I see -- I only see the one here.  So...

15  Q    Oh, I'm sorry.  Well, thank you.

16          We can expand the top.

17          All right, Mr. Triolo.  Now you should be able to see

18  both of them.  You saw him twice in April?

19  A    Yes.

20  Q    And you saw him twice in May?

21  A    Yes.

22  Q    And you saw him twice in June?

23  A    Yes.

24  Q    And you saw him twice in July?

25  A    That's correct.

1          MS. CUNNINGHAM:  If we look at JSS12, which is the

2    page we were looking at a moment ago, and expand the -- again,

3    that central section, Ms. Sabino, near where your cursor is

4    right now.

5          Upwards, if you can.

6          Wonderful.  Thank you.

7    BY MS. CUNNINGHAM:

8    Q    All right.  Dr. McDaniels prescribed a lumbar orthotic for

9    you.  Do you recall that?

10   A    Is that a -- is that -- yes, traction.  Yes, I do remember

11   that.

12   Q    So, sir, I'm actually referencing the lumbar orthotic,

13   which I believe is a back brace.

14   A    Oh, yes.

15   Q    Did you wear a back brace in this time period?

16   A    At that point in time, the back brace really wasn't doing

17   anything for me.

18   Q    How much did you try it before you made that

19   determination?

20   A    I don't remember offhand how long it was.  I just know it

21   was -- it didn't help with any of the aggravating symptoms that

22   was going on.

23   Q    At the bottom of this page and the top of the next page,

24   Dr. McDaniels gave you some recommended work restrictions.  It

25   starts with the disability section and goes to the top of the

1    next.

2           And so he gave you some recommended restrictions to

3    help your recovery as are listed here; right?

4    A    Yes.

5    Q    Did you follow these restrictions?

6    A    Well, I mean, I couldn't follow the no walking for more

7    than, you know, 30 minutes at a time.  I'd be on my feet for

8    that, but I would -- at that time I was at work.  But as far as

9    everything else, yes.

10   Q    All right.  The no sitting for more than 20 minutes is

11   also something that you followed?

12   A    I mean, at that time, I wasn't able to sit for long

13   periods of time anyway, so if, you know, I needed to get up, I

14   got up.  But unfortunately with my duties, walking is a big

15   part of my job.  I'm all around the hospital.

16   Q    All right.  If we take a look at the next part of the

17   note, he actually recommended that you take a little bit of

18   time off work to give your body time to recover; right?

19          And we can expand it so you can see.  It's right

20   under the part we were just looking at.  So...

21          At the top of the part that's expanded, do you see

22   that?

23   A    Yes, I see that.

24   Q    All right.  You had leave time with your job at Baptist;

25   yes?

TRIOLO v USA                    September 22, 2020  Vol I-**183**

1  A    I'm not sure how much time was allotted to me at that

2  time, but I do know I had tuition and federal student loans to

3  pay, car payment.  I had bills like everybody else, utilities.

4  It's not like I could just stop working.

5  Q    Is it your testimony that you did not have the ability to

6  take a couple of days off to recuperate?

7  A    I'm sorry, what was your question?

8  Q    Is it your testimony that you did not have the ability to

9  take a couple of days off to give yourself the chance to

10  recover?

11        MR. KINNEY:  Objection, Your Honor.  The reason why

12  I'm objecting is that the way she's phrasing the question is

13  indicating the document says that if he takes time off, he'll

14  fully recover.  It indicates none of that.

15        THE COURT:  Well, why don't you rephrase.

16  BY MS. CUNNINGHAM:

17  Q    Is it your testimony, sir, that you did not have leave

18  time that would have allowed you to take a few days off?

19  A    I never said I didn't have any leave time to take off.

20  Q    Okay.

21  A    But he never asked me that either.

22        MS. CUNNINGHAM:  If we take a look at the next page,

23  JSS14, and if we could just expand that top portion.

24        Thank you.

25  BY MS. CUNNINGHAM:

TRIOLO v USA                    September 22, 2020  Vol I-184

1    Q    This reflects that Dr. McDaniels referred you for an MRI

2    at this point with the Advanced Diagnostic Group, but you did

3    not get an MRI until the end of April.  Is that true?

4    A    Yes.

5    Q    All right.  Let's take a look back for one second at the

6    first page of the exhibit, which is JSS01.

7              While that's coming up, on direct, you talked a

8    little bit about having headaches previously and having a

9    history of sleep apnea.

10             Do you recall that testimony?

11   A    Yes.

12   Q    All right.  You didn't report to Dr. McDaniels that you

13   had a history of migraines, did you?

14   A    I don't recall if I did or not.  I think I was just there

15   for what was going on at that time.

16   Q    And you didn't tell him about your history of sleep apnea?

17   A    I don't know how that was relevant to what was going on

18   with me then.

19   Q    All right.  Let's take a look at one of your prior medical

20   records.  This is Plaintiff's Exhibit 4, and this is records

21   from Baptist Primary Care.

22             If we look at page BPC5, which should be the fifth

23   page of the exhibit, so the first half, including the encounter

24   date, if you can.

25             Thank you.

1          Now, Mr. Triolo, this is a note from an encounter

2    date of June 6 of 2015 with Dr. Jones at the Baptist Primary

3    Care.

4          Do you see that?

5    A    Yes.

6    Q    Okay.  And if I recall correctly, you testified that the

7    headaches that you were having after the car accident kind of

8    started at the back of your head and neck and worked their way

9    up; correct?

10   A    That's correct.

11   Q    So if we take a look at this narrative, this indicates

12   that you were having migraine-type headaches two to three times

13   per week.

14         Do you see that, the second line of this paragraph?

15   A    Yes.

16   Q    And that in most instances, you are taking Excedrin

17   migraine and IBU at onset but other times is severe and not

18   resolved with early treatment.

19         That's what you were reporting; is that right?

20   A    That's what it says, yes.

21   Q    Okay.  If we continue, it describes the headaches as

22   starting at the back of the head and neck and working its way

23   up.

24         Do you see that?

25   A    Yes.

1  Q    You've indicated that you thought there might be a

2  correlation with your exercising, and that you were doing

3  resistance training with Bowflex; is that right?

4  A    Yes.

5  Q    And so you did, in fact, experience those type of

6  headaches prior to the car accident; is that correct?

7  A    Well, no.  This -- this is totally different --

8           MR. KINNEY:  Your Honor, under the rule of

9  completeness, I'd ask that he be allowed to read the sentence

10  right before the one she directed him to read that identified

11  the location of the headaches.

12           It's on BPC, page 5.

13           THE COURT:  I think you can address it in redirect.

14           MR. KINNEY:  Thank you, Your Honor.

15           THE COURT:  Go ahead.

16  BY MS. CUNNINGHAM:

17  Q    All right.  If we take a look --

18  A    I would just -- may I say something, Your Honor?

19           THE COURT:  No, sir.  You answer the question.

20           THE WITNESS:  These --

21           THE COURT:  Mr. Triolo, let her ask the question.

22           THE WITNESS:  I'm sorry, Your Honor.

23           MS. CUNNINGHAM:  All right.  Let's take a look at the

24  review of symptoms that is on the same page a little bit

25  further down.  The very bottom section.

1   BY MS. CUNNINGHAM:

2   Q    All right.  This is reflecting that you were sleeping six

3   to eight hours a night, but awakened frequently, and you felt

4   that was happening because of apneic episodes.  Is that what

5   this record states?

6   A    Yes.

7   Q    And if we look at the next page, BPC6, the assessment

8   section of the record, this assessment included fatigue, poor

9   sleep, snoring, migraine headaches, tension headaches, and

10  insomnia with sleep apnea.

11          That's what the record reflects?

12  A    Yes.  It's -- I didn't have insomnia, though.  Insomnia is

13  not sleepy at all.

14          MS. CUNNINGHAM:  All right.  Thank you.  You may take

15  that down.

16  BY MS. CUNNINGHAM:

17  Q    So, Mr. Triolo, you then proceeded to also receive care

18  from a Respiratory Care and Sleep Medicine Center; correct?

19  A    Yes.

20  Q    And you were diagnosed with obstructive sleep apnea --

21  with a moderate sleep apnea; is that true?

22  A    That's correct.

23  Q    And you tried an auto -- an auto PAP device?

24  A    I still have an auto PAP device.  I wear it every day.

25  Q    So if we look at --

 1              MS. CUNNINGHAM:  This is a defendant's exhibit, Your
 2      Honor.  Let me just see what parts are objected to.
 3              MR. KINNEY:  I've got a surgeon waiting outside and
 4      I've got a pain management physician that's on the way.
 5              Can we take a short break and at least contact that
 6      pain management physician and tell him we're not going to reach
 7      him today?
 8              THE COURT:  Okay.  It's time for our afternoon break.
 9      It's ten minutes to 3:00.  We'll come back on the record at
10      3:00 p.m.
11              COURT SECURITY OFFICER:  All rise.
12          (Recess taken, 2:52 p.m. - 3:03 p.m.)
13              COURT SECURITY OFFICER:  All rise.
14              This Honorable Court is now in session.  Please be
15      seated.
16              THE COURT:  All right.  You may continue.
17              MS. CUNNINGHAM:  Thank you, Your Honor.
18      BY MS. CUNNINGHAM:
19      Q    All right.  Mr. Triolo, I'd like to take -- ask you to
20      take a look at some medical records from Point Medical
21      Services.
22              Is that an entity that you saw for medical treatment
23      in the past?
24      A    Yes, I believe I have.
25      Q    All right.  Defendant's Exhibit 15 contains some records

 1   from that entity.

 2           It's my understanding that these are your medical

 3   records from visits you had for conditions prior to the car

 4   accident.  Is that correct?

 5           MR. KINNEY:  Your Honor, I had previously entered an

 6   objection on the exhibit list.  I'm withdrawing the objection

 7   and stipulating.  It's Defendant's Exhibit No. -- I believe

 8   it's 15.

 9           THE COURT:  All right.  So 15 is admitted.

10           MR. KINNEY:  Yes, Your Honor.

11        (Plaintiff's Exhibit 15 was admitted in evidence.)

12           THE COURT:  All right.  Go ahead.

13   BY MS. CUNNINGHAM:

14   Q    All right.  Mr. Triolo, if you may take a look at this,

15   Defendant's Exhibit 15, Bates No. POINTE0021.  This is a visit

16   from November 16th, 2015.

17           And let's just take a look at some of the complaints

18   that are reflected here.  You can expand the history of present

19   illness.

20           Thank you.

21           THE COURT:  Ms. Cunningham --

22           MS. CUNNINGHAM:  Yes, Your Honor, sorry, Defendant's

23   Exhibit 15.

24           THE COURT:  Go ahead.  I'll catch up.

25   BY MS. CUNNINGHAM:

TRIOLO v USA                    September 22, 2020  Vol I-190

1    Q    All right.  In this record -- this record reflects that

2    you were reporting worsening fatigue with symptoms that started

3    six months ago.

4              Do you see that part of your record?

5    A    Yes.

6    Q    You reported that this was moderately limiting your

7    activities, and that important triggers -- and I'm not reading

8    every line here -- but important triggers include exertion,

9    stress, and work?

10   A    Yes.

11   Q    That you had both malaise and myalgias.

12             Do you see that?

13   A    Yes.

14   Q    What do those words mean?

15   A    Malaise, and that's just a decrease in activity, fatigue,

16   in other words.

17   Q    All right.  And myalgias?

18   A    I'm not sure what that is.

19   Q    In the next paragraph, you were presenting with weight

20   gain.  Is that accurate?

21   A    Yes.

22   Q    You're indicating here that there were triggers, including

23   social stressors, exacerbated by stress and sedentary

24   lifestyle.

25             Do you see those sentences?

TRIOLO v USA                    September 22, 2020  Vol I-**191**

1    A    Yes.

2    Q    All right.  And the next sentence includes positive for

3    decreased muscle strength, positive for malaise, and positive

4    for myalgias.

5              Do you see that part of the record?

6    A    Yes.

7    Q    All right.  And the review of systems reflected that you

8    were having a number of problems including poor sleep and

9    decreased concentration.

10              Do you agree that that's what this record reflects?

11   A    That's what it says.

12   Q    Okay.  And these were not complaints that you reported to

13   Dr. McDaniels when you saw him for treatment.  You would agree

14   with that statement?

15   A    Yes.

16   Q    So -- okay.  This -- so if we go back to sort of February

17   of 2017, the period of time just shortly following the

18   accident, if we take a look back at Defendant's Exhibit 51,

19   which is the demonstrative exhibit about Baptist Medical

20   Center.

21              The top part of that record is fine, just the first

22   few lines.  I'm sorry, the -- probably need the next line too.

23   Thank you.

24              All right.  Sir, this indicates that the pay

25   period -- there are two pay periods there next to one another

TRIOLO v USA                September 22, 2020  Vol I-**192**

1   that -- the first one begins February 19th and ends on the 25th

2   of 2017.  The second one begins on the 26th of February and

3   ends on March 4th.

4              Do you see those two pay periods?

5   A    Yes.

6   Q    And there's an indication here that you took 20 hours off

7   of work during those two pay periods.  Do you see that?

8   A    Yes.

9   Q    All right.  Do you recall what you were doing during that

10  time off?

11  A    No, I don't.

12  Q    Okay.  Do you have recollection of going to the Daytona

13  500 this year, in 2017?

14  A    In 2017, yes.

15  Q    Okay.  And so on this year -- and we have a calendar if it

16  would help to look at -- at it, but February 26th of 2017 was

17  the Daytona 500.  Does that sound right to you?

18  A    Sounds about right, yes.

19  Q    Okay.  And how -- tell me about that experience.  Is that

20  your first time to a Daytona 500?

21  A    Yes, it was.

22  Q    All right.  And who did you go with?

23  A    I went with a friend who lives in New York.  His father

24  lives in Orange County.  He gets tickets all the time for the

25  Daytona 500.  Big car guys.  He had an extra ticket and asked

1   if I wanted to go.

2   Q    It's in Daytona Beach; right?

3   A    I don't know if that's the beach.  I just know Daytona

4   Speedway.  I don't know exactly where it is.

5   Q    Did you stay overnight?

6   A    No.

7   Q    Did you drive down with someone?

8   A    No.

9   Q    Just went by yourself down there and back?

10  A    And I met my friend.  He was staying at his father's in

11  Orange County.

12  Q    Okay.  Do you recall what time you got there that morning?

13  A    I don't recall.  I think it was more later in the morning,

14  if I had to -- or early afternoon.  I don't recall the exact

15  time we got there, no.

16  Q    All right.  We -- well, let's take a -- we can look at

17  these if we need to.  But I'm just going to ask you about it

18  first and we'll see if we actually need to look at them.

19        Your car was actually hit in the parking lot while it

20  was at the speedway; right?

21  A    It was.

22  Q    Okay.  And the records reflect that the -- and you know

23  what?  We should probably do this just properly for the record.

24        MS. CUNNINGHAM:  Defendant's Exhibit 42, which is the

25  insurance records from GEICO, include a report about this

 1    incident.

 2              This exhibit presently is objected to in whole.

 3              THE COURT:  What's the objection?

 4              MR. KINNEY:  Relevance.  Mr. Triolo wasn't in this

 5    vehicle at the time of the accident.  He's not seeking

 6    compensation or any -- claiming any injuries from his car being

 7    backed into while it was parked in Daytona.

 8              THE COURT:  All right.  Ms. Cunningham, what's the

 9    relevance?

10              MS. CUNNINGHAM:  Your Honor, there are two prongs.

11    There's the information in here about the time of the incident,

12    which helps sort of anchor the time that Mr. Triolo was at the

13    race and the length of time that he might have been there.

14              It also contains information about the damage done to

15    his vehicle, which there had been some confusion about whether

16    that was being claimed in this accident.  I think we now know

17    it's not being claimed in this accident.  But there -- the very

18    last page of the record, GEICO80, has information about the

19    date and time of the incident.

20              So, Your Honor, I'm just -- it could be more of a --

21    just trying to help get Mr. Triolo back into that day, what he

22    was doing there, and just talk a little

23    bit about it in that sense.

24              THE COURT:  Well, I fail to see the relevance of --

25    based on what you just told me, of the majority of it, but if

1   all we're using it for is to establish the time frames, I'm

2   inclined to simply allow it but say that I would not intend to

3   review any portions that are not specifically addressed here in

4   court.

5          MS. CUNNINGHAM:  That's fine, Your Honor.  Thank you.

6   BY MS. CUNNINGHAM:

7   Q    Okay.  Mr. Triolo, let's just take a look --

8          MS. CUNNINGHAM:  I'd like to move Defendant's 42 into

9   evidence, please.

10         THE COURT:  Subject to the qualification that I said,

11  which is that I'm only going to review specific portions that

12  are addressed on the record.

13      (Defendant's Exhibit 42 was admitted in evidence.)

14         MS. CUNNINGHAM:  Okay.  So let's just take a look at

15  GEICO80, please.

16         All right.  Let's -- thank you very much.

17  BY MS. CUNNINGHAM:

18  Q    Okay.  Mr. Triolo, this indicates that the incident

19  occurred at 11:00 a.m. at the speedway.  Do you see that?

20  A    Yes.

21  Q    And it's my understanding the race started about 3:00.

22  Does that sound about right to you?

23  A    2:00, 3:00, I believe.

24  Q    So you were there that morning a good few hours before the

25  race started.

```
 1              What did you do when you got there?
 2   A     When I got to the race?
 3   Q     Yes, sir.
 4   A     Watched the race.
 5   Q     Okay.  But if you were there before 11:00 in the morning
 6   and the race didn't start till 2:00 or 3:00, what were you
 7   doing in that period of time?
 8   A     Finding a seat, looking at some of the cars.  We had a
 9   pass where you could go into the -- to the -- I forgot what
10   they're called.  Where the racers are, and just take a look at
11   a couple cars.
12   Q     Okay.  And then was there a seat in the stands that you
13   eventually took?
14   A     Yes.
15   Q     How long did the race last?
16   A     A couple hours.
17   Q     Okay.  Were you standing up for that period of time?
18   A     I was -- I stood and I sat.  If there was an accident, you
19   stand up and look.  For the most part you're sitting down
20   watching the race.
21   Q     But you had a good day at the speedway?
22   A     It was a good day.
23   Q     All right.  Do you remember what time you left that
24   evening?
25   A     I'm not sure.  We -- we had went and got something to eat
```

TRIOLO v USA                    September 22, 2020  Vol I-**197**

1   after the race was over.  And then when we were walking back to

2   the car, that's when I had found out that my car was hit.

3            We didn't actually know until we got actually inside

4   the car and there was a little letter on my windshield.

5   Q    Okay.  And you were able to take the time off from work in

6   order to go to the speedway and enjoy the race that day; yes?

7   A    Did I have to take time off for that race?  I don't recall

8   if I took time off that day for the race.

9   Q    All right.  Well, we were looking a moment ago at

10  Defendant's Exhibit 51.  Do you remember another reason for the

11  time that was taken off in that time frame?

12  A    I mean, if I took off -- I don't remember taking a day off

13  for the race, is what I'm saying, having to take a day.

14           It was how many years ago?  I can't remember if I

15  took a day off or not.

16           MS. CUNNINGHAM:  All right.  So we need to take the

17  record down, please.

18           So --

19           THE COURT:  All right.  If that was the only document

20  in Exhibit 42, then I'll just limit Exhibit 42 to page 8.

21           MS. CUNNINGHAM:  That's fine, Your Honor.

22           If it's not made an issue of later, then there won't

23  be a need for me to have the other documents admitted.

24           THE COURT:  Okay.

25  BY MS. CUNNINGHAM:

1  Q    Okay.  So after the Daytona 500, you continued your

2  treatment with Dr. McDaniels; yes?

3  A    Yes.

4  Q    And let's just take a look at a few other of those notes

5  from him.

6        So the period of time that you were treating with

7  him, he was not providing you any medications; is that right?

8  A    That's right.

9  Q    And the -- there was a point in time, and we can take a

10  look at the particular record, but there was a point in time in

11  June where he gave you a TENS unit to take home.  Do you

12  remember that?

13  A    Yes.

14  Q    And you were instructed to use both the TENS unit and a

15  runner's roller.  Do you remember that?

16  A    Yes.

17        MS. CUNNINGHAM:  Okay.  And let's just take a look at

18  Plaintiff's Exhibit 6, JSS52.

19        So this is visit date of July 11th of 2017.

20        If we look at the Subjective.

21        Thank you.  Okay.

22  BY MS. CUNNINGHAM:

23  Q    So this is five months after your car accident; right?

24  A    Yes.

25  Q    And after doing various different therapies, you reported

1    to him that the TENS unit helped you a lot; yes?

2    A    Yes.

3    Q    And that the runner's roller was helping with hip and leg

4    pain; right?

5    A    As far as -- yeah, the -- not the shooting pain, but just

6    the aching end of it.  Not the shooting, stabbing pain.

7    Q    Okay.  You'll agree with me this particular record doesn't

8    distinguish; right?

9    A    Yes.

10   Q    But of the treatments that you received while you were

11   with Dr. McDaniels, the simple foam roller, five months after

12   the accident, gave you some relief; is that fair?

13   A    Some relief, yes.

14   Q    All right.  After -- after you started seeing

15   Dr. McDaniels, you started seeing Dr. Asad, and you talked a

16   little bit about that on direct.

17            MS. CUNNINGHAM:  Let's just take a look at part of

18   the note from the first visit you had with Dr. Asad that was

19   marked 162017.  This is Plaintiff's Exhibit 13.

20            All right.  If we could go to UNC2, please, and

21   expand the top part, the History of Present Illness section,

22   please.

23   BY MS. CUNNINGHAM:

24   Q    All right.  You reported -- and some of this may have

25   already been discussed already, but you reported to Dr. Asad

```
 1   that immediately after the accident, you were experiencing
 2   tightness and spasms in the mid and lower back.
 3           Do you see that reflected in this note?
 4   A   Yes.
 5   Q   Okay.  You agree with me that that was not reflected in
 6   the Emergency Department records?
 7   A   Of having tightness and spasms?
 8   Q   Correct.
 9   A   I'm -- whatever the -- said tightness and back and neck
10   pain, I believe it was, so spasms.  Probably didn't say spasms
11   in the ED.
12   Q   Okay.  If we move forward to UNC7, Dr. Asad reached a
13   number of diagnoses.  One of them was -- and, I'm sorry, let
14   Ms. Sabino get to the page.
15           MS. CUNNINGHAM:  If we can pull up maybe the top
16   two -- the top half or so of the page.  Thank you.
17           THE COURT:  And this is page 7?
18           MS. CUNNINGHAM:  Yes, Your Honor.  Exhibit 13.
19   BY MS. CUNNINGHAM:
20   Q   So one of the things that Dr. Asad diagnosed you with was
21   headaches; right?
22   A   Yes.
23   Q   There's no indication in these records that you reported
24   to Dr. Asad that you had had headaches prior to the accident.
25           Do you agree with that?
```

1    A    I would have to look that over.

2    Q    All right.  Do you have any recollection of reporting to

3    him your prior history of headaches?

4    A    I don't recall if I did or didn't.

5    Q    All right.  The -- this physician also -- you reported a

6    number of issues to Dr. Asad that caused him to diagnose you

7    with a postconcussion syndrome.  Do you recall that?

8    A    Yes.

9    Q    All right.  And because of that, you were directed to see

10    a number of individuals.

11         MS. CUNNINGHAM:  Let's take a look at the last note,

12    the note from the last visit with this practice, which was

13    May 25, 2017.  And that's at UNC24.

14    BY MS. CUNNINGHAM:

15    Q    Okay.  This particular visit was actually with the

16    physician's assistant, Ms. Chasten.  Do you see that?

17    A    I think if you can blow it up a little bit.

18    Q    I'm sorry.  Thank you.

19    A    Yes.

20    Q    Okay.  So let's take a look at -- yes, that's fine.

21         Okay.  At the bottom of this section, it says:  We'll

22    refer to Dr. Kramarich with pain management.

23         Do you see that?  It's the second-to-last line in

24    this?

25    A    Yes.

TRIOLO v USA                    September 22, 2020  Vol I-202

1  Q    And it also says:  Will refer to Dr. Cannestra for

2  surgical options.

3            Do you see that?

4  A    Yes.

5  Q    Okay.  Dr. Kramarich is the physician with Riverside Spine

6  & Pain.  Is he someone that you ever reached out to?

7  A    No.

8  Q    And Dr. Cannestra is a surgeon with Lyerly Neurosurgery.

9  Is he someone you ever reached out to?

10  A    No.

11  Q    If you look at the -- if you can expand the next section

12  of goals.

13            Yes.  Thank you.

14            At the end of this section, there are a few things --

15  look at the last few lines.  They were considering an MRI of

16  your brain, but had indicated that you preferred to hold off;

17  right?

18            The fourth line from the bottom and the third line

19  from the bottom.

20  A    That's what it says, but I don't remember --

21            THE COURT:  I'm sorry, sir.  I don't understand what

22  you just said.

23            THE WITNESS:  That's what it says, but I don't

24  remember ever being asked if I wanted an MRI of my brain.

25  BY MS. CUNNINGHAM:

1  Q    It also indicates here that you were referred to Dr. Ross

2  Addeo for neuropsychometrics testing, and that you preferred to

3  hold off.

4          Do you recall that?

5  A    I don't.  I do not recall that.

6  Q    Okay.  And this indicates that you were referred to Casey

7  Harlow for a balance master assessment.

8          Do you see that?

9  A    Yes.

10  Q    And I can tell you we have no indication in any of the

11  records that you ever saw Ms. Harlow for a balance master

12  assessment.

13          Do you recall seeing her?

14  A    I don't ever remember any of these names.

15  Q    All right.  Did you ever have a balance assessment done

16  outside Dr. Asad's office?

17  A    No.

18  Q    All right.  With respect -- and we can let that come down.

19  Thank you.

20          Okay.  With respect to the referral to Dr. Kramarich

21  for pain management, was there a reason you did not reach out

22  to him?

23  A    I don't recall.  The only --

24          MR. KINNEY:  Foundation.

25          Mr. Triolo testified that he was informed of these

 1    referrals.

 2            THE COURT:  Well, you can ask your question and he

 3    can answer it.

 4            I recall his testimony differently.  Go ahead.

 5            THE WITNESS:  What was the question?

 6    BY MS. CUNNINGHAM:

 7    Q    Yes, sir.  Did you ever reach out to Dr. Kramarich for a

 8    pain management opinion?

 9    A    No, I don't never remember getting a referral for that

10    gentleman.

11    Q    Okay.  And did you ever reach out to Dr. Cannestra or

12    anyone at Lyerly Neurosurgery to discuss with them the

13    possibility of surgery or having a surgical consult?

14    A    No.  Again, another name I don't remember getting a

15    referral from from Dr. Asad.

16    Q    All right.  So is it your testimony that you were not

17    aware that Dr. Asad had referred you to these two individuals?

18    A    I don't remember ever hearing those names.  So if I was

19    referred to them -- if he referred me, I didn't know about it.

20    I was always referred to Dr. Pardo.

21    Q    All right.  How did you get referred to Dr. Pardo?

22    A    I was referred to Dr. Pardo from Dr. Asad.  That was my

23    understanding.

24    Q    Okay.  What is that understanding based on?

25    A    From the referral from Dr. Asad.  Dr. Asad -- I got the

1    referral from Dr. Asad to go to Dr. Pardo.  That's how that

2    connection happened.

3    Q    Okay.  All right.  Your first visit with Dr. Pardo was on

4    July 11th of 2017; is that right?

5    A    Yes.

6    Q    The Dr. Pardo records are at Plaintiff's Exhibit 9.

7          Okay.  If we look at SJIPS-3, which is the third page

8    of the exhibit, the description of events that caused your

9    injury -- just kind of blow up in the middle there, please.

10          That's fine.  Whatever is captured is fine.

11          All right.  This says:  I was rear-ended while at a

12    traffic light.

13          And this is your handwriting; correct?

14   A    Yes.

15   Q    Okay.  Do -- did you -- did you provide Dr. Pardo, in this

16   initial visit, with other information about the car accident,

17   that you recall?

18   A    Yes.

19   Q    All right.  And I think there is another note that

20   reflects some additional information that we can take a look

21   at.  Okay.

22          If we look at the questionnaires that you filled out

23   at page 4 -- SJIPS-4 -- I'm sorry, Bates No. 4.  At the bottom

24   of the page.  All right.  Thank you.

25          This questionnaire asks:  Have you had any injuries,

1   other auto injuries, falls, sports injuries, et cetera, in the

2   past that were significant or required medical evaluation or

3   treatment?

4           And here you checked no; is that right?

5   A    I see what other medical tests.  Is that what you're

6   asking?

7   Q    No, sir.  The question underneath:  Have you had any

8   injuries?

9   A    Yes, I marked "no."

10  Q    So if we take a look at the next page, Bates No. 5.  In

11  the middle of the page, it asks you to list all surgeries.  And

12  this indicates surgery for the left forearm and compound

13  fracture.

14          Do you see that?

15  A    Yes.

16  Q    All right.  Is this the fracture that you sustained in the

17  car accident that you discussed on direct involving the black

18  ice?

19  A    Yes.

20  Q    All right.  Did you disclose to Dr. Pardo that you had --

21  that this forearm compound fracture was the result of a car

22  accident?

23  A    I believe I did.  I can't be too sure if we talked about

24  that or not.  I don't remember.

25  Q    Take a look at the top half of this same page.  You have a

1   number of things checked off here, and I'm just going to read
2   the things that are checked "yes," okay?
3          So you have checked yes:  Fatigue, memory loss,
4   headaches, depression, irritable, difficulty with sleep, in
5   this first section of symptoms.
6          Do you agree that all those were checked yes?
7   A    Yes.
8   Q    Did you report to Dr. Pardo any of your preexisting
9   history of any of these conditions?
10  A    I'm not sure if I did or not.  I don't remember if I did
11  or not.
12  Q    If we look at the same page at the bottom of the page, the
13  Current Medication section.
14         All right.  This indicates that when you came to
15  Dr. Pardo, you were not taking any medications; is that right?
16  A    Right.
17  Q    Okay.  So Dr. McDaniels did not provide you any
18  medications; right?
19  A    That's correct.
20  Q    Dr. Asad tried a couple of things, one for a muscle
21  relaxant, the Methocarbamol; right?
22         That's a muscle relaxant?  Yes?
23  A    Yes.
24  Q    And he also tried gabapentin, which is a nerve pain
25  medication?

TRIOLO v USA                    September 22, 2020  Vol I-208

1   A    That's correct.

2   Q    And you tried both of those and neither of them worked for

3   you; right?

4   A    Very minimal.

5   Q    So at the time you got to Dr. Pardo, you were not taking

6   any narcotic medication; correct?

7   A    That's correct.

8   Q    So you had those eight pills that were given to you at the

9   Emergency Department; right?

10  A    Yes.

11  Q    But until you came to Dr. Pardo in that stretch from

12  February to July, you did not have any other narcotic

13  medication; correct?

14  A    That's correct.

15  Q    Okay.  So the testimony earlier about having had Percocet

16  continuously from the accident is actually not correct; right?

17  A    Having Percocet from the accident?

18  Q    Yes, sir.  I'm sorry.  That's a bad question that I'll

19  reframe.

20       You didn't start taking Percocet until after you

21  saw -- began to see Dr. Pardo; is that true?

22  A    That's correct.

23  Q    Now, in your medical history, when we -- if we go, I'm

24  sorry, back to some of those top things you probably don't

25  really need to see again, you never sought sort of outside

```
 1   counseling for depression, did you?
 2   A     No.
 3   Q     And you haven't treated with anyone for anxiety?
 4   A     No.
 5             MS. CUNNINGHAM:  At the bottom of page 6 -- Bates
 6   No. 6 -- the section with his signature, please.
 7   BY MS. CUNNINGHAM:
 8   Q     All right.  Is this your signature, sir?
 9   A     Yes.
10   Q     All right.  And can you read that out, please.
11   A     To the best of my knowledge, the questions on this form
12   have been accurately answered.  I understand if I provide
13   incorrect information, it can lead to a misdiagnosis.  It is my
14   responsibility to inform doctor's office of any change in my
15   medical status.
16   Q     And you understand that from your profession; right?
17   A     Yes.
18   Q     So let's take a look at the note that's the typewritten
19   note which is at Bates No. page 9.
20             And, again, you may have looked at some of this
21   already so we'll look at what we might not have.
22             This is the July 11th, 2017, encounter date.  If you
23   could just expand some of the top portion so we can see that --
24   read that first paragraph clearly.
25             Okay.  Can you see that, Mr. Triolo?
```

1    A    Yes.

2    Q    All right.  Here, you're indicating to Dr. Pardo, or at

3    least his note is reflecting that you're reporting to him:

4    Suffering blunt trauma and being dazed.

5              Do you see that?

6              I'm sorry.  It's the first paragraph.  The third line

7    down.

8    A    Yes.  I see it.

9    Q    All right.  The blunt trauma that is referenced here, do

10   you have an understanding of what that means?

11   A    Well, the blunt trauma was from being rammed from behind.

12   That's blunt trauma.

13   Q    To the best of your recollection, did you -- we've now

14   looked at that sort of intake form and this particular note.

15   Did you provide Dr. Pardo with any other information about the

16   accident itself?

17   A    As far as my -- what I was -- the symptoms?

18   Q    No, sir.  In terms of the forces involved or how it

19   happened or things of that nature.

20   A    We discussed it.  We talked about it.

21   Q    All right.  You indicated to him -- if we can expand to

22   the sort of next section, the bottom of the history, so we can

23   capture the bottom of the history of present illness.

24             All right.  Let's take a look at -- do you see the

25   section starting Aggravating Factors?

TRIOLO v USA                    September 22, 2020  Vol I-211

1   A    I don't see that.

2   Q    It's about five lines down.

3   A    Aggravating factors.  Yes, I see it.

4   Q    All right.  So you're reporting aggravating factors

5   include prolonged sitting, prolonged standing, going from

6   sitting to standing, long car rides, night pain, and morning

7   pain.

8          Do you see all that?

9   A    Yes.

10  Q    And you reported to him that you were doing chiropractic

11  adjustments at two sessions per week.  Do you see that?

12  A    Yes.

13  Q    Okay.  But you weren't actually doing two sessions per

14  week.  I think we looked at that in the notes; correct?

15  A    Okay.

16  Q    You agree that you were not doing two sessions per week of

17  chiropractic treatment?

18  A    But sometimes I was, though.  Because we had seen that

19  there was three or four times in a month that I had seen

20  Dr. McDaniels, so that would be at least two times a week,

21  two times within a week.

22  Q    To have four visits a month?

23  A    I'm sorry.  I'm thinking in my pay period.  I'm stuck on

24  my pay period, so, yes, I would agree.

25  Q    Okay.  Thank you.

TRIOLO v USA                    September 22, 2020  Vol I-212

1        All right.  So this very first visit with Dr. Pardo,

2   he gave you an injection; right?

3   A    Yes.

4   Q    And he gave you another injection on your second visit

5   with him; is that right?

6   A    Yes, if that's what it says.

7   Q    Okay.  It's my understanding you had an injection on

8   July 11th, and another injection on July 20th?

9   A    July 20th.

10  Q    And a third injection on August 11th.

11       Does that sound right to you, three in that

12  July/August time frame?

13  A    Yes.

14  Q    All right.  And then it's my understanding he did not give

15  you any more injections from that period until you had your

16  surgery; is that correct?

17  A    Sounds about right.

18  Q    All right.  So you did not have any medial branch nerve

19  block injections prior to your surgery, did you?

20  A    I don't recall.  I don't remember or not if I did.

21  Q    Well, it's my understanding that the three injections you

22  had were a lumbar epidural steroid injection -- do you remember

23  having a lumbar epidural steroid injection?

24  A    Yes, uh-huh.

25  Q    And I'm so sorry, sir, because I misspoke.

TRIOLO v USA                    September 22, 2020  Vol I-213

1           You had one prognostic medical branch nerve block at

2    L2-L3/L4-L5, and then you had one transforaminal steroid

3    injection at L5.  Does that sound about right?

4    A    Yes.

5    Q    Okay.  What you did not have before the surgery was the

6    radiofrequency ablation.  Do you agree with me on that?

7    A    Yes.

8    Q    And those are the procedures you've been having subsequent

9    to the surgery --

10   A    That's correct.

11   Q    -- that you indicated you found helpful; is that right?

12   A    That's correct.

13   Q    All right.  Now, Mr. Triolo, you've indicated that the

14   condition -- that the symptoms that you're experiencing and the

15   symptoms -- pardon me.  Let's try that again.

16           You've indicated that the symptoms that you were

17   experiencing caused you to sort of miss out on things with

18   friends and family.  Do you recall that testimony?

19   A    Yes.

20   Q    And you testified that the accident has had -- affected

21   your ability to go out and be social.  Do you recall that?

22   A    Yes.

23           MS. CUNNINGHAM:  I'm sorry.  We can take this exhibit

24   down, please.

25   BY MS. CUNNINGHAM:

TRIOLO v USA                    September 22, 2020  Vol I-214

1  Q    Have you -- in this time period when you were getting

2  these injections and just getting started seeing Dr. Pardo, did

3  you take any vacations or out-of-town trips?

4  A    Yes, I did.

5  Q    Okay.  All right.  Tell me about that, please.

6  A    There was the -- or during.  Is that before -- are we

7  speaking before or after my surgery?  I'm sorry, I didn't hear

8  it.

9  Q    Before, sir.

10  A    No -- no, none.  And I don't believe I took any vacations

11  before, prior to surgery.

12  Q    Okay.  Any out-of-town trips prior to the surgery other

13  than going to the Daytona 500?

14  A    None.  None that I can recall.

15  Q    Okay.  You -- on direct, there was a reference to a

16  cruise.  When was that taken?

17  A    That was in July/August of 2018.

18  Q    Okay.  So that was after your surgery?

19  A    Yes.

20  Q    All right.  So nothing -- no out-of-town trips prior to

21  your surgery?

22  A    None that I can recall.

23  Q    Okay.  Sir, is it your testimony that you did not go to

24  the Keys in 2017?

25  A    Yes, I did go to the Keys in 2017.

```
 1   Q    Okay.  And is it your testimony that you did not go to
 2   Port Charlotte in 2017?
 3   A    Port Charlotte?
 4   Q    Yes, sir.
 5   A    Yes.  It was to visit a friend that I have not seen in,
 6   like, 30 years.  Her mom lived there.  I took a ride there.
 7   Yes.
 8   Q    Okay.  Let's start first with the Keys trip.
 9             How did you get to the Keys?
10   A    It was a ride, car ride.
11   Q    Okay.  Your car or someone else's?
12   A    Somebody else's.
13   Q    Who was it?
14   A    I believe her name was Megan at the time.  It was in her
15   car.  There was two separate cars, but it was in a -- a woman
16   named Megan's truck with a couple other people.
17   Q    Okay.  How many people went on this trip?
18   A    I believe it was six.
19   Q    Okay.  And were these people that you knew socially?
20   A    Yes.  I had met them -- I had met them out -- in town.
21   Q    Okay.  When did you meet them?
22   A    That's a good question.  It was probably 2000 -- late
23   2015, maybe '16.  I had known them for a little bit.
24   Q    Okay.  And this is a group of friends that you went out
25   with?
```

TRIOLO v USA                    September 22, 2020  Vol I-216

1    A    I mean, I wouldn't call them, like, friends.  We were

2    acquaintances and I saw them out from time to time.  And when

3    we saw them out, I would -- you know, I would hang out with

4    them.  It wasn't like they would call me up, hey, come here,

5    come there.

6              Basically what it came down to was one of the girls

7    in that group, we were thinking about maybe getting together,

8    and they were going on that trip and she invited me.  That's

9    how that happened.

10   Q    Okay.  So how many -- where did you go?

11   A    I believe it was Marathon.

12   Q    All right.  How many days did you stay there?

13   A    I don't recall how many days.  It was a couple days.

14   Q    What -- did you do any of the driving down there?

15   A    No, I did not.

16   Q    Did you stop over on the way or you drive straight

17   through?

18   A    Many times.  They actually stopped for me once or twice,

19   and, of course, gas.  So there was breaks where you can get

20   out.

21   Q    What I mean is did you stay overnight somewhere on the way

22   down?

23   A    No.  We left early that morning and then got there late in

24   the afternoon, whenever it was.

25   Q    All right.

1   A    Early evening.

2   Q    And you did the same on the return trip?

3   A    Yes.

4   Q    The period of time that you were in the Keys, what did you

5   do?

6   A    We went out to restaurants.  And there was a boat ride.

7   We went to the boat and we went on the boat and just kind of --

8   they did snorkeling and I was on the boat.

9   Q    Okay.  So you're -- we can take a look back, if it would

10  be helpful.  If we look at Defendant's Exhibit 51 again, it's

11  the demonstrative about your work hours.

12       The second page of the demonstrative shows -- if we

13  expand the 7-16 and -- yes, those two lines.  Thank you.

14       Okay.  Mr. Triolo, so this period of time from

15  July 16th through July 29th shows that you took 60 hours of

16  leave.

17       Does this correspond with the period of time that you

18  went to the Keys?

19  A    I don't know the exact dates, but that's -- so that's what

20  I took, those three days.

21  Q    I'm sorry, sir?

22  A    Yeah, if that -- if that was the time, that would be the

23  dates.  I don't remember the exact dates, but I believe it was

24  in that -- around that time.

25  Q    All right.  Jacksonville to Marathon is about an 8-hour

1   drive?

2   A    I don't recall how long it was.  It was a good ride.

3   Q    And how many hours would you say you were out on a boat?

4   A    A couple hours.

5   Q    Okay.  So do you remember -- does this time frame of leave

6   refresh your memory on how many days you were in the Keys?

7   A    Yeah.  I just don't -- I don't remember taking days off

8   for the Keys back in 2017.  I don't remember if I took days off

9   or if it shows I did.

10  Q    Okay.  Do you have reason to believe that this time off

11  was taken for a different purpose?

12  A    No.

13  Q    So you were, in fact, able to travel out of town with

14  friends and enjoy a Keys vacation in summer of 2017; correct?

15  A    I was able to go out of town, yes, with a bunch of breaks

16  in between.

17  Q    All right.  So now let's talk about the Port Charlotte

18  trip.

19       When did that occur?

20  A    I don't remember the exact date.  I just remember a friend

21  getting in touch with me saying she was going to be seeing

22  her -- I believe her father passed away and that's why she

23  went -- she went to go see her mother, and I drove out there to

24  see her.  I hadn't seen her in like 30 years.  We were very

25  close.

TRIOLO v USA                    September 22, 2020  Vol I-219

1   Q    And I should have asked, were your brothers involved in

2   any of these trips?

3   A    No.

4   Q    The distance from Jacksonville -- or, pardon me, from

5   Middleburg to Port Charlotte is maybe a 4-hour-15-minute drive,

6   something like that?

7   A    Something like that.

8   Q    Did you drive yourself?

9   A    I did.

10  Q    And how many days did you stay in that area when you got

11  there?

12  A    Two, maybe three days, if I recall.

13  Q    Okay.  What did you do while you were in Port Charlotte?

14  A    I just caught up with my friend and her mom and her

15  sisters.

16  Q    Did you guys go out?

17  A    Just to get something to eat.  Other than that, we were at

18  her mom's house.

19  Q    All right.  Any other out-of-town trips in this period of

20  time between the accident and your surgery?

21  A    Again, not that I have good recall.

22       MS. CUNNINGHAM:  Okay.  Ms. Sabino, you can take that

23  exhibit down.  Thank you.

24  BY MS. CUNNINGHAM:

25  Q    All right.  Did you tell Dr. Pardo or any of your other

```
 1   physicians about these trips?

 2   A    I don't -- I don't remember if I did or not.

 3   Q    All right.  So let's talk about Dr. Toumbis.  You first

 4   saw Dr. Toumbis on October 20th of 2017.

 5              Does that sound about right to you?

 6   A    Yes.

 7              MS. CUNNINGHAM:  Pardon me, Your Honor.  So this is

 8   Defendant's Exhibit 21.  This was stipulated to, so I believe

 9   this has already been admitted.

10              THE COURT:  Go ahead.

11              MS. CUNNINGHAM:  If we can pull up Defendant's

12   Exhibit 21, Bates No. OPSI12, please.

13   BY MS. CUNNINGHAM:

14   Q    All right.  So Page No. 12, OPSI12, is a personal intake

15   form from the Orange Park Spine Institute, which is where

16   Dr. Toumbis practices.  Is that your understanding?

17   A    Yes.

18   Q    Okay.  Now, here -- pardon me one moment.

19              Okay.  So in this record, you disclose to Dr. Toumbis

20   the black ice, left forearm prior accident.  Do you see that in

21   the record?  Kind of in the center of the record.

22   A    Yes.

23   Q    All right.  Did you talk to him about that accident and

24   how it occurred?

25   A    I don't remember if I -- if I actually spoke to him about
```

1    it.  That was quite a little while back.  I'm sure if he wrote

2    about it, we probably talked about it.

3    Q    All right.

4    A    I can't be certain.

5    Q    Let me just ask you a little bit about that accident.

6         So that was a car accident, not a motorcycle

7    accident?

8    A    That's correct.

9    Q    All right.  And this was in winter, so your windows were

10   rolled up?

11   A    Yes.

12   Q    And the fence broke your window and broke your arm; is

13   that what happened?

14   A    That's correct.  Came through the window.  I put up my

15   arm.  The truck was going towards the fence.  When I saw the

16   fence coming, I just kind of put my arm up.  Broke through and

17   shattered my arm.  I had compound fractures.

18   Q    Okay.  How fast was your vehicle going at the time of the

19   accident?

20   A    Well, it was -- there was snow on the ground, so if I had

21   to guess, probably 45.  It was a highway, so 45, 50.  Going to

22   be flying in the morning in January in New York.  So...

23   Q    And you were treated after that accident?

24   A    Yeah, I had surgery that day.

25   Q    Okay.  Were you transported by ambulance from the scene?

TRIOLO v USA                    September 22, 2020  Vol I-222

```
1   A    Yes, I was.

2   Q    Were you on a backboard?

3   A    You mean like a gurney?  Yes.  I believe they got me out

4   of the truck and put me on a gurney and brought me to the

5   ambulance.

6   Q    Did they have to do something to actually get you out of

7   the truck, meaning was your vehicle damaged in a way that you

8   were unable yourself to open the door?

9   A    I couldn't open the door because I was -- I was holding my

10  arm.  It was kind of -- here to my hand was like this in my lap

11  (indicating).  So I was, at that point, holding it straight.

12       So I couldn't get myself out of the door.  There were

13  some witnesses that pulled over.  I believe they helped me out

14  of the truck.

15       MR. KINNEY:  I'm having a hard time hearing you.  Can

16  you speak up?

17       THE WITNESS:  Yes.

18  BY MS. CUNNINGHAM:

19  Q    And you don't have any medical records anymore from your

20  treatment in that -- as a result of that car accident?

21  A    I don't, no.

22  Q    All right.  Let's take a look at the same exhibit, OPSI21.

23       Dr. Toumbis had a lot of different forms that you

24  filled out when you went to his practice; is that fair to say?

25  A    Yes.
```

1    Q    And let's just take a look at this form.

2         So is this your handwriting?

3    A    Yes, except for that 2.  I don't believe that 2 is me.

4    Q    I see.  Okay.  That does look curlier, doesn't it?

5    A    Yeah.  That doesn't look like my handwriting.

6    Q    Okay.  But the handwriting at the bottom looks like your

7    handwriting?

8    A    Yes.

9         MS. CUNNINGHAM:  Okay.  Let's, if we can, expand the

10   narrative, the last sections please.

11   BY MS. CUNNINGHAM:

12   Q    All right.  So this form asks what the other vehicle was

13   doing just before impact.

14        Do you see that part of the questionnaire?

15   A    Just before impact, my vehicle?

16   Q    Well, we can look at that first.

17        So that first part is asking just before impact what

18   your vehicle was doing.

19        And go ahead and read that, please.

20   A    Stopped at a traffic light on Old St. Augustine Road and

21   Greenland, and U.S. Postal truck rear-ended me.

22   Q    Okay.  And let's look at the next paragraph.

23        That says:  Just before impact, the other vehicle

24   was -- and then would you read for me, please, what you wrote.

25   A    It says stopped at a traffic light.

TRIOLO v USA                    September 22, 2020  Vol I-224

```
1   Q    All right.  And so this means, if I understand it
2   correctly, that the Postal Service vehicle was stopped at the
3   traffic light before the accident occurred; isn't that true?
4   A    That's what that would say, but I believe I probably read
5   that as my car, stopped at a traffic light.
6   Q    Well, but you'd just written in the prior narrative
7   "stopped at traffic light;" right?
8   A    Yes.  But I was probably reading that as far as my car.  I
9   didn't -- I probably did not read that right.
10            Just before impact the other driver -- I probably
11  read just before the impact of the vehicle -- impact of the
12  vehicle, stopped at a traffic light.
13            I -- I'm pretty sure I felt that that question was
14  for me.  I just didn't read it correctly and I put "stopped at
15  a traffic light."
16            MS. CUNNINGHAM:  All right.  Well, let's take a look
17  at the next page of this record, OPSI22.  The bottom half of
18  this document, please.
19  BY MS. CUNNINGHAM:
20  Q    All right.  This asked for your approximate speed before
21  impact, and the approximate speed of the other vehicle just
22  before impact.
23            Do you see that part?
24  A    Yes.
25  Q    What did you list for your speed?
```

TRIOLO v USA                    September 22, 2020  Vol I-225

1   A    I put a question mark.

2   Q    So the first one?

3   A    Oh, my speed, I'm sorry.  Zero.  Zero miles per hour.  I

4   was stopped at a traffic light.

5   Q    And the question mark is for the approximate speed of the

6   other vehicle?

7   A    That's correct.

8   Q    Because you don't know?

9   A    I have no idea, offhand, how fast she was going.

10  Q    All right.  So if we keep looking at these records, at

11  OS -- OPSI6, there are some narrative notes -- not medical

12  notes, but notes from the practice, kind of administrative

13  stuff about their interactions with patients.

14        All right.  So I'm just going to give you a moment to

15  read the note at 10-17-2017, the first one in that series.

16  They're in reverse chronological order here.

17  A    Okay.  Want me to read it out, you said?

18  Q    You can read it to yourself first, just so you're able to

19  read it, and then we'll -- let me know when you're done, then

20  we'll proceed.

21  A    I'm done.

22  Q    Okay.  So you have Blue Cross Blue Shield health insurance

23  through your job at Baptist; correct?

24  A    Yes.

25  Q    Okay.  And you have a PPO plan; correct?

1    A    Yes.

2    Q    And you -- here, there is an indication that they wanted

3    to let you know that they weren't contractors with Blue Cross

4    Blue Shield; they would be out of network.  And they just

5    wanted to make sure that you knew that.

6         Is that your recollection?  Do you have a

7    recollection of this?

8    A    I never -- no, I don't have a recollection of this.

9    Q    So let's -- before we go off from this one, when you are

10   out of network, you still have coverage through your insurance,

11   right, you just maybe have to do a little more paperwork to

12   make it work?

13        MR. KINNEY:  Objection, Your Honor.  Relevance, for

14   his health insurance.

15        THE COURT:  Ms. Cunningham?

16        MS. CUNNINGHAM:  Yes, Your Honor.  On the damages

17   issue in terms of purposely choosing not to bill health

18   insurance and using letters of protection for his medical care.

19        THE COURT:  That was raised in the trial briefs.

20        MR. KINNEY:  Yes, Your Honor, but what does health

21   insurance have to do with this case as far as the defense's or

22   the plaintiff's claims?

23        What would it matter whether he has health insurance

24   or not, or whether his recollection of this office's inquiry of

25   whether he's going to use health insurance or not?

1          MS. CUNNINGHAM:  May I respond, Your Honor?

2          THE COURT:  You may.

3          MS. CUNNINGHAM:  It's a mitigation of damages issue.

4   The plaintiff has an obligation to prove reasonableness of

5   damages, and the plaintiff also has the obligation to mitigate

6   damages.  If there's purposeful decisions being made to use

7   letters of protection instead of billing available insurance

8   that affects the amount of damages, it prevents then the

9   contractual discounts from being applied which otherwise would

10  have been applied which otherwise would have resulted in liens

11  in cases in medical bills as they stand presently.

12          MR. KINNEY:  Your Honor, that's not a mitigation of

13  damages; that's them trying to take advantage of his health

14  insurance to pay something different, if something at all.

15          The problem is they have not presented any type of

16  expert testimony that that would result in any different set of

17  damages than would be here today.

18          THE COURT:  Well, I'm going to allow the testimony

19  and I'll let you-all argue that in your findings of fact and

20  conclusions of law, and you can actually present case law on

21  that matter.

22          MS. CUNNINGHAM:  Thank you, Your Honor.

23          THE COURT:  Go ahead.

24  BY MS. CUNNINGHAM:

25  Q    Okay.  So if we go to the prior page of PSIO5, this is a

1   continuation of the notes that we just looked at.

2           So if we can blow up the notes section on this page

3   as well, please.  I'm sorry, so we should be at -- there we go.

4   OPSI5 -- oh, I'm sorry, that's the -- so we should be on

5   page 5, OPSI5.

6           Okay.  So this note at the very bottom, 10-11-2017,

7   I'll give you a moment to read that and then I'll ask you a

8   question, sir.

9   A    Okay.

10  Q    Okay.  So, in other words, this reflects that your lawyers

11  let this practice know that even though you were out of network

12  with Blue Cross Blue Shield, that would not be an issue because

13  you were not intending to bill your health insurance.

14          Were you aware that that decision was being made?

15  A    At that particular time, I don't think we ever spoke about

16  it, but I didn't see the reason why I would be using my health

17  insurance anyway.

18  Q    Okay.  And why would you not be using your health

19  insurance?

20          MR. KINNEY:  Objection, Your Honor.  Relevance.

21  Same -- same issue.

22          THE COURT:  I'm going to allow it.

23          MR. KINNEY:  Yes, Your Honor.

24          THE COURT:  You'll be able to argue that in your

25  conclusions.

1    THE WITNESS:  So, I mean, I didn't get hurt at work;

2    I didn't get hurt at home or -- you know, your client hurt me.

3    I didn't see any particular reason why I needed to pay my

4    insurance -- use my insurance for, you know -- you know, seeing

5    office visits -- or paying office visits at that point, I'd be,

6    you know, out-of-pocket expenses for something that your client

7    did.  I didn't feel like I needed to pay my -- use my insurance

8    for that.

9    Q    Did you understand the risk inherent in doing that?

10   A    At that particular time, no.

11   Q    Okay.  But now you understand there was a risk inherent in

12   doing that?

13   A    And what's that risk?

14   Q    Well, as time goes by, after a certain period of time, you

15   can no longer bill your health insurance; right?

16   A    Right.  There's a -- there's a total that you have to pay.

17   Q    Okay.  But, in other words, it was a purposeful decision

18   on your part to not bill your health insurance?

19   A    I didn't feel like I needed to use my health insurance.

20        MS. CUNNINGHAM:  All right.  We can take that down.

21   Thank you.

22   BY MS. CUNNINGHAM:

23   Q    What -- you indicated that Dr. Topp or -- pardon me, that

24   Dr. Toumbis talked to you about his findings for you; is that

25   right?

TRIOLO v USA                    September 22, 2020  Vol I-230

1    A    Yes.

2    Q    All right.  And what did he tell you?

3    A    He told me that the -- basically, the acute syndromes and

4    the pain that I was experiencing was from the force from the

5    accident.  That was the final, you know, conclusion of it all,

6    and that the surgery, that was needed was because of the impact

7    of the accident.

8    Q    It's your testimony that that's what he told you?

9    A    That wasn't all that he told me.  That was just kind of

10   the conclusion as to why he recommended surgery.

11   Q    All right.

12   A    It was a lot that he said.  I can't remember everything he

13   said.  I just remember the conclusion as to why the surgery,

14   because when it came to the back surgery, that was, you know,

15   kind of concerning to me.

16   Q    All right.  Between this visit with -- you never treated

17   with Dr. Toumbis again; is that correct?

18   A    That's correct.

19   Q    And you did, however, continue to communicate with his

20   office; is that right?

21   A    I believe I tried to reach out to for a second opinion,

22   yes.

23            MS. CUNNINGHAM:  Well, let's take a look at OPSI007.

24   And, I'm sorry, that's also the same exhibit, Defendant's

25   Exhibit 21, OPSI007.

1  BY MS. CUNNINGHAM:

2  Q    All right.  So your surgery was in March of 2018; correct?

3  A    That's correct.

4  Q    All right.  And -- but you continued to stay in touch with

5  this office well past your surgery; right?

6  A    Dr. Toumbis' office?

7  Q    Yes, sir.

8  A    After my surgery?

9  Q    Yes, sir.

10        So if we look at the entry on this page from

11  October 12th of 2018, you're still talking to them about him

12  possibly looking at an MRI for you, and you're talking about

13  dropping it off?

14  A    Well, I wouldn't say still, because from the time I saw

15  him the first time through the rest of that year into my

16  surgery and then after my surgery, I was not talking to him.

17  So after my surgery was done and I was starting to have

18  symptoms and whatnot, I wanted to see if I can get a second

19  opinion on the MRI.  So I -- we tried to find where he was and

20  I reached out to him.

21        So, yes.  But I wasn't still talking -- you say

22  "still talking to him," no.  That's -- I had to find where he

23  was and see if he would look.

24  Q    And did he still have a practice in Jacksonville?

25  A    No.  He didn't have a practice in Jacksonville.  I believe

TRIOLO v USA                    September 22, 2020  Vol I-232

```
 1   he had somebody, like a secretary or whatever, that I could
 2   talk to, but he was not in Jacksonville at the time.
 3   Q    All right.  But you were still in contact with his office
 4   about potentially providing medical care?
 5   A    Medical care?  I just want -- I believe -- I got in touch
 6   with Dr. Toumbis just to read a postsurgical MRI.
 7   Q    All right.
 8   A    Give a second opinion on it.  I don't know about care.
 9   Q    So let's just -- we'll switch gears here and try and sort
10   of speed things up a little bit.
11         If we can take a look at Plaintiff's Exhibit 4, which
12   is the Baptist Primary Care record, BPC5.
13         This is a note -- pardon me.  Let me make sure I have
14   the right page reference.
15         My apologies, it's BPC3.
16         All right.  This is a note from an October 26, 2017,
17   visit to your primary care physician at the Baptist Primary
18   Care facility.  And it's my understanding that this is the
19   first time you went back to your primary care -- the first time
20   you had seen your primary care provider subsequent to the car
21   accident.
22         Does that sound right to you?
23   A    October 26, 2017, so, yes.
24   Q    I'm sorry, sir, is that a yes?
25   A    Yes.
```

TRIOLO v USA                    September 22, 2020  Vol I-233

```
 1   Q    And here, you were here on a visit for something that's
 2   connected to your eye.  But there's -- you're welcome to take a
 3   moment to look at this, and we can expand it if you need to,
 4   but it doesn't appear to me -- well, let's look at the second
 5   page -- oh, pardon me, the next page, which is BPC4.
 6            MS. CUNNINGHAM:  And I apologize to the Court and
 7   Mr. Triolo.  We'll look at this, then we'll go back to the
 8   first page.
 9   BY MS. CUNNINGHAM:
10   Q    So your -- the doctor did a physical exam.  You got your
11   vital signs recorded.
12            Do you see all of that?
13   A    Yes.
14   Q    All right.  Let's go back to the first page, BPC3, and
15   just expand the History of Present Illness section.
16            This is reporting a variety of things, nothing linked
17   to back pain or anything related to that.
18            Do you agree with me?
19   A    Yes.
20   Q    All right.  So is there a reason, you know, for not -- did
21   you talk to your primary care provider about any of the pain or
22   symptoms that you were experiencing, in your view, as a result
23   of the car accident?
24   A    No.  I spoke to him about what I was there for that day.
25   Q    All right.  The next provider that you went to see was
```

```
1   your surgeon, Dr. Topp.  You saw him on -- first on
2   November 8th of 2017.
3              MS. CUNNINGHAM:  Let's take a look at Dr. Topp's
4   record.  That's Plaintiff's Exhibit 11.
5   BY MS. CUNNINGHAM:
6   Q    All right, sir.  So here, is this form your handwriting?
7   A    Yes.
8              MS. CUNNINGHAM:  All right.  Let's blow up the bottom
9   half of this document, please.  This is Topp 1.  Just the first
10  page in the document -- in the exhibit.
11  BY MS. CUNNINGHAM:
12  Q    All right.  Now, on direct, you indicated that Dr. Pardo
13  referred you to Dr. Topp.
14             Do you recall that testimony?
15  A    Yes.
16  Q    All right.  This reflects or indicates that Dr. Asad
17  referred you, but I can tell you there's no referral from
18  Dr. Asad in his records.
19  A    Yeah, I just -- I put the wrong doctor in.
20  Q    All right.  So your -- do you have a recollection of
21  Dr. Pardo referring you to Dr. Topp?
22  A    It was my understanding Dr. Pardo was the one who referred
23  Dr. Topp to me.
24  Q    Okay.  And what was the basis of that understanding?
25  A    The basis of the understanding was -- the basis I
```

TRIOLO v USA                    September 22, 2020  Vol I-235

 1  understood was Dr. Pardo referred Dr. Topp.

 2  Q    And what I mean, sir, did you have a conversation with

 3  Dr. Pardo about that?

 4  A    Yes.

 5  Q    Okay.  Do you know when that conversation occurred?

 6  A    No.  I don't remember offhand when it happened.  I just --

 7  it was my understanding he recommended me to Dr. Topp to see

 8  for a surgical procedure.

 9  Q    Do you know how far in advance of this visit that referral

10  was made?

11  A    Not offhand.  No, I don't remember.

12  Q    All right.  For both Drs. Topp and Dr. Pardo, you entered

13  into letters of protection with their offices or with them or

14  their offices, depending on how it worked; is that right?

15  A    Yes.

16  Q    Okay.  And what in your -- well, strike that.

17          All right.  So let's sort of fast-forward a little

18  bit.

19          You have your surgery.  You've indicated that you had

20  a friend with failed back surgery; right?

21  A    I've had two people in my life who had surgeries -- back

22  surgeries.  After it was over, they were different people.  It

23  was bad.

24  Q    So you understood, then, that you needed to do everything

25  in your power to make sure that your surgery was successful;

1  right?

2  A    Yes.

3  Q    And that means following the directions of your health

4  care providers to make sure that your recovery goes as well as

5  possible; right?

6  A    As best as I could, yes.

7  Q    Okay.  You received -- well, on direct I thought you

8  testified that you had not received any in-house medical care

9  after your surgery.

10              Was that your testimony?

11  A    Yes.  We didn't have a nurse that actually came to the

12  house, but they got in touch with me and, you know, made sure I

13  was able to take care of myself.

14              They were basically making sure that they didn't need

15  to come there, physically come there to take care of me.  So

16  just like checking in, how I was doing, was I able to, you

17  know, do this or do that sort of thing.

18  Q    Okay.  Let's take a look at Plaintiff's Exhibit 12.

19              This is a medical record from an entity called

20  Trilogy Home health care.

21              Do you recall getting treatment from Trilogy Home

22  health care?

23  A    Like I just said, I never had an in-house nurse, if that's

24  Trilogy health care.

25  Q    All right.  Well, let's take a look at this record.

TRIOLO v USA                    September 22, 2020  Vol I-237

1        You understand what a home health care provider is;

2   right?

3   A    Yes.  It's somebody that comes in if you can't ambulate

4   and shower, if you can't, you know, feed yourself, that type of

5   situation.

6   Q    All right.  And isn't it true that you had staff coming

7   out from Trilogy Home health care to the house after your

8   surgery to help you?

9   A    I don't recall having a nurse help me.

10        MS. CUNNINGHAM:  Okay.  Let's take a look at THH0033.

11   BY MS. CUNNINGHAM:

12   Q    All right.  The assessment instruction performance

13   section.  This is a little tricky to read, so if you can't read

14   it, sir, we can give you the hard copy.

15        MS. CUNNINGHAM:  But, Ms. Sabino, maybe we can blow

16   up that assessment instructional performance section.  That

17   might help.

18   BY MS. CUNNINGHAM:

19   Q    All right.  SOC42 -- I'm just going to read this.  I think

20   I can read it.  If I make a mistake, you can let me know.

21   Okay?

22   A    Okay.

23   Q    42-year-old white male referred to home health from

24   Dr. Topp for post-op vitals, flesh and wound care, check for

25   five days.  Patient's significant other, Amber, and two small

TRIOLO v USA                 September 22, 2020  Vol I-238

 1 | children, present for SOC.

 2 |         Do you know what SOC stands for?

 3 | A    No, I don't.

 4 | Q    Okay.  The --

 5 | A    I do not.

 6 | Q    All right.  Does this trigger any memories about whether

 7 | or not somebody came to your house to help you or to treat you?

 8 | A    Are you sure this isn't at the surgical center itself?

 9 | Q    Yes, sir.  These are records that were provided to us as

10 | being from Trilogy Home health care, and we received similar

11 | records from our subpoena to them.

12 | A    But was this done at the surgical center the day of

13 | surgery?  That's my question.

14 | Q    No, sir.

15 | A    Amber -- Amber worked -- and Amber, significant other --

16 | Amber and two small children.  I mean, they were there the day

17 | of the surgery.  So is this the day of the surgery?

18 |         MS. CUNNINGHAM:  Well, let's go back to the first

19 | page of the exhibit, THH1.

20 |         Can you blow up the very top where there's a visit

21 | date.

22 | BY MS. CUNNINGHAM:

23 | Q    Do you see that date, sir, 3-23-2018?  Do you see that?

24 | A    Okay.  Yeah, it's really hard to read up here, but I see

25 | the date 3-23.

TRIOLO v USA                    September 22, 2020  Vol I-239

```
 1   Q    All right.  That's the date after your surgery; correct?

 2   A    Yes.

 3   Q    And there -- you know, I'm happy to give you a binder to

 4   sort of flip through all these things, but I think sort of more

 5   importantly, we can just look at some of the things that they

 6   were to do.

 7            So if you can go to THH12, please.

 8            The sort of bottom half, there's a section for

 9   additional orders.

10            That's fine, thank you.

11            All right.  Additional orders:  SN -- skilled

12   nursing, right? -- to instruct patient on nonpharmacologic pain

13   measures, including relaxation technique, massage, stretching,

14   and positioning.

15            Do you see that?

16   A    Yes.

17   Q    I'm sorry, sir, that was a yes?

18   A    Yes, I see it.

19   Q    All right.  So part of the purpose of having home health

20   come to your house was to help you with that postsurgical

21   recovery; right?

22   A    Yes.  I mean, that's -- that's what it's supposed to be,

23   yes.

24   Q    Okay.  But you have no recollection of this happening?

25   A    I mean, if this was the day after?
```

TRIOLO v USA                    September 22, 2020  Vol I-240

1   Q    Yes, sir.

2   A    I don't -- I don't recollect it at all.  I was on a lot of

3   pain meds at that time as well, though, but I don't remember a

4   nurse coming in and actually helping me.

5   Q    Okay.  Do you recall terminating the nurse's services?

6   A    Doing what, now?

7   Q    Do you recall canceling the home health services?

8   A    I don't recall that, no.

9        MS. CUNNINGHAM:  All right.  So this is contained

10  within Defendant's Exhibit 25.  There were some pages objected

11  to on relevance grounds, but the pages I'm going to ask about

12  are within the set of pages that were stipulated to.

13       MR. KINNEY:  Can you tell me the exhibit number one

14  more time?

15       MS. CUNNINGHAM:  Yes.  It is Defendant's Exhibit 25.

16  And it was stipulated, according to the prior filing, as to 1

17  through 3, 5 through 7, and 11 to 91.

18       THE COURT:  Tell me the pages that were stipulated to

19  again.  1 through 3?

20       MS. CUNNINGHAM:  Yes, Your Honor, 1 through 3, 5

21  through 7, and 11 through 91.

22       So there were three pages objected to, and they were

23  pages 4, 8, 9, and 10.

24       THE COURT:  All right.  So I'll admit 1 through 3, 5

25  through 7, and 11 through -- what was it -- 11 through 91 of

```
 1   Exhibit 25?
 2           MS. CUNNINGHAM:  All right.  Thank you, Your Honor.
 3        (Defendant's Exhibit 25 was admitted in evidence.)
 4   BY MS. CUNNINGHAM:
 5   Q    All right.  Mr. Triolo, so Defendant's Exhibit 25, the
 6   Bates number is Trilogy 0072.
 7           All right.  Do you see this -- this is a date of the
 8   March 27, 2018.  So this is a few days after your surgery;
 9   right?
10   A    Okay.
11   Q    And this indicates "the patient left message with office
12   that he no longer wants home care."
13           Do you see that?
14   A    Yes.
15   Q    Do you have any recollection of why you did not want the
16   home care?
17   A    I don't recall.  Like I said, I was on a lot of pain meds.
18   I don't remember making that phone call.  But after surgery I
19   was able to get up and down and walk to and from and wash up,
20   so -- eat.
21           MS. CUNNINGHAM:  All right.  Thank you, we can take
22   that down.
23   BY MS. CUNNINGHAM:
24   Q    All right.  Dr. Topp, also you mentioned on direct, told
25   you you needed to start stretching.
```

TRIOLO v USA                    September 22, 2020  Vol I-242

1      Do you remember that testimony?

2  A    Yes.

3  Q    All right.  In fact, Dr. Topp actually referred you to

4  physical therapy; isn't that true?

5  A    Yes.

6          MS. CUNNINGHAM:  And we can pull up Plaintiff's

7  Exhibit 11, Bates No. Topp 59, please.

8  BY MS. CUNNINGHAM:

9  Q    All right.  So after your surgery, Dr. Topp referred you

10 to Heartland Rehabilitation; do you recall that?

11 A    Yes.

12 Q    And this indicates that you were reporting to him, it's my

13 understanding -- you can tell me if this is right.  You were

14 reporting to him that you didn't want to go there because they

15 did not accept letters of protection; is that accurate?

16 A    Because they did what?

17 Q    That they did not accept letters of protection.

18 A    I don't ever remember saying anything like that.

19 Q    All right.  Well, do you recall why you didn't go to

20 Heartland Rehab?

21 A    I don't recall why.  I know I started -- I started my own

22 stretching routines.  As far as -- I can't remember -- there

23 was something that happened.  I don't recall what happened, but

24 it had nothing to do with what you said.  I don't remember

25 saying that or hearing about that.

TRIOLO v USA                    September 22, 2020  Vol I-243

1   Q    So when you say your own stretching routines, you mean you

2   were doing something at home?

3   A    Yes.

4   Q    All right.  But Dr. Topp wanted you to do formal physical

5   therapy; correct?

6   A    Yes, he did.

7   Q    And he wanted you to do that, in part, because he had

8   observed some things that he thought would benefit from you

9   having therapy; fair?

10  A    I just know he did want me to go to therapy.

11  Q    I'm sorry?

12  A    I just know he did -- he did want me to start therapy.

13  Q    Okay.  So April 12th -- you have the surgery March 22nd;

14  right?

15  A    That's correct.

16  Q    April 12th, you haven't started physical therapy yet;

17  right?

18  A    That's correct.

19  Q    The records that we have indicate that you didn't have an

20  initial physical therapy evaluation until August 2nd of 2018.

21  Do you recall that?

22  A    August 2nd?

23  Q    And we can show you a record within the same exhibit at

24  Topp 53.

25          So if we go to the top of the page so we can see the

```
 1   visit date, please.  All the way to the top probably.
 2            Yes, thank you.
 3            Okay.  Do you see that visit date, upper right-hand
 4   corner, August 2nd of 2018?
 5   A    Yes.
 6   Q    And this was Select Physical Therapy.
 7            Do you recall going to this practice?
 8   A    Yes.
 9   Q    And this -- it's my understanding this visit was an
10   initial evaluation with them.
11            And at this point, if we look at the assessment
12   section.
13            Thank you.
14            Okay.  The second line of this in the center.
15            The second line under the assessment, do you see
16   that?  Where the therapist indicated:  Overall rehabilitation
17   potential is excellent.
18   A    Okay.
19   Q    All right.  And at the -- this therapist had determined or
20   recommended -- and we may actually have to shift to the
21   different version of this record to see it, but they had
22   recommended therapy twice a week for four weeks.
23            Do you remember that?
24   A    Yes.
25   Q    All right.  Let's take a look.  Let's shift over to
```

TRIOLO v USA                    September 22, 2020  Vol I-245

 1  Plaintiff's Exhibit 8, please, which is records Select physical
 2  therapy facility.
 3           All right.  SPT-7 is the same initial evaluation we
 4  were just looking at.
 5           And SPT-10, if we can expand the plan.
 6           All right.  Frequency and duration, do you see that
 7  part?
 8  A    Yes.
 9  Q    All right.  It is recommended that the patient attend
10  rehabilitative therapy for two visits a week with the expected
11  duration of four weeks.
12           Do you see that?
13  A    Yes.
14  Q    However, you actually never did this therapy, did you?
15  A    No.
16  Q    You actually discharged yourself after this initial
17  evaluation; right?
18  A    Well, from -- what they told me was they actually told me
19  not to have therapy there, because I could get therapy done at
20  Baptist Medical Center for free.
21  Q    Okay.  I'm sorry.  Who told you that?
22  A    The -- Select.  The people who take care of all that
23  information.  When I walked in to -- for the next one, they
24  spoke to me about the therapy, and, you know, I can -- I'd be
25  paying there, but that, you know, I could go to Baptist Medical

```
 1   and have it for free.  So...
 2   Q    So I can tell you that we've never received any records
 3   indicating that you did physical therapy at Baptist Medical.
 4   A    No.  Because of what I was learning from them and all the
 5   questions that I asked them, and what I needed to do, I ended
 6   up doing that on my own.
 7   Q    All right.  So you never had formal physical therapy after
 8   your surgery; is that correct?
 9   A    No, not formal physical therapy.
10   Q    And, I'm sorry, that was a poorly worded question again.
11        Did you ever have formal physical therapy after your
12   surgery?
13   A    No.
14   Q    You did go back to work sometime near the end of May of
15   2018?
16   A    That's correct.
17   Q    All right.  And after your surgery, you continued to take
18   trips; is that fair?
19   A    I took a trip after -- after my surgery, yes.
20   Q    All right.  Where -- you talked about the cruise already.
21   We'll just talk about that for a second.
22        Where was that cruise to?
23   A    To a couple places, Honduras, Belize, Cozumel.  There was
24   one other one in there.  I can't remember what it was.
25   Q    How long was the cruise?
```

TRIOLO v USA                    September 22, 2020  Vol I-247

```
1    A    Five days.
2    Q    Who did you go with?
3    A    I went with Wendy Haggard and her significant other, my
4    friend Josh and his fiancée now, and myself.
5    Q    All right.  So how many were you altogether?
6    A    Five.
7    Q    All right.  In addition to the cruise, any other
8    out-of-town trips from the surgery to the present?
9    A    Yeah.  I went to my 20th high school reunion.
10   Q    And that was in New York?
11   A    Yes.
12   Q    When was that trip?
13   A    I believe that was July of 2019.
14   Q    Okay.  Any other trips, out-of-town trips?
15   A    None that I can recall after that one.
16   Q    Okay.  Have you attended Biketoberfest since your surgery?
17   A    I'm trying to think if I have after the surgery.
18              '18, yes, but it was not on my bike, if I remember
19   correctly, the first year.  I remember being at a
20   Biketoberfest.  I can't remember what year it was, though.
21   Q    All right.  Have you only gone one time?
22   A    Since my surgery, I believe it was one time, yes.
23   Q    All right.
24   A    I can't -- I can't recall how many -- I believe it was one
25   time since my surgery.
```

TRIOLO v USA                September 22, 2020  Vol I-248

```
 1   Q    Did you go the year prior to your surgery?

 2   A    I believe it was the next year after.

 3   Q    All right.  And so it's your testimony that you went to

 4   Biketoberfest in a car rather than your motorcycle?

 5   A    Oh, I went in October '19 to Biketoberfest.  I believe I

 6   went on my bike.  We went out to October -- it wasn't a -- a

 7   rally or anything like that, but I had -- I had driven and met

 8   somebody out there.  I didn't take my bike.

 9             THE COURT:  I'm sorry, I got very confused by that

10   whole thing.

11             Wait.  Hold on.

12             THE WITNESS:  Yes, ma'am.

13             THE COURT:  Had you gone -- before your surgery, had

14   you gone to Biketoberfest?

15             THE WITNESS:  Oh, yes, ma'am.

16             THE COURT:  I guess, between the fall and your

17   surgery?

18             THE WITNESS:  The year prior to my surgery, I don't

19   believe I went to Biketoberfest.  It was the year after I went.

20             THE COURT:  The year after your surgery?

21             THE WITNESS:  Yes, I believe so.

22             THE COURT:  And then at one point you said you had

23   gone on your bike and then you said you didn't go on your bike.

24             THE WITNESS:  So that was a different time.

25             I had a couple friends that were in Daytona, and I
```

 1 | remember my back was not up to a bike ride, so I drove out
 2 | there and met them at a restaurant and then drove home.
 3 |             THE COURT:  Go ahead.
 4 | BY MS. CUNNINGHAM:
 5 | Q    Okay.  And I may still be a little confused.
 6 |             The year that you went on your bike -- since the
 7 | surgery you have gone to Biketoberfest on your motorcycle; is
 8 | that correct?
 9 | A    Yes.
10 | Q    Okay.  And that's riding your motorcycle from your home in
11 | Middleburg to Daytona Beach?
12 | A    Yes.
13 | Q    All right.  And that's something you're able to do?
14 | A    Yes.
15 | Q    All right.  And when you go to Biketoberfest, that's a lot
16 | of standing around and things of that nature; would you agree?
17 | A    Not necessarily.  We would walk from place to place, but
18 | you can sit down and watch bands.
19 | Q    All right.  And when you went since your surgery, how long
20 | were you down there?
21 | A    You stay down there for the day.  You know, it's -- we're
22 | back, you know, late at night, but we don't stay there
23 | overnight and -- yeah.
24 | Q    Okay.  So you go on your bike from Middleburg to Daytona
25 | Beach and back in one day?

TRIOLO v USA                    September 22, 2020  Vol I-250

1    A    Yes.

2    Q    Okay.  And you've done that once since your -- since the

3    surgery?

4    A    So 2019, and then I don't believe I was just in the last

5    one because obviously with the pandemic.

6    Q    All right.  And in 2018 you went but you drove your car?

7    A    I don't remember going in 2018.  I don't recall going to

8    Bike Week in 2018.  I went in 2019.

9              When I went in my car, it was the same year, 2019,

10   but it was not a Bike Week.  I just met some friends out there.

11   Q    All right.  I have something to refresh your recollection.

12   I will hand it to you if you give me just a moment.

13             MS. CUNNINGHAM:  I'm trying to make a decision about

14   whether I've established a foundation for this to be

15   impeachment, if he's denied it.  I'm just unclear whether he's

16   actually denied it or not denied it.

17             THE COURT:  I confess that I'm very confused by

18   Mr. Triolo's testimony on this matter.  So I'll let you-all

19   confer and then we'll see where we end up.

20   BY MS. CUNNINGHAM:

21   Q    Is it your testimony, sir, that you did or did not go to

22   Biketoberfest in October of 2018?

23   A    I don't remember if I went in 2018.

24             THE COURT:  I'm sorry, are you-all saying '18 or '19?

25             MS. CUNNINGHAM:  So this question is about '18.  It's

1   my understanding that he's saying in 2019 he went on his bike.

2   BY MS. CUNNINGHAM:

3   Q    Correct?

4   A    I went to Biketoberfest -- Bike Week, I'm sorry, that's a

5   different -- so I went to Bike Week in 2019, yes.

6   Q    Okay.  And Bike Week is in March-ish; right?

7   A    Right.

8   Q    Okay.  So Bike Week 2019 was when you were on your

9   motorcycle there and back; correct?

10  A    Right.

11  Q    And October of 2018, you don't remember whether you went,

12  or you remember going and you were in your car?

13  A    I don't remember going to Biketoberfest.  That's

14  Biketoberfest; that's not a Bike Week.  I don't remember going

15  to Biketoberfest in 2019.

16         MS. CUNNINGHAM:  Your Honor, I think at this point I

17  can properly bring this up.

18         THE COURT:  All right.  Go ahead.

19         MS. CUNNINGHAM:  Ms. Sabino, if you can, can you

20  please bring up [unintelligible].

21  BY MS. CUNNINGHAM:

22  Q    Okay.  Sir, I will ask you a few questions about this just

23  to sort of establish what it is.

24         THE COURT:  And, I'm sorry, I didn't hear what

25  document this is.

1          MS. CUNNINGHAM:  This is an impeachment document,

2    Your Honor.

3    BY MS. CUNNINGHAM:

4    Q    Sir, it's my understanding that this is a printout from

5    your Facebook page.

6          The name Richard Triolo is up in the left-hand side.

7    I think you would agree these are photographs, your

8    photographs?

9    A    Yes.

10   Q    All right.  This is your Facebook page or something from

11   your Facebook page?

12   A    Yes.

13   Q    Okay.  On the right-hand side, do you see -- can you read

14   the exchange -- comment exchange between you and Mr. Step?

15          If not, we can blow that part up.

16   A    Yes.  It says -- I say:  Yeah, Friday and Saturday, we are

17   going to be, question mark.

18   Q    I'm sorry.  Let's -- just if we can back up to the first

19   part of the post and stuff, the first question, right.

20          Oh, no, you're -- what you have is fine.

21          So the -- Mr. Step is posting a comment or posting on

22   your page to ask you:  You coming down for Biketoberfest;

23   right?

24   A    Yes.

25   Q    Is the first part.  Do you see that?

TRIOLO v USA                September 22, 2020  Vol I-253

```
 1    A    Yes.

 2    Q    Okay.  Now read from there, please.

 3    A    So I said:  Yeah, Friday and Saturday we're going to

 4    leave, question mark.

 5    Q    All right.  Will you keep reading, please.

 6    A    And then Brian said:  I don't know yet.  Shoot me a text

 7    while you're here.  I'm probably going to Main Street to see

 8    jazz Friday night at 7:30 at Full Moon.

 9              And I said:  All right.

10              And he said:  Yeah, leaving here soon.

11    Q    That last one, the:  "Yeah, I'm leaving here soon," is

12    you; right?

13    A    Yes, yes.

14    Q    Okay.  So you did go to Biketoberfest in October of '18;

15    correct?

16    A    Yes, I guess I did.  I just didn't remember if it was

17    2000 -- if I went in 2018 or not.

18    Q    So this was the year of your surgery?

19    A    Yes.

20    Q    And having looked at this, do you still think that you

21    went down in a car?

22    A    In a car?

23    Q    Yes, sir.

24    A    This would be 2018, so I didn't go in a car.

25              I'm trying to -- so I said:  All right, and said:
```

TRIOLO v USA                    September 22, 2020  Vol I-254

1  I'm leaving here soon.

2          I'm trying to remember, though, if I actually went,

3  though.  I mean, I'm telling him, "Yeah, I'm leaving here

4  soon," but I don't know if I actually went.

5          I mean, is there any other -- I could have said that

6  and never -- and never went.  Because I don't remember being --

7  actually, you know, going to it.  I don't recall being there in

8  2018.

9  Q    You do ride Harleys; right?

10  A    Yes, I do.

11  Q    And you're still riding?

12  A    Yes, I am.

13          MS. CUNNINGHAM:  All right.  I think we can take that

14  down.  Thank you.

15  BY MS. CUNNINGHAM:

16  Q    All right.  There -- if we can -- one -- one brief thing

17  back in Dr. Asad's record.  So that is back at Plaintiff's --

18          MR. KINNEY:  I believe it's 11.

19          MS. CUNNINGHAM:  All right.

20          MR. KINNEY:  It's 13.

21          MS. CUNNINGHAM:  Okay.  Thank you.  So

22  Plaintiff's 13.

23          So I apologize, Your Honor.  This is Dr. Asad's

24  records, but this is a record that is not captured in

25  plaintiff's version of Dr. Asad's records.

```
 1              So our records are Defendant's 19, and I will look to
 2    see if there's an objection.
 3              THE COURT:  19 has not yet been admitted.
 4              MS. CUNNINGHAM:  All right.  The page that I am
 5    asking about is UNC-0038, which is one of the pages objected
 6    to.
 7              THE COURT:  What's the objection, Mr. Kinney?
 8              MR. KINNEY:  I see it listed as objected to, but I
 9    don't think I intended to.  I think it's the stipulated facts.
10              The next page, page 39 --
11              THE COURT:  All right.  So there's no objection to
12    page 38?
13              MR. KINNEY:  No.
14              THE COURT:  Go ahead.
15              MS. CUNNINGHAM:  All right.  Thank you, Your Honor.
16              THE COURT:  Defendant's Exhibit 19, page 38, is
17    admitted.  We'll address the remainder of it at another time if
18    it comes up.
19         (Defendant's Exhibit 19 was admitted in evidence.)
20              MS. CUNNINGHAM:  Okay.  So, Ms. Sabino, if you could
21    please bring up Defendant's 19, page 38, which is UNC-38.
22    BY MS. CUNNINGHAM:
23    Q    While this is coming up, just to reorient you, this is a
24    letter that was sent by Lyerly Neurosurgery to Dr. Asad.  The
25    date is October 7th of 2017.
```

 1              And if we can expand the parts with the check marks

 2      at the bottom, please.

 3              All right.  So this indicates that Lyerly

 4      Neurosurgery had attempted to contact you, were unsuccessful,

 5      and they're reporting that back to Dr. Asad.

 6              Just to circle back to that issue briefly.  Do you

 7      have any memory of phone calls or messages from Lyerly

 8      neurosurgery to schedule an office visit?

 9      A    I do not, no.

10      Q    All right.  So let's --

11              MS. CUNNINGHAM:  We can take that down.  Thank you.

12              Okay.  So the next exhibit I'm going to move to enter

13      is also objected to.  It's Defendant's Exhibit 12, plaintiff's

14      answers to defendant's first set of interrogatories.

15              THE COURT:  What's the objection to -- you said it's

16      Plaintiff's Exhibit 12.  Did you mean to say that?

17              MS. CUNNINGHAM:  No, Your Honor.  I didn't mean --

18      sorry, it's Defendant's Exhibit 12, but it's plaintiff's

19      answers to defendant's interrogatories.

20              THE COURT:  Okay.  What's the objection to?

21              MR. KINNEY:  Yes, Your Honor.  They're trying to

22      introduce them in total instead of the actual one being used

23      for impeachment purposes.  It's being used as a statement of

24      the plaintiff, out-of-court statement of the plaintiff.

25              MS. CUNNINGHAM:  And, your Honor, it's my

 1   understanding that it comes in as a statement of the party

 2   opponent.

 3            THE COURT:  It would seem to me to be his statement,

 4   which would be admissible.  I guess I was waiting --

 5            MS. CUNNINGHAM:  Oh, I'm sorry.

 6            MR. KINNEY:  So, for instance, Interrogatory No. 4

 7   identifies the cell phone provider and his full cell phone

 8   number.

 9            Why is that relevant for this case?

10            MS. CUNNINGHAM:  Your Honor, just to clarify, the

11   objection was hearsay.  That was the objection that was stated

12   in -- in Document 68 when plaintiff filed their objections to

13   defendant's exhibits.

14            THE COURT:  I don't see how his answers to

15   interrogatories are hearsay.

16            MR. KINNEY:  Yes, Your Honor.

17            THE COURT:  So if hearsay is the objection it's

18   overruled.  To the extent that there's a question of relevance,

19   as I said, because this is a bench trial, if it's irrelevant, I

20   can just simply disregard it.

21            I also would suggest that -- well, I think that's all

22   I need to say.  But the hearsay objection is certainly due to

23   be overruled.

24            MR. KINNEY:  Yes, Your Honor.

25            Can we redact, before it's admitted into evidence,

 1   page -- on page 3, the phone number of Interrogatory No. 4?

 2            THE COURT:  I'm trying to find Exhibit 12.

 3            MS. CUNNINGHAM:  I'm sorry, Your Honor.  There should

 4   be a small exhibit binder that has the first 12 in it.

 5            THE COURT:  That's the one I'm trying to find.

 6            Yes, what is it that needs to be redacted?

 7            MR. KINNEY:  Just the answer to Interrogatory No. 4,

 8   if we could redact some portion of the personal number.

 9            MS. CUNNINGHAM:  I mean, Your Honor, I don't have any

10   inherent problem with that.  The number is scattered throughout

11   the records in various other places, so I'm not sure it's

12   necessary, but I don't have a...

13            THE COURT:  All right.  Yeah, if you want to redact

14   that.  I can tell you I've seen that number in any number of

15   places in the medical records, but we'll go ahead and I'll ask

16   you to redact that, Ms. Cunningham.

17            MS. CUNNINGHAM:  Yes, Your Honor.

18            Okay.  Ms. Sabino, you can now bring up Defendant's

19   Exhibit 12, please.

20   BY MS. CUNNINGHAM:

21   Q    All right.  Mr. Triolo, we'll leave this large for a

22   moment because I'm going to just have you see what the top of

23   this is.

24            Okay.  This is plaintiff's answers to defendant's

25   first set of interrogatories.

TRIOLO v USA                    September 22, 2020  Vol I-259

1           Do you see that?

2    A    Yes.

3    Q    And let's look at the last page, which is the 11th page.

4    This is the verification page.

5           Is that your signature, sir?

6           I should clarify --

7    A    Yes.

8    Q    And this states that you're declaring under penalty of

9    perjury that the answers are true and correct.

10          That's what it states; yes?

11   A    Yes.

12   Q    Okay.  So let's take a look at page 22 -- pardon me,

13   page 10, and then when that comes up let's look at No. 22.

14          Okay.  Let me know when you've had a chance to read

15   this.

16          Well -- and I'll read part of it into the record.

17   Interrogatory No. 2 asks:  Have you been involved in any

18   accident or incident of any kind, either before or after the

19   accident described in the amended complaint?  And then it goes

20   on from there about what to do if the answer is yes.

21          Do you see that?

22   A    Yes.

23   Q    Okay.  And you answered here:  Yes, March of 2002 in Long

24   Island, I hit black ice and ran off the road.  I had a compound

25   fracture on my left arm.  I do not recall who the medical

TRIOLO v USA                    September 22, 2020  Vol I-260

 1    provider I went to was.

 2              Did I read that accurately?

 3    A    Okay, yes.

 4    Q    And this is the accident we've already discussed; correct?

 5    A    Yes.

 6    Q    Okay.  Have you been involved in any other motor vehicle

 7    accidents other than the one at issue in our case and the one

 8    in March of 2002 in Long Island?

 9    A    March of 2002 in Long Island and then that accident, not

10    that I recall, ma'am.  Not that I recall.  I don't recall.

11              THE COURT:  Okay.  And just for clarification of the

12    record, you were reading from Interrogatory No. 22.

13              You identified Interrogatory No. 2.  So that was

14    Interrogatory No. 22, not 2.

15              MS. CUNNINGHAM:  Yes, Your Honor.  Thank you.

16    BY MS. CUNNINGHAM:

17    Q    Okay.  Mr. Triolo, were you in a car accident on

18    October 2nd of 1995?

19    A    October 2nd, 1995.  Yes, Yes, I was.  Yes.

20    Q    And that car accident took place in Mastic, New York; is

21    that right?

22    A    Yes, Mass Beach.

23    Q    And in that -- that car accident, you had a head-on

24    collision with another vehicle; correct?

25    A    Yes.  It was driver's side to driver's side, yes.

1   Q    All right.  And in that collision, your -- both vehicles

2   suffered extensive front-end damage; is that correct?

3   A    Yes.

4   Q    Okay.  And your air bag deployed; correct?

5   A    Yes.

6   Q    And the vehicle -- or the vehicles collided with enough

7   force that the passenger in the other vehicle died as a result

8   of the injuries that he sustained in that accident; isn't that

9   true?

10  A    Yes.

11  Q    All right.  Why did you not disclose this accident in your

12  answers to interrogatories?

13  A    I didn't -- I didn't feel it was relevant.  I didn't have

14  any injuries from it, and not -- maybe I should have, but it's

15  not really something I like to remember either.  But there

16  was -- I didn't feel it was relevant to anything that was going

17  on with me from this accident.

18  Q    You'll agree --

19  A    Yeah, it was 1995.  It's not like I was thinking about

20  that either.  It was a long time ago.

21  Q    Your car sustained significant damage; correct?

22  A    Yes.

23  Q    All right.  Did you receive -- were you taken -- did you

24  receive any medical care after that accident?

25  A    No.

1   Q    None at all?

2   A    None that I remember.  It was 1995.  I don't remember

3   getting medical treatment from it.  I don't remember going into

4   the hospital after that.  I went home.  It was literally right

5   down the block from my house.

6   Q    This morning your attorney asked if you had ever been in

7   another motor vehicle accident, and you said no; right?

8   A    Yes, I did.

9   Q    Okay.  And this is not an accident that you forgot about;

10  right?

11  A    Well, when he said that, I believe I answered with the

12  2000 accident.  So...

13  Q    Right.  And he asked if you've ever been in any other

14  motor vehicle accident other than the 2002 accident and the

15  accident at issue in our case; right?

16  A    Yes.

17  Q    Okay.  And this accident in 1995 is not something that

18  you've reported to any of your medical providers; right?

19  A    That's correct.

20  Q    It -- you don't have any records from the time frame that

21  have been disclosed regarding this; correct?

22  A    I don't have medical records, no.

23  Q    All right.  Let's take a look at Interrogatory No. 24.

24       This interrogatory asks:  Have you ever made a claim

25  under any state or federal workers' compensation laws?  And

1    then it goes on from there:  If the answer is yes, and here you

2    answered no.

3              Do you see that?

4    A    Yes.

5    Q    All right.  Did -- have you ever made a claim under any

6    state or federal workers' compensation laws?

7    A    I don't remember if I have ever made any.

8    Q    Okay.  You talked this morning about your work for United

9    Parcel Service.

10             Do you recall that testimony?

11   A    Yes.

12   Q    All right.  Isn't it true that while you were working for

13   them, you broke or crushed your foot?

14   A    It was a long time ago.  I -- yes.  Yes.

15   Q    And that was an injury covered by workers' compensation

16   coverage, wasn't it?

17   A    Yes, ma'am.  It was just something I don't remember.  It

18   happened so long ago.  It's nothing that I remember that comes

19   to mind very quickly.

20   Q    All right.  And while you were working for United Parcel

21   Service, you also had other injuries that were covered by

22   workers' compensation, like hand sprains.

23             Do you recall those injuries?

24   A    I don't remember hand sprains, no.

25   Q    And when you worked for Master Cooling and Heating, isn't

1  it true that you broke your hand while you were working for

2  them?

3  A    I was working for them when I broke my hand, yes.

4  Q    Okay.  And that injury was also covered by workers'

5  compensation; correct?

6  A    I believe so.

7  Q    And while working for Master Cooling and Heating, you also

8  sprained your ankle; right?

9  A    A sprained ankle, yes.

10 Q    Okay.  And that injury was covered by workers'

11 compensation; right?

12 A    Yes.

13 Q    And you'd agree with me that these are all orthopedic

14 injuries?

15 A    Okay, yes, I would agree.

16 Q    And you did not report this prior history to any of your

17 medical providers, did you?

18 A    No.  I didn't feel -- I didn't remember them, to be honest

19 with you, but they didn't have anything to do with what was

20 going on with me at that particular time.

21 Q    All right.  Let's look at the answer -- pardon me.  If we

22 go to defendant's -- pardon me.  The same exhibit, the same

23 page, Interrogatory No. 25, please.

24       Interrogatory No. 25 asks if you have ever been

25 convicted of a felony or a misdemeanor or a crime involving

1   dishonesty or false statement.  Please state the crime and date

2   committed, the date of conviction, and the jurisdiction in

3   which you were convicted.  And your answer here is no.

4           So I'm going to ask you:  Have you ever been

5   convicted of a felony or a misdemeanor or a crime involving

6   dishonesty or false statement?

7   A    I've never been convicted of a felony or a misdemeanor for

8   a dishonest false statement.  I don't recall any -- anything of

9   that nature ever happening.

10  Q    Okay.  So this is asking a felony or a misdemeanor or a

11  crime involving dishonesty or false statement.

12          So have you at all -- I'll just break it down.

13          Have you ever been convicted of a felony?

14  A    I've never been convicted of a felony, no.

15  Q    Okay.  Have you ever been convicted of a misdemeanor?

16  A    I don't believe I was convicted of a misdemeanor, no.  It

17  was 1996, maybe.  It was a driving under the influence.  That's

18  about the only time I've ever had trouble with the law.

19  Q    Okay.  And was that not a misdemeanor DUI conviction?

20  A    I'm not sure if that was a misdemeanor.  I don't know -- I

21  don't remember it being like a misdemeanor.  I just remember it

22  being driving under the influence.

23  Q    All right.  Did that result in your license being

24  suspended?

25  A    Yes.

TRIOLO v USA                    September 22, 2020  Vol I-266

1    Q    And that was --

2    A    Actually, I -- I don't remember if my license was

3    suspended.  I just remember I had to see a counselor for a

4    number of times, and that was pretty much my -- my points that

5    I had to accumulate to -- or I could drive to and from work.  I

6    remember that.

7           So I can't remember exactly if my license was

8    suspended because it happened in Nassau County.  It's different

9    from Nassau County and Suffolk County.  They have different

10   rules.

11          MS. CUNNINGHAM:  Okay.  If we go to page 6 of this

12   exhibit.  Defendant's 12, page 6.

13          All right.  If we could just look at the top part,

14   please, of Interrogatory No. 17.

15   BY MS. CUNNINGHAM:

16   Q    All right.  Here we asked -- the question states:

17   Identify each health care provider who has examined and/or

18   treated you, and/or each health care facility where you have

19   received an examination or treatment during the past ten years.

20   And then it asks for more information.

21          So when we looked at the last page -- we don't have

22   to go back there.  I think I can just tell you that it was

23   notarized on May 28th of 2019.  Okay?

24   A    Okay.

25   Q    Does that sound right?

1      So ten years prior to that would go back to 2009;

2  right?

3  A    Okay.

4  Q    Which would go back to the period of time that you were

5  still living in New York; correct?

6  A    Yes.

7  Q    Okay.  And we, I can tell you, did not receive any medical

8  records from you from the period of time that you lived in New

9  York.

10      Did you treat with any medical providers during the

11  period of time that you lived in New York?

12  A    I mean, I'm sure I went to a clinic, you know, kind of

13  like a walk-in type of clinic from time to time, sure.

14  Q    All right.  The testimony that you gave earlier was that

15  you had sort of years -- and, Ms. Sabino, I'm sorry, you're

16  welcome to take that down -- years of playing football and

17  wrestling and working out intensively and all those sorts of

18  things.

19      And is it your testimony that in all of those years,

20  you never experienced any kind of neck pain or back pain?

21  A    Yes.

22  Q    Okay.  So let's talk briefly about pharmacies.

23      You use Walgreens as your pharmacy; right?

24  A    That's correct.

25  Q    Okay.  Do you use any other pharmacies?

```
1   A    As far as getting my medications that I'm provided, no.

2   Q    So one of the drugs that Dr. Pardo prescribed for you was

3   the morphine?

4   A    Oh, yes.  There was a separate pharmacy that I had to see

5   for the morphine itself.  Yes, I remember that.

6   Q    Okay.  And what pharmacy was that?

7   A    I don't remember the name.  It was out on, like, Beach

8   Boulevard and Hodges.

9   Q    All right.

10  A    For some reason Walgreens did not provide that medication,

11  but this pharmacy did.

12  Q    So do you know why that pharmacy location was never

13  disclosed in this litigation?

14  A    No, I never really thought about it.  The medication --

15  the morphine medication is still on there as taking it.  I

16  just -- wasn't something I thought about.  I'm always at

17  Walgreens.

18  Q    All right.  Let's take a look at Plaintiff's Exhibit 14,

19  which are the Walgreens records.

20           THE COURT:  Mr. Kinney, is your surgeon still out

21  there?

22           MR. KINNEY:  Yes, Your Honor.

23           THE COURT:  I would send him home.

24           Before you go, to accommodate his schedule, why don't

25  we just plan on starting with the surgeon at 9:00 a.m., get him
```

```
 1   in and get him out.
 2              Would that work?
 3              MR. KINNEY:  I'm not sure he's available.
 4              MR. MOORE:  We have some at 11:00.
 5              THE COURT:  You can remove your mask when you're
 6   speaking.  You need to be at a microphone regardless.
 7              MR. MOORE:  We've had him here since 11:00, thinking
 8   he was going to go at 1:00, right after lunch, Your Honor.
 9              We didn't realize Mr. Triolo's testimony would be all
10   day, so we didn't clear tomorrow with him.
11              THE COURT:  You want to go talk to him about whether
12   he would want to do first thing in the morning or --
13              MR. MOORE:  Sure, Your Honor.  Yeah, I'd be happy to
14   do that.  I know we are coming back obviously Monday for the
15   life care planner's testimony, so I'll mention that to him,
16   too.  Let me check on it.
17              THE COURT:  Hold on.  Let me see how much time I have
18   on Monday.  I think I have a pretty busy day.
19              MR. KINNEY:  Jodi is saying there's no way on Monday.
20              THE COURT:  Monday is my sentencing day.  So...
21              MR. MOORE:  Let me go ask him about tomorrow, Your
22   Honor.
23              THE COURT:  Okay.
24         (Pause in proceedings.)
25              THE COURT:  How long do you think -- I know he's not
```

 1   your witness, but how long do you think the surgeon will be on

 2   the stand?

 3            MR. KINNEY:  I think we'll have him on direct for an

 4   hour.

 5            THE COURT:  She said there's been a motion to

 6   continue in my 3:30 sentencing, but I don't know that we -- if

 7   we start him at 3:30, I don't -- and you have him for an hour.

 8   At the pace we're moving now, I don't think that we would

 9   finish him by 5:30.

10            Let's see what Mr. Moore -- and, Mr. Triolo, you can

11   feel free to get up and stretch.

12            THE WITNESS:  Thank you, Your Honor.

13            MR. KINNEY:  Are we going to wait for them to come

14   back?

15            THE COURT:  Actually, no, let's not.  I was, but we

16   shouldn't.  We should plow on.

17            We are going -- yeah, we are -- I got to tell you

18   that when we finish today, I'm just telling you-all, you got to

19   pick up the pace, because this -- I did not expect this, and I

20   do have -- I scheduled other things later in the week based on

21   this being finished.

22            What exhibit were we turning to?

23            MR. KINNEY:  14, Plaintiff's Exhibit.

24            MS. CUNNINGHAM:  Plaintiff's Exhibit 14.

25            THE COURT:  Plaintiff's exhibit.  I have the wrong

TRIOLO v USA                September 22, 2020  Vol I-271

 1  binder.
 2          Okay.  Plaintiff's 14, here it is.
 3          Go ahead, Ms. Cunningham.
 4          MS. CUNNINGHAM:  Thank you, Your Honor.
 5  BY MS. CUNNINGHAM:
 6  Q    If we -- this is a little bit challenging to read, sir,
 7  but if we can get to Walgreens 9, which is page 9, and then
 8  we'll see if we can turn it so you can see it.  And if not, you
 9  probably have a set of plaintiff's exhibits in front of you.
10  I'm sure we can get you the page.
11          It's going to be very hard to see.
12          THE COURT:  Hold on a minute.
13       (Mr. Moore enters the courtroom.)
14          MR. MOORE:  He's got surgeries tomorrow, Your Honor.
15  He said he would have to clear them all.  I told him I would
16  mention to you, he said Tuesdays or Wednesdays of the next
17  two weeks would work for him to come back, Your Honor.
18          I mean, I --
19          THE COURT:  All right.  Well, I'm not going to ask
20  him to clear people -- clear surgeries.  People are counting on
21  him, so give me a moment.
22          MR. KINNEY:  We have him under subpoena, Your Honor.
23          MR. MOORE:  Surgery center, so it would be very
24  expensive probably to -- okay.
25          THE COURT:  Can he not come later this week?

```
 1              MR. MOORE:  I mean, I can...

 2              MR. KINNEY:  Thursday.

 3              MR. MOORE:  I could ask him.  I'll go -- let me -- I

 4    can go call him real quick and check, Your Honor.  Thursday

 5    this week.  Okay.  I'll double-check.

 6              THE COURT:  All right.  Go on with your next

 7    question.  We're looking at Plaintiff's Exhibit 14, page 9.

 8              MS. CUNNINGHAM:  Plaintiff's Exhibit 14, page 9.

 9    BY MS. CUNNINGHAM:

10    Q    And, sir, this may be hard for you to see, but the third

11    entry from the bottom, it's for a drug called E-m-b-e-d-a.

12    It's my understanding that that's a morphine extended-release

13    drug.

14              Are you familiar with that drug, sir?

15    A    What -- I can't really read -- but what is it called?

16    Q    It's called -- E-m-b-e-d-a is the drug's name, Embeda?

17    A    Embeda.  I don't remember that one.  I remember a

18    different one.

19    Q    So the -- some of these things have different names,

20    right, as you know?

21    A    Yes.

22    Q    But Walgreens has this one instance -- this is the only

23    instance in the Walgreens records of dispensing an

24    extended-release morphine drug to you.  But they were able to

25    dispense it, according to these records.
```

1          Do you have a recollection of getting an

2     extended-release morphine prescription from the Walgreens?

3     A    No, I don't.  That was the reason why we had to go to the

4     other -- I had to go to the other pharmacy on Beach and Hodges.

5     Q    All right.  And you don't recall the name of that

6     pharmacy?

7     A    I don't remember the name of it.  Sorry, I don't know the

8     name of it.

9          MS. CUNNINGHAM:  All right.  So we can take that

10    down.  Thank you.

11         All right.  Let's take a look at Plaintiff's

12    Exhibit 9, which is the St. Joseph Interventional Pain

13    Specialists record.  Let's look at Bates No. 1-2-0, 120.

14    BY MS. CUNNINGHAM:

15    Q    This is -- while it's being brought up, I will tell you

16    this is a note from your encounter with Dr. Pardo on

17    January 22nd of 2019.

18         And if we can just blow up kind of the top of the

19    record so it can be seen more easily.

20         Thank you.

21         Okay.  Mr. Triolo, so at this point, January of 2019,

22    you're rating -- you're feeling so much better, rating your

23    low-back pain at 2 out of 10.

24         Do you see that?

25    A    Yes.

1   Q    And after this incident, then you had a fall off a ladder;

2   isn't that true?

3   A    It wasn't a -- I wouldn't state it was a fall.  It was

4   a -- just kind of a coming down off the ladder.

5   Q    Okay.  You stepped down off the ladder in a way that

6   caused immediate pain in your Achilles; is that right?

7   A    That's correct.

8   Q    So let's take a look at Plaintiff's Exhibit 4, which is

9   the Baptist Primary Care record.

10          And the first page of the record is the -- well --

11  all right.  So you went to your primary care doctor on

12  February 28th of 2019.

13          Do you see that record?

14  A    Yes.

15  Q    Okay.  So here you reported to the primary care practice

16  that you developed right Achilles discomfort a few weeks ago,

17  walking differently secondary to back problem.

18          Do you see that line?

19  A    Yes.

20  Q    Yes.  Okay.  And then the next line says:  Felt twinge

21  coming down off ladder a few days ago and getting worse since.

22          Do you see that?

23  A    Yes.

24  Q    All right.  Let's take a look next back at Dr. Pardo's

25  record, so Plaintiff's Exhibit 9, your visit with him, SJIPS

```
 1   124.
 2            This is an encounter date from the 28th of February.
 3            And if we can blow up the top part here, you're
 4   reporting to him:  I have pain on the right side of my lower
 5   back.
 6            Do you see that?
 7   A    Yes.
 8   Q    Okay.  And so you're reporting right lumbar pain
 9   aggravated with prolonged standing and extension, and the other
10   things that are in this record.  But there's no reflection here
11   that you reported to him -- well, let's just keep this record
12   in mind for a second here.  Okay?
13            You agree with me there's not a discussion here as to
14   the ladder, or stepping off the ladder, or anything of that
15   sort.  Do you see that?
16   A    Yes.  But I'm not there to see Dr. Pardo for a hurt foot.
17   Q    All right.  Let's talk about -- now, next to Defendant's
18   Exhibit 32 -- and let me just check before this is pulled up.
19            There is a relevance objection to these records as a
20   whole.
21            MR. KINNEY:  I'm sorry, what's the exhibit number?
22            MS. CUNNINGHAM:  Exhibit 32.  So the pages I'm going
23   to ask about --
24            MR. KINNEY:  Your Honor, just based on the rulings
25   and the testimony that's been taken today, I'm going to go
```

1    ahead and withdraw the objection to No. 32, the defendant's

2    exhibit.

3              THE COURT:  32 is admitted.  Go ahead.

4         (Defendant's Exhibit 32 admitted in evidence.)

5              MS. CUNNINGHAM:  Thank you, Your Honor.

6    BY MS. CUNNINGHAM:

7    Q    Defendant's Exhibit 32 -- pull up the Bates No. JEFAA-3.

8              Sir, these are records from a podiatry practice, J.D.

9    Foot and Ankle.  Do you recall seeing Dr. Emily Ernst, the

10   podiatrist there?

11   A    Yes, I do.

12   Q    All right.  To your podiatrist, to Dr. Ernst -- let's take

13   a look at the history of present illness.

14             To her, you reported stepping off a ladder on

15   February 19 with immediate pain in the Achilles.  Did not seek

16   treatment, and states that the pain is getting worse.  Relates

17   that he is now having shooting pain into his calf and up his

18   leg.  Relates that he feels like he is walking funny and is now

19   irritating his spinal fusion.  Denies other injuries or

20   complaints.

21             All right.  Did I read that accurately?

22   A    Yes.

23   Q    Okay.  And so in this instance, this fall -- or, pardon

24   me, stepping off of a ladder that caused you immediate pain,

25   you're reporting to this physician that that is causing you

1   difficulty walking and it's irritating your fusion.  But you

2   did not report this incident to Dr. Pardo; correct?

3   A    I didn't report it to doctor -- I'm not there -- my foot

4   to Dr. Pardo.  I'm there for my back and what's going on for my

5   back.

6          This is a foot doctor, so that's why I gave her that

7   description there.

8   Q    All right.  And is it accurate that the issue with your

9   foot was actually causing you irritation in your back?

10  A    At that particular time, it started to, yes, because of

11  the limping.  So I was starting to overcompensate.

12  Q    All right.

13  A    So it started irritating the right side.

14  Q    And you had preexisting ankle injuries prior to the car

15  accident; right?

16  A    Sure, I've rolled ankles, yes.

17  Q    And this doctor gave you a CAM walker to wear; right?

18  A    Yes.

19  Q    Okay.  And a CAM -- well, how would you describe a CAM

20  walker?  Some people call it a CAM boot.

21  A    Yeah, it basically just keeps your -- keeps your ankle

22  stable.

23  Q    Right.  It also raises one leg a little bit higher than

24  the other; right?

25  A    Yes, it does.

TRIOLO v USA                      September 22, 2020  Vol I-278

```
 1   Q    Okay.  Now, in the next record from Dr. Ernst, it begins
 2   at JEFAA-5, this indicates that you've been -- and I should
 3   clarify.  The encounter date here is April 5th of 2019.  This
 4   indicates that you've been wearing your boot as instructed
 5   until two days ago.  So basically a little under a month in the
 6   boot is what you were reporting to her.
 7           Is that what you were reporting?
 8   A    Yes.
 9   Q    All right.  Did you wear this boot when you went to see
10   Dr. Pardo?
11   A    I don't remember if I did or not.
12   Q    All right.  There -- do you remember taking it off to go
13   see Dr. Pardo?
14   A    Like I say, I don't remember if I had it on or not when I
15   saw Dr. Pardo.
16   Q    Okay.  You saw Dr. Pardo on both May 28th and April 1st,
17   and there's no indication of -- in either of those records that
18   you were wearing a CAM boot or that you had sustained this
19   injury.
20           Do you have any reason to believe that you told him
21   about the injury or told him about the CAM boot?
22   A    Like I said, I wouldn't discuss another injury with
23   Dr. Pardo, because he's -- in my mind, when I go see Dr. Pardo,
24   it's for the symptoms and the pain that I'm having right now,
25   and that's why I'm seeing him, for that.  I'm not seeing him
```

1    for my Achilles or my foot.  He's not a foot doctor, so I

2    wouldn't relay that injury to him.  That would be my reason why

3    I didn't say anything to him.

4            MS. CUNNINGHAM:  Your Honor, may I ask you -- I'm

5    nearing the end here, but I also see where we are from a time

6    standpoint.

7            THE COURT:  Just keep going.

8            MS. CUNNINGHAM:  Okay.

9            THE COURT:  We'll go until 6:00, if you'll let them

10   know out front.

11           MS. CUNNINGHAM:  Okay.

12           THE COURT:  But we will have to stop at 6:00 because

13   otherwise I'm keeping too many courthouse personnel here.

14           MS. CUNNINGHAM:  Okay.

15   BY MS. CUNNINGHAM:

16   Q    All right.  So let's take -- the next exhibit I want to

17   look at is Defendant's Exhibit 31 that also has a relevance

18   objection.  It's a relatively small set of records from the

19   Respiratory Care and Sleep Medicine Group.

20           THE COURT:  Is there still an objection to these?

21           MR. KINNEY:  I actually don't remember this one, so

22   I'm trying to flip through it real fast, Your Honor.

23           MS. CUNNINGHAM:  The objection that was raised was a

24   relevance objection.

25           MR. KINNEY:  Withdrawn, Your Honor.

```
 1          THE COURT:  All right.  Then Defendant's Exhibit 31
 2   is admitted.
 3       (Defendant's Exhibit 31 was admitted in evidence.)
 4          MS. CUNNINGHAM:  All right.  Ms. Sabino, if you would
 5   please bring up Defendant's Exhibit 31 at RESP-0013.
 6   BY MS. CUNNINGHAM:
 7   Q    Sir, this is a note from a visit on March 21, 2019, with
 8   the Respiratory Care and Sleep Medicine Center.
 9          Is this the center that you visited for treatment of
10   your sleep apnea?
11   A    Yes.
12   Q    All right.  If you'd look at the top part here, this
13   indicates that you had stopped using your APAP for a period of
14   time due to lack of supplies, and that it feels great to be
15   back on it.
16          Do you see that?
17   A    Yes.
18   Q    Okay.  What period of time were you off your APAP?
19   A    I don't remember the period of time.  So I know the -- I
20   was not aware that -- that I needed to see a doctor in a
21   certain period of time.  That was not relayed to me.
22          So supplies came at my house.  They gave me a call,
23   asked if I needed more supplies, I'd say yes.  In that time
24   frame, it just kind of stopped.  And I didn't realize it, and I
25   stopped using my CPAP because I didn't have the proper -- I
```

 1   felt my circuit was dirty, the reservoir was dirty, and I

 2   needed a new mask.

 3            And I found out I had to start as a whole new patient

 4   and I had to get a whole new doctor because the original doctor

 5   was not working at Baptist South anymore.  So it was a whole

 6   process where I had to apply as a whole new patient, see the

 7   doctor, and then start everything over again.  So -- but I

 8   don't really remember the period of time, how long it was in

 9   between that.

10   Q    Do you have any sense of it at all?  I mean, in other

11   words, are we talking about a year-long period?  Are we talking

12   about longer than a year, less than a year?

13   A    No, it was less than a year.  I feel it was less than a

14   year.

15   Q    Okay.  But for more than six months, would you say, more

16   than eight months?

17   A    I wouldn't say -- I wouldn't say more than six months.

18   That's -- but, again -- I wouldn't say more than six months,

19   but I don't remember the time frame in between from when the

20   supplies had stopped, you know, calling me on a consistent

21   basis when it was ready, and when everything started up again.

22   Q    All right.  So there was a not insignificant period of

23   time where you were not on your APAP; is that correct?

24   A    So it was -- it was intermittent at that point.  I was

25   going on and I was going off.  I wasn't like completely off for

1    that whole time.  I believe I was on it, but not, you know,

2    staying on it.  And, you know, I had a thing about dirty

3    equipment.  I felt the circuit, the reservoir, the mask,

4    everything was dirty and was kind of bothered.

5    Q    Wouldn't you agree that when you're on it, you feel

6    better; right?

7    A    Oh, yes, most definitely.

8    Q    So let's talk a little bit about kind of where -- where

9    things are today.

10             So you are -- you are working out some, it sounds

11   like?

12   A    You know, working out is very inconsistent -- very

13   inconsistent at best.  There's nothing where I can stay steady

14   because of, you know, I have good days and bad days like

15   every -- everything else.

16             There will be days that I'm off where I'd like to do

17   a little something but I can't because maybe it's raining and

18   I'm in too much pain to do so.

19   Q    Okay.  Would you say that at this point in time you have

20   sort of good mobility in your spine?  You're able to sort of

21   bend all the way over, get yourself all the way back, like,

22   with ease?

23   A    It all depends on what time of the day we're at.

24             So you have to remember, I wake up 4:00 every

25   morning, and I'm stretching for an hour before I even start my

1   day.  So after I stretch and I get that whole stretch routine

2   done, my mobility is better, yes.  I have range of motion.  I

3   have mobility.  I'll say that, yes.

4   Q    Okay.  So once you've gotten up and sort of done your

5   stretching, then you're able to do your activities around the

6   house, around the yard, without difficulty?

7   A    I can do the chores.  It's when everything is over is the

8   issue.

9         So I -- like, everything comes with a price.  So if I

10  do the yard, for the rest of the day, I'm achy, I'm sore.  I'm

11  in the recliner, I'm on the floor.  I'm stretching a couple

12  times.

13        Same thing with everything else: the yardwork,

14  cleaning of the house, even after work.

15        MS. CUNNINGHAM:  Your Honor, may I just have a

16  moment?

17        THE WITNESS:  Your Honor, would it be okay if I could

18  stand for the rest of the testimony?

19        THE COURT:  Yes.  Well, no.  For the rest of the

20  testimony, no, I need you speaking in the microphone.

21        If you want to stretch, please go ahead and do that.

22  BY MS. CUNNINGHAM:

23  Q    All right.  So on direct, you testified about your ability

24  to mow the lawn and do yardwork and things like that.  Do you

25  recall that testimony?

TRIOLO v USA                    September 22, 2020  Vol I-284

1   A    Yes.

2   Q    Okay.  And so is it your testimony that that's something

3   that you can do for kind of an hour and then, you know, you're

4   sort of done; you've got to go to the recliner and lie down?

5   A    Most times, yes.  I mean, after -- I go grocery shopping

6   from time to time after I do that, but for the most part, I

7   mean, I'm achy, I'm sore, you know, after I cut the yard, yes.

8   Q    And the -- would you say that you're unable to spend, you

9   know, three hours outside doing yardwork and things of that

10  nature?

11  A    I wouldn't say that.

12  Q    So you are able to spend three hours outside doing

13  yardwork?

14  A    If I needed to spend three hours doing the yard, yes, at

15  that point, I stretch.  I'm on meds and, you know, I can get

16  the yard done.  If I need three hours to get the yard done,

17  then I'll take three hours.  It's what happens after the

18  yardwork.

19  Q    All right.  So if we take a -- well, so the -- the

20  instances that you're talking about, if -- if the period of

21  time that you are outside and working -- are you -- are there

22  days where you're able to do it; you're able to stay out there;

23  you're pain-free, and you don't go -- you know, you don't have

24  to head straight to the recliner?  You're okay; you're hanging

25  out; you're feeling good, do you ever have those days?

1    A    So I'm never pain-free.  I just want to put that out

2    there.  I'm never pain-free.  But, I mean, what -- if I go to

3    my brother's house maybe after the yard, have dinner there, but

4    if I'm -- I don't feel like after I cut the yard, I'm out

5    galavanting around all over the place.  You know, I'll go to my

6    brother's house for dinner or I'm home.  Maybe I'll do some

7    grocery shopping real quick, but I'm not out socializing.

8    That's kind of -- I feel like you're asking me if I'm out

9    socializing after the yard.

10   Q    Okay.  And it's probably a poor question on my part.  So

11   in other words, are you in a situation where you're not doing

12   your yardwork and then running inside to the recliner and lying

13   down?

14   A    No.  I can get through the yardwork.  I can get through

15   the yardwork.  I'm not pain-free, but I can get through it.

16          MS. CUNNINGHAM:  Okay.  Your Honor, we would like to

17   show some surveillance video that we believe is appropriate

18   impeachment.  It's short.

19          THE COURT:  All right.

20          MR. KINNEY:  Your Honor, this is something that was

21   just disclosed to us.  It wasn't turned over in discovery,

22   despite our requests.  It's something that was just turned over

23   to us.

24          MS. CUNNINGHAM:  I let plaintiff's counsel know and

25   there was no objection raised.  And I explained that this was

```
 1   from the same period of time as the newly introduced records
 2   was.
 3              MR. KINNEY:  You know what, Your Honor.  I'm going to
 4   withdraw my objection.  If you want to watch it, we'll watch
 5   it.
 6              MS. CUNNINGHAM:  It's brief, Your Honor.
 7              Mr. Triolo, this will come up and I'll narrate while
 8   it's on, because otherwise it won't be reflected in the record.
 9              Okay.  So --
10              THE COURT:  And just so you-all know, I have a screen
11   down here that's clearer for me, so I'm not looking at that.
12              MR. KINNEY:  It should be on your screen in front of
13   you.
14       (Video played.)
15   BY MS. CUNNINGHAM:
16   Q    Okay, sir.  So this is surveillance video taken July 18th,
17   2019.
18              This is you in the -- in this video, sir?
19   A    Yes.
20   Q    Okay.  And here you're mowing your lawn.  This particular
21   part starts at 10:25, but it's my understanding that you've
22   been out there for some time prior.
23              Here you're checking your phone.  Now you're sort of
24   back to using -- using your mower.  You've turned it around,
25   walking back the other way.
```

TRIOLO v USA                 September 22, 2020  Vol I-287

```
 1          This mower that you're using is a push mower;
 2   correct?
 3   A    That's correct.
 4   Q    All right.  And is this at your house, sir?
 5   A    Yes.
 6   Q    You've got an extension cord that you are using.  You're
 7   bending down, I assume to plug the extension cord into the
 8   piece of equipment you're about to use; is that right?
 9   A    It looks like I'm wrapping up the cord.
10   Q    Okay.  All right.  And so here -- this is still on the
11   18th.  Now it's 11:21.  You're still outside.  This is
12   initially kind of blowing off the -- pardon me, hosing off the
13   lawnmower.  And then you're bending down, doing something with
14   the lawnmower -- do you know? -- and then you're lifting up the
15   lawnmower.
16   A    I'm just getting the water off the lawnmower at that point
17   just to help it to dry better.
18   Q    Okay.  You're lifting the lawnmower up one-handed to be
19   able to drain the water off.
20          You were rinsing it off after having mowed the lawn;
21   is that right?
22   A    Right.
23   Q    Okay.  So you kind of walked away.  No indication of sort
24   of grimacing or anything.
25          So this is 11:22 on the same day.
```

1       Here you're bending down fully to pick up some

2   bricks, it looks like, and checking your phone.

3   A    Probably switching -- just switching the music in my ear

4   at that point, switching to a different song.

5   Q    All right.  So you're listening to music while you're

6   doing your work outside; right?

7   A    Sure.

8   Q    And so here you sort of come back out.

9       And you'd agree with me you're sort of walking around

10  without indication of difficulty, moving, walking, no

11  difficulty pushing the mower, no difficulty bending down to get

12  those bricks?

13  A    No difficulty bending, you know, the range of motion.

14  But, I mean, if you watch me walk back into that garage, to me,

15  it looks like I was -- I was all sore and stiff at that point.

16  It didn't seem like I was walking as fast as I normally do.

17      MS. CUNNINGHAM:  Just for the record, those latter

18  few clips were from August 1st of 2019.  The first were from

19  July 18th of 2019.

20      All right.  Thank you, Your Honor.  Nothing further.

21      THE COURT:  I'm sorry, the first clip was -- what was

22  the date?

23      MS. CUNNINGHAM:  I'm sorry, Your Honor.  Let me make

24  sure I have this written down right.  July 18th of 2019.

25      And I should have narrated when the date changed, and

1  I apologize for that, but the latter parts were from August 1st

2  of 2019.

3          I'm sorry, Your Honor, let me just...

4          MR. KINNEY:  Your Honor, can the plaintiff get a copy

5  of the --

6          MS. CUNNINGHAM:  I'm sorry.  I guess there was a

7  miscommunication.  What was shown was just July 18th.

8          MR. KINNEY:  Your Honor, since this was just turned

9  over to us, can we get a complete copy of the entire

10  surveillance to see what they cut out?  Looks like these were

11  selected clips.

12          MS. CUNNINGHAM:  If I may clarify, I provided the

13  complete disc to your office.  These are clips from everything

14  that was on the CDs that I sent.

15          MR. KINNEY:  We did not receive discs with hours of

16  surveillance on it.  We received discs with minor edited clips.

17          MS. CUNNINGHAM:  So I sent two CDs over with

18  surveillance, and that's the surveillance that we have.  So it

19  probably totaled may be an hour on both the CDs, maybe not that

20  much.

21          THE COURT:  All right.  It sounds like it's been

22  turned over.  I'll let you-all talk about that.  If it hasn't,

23  we can discuss it in the morning.

24          What's being represented to me is that you have been

25  given the complete surveillance, but I'll just make sure you

TRIOLO v USA                    September 22, 2020  Vol I-290

```
 1    confirm that, Ms. Cunningham.
 2              MS. CUNNINGHAM:  Yes, Your Honor.
 3              THE COURT:  All right.  Are we finished -- I'm sorry,
 4    do you have redirect?
 5              MR. KINNEY:  Yes, I do.
 6              THE COURT:  Okay.  As I said, we'll go until 6:00.
 7                        REDIRECT EXAMINATION
 8    BY MR. KINNEY:
 9    Q    Do you still have the exhibits up next to you?
10    A    Yes.
11    Q    Mr. Triolo, if you would, go to Defendant's Exhibit 39.
12              THE COURT:  I don't think defendant's exhibits are in
13    that folder, Mr. Triolo.
14              THE WITNESS:  I'm sorry.
15              THE COURT:  The Government can pull it up.
16    Defendant's 39, what page?
17              MR. KINNEY:  Pages 38 and 39.
18              You can see it on your screen?
19              THE WITNESS:  Yes, I can.
20    BY MR. KINNEY:
21    Q    Sorry about that.  I thought we were waiting on the paper.
22              Okay.  So do you remember that it was talked about,
23    your job responsibilities as a respiratory therapist at Baptist
24    Medical Center?
25    A    Yes.
```

1    Q    And just for convenience, trying to make this a little

2    more efficient, the job responsibilities were quite similar to

3    your moonlighting job over at Orange Park Medical Center?

4    A    Yes.

5    Q    Okay.  And when you took the position on -- I believe it

6    was April of 2014; is that correct?

7    A    Yes, sounds about right.

8    Q    Okay.  Do you see on page 39, the list of the lifting

9    requirements?

10   A    Yes.

11   Q    Did you have any problems with any of those whatsoever

12   when you took the position in April of 2014?

13   A    No.

14   Q    Okay.  And you see where it says:  Physical demands:

15   Sitting, standing, squatting, walking, stair-climbing,

16   crawling, bending, horizontal reaching, overhead reaching, all

17   of that, did you have any problems doing those things when you

18   took the position on October of '14 -- strike that -- on

19   April of 2014?

20   A    No.

21   Q    If you'd turn to the next page, there are some additional

22   requirements, and I don't think it's necessarily physical, so

23   maybe I got ahead of myself a little bit.  So page 39 is

24   basically the physical requirements.

25          Since you've been at your position at Baptist Medical

TRIOLO v USA                    September 22, 2020  Vol I-292

```
 1   Center, did there come a time when you had trouble with some of
 2   these requirements?
 3   A    Yes, I did.
 4   Q    Okay.  And when did that come about?
 5   A    That was after February 11, 2017.
 6   Q    Okay.  And, in fact, you did report to at least one of
 7   your physicians after the motor vehicle collision that you did
 8   start to impose some restrictions at your work.  Do you
 9   remember that?
10   A    Yes.
11   Q    And do you remember which doctor you reported that to?
12   A    I believe it was Dr. McDaniels.  I believe it was
13   Dr. McDaniels.
14   Q    Okay.  If you would, go to Plaintiff's Exhibit 9.  This is
15   actually Dr. Pardo with St. Joseph's.  And I'd like you to turn
16   to page 6.  And this is going to be in the paper records in
17   front of you.  I'm sorry, to your left in the paper exhibits.
18   A    Exhibit 6, you said?
19   Q    Yes.
20   A    Okay.
21   Q    Here, let me move it along.  It's okay.
22         On page 6, on your intake form, you wrote:  Are there
23   any work -- current work restrictions?  If yes, please
24   describe.
25         And you wrote:  I do not help in heavy lifting
```

TRIOLO v USA                    September 22, 2020  Vol I-293

 1  anymore.
 2          Do you remember writing that on your intake form with
 3  Dr. Pardo's office the first time you saw him July 11th of
 4  2017?
 5  A    Yes.
 6  Q    So were you being provided with workplace accommodations
 7  at Baptist Medical Center so that you didn't have to do the
 8  duties that you were initially hired for?
 9  A    No.
10  Q    Okay.  Were you imposing some restrictions on yourself at
11  work?
12  A    Yes.
13  Q    Okay.  Did you talk to your employer about that?
14  A    So my employer knew that I was in a car accident, so, you
15  know, just as long as I was able to take care of my patients,
16  and they were fine with me just, you know, not being able to
17  lift patients up anymore and do the little extra that I used to
18  do that I don't -- no longer do.
19  Q    When you're at work, do you back away from or get help so
20  that you don't have to go through the heavy lifting, bending,
21  pulling, and pushing?
22  A    Well, when it comes to pushing up on patients, I tell the
23  nurse; I'll get the tech, and I have the tech and a nurse do
24  it.
25  Q    Okay.  We talked about on the cross-examination the seat

1    in your vehicle after the impact.

2              Do you remember what you testified to after the

3    impact what happened to your seat?

4    A    It reclined.

5    Q    All right.  And you went through the repair records and

6    there's no indication there that the driver's seat was broken.

7    Do you recall that?

8    A    I recall that, yes.

9    Q    All right.  But did you have to do anything to your seat

10   after the impact in order to fix the position of it?

11   A    I actually had to take the -- it was power, so -- power

12   seats, so I had to use the power control and kind of reach back

13   like this and just kind of pull up on the seat and kind of help

14   it a little bit to get going.

15   Q    Was it just the power button alone; would the seat come

16   up?

17   A    No.  And then that's the reason why I reached back and

18   started giving it a little nudge to get it going.

19   Q    Once you got it to engage, did the seat come back up?

20   A    Yes.

21   Q    Have you had any more problems with that seat after you

22   were able to get it to reengage in that power mode?

23   A    I don't recall any problems with that seat, no.

24   Q    All right.  We saw a somewhat side-view shot of a -- at

25   the accident scene, your vehicle, and I think we saw part of

1  the postal truck, and there was also a dog there, too?

2  A    Yes.

3  Q    I didn't remember that the dog was there.  But in between

4  the accident scene, once you get released from the police

5  officer, did you go straight to the Baptist Medical Center, or

6  did you have to go do something with your dog, or did you take

7  the dog to the ER, or what happened with the dog, essentially?

8  A    Well, my brother was there, so he took the dog to his

9  house.

10         The dog is there all the time.  We used to -- you

11  know, my brother works nights, I work days, so we share the

12  same weekend when we work.  We drop him off and he pretty much

13  stays there the whole weekend.  He's pretty familiar with

14  that -- with my brother in the house.

15  Q    When the impact occurred, did you know it was going to

16  occur?

17  A    No.

18  Q    Did you brace for impact?  Moments before, did you brace

19  your arms or brace your feet or anything?  Did you have any

20  indication that you were about to get hit from behind?

21  A    No indication at all.

22  Q    Did you hear squealing brakes?

23  A    I did not.

24  Q    Did you go from the scene -- after getting released, did

25  you go straight to Baptist Medical Center or did you make any

TRIOLO v USA                  September 22, 2020  Vol I-296

1   trips anywhere else in between?

2   A    After the scene, after I got the report from the sheriff,

3   I went right to the ED.

4   Q    Right to where?

5   A    The emergency room.  After the accident, I went right to

6   the emergency room.

7   Q    And do you remember speaking to -- I don't know if it's a

8   supervisor or somebody else that came to the scene that said

9   that they were there from the Postal Service?

10  A    I vaguely remember speaking to somebody.

11  Q    Did that person do any type of physical examination of

12  you?

13  A    No.

14  Q    Did they do any type of medical assessment of you?  Like,

15  did they have a questionnaire where they asked you a bunch of

16  questions about any symptoms or how you were feeling?

17  A    I don't remember a questionnaire.

18  Q    Did they ask you to fill anything out on the scene?

19  A    No, not that I recall.

20  Q    Thank you.

21       Did they videotape you at the scene?

22  A    Not that I recall, no.

23  Q    Did they audio record you at the scene?

24  A    No.

25  Q    Do you recall them speaking to your brother?

TRIOLO v USA                    September 22, 2020  Vol I-297

```
 1   A    I don't remember them speaking to my brother.  I believe
 2   my brother was there when they were speaking to me.  I don't
 3   think they actually spoke to him, though.
 4   Q    Do you -- did you tell the postal supervisor about the
 5   driver being on the phone at the time of impact?
 6   A    I believe I did, yes.  I also told the sheriff as well.
 7   Q    I'm going to ask you to go to Exhibit No. 2, Plaintiff's
 8   Exhibit No. 2.
 9           This may have only been confusing to me, and so --
10   but I had a note for me to ask you about this.
11           So page 2 of Plaintiff's Exhibit No. 2, and we're
12   dealing with the addendum by Dr. Christina Caro.
13           Do you see that?
14   A    Yes.
15   Q    And do you see an indication where it says:  R-O-M not
16   assessed.  Collar placed.
17           Did that indicate that they did not do a range of
18   motion on your neck at that time?
19   A    That's correct.
20   Q    And is that what you were talking about when you said that
21   they never -- they didn't do a physical exam on your neck?
22   A    That's correct.
23   Q    In fact, the note indicates, what:  Neck exam was not
24   completed; correct?
25   A    Yes.
```

TRIOLO v USA                    September 22, 2020  Vol I-298

```
 1   Q    If you go to page 4 --
 2             THE COURT:  Of Plaintiff's 2?
 3             MR. KINNEY:  Exhibit 2, page 4, Your Honor.
 4   BY MR. KINNEY:
 5   Q    If you go to -- and this goes into the -- into the
 6   examination.
 7             Do you see where it says "musculoskeletal"?
 8   A    Yes.
 9   Q    Right after that, what's that read?
10   A    Says:  Normal range of motion.
11   Q    Okay.  How would they know normal range of motion if they
12   didn't do a range of motion test on you?
13   A    Exactly.
14   Q    Okay.  And you were in a -- you were placed in a cervical
15   collar; correct?
16   A    That's correct.
17   Q    Mr. Triolo, I'm asking this question not just about
18   Baptist Medical Center, but of all of your treatment records
19   that -- whether you've been through with me or with the United
20   States Attorney's Office.  Do you write the chart notes for
21   these doctors yourself?
22   A    No.
23   Q    There are instances where you do the intakes; right?  And
24   we've been through a lot of those.
25   A    Yes.
```

1   Q    But you don't tell the doctors how to chart and what to

2   write in there, do you?

3   A    No.  You got to remember it's an Emergency Department.

4   You got a lot of people coming in, and their thing is to --

5   Q    Mr. Triolo, you've got to wait for the questions.  It's

6   just the way it works.

7   A    Sorry, Mr. Kinney.

8   Q    Yes, no problem.  It's been a long day.

9         Mr. Triolo, is the reason why you went and followed

10  up and saw Dr. McDaniels at the chiropractor's office because

11  the -- your symptoms increased after the emergency room?

12  A    That is correct.

13  Q    Okay.  And where did your symptoms increase?

14  A    So my symptoms started -- by the time I got to

15  Dr. McDaniels, that's what the pain started going down into my

16  glute, across the hip flexor and flexor, and down into the

17  hamstring.

18        THE COURT:  And you're indicating on your right-hand

19  side?

20        THE WITNESS:  On my right-hand side, yes, ma'am.

21  BY MR. KINNEY:

22  Q    I know this is jumping around a little bit, but I want you

23  to please pull Exhibit No. 4.

24        THE COURT:  And we'll have to stop after this.

25        MR. KINNEY:  Yes, Your Honor.

TRIOLO v USA                    September 22, 2020  Vol I-**300**

1   BY MR. KINNEY:

2   Q    Okay.  If you would, turn to page 5.

3             And you see where the HPI is; correct?

4   A    Yes.

5   Q    All right.  Go down one, two, three, four -- fifth line,

6   the first word is "headache"; do you see that?

7   A    Yes.

8   Q    Read where you told the doctor the location of your

9   headache was.

10  A    Location:  Often behind both eyes, but seems to start at

11  the back of the head and neck and work its way up.

12  Q    Okay.  The headaches that you were having -- and the date

13  of this office visit with your primary care physician is

14  August 6th of 2015 at 9:30 in the morning; do you see that?

15  A    Yes.

16  Q    When you were having these headaches behind the eyes, was

17  that associated with your issues with the sleep disorder?

18            I can't remember which one you had.  Was it sleep

19  apnea?

20  A    Yes.

21  Q    Okay.  Was this associated with the sleep apnea?

22  A    Yes.

23  Q    Now, you have your primary care records in front of you.

24  Okay.  And what I'd like you to do is at any time prior to the

25  motor vehicle collision -- so February 11th, 2017 -- did you

1  ever see your doctors at the primary care for neck pain or back

2  pain?

3  A    No.

4  Q    Okay.  At any time during the cross-examination that there

5  was any record shown to you where they showed you that you had

6  complained of back pain prior to the motor vehicle collision?

7  A    No.

8  Q    Was there any record shown to you during that

9  cross-examination where you complained of neck pain prior to

10 the motor vehicle collision?

11 A    I believe they did show something.

12 Q    Okay.  Are you talking about the headaches where it

13 started in the back of the head and then moved up?

14 A    Yes.

15 Q    Okay.  But were you shown any records where you complained

16 of neck pain?  Not headaches, neck pain.

17 A    No.

18 Q    Prior to this motor vehicle collision -- have you had any

19 symptoms of neck pain prior to the motor vehicle collision?

20 A    None.

21 Q    What about back pain?

22 A    No back pain.

23 Q    What about radiating pain down into your leg anytime

24 before the motor vehicle collision?

25 A    Never.

TRIOLO v USA                    September 22, 2020  Vol I-302

1   Q    And if you would, there was some discussion about you not

2   informing your doctor about the motor vehicle collision with

3   the primary care.

4          Please turn to BPC21 of Exhibit No. 4.

5   A    21?

6   Q    Yeah.  Page 21, Exhibit No. 4.

7          Do you see where it says Emergency Department Note at

8   the top?

9   A    Yes.

10  Q    Okay.  Right under that, what does it say?

11  A    Emergency -- I'm sorry, say it again.

12  Q    Right under Emergency Department Note, right under that,

13  what does it say?

14  A    I'm sorry, I thought I saw Emergency Department Note.

15  Q    So we're on page 21.

16  A    Yes.

17  Q    At the very top, what does it read?

18  A    Baptist Primary Care, Black Creek South.

19  Q    And so doesn't it appear that your primary care doctor

20  received the Emergency Department note of your February 11th,

21  2017, motor vehicle collision in which you had -- had

22  indications of neck pain and back pain?

23  A    Yes.

24          THE COURT:  All right.  We're going to have to stop

25  this and pick it up tomorrow.

1           MR. KINNEY:  Yes, Your Honor.

2           A couple of scheduling questions.  So I can have

3    the --

4           THE COURT:  Just a moment.

5           You may step down, sir --

6           THE WITNESS:  Thank you, Your Honor.

7           THE COURT:  -- for now.

8           Go ahead.

9           MR. KINNEY:  A couple issues.  One, I'm not familiar

10   with what the rule is regarding client communication.

11          He's still on the stand.  He's subject to the

12   redirect.  Am I allowed to communicate with my client?  Is

13   there an order in place that I am not allowed to communicate

14   with the client?

15          I need some guidance as to whether I can communicate

16   with him.

17          THE COURT:  I think generally it's that the

18   presumption is that there won't be discussion specifically

19   about testimony.

20          MR. KINNEY:  Thank you, Your Honor.

21          So I can have my pain management physician here at

22   9:00 a.m., which that's probably -- we're probably talking

23   two or three hours.

24          I anticipate another hour with Mr. Triolo on

25   redirect.

1        Your Honor, that cross was almost four-and-a-half,

2   five-hours long.

3        THE COURT:  All right.  Let's just go ahead and have

4   the pain management doctor at 9:00 a.m. and move through that

5   and complete Mr. Triolo after that.

6        MR. KINNEY:  Yes, Your Honor.

7        So the order --

8        THE COURT:  Well, it would be better for Mr. Triolo

9   to finish his testimony.

10        Can you have the pain management doctor here at

11   10:30?

12        MR. KINNEY:  I'm going to call him as soon as we get

13   out of here.  I'm fairly certain that that is -- I'm 99%

14   certain that that is happening.

15        THE COURT:  Okay.  Let's do that.

16        MR. KINNEY:  Okay.  So my order will be Mr. Triolo,

17   Dr. Pardo, Bruce Schmucker, Brian Schmucker, and Dr. McDaniels

18   for tomorrow.  That will be my day.

19        MR. MOORE:  We've got -- Your Honor, Dr. Topp said he

20   is willing to clear his afternoon schedule.  He can leave his

21   office by 1:00.

22        The problem Thursday, he's having a personal medical

23   issue which requires him to be sedated.  He can't do Thursday.

24   But tomorrow afternoon he's willing to come.  He's just going

25   to have to cancel all his appointments tomorrow afternoon.

 1         I anticipate my direct of him will probably be close

 2    to two hours.  I can try to speed through it maybe an hour and

 3    a half -- not speed through it, but I don't know what

 4    Ms. Cunningham's cross would be with him.  But obviously we'd

 5    have to move around probably the before-and-after witnesses if

 6    we did that.

 7              THE COURT:  Yeah.

 8              Yeah, okay.  So we're going to do Mr. Triolo starting

 9    at 9:00.

10              You're going to do the pain management, and you said

11    he's going to be two or three hours?

12              MR. KINNEY:  Yeah, with their cross.  I think their

13    cross takes --

14              THE COURT:  Okay.  And then I guess we would have to

15    do Dr. Topp after the pain management?

16              MR. KINNEY:  Yes, Your Honor.

17              THE COURT:  So that means no -- no brothers, and I

18    forgot the other one.

19              MR. KINNEY:  Dr. McDaniels.

20              THE COURT:  So Dr. McDaniels you'll have to move to

21    Thursday.

22              MR. KINNEY:  Yes, Your Honor.

23              We might have room for Dr. McDaniels at the end of

24    the day.

25              THE COURT:  Well, that's fine.  Have him here.  If we

 1   can finish him, that's great.

 2            MR. KINNEY:  Yes, Your Honor.

 3            THE COURT:  I just wouldn't ask him to be here before

 4   about 2:30 or 3:00 in the afternoon.

 5            MR. KINNEY:  Okay.

 6            THE COURT:  Anything else, Ms. Cunningham?

 7            MS. CUNNINGHAM:  We'll have to wait and see about

 8   Ms. Segouin, the postal service person who had the COVID test

 9   yesterday.  And the -- we're already past your time.

10            The other witness that both sides were trying to

11   call, because -- has not been able to be served.  So she is a

12   former employee and I thought she was going to be able to come.

13            I scheduled her before the pretrial conference,

14   that's why I was hoping that she was coming, but we've not been

15   able to secure her appearance and neither has the plaintiff.

16   So I -- I may have to talk about that tomorrow, how to handle

17   that.

18            THE COURT:  Well, I -- I mean, you-all are -- either

19   have to serve her or --

20            MS. CUNNINGHAM:  Yeah, we have.

21            THE COURT:  So.

22            Okay.  Let me look at one thing just so that I can

23   inform you-all.

24            I -- because we do not look like we are going to

25   finish in the period of time that we discussed, I'm rather

1    concerned about time.

2          I will tell you-all that Thursday at 3:00, I have to

3    stop, because I -- I'm the group chair for the inn of court,

4    and we have a -- we are filming -- our meetings are virtual.

5    We're having to film our presentation, and there are 18 other

6    people already committed to that, so I can't move it or miss it

7    because I have to play a role.  So we will stop early on -- at

8    3:00.

9          And then on Friday, I'm swearing in new American

10   citizens at 8:00, and I'm not putting them off.  That will take

11   my morning.

12         MR. MOORE:  Your Honor, we would be willing to start

13   earlier any particular day, Wednesday or Thursday, if it helps.

14         THE COURT:  Just a minute.

15         We'll go ahead and start tomorrow and Thursday

16   at 8:00.  I am going to tell you-all that you need to work over

17   the evening to streamline your presentations.  We're getting a

18   lot of redundancy and we're having a lot of lost time.  And I'm

19   not a jury that you have to be worried about whether or not

20   they're paying attention.  I'm paying attention to everything;

21   I'm writing it down.  You don't have to tell me twice.  But

22   we -- and I'm going to start probably telling you-all if I'm

23   hearing repeating, because this should not take this long or go

24   at this pace.  The pace that we're going at is what's of

25   concern to me.

 1             And look at your outline.  Let's see if we can not
 2    have a whole other hour of Mr. Triolo on redirect.
 3             And I'll ask you, Ms. Cunningham, to make sure that
 4    your recross is limited to only the things that he addresses in
 5    his redirect.
 6             If it's something you missed --
 7             MS. CUNNINGHAM:  Yes, I understand.
 8             THE COURT:  All right.
 9             Yes, sir?
10             MR. MOORE:  I was going to just make the point, Your
11    Honor, if you want to -- for instance, when I'm directing
12    Dr. Topp tomorrow, we're kind of going through some of the
13    basics, the mechanics of the spine.  If you tell me to move on
14    because you've already heard it, that's fine too.  Just speed
15    it up a little.
16             THE COURT:  Yeah, I probably will, because I've heard
17    lots of those doctors.
18             MR. MOORE:  I'm sure you have.  It's not a problem.
19             THE COURT:  Yes, ma'am?
20             MS. CUNNINGHAM:  I'm sorry, Your Honor.  But to go to
21    what you just said, I think if we start at 9:00, that would
22    actually give a greater chance of being in a better position to
23    make sure things are condensed and sharp.
24             If there's any way we could start at 9:00 or 8:30
25    tomorrow rather than 8:00.

TRIOLO v USA                        September 22, 2020  Vol I-**309**

1              THE COURT:  All right.  We'll compromise at 8:30.

2              MS. CUNNINGHAM:  Okay.  Thank you.

3              THE COURT:  All right.  With that, do you need to

4      radio down and tell them to open the doors to let them out?

5              COURT SECURITY OFFICER:  Yes, Your Honor.

6              THE COURT:  Otherwise I think you are falsely

7      imprisoned.

8              We are in recess.

9              COURT SECURITY OFFICER:  All rise.

10         (Proceedings recessed at 6:14 p.m.; to be continued on

11     September 23, 2020.)

12                            -  -  -

1

2                    C E R T I F I C A T E

3

4   UNITED STATES DISTRICT COURT)

5
    MIDDLE DISTRICT OF FLORIDA  )
6

7       I hereby certify that the foregoing transcript is a true

8   and correct computer-aided transcription of my stenotype notes

9   taken at the time and place indicated herein.

10

11

12            Dated this 2nd day of November 2020.

13

14

15

16            /s/Cindy Packevicz Jarriel

17            Cindy Packevicz Jarriel, RPR, FCRR

18

19

20

21

22

23

24

25