1

```
          IN THE UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
                JACKSONVILLE DIVISION


          CASE NO:  3:18-cv-919-J-34JBT


RICHARD A. TRIOLO,                Jacksonville, Florida

          Plaintiff,             Date:  September 23, 2020

v.                               Time:  8:35 a.m. - 6:05 p.m.

UNITED STATES OF AMERICA,         Courtroom:  10B

          Defendant.
```
_____

**BENCH TRIAL**
**(Volume II)**
BEFORE THE HONORABLE MARCIA MORALES HOWARD
UNITED STATES DISTRICT JUDGE

OFFICIAL COURT REPORTER:

Cindy Packevicz Jarriel, RPR, FCRR
221 N. Hogan Street, #128
Jacksonville, FL  32202
Telephone:  904.301.6843
E-mail:  cindyrprfcrr@gmail.com
     (Proceedings reported by stenography; transcript
produced by computer.)

1

2                          A P P E A R A N C E S

3

4      COUNSEL FOR PLAINTIFF:

5      **PHILIP KINNEY, ESQ.**
       **BENJAMIN MOORE, ESQ.**
6      Kinney & Sasso, PLLC
       191 RG Skinner Parkway, Suite 703
7      Jacksonville, FL  32256-9678

8

9      COUNSEL FOR THE DEFENDANT:

10     **COLLETTE CUNNINGHAM, ESQ.**
       **KYESHA MAPP, ESQ.**
11     United States Attorney's Office
       300 North Hogan Street, Suite 700
12     Jacksonville, FL  32202

13

14

15

16

17

18

19

20

21

22

23

24

25

1              T A B L E   O F   C O N T E N T S

2    Proceedings:

3    Plaintiff's Witnesses:

4    **RICHARD TRIOLO**

     Redirect Examination by Mr. Kinney (Continued)......Page   11
5    Recross-Examination by Ms. Cunningham..............Page   38

6

7    **REYNALDO PARDO, M.D.**
     Direct Examination by Mr. Kinney....................Page   55
     Cross-Examination by Ms. Cunningham................Page 145

8

9    **RAYMOND TOPP, M.D.**
     Direct Examination by Mr. Moore.....................Page 198
10   Cross-Examination by Ms. Cunningham................Page 272

11

12                     E X H I B I T S

13   Received in Evidence                            Page

14   Defendant's Exhibit 20............................145
     Defendant's Exhibit 22............................311

15

16

17                        -  -  -

18

19

20

21

22

23

24

25

TRIOLO v USA                    September 23, 2020  Vol II-

4

P R O C E E D I N G S

1

September 23, 2020                                      8:35 a.m.

2

- - -

3

            COURT SECURITY OFFICER:  All rise.  The United States
District Court, in and for the Middle District of Florida, is
now in session.  The Honorable Marcia Morales Howard presiding.
            Please be seated.
            THE COURT:  We are back on the record in Case No.
3:18-cv-919-J-34JBT.
            Mr. Kinney and Mr. Moore are here on behalf of
Mr. Triolo.  Mr. Triolo is in the courtroom.
            Ms. Cunningham and Ms. Mapp are here on behalf of the
United States, with the assistance of Ms. Sabino.
            Mr. Triolo, if you'll resume your spot on the witness
stand.
            THE WITNESS:  Yes, Your Honor.
            MR. KINNEY:  Your Honor, I do have a motion to make
prior to beginning of testimony, if I may proceed?
            THE COURT:  Sure.
            MR. KINNEY:  Your Honor, as you recall yesterday,
immediately upon cross-examination, when defense brought to the
Court's attention that my client may or may not have health
insurance, and I objected and said health insurance shouldn't
be brought into this trial, Your Honor, I believe that it
violated the collateral source rule.

TRIOLO v USA                    September 23, 2020  Vol II-

1          I do believe the defense has always known that they

2     will never bring the insurance policy, the terms of the

3     insurance policy, what is or what is not covered, whether the

4     doctors Mr. Triolo treats with are within network, out of

5     network, whether he's required to pay a portion of the charges,

6     whether it's covered at all, whether he has deductibles -- the

7     defense has never intended to bring that information to bear to

8     this courtroom, but merely sought to raise the collateral

9     sources that may or may not have been available to him.

10          And the Court allowed him to then proceed, over

11    objection, to testify that he did have insurance.  I believe

12    that's so prejudicial to this case now because now the Court

13    has in its knowledge, as a trier of fact, that he has available

14    insurance, and should it have been applied to Mr. Triolo's

15    medical expenses in this case.

16          I think the only fair thing for Mr. Triolo at this

17    point, because that's going to sit over his case, is to -- is

18    to mis-try this case.

19          I'm asking the Court to declare this case is a

20    mistrial, that the prejudicial effect of that information

21    completely outweighs anything that they could have done with

22    this case defensively, knowing that none of that information

23    was ever going to come in except the mere questions of asking

24    about:  Do you have insurance?

25          THE COURT:  Ms. Cunningham?

 1          MS. CUNNINGHAM:  Well, Your Honor, this is the first
 2   I'm hearing of this position.  It was not discussed with me
 3   prior to Mr. Kinney saying it in open court, so he and I have
 4   not had the chance to discuss what my response to it would be.
 5   But I can say a number of things.
 6          First of all, under Middle District of Florida --
 7   pardon me, this is actually Federal Middle District of
 8   Florida -- but other federal district courts in jury trials
 9   have found that information about the plaintiff having medical
10   insurance that wasn't billed is relevant and is information
11   that can go to the jury.
12          The *In Re American Airlines Flight 331* case, the
13   Westlaw cite is 2014 WL 12809822, dated April 2nd, 2014, from
14   the Southern District of Florida.  And the -- that case
15   basically explains -- similarly to here the defendant was
16   seeking to introduce evidence of plaintiff's insurance coverage
17   to show that plaintiff was able to submit her medical claims to
18   her insurance provider, which also happened to be Blue Cross
19   Blue Shield.
20          Plaintiffs argued that mention of that at trial would
21   be either irrelevant or otherwise unduly prejudicial.  The
22   court found that argument had no merit.
23          In this case, it was filed as a motion in limine --
24   pardon me, in the *American Airlines* case, the plaintiff filed a
25   motion in limine.

 1          In the instant case, the Government has on its
 2   witness list records from Blue Cross Blue Shield that were
 3   subpoenaed during discovery.  The plaintiff has had those
 4   records since probably -- at some point in 2019.  I can find
 5   the exact date if we need them.
 6          They also have the burden of proving the
 7   reasonableness of the medical expenses that they are seeking.
 8   We do not have evidence of the precise charges or reimbursement
 9   amount that Blue Cross Blue Shield would have paid, and that
10   was just a reality of what's in the case.
11          We do have evidence of what Blue Cross Blue Shield
12   paid those providers that plaintiff did submit those claims to.
13          For example, he did use his Blue Cross Blue Shield
14   insurance with respect to Walgreens.  He used his Blue Cross
15   Blue Shield insurance with respect to certain other things.  I
16   believe Baptist Health Care and some other things in the
17   record.
18          There was a Precision Imaging, for example.  All of
19   the Precision Imaging bills were submitted to Blue Cross Blue
20   Shield.  For his surgical procedures, the -- the anesthesia
21   provider, Envision, that anesthesia bill originally was
22   submitted to Blue Cross Blue Shield.  Blue Cross Blue Shield
23   paid it.
24          If -- there is evidence in the record of a
25   contractual adjustment that Blue Cross Blue Shield made and

 1    then that amount was refunded and now the amount being sought

 2    in litigation is the amount that Blue Cross Blue Shield would

 3    have paid if that claim hadn't been reversed.

 4            So there is evidence in litigation that's relevant to

 5    the damages.  Whether or not Mr. Triolo had insurance was

 6    something that was clear in discovery, and I do not think it

 7    provides any basis for a mistrial of this matter.

 8            MR. KINNEY:  Your Honor, may I respond?

 9            THE COURT:  You may.

10            MR. KINNEY:  The difference in that case is that the

11    defense sought to introduce evidence of the policy itself.

12            Here, they've done none of that.  They haven't listed

13    an expert witness in billing; they haven't sought to introduce

14    the policy; they haven't put in any of the terms of the policy,

15    the pricing, whether they're in network, out of network.

16            All they've said is:  Mr. Triolo, you didn't submit

17    these to your health insurance.

18            What I'm saying is those matters, as far as set-offs

19    or any type of collateral source, should have been preserved

20    for post-trial and not infected this trial so that somehow now

21    the Court has to deal with Mr. Triolo, why didn't you submit

22    these to your health insurance?

23            The defense shouldn't be able to take advantage of

24    Mr. Triolo has -- whether he has benefits or not.  The

25    defense -- the collateral source rule is built upon that a

1   party that injures another party can't then advance his -- his

2   collateral sources as a defense to their case.

3              MS. CUNNINGHAM:  Your Honor, may I make one

4   additional point?

5              THE COURT:  Yes.

6              MS. CUNNINGHAM:  The plaintiff had enough notice

7   about insurance as an issue in this case that a motion in

8   limine could have been filed, and one was not filed.

9              This issue could have been discussed during the

10  parties' meeting prior to filing the pretrial statement; it was

11  not.  This could have been discussed at any point, really,

12  prior today, and it has not been.

13             So I would think at this point in time the

14  appropriate course would be to allow it to proceed, and if

15  there's additional briefing that they would like to submit in

16  post-trial briefing.

17             THE COURT:  Give me a moment to look at one thing.

18             All right.  I was looking back at my recollection of

19  the trial brief that the defense filed, and I think I

20  referenced it when I ruled on this issue earlier, and that was

21  that it was evident from the trial brief that amongst arguments

22  that the defendant intended to raise was the decision by

23  Mr. Triolo to proceed based on letters of protection rather

24  than bill his insurance company, and that that was relevant to

25  the credibility of his treatment providers.

1          To the extent that it addresses the reasonableness of

2     the expenses of the medical treatment, I'm not quite as certain

3     of that, but I do think that it has some relevance as to that

4     credibility determination.  And to the extent that -- as I said

5     earlier, to the extent that you-all think it is truly

6     inadmissible and improper for the Court to consider at all in

7     reaching its decision, then you can address that in your trial

8     briefs.

9          Unlike a jury, the Court is fully capable of

10    disregarding that if, upon reading your post-trial findings of

11    fact and conclusions of law, you cite to evidence which are --

12    or, pardon me, not cite to evidence -- you cite to case law

13    which would support your position that it is absolutely

14    inadmissible.

15         But at this stage, I would have to agree with the

16    United States that given the fact that it was clear from the

17    trial brief that this evidence was going to be brought up, the

18    course of action would have been to have addressed it pretrial,

19    not after the testimony.

20         We're far -- we've gone through a day of trial.  I

21    think we can continue the trial.  And if at the stage of the

22    proceedings where I'm -- where it's submitted to me and I'm

23    looking at the evidence, if the case law suggests that it was

24    inadmissible for any purpose, then I simply won't consider it

25    for any purpose.  And I'm capable of doing that and convinced

TRIOLO v USA                          September 23, 2020   Vol II-
11

```
 1   that no mistrial is warranted under the circumstances.
 2            MR. KINNEY:  Thank you, Your Honor.
 3            I'd like to continue my redirect examination of
 4   Mr. Triolo at this time.
 5            THE COURT:  Go ahead.
 6            Mr. Triolo, do you understand that you're still under
 7   oath?
 8            THE WITNESS:  Yes, Your Honor.
 9            THE COURT:  All right.  Come on up.
10                      REDIRECT EXAMINATION
11   BY MR. KINNEY:
12   Q   Mr. Triolo, I'd like to review with you Defendant's
13   Exhibit 9, the placement of evidence during the
14   cross-examination.  And I believe they're going to put it up on
15   the board, the note for you.  If not, I can locate a paper copy
16   in the binder that's at the clerk's desk.
17            MS. CUNNINGHAM:  Your Honor, I don't believe this is
18   appropriate redirect.
19            This is Defendant's Exhibit 9.  Is that what it --
20   what you're referencing, Mr. Kinney?
21            MR. KINNEY:  Yes.
22            MS. CUNNINGHAM:  That exhibit, Your Honor, was not
23   referenced at any point in my cross-examination of the
24   plaintiff.
25            THE COURT:  Then why are we talking about it?
```

TRIOLO v USA                    September 23, 2020  Vol II-

12

```
 1            MR. KINNEY:  Your Honor, during the
 2   cross-examination, there was quite a bit of examination about
 3   the Postal Service coming to the scene of the collision and
 4   questioning Mr. Triolo, and this is the accident investigation
 5   form that resulted from that conversation.
 6            THE COURT:  All right.  Go ahead.
 7            I guess it was also moved into evidence during that
 8   cross-examination.
 9   BY MR. KINNEY:
10   Q    Mr. Triolo, we're looking at Defendant's Exhibit 9, and
11   it's Bates labeled page 48.
12            If we could, could you expand into the middle section
13   where there's -- if you look at the line numbers on the
14   left-hand side, there's a Line No. 14.
15            Okay.  Mr. Triolo, are you able to see that screen in
16   front of you?
17   A    Yes.
18   Q    All right.  At line 14, do you see where it says:
19   Direction traveled, straight ahead?
20   A    Straight ahead?
21   Q    Yep.  Where it -- do you see No. 14 on the left-hand
22   column?
23   A    Yes.
24   Q    All right.  And then the next, to the right, is a box that
25   says:  Travel direction.
```

1        Do you see that?

2   A    Yes.

3   Q    And it says "straight ahead" there; do you see that?

4   A    Yes.

5   Q    The next box to the right, it says:  Distance traveled

6   after impact.

7        And what did the investigator write down for the

8   amount of travel your vehicle made after the impact?

9   A    I believe it's 15 feet.

10  Q    Mr. Triolo, the point of impact -- you were stopped at a

11  red light; correct?

12  A    That's correct.

13  Q    And you had your -- did you have your foot on the brake?

14  A    Yes.

15  Q    Earlier on the cross-examination you were asked if you

16  knew exactly how far your foot -- excuse me, how far your

17  vehicle traveled.

18        Do you remember that?

19  A    I do.

20  Q    And you weren't able to pin down accurately the distance?

21  A    That's correct.

22  Q    The 15 feet, does that sound about right to you?

23  A    Again, I -- I don't know how far I -- how far I traveled.

24  Q    Earlier it was presented that Ms. Rentz, her foot merely

25  slipped off of the brake, rolled forward, and basically kissed

1    the back of your bumper.

2            Do you remember that?

3    A    Yes.

4    Q    Does 15 feet -- would your vehicle have surged forward

5    15 feet if her foot had just slipped off the brake accidentally

6    and rolled forward and touched your bumper?

7    A    No.

8    Q    If you could, turn to page 49.  And I'm going to be at

9    line 24 through 26, so kind of the top third.

10           All right.  Do you see line 24?

11   A    I do.

12   Q    Says:  Nature and extent of damage.

13           Do you see that section?

14   A    Yes.

15   Q    Okay.  And what does it say right there?

16   A    No damage to LLV.

17   Q    Okay.  Mr. Triolo, there was damage to the Postal Service

18   truck; correct?

19   A    Yes.

20   Q    There was damage to your truck -- your car; correct?

21   A    Yes.

22   Q    And so this -- this investigation, this is wrong, isn't

23   it?

24   A    Yes.

25   Q    Okay.  If you go down to the next -- if you jump down

TRIOLO v USA                    September 23, 2020  Vol II-

1   two lines, in twenty -- I believe it's 26, where it says:

2   Description of how accident occurred.

3   A    Yes.

4   Q    What's written in that box?

5   A    There's nothing written.

6   Q    And, Mr. Triolo, you told the investigator that the driver

7   was on the cell phone at the time of impact.

8            Do you remember that?

9   A    Yes.

10            MS. CUNNINGHAM:  Objection.  Leading.

11            THE COURT:  Sustained.

12            MR. KINNEY:  Thank you, Your Honor.

13   BY MR. KINNEY:

14   Q    Mr. Triolo, did you tell the investigator at the scene

15   that the driver of the Postal Service truck was on the cell

16   phone at the time of impact?

17   A    Yes.

18   Q    Do you know why that was omitted?

19   A    I have no idea why.

20            MR. KINNEY:  Okay.  I'm done with Exhibit 9.

21            Thank you very much.

22   BY MR. KINNEY:

23   Q    I'm going to put Exhibit 6 -- Plaintiff's Exhibit 6 up on

24   the board.

25            I'm sorry, Exhibit 4, not Exhibit 6.  This is the

 1    Baptist Primary Care records, and at page 6.
 2            If you'd look on the screen in front of you.  I've
 3    figured out how to use this a little bit better today.
 4            All right.  Mr. Triolo, are we looking -- let's see.
 5    All right.  We're looking at the top half of page 6 from
 6    Exhibit No. 4 of your primary care records.
 7            And do you see what the encounter date is on here?
 8            THE COURT:  I'm sorry, is that Plaintiff's 4?
 9            MR. KINNEY:  This is Plaintiff's 4.
10            THE COURT:  Okay.  Go ahead.
11    BY MR. KINNEY:
12    Q    And do you see what the encounter date is?
13    A    August 6, 2015.
14    Q    And was this before the motor vehicle collision?
15    A    Yes.
16    Q    Was this before you had ever had any problems with your
17    lumbar spine whatsoever?
18    A    Yes.
19    Q    Mr. Triolo, there was a physical exam that was done on
20    this date, August 6, 2015.
21            Do you see that?
22    A    Yes.
23    Q    Okay.  And if you could skip down five or six lines
24    where -- the section for your back.
25    A    Okay.

| | | |
|---|---|---|
| 1 | Q | Okay.  Do you see the capitalized acronym there? |
| 2 | A | Yes. |
| 3 | Q | What's that stand for? |
| 4 | A | Range of motion, forward range of motion. |
| 5 | Q | All right.  What does the "F" stand for? |
| 6 | A | Forward, I believe. |
| 7 | Q | Forward range of motion? |
| 8 | A | Yes, correct. |
| 9 | Q | All right.  And what's the rest of that? |
| 10 | A | No scoliosis, normal lordosis, no tenderness, |

11  neurovascularly intact.

12  Q    Mr. Triolo, does it appear that you had a fully

13  functioning back on August 6 of 2015?

14           MS. CUNNINGHAM:  (Stood up.)

15           THE COURT:  Sustained.  Leading.

16  BY MR. KINNEY:

17  Q    Mr. Triolo, did you have any complaints of back pain at

18  your doctor's -- at your primary care doctor's visit on

19  August 6th of 2015?

20  A    No.

21  Q    Did the doctor note any problems whatsoever in your lumbar

22  spine from August 6th, 2015?

23  A    No.

24  Q    I'm on Exhibit 6 -- this is Plaintiff's Exhibit 6.  I'm

25  going to move to page 10.

TRIOLO v USA                    September 23, 2020  Vol II-
18

```
 1            All right.  Mr. Triolo, do you see that in front of
 2    you?
 3    A    Yes.
 4    Q    Okay.  Now, did you write in -- did you write in this
 5    description of how the collision occurred?
 6    A    No, I didn't write it in.
 7    Q    All right.  I want to start -- it says:  Patient was at
 8    traffic light.
 9            So it was written in this -- in your chiropractor's
10    note on, I believe, February 16, 2017.  So just five days after
11    the accident, it says:  Patient was at a traffic light.
12            Is that true?
13    A    Yes.
14    Q    Traffic started to move forward.
15            Was that true?
16    A    No.
17    Q    Okay.  Tapped brake.
18            Did you tap your brake?
19    A    No.
20    Q    Okay.  Next section.  Hit the horn.
21            Did you hit the horn?
22    A    No.
23    Q    Did the Postal Service truck hit the horn?
24    A    No.
25    Q    Patient's vehicle was struck in the rear by a mail truck.
```

TRIOLO v USA                    September 23, 2020  Vol II-

19

1         Was that part true?

2    A    Yes.

3    Q    Truck was traveling at approximately 30 to 40 miles per

4    hour.

5         Do you know whether or not that's accurate?

6    A    I do not.

7    Q    Do you know where -- in the sections where you said that

8    aren't accurate, do you know where Dr. McDaniels got that

9    description from?

10   A    No.

11   Q    Did he get it from you?

12   A    No.

13   Q    I'm going to move to the same exhibit, page 13.

14        Mr. Triolo, we talked yesterday about your -- your

15   work as a respiratory therapist.  And do you feel a duty of

16   loyalty to the patients you serve at Baptist -- at Baptist

17   South?

18   A    Absolutely.

19   Q    Do you develop personal relationships with your patients?

20   A    With my patients and their families, yes.

21   Q    And on this note, it indicates that he's recommending --

22   Dr. McDaniels is recommending taking off approximately -- looks

23   like a week of work.  And the response is:  He informed me that

24   it would be tough to do.  He needs to work.

25        Why did you tell Dr. McDaniels that it would be tough

TRIOLO v USA                    September 23, 2020  Vol II-
                                                                    20

1    to take time off from work?

2    A    Well, it's a full week and I enjoy work.  I enjoy going to

3    work every day and being a respiratory therapist.

4    Q    If we could, let's go to page 6 in the exhibit.  I'm

5    sorry, page 12.  Same visit.

6         Mr. Triolo, do you see the top section where it says:

7    Patient instructions?

8    A    Yes.

9    Q    Would you read the rest of that line.

10   A    Therapy goals for pain control discussed.  Stay active.

11   Activity as tolerated.

12   Q    Mr. Triolo, did you understand that Dr. McDaniels wanted

13   you to stay active?

14   A    Yes.

15   Q    Did you understand that to mean stay off the couch?

16   A    Yes.

17   Q    Did he explain -- did Dr. McDaniels explain why it was

18   important for you to stay active?

19   A    If he did, I don't recall, but I don't recall the exact

20   reason why.

21   Q    Well, you mentioned both during the direct and the

22   cross-examination that the morning times are the worst.

23   A    Yes.

24   Q    Okay.  And what's going on when you first wake up in the

25   morning?

1            Haven't you been pretty much sedentary for six to
2    eight hours before that?
3            MS. CUNNINGHAM:  Objection.  Leading.
4            THE COURT:  Sustained.
5            Mr. Kinney, I'm going to ask you to ask proper direct
6    examination questions, please.
7    BY MR. KINNEY:
8    Q    Mr. Triolo, are you sedentary throughout the night before
9    getting up in the morning?
10   A    Yes.
11   Q    And remind us, how long does it take you to get moving in
12   the mornings?
13   A    An hour.
14   Q    And you mentioned that you wake up at 4:00 a.m. to start
15   that process.
16            Before the collision, what was your normal routine
17   for waking up?
18   A    I would wake up anywhere from 5:15, and be out of bed at
19   5:30, and out the door at, like, twenty to 6:00.
20   Q    When he recommended to you to stay active on, I believe,
21   the 16th, that was before that you went to the Daytona 500 that
22   year; correct?
23   A    Yes.
24   Q    And so the -- when you went to the Daytona 500, did you do
25   anything more than people-watching and watching fast cars turn

TRIOLO v USA                    September 23, 2020  Vol II-

22

1    left around an oval?

2    A    No.  That's basically what it was.  That was the day.

3    Q    Is there anything more strenuous or exacerbating that you

4    were doing in Daytona than what you would have been doing in

5    Middleburg, Florida, had you not gone to the Daytona 500?

6    A    No.

7    Q    And similarly, what about going to Port Charlotte?  Was

8    there anything about Port Charlotte that was more arduous or

9    caused you further injuries than staying in Middleburg?

10   A    No.

11   Q    I think we also talked about the Keys.  Anything about the

12   Keys, going to the Keys on that trip?  Anything more arduous

13   about that trip?

14   A    No.  Pure relaxation on that trip.

15   Q    Did you go golfing?

16   A    No.

17   Q    Did you go -- run around on WaveRunners?

18   A    No.

19   Q    Deep-sea fishing?

20   A    No.

21   Q    Play pick-up games of basketball?

22   A    No.

23   Q    The TENS unit -- we're at page -- Exhibit 6, page 51.

24        All right.  Mr. Triolo, on page 51 of Exhibit 6, do

25   you see right in the middle where you were approved for a TENS

1   unit?

2   A    Yes.

3   Q    Okay.  And on the next visit, on page 52, do you recall

4   reporting:  TENS -- TENS unit is helping a lot?

5   A    Yes.

6   Q    Okay.  And where were you using the TENS unit?

7   A    My neck.

8   Q    Did you use the TENS unit on your low back?

9   A    No.

10  Q    Did you use the runner's roller in the hip and leg area as

11  the note suggests?

12  A    Yes.

13  Q    And what type of relief did that provide?  Did that

14  provide neurological relief to you, or did it provide relief as

15  far as the myofascial pain?

16  A    Yes.  It basically helped with the tension and the knots.

17  Q    Did it eliminate the radiating pain that was coming from

18  your back down into your right leg?

19  A    No.

20  Q    Mr. Triolo, I believe they counted up yesterday, it was 14

21  visits to the chiropractor.  And so I want to compare how you

22  were doing on that first visit to your last visit.

23       July 20th, 2017, that would be -- I'm sorry,

24  February 11 -- February 16, 2017.  That's at page 10 and 11.

25       Okay.  Mr. Triolo, you see we're on page 10 of

TRIOLO v USA                    September 23, 2020  Vol II-

24

1    Exhibit No. 6.  And do you see the objective section?

2           See where it says Objective on the left-hand column?

3    A    Yes.

4    Q    All right.  And the initial part, do you see where it says

5    Cervical Spine?  At the very top.

6    A    Yes.

7    Q    Put your eyes down to where it says Lumbar Spine; do you

8    see that?

9    A    Yes.

10   Q    I'd like for you to read that to yourself.  And when you

11   get to the end, I'm going to scroll to the next page, because

12   it continues to the next page.

13          Tell me when you finished reading the Lumbar Spine on

14   page 10.

15   A    Okay.

16   Q    If you would, finish reading the Lumbar Spine Objective

17   section.

18   A    Okay.

19   Q    And, Mr. Triolo, did you read all the way down to where it

20   says "sensation"?  Did you read to that line?

21   A    Yes.

22   Q    Now, if you would, go to page 56.

23          All right.  Mr. Triolo, do you see we're on page 55?

24   A    Yes.

25   Q    And you see the word "objective" there; right?

TRIOLO v USA                    September 23, 2020  Vol II-
25

1   A    Yes.

2   Q    I want you to come down to the Lumbar Spine section, and I

3   want you to read the results of the objective assessment for

4   your lumbar spine on the last date of your chiropractic

5   treatment from -- that's July 20th of 2017.

6   A    Okay.

7   Q    Mr. Triolo, you've read the objective results of the first

8   date you were there and the last date you were there.

9         Did you have any -- did you make any gains in your

10  injuries?  Did you -- did anything change from day one to the

11  14th visit five months later?

12  A    No.

13  Q    Is that the reason why you transferred your care to

14  St. Joseph Interventional Spine and Pain Management -- excuse

15  me, St. Joseph Interventional Pain Management?

16  A    Yes.

17  Q    I want to look at Exhibit 15.

18        Do you remember being asked about, on

19  cross-examination, going to a place called Pointe Medical

20  Services?

21  A    Yes, I do.

22  Q    Are you familiar with Dr. Bernard there?

23  A    Yes, I am.

24  Q    And do you know why you went to Pointe Medical Services to

25  see Dr. Bernard?

TRIOLO v USA                    September 23, 2020  Vol II-

1   A    Yes.  I felt as though, you know, at that time I needed

2   to -- a little more than I had as far as being able to work

3   out, get through the workouts, work out a little bit harder and

4   get better results.

5   Q    Okay.  And did he ultimately diagnose you with low

6   testosterone?

7   A    Yes.

8   Q    And from your treatments at Pointe Medical Services, did

9   you receive prescriptions for testosterone injections?

10  A    Yes, I did.

11  Q    Did that help you in getting -- the fatigue symptoms you

12  were feeling, did that help to resolve the fatigue symptoms you

13  were feeling?

14  A    Yes, it did.

15  Q    Back to plaintiff's exhibits now.

16       Let me ask you about Plaintiff's Exhibit No. 13.  And

17  I'm going to be at page 2 of 13.

18       Madam Clerk, can I recapture the screen.  Thank you.

19       So on page 2 of Exhibit 13 -- and, Mr. Triolo, you --

20  I'm trying to scan it as big as I can.

21       You see in the middle here, it says:  He noticed pain

22  in the neck the day after accident.

23  A    Excuse me a minute.  I'm trying to find it.

24       Yes, I see it.

25  Q    He noted pain in the neck the day after the accident.

 1            Do you see that?

 2  A    Yes.

 3            THE COURT:  And remind me whose records these are,

 4  please.

 5            MR. KINNEY:  These are from Universal Neurological

 6  Care, the neurologist he was referred to by Dr. McDaniels, the

 7  chiropractor.

 8            THE COURT:  Dr. Toumbis?

 9            MR. KINNEY:  No, that's a surgeon.  This is Dr. Asad,

10  a neurologist.

11            THE COURT:  Okay.  That's fine.  Go ahead.

12            MR. KINNEY:  And this is from a visit date March 16,

13  2017.

14  BY MR. KINNEY:

15  Q    Mr. Triolo, that description is not -- strike that.

16            Mr. Triolo, is that description of when you noted --

17  initially noted neck pain, is that accurate?

18  A    No.

19  Q    Mr. Triolo, do you recall the records from Baptist Medical

20  Center?

21  A    Yes.

22  Q    Do you recall seeing in the records from Baptist Medical

23  Center that you had informed them that you had neck pain the

24  day of the accident?

25  A    Yes.

```
 1   Q    And did you get a CAT scan of your neck the same day as

 2   the accident?

 3   A    I did.

 4             THE COURT:  Hold on.

 5             Ms. Cunningham, if you're going to get up to object,

 6   you're actually going to have to speak.  Because I'm looking

 7   down, taking notes.

 8             MS. CUNNINGHAM:  I know, Your Honor.  I'm sorry.

 9             THE COURT:  There's a couple of times that I have not

10   registered objections to questions that were appropriately

11   objectionable because you're not speaking and I'm not seeing

12   you.

13             MS. CUNNINGHAM:  Yes, Your Honor.

14             THE COURT:  You're going to have to speak or your

15   objection is waived.

16             MS. CUNNINGHAM:  Yes, Your Honor.

17             THE COURT:  So go ahead -- and, Mr. Kinney, I'm going

18   to ask you, you're leading a good bit, so please...

19             MR. KINNEY:  I'm trying to catch myself, Your Honor.

20             THE COURT:  All right.  Go ahead.

21   BY MR. KINNEY:

22   Q    Mr. Triolo, had you ever heard of a Dr. Kramarich?

23   A    No.

24   Q    Had you ever heard of a Dr. Cannestra?

25   A    No.
```

TRIOLO v USA                    September 23, 2020  Vol II-
29

1    Q    Do you ever recall receiving messages or phone calls from
2    either of their practices asking you to come make an office
3    visit with either one of those doctors?
4    A    No.
5    Q    Did Dr. Asad at Universal Neurological Care tell you to go
6    see Dr. Kramarich?
7    A    No.
8    Q    Did he tell you to go see Dr. Cannestra?
9    A    No.
10   Q    When you went to see Dr. Pardo in July of 2017, were you
11   suffering from headaches at that point in time?
12   A    Yes, I believe I was.
13   Q    And prior to the motor vehicle collision, let's say, for
14   the six months prior to the motor vehicle collision, were you
15   suffering from the migraines you had previously sought help
16   for?
17   A    No.
18   Q    Do you recall going to get help for the migraines in 2015?
19   A    Yes.
20   Q    And what is it that helped you recover from those
21   migraines?
22   A    The CPAP machine.  I wear it every night.
23   Q    Mr. Triolo, you were in the room for a motion I made
24   earlier.  And I want you to recall there was testimony
25   yesterday you were asked about your health insurance.

TRIOLO v USA                   September 23, 2020  Vol II-
30

```
 1           Do you recall that?
 2   A    Yes.
 3   Q    Mr. Triolo, do you get your health insurance as a group
 4   benefit or employee group benefit?
 5   A    Yes.
 6   Q    You do.
 7           And are you required to pay for that health
 8   insurance?
 9   A    I am.
10   Q    And do you have a deductible?
11   A    I do.
12   Q    Do you know what your deductible is?
13   A    $6500.
14   Q    Mr. Triolo, do you have considerable financial wealth?
15           MS. CUNNINGHAM:  Objection.  Leading.
16           THE COURT:  That one actually wasn't leading.
17           Overruled.  Go ahead.
18           THE WITNESS:  No, I do not.
19   BY MR. KINNEY:
20   Q    Do you depend on your paychecks to pay your bills?
21   A    I sure do.
22   Q    Your average weekly wage, do you recall what it is?
23   A    936 -- $936.86.
24   Q    What would it have done to you financially to have to come
25   up with a $6500 deductible?
```

1  A    That's a nice dent.  I would be paying for that.  That

2  wouldn't have been good for my financials.

3  Q    And in addition to a $6,500 deductible, do you have to

4  make copays?

5  A    I do.  The copays, I believe, is anywhere from $55 plus,

6  depending on...

7  Q    And is -- are there -- in addition to copays, do you also

8  have to pay a percentage -- and this may be the same as copay,

9  as what I'm thinking of, but do you also have to pay a

10  percentage of any services you receive?

11  A    Yes, I do.  I'm not sure of the percentage.  I know I have

12  to pay a copay, and if there's any sort of procedures or --

13  that are done to me, I have to -- I'd be paying, like,

14  $240-plus for every one of those procedures.

15  Q    Mr. Triolo, is your insurance then truly insurance in the

16  sense that it's just free?

17  A    No.

18  Q    Do you know how much your insurance program pays for

19  services?

20  A    No.

21  Q    Do you know whether they would approve -- your insurance

22  company would approve the services?

23  A    No.

24  Q    Do you know whether your insurance company would pay for

25  the surgery you had on your low back?

TRIOLO v USA                    September 23, 2020  Vol II-
32

```
 1    A    I'm not sure if they would have or not.

 2    Q    Do you know whether your insurance would pay for the --

 3    the pain management treatment that you've had?

 4    A    No.

 5    Q    Do you know whether it would pay for the chiropractic care

 6    that you've had?

 7    A    No.

 8    Q    Do you know whether the insurance considers Topp Spine and

 9    Orthopedics to be in network?

10    A    I do not.

11    Q    Do you know whether your insurance considers Dr. Pardo to

12    be in network?

13    A    I do not know.

14    Q    What about Dr. McDaniels?

15    A    I do not know.

16    Q    Mr. Triolo, were you even aware that your -- that an

17    anesthesiologist submitted a bill to your insurance?

18    A    I was not aware.

19    Q    Mr. Triolo, yesterday you were asked about a collision

20    when you were, I believe, 19 or 20 years old.

21    A    Yes.

22    Q    Do you remember that -- that testimony?

23    A    Yes.

24    Q    And do you recall that you did not list that in your

25    interrogatories?
```

```
 1   A    That's correct.

 2   Q    Okay.  Tell us why you didn't list it in your

 3   interrogatories.

 4   A    I never sought any medical treatment or had any injuries

 5   from that accident.

 6   Q    Mr. Triolo, yesterday it came to light that there was --

 7   the driver in the other vehicle died.

 8   A    That's correct.

 9   Q    Can you explain why the other driver died but you had no

10   injuries?

11   A    He was driving an older-model car.  I don't remember the

12   make and the model.  It was an older car.  He wasn't wearing a

13   seat belt.

14          MS. CUNNINGHAM:  Objection.  Calls for speculation,

15   Your Honor.

16          THE COURT:  I'm going to sustain the objection.

17          If he wants to describe the accident, he can describe

18   the accident, but I don't think he can opine as to why one

19   driver was injured and the other was not.

20   BY MR. KINNEY:

21   Q    Mr. Triolo, did you get out of your car after the

22   collision?

23   A    Yes, I did.

24   Q    Did you approach the other vehicle?

25   A    I did.
```

TRIOLO v USA                    September 23, 2020  Vol II-
34

1   Q    Did you see the other gentleman in his vehicle?

2   A    Yes.

3   Q    Was he wearing his seat belt?

4   A    No.

5   Q    At the time of the collision, were you wearing your seat

6   belt?

7   A    Yes.

8   Q    Did your air bag deploy?

9   A    Yes.

10  Q    Did you have to seek medical treatment after the

11  collision?

12  A    No.

13  Q    And what's -- to the best of your recollection, what year

14  that collision took place?

15  A    '96/'97, maybe.  '96/'97.

16  Q    I'm not asking emotionally, but were there any negative

17  effects to your body resulting from that collision?

18  A    No.

19  Q    When you were with Master Cooling and Heating, is that

20  when you sprained your ankle or broke your hand?

21  A    Broke my hand, yes.

22  Q    All right.  Are you -- are you the person -- did you

23  actually submit a work comp claim for a broken hand?

24  A    It was so long ago, I don't remember if I made the claim

25  or not.

TRIOLO v USA                    September 23, 2020  Vol II-
35

1   Q    Can you give us some sort of sense of what time frame
2   we're talking about, even if it's a range of years.

3   A    So 1999 to 2006, '5/'6.

4   Q    Is there anything about that event of breaking your hand
5   that caused you neck pain or back pain?

6   A    No.

7   Q    And I think the other one was an ankle injury.
8        What was the ankle injury?  Where did that happen?
9        Was that at UPS?

10  A    I believe so.

11  Q    Okay.  Do you remember spraining your ankle or injuring
12  your ankle at UPS?

13  A    I don't.

14  Q    Mr. Triolo, did you watch the surveillance clips that we
15  saw yesterday afternoon from July 18th, 2019, that were shown
16  on the board?

17  A    Yes.

18  Q    Is there anything on that surveillance that you're
19  contending or you've ever contended that you can't do?

20  A    No.

21  Q    Have you ever told anyone that you couldn't mow or push a
22  lawnmower in your yard?

23  A    No.

24  Q    Have you ever told anyone that you couldn't bend over and
25  pick up paper in your yard?

 1    A    No.

 2              MR. KINNEY:  Your Honor, I'm putting on the board

 3    plaintiff's demonstrative aid.

 4              MS. CUNNINGHAM:  Your Honor, this has not been

 5    discussed yet.  It wasn't discussed on direct.

 6              THE COURT:  It wasn't part of the cross, is my

 7    recollection, so why are we doing it on redirect?

 8              MR. KINNEY:  Well, Your Honor, because she attacked

 9    the bills with the health insurance.  I had no plans of doing

10    that until she attacked the bills claiming that he had health

11    insurance and somehow it's improper to attach the medical bills

12    with the issue that he has now.

13              THE COURT:  Well, what is it that the summary of the

14    medical bills is going to do to address whether or not there

15    was health insurance?

16              MR. KINNEY:  I'm going to ask him to address the

17    bills and ask him if he's going to ask the Court to award this

18    amount for his recovery of past medical expenses and why.

19              THE COURT:  You're going to have to explain better,

20    I'm not following that.

21              I guess -- let me explain my question.  My assumption

22    is that -- is he not asking for all of what's on that summary?

23              MR. KINNEY:  Yes.  In this phase of the trial, we're

24    asking the Court to enter an award of those numbers.  I was

25    going to ask him to affirm if this is what he's asking the

```
 1   trial court to award him and the reason why.
 2            THE COURT:  That's beyond -- that's beyond the scope.
 3   BY MR. KINNEY:
 4   Q    Mr. Triolo --
 5            THE COURT:  If what you were telling me was you were
 6   going to go through and show what was something -- what was
 7   covered by insurance or something not, but just going through
 8   these are my damages, that was something that could have been
 9   done on direct.
10            Go ahead.
11            MR. KINNEY:  Your Honor, we answered -- yes, Your
12   Honor.
13   BY MR. KINNEY:
14   Q    Mr. Triolo, it's now been three years and about
15   nine months since the motor vehicle collision.
16            As you sit here today, do you still have physical
17   limitations from your injuries?
18   A    Yes.
19   Q    So are these injuries interfering on a daily basis for
20   you?
21   A    Yes.
22   Q    Can you tell me where that's located and what you're
23   experiencing?
24   A    It is left side, lower right back, and from there, there's
25   a radiating pain that goes across the hip flexor to the glute,
```

TRIOLO v USA                     September 23, 2020  Vol II-
38

```
 1   hamstring, and down into the calf, all on the left side.
 2   Q    And what is the best treatment that you have found that
 3   works for you to control the levels of pain?
 4   A    The ablations, radiofrequency ablations.
 5              MR. KINNEY:  All right, Your Honor.
 6              THE COURT:  Ms. Cunningham, you're limited only to
 7   matters addressed by counsel in redirect.
 8              MS. CUNNINGHAM:  Yes, Your Honor.
 9                      RECROSS EXAMINATION
10   BY MS. CUNNINGHAM:
11   Q    Good morning, Mr. Triolo.
12   A    Good morning.
13   Q    On redirect you were asked about Defendant's Exhibit 9,
14   which is an accident investigation worksheet from the post
15   office.
16              Do you recall that testimony?
17   A    Yes.
18   Q    All right.  You're not employed by the Postal Service, are
19   you?
20   A    No.
21   Q    Have you ever been employed by the Postal Service?
22   A    No.
23   Q    Do you know who filled out this form?
24   A    No.
25   Q    Do you know what they -- the individual who filled out
```

1    this form meant by any particular thing that was written here?

2    A    No.

3    Q    Now, yesterday, it's my recollection that you did not

4    remember what you told the Postal Service about a number of

5    things.

6            But is it your testimony today that you specifically

7    recall telling them that there was damage to the front of the

8    postal vehicle?

9    A    Yes.

10   Q    All right.  Who did you tell that to?

11   A    The -- there was somebody that came out from the Postal

12   Service that day.

13   Q    A man or a woman?

14   A    I believe it was a woman.

15   Q    You don't recall her name?

16   A    No.  I don't think I ever got her name.  If I did, I don't

17   remember it.

18   Q    All right.  In the period of time -- you looked with

19   plaintiff's counsel at the first note from your visit with

20   Dr. McDaniels on February 16th.

21           Do you recall that testimony?

22   A    Yes.

23   Q    And we've talked -- you were asked on redirect about the

24   recommendations that Dr. McDaniels made to you, including take

25   a little time off to recuperate.

TRIOLO v USA                    September 23, 2020  Vol II-

40

```
 1            Do you recall that testimony?
 2  A    Take some time off from work, yes.
 3  Q    Yes, sir.
 4            All right.  And the reason for that recommendation
 5  is -- did you have an understanding as to why he was making
 6  that recommendation for you?
 7  A    I don't recall the exact reason at that time, no.
 8  Q    All right.  Did he explain to you that you improve your
 9  chances of recovering from any injuries sustained in a motor
10  vehicle accident if you give your body a chance to rest close
11  in time to the incident?
12  A    I don't recall a conversation.
13  Q    And if you come to therapy repeatedly, so you get the
14  stretching and you get the massage, and you get those things
15  that can help you recover?
16  A    Well, he felt that I could be helped from therapy with
17  him, so I continued to see him.
18  Q    All right.  If you were physically unable to go to work,
19  you would have not gone; isn't that true?
20  A    Yes.
21  Q    The -- there are various places in the records where you
22  talk about what aggravates your injuries.
23            Do you recall some of those -- some of that
24  discussion from yesterday?
25  A    Yes.
```

1    Q     Okay.  One of the things that you have reported to

2    different physicians is that long car trips aggravate your

3    injuries.

4              Do you recall that testimony?

5    A     Yes.

6    Q     Okay.  And if we look -- I don't think we need to look

7    back at it, but I can pull it up if we need to, but your

8    attorney had you look at Plaintiff's Exhibit 6, that first

9    visit with Dr. McDaniels at JSS-13, where he made a few

10   recommendations for you that included not sitting for more than

11   20 minutes.

12             Do you recall that recommendation?

13   A     Yes.

14   Q     And not walking for more than 30 minutes.

15             Do you recall that recommendation?

16   A     Yes.

17   Q     And those were recommendations made to you on that very

18   first visit of February 16th.

19             Do you recall that?

20   A     Yes.

21   Q     Now, you, I think, would agree -- do you agree that going

22   to the Daytona -- well, let me ask this a different way.

23             On recross, you said something about all those

24   different activities that you did was no more taxing than being

25   in your house in Middleburg.  Those were not your exact words

1    but I think that was the gist of your testimony.

2            Is that correct?

3    A    Yes.

4    Q    All right.  So with respect to the Daytona 500 trip,

5    that's a drive of approximately one-and-a-half hours from your

6    home in Middleburg to the speedway; correct?

7    A    Yes.

8    Q    We know that you got there sometime prior to 11:00 a.m.;

9    correct?

10   A    Sounds about right.

11   Q    We know that you spent time prior to that -- prior to the

12   start of the race walking around, looking at cars, doing other

13   things that you do when you go to the Daytona 500; right?

14   A    Yes.

15   Q    And then at some point you took your seat in the stands

16   where you remained for a number of hours until the race

17   concluded; correct?

18   A    No.  I never said I was in the seat the whole -- the whole

19   race.

20   Q    Okay.  So tell me, what were you doing during the race?

21   A    I watched the race, but I wasn't in the seat for the whole

22   four hours or whatever it was.  I mean, I had to get up and

23   walk away, stand for a little while, and, you know, whether I

24   went to the bathroom or just to walk around from sitting too

25   long.  And then when I felt that I needed to go sit back down,

```
 1    I went and sat back down.
 2    Q    All right.  Is it your testimony that you did not sit for
 3    more than 20 minutes while you were at the speedway?
 4    A    Yes.
 5    Q    Is it your testimony that you did not walk for more than
 6    30 minutes while you were at the speedway?
 7    A    Yes.
 8    Q    If we look at the -- strike that.
 9         Let's talk about the -- briefly talk about some of
10    the other trips.
11         So there was a discussion about cost for you of
12    medical care if you utilized your insurance.
13         Do you recall that conversation?
14    A    Yes.
15    Q    What did it cost you to go to the Keys?
16    A    I don't remember offhand.  It was split up between all of
17    us, so it was pretty affordable.
18    Q    Okay.  What did it cost to go on the cruise that you went
19    on?
20    A    I don't recall how much it was, but we went because it was
21    a -- I remember it being a good deal.  They had a good deal at
22    that particular time.
23    Q    From the period of the day of the accident to the date of
24    the surgery, you were working two jobs; correct?
25    A    Yes.
```

TRIOLO v USA                    September 23, 2020  Vol II-
44

1    Q    And a single man with no child support or something of

2    that nature; correct?

3    A    Yes.

4    Q    Living in a house with your brother; correct?

5    A    Yes.

6    Q    Okay.  If you -- and you made a -- as we discussed

7    yesterday, a purposeful decision not to bill your insurance;

8    correct?

9    A    Yes.

10   Q    Okay.  And there was some discussion about whether we know

11   what your insurance would have paid or would have covered.

12          Do you recall that discussion on redirect?

13   A    Yes.

14   Q    All right.  And the reason we don't know, the reason we

15   don't have that information, is because you did not submit your

16   bills to insurance; correct?

17          MR. KINNEY:  Objection.  Counsel is testifying.

18   That's not in evidence.  She is making the --

19          THE COURT:  Is there a question, Ms. Cunningham?

20   Because that was a statement.

21          MS. CUNNINGHAM:  I'm sorry, I thought -- it was

22   trying to be a question, so I apologize if it wasn't.

23          THE COURT:  Rephrase.

24          MS. CUNNINGHAM:  Thank you, Your Honor.

25   BY MS. CUNNINGHAM:

```
 1  Q    If you had submitted your claims to insurance, would we
 2  know whether insurance would have covered them?
 3              MR. KINNEY:  Objection.  Calls for speculation.
 4              He's not a representative of the insurance company.
 5              THE COURT:  I'm going to sustain the objection.
 6              MS. CUNNINGHAM:  All right.
 7  BY MS. CUNNINGHAM:
 8  Q    With respect to the surveillance that was shown yesterday,
 9  at points in time in your medical records, you have told
10  medical providers that you had restricted range of motion in
11  your back; isn't that true?
12  A    Yes.
13  Q    Okay.  And I believe on the -- the video we watched
14  yesterday, we saw instances -- two instances of you bending
15  completely over, once to pick up bricks and once to do
16  something with another appliance that was out of sight.
17              Do you recall that?
18  A    I picked up -- it wasn't a brick.  It was half a paver,
19  like, broken in half, but, yes.
20  Q    I'm sorry, half a what?
21  A    It was half a paver.  It was broken in half.
22  Q    A paver?  I'm sorry, I thought --
23  A    Sorry, my accent.  I apologize.
24  Q    That's okay.  I thought you were saying "paper."
25              Sir, you testified on redirect that you wear your
```

 1   CPAP every night.
 2           Do you recall that testimony?
 3   A    Yes.
 4   Q    Okay.  But yesterday we talked about the fact that there
 5   was a meaningful period of time where you were not using it
 6   because you didn't have supplies.
 7           Remember that testimony?
 8   A    Yes.  But that was a -- that was a while back.
 9   Q    A while back?
10   A    But, yes, that did happen.  I had to go through that whole
11   process of getting a doctor for supplies and whatnot, yes.
12   Q    But that period of time was a period of time that occurred
13   after the accident in this case; isn't that correct?
14   A    I believe it was after the accident, yes.
15   Q    Did you disclose your testosterone treatment to any of
16   your medical providers?
17   A    No.
18   Q    So you didn't give them the opportunity to evaluate
19   whether the symptoms you were experiencing were the same kind
20   of symptoms that you experienced due to low testosterone; isn't
21   that true?
22   A    No, I did not know that my symptoms are from experiences
23   with low testosterone.
24   Q    And you didn't tell them, so they didn't have the
25   opportunity to make that evaluation, did they?

TRIOLO v USA                    September 23, 2020  Vol II-
47

1    A    I did not feel that my testosterone therapy had anything

2    to do with the accident that occurred.

3    Q    All right.  On recross, we looked at Plaintiff's Exhibit

4    -- pardon me, United States Exhibit -- Defendant's Exhibit 13,

5    which was records from the Baptist Primary Care Fleming Island

6    practice.

7          Do you recall that?

8    A    I'm sorry, what is it from?

9    Q    I'm sorry, sir, let me just...

10         THE COURT:  I thought 13 was Dr. Asad.

11         MS. CUNNINGHAM:  I'm sorry, Your Honor.  I was

12   referencing Defendant's 13, but I think that's the wrong

13   reference.  Pardon me.  Let me get the right --

14         THE COURT:  Or, I'm sorry, Plaintiff's 13 was

15   Dr. Asad.

16         MS. CUNNINGHAM:  All right.  Pardon me for that

17   interruption, Mr. Triolo.

18   BY MS. CUNNINGHAM:

19   Q    You have testified that -- let me ask you this way.  On

20   recross, you were asked about some of the primary care records

21   where you were reporting headaches but not reporting any kind

22   of back pain.

23         Do you recall that testimony?

24   A    Yes.

25   Q    Okay.  And there was -- you were asked also to sort of

```
 1   look at the back exam from that record.
 2           You don't have scoliosis presently; correct?
 3   A    That's correct.
 4   Q    And we've discussed your range of motion.  The visit that
 5   we went -- pardon me.  So this visit is 2015, is what you
 6   discussed on direct -- on recross -- redirect.
 7           Yesterday we spoke about your primary care visits
 8   post the accident.
 9           Do you remember that discussion?
10   A    Was that the -- are we talking about the -- after the
11   accident at ED or the primary care?
12   Q    I'm sorry.  So we talked about the primary care visits
13   that you had -- the two primary care visits you had to your
14   primary care provider in the period of time after the car
15   accident.
16           Do you remember that discussion?
17   A    Yes.
18   Q    And when we looked at the 2019 visit --
19           MR. KINNEY:  Objection.  That's out of the scope.  My
20   inquiry was limited to the August 2015 note on page 5 of
21   Exhibit 4.
22           THE COURT:  Sustained.
23           MS. CUNNINGHAM:  Your Honor, I'm going to try and ask
24   this a different way to see if it explains why it's connected.
25           THE COURT:  Okay.
```

```
 1   BY MS. CUNNINGHAM:

 2   Q    All right.  So is the -- you have a visit after the car

 3   accident where you don't report the car accident or back pain

 4   to your provider; correct?

 5   A    Yes.

 6   Q    And there's testimony yesterday about how when you go to a

 7   particular physician, you don't tell them things that you don't

 8   think are relevant to the particular treatment you're asking

 9   them to provide that day; is that accurate?

10          MR. KINNEY:  Objection.  Confusing and outside the

11   scope.

12          THE COURT:  Sustained.

13          MS. CUNNINGHAM:  All right.

14   BY MS. CUNNINGHAM:

15   Q    All right.  Mr. Triolo, with respect to the 1995 car

16   accident, you were asked on redirect about the interrogatory

17   answers.

18          Do you recall that discussion?

19   A    Yes.

20   Q    But yesterday, under oath in this courtroom, when your

21   attorney asked if you had ever been in any motor vehicle

22   accident other than the black ice incident, you answered no;

23   isn't that true?

24          MR. KINNEY:  Objection.  Outside the scope of my

25   inquiry related to the interrogatories.
```

```
 1          THE COURT:  All right.  I'm going to allow it.  It
 2   relates to the truthfulness of that interrogatory answer as
 3   well as the testimony.  Go ahead.
 4          MS. CUNNINGHAM:  Did you hear my question, sir?
 5          THE WITNESS:  If you can repeat it, please.
 6   BY MS. CUNNINGHAM:
 7   Q    Okay.  Under oath in this courtroom yesterday, your
 8   attorney asked if you had ever been in any motor vehicle
 9   accident other than the black ice incident and the 2017
10   incident, and you answered no.
11          Isn't that what your testimony was yesterday?
12          MR. KINNEY:  Objection.  Foundation.
13          My question was whether he was injured in a prior
14   accident, not any accident, fell off the curb.  It was limited
15   to the question about accidents in which he's injured.
16          THE COURT:  All right.  I'll have to look back at --
17   I don't recall exactly how it was phrased.  I'm going to allow
18   the question and then I'll look back at it when we -- when we
19   have the transcript.
20          Go ahead.
21          THE WITNESS:  Yes.
22          MS. CUNNINGHAM:  All right.  Nothing further, Your
23   Honor.  Thank you.
24          THE COURT:  Mr. Triolo, I'll ask you to take that
25   microphone cover off and throw it away.
```

```
 1            MR. KINNEY:  Your Honor, may I have one question in
 2   follow-up?
 3            THE COURT:  I allow direct and redirect, and cross
 4   and recross.  You-all have had this witness on the stand
 5   since 9:15 yesterday morning.  Any questions should have been
 6   asked by now.
 7            You may step down, sir.
 8            Who is your next witness?
 9            MR. KINNEY:  Your Honor, it should be Reynaldo Pardo.
10   I just checked the hallway.  I asked him to be here
11   between 9:30 and 10:00.  I believe he's here.
12            THE COURT:  Okay.  Madam Deputy.
13        (Pause in Proceedings.)
14            MR. KINNEY:  Your Honor, he's very close.  He's very
15   close.  He's downstairs, so he should be here in a few minutes.
16            THE COURT:  Okay.
17            MR. KINNEY:  Downstairs parking, circling the
18   building.
19            THE COURT:  Okay.  That's not quite the same thing as
20   downstairs.
21            MR. KINNEY:  Yeah, I realized when I heard myself say
22   it.
23            THE COURT:  All right.  Why don't we take about
24   seven minutes and then we'll get started.
25            COURT SECURITY OFFICER:  All rise.
```

```
 1        (Recess taken, 9:51 a.m. - 10:00 a.m.)
 2             COURT SECURITY OFFICER:  This Honorable Court is back
 3   in session.
 4             Please be seated.
 5             THE COURT:  Do we have Dr. Pardo?
 6             MR. KINNEY:  I don't see him.
 7             COURTROOM DEPUTY:  I'll go look for him and get some
 8   water.
 9             MS. CUNNINGHAM:  Your Honor, may I ask Mr. Kinney a
10   question while we're waiting?
11             THE COURT:  Go ahead.
12        (Recess taken.)
13             COURT SECURITY OFFICER:  This Honorable Court is back
14   in session.  Please be seated.
15             THE COURT:  Do we know where he is?
16             MR. KINNEY:  I don't know.  He's not answering his
17   cell phone.
18             THE COURT:  Maybe he's in the elevator.
19             MR. KINNEY:  I talked to him right after Mr. Triolo.
20   He said he was downstairs parking.
21             MS. CUNNINGHAM:  Does he know we're at the federal
22   courthouse and not the state courthouse?
23             THE COURT:  That happens a lot.
24             MR. KINNEY:  We gave the 300 Hogan.
25             THE COURT:  That doesn't matter.
```

```
 1              Give us a minute.
 2              Madam Court Reporter, are we on the record?
 3              COURT REPORTER:  Yes.
 4              THE COURT:  Mr. Kinney, in an abundance of caution, I
 5      did go back to look at the question yesterday morning.
 6              And the question asked was:  Returning back to
 7      February 11, 2017, other than that one accident, any other
 8      accidents of any kind whatsoever, I mean, motorcycle, horseback
 9      riding, car accident, anything whatsoever, parachute out of a
10      plane, anything whatsoever other than that one time you got
11      your hand broke by the fence?
12              Answer:  No.
13              Question:  Have you ever been in an auto accident
14      where somebody hit you before or you've hit them?
15              Not where I've hit them or I've -- hit them or they
16      hit me, but I've been in an auto accident before.
17              And then it goes on to talk about the fence crash.
18              So to the extent that there was a question about
19      whether it was proper cross, I think it was.
20              MR. KINNEY:  Okay.
21              THE COURT:  But I was concerned when you stated that
22      you -- it wasn't how I recalled it and so I wanted to
23      double-check.
24              MR. KINNEY:  Yeah, I just wanted to try and think
25      back what led up to the wrap-up question, if there was any --
```

1    asking about injuries.  I'm not sure.  I can't remember.

2           THE COURT:  All right.  We do not have -- we've now

3    wasted about 20 minutes.

4           If he's not answering his phone, my suspicion is he's

5    in the state -- well, I don't think they'll let him into the

6    state courthouse.  That's why I thought perhaps he was just on

7    the elevator in our building.

8           Is Mr. Moore trying to reach him?

9           MR. KINNEY:  He just ran down to the front check-in

10   security area.

11          He's got him.

12          THE COURT:  Excuse me?

13          MR. KINNEY:  Mr. Moore just texted he got him.

14          THE COURT:  Okay.

15       (Pause in proceedings.)

16          THE COURT:  Does "he's got him" mean he's down here

17   or does it mean he actually has him in the building?

18          Okay.

19       (Dr. Pardo enters the courtroom at 10:12 a.m.)

20          MR. KINNEY:  Seat of honor.

21          THE COURT:  Mr. Kinney, while you're getting -- while

22   he's getting situated, can you tell me what the -- remind me

23   what exhibit Dr. Pardo's records are so I can have that one up.

24          MR. KINNEY:  Yes.  Exhibit 9, and we'll also be

25   dealing with Exhibit 4 and 26, and a film that I have loaded

1   into the laptop.

2           COURTROOM DEPUTY:  Sir, if you could stand up for me,

3   please, and raise your right hand.

4           Do you solemnly swear that the testimony you're about

5   to give before this Court will be the truth, the whole truth,

6   and nothing but the truth, so help you God?

7           THE WITNESS:  I do.

8           COURTROOM DEPUTY:  You may have a seat.

9           MR. KINNEY:  Your Honor, may Dr. Pardo remove his

10  face mask?

11          THE COURT:  Yes.  Please do so, sir.

12          And that's a clean microphone cover placed for you.

13          COURTROOM DEPUTY:  If you could please state your

14  name for the record and spell your last name.

15          THE WITNESS:  Reynaldo Pardo, P-a-r-d-o.

16          THE COURT:  Go ahead.

17      **REYNALDO PARDO, M.D., PLAINTIFF'S WITNESS, SWORN**

18                   **DIRECT EXAMINATION**

19  BY MR. KINNEY:

20  Q    Good morning, Dr. Pardo.

21  A    Good morning.

22  Q    Let's first start out by introducing you and what you do

23  as your profession.

24  A    I am a physician, a medical doctor, with specialty in

25  anesthesiology, and a subspecialty in interventional pain

```
 1   medicine.
 2   Q    And how old are you, sir?
 3   A    62.
 4   Q    And how long have you been practicing as a medical doctor?
 5   A    Since '87, 1987.  So, I don't know, 30-some years.
 6   Q    And do you have a practice here in Jacksonville?
 7   A    I do.
 8   Q    Was your practice always here in Jacksonville?
 9   A    No.
10   Q    Where did you go to medical school?
11   A    In Mexico City, Universidad LaSalle.
12   Q    Did you do your residency in Mexico City as well?
13   A    No, in Chicago, Illinois.
14   Q    Where did you do your residency?
15   A    At the University of Illinois Medical Center.
16   Q    And when you did your -- what did you do your residency
17   in?
18   A    Started in general surgery.  Did two years of general
19   surgery and then switched to anesthesiology.
20   Q    Did you go into a practice then or did you go into a
21   fellowship?
22   A    I went into practice.
23   Q    And what did your practice consist of?
24   A    Clinical anesthesiology.  First I was a teaching
25   professor -- assistant professor at the University of Illinois,
```

TRIOLO v USA                      September 23, 2020  Vol II-
57

1   and so I was a teaching attending for the residents.  Then I

2   worked at Cook County Hospital in Chicago, also as a teaching

3   attending.  And then I went into private practice in '94.

4   Q    What type of private practice did you join?

5   A    It was a community hospital with all types of general

6   surgery.  There was cardiovascular bypass surgery.  I did the

7   anesthesia for that.  Neurosurgical interventions, major

8   vascular surgery, spine surgery, general surgery, you know,

9   abdominal surgery, and obstetrics and gynecology, C-sections

10  and epidurals.

11        So pretty much a regular community, full spectrum of

12  anesthesiology.

13        I was also doing pain management on my days off or

14  after hours.

15  Q    And are you board certified?

16  A    Yes.

17  Q    What's your board certification in?

18  A    In anesthesiology and in pain medicine, both by the

19  American Board of Anesthesiology.

20  Q    What is your current form of practice?  What do you

21  primarily practice?

22  A    I have a solo practice.  I have an office in the South

23  Mandarin area, and it's exclusively chronic pain medicine

24  and -- with an emphasis in intervention.  So it's an

25  interventional pain clinic.

1  Q    Was there at some point along the line -- I know you've

2  been practicing 30-some years.  Was there some point along the

3  year -- could you give us some estimate of what year you

4  switched from doing anesthesiology and switched into doing pain

5  management.

6  A    Sure, 1992.  I went full-time with pain medicine.

7  Q    Was there a fellowship or a training program you went

8  through for that?

9  A    I didn't do a fellowship, but I had -- I was grandfathered

10 in to the American Board of Anesthesiology in pain medicine.

11       I sat for the test.  I passed the examination in '98.

12 It was the last year that the American Board of Anesthesiology

13 allowed a physician to sit for the exam and submit evidence

14 that you had the experience and the -- the experience of having

15 done pain medicine for at least eight years.

16       And I had to obtain a letter from the chairman of our

17 department, a well-known internationally -- a researcher in

18 pain medicine.  He wrote a letter, and the staff -- the chief

19 of staff at the hospital where I was working also wrote a

20 letter, confirming that I was involved in pain medicine at

21 least for 50 percent -- 25 percent of my time for the past four

22 years.

23 Q    And I think you're talking about the time you spent up in

24 Illinois.

25       Do you recall when you transitioned or moved back --

1    or moved to Florida?

2    A    Moved the family in 2010.  I stayed back working in

3    Illinois.  My first year working here in Florida was in 2010.

4    Q    Did you immediately go into private practice when you

5    moved here in 2011, then?

6    A    In 2010, I worked at Baptist downtown as an

7    anesthesiologist.  And then in 2011, I purchased the practice

8    that I have now.

9    Q    You mentioned interventional pain management is your

10   specialty.  Could you describe that.

11   A    Yes.  In anesthesiology, we practice general anesthesia

12   and regional anesthesia.

13        Regional anesthesia is mainly done through injections

14   targeting peripheral nerves or even the central spine, you

15   know, as an epidural block or a spinal block, but we also do

16   anesthesia with regional block.  So those techniques can be

17   applied to pain medicine, by injecting cortisone instead of

18   local anesthetics into the neuroaxial, we call it, the epidural

19   or spinal route.

20        And then the peripheral anesthesia techniques can be

21   applied to pain medicine.  And, for example, the most common

22   procedure we do at our practice is an epidural steroid

23   injection, whether it's cervical, thoracic, lumbar.

24        And then we do peripheral nerve blocks.  In case of a

25   shoulder pain, for example, a suprascapular nerve block that we

TRIOLO v USA                    September 23, 2020  Vol II-
60

1    would use for anesthesia can be used also to determine if

2    relieving the pain from a block at the suprascapular nerve with

3    radiofrequency ablation would provide relief for the patient,

4    and many other peripheral nerves and joints as well.

5           There's another category, which is intra-articular

6    steroid injections, or injections of hyaluronic acid.  So

7    that's in our target practice for arthritis, for joint

8    arthritis.

9    Q    All right.  Do you do your procedures at a surgery center

10   or do you have an operating room within your practice?

11   A    We have a procedure room within our office.  There are

12   certain procedures we need to do at the surgery center.  The

13   implantable devices, for example, peripheral and central spinal

14   cord stimulators, need to be trialed.  We do the trial at my

15   office, and then if the result is positive, the patient can

16   obtain the permanent implant at a surgery center.

17   Q    Throughout the course of your years as a medical doctor,

18   have you treated car accident victims?

19   A    Yes.

20   Q    Have you treated car accident victims that have been

21   involved in rear-end motor vehicle collisions?

22   A    Yes.

23   Q    I want to present to you a demonstrative aid we've got.

24          MR. KINNEY:  Your Honor, may I approach?

25          THE COURT:  You may.

1    BY MR. KINNEY:

2    Q    Doctor, I'm going to warn you.  The judge has heard this

3    testimony before, probably more times than I ever will in my

4    entire career.

5            So I don't want to go into super nitty-gritty detail

6    here, but I want to get the basics.  Okay.  So tell us what

7    you're holding in your hand.

8    A    A model of a skeleton, at least partially.

9    Q    Could you orient us to cervical, thoracic, and lumbar.

10   A    Cervical spine, thoracic spine, lumbar spine (indicating).

11   Q    All right.  And there's -- could you tell us the

12   difference between discs and bones, and show us the differences

13   and what their functions are.

14           MS. CUNNINGHAM:  Your Honor, at the outset of his

15   testimony, I just want to ensure that the doctor's testimony

16   remains within that appropriate for a nonretained expert, to

17   the extent that he's discussing things that are pertinent to

18   explaining the care and treatment that he provided and not just

19   providing to the general discussion.

20           THE COURT:  Right.  I think his discussion of the --

21   certainly the lumbar spine would be part of his care and

22   treatment.

23           And if there's a particular question that you think

24   goes beyond it, Ms. Cunningham, you'll object.

25           Go ahead, sir.

 1           THE WITNESS:  The basic unit of the spine is the

 2    vertebral -- the vertebra, so a single bone vertebra, and it's

 3    connected to another vertebra by -- anteriorally by the

 4    intervertebral disc.  And in the back, it's connected by the

 5    facet joints.  And that's the unit of the spine.

 6    Q    I'm sorry.  What's the function of the discs?

 7    A    Sort of a shock-absorbing element.  It's not bony.  It's

 8    a -- relatively soft.  The wall is very fibrous and rigid, and

 9    the center is jelly-like material.

10    Q    What's the function of the facet joint?

11    A    To allow the spine to have range of motion; so extension,

12    flexion, rotation.

13    Q    And as far as the nerves, just generally their function.

14    A    So the bony and discs create a spinal canal.  In the

15    cervical and thoracic spine, we have the spinal cord, and in

16    the lumbar spine, we have peripheral -- I'm sorry, spinal

17    nerves running down the canal, and they exit -- a pair of them

18    exit at each level, one right, one left.

19    Q    If a facet joint becomes injured, is it within the scope

20    of your general practice as a pain management physician that

21    you can provide treatment to relieve that injury?

22    A    Yes.

23    Q    And for the disc, do you have treatment modalities for an

24    injury to a disc?

25    A    Yes.

1  Q    And for the nerves, do you have treatment modalities for

2  injuries to the nerves?

3  A    Yes.

4  Q    You can set that to the side.  We're going to get back to

5  it a little bit later.  Thank you.

6         Dr. Pardo, did you have come to your practice a

7  gentlemen by the name of Richard Triolo?

8  A    Yes.

9  Q    If you would, to your left are some folders.  Would you

10 mind pulling out the folder that's labeled Exhibit No. 9.

11         Do you have that?

12         And you see at the bottom -- you see at the bottom

13 where it says SJIPS and then a series of Os and a 1 on that

14 first page?

15 A    Yes.

16 Q    Okay.  Those are called Bates labels.  So if we're talking

17 about them in your medical chart, and I want to refer you to a

18 certain page, I'd say:  Hey, Dr. Pardo, would you please go to

19 page 10.  Use those numbers, the Bates label numbers at the

20 right-hand corner.

21         As well, I have the same chart up digitally.  Some of

22 it is tough to see.  I can expand, contrast, do whatever.

23         All right.  If you would, starting at page 3 of your

24 chart.  I notice the date's absent, but we'll get to that in a

25 few moments.

1        When Mr. Triolo came to your practice, did he fill

2   out this auto accident -- I'm sorry, auto injury patient

3   history form or did someone in your office fill that out?

4   A    Mr. Triolo filled that out.

5   Q    And if you pick up pages 3 through 8, are those all pages

6   that Mr. Triolo would have filled out?

7   A    Yes.

8   Q    Are you with him in the -- in the room when he fills this

9   out or does he -- is it filled out before he actually meets

10  with you?

11  A    He filled this out before he met with me.

12  Q    In addition to getting this information in writing, do you

13  meet with the patient and -- to have a discussion before doing

14  any type of physical examination?

15  A    Yes, usually.

16  Q    And approximately how long would the -- strike that.  How

17  long would the first initial meeting take?

18  A    You mean the same initial visit, before I start my history

19  and physical?

20  Q    Yes.  In other words, how long are you having a

21  conversation with him?

22  A    Just maybe five minutes.

23  Q    And what is it during that five minutes that you're trying

24  to -- what information are you trying to obtain during that

25  five minutes?

TRIOLO v USA                    September 23, 2020  Vol II-

1   A    I'm actually introducing myself, and I'm basically finding

2   out if everything that he wrote -- I thank him for filling out

3   the intake form and I review it briefly.  Sometimes there's an

4   MRI, and I can just be aware that there's an MRI in the file,

5   and then -- and then after that, we begin the history.

6   Q    Okay.  And do you do any follow-up questions if you see

7   something on here?

8   A    Right.  I look at the list of complaints that are in the

9   first page; 1, 2, 3, in this case.  I look at the schematic --

10  body schematic that he filled out.  And then I will corroborate

11  that the information was complete.  Many times it isn't, and

12  that's -- I add that to my -- to my history.

13  Q    Are you talking about the chart note history?

14  A    The actual chart that I'm going to dictate is sometimes a

15  little more complete than this.  Patients fill this to the best

16  of their ability but sometimes they forget:  Oh, that's right.

17  My knee hurts or my shoulder hurts also.

18             I will add that to the history.

19  Q    Before offering any treatment or arriving at a diagnosis,

20  is it important for you to get a history of your patient?

21  A    Yes.

22  Q    Was it important for you to get a history of Mr. Triolo?

23  A    Definitely.

24  Q    Is it important to get Mr. Triolo's perception of what

25  caused the symptoms he's there to see you for?

1    A    Yeah, part of the history.

2    Q    Why is it important to you to develop an understanding of

3    when his symptoms arose?

4    A    If the patient reports that symptoms began right after a

5    motor vehicle collision, then, you know, I look into that.

6         I look at -- it's important for me to establish a

7    differential diagnosis as accurate as possible, and that has to

8    be narrowed down with the information the patient's giving us.

9         So if there's an auto accident, it's an event that

10   the patient was involved with, and I need to see if there's an

11   association with the -- the condition that he presents with.

12   Q    Will you tell us what a differential diagnosis means.

13   A    It's all the possible diagnoses given a set of symptoms

14   and physical findings.  And the list could be, you know,

15   enormous.  For example, if the patient has pain in his hand,

16   well, that would include autoimmune diseases, it would include

17   infectious diseases, and it could include traumatic diseases.

18        But if there's a history that, you know, brings one

19   of those conditions as more relevant, well, then we focus our

20   workup with that -- with that information.

21   Q    Dr. Pardo, is it important to you, before commencing any

22   treatments, to develop an understanding of what caused the

23   injuries?

24   A    Yes.  Best as I can, yes.

25   Q    Why is it important?

1    A    Again, I have to establish a relationship or an

2    association between an event, and I have to confirm that the

3    patient was involved in that event.  And many patients do come

4    in with a police report, so I know they're not just telling a

5    story; there's actually an event that the patient's been

6    involved, and I associate that with a condition or illness or

7    disability that the patient presents with.

8           I had to make sure that that -- that that event was

9    real, that the patient was involved, and that the event

10   actually caused -- actually applies to the set of findings that

11   I see in the patient.  So the condition has to match the -- the

12   reported event or causal event.

13   Q    If a patient came in and just said:  Doctor, I have neck

14   pain, just from that alone, would you be able to develop this

15   differential diagnosis and provide treatment?

16   A    Yes.

17   Q    Okay.  And just from saying neck pain alone, that alone is

18   going to be able to come up with a cause?

19   A    No.

20   Q    Okay.  So why is it that you need to go beyond just

21   hearing the symptom?

22   A    Again, it narrows my diagnosis.

23          So, for example, someone comes in -- instead of the

24   neck, let's say it's shoulder.  Someone comes in and says:  I

25   have shoulder pain, and there's no other further information.

1    No initial event, for example.  I could then order x-rays of

2    the shoulder, order an MRI, order a series of lab tests, and

3    everything could come back negative.  And the patient wants me

4    to treat the shoulder pain but I can't see any corroborating

5    findings in my labs or in my imaging testing.

6            But then he gives me additional information that he

7    was actually rear-ended.  He was involved in a car accident.

8    And so then I'm going to look at hyperextension/hyperflexion

9    injury in the cervical spine as the source.

10           If I had known that from the beginning, I could have

11   been looking at the cervical spine and possibly could have

12   found injury to his discs, to his nerve roots, et cetera.

13   Q    What's referred pain?

14   A    Pain that is sourced or starts in one point but it refers

15   itself to other areas of the body.

16   Q    Is that what you were referring to when you said:  Hey, if

17   the patient tells me my shoulder hurts, and that's it, I could

18   proceed with providing the wrong treatment on the wrong body

19   part?

20   A    Well, yes.  In fact, I would be -- it's like a red

21   herring, you know.  I would be chasing -- a wild goose chase,

22   trying to find out without the full information.

23           If I had known from the beginning that there was an

24   auto injury or fall -- slip and fall -- well, I would be

25   looking at the cervical spine and try to shrink or condense

TRIOLO v USA                     September 23, 2020  Vol II-

 1   that differential diagnosis so that it's more relevant, and I

 2   can find proper treatment at a faster rate.

 3   Q    Okay.  If you would refer to your chart at page 3.

 4        If you could, tell us the information that Mr. Triolo

 5   gave you on that first visit.

 6   A    Page 3 of the auto -- of the intake form; right?

 7   Q    Yeah.  Use the Bates labels, please.

 8   A    Yes.  He said that he had low-back pain that radiates down

 9   to the glute, to the hamstring, and across the hip flexor.

10   Q    Did he indicate to you what -- what event caused the

11   injury?

12   A    Yes.  On that same page, he wrote:  I was rear-ended while

13   at a traffic light.

14   Q    And the -- going forward, you started to read the

15   symptoms.  And how is it that you have this set up?  Is it

16   least of the concerns first or is it the worst of the concerns

17   that are listed first?

18   A    Yeah.  We ask the patient to start with the worst symptom

19   first.

20   Q    And what was it that he indicated was the worst area of

21   concern?

22   A    Low-back pain that radiates down the glute to the

23   hamstring and the hip.

24   Q    And what did he rate that pain?

25   A    9-10 -- over 10.

```
 1   Q    And was that significant to you?

 2   A    Yes.

 3   Q    Why is that?

 4   A    It's a very high rate on the numerical scale.

 5   Q    On the next one, what did he indicate?

 6   A    That he had neck pain, right side upper neck.  Pain

 7   radiates down into the trap -- so he means trapezius -- around

 8   the scapula.

 9   Q    And what were the pain ratings that he provided?

10   A    5 to 8 as the best -- when he feels the best, and 9 to 10

11   at its worst.

12   Q    Also he lists his headaches.  Do you see that?

13   A    Yes.

14   Q    And what was the rating for those?

15   A    0 at times; and at its worst, 9 to 10.

16   Q    Doctor, would it be important to you to know that he

17   had -- in 2015 suffered migraines and sought treatment for

18   that?

19   A    It would have been -- it's always good to have all the

20   information.  However, migraines are -- have a particular way

21   of presenting themselves and it's a totally different treatment

22   modality.  So it wouldn't have affected necessarily the

23   findings of hyperextension or a hyperflexion injury.

24   Q    If he hadn't suffered from these migraines for six months

25   to a year prior to coming to see you -- and I think the next
```

 1   few pages shows it, July 11 -- if he hadn't suffered from

 2   migraines for six months to a year prior to coming to see you,

 3   would it be pertinent to you to know about the headaches?

 4   A    Not necessarily.

 5            MS. CUNNINGHAM:  Objection.  Hypothetical.

 6            THE COURT:  I'm going to allow it, but let's keep it

 7   to his treatment of Mr. Triolo.  But I think it's a fair

 8   question, but you were going to ask him about it as well,

 9   Ms. Cunningham.  But go ahead.

10   BY MR. KINNEY:

11   Q    If you would turn to page 4.  What does he indicate to him

12   where the pain was the worst, what times of the day?

13   A    Sometimes it feels --

14   Q    Right above that.

15   A    Right above that, therapies.

16   Q    Do you see the second question on your form?

17   A    Yes.  On page 4; right?

18   Q    Yes.

19   A    Where it says:  Worst times of the day, in the morning and

20   at night.

21   Q    Why do you want to know -- when a patient comes to see you

22   from an auto accident, why do you want to know when his pain is

23   at its worst?

24   A    It does point to certain structures.  Joints, for example,

25   in the morning can be -- have an increased amount of pain, can

1    present with increased pain.  And as the joint is being

2    mobilized, as there's more range of motion and the patient

3    usually takes something for their pain, you know, that pain

4    will be partially relieved.

5              But morning pain is typically something that can be

6    very intense when there's arthritis, arthropathy of any sort in

7    the mornings.

8    Q    What is it about the mornings that present that additional

9    level of pain?

10   A    A lot of activity, too, getting up from bed, you know,

11   taking a shower, getting dressed.  There's a lot of activities

12   of daily living that the patient needs to complete.  And, you

13   know, after being immobile for eight hours, it can be quite

14   painful.

15   Q    In the next section, the diagram, is it Mr. Triolo that

16   filled in this diagram?

17   A    Yes.

18   Q    And is that what you understood the areas that you would

19   be possibly providing treatment to?

20   A    Yes.

21   Q    And do you see in the bottom section, the check marks for

22   what other medical tests have already been completed?

23   A    Yes.

24   Q    And what tests did he indicate had been completed?

25   A    X-rays, MRI scans, nerve conduction study.

TRIOLO v USA                    September 23, 2020  Vol II-
73

1   Q    All right.  And did Mr. Triolo bring to you the MRI CD?

2   A    I have seen the CD.  I can't remember if I saw it that

3   first -- on that first visit, though.

4   Q    Have you at any time during his treatment course seen the

5   MRI films yourself?

6   A    Yes.

7   Q    Have you also reviewed the radiologist's report?

8   A    Yes.

9   Q    All right.  If you would, turn to page 3 of -- I'm sorry,

10  page 5.

11        In the section in the middle, it indicates:  Please

12  list all surgeries you have had in the past including the

13  approximate date of those surgeries.

14        And do you see what he listed there?

15  A    Left forearm compound fracture.

16  Q    And if you would, do you see right above that, it says:

17  Please indicate and list all current and past medical problems?

18  A    Yes.  It says sleep apnea.

19  Q    Okay.  Is there any section on your form that would ask

20  him to disclose every trip and fall, every motor vehicle

21  collision that he was involved in which he wasn't injured?

22  A    No.

23  Q    Would it be pertinent to you in your diagnosis and

24  treatment of Mr. Triolo to know whether or not he was involved

25  in a motor vehicle collision 20-plus years in the past in which

```
 1   he was not injured?

 2   A      No.

 3   Q      If you could turn to page 6.

 4          Now, Doctor, as a general rule of thumb, do you ask

 5   your patients, once they're injured in an accident, to become

 6   sedentary?

 7   A      No.

 8   Q      Do you -- do you encourage them to be active?

 9   A      Yes.

10   Q      Why?

11   A      My goal is to maintain the patient's activity.  We all

12   need to be active.  We all need to complete tasks throughout

13   the day.

14          The patient will tell me:  I can't do this or that.

15          Okay.  I'm not going to force them to do it, but, you

16   know, be as active as you can, unless I've done a procedure.

17          If we've done an injection of cortisone, for example,

18   I ask the patient to limit that activity, especially to

19   flexion, spinal flexion, because I want the cortisone to take

20   effect, to have the proper effect.

21          Now, after those procedures, the patient can reinjure

22   themselves if they exert themselves too much.  I will ask them

23   to have good body mechanics.  So avoid bending all the way down

24   and twisting with a load, so that pressure on the discs and the

25   torquing with a load can definitely aggravate a herniated disc,
```

1  and tilting back too much with a load can also aggravate and

2  reinjure the facet joints.

3          So, you know, it's a -- I try to instruct the

4  patients on proper spinal mechanics, especially.  And then if

5  there is an injury to a joint, well, we want that joint to be

6  mobilized by a chiropractor or physical therapist.

7  Q    If you would, turn to page 9.

8          Dr. Pardo, is this your first treatment date with

9  Mr. Triolo?

10  A    Yes.

11  Q    What's the date that you first saw him in your office?

12  A    July 11, 2017.

13  Q    And what did you record as your -- as the history of the

14  illness?

15  A    That he was involved in a motor vehicle collision, the

16  driver of a Ford Mustang.  That he was stopped at a traffic

17  light and sustained a rear-ended collision.  He went to the

18  emergency department.

19          Then I list the current complaints, mid-to-lower back

20  pain, described as constant and deep and intense.  There's

21  tightness in the mid-to-lower back muscles.  He also reported

22  having neck pain, worse on the right side of the neck, and

23  referred to the right shoulder blade.

24          Currently there was severe lower back pain referred

25  to the right lower extremity, the right inguinal area, the

```
 1   right groin, that the pain was referred down the back of the
 2   thigh to knee level.  Lower back pain and right lower extremity
 3   was rated a 9 to 10 over 10 on the visual analogue score.
 4           He denied any radicular symptoms below knee level.
 5   So no pain, numbness, tingling, weakness below knee level.
 6           There's a constant right paracervical -- that's to
 7   the right of the neck -- pain referred to the right shoulder
 8   blade area again.  That neck pain was also referred to the
 9   occipital area, the back of the head.  The pain is aggravated
10   by range of motion, cervical range of motion.
11           He denied any upper extremity radiculopathy.  That
12   means no numbness, tingling, weakness, pain in the upper
13   extremity, arms or hands.
14   Q   Let me stop you there.
15   A   Yeah.
16   Q   So looking to the low-back chart notes, you wrote:  He
17   denies any radicular symptoms below the knee level.
18           Does that indicate that he was suffering from
19   radicular symptoms above the knee level?
20   A   Yes.
21   Q   Okay.  And was that significant to you?
22   A   Yes.
23   Q   Why so?
24   A   It points to a nerve root compression.
25   Q   What is nerve root compression?  And if you need to use
```

1    the model, please do so.

2    A    Sure.  Well, the lower extremities are innervated by the

3    lumbar nerve roots.  These are the nerve roots that exit on

4    each side of the spine.  And they have a certain dermatome, a

5    certain location where they innervate.

6         So the groin area, for example, is the L1 dermatome.

7    So it's innervated by the first lumbar nerve.

8         The front of the thigh is L2; the knee is L3.  And

9    the lower extremity, the leg and foot, are usually L4, L5, and

10   S1.  So it denotes where the injury could be located.

11   Q    And understanding from his reports to you that his pain

12   was radiating down to the posterior aspect of the right thigh

13   to the knee level, what would that indicate to you as far as

14   what nerves are at play?

15   A    That could also indicate that there's facet arthropathy.

16   Because the facet joint pain, which is in the back of the --

17   not the nerve root, but the back of the spine where we have the

18   connection between one vertebra and the other, those joints,

19   when they're injured, will have a referred pain pattern as

20   well, but they don't follow that dermatomal charting that we

21   have with the nerve roots.

22        So typically the upper lumbar facet, L1-2, L2-3, will

23   refer their pain to the buttock area, to the lower back and

24   buttock area.  The lower facet, L4-5 and L5-S1, will refer it

25   down to hips and thigh, rarely the calf.  The L5-S1 joint might

1  refer to the upper calf, but not to the lower -- to the ankle

2  or foot.

3  Q    Can the facet joints be injured in a rear-end motor

4  vehicle collision?

5  A    Yes.

6  Q    What is the motion of the body that causes the facet

7  joints to be injured in a rear-end motor vehicle collision?

8  A    Anything that --

9         MS. CUNNINGHAM:  Objection, Your Honor.  Again, to

10  the extent that this is not information that pertains

11  specifically to Mr. Triolo in terms of the information the

12  doctor had available to him at the time of the accident,

13  whatever information he used to reach whatever conclusions he's

14  going to discuss here today.

15         MR. KINNEY:  Your Honor, can I respond?

16         THE COURT:  Sure.

17         MR. KINNEY:  Your Honor, he diagnosed him with facet

18  arthropathy from the motor vehicle collision.  Clearly he'll

19  have an understanding of why the facet become injured in the

20  motor vehicle collision.

21         THE COURT:  I'm going to overrule the objection

22  subject to the explanation that I gave in the summary judgment

23  order.

24         Go ahead.

25  BY MR. KINNEY:

TRIOLO v USA                    September 23, 2020  Vol II-

1  Q   Mr. -- or Dr. Pardo, excuse me.  Dr. Pardo, are the facet

2  joints -- I'm sorry, you answered that question.

3         What is it about the motion of the body that allows

4  the facet joints to be injured in a rear-end motor vehicle

5  collision?

6  A   Any type of excessive extension, flexion, and rotation or

7  even lateral tilt of the joints, so there's a certain range of

8  motion limited at certain points.

9         If you take -- if you take a joint and you

10  hyperextend it, you can injure -- injure the joints, whether

11  it's the cartilage, the articulate cartilage of the joint, you

12  can even fracture the joint.

13         If I take my elbow and somebody goes and puts it

14  on -- on a point and then hyperextends my elbow, I'm going to

15  have a fracture.  In the same way, that can happen with facet

16  joints, any joint that has a limited extension.

17         If you take your head and throw it all the way back,

18  there's a certain point you don't want to extend it any

19  further, but if something comes and hits you on the head very

20  hard, you're going to hyperextend beyond the point where it's

21  limited, and that can cause injury.

22  Q   And in the -- if you skip down -- we're still on page 9.

23  If you skip down, it says Medical History.

24         What is that -- first, before you get to the note,

25  what is that -- what is the purpose of having that there?

1   A    Medical history?

2   Q    Yeah.  What's the reason you have this section -- see

3   where it says Interval History, and then underneath that,

4   Medical History?

5   A    Yeah.  It's important to know what other -- we call them

6   comorbidities.  What other medical conditions does the patient

7   have -- diabetes, hypertension, coronary artery disease?

8            Did he suffer from seizures?

9            Does he have asthma?

10           Does he have epilepsy?

11           You know, does he have kidney failure?

12           It's important to know that.

13  Q    What did you write in next to medical history?

14  A    No significant past medical history.

15  Q    Did you do that based upon the intake forms alone?

16  A    No.  I basically asked him, I think -- I think I -- I

17  noticed the discrepancy because I didn't mention the sleep

18  apnea.  Yeah.

19  Q    Is that -- when you wrote in "no significant medical

20  history," is that based on -- also on your, basically, your

21  interview of him when he first presents?

22  A    Correct.  Correct.  And apparently he doesn't suffer from

23  severe sleep apnea.  I don't believe he uses a CPAP machine.

24  But it's some -- it's part of his history and that's why he

25  entered it in the intake form.

TRIOLO v USA                    September 23, 2020  Vol II-

1    Q    With regard to his back pain, was there any past

2    significant medical event that was pertinent to your evaluation

3    of him?

4    A    Not that I know of.

5    Q    And in regard to his cervical pain that he presented with,

6    was there any past medical history that was pertinent to your

7    evaluation of him?

8    A    No.

9    Q    All right.  If you would turn to page 10.

10        And on the first visit, did you do a physical

11   examination of Richard Triolo?

12   A    Yes.

13   Q    Could you tell us what you did during your exam and what

14   your findings were.

15   A    We asked the patient to take a few steps just to see what

16   type of gait he presented with.

17        We checked his -- just a general exam, head, ears,

18   nose, and throat.  Respiratory, quick -- just try to find if

19   there's any wheezing or rhonchi.

20        In the heart, that there's normal heart sounds, that

21   there's no murmur.

22        That the abdomen is nontender, you know, on

23   palpation.  There's no masses in the abdomen.

24        And then we target the cervical spine.  We look at

25   the patient's range of motion to see if there's any restriction

TRIOLO v USA                    September 23, 2020  Vol II-
82

1   in it from the normal -- commonly normal, for angles.

2           And then we palpate the spine, especially the facet

3   joints and the spinous processes, which are the little bones in

4   the back.

5   Q    What do you mean "palpate"?

6   A    Press on them.  Take my hand and actually press on the

7   facet joints and the spinous processes and the muscles that

8   the -- the musculature around the spine.

9   Q    What's the reason for doing the palpations?

10  A    If there's tenderness in a certain structure, it could

11  point to it as being injured.

12  Q    All right.  And once you -- once you do the palpations,

13  what's next in the examination?

14  A    In general, we look at --

15  Q    Well, you know, what -- not generally.

16          THE COURT:  Right.

17  BY MR. KINNEY:

18  Q    For the patient, for Mr. Triolo on that day.

19  A    Sure.  So I'm looking at that he had tenderness in the

20  posterolateral structures.  Those are the facet joints of his

21  neck.  From C2-3 all the way down to C7-1, both sides were

22  tender, so that means that it could point to a facet injury.

23  The right side was worse than the left.

24          The extension elicited occipital neuralgia.  So that

25  means that when he extended his head, there was referred pain

1  to the occipital, to the back of the head.

2          It also elicited parascapular pain.  So his neck pain

3  also went down to his shoulder blade.  And the right side was

4  greater than the left side.

5          Cervical flexion, bringing your chin down to your

6  chest, caused pain referred to the thoracic midline.  So that

7  means in the posterior thoracic spine, between the shoulder

8  blades.

9          There was negative Spurling's test as it tilted, a

10  lateral tilt of the head with compression.  If there's severe

11  nerve root compression, that would elicit pain down the arm,

12  and it didn't.  And axial compression also was negative.

13  Q    What is axial compression?

14  A    The patient does not tilt, like in Spurling's, but just

15  with the head in a neutral position, I take my hands and I put

16  pressure to see if it -- usually it denotes discogenic pain.

17  If the disc is ruptured, if there's an annular tear, and

18  there's pain coming from the disc itself, it would be positive.

19  Q    I apologize.

20          Was there any indication that he had a disc injury

21  when you did the axial compression test to his cervical spine?

22  A    Looking at my notes, I assumed there wasn't.  I don't

23  clearly remember that first visit, but no.

24  Q    And then, quite frankly, we're not here to talk about

25  thoracic, so I'm going to skip by that for expediency purposes.

 1          If you could, would you tell us about your
 2   examination to his lumbar spine.
 3   A     There was tenderness at L3-4 through L5-S1.  And these are
 4   the posterolateral structures, so this refers to the facet
 5   joints which are on each side of the spinous process.  The
 6   right side was greater than left.
 7          The lumbar extension was limited only to 10 or
 8   20 degrees, and it caused -- it reproduced his usual and common
 9   pain, the concordant pain, the pain that went down the right
10   thigh.  So that points to the facet joints and not so much the
11   nerve root.
12   Q     Hold on right there.  I want to ask you if you could --
13   with this spine model, could you show us the posterolateral
14   structures, L3-4 through L5-S1, and tell us why, when you did
15   that test -- what was it about that that led to you looking at
16   the facet joints?
17   A     Okay.  So the bottom joint is L5-S1.  The next one up,
18   L4-5.
19          THE COURT:  You're probably wanting to show that to
20   me.
21          THE WITNESS:  I'm sorry.
22          So we call this the sacrum, the base of the spine.
23   That connects to L5.  So L5-S1 is the largest lumbar joint in
24   the back.  When we flex, we open the joint; we separate it.
25   Not that far down -- not that far open, but you can see the

1    inside of the facet joint.  This is where the articular

2    cartilage is located, the cartilage that could be damaged.

3              And when you extend and you tilt back, you close the

4    joint.  You approximate this bone to this one, closing the

5    joint, rubbing bone against bone.  That can elicit pain if

6    there's damage of that facet joint.  So that's L5-S1, L4-5, and

7    L3-4.

8    Q    What is it that's inside that facet joint -- I've heard

9    you talk about cartilage and bone.

10             Is there anything inside that facet joint that would

11   cause somebody to perceive pain?

12   A    Typically inflammation of a joint is called arthritis;

13   right?  Or a disease of the joint is -- we call it arthropathy.

14   And that -- most of the time, it refers to a damage of the

15   articular cartilage.  All joints are lined or covered by

16   articular cartilage, nice smooth tissue that allows the joint

17   to glide without a lot of friction, instead of being bone

18   against bone.

19             So we talk about facet injury as injury to that

20   articular cartilage.

21             The joint is innervated.  It has nerve endings that

22   send messages of pain upwards toward the brain, and that's

23   where the patient will feel -- that's what conducts pain or

24   transfers pain upstream to the brain whenever there's an

25   injury.  Just like when you have knee pain, a nerve innervating

1  the joint.

2  Q    Can those facet joints be permanently injured in a

3  rear-end motor vehicle collision?

4         MS. CUNNINGHAM:  Objection.  Calls for opinion beyond

5  the scope of his treatment of this patient.

6         THE COURT:  All right.  As I said, I'm going to hear

7  all of his testimony, and at the conclusion of it, I will

8  determine if all of the opinions that he states are within the

9  realm of what was necessarily obtained in the course and

10  treatment of Mr. Triolo, so subject to my explanation in the

11  summary judgment order.

12         MS. CUNNINGHAM:  And just to clarify, Your Honor,

13  given that, I assume that means I don't need to continue to

14  make that objection?

15         THE COURT:  Yes.

16         Go ahead.

17  BY MR. KINNEY:

18  Q    Dr. Pardo, can the facet joints in that lumbar spine be

19  injured in a rear-end motor vehicle collision?

20  A    Yes.

21  Q    Is it important for you to understand the mechanism of the

22  injury before proceeding with providing treatment to a -- to a

23  facet joint?

24  A    Yes.

25  Q    Why is that?

TRIOLO v USA                    September 23, 2020  Vol II-

1  A    It could determine that the hyperextension I was talking

2  about actually took place.  If, in a rear-end collision,

3  there's severe hyperextension of the facet joint, that could

4  injure the cartilage, as we said before, could injure the

5  capsule which is formed by the ligaments.  That capsule keeps

6  the synovial fluid that every joint has within the joint.  Once

7  that is disrupted, there's no synovial fluid in the joint and

8  it could also even cause damage to the bone.

9  Q    By determining the cause of the symptoms, the cause of the

10 injury, does that allow you to rule out other things?

11 A    Yes.

12 Q    So you're not chasing things like, you know, chasing my

13 shoulder, for the analogy you gave us earlier.

14 A    Yes.

15 Q    Is that why you ruled out other causes -- I'm sorry, other

16 injuries?

17 A    It does.  Without that, I would be looking at other causes

18 like autoimmune inflammation, autoimmune disease, infectious

19 disease.  Tuberculosis causes severe disruption of an injury to

20 the bone and many other causes.

21     He could have discitis, you know, an inflammatory and

22 infectious disease, so on.  And so knowing that there was an

23 event that the patient was involved in and that that event

24 would have to correlate, you know, the findings have to be

25 consistent with the type of injury that the patient was in,

TRIOLO v USA                    September 23, 2020  Vol II-

88

1    well, then, that limits or focuses my treatment.

2    Q    What was it about your examination of those facets on

3    July 11th of 2017 that led to you suspecting a facet injury?

4    A    Yes.  Well, as it says here, the tenderness to the

5    posterolateral structures, which are formed by the facet

6    joints -- the tenderness at my palpation caused tenderness, and

7    then the extension was limited.

8             The patient could not extend fully 30 degrees,

9    limited by -- to 10, and it elicited his concordant pain.

10   Q    I stopped you at flexion limited to 80 degrees.

11            So going back to page 10, if you would, continue to

12   apprise us of your examination that day.

13   A    Yeah.  Flexion limited to 80 degrees.  It elicits

14   radicular pain on the right side.

15            So that would mean the opposite, you know, flexing

16   and leaning forward, bending the spine forward, and it

17   reproduced his pain going down the leg as well.

18   Q    What did that indicate to you?

19   A    Typically it indicates nerve root compression, so that the

20   nerve root that goes to the -- down the leg is being pinched.

21   Q    And if you could, continue on with your examination.  I

22   believe the next is the Fortin finger.

23   A    Right.  That's --

24   Q    What is the Fortin finger sign?

25   A    The Fortin finger sign is simply pressing in the area of

1    the sacroiliac joint.  The sacrum connects the pelvic bone and

2    forms one of the largest, most irregular joints in our body,

3    called the sacroiliac joint, the SI joint.

4         It doesn't move very much.  It's very limited in its

5    motion.  It mainly supports the upper body, sort of a wedge

6    where the weight load is anchored on those two joints, and

7    that's connected to the lower extremities.

8         So pressing onto that SI joint, the posterior aspect

9    of that joint, causes pain, and that's a positive Fortin finger

10   sign.

11   Q    What does it indicate to you -- if you have a positive

12   Fortin finger, what does that indicate?

13   A    Injury to the sacroiliac joint.

14   Q    All right.  If you could, the next section indicates:

15   Lower extremities motor function.

16   A    Correct.  And he had slightly decreased motor function, 4

17   over 5, to flexion/extension of the hip, and of the knee and

18   then the ankle.

19   Q    How did you test his motor function?

20   A    I simply have the patient push up against my resistance.

21        So if he's in the sitting position, I ask him to

22   bring his knee up, so that flexes the hip, and I try to push it

23   down, and I ask him now to resist.

24        If they're able to do that strongly, that's 5 over 5,

25   which we expect as a normal finding.  But if it's -- if there's

```
 1   a weakness and they -- they're -- it's giving out and I'm able
 2   to push the leg down, the knee down, well, that's 4 over 5.
 3             If they can't even bring the knee up, you know, that
 4   would be 3 to 0.
 5   Q    Did you compare one --
 6   A    And I compare one side to the other.
 7   Q    And how did he do on the motor test?
 8   A    He -- on the right side, he had decreased motor, slightly,
 9   in other words, 4 over 5.
10   Q    Was that consistent with his reports to you of pain in his
11   back and radiating down his right leg?
12   A    Yes.
13   Q    Now, the sensory, what are you doing in this part of the
14   exam?
15   A    Well, that's -- we take a pin and we do the pinprick test.
16             Sensory, L4, L5, and S1, had deficit on the right
17   side.
18             So the dermatomes I was talking about, he exhibited
19   less sensory -- he wasn't able to determine whether it was as
20   sharp as the other side.  It was less sharp to the pinprick
21   than the left side.
22   Q    Was that consistent with his subjective reports to you?
23   A    Well, it's consistent of nerve root injury.
24   Q    And was it --
25   A    And consistent with his symptoms.
```

TRIOLO v USA                    September 23, 2020  Vol II-

91

```
 1   Q    Was it greater on the right or the --
 2   A    On the right side.
 3   Q    I'm sorry.  Which side did he have the deficits on?
 4   A    The right side.
 5   Q    What is DTR?
 6   A    Deep-tendon reflexes.
 7   Q    And how did he do there?
 8   A    He had 1 over 2, so slight weakness or response to tapping
 9   the tendon.
10   Q    Was that on the right side as well?
11   A    Yes, it was.
12   Q    And SLR?
13   A    Straight-leg raise.
14             So we ask the patient to lay flat on his back and
15   raise the right leg or left leg.  And the pain can limit that
16   or when there's nerve-root compression.  He noticed there was
17   some discomfort or pain at 45 degrees on the right side.
18   Q    If he had no -- no pain complaints or no problems, how far
19   would he have been able to raise the leg?
20             Up here you said 45 degrees on the right?
21   A    Yeah.
22   Q    What would it have gone to?
23   A    If he's strong, then up to 90 degrees.
24   Q    All right.  The next is Imaging Section.
25             Do you see that?
```

```
 1   A    Yes.

 2   Q    And I've got the MRI loaded.

 3              Now, let me ask you, Doctor, as part of your medical

 4   practice, do you review MRIs yourself?

 5   A    Yes, I do.

 6   Q    Okay.  And do you ever just rely on a report from a

 7   radiologist?

 8   A    No.  The radiologists are specialists in doing the film.

 9   I'm not a radiologist, but I've had enough, you know,

10   instruction during -- over the years on how to read a lumbar

11   spine MRI.

12   Q    How many years have you been reading lumbar spine MRIs?

13   A    Since '92.

14   Q    When patients initially come to see you complaining of

15   low-back pain, do you ask them:  Hey, bring me your MRI films?

16   A    Yes.  They may not have it on the first visit, but at some

17   point I like to sit down and look at the disc.  It's usually a

18   little CD.

19   Q    Why are you asking them to bring MRI films -- strike that.

20              Why do you want to review the films yourself?

21   A    I want to make sure that there is something I'm treating,

22   that there is an injury to the spine, and that I can see and

23   confirm what the radiologist has written in his report.

24              THE COURT:  Yes, Ms. Cunningham?

25              MS. CUNNINGHAM:  Your Honor, I'm going to object that
```

TRIOLO v USA                    September 23, 2020  Vol II-
                                                         93

1  the expert disclosure for this witness does not indicate that

2  he relied upon an MRI in referring his decision in terms of --

3  he did not indicate that he himself viewed the MRI and made

4  independent assumptions about what it showed.

5          THE COURT:  It says -- well, I'm looking at the

6  pretrial stipulation that may not be any different than what

7  was in the disclosure.  I don't have the disclosure handy.

8          The pretrial stip says he will testify to his review

9  of the lumbar MRI and x-rays.

10          Is that different than what's in the disclosure?

11          MS. CUNNINGHAM:  Your Honor, let me take a look here.

12          So there's, I believe, a generic reference to what he

13  will testify to, right, from a standpoint of the actual

14  opinions that were identified in the disclosure.  There's no

15  indication that those opinions were --

16          MR. KINNEY:  Your Honor, if I can jump in and

17  forestall this.

18          On page 5 of the plaintiff's expert witness

19  disclosure, it states:  He will testify to his review of the

20  lumbar MRI and x-rays.

21          MS. CUNNINGHAM:  Well, Your Honor, just for purposes

22  of context here, this sequence that followed is quoting from

23  the MRI report, and so the objection is that it does not

24  clearly state that the opinions to be offered are based upon

25  his independent review as opposed to simply relying upon the

TRIOLO v USA                    September 23, 2020  Vol II-
94

 1  radiology report.  And I have copies of this disclosure.
 2          THE COURT:  With the -- what was listed in the
 3  pretrial stip, wasn't that cut and pasted from the disclosures?
 4          MR. MOORE:  Yes, Your Honor.
 5          THE COURT:  I mean, I thought it was verbatim.
 6          Ms. Cunningham, if I can see the --
 7          MS. CUNNINGHAM:  Yes, Your Honor.
 8          I believe it is verbatim.  One of the issues that we
 9  noted that was -- needs to be considered by the Court in the
10  pretrial statement of the legal section is just the scope and
11  the -- really just to sort of preserve the objection from that
12  point.
13          THE COURT:  Okay.  Well, to the extent that the
14  objection is it wasn't disclosed that he was going to testify
15  to his review of the lumbar MRI and x-rays, I'm going to
16  overrule that.
17          Go ahead.
18          MS. CUNNINGHAM:  And, Your Honor, just so my
19  objection is articulated appropriately, you've made your
20  ruling, but I just want to make sure I'm saying it
21  appropriately.
22          It's not simply that he was going to review them, but
23  that the opinions he is offering are based on his review of
24  certain findings in this MRI.
25          That's perhaps a better way to state the objection.

TRIOLO v USA                    September 23, 2020  Vol II-

 1              MR. KINNEY:  Computer locked up.

 2              THE COURT:  All right.  We're -- you can -- you can

 3    ask him about it and then he can testify as to whether or not

 4    those were opinions he formed during the course of his

 5    treatment of Mr. Triolo and whether they were necessary to his

 6    treatment of Mr. Triolo.

 7              That's the sort of information which we discussed was

 8    not available to the Court in the ruling on the summary

 9    judgment.

10              Go ahead.

11              MR. KINNEY:  Sorry, Your Honor.  The computer's

12    locked up.

13              THE COURT:  Well, of course it is.

14              MR. KINNEY:  We got it.  All right.  I got it.

15              THE COURT:  That's what technology does.

16              MR. KINNEY:  I forgot my last question.

17              THE WITNESS:  You were asking about the MRI, if I

18    looked at the MRI.

19    BY MR. KINNEY:

20    Q    All right.  Did you review Mr. Triolo's MRI film?

21    A    At some point.  I don't have the exact recollection, but

22    yes, I did review it, and that's my usual and customary way of

23    practicing.  I always want to look at the MRI image, not just

24    the report.  That's what I do routinely.

25              THE COURT:  Well, when you say "at some point," at

```
 1    some point before this trial or did you review it during --
 2              THE WITNESS:  Initially during --
 3              THE COURT:  You have to let me finish.
 4              THE WITNESS:  Oh, I'm so sorry.
 5              THE COURT:  Or did you review it during your
 6    treatment of Mr. Triolo?
 7              THE WITNESS:  Yes.  At the beginning of his
 8    treatment, I asked the patient to bring the images so that we
 9    can review them together.  That's my usual and customary way of
10    practice.
11              THE COURT:  Go ahead.
12    BY MR. KINNEY:
13    Q    Dr. Pardo, did you review the lumbar MRIs with Mr. Triolo
14    within the first couple of office visits?
15    A    At the beginning, 2017, in the first three or four, most
16    likely.  I ask the patient:  Bring the disc as soon as you can.
17    Q    Did you review the lumbar MRI with Mr. Triolo prior to
18    eventually referring him out, I believe, in October of 2017,
19    for a surgical evaluation?
20    A    Yes.
21    Q    Okay.  Is it the sagittals you want to look at?  Is that
22    the --
23    A    Sure.  And if I may say, I have a clear recollection
24    because it was a remarkable MRI.  Not usual.
25    Q    All right.  I am clicking on the -- Dr. Pardo, I'm
```

1   clicking on the sagittal C2, and looking for the button that

2   will change the view.

3   A    If you right click your mouse and then drag it -- I'm

4   sorry, left click your mouse and drag it up or down, it may

5   change.

6   Q    Okay.

7   A    Okay.

8   Q    All right.  Dr. Pardo, would you tell me which image you

9   want me to stop on to discuss Mr. Triolo's injuries.

10  A    Unfortunately, it's very dark.  So we could right click,

11  and that allows you to -- let's see if there's -- okay.

12       The other thing you can do is left click, and instead

13  of going up and down, you slide left to right.  Changes the

14  contrast.

15  Q    All right.  Did I change it enough?  How about right

16  clicking?

17  A    Okay.  Let's look -- you see it says:  Contrast enhance,

18  bone enhance.

19       Yep, that helps a lot.

20  Q    Okay.

21  A    Now, if you slide up side to side, left to right, it may

22  change.  Okay, that's better.

23       How about going up and down?

24       Okay.  The same.

25       All right.  Still a little dark, but I can see it

1    better.

2    Q    Would it help if I just handed you my laptop?

3    A    I can see the spondylolisthesis here clearly.

4    Q    Okay.  All right.  If you could, I believe you have the

5    ability to click on your screen and get a red marker.

6         THE COURT:  If you just -- no, if you just touch the

7    screen, it's going to make a mark where you touch it.

8         THE WITNESS:  Okay.

9    BY MR. KINNEY:

10   Q    I think you got to touch the little pen first.

11   A    Right in that area.

12   Q    Okay.  So let me ask some questions.

13        All right.  What part of Mr. Triolo's body are we

14   looking at here?

15   A    We're looking at his lumbar spine.

16   Q    All right.  And is there anything that you're seeing on

17   the lumbar MRI that is consistent with his subjective reports

18   to you from that first visit of July 11, 2017?

19   A    Yeah.

20   Q    Okay.  And what is it that you see on the lumbar MRI?

21   A    Most evident is the spondylolisthesis at L5-S1.

22   Q    Tell us all, what is spondylolisthesis?

23   A    So the body of the vertebra, and that is -- that's this

24   body right here -- is sliding forward in relation to the

25   sacrum, which is right here.

 1          I don't know how to erase the marks, though.

 2          THE COURT:  So up at the top, you see there's a

 3   little green arrow.

 4          THE WITNESS:  Top right?

 5          THE COURT:  The top right.  You see a little green

 6   arrow.  Click on that, and you look at the bottom, it says

 7   clear.

 8          THE WITNESS:  Yeah, thank you.

 9          So L5 is slipped forward.  There's an alignment that

10   you should have.  And I'm going to make a mark, now that I know

11   how to erase this.  And it's supposed to follow -- it's like a

12   stack of blocks that you have lined up perfectly.

13          And when you have one block that's slightly slipping

14   forward, you have listhesis, anterolisthesis.  And you can see

15   that at L5.

16          This is L5.  And you can see on the back of it how,

17   right here, there's a lot of disc material from the L5-S1 disc,

18   that there's a void right here.  The posterior edge is slipping

19   forward.

20          So L5 is slipping forward in relation to S1.  So this

21   is L5, and it's slipping forward in relation to the bottom, S1.

22   BY MR. KINNEY:

23   Q    What would this be considered, mild -- or what would you

24   considerate it, mild, moderate, severe?

25   A    This is moderate, I would say.  Moderate -- mild to

1  moderate, because it's slipping forward.  Unfortunately, the
2  most severe cases, patients can't walk.  50 percent or greater
3  of listhesis comes with practical disability, not being able to
4  stand and walk, because the compression on the nerve root is
5  severe.
6          So even a grade 1 -- it's classified in grades: grade
7  1, 2, and 3.  This is a 5-millimeter -- it looks like a
8  5-millimeter grade 1 spondylolisthesis.  So that's sufficient
9  to compress the nerve roots.
10          So here's L5 and here's S1.  And if this is sliding
11 forward -- this is slipping forward, the little tiny opening
12 called the neuroforamina is constricted by that motion forward
13 of the vertebra.  And it can impinge -- can really impinge on
14 that nerve root on both sides bilaterally.  In his case, it was
15 more right side than left.  But spondylolisthesis is an area of
16 instability.
17          So there's not a stable -- a structure holding the
18 vertebra at that point.  It can easily be moving depending on
19 his motion.
20 Q    With what you saw in the MRI, was that consistent with
21 your physical -- the findings on your physical exam?
22 A    Yes.
23 Q    And what are the symptoms that somebody that has this
24 spondylolisthesis, 5-millimeter anterior spondylolisthesis --
25 what are some of the symptoms that would develop from that?

1    A    Back pain, leg pain, leg weakness, numbness, tingling.  In

2    his case, the spondylolisthesis was due to a fracture on the

3    pars interarticularis.  So it's a different kind.

4         There's two types -- in general, there's two types

5    of --

6    Q    I tell you what, the next -- the next person that's going

7    to take that seat is going to talk about the fracture.  I want

8    to move on today a little bit quicker than normally.

9    A    Yes.

10   Q    And I know we've got testimony about that fracture.

11        So if you could, I want to talk about -- we talked

12   about the spondylolisthesis.

13        If somebody had this 5-millimeter anterior

14   spondylolisthesis and -- would they -- would they have no

15   symptoms whatsoever?

16   A    Rarely.  Not likely.

17   Q    The disc, how does the disc look between L5 and S1?

18   A    In the first place it's desiccated.  So...

19   Q    What does that mean?

20   A    It's dried up.  There's no nucleus pulposus.

21        So the white on a T2 MRI technique lights up anything

22   that is water or has water content.  And as you can see, the

23   spinal fluid lights up on the MRI.

24        You can see the other discs having some water content

25   because it has a jelly-like material.  But L5-S1 is dried up.

 1   It has no -- nothing is lighting up.  Plus, you can see that
 2   the posterior part of the disc is herniating towards the spinal
 3   canal.
 4   Q    Dr. Pardo, do you have an opinion as to whether that disc
 5   was injured in the motor vehicle collision?
 6   A    I think that it could have been degenerated, but the motor
 7   vehicle collision aggravated the condition.
 8   Q    Let me clear that up, then.
 9            Prior to the motor vehicle collision, is it more
10   likely than not that L5-S1 had desiccation?
11   A    It's likely, yeah.
12   Q    And then did the motor vehicle collision from February 11,
13   2017, did that do anything to aggravate the disc at L5-S1?
14   A    I believe so.
15            MS. CUNNINGHAM:  I'm going to object, Your Honor.
16   This case has never been an aggravation case.  In interrogatory
17   responses, they expressly state that there is no preexisting
18   conditions, that they're not making a case that this is an
19   aggravation case.
20            The affidavits of both physicians say there are no
21   preexisting conditions.  The pretrial statement says that.  The
22   trial brief says that.
23            THE COURT:  I'm going to stop you.  That's my
24   understanding as well, that it was very clear that it was not
25   an aggravation case.

 1          MR. KINNEY:  Yes, Your Honor.  I was actually just
 2    trying to get the information out to the Court and from
 3    Dr. Pardo.  But, yes, there are other injuries in the spine,
 4    some of which he just talked about, and I wanted to parse out
 5    the different -- the different conditions that he sees and what
 6    he's -- what he has concluded was caused from this motor
 7    vehicle collision.  That's all I was doing.
 8          THE COURT:  Well, you're going to have to deal with
 9    the testimony he gave.
10          Why don't you rephrase your question, because as
11    stated, I -- I think it's problematic.
12    BY MR. KINNEY:
13    Q    All right.  Dr. Pardo, looking at the film, is there
14    anything about the film that supports your physical exam with
15    regard to the facet joints?
16    A    Yes.
17    Q    Am I on the right image or do I need to move images?
18    A    Probably slide it up and down.
19          Yeah, there you go.  Now we can see the facet joint.
20    Q    Okay.  If you could, take that red pen and point out to us
21    where the facets are.
22    A    Sure.  They're right here (Indicates), those two posterior
23    structures.  And this is one end, one side.  I'm not sure if
24    it's left or right, but it shows enlargement of the facet.  It
25    shows that there's decreased joint space.  So most likely

1    rubbing, you know, one part of the joint to the other, and

2    causing pain.

3    Q    And between the physical examination, the subjective

4    reports of Mr. Triolo, and your review of the MRI of April 4th

5    of 2017, did you come to any opinions as to whether Mr. Triolo

6    had suffered an injury to his facet joints from the February

7    11, 2017, motor vehicle collision?

8    A    Yes.

9    Q    What is your opinion with regard to his facet joints?

10   A    That they were injured during the motor vehicle collision.

11   Q    Can you tell us which facet joints?

12   A    L3-4, L4-5, and L5-S1.

13           THE COURT:  I'm sorry, can you repeat.

14           THE WITNESS:  L3-4, L4-5, and L5-S1.

15           This is the view that also shows this spondylosis --

16   that's spondylolyses.  That's an injury also to the facet.

17   BY MR. KINNEY:

18   Q    Let me ask a question, then.

19   A    Sure.

20   Q    With the -- I know -- we'll talk about the spondylolysis

21   in just a moment.

22           With regard to the L3-4, L4-5, and L5-S1 facets that

23   you diagnosed and as being injured in the motor vehicle

24   collision, is that right-sided, left-sided, or is it bilateral?

25   A    Typically it's bilateral.  In his case, it was evident on

TRIOLO v USA                          September 23, 2020  Vol II-

1    the right side initially.

2    Q    If you could, tell us about what treatment you offered to

3    him on the first day of service.

4    A    I offered a lumbar epidural steroid injection.

5    Q    And using the spine model, could you show us what you were

6    doing.

7    A    Yes.  We identify the interlaminal foramina, which is the

8    space between one posterior lamina and the other, and we direct

9    an epidural needle under X-ray guidance to the posterior

10   epidural space, and we confirm with contrast solution, it's a

11   dye, something I can see under X-ray, that there's actually

12   flow within the epidural space, and then we follow with an

13   injection of betamethasone, cortisone, a corticosteroid, and

14   local anesthetic.

15   Q    What's the purpose of providing him with a lumbar epidural

16   injection?

17   A    Relief of his severe pain.

18   Q    What that lumbar epidural injection, would that change

19   the -- would that change the structure of how you're seeing the

20   spondylolisthesis?

21   A    No.

22   Q    What is it designed to do with regard to

23   spondylolisthesis, if it does at all?

24   A    Corticosteroids are the strongest anti-inflammatory drugs

25   we have available.  And by injecting it into the area that's

 1   causing pain, we attempt to relieve that inflammation that
 2   causes chronic pain.
 3           So the nerve roots are assumed to be impinged by the
 4   spondylolisthesis.  The facets can be inflamed because of the
 5   injury they sustained.  The disc that's being -- that is
 6   herniated, reported herniated, all of the structures in the
 7   spine can be relieved by injecting a very potent
 8   anti-inflammatory.
 9           So its -- its purpose is to decrease the
10   inflammation, because inflammation causes chronic pain as well.
11   Q    Would an epidural injection alone, will that fix his
12   problem?
13   A    Not likely.
14   Q    Will it provide temporary relief?
15   A    That's what we were attempting to do, yes.
16   Q    And you brought it up and I want to talk about the
17   spondylolisthesis.
18           Can you tell us what spondylolisthesis is?
19   A    Spondylolisthesis is the slipping forward of the vertebra,
20   and spondylolysis is a defect or fracture -- it is a fracture.
21   It's a separation of the bone at the pars.
22           And I can show you on the model.
23           Right underneath the pedicle, which is this
24   structure, behind the superior articular process, the vertebra
25   has its thinnest and narrowest point in that part of the

1    structure, the pars, and so forces can easily fracture the

2    pars.  So if there's going to be a fracture of the vertebra,

3    that's usually where it happens.

4    Q    I've seen in reports where it refers to that broken bone

5    as a pars defect.  Does that mean somebody was born with it?

6    A    Not necessarily, no.  It's a defect because the bone is

7    very thin at that point and then it fractures.

8    Q    Were you able to visualize the pars fracture on the MRI at

9    all?

10   A    Yes.

11   Q    Okay.  Could you tell me -- are we on the correct slide?

12   A    Yes, we are.

13   Q    If you could circle what you had --

14   A    Okay.  This case, I'm going to make it -- I'm attempting

15   to draw an arrow, but if you follow that line just -- so I'm

16   going to encircle it and then erase it.

17            There you go.

18            There's a thin lucency, a light -- a white line

19   between this bone and this bone down here.  I'm going to erase

20   that.

21            Maybe if I point it out?

22            THE COURT:  Yeah, it's hard to tell.

23            THE WITNESS:  Yeah, it's this lucency right here.

24   (Indicating on large overhead screen.)

25            THE COURT:  We don't -- never had anyone do that

 1   before.  I'd rather --
 2             THE WITNESS:  Rather not?
 3             THE COURT:  Yeah.
 4             THE WITNESS:  All right.
 5             Okay, the shadow will show it.  Right here.
 6             THE COURT:  Okay.
 7             THE WITNESS:  So that thin white line -- this is one
 8   facet right here.  This is a facet joint.  You can see the
 9   joint space right here.  This is another.  Way up there, that's
10   the facet joint right there.  And between the facet joint, the
11   pars is right here.  Right under this facet, the pars is right
12   here, just posterior to the nerve root.  This is the nerve root
13   and this is the foramin, and right there is the fracture.  That
14   white line that you see me pointing at, that's the separation.
15   That's a defect.
16             We call it bony defect, not because it's a defect
17   you're born with; it's a fracture.  And any fracture is
18   considered an interruption or defects in the bone continuum.
19   BY MR. KINNEY:
20   Q    Did visualizing that pars fracture, did that assist you in
21   determining what was causing his spondylolisthesis?
22   A    Correct, yes.
23   Q    What is it about the fracture that's leading to the
24   spondylolisthesis?
25   A    Well, without that pars, the vertebra has nothing stopping

 1   it from moving forward.

 2          So kind of complicated.  But if -- if -- if you

 3   separate the pars, if you have a fracture at the pars, the

 4   superior articular process, which is part of the joint that

 5   moves up, it's separated now from its vertebra.  It is that

 6   that holds the vertebra in place.  But if there's a disruption

 7   in the -- in the pars, in that narrow area, then nothing is

 8   holding the vertebra back, and it can simply -- because it's

 9   separated, it can slide forward.

10          Yeah, it's difficult to show, but, yeah,

11   unfortunately it's the L5 pars that holds it to the sacrum.

12   It's the sacrum that holds that L5 vertebra.  Once the pars is

13   separated, nothing is holding it and it's free to move forward.

14   Q    The spondylolisthesis, the fracture, do you have an

15   opinion as to whether that was caused from the motor vehicle

16   collision of February 11, 2017?

17   A    I do.

18   Q    What is your opinion how that fracture arrived?

19   A    That it happened because of the forces from the collision.

20   Q    Was that the same as what you described for the facet

21   joint and the extension motion?

22   A    Yes.

23   Q    In your opinion, was Mr. Triolo's symptoms of pain and

24   radiation -- pain in the back radiating to his leg, was that

25   being caused from the desiccation from the disc?

1   A    No.

2   Q    Was it being caused from the spondylolisthesis, the

3   fracture?

4   A    Well, the fracture leads to nerve root compression.  And

5   so the fracture itself, no.  It is the result of that slipping

6   forward, that listhesis, that causes nerve root compression.

7           I mean, the fracture can cause pain.  It's well-known

8   and we do radiofrequency ablation to relieve pain that's just

9   in the back, but you're talking about the referred pain down

10  the leg.  That's more a function of the nerve root being

11  pinched and the facet arthropathy.  They overlap their referred

12  pain path.

13  Q    All right.  And, Dr. Pardo, let's move forward and go to

14  page 15 of the note.

15          Before I do, I want to ask you a few questions.

16          Now, having -- I talked about the spondylolisthesis

17  and the spondylolysis.

18          Is there anything -- having the spondylolysis and the

19  spondylolisthesis on film, done the examination, can you tell

20  me is there anything that chiropractic care could have done to

21  fix this?

22  A    I'm not a chiropractor, but...

23          MS. CUNNINGHAM:  Your Honor, objection.  Outside the

24  scope of this witness's --

25          THE COURT:  Sustained.

```
 1            MR. KINNEY:  Fair enough.
 2   BY MR. KINNEY:
 3   Q    Doctor, hold on.  We'll move on.
 4   A    Sure.
 5            THE COURT:  Someone's phone is going off.
 6   BY MR. KINNEY:
 7   Q    Are you with me on page 15 of your chart?
 8   A    Yes.
 9   Q    All right.  Is page 15 something that you fill out or have
10   the patient fill out?
11   A    The patient filled it out.
12   Q    Okay.  When you went and saw -- excuse me.  When
13   Mr. Triolo came and saw you in follow-up, what day did he
14   follow up with you?
15   A    The second visit, you mean?
16   Q    Yes, Doctor.  We're on page 15.
17            If you want you can look at the screen in front of
18   you.
19   A    July 20th, 2017.
20   Q    Okay.  So a few days after that you gave him the lumbar
21   epidural injection?
22   A    Yeah, that's right.
23   Q    And how did he do with the lumbar epidural injection?
24   A    There was no significant relief.
25   Q    I'm sorry, I'm on the wrong page.  That's why you were
```

TRIOLO v USA                    September 23, 2020  Vol II-
112

1  looking at me funny.

2          All right.  So page 19, when was the follow-up after

3  the lumbar epidural injection?

4  A    July 20th of 2017.

5  Q    I've got it on the screen in front of you, on the computer

6  monitor.

7  A    It says August 3rd.

8  Q    Okay.  And did he report to you how he was feeling?

9  A    On -- are you talking about the visit after the epidural?

10 Q    Yes.

11 A    Okay.  That would be July 20th.

12 Q    Okay.  I got confused in my notes.  Let me go back to

13 page 15.

14         All right.  How did he report to you the lumbar

15 epidural worked?

16 A    I'm trying to find my note.

17         He reports on his pain assessment that he is -- his

18 pain was still an 8 over 10, that there was lower back pain

19 down into the gluteus, the lower hamstring, and across the

20 right hip flexor.

21         So no significant relief.  It was the same.  He

22 encircled the pain as -- described as the same.

23 Q    If you could, go to page 16.  I've got it pulled up on the

24 computer monitor as well.

25 A    Yeah.

1    Q    Okay.  So what date is the next procedure?

2    A    July 20th.

3    Q    What type of procedure did you do on July 20th?

4    A    Prognostic medial branch nerve block.

5    Q    And what is a prognostic medial nerve block?

6    A    It's a nerve block with local anesthetic to take the

7    sensation away from the facet joints.

8    Q    And is it a permanent treatment?

9    A    No.

10   Q    Why not?

11   A    It's a diagnostic treatment using local anesthetic.

12   2 percent lidocaine, similar to what a dentist would use.

13   You're numb four to six hours and then it wears off.

14   Q    What's the most that somebody might get benefit out of a

15   nerve block?

16   A    A week maybe, at the most.

17   Q    And what's the reason why you would do that to only get

18   maybe up to a week of relief?

19   A    Just to assess -- it's usually just a few hours.  Just to

20   confirm the diagnosis of facet arthropathy as the main pain

21   generator.

22   Q    So you gave him the medial branch block at what levels?

23   A    Well, the nerves of L2, L3, L4, and L5, and that blocks

24   the three joints, the bottom joints, L3-4, L4-5, and L5-S1.

25   Q    And did you do that on the right side or the left side?

1    A    On the right side only.

2    Q    If you could, turn to -- not his individual written

3    follow-up, page 19, but I want to discuss page 20.

4    A    Yes.

5    Q    What was the result of the medial branch block on the

6    right side from July 20th?

7    A    He reported no significant relief of his paralumbar and

8    right lower extremity pain on the date of the procedure.

9    Q    What did that indicate to you as far as the source of his

10   pain going into his right leg, then, since the medial branch

11   block didn't give him any relief?

12   A    That there was another area causing the majority of the

13   pain.

14   Q    Did that cause you to refer back to the spondylolysis?

15   A    Yes, and listhesis and nerve root compression.

16   Q    Did you -- turning to page 22, did you begin a course of

17   prescriptive medications for Mr. Triolo?

18   A    Yes.

19   Q    What medications did you prescribe?

20   A    I gave him an anti-inflammatory, Diclofenac; Doxepin is a

21   tricyclic antidepressant we use to modify the pain perception;

22   Norco is hydrocodone, a very mild narcotic pain reliever; and

23   the Zanaflex is tizanidine.  It's a muscle relaxer.

24   Q    Were these medications given to him for his injuries to

25   his lumbar spine or his cervical spine or both?

TRIOLO v USA                    September 23, 2020  Vol II-
115

1    A    Both.

2    Q    If you could, turn to page 23.

3          And what's going on on August 11th of 2017?

4    A    We went ahead and did a transforaminal steroid injection.

5    That's an injection of corticosteroids into the nerve root on

6    the right side of L5.

7    Q    What's different between this injection and the lumbar

8    epidural steroid injection you did originally?

9    A    This is one-sided, so it deposits all of the medication to

10   the affected side, and it's closer to the nerve root and the

11   disc that's herniated.

12   Q    Does it have anti-inflammatory components to it, that

13   treatment, that you discussed earlier when you were doing the

14   epidural?

15   A    Yes.  It has that corticosteroid that's the most potent

16   anti-inflammatory, and attempts to deliver it right at the

17   suspected source of pain.

18   Q    All right.  If you could, turn to page 26.

19          And on page 26, do you see where -- right after you

20   record he underwent a transforaminal -- right after that, it

21   says:  He reports.

22          What did he report to you after having the

23   transforaminal steroid injection at L5?

24   A    He reported having increased pain intensity after the

25   procedure.  There was worse pain referred to the right lower

 1  extremity.  And after a few days, the pain went back to its

 2  normal intensity or its prior intensity.

 3  Q    Would that indicate to you that one of your procedures

 4  elevated his pain?

 5  A    It most likely was an increased compression of the nerve

 6  root.  So there's very minimal space in the foramina and in the

 7  central spinal canal, injecting fluid right next to the nerve

 8  root can compress it even further.

 9  Q    The next note, beginning at page 26, this is a note from

10  August 21, 2017.

11            Do you see that?

12  A    Yes.

13  Q    Is this essentially a follow-up?

14  A    Yes, it is.

15  Q    If you would, turn two pages, to the last page of the

16  note, page 28.

17            And it appears that there was a change in his

18  medications.

19  A    Yes.

20  Q    What was the change?

21  A    We added another narcotic painkiller, Arymo Extended

22  Release.  So it's an extended-release morphine sulfate.  Lasts

23  12 hours.  So he was going to take one every 12 hours so that

24  he could have extended release opioid throughout the 24-hour

25  day.

1   Q    Okay.  And was this a higher level of narcotic pain

2   medication?

3   A    Yes.

4   Q    Okay.  And why is it that you felt you needed to elevate

5   the pain medication at this point?

6   A    Because he needed relief.  He was in a lot of pain.

7   Q    All right.  Do you remember at one point referring him for

8   surgical evaluation?

9   A    Yes.

10  Q    And if you want, you can go to page 1 of your chart.  If

11  you can turn to page 1 of your chart, if you'd like to.

12          Did you initially refer Mr. Triolo to Dr. Dean

13  Toumbis?

14  A    Yes.

15  Q    And did you receive any reports back from your patient

16  as -- in follow-up to his evaluation with Dr. Toumbis?

17  A    I believe he recommended doing surgery, doing a procedure,

18  a surgical procedure.

19  Q    Do you recall whether or not at that point in time

20  Mr. Triolo was prepared to have his back fused?

21          MS. CUNNINGHAM:  Objection.  Leading.

22          THE COURT:  Overruled.

23          THE WITNESS:  I believe he -- he -- he stated that he

24  was considering having it done.

25  BY MR. KINNEY:

1  Q    Do you remember having to refer him out for a second

2  opinion?

3  A    Yes.

4  Q    Okay.  And do you know whether you referred Mr. Triolo to

5  Dr. Topp at Topp Spine?

6  A    I did.  I'm sorry, yes, I did.

7  Q    There's a note in here that once an evaluation was

8  performed and recommended for surgery, that you would no longer

9  provide interventional pain management.  Why is that?

10  A    We -- I wanted to see -- I wanted him to go -- it was

11  pretty well established that surgery was going to be the next

12  step.  So we treated him medically instead of doing further

13  procedures.

14        I had already done -- I had already injected

15  cortisone into the area, the affected area, and I had already

16  done a block to the facets, and they were both negative in

17  terms of providing any relief.  So I felt that the injury was

18  severe enough that it needed that surgical approach.

19  Q    If you would, jump forward in your records, and we're

20  basically moving forward to July 5th, 2018, page 77.

21        And this is approximately three or four months after

22  the surgery to the lumbar spine.

23        If you're on page 77, what is it that you were doing

24  on this day?

25  A    A transforaminal steroid injection.

TRIOLO v USA                    September 23, 2020  Vol II-
119

1   Q    Prior, you were doing injections on the right side or

2   focused on injections on the right side, excuse me.

3        In this one, it's now at the same level but on the

4   left side.

5   A    Correct.

6   Q    Why is that?

7   A    After he underwent the lumbar fusion, Mr. Triolo developed

8   pain on his left side.  He stated that the procedure, the

9   surgical procedure, intervertebral fusion, provided complete

10  relief of his right side pain, the original pain, and that

11  it -- it had now -- he had now developed pain on the left side,

12  left side of his lower back, left paralumbar area, and was also

13  being referred down the left leg.

14  Q    When you said -- by complete relief, you mean complete

15  relief of his right-side pain, you're talking about the right

16  side of the back or the right pain shooting down his leg?

17  A    Well, the right side of his back and the right leg,

18  approximately, because it always went down to knee level.

19  Q    Then on this day, on July 5th, 2018, you did a

20  transforaminal on the left side, and if you could, turn to the

21  next page, page 58 -- 78, thank you.  78.

22        So when you're doing your interventional procedures,

23  you had live X-ray?

24  A    Yes.

25  Q    And why do you have live X-ray?

1   A    It would be impossible to place the needle into the lumbar

2   foramina without X-ray guidance and just blindly...

3   Q    I don't want to spend a lot of time on this because we

4   have another doctor coming to talk about this, but when you did

5   the live X-ray, did you see the surgical site?

6   A    Yes.

7   Q    And looking at this screen in front of you, what is that?

8   What do you see there?

9   A    Yeah.  You can see the screw going into the vertebral body

10  and the rod that connects the L5 to the S1 screw.

11  Q    All right.  Jumping forward, you -- on page 96 there's

12  another interventional procedure.

13        And what's the date of this procedure, doctor?

14  A    October 17, 2018.

15  Q    Okay.  You tried the transforaminal injection on the left

16  side.  This time what are you trying?

17  A    I'm trying to block the facet joints.  I'm trying to now

18  assess if the pain that Mr. Triolo has developed on the left

19  side is coming from the facet joints.

20  Q    And how did he respond to the medial branch block that you

21  did on the left side?

22  A    I believe it was a complete relief.  I'm trying to --

23  moving forward on to the note of 10-25, the follow-up, and he

24  reports complete relief of his lumbar axial pain for the rest

25  of that procedure day.

1   Q    Was that -- again, like you had testified earlier, was

2   that designed to last more than a day, or should it have lasted

3   longer?

4   A    No.  It's designed to just last -- if it's going to be

5   positive, it's at least going to be four to six hours.  And it

6   has to be better than 50 percent relief for it to be considered

7   positive.

8   Q    Now, in your note, Doctor, you write down:  He reports

9   complete relief of his lumbar axial pain for the rest of that

10  procedure day.

11        What's the axial pain?

12  A    The pain in his back, the lumbar spine midline, maybe the

13  sacrum, but not the leg.

14  Q    Not the leg.

15        Okay.  Having given him this prognostic block, what

16  did that mean to you?  What did that tell you?

17  A    That the pain was coming from the facet joint.  The left

18  side of the facet joints were a major pain generator.

19  Q    And if you'd turn to page 101 in the plan of care, did you

20  recommend going forward with a second medial branch nerve block

21  on the left side?

22  A    Correct.  That's the standard of care, two positive

23  prognostic blocks.

24  Q    You anticipated what I was going to ask you.

25        And did you do a second medial branch block?

1    A    Yes.

2    Q    Did you do that on October 25, 2018?

3    A    Yes.

4    Q    And if you turn to page 106.  When you met with him on

5    November 8, 2018, what did he report to you as far as relief

6    from that second medial branch block on the left side?

7    A    He reports obtaining near complete relief again.  So both

8    procedures were positive.

9    Q    Did that allow you to make any conclusions about

10   Mr. Triolo's condition?

11   A    Yes.

12   Q    Okay.  What conclusions did you arrive at?

13   A    That the facet injury was one of the principal or main

14   pain generators.

15   Q    Did it allow you to identify the level that the facet --

16   that are injured?

17   A    Yes.  Because I blocked those three joints.

18   Q    Is that 3-4, 4-5?

19   A    And 5-S1.

20   Q    5-S1?

21   A    Yes.

22   Q    Dr. Pardo, if you could, turn to page 108.

23        All right.  First, tell us what is a radiofrequency

24   ablation?  What does that do?

25   A    It exposes the medial branch nerve to radiofrequency

1  energy.

2  Q    And were you doing that to attack the injury at the facet

3  joints?

4  A    His lumbar facet joints.  Yeah, we -- it's an attempt to

5  desensitize the joints.

6  Q    What actually happens to the nerves when you do that

7  procedure?

8  A    By exposing them to radiofrequency energy at a temperature

9  of 80 degrees, it coagulates or strips the myelin sheath from

10  the exterior of the nerve.

11  Q    Is the myelin sheath the outer layer of the nerve?

12  A    Yes.

13  Q    Is that going to be a permanent treatment, then?  Once you

14  have one, you don't ever need one again?

15  A    No.

16  Q    Why is that?

17  A    The myelin regenerates in about 6 to 12 months in most

18  patients.  In the elderly it may last up to 18 months.  The

19  relief will last 18 months because it takes that long for the

20  myelin to regenerate.  But in most patients in Mr. Triolo's age

21  group, it would be about six months to a year.

22  Q    All right.  Did you perform a radiofrequency ablation on

23  November 8, 2018?

24  A    Yes.

25  Q    And did you do it at the same level that you tested with

TRIOLO v USA                    September 23, 2020  Vol II-
124

1    the medial branch block?

2    A    Yes.

3    Q    All right.  If you could, turn to page 117.  Actually --

4    yep, go to page 117.

5              All right.  What was it that he reported to you as

6    far as the results from the radiofrequency ablation procedure

7    that you did on the left side on the prior -- on the prior

8    visit?

9    A    The patient reported significant relief of his left

10   paralumbar and parasacral pain with relief from the radicular

11   symptoms to the left side.

12   Q    Were you expecting to get relief from the radicular

13   symptoms at that point?

14   A    I was expecting to at least get relief to the areas where

15   facet joints refer their pain to, which is the buttock, hip,

16   and thigh.  And we did.

17   Q    Did this mean that Mr. Triolo was pain-free in all areas

18   of his lumbar spine?

19   A    At this point, there had been significant relief.  He

20   reported significant decrease in his pain intensity.

21   Q    So if you'll notice -- if you'll notice, on page 116, one

22   page prior, Mr. Triolo circled 8 or 9, or actually both, for

23   his pain.  Do you know why he circled 8/9 on his pain?

24   A    No, I'm not sure.

25   Q    And when you recorded that he had significant relief, was

1   that from your meeting face to face with him?

2   A    Yes.

3   Q    Okay.  And do you know what else -- looking through your

4   notes, what else could have been in pain at this point?

5   A    Well, he does state at the end --

6        MS. CUNNINGHAM:  Objection.  Objection.  Calls for

7   speculation.

8        THE COURT:  Yeah, I mean, I think we'll have to look

9   at what the record is.  I'm not quite sure I see how he can

10  answer that question.

11  BY MR. KINNEY:

12  Q    Doctor, would you refer to the last line of your history

13  of present illness.

14  A    The patient complains of slight right lumbar pain.

15  Q    Does it appear that initially you addressed the right; the

16  right gets addressed with surgery and medications, and then you

17  switch -- you're now on the left side?

18  A    Should be the left side.

19  Q    Traded off?

20  A    Yes.

21  Q    Having now addressed the left, what happens with the

22  right?

23  A    Yeah.  Typically the brain focuses on the area of most

24  intense pain.  So that's my belief, that initially it was that

25  spondylolisthesis and lysis that we discussed earlier, and

 1  nerve root compression that needed to be relieved.  The
 2  surgery, the lumbar fusion, repaired that defect, that injury.
 3         The facet arthropathy can typically occur following
 4  an injury, an auto accident, and then can be aggravated or made
 5  worse by lumbar fusion.
 6         The areas above and below the fusion are usually
 7  having to be overworked following a lumbar fusion.  So facet
 8  arthropathy and sacroiliitis are typically other conditions
 9  that develop as a result of a fusion.
10         And being that he had post-operative pain on the left
11  side, my diagnosis was that it was an injury that had been --
12  an additional injury to the facet joint.  So there was an
13  initial injury to the joints, and then the surgery aggravated
14  the facets, and that was confirmed by positive prognostic
15  blocks and confirmed also by the radiofrequency on the left
16  side.  He obtained relief.
17         So if you treat the facets on the left side, most
18  likely now this new right-sided pain was also facet in
19  source -- as a source.
20  Q    When you do the procedure, the radiofrequency ablation --
21         THE COURT:  I'm going to say this again.
22         MS. CUNNINGHAM:  I know.  I'm sorry, Your Honor.
23         THE COURT:  Ms. Cunningham, if you stand up -- if you
24  want to be heard, you have to speak.  I'm not going to
25  interrupt the witness.  If you want to be heard, you have to

1    interrupt the witness.

2              MS. CUNNINGHAM:  I know, Your Honor.  I apologize.

3              THE COURT:  So, wait -- what?

4              MS. CUNNINGHAM:  In part, I was waiting to see if

5    there was something particular said and it was never quite

6    said, so I will -- my objection is the extent that there's a

7    new opinion being offered about a new injury that wasn't

8    previously disclosed, that also was outside the scope of the

9    expert disclosure.

10             MR. KINNEY:  Your Honor, he didn't testify to a new

11   opinion.  He's describing the same L5-S1, the same levels for

12   the facet joints, and chasing it back and forth before and

13   after the surgery.

14             My next question is, on the next note, both to clear

15   up why I'm asking him -- well, my next -- very next question

16   was:  Can these procedures be painful in and of themselves?

17   And you'll see on the next note where this is all leading.

18             THE COURT:  All right.  I'm going to --

19             MR. KINNEY:  There's no new injury that he's

20   testified to.

21             THE COURT:  I will review the -- I'm trying to look

22   at the -- I think that, if I understand the objection, the

23   objection is whether the opinions about the left-sided injury

24   are new opinions, and I'm going to have to look back at the

25   expert disclosure.

1        I'll allow the inquiry for the moment, but I will --

2    it's subject to me determining whether it was encompassed

3    within his expert disclosure.

4    BY MR. KINNEY:

5    Q    Dr. Pardo, does the radiofrequency ablation procedure, in

6    and of itself, does that cause the patient discomfort or pain?

7    A    Light discomfort for a few days.

8    Q    All right.  And if you could, turn to the next section,

9    the next note, page 119.

10   A    Yes.

11   Q    Dr. Pardo, how did he do when he came back and reported on

12   January 22nd, 2019?

13   A    Much better.

14   Q    And if you could, tell us what your reports were on that

15   same visit from -- on page 120.

16   A    I stated that he reported feeling much better.  Rated his

17   low-back pain at a 2 over 10 on the visual analogue score, and

18   he had improved range of motion.

19        THE COURT:  Can you make sure to pull that

20   microphone.

21        THE WITNESS:  So he reported much better, feeling

22   much better.  His back pain had been reduced to an intensity of

23   2 over 10 on the visual analogue score, and he had improved

24   range of motion.

25   BY MR. KINNEY:

TRIOLO v USA                    September 23, 2020  Vol II-
129

1  Q    Okay.  And was this the best report that he had given

2  since he had been in your practice?

3  A    Yes.

4  Q    If you could, turn to the next page, page 121, under the

5  care plan.

6           What are you recommending on January 22, 2019?

7  A    Radiofrequency on the right side for the facet joints.

8  Q    Why is that?

9  A    The examination showed that there was tenderness on the

10 right side of the posterior lateral structures, and it made

11 sense to just go ahead and do radiofrequency on the right side

12 as well.

13          It's -- it's my -- my diagnosis at that point that

14 the pain he was exhibiting on the right side was also due to

15 the facet joint injury.

16 Q    All right.  He comes to see you again on March 28, 2019.

17 It's page 128.

18          Are you with me?

19 A    Yes.

20 Q    So this is almost five months after the left RFA.  How are

21 things going for him now that it's five months after the

22 left-side RFA?

23 A    He reports left and right lower back pain, and left

24 radiation down into the hamstring.

25 Q    What is this indicating to you five months after the RFA

1   on the left side?

2   A    That the injury is -- that pain from the facet joints are

3   Recurring.

4   Q    And did you -- on April 1, page 132, did you do another

5   RFA?

6   A    Yes.

7           THE COURT:  Sorry, I missed the page.

8           MR. KINNEY:  I'm sorry, the chart note actually will

9   be at 133.

10  BY MR. KINNEY:

11  Q    On 133, that's your chart note; correct?

12  A    Yes.

13  Q    And did you document why you wanted to proceed with a

14  right-sided lumbar radiofrequency procedure?

15  A    Everything -- physical and exam both were consistent with

16  lumbar facet arthropathy, so I recommended proceeding with

17  another ablation.

18  Q    Did you do -- turning to page 135, did you do a right-side

19  lumbar radiofrequency ablation?

20  A    Yes.

21  Q    Same levels as before?

22  A    Well, this was on the right side.

23  Q    Yes, but at the same level?

24  A    The same levels as on the left side, yes.

25  Q    If you would turn to page 140.

TRIOLO v USA                    September 23, 2020  Vol II-
131

1           Again, we're looking at Mr. Triolo's self-report.
2   And he indicates lower left back pain, and you've just done the
3   right-side RFA.  Indicates:  Lower left back, radiating down
4   into the calf.
5           Did he make any indication that he was having
6   right-sided pain on his self-report sheet?
7   A    No.
8   Q    And then if you turn to your note, the next page, 141, how
9   did he do?
10  A    He reports near complete relief of the lumbar pain on the
11  right side.
12  Q    And if you go to the second-to-last line of your history
13  of present illness, the patient reports recurrence; do you see
14  that?
15  A    Yes.
16  Q    Okay.  What did you record as far as the regeneration of
17  nerves on the left side?
18  A    That most likely there had been regeneration and that we
19  should go ahead with repeat radiofrequency ablation.
20  Q    On April 29th, did you do a procedure at page 143?
21  A    Yes.
22  Q    Okay.  Did you do a procedure at the same levels but on
23  the left side this time?
24  A    Yes.
25  Q    And if you could, on May 28th, 2019, you met with him, at

1    page 145?

2    A    Okay.

3    Q    What did he rate his pain for the lower back after

4    going -- undergoing the RFA?  Was it after undergoing the

5    bilateral lumbar RFA?

6    A    Yes.  The pain was rated 6 over 10.

7    Q    Was that a level of relief that was acceptable?

8    A    No.

9    Q    Did you continue to provide Mr. Triolo with pain

10   management medications?

11   A    Yes.

12   Q    Throughout this time?

13   A    Yes, I did.

14   Q    And on -- if you could, go to page 155.

15   A    I can tell you that we had already discontinued the

16   morphine at that point.

17   Q    Thank you.  But was he continuing on with the Percocet?

18   A    Yes.

19   Q    Page 155 starts with the chart note of the self-report.

20        And then page 156, did you order a new lumbar MRI?

21   A    Yes.

22   Q    Why did you order a new lumbar MRI?

23   A    He had undergone the fusion, and there were still symptoms

24   of radiculopathy down the leg.  I wanted to know if the image

25   would show a new injury, either a new herniated disc above the

TRIOLO v USA                    September 23, 2020  Vol II-

1    fusion, or the condition of the fusion itself, to determine

2    whether there was something pressing against the nerve root on

3    the left side now.

4    Q    Okay.  And turning to page 157, did you note in your chart

5    whether the new lumbar MRI of August 14, 2019, had anything

6    significant?

7              MS. CUNNINGHAM:  Your Honor, I'm going to object to

8    the extent that this is attempting to elicit a new opinion that

9    was not disclosed in the expert's report.

10             THE COURT:  So noted.  Go ahead.

11             THE WITNESS:  The prior fusion was seen on the MRI

12   without the stenosis or narrowing.  A shallower posterior disc

13   herniation was seen.  There is high-signal annular fissure.

14   That simply means there is still disc material at the L5-S1

15   level.

16   BY MR. KINNEY:

17   Q    Did that indicate to you -- seeing that, did that indicate

18   to you that he did not have an injury to his facet joints that

19   you had been treating?

20   A    No.

21   Q    Seeing -- in other words, seeing this at the level he

22   actually had the fusion at --

23   A    Right.

24   Q    -- there's now an MRI that you've gotten that shows that

25   there's herniated material there?

1    A    Right.

2    Q    Okay.  Did that take away your diagnosis that he had

3    suffered injuries to his facet joints of the lumbar spine?

4    A    No, no.  It does not exclude facet arthropathy.

5    Q    I want to skip ahead a little bit.

6         Okay.  If you could go to your op note, page 170.

7         On this day, what did you -- kind of interventional

8    treatment did you provide to him?

9    A    We did a radiofrequency ablation on the left side.

10   Q    And what was that there to address?

11   A    The facet arthropathy.

12   Q    And, if you could, go to the most recent procedure you did

13   for him.

14   A    That was September.

15        MS. CUNNINGHAM:  Your Honor, objection to this

16   record.  It was provided -- this is the third procedure done on

17   September 14th, and the records were provided to us a day or so

18   after that, so this is from last week.  It's postdated the

19   period of time that the Court already had ruled on about the

20   records that were permitted to come in after the end of

21   April 2019.

22        MR. KINNEY:  Your Honor, we addressed it in pretrial

23   that Mr. Triolo was a life-long pain management patient, would

24   continue to have the same treatments that were established in

25   his prior medical records, and was demonstrated in his life

TRIOLO v USA                      September 23, 2020  Vol II-
135

```
 1    care plan that he was predicted to have.
 2              THE COURT:  I think I overruled the objections at the
 3    pretrial, so go ahead.
 4              Although, Mr. Kinney, we've been going about
 5    two hours with this witness.
 6              MR. KINNEY:  Have we really?
 7              THE COURT:  Yeah, we really have.  And that's despite
 8    losing 20 minutes, so move along, please.
 9    BY MR. KINNEY:
10    Q    So August -- I'm sorry, November 14, 2020, did you provide
11    Mr. Triolo with another procedure?
12    A    Yes, I did.
13    Q    And what type of procedure was this one?
14    A    It's a lumbar radiofrequency ablation.
15    Q    And did you do it on the left side or the right side?
16    A    Left side.
17    Q    And was it to provide the same type of relief that you had
18    done these procedures for in the past?
19    A    Yes.
20    Q    And do you continue to recommend that Mr. Triolo continue
21    to have lumbar radiofrequency ablation procedures on an annual
22    basis going forward?
23    A    Yes.
24    Q    Dr. Pardo, do you have an opinion as to whether Mr. Triolo
25    should continue to have these lumbar radiofrequency ablation
```

1  procedures at least one time per year for the rest of his life?

2  A    Yes.

3  Q    All right.  Doctor, what is it -- do you have an

4  opinion -- strike that.

5          Do you have opinions as to whether Mr. Triolo

6  suffered any injuries to his lumbar spine from the motor

7  vehicle collision of February 11th, 2017?

8  A    Yes, I have an opinion.

9  Q    What injuries is it your opinion, within -- based upon a

10 reasonable degree of medical probability, what injuries did he

11 suffer from that collision?

12 A    He suffered injury to his facet joints, facet joint

13 arthropathy; suffered an injury to his pars interarticularis

14 spondylolysis, that resulted in spondylolisthesis of L5-S1; and

15 developed herniated disc protrusion at L5-S1; that compressed

16 the L5 nerve root on the right side, which needed the inter --

17 the posterior lumbar fusion.

18 Q    Okay.  The facet joint injuries, is that bilateral?

19 A    Yes.

20 Q    Okay.  Are those permanent injuries, within a reasonable

21 degree of medical probability?

22 A    Yes, they are.

23 Q    The spondylolisthesis, is that also a permanent injury,

24 within a reasonable degree of medical probability?

25 A    The spondylolysis, which is the fracture, is, and the

 1  listhesis, which is the slipping forward, is fused now.  So

 2  it's an attempt to keep it from slipping forward any further.

 3  Q    Is the fracture of the pars a permanent injury, within a

 4  reasonable degree of medical probability?

 5  A    Yes, sir.

 6  Q    And the slipping forward of the disc, was that addressed

 7  in -- as part of the surgery?

 8  A    Yes.

 9  Q    Is that spondylolisthesis a permanent injury, within a

10  reasonable degree of medical probability?

11  A    Yes.

12  Q    All right.  What is the basis for you testifying that he

13  suffered these injuries from the motor vehicle collision of

14  February 11th, 2017?

15  A    What is the basis?  My medical expertise in the area.

16  Q    What did you consider -- what did you consider before

17  arriving at these opinions?

18  A    I considered that he needed the treatment that we -- you

19  know, that we did, forward, throughout.

20  Q    Did you consider his history, his medical history, prior

21  to the motor vehicle collision of February 11, 2017?

22  A    No.

23  Q    Okay.  Did you consider the medical history as he related

24  it to you on his initial visit when he came to see you in July

25  of 2017?

1    A    Yes, I did.

2    Q    All right.  Did you consider your physical examinations of

3    him during the initial and subsequent visits?

4    A    Yes, I did.

5    Q    Did you also consider the lumbar MRI that -- from

6    April 4th of 2017 from Baymeadows MRI?

7    A    Yes.

8    Q    Did you consider his responses to your treatment?

9    A    Yes.

10   Q    Did you consider his response to the surgery?

11   A    Yes.

12   Q    Did you consider his responses to the medications that you

13   prescribed?

14   A    Yes.

15   Q    Did you consider his -- his continuing subjective

16   complaints throughout the course of your treatment of three and

17   a half years at this point?

18   A    Yes, I did.

19   Q    Dr. Pardo, did you speak with our retained expert, Mr. Gil

20   Spruance?

21   A    I did.

22   Q    And Dr. Spruance prepared a life care plan and references

23   you as the source of the recommended treatment.  And I'm going

24   to ask you about the recommendations.

25            Dr. Pardo, within a reasonable degree of medical

TRIOLO v USA                    September 23, 2020  Vol II-
139

1   probability, are you of the opinion as to whether Mr. Triolo

2   should have available to him 12 office visits with you or some

3   pain management doctor?

4   A    Yes.

5   Q    Is that for the rest of his life?

6   A    Yes, as long as he's taking opioid pain medication, he

7   needs to be evaluated monthly.

8   Q    Dr. Pardo, are you recommending that he submit to urine

9   drug screenings four to six times annually?

10  A    Yes.

11  Q    And is that for the rest of his life?

12  A    As long as he's taking opioids, yes.

13  Q    Dr. Pardo, are you recommending that he have available to

14  him 45 pills of oxycodone/acetaminophen -- that's the Percocet;

15  right?

16  A    Yes, yes.

17  Q    Are you recommending that he have the

18  oxycodone/acetaminophen, 45 pills available to him on a monthly

19  basis?

20  A    Yes.

21  Q    And is that the rest of his life?

22  A    Most likely.

23  Q    Are you recommending, Dr. Pardo, that he have available to

24  him a bilateral three-level lumbar radiofrequency ablation at

25  least one time annually?

```
 1   A    Yes.
 2   Q    And, again, is that for the rest of his life?
 3   A    Yes.
 4   Q    Dr. Pardo, are all the opinions -- actually, I had one
 5   more.
 6            Can you pull Exhibit 26 -- Exhibit 26 out of the
 7   folder.
 8            Do you have Exhibit 26?
 9   A    Yes.
10   Q    And you're welcome to flip through it.
11            Do you recognize Exhibit 26?
12   A    I have one page.
13   Q    I can give you mine.
14            Dr. Pardo, do you recognize Exhibit 26?
15   A    Yes.
16   Q    And do you personally do the data entry billing at your
17   office?
18   A    No.
19            MS. CUNNINGHAM:  Pardon me.  Just for the sake of
20   correcting the record, are you asking about Plaintiff's
21   Exhibit 26 or Plaintiff's Exhibit 28?
22            MR. KINNEY:  It should be the bill.  Did I give you
23   the wrong number?
24            Exhibit 28.
25            THE COURT:  Yeah, 28.
```

 1   BY MR. KINNEY:

 2   Q    You've got Exhibit 28 in front of you?

 3   A    Yes, I do.

 4   Q    Dr. Pardo, I know you -- do you personally do the data

 5   entry that creates the bills in your office?

 6   A    No.

 7   Q    Do you provide the information to your staff that informs

 8   the staff what services you provided, what treatments you've

 9   given?

10   A    Yes, I do.

11   Q    Okay.  And in reviewing Exhibit 28, are all of those items

12   listed on there for treatment that was provided to Mr. Triolo

13   for injuries related to the motor vehicle collision of February

14   11th, 2017?

15   A    Yes.

16   Q    Dr. Pardo, have all of the opinions that you've given

17   today, have they been based upon a reasonable degree of medical

18   probability?

19   A    Yes.

20           MR. KINNEY:  Thank you, Your Honor.

21           THE COURT:  All right.  It's 12:25.  We will break

22   until 1:30 and we will continue with the cross-examination of

23   Dr. Pardo.

24           COURT SECURITY OFFICER:  All rise.

25           (Recess taken, 12:25 p.m. -  1:38 p.m.)

1           COURT SECURITY OFFICER:  All rise.  This Honorable

2    Court is now in session.

3           Please be seated.

4           THE COURT:  All right.  Next witness.

5           I'm sorry.  Cross-examine Dr. Pardo.

6           MS. CUNNINGHAM:  Before Dr. Pardo takes the stand,

7    there is a defendant's exhibit with some of Dr. Pardo's medical

8    records as well.  It is Defendant's Exhibit 20.  It was

9    stipulated as to all but the last two pages.  There is a

10   relevance objection to the last two pages.

11          One of those pages has a driver's license.  We will

12   be happy to redact that in line with the Court's order

13   yesterday on the other exhibits.

14          The last page is simply a copy of Mr. Triolo's Blue

15   Cross Blue Shield insurance card, and I would ask that that be

16   left in the record as it is relevant for the reasons we've

17   already discussed.

18          THE COURT:  I mean, are you going to be introducing

19   any additional information about the fact that he has Blue

20   Cross Blue Shield?  Is there any information on the card, like

21   the plan, that you're going to tell us something about?

22          MS. CUNNINGHAM:  No, there is not, Your Honor.

23          THE COURT:  So it doesn't -- it was only there --

24          MS. CUNNINGHAM:  Only because it's the doctor's

25   record, his own -- it was in the record that came from the

TRIOLO v USA                    September 23, 2020  Vol II-
143

1   doctor's medical office.  That's the only reason for leaving it

2   in.

3           THE COURT:  I don't -- oh, I guess because I'm

4   looking at the plaintiff's exhibit, I don't have it.

5           So you had moved -- you moved in Dr. Pardo's records

6   as your exhibit what?

7           MS. CUNNINGHAM:  So we have not yet moved it in.  I

8   am seeking to move it in as Defendant's Exhibit 20.

9           THE COURT:  Okay.  And, Mr. Kinney, you want to -- so

10  that there's -- you-all are agreed as to the driver's license.

11          Let me hear from you as to the other matter.

12          MR. KINNEY:  Yes, Your Honor.  I do continue to have

13  grave concerns about bringing in collateral sources into this

14  trial.  I understand the Court's prior ruling.  I do think

15  continuing to do so will continue to affect the trial.

16          I heard the Court's ruling earlier.  I still have the

17  same objections about bringing in the collateral sources into

18  this trial.

19          THE COURT:  All right.  I'll tell you, Mr. Kinney, I

20  looked at the cases that Ms. Cunningham cited, and they do

21  appear to support the admissibility of that information.  So...

22          MR. KINNEY:  Yes, Your Honor.

23          But there were stark differences.  There's nothing on

24  that exhibit list of theirs or any expert witness or any

25  witness that's going to come in and testify as to all the

1   things that I talked about before, whether it's covered,
2   whether they're in network, whether the terms allow for the
3   procedures, whether they would except or reject having it, how
4   much it would cost him, what the price list is.  None of that
5   is going to come into trial.  It's just this grandiose position
6   of:  Well, there's insurance that must pay for it, therefore
7   the bills are unreasonable.
8            THE COURT:  No, I think that all goes to the weight
9   of the evidence.
10           And you're free to argue all of those things with
11  regard to how the Court considers it, but I don't think it -- I
12  don't think it supports inadmissibility, and I've -- well, I'm
13  not even going to go back to the mistrial issue.
14           All right.  It is -- well, I will say this.  It is
15  routine in a bench trial that the Court hears evidence that it
16  ultimately determines is not admissible and doesn't consider.
17  I don't think I've ever seen a suggestion that that's
18  appropriate for a mistrial.
19           A mistrial usually addresses other information that's
20  presented to the jury.  But certainly if I determine later that
21  the information is not admissible or that it shouldn't be given
22  any weight, I won't consider it.
23           As to whether we need the Blue Cross Blue Shield
24  card, we don't.  We've got -- we have the evidence that he's
25  covered by Blue Cross Blue Shield.

1          I'll admit the exhibit -- and, I'm sorry, tell me the

2    number, defendant's?

3               MS. CUNNINGHAM:  Defendant's Exhibit 20, Your Honor.

4               THE COURT:  Defendant's Exhibit 20, as stipulated, is

5    admitted.

6          (Defendant's Exhibit 20 admitted in evidence.)

7               MS. CUNNINGHAM:  All right.  Thank you, Your Honor.

8               THE COURT:  Dr. Pardo, would you please come up and

9    you can remove your mask once you're seated at the witness

10   stand.

11              MS. CUNNINGHAM:  Thank you, Your Honor.

12                          CROSS-EXAMINATION

13   BY MS. CUNNINGHAM:

14   Q    Good afternoon, Dr. Pardo.

15   A    Good afternoon.

16   Q    All right.  So I'd like to start with talking a little bit

17   about some of the prescription medications that Mr. Triolo was

18   prescribed.  Okay?

19   A    (Nods head.)

20   Q    For a period of time, you were prescribing both

21   hydrocodone and the extended release morphine; correct?

22   A    Correct.

23   Q    Do you send prescriptions directly to a patient's pharmacy

24   or do you give them a hard copy of the prescription?

25   A    We very recently started e-prescribing, so at the time we

1    began treating Mr. Triolo, they were all hard copies given to
2    the patient.
3    Q    Okay.  Do you require the patient to report to you the
4    pharmacy that they are using?
5    A    No.
6    Q    Are you familiar with the E-FORCSE® database, which is
7    also known as the Florida Prescription Drug Monitoring Program?
8    A    Yes.
9    Q    Just very briefly, what is that, sir?
10   A    It's a database, state database, that pharmacies are
11   required to enter any controlled substance information into
12   that database.
13   Q    Okay.  And that database also exists so providers can
14   ensure that their patients are filling prescriptions; correct?
15   A    Yes.
16   Q    Have you ever checked that database with respect to
17   Mr. Triolo?
18   A    Yes, many times.
19   Q    Okay.  Do you save records of those checks when you do
20   that?  I mean, is that something that becomes part of his
21   medical records?
22   A    No.
23   Q    Okay.  All right.  When patients come to your practice,
24   they fill out a form asking about their pain that day; right?
25   A    Correct.

TRIOLO v USA                    September 23, 2020  Vol II-
147

1    Q    And those forms ask -- and I'm happy to bring one up,

2    although I'm sure you're familiar with it.

3            Just for the record, the first one that Mr. Triolo

4    filled out was on July 20th of 2017 -- I'm actually -- I don't

5    think we need to bring it up.  Pardon me, this is Plaintiff's

6    Exhibit 9.  Plaintiff's Exhibit 9, SJIPS0015.

7            And I think you had looked at this on direct.  But

8    these forms all have the same language in it; correct?

9            And I'm happy to bring it up, sir, if that's easier.

10   A    What page?  I'm sorry.

11   Q    Page 15.

12           MS. CUNNINGHAM:  Ms. Sabino, you're welcome to bring

13   it up.  It's Plaintiff's Exhibit 9.

14           THE WITNESS:  Okay.  I have it.

15   BY MS. CUNNINGHAM:

16   Q    And so one of the things you ask them is if they know of

17   anyone that has been in a motor vehicle accident within the

18   past year that resulted in injuries.

19           Do you see that question?  It's Question No. 6 on the

20   form.

21   A    Yes.

22   Q    Why do you ask that question?

23   A    We probably want the patient to refer them to us.

24   Q    Okay.  You also require the patient to complete a number

25   of forms on their initial visit; correct?

```
 1   A    Yes.

 2   Q    And let's just take a look at a couple of those forms.

 3        So, Doctor, I am going to bring over -- we have a set

 4   for you of the defendant's exhibits.  This will be Defendant's

 5   Exhibit 20.  It will come up on the screen as Bates numbered

 6   page SJIPS-22.  This is defendant's exhibit.  And I'm also

 7   going to bring it to you in a binder.  Okay?

 8        THE COURT:  Go ahead, Ms. Cunningham.

 9        MS. CUNNINGHAM:  Thank you, Your Honor.

10   BY MS. CUNNINGHAM:

11   Q    And, actually, I'm sorry, I didn't give you the page

12   number, did I?

13        If you will actually go to page 13 of this exhibit,

14   Bates No. SJIPS-13.

15        Okay.  Sir, in the -- in the standard forms for your

16   office, you have a background check authorization; is that

17   correct?

18   A    Yes.

19   Q    Okay.  And one of the things that you ask individuals who

20   are joining your practice is this series of questions in the

21   middle of the form.

22        Do you see those one, two, three questions?

23   A    Yes.

24   Q    One of the questions is:  Have you ever been arrested;

25   correct?
```

1    A    Yes.

2    Q    And one of the questions is:  Have you ever been convicted

3    of a drug-related offense; do you see that?

4    A    Yes.

5    Q    Why do you ask these questions?

6    A    Most likely it will determine whether I'm going to

7    initiate morphine or any other narcotic opioid therapy.  We

8    would probably just limit the care to an interventional therapy

9    and have to explain to the patient that because of these prior

10   offenses, I wouldn't be able to prescribe narcotics.

11   Q    Okay.  And why is that?  What's the reasoning behind that?

12   A    Well, we don't want -- you know, there's a national

13   epidemic, you know, on opioid abuse, and we don't want to

14   contribute to it.

15   Q    If a patient had a DUI arrest in the past, is that

16   something you would want to know about?

17   A    Any kind of arrest, yes.

18   Q    Your patients also have to enter into agreements for

19   controlled substances and narcotic prescriptions; correct?

20   A    Yes, correct.

21   Q    All right.  So also in Defendant's Exhibit 20 -- this is

22   at Bates No. page SJIPS-12.

23   A    I'm sorry, what page?

24   Q    Page 12, sir.

25   A    Yes.

1  Q    And there is a lot on this form.  Perhaps we could just

2  expand the top half.

3         All right.  And so this agreement for controlled

4  substances, narcotic prescriptions, sets out a number of

5  conditions for patients who you are going to be prescribing

6  narcotics to; correct?

7  A    Correct.

8  Q    All right.  One of the things they consent to, and I

9  believe that's sort of the second-to-last paragraph in the part

10  that's blown up on the screen, is that they give consent for

11  random drug screening?

12  A    Yes.

13  Q    Okay.  Why is that something that you have patients

14  consent for?

15  A    Random urinalysis is routine when prescribing opioid

16  medication to make sure that the patient is taking the

17  medicine, that it appears in the urine test, and that there are

18  no illicit drugs in the analysis.

19  Q    Okay.  Has Mr. Triolo been required to undergo any random

20  drug screening?

21  A    I'm sure he has, but I don't recall at this point.

22  Q    If he had, is that something that would be reflected in

23  the medical records?

24  A    Yes.

25  Q    All right.  I can tell you that the United States issued a

1    subpoena to your office for records, and that we've also

2    received records from the plaintiffs that were obtained also

3    through your office.  We have not received any indication that

4    there's been any random drug screening.

5            Does that suggest to you that he has not had any done

6    at the practice?

7    A    Either that or the report wasn't added to the chart.

8    Q    Okay.  If it had been done, would that have been billed

9    for?

10   A    I suppose so.

11   Q    Okay.  And is part of the reason you do this testing to

12   try and -- well, strike that.

13           We can take the exhibit down.  Thank you.

14           So, Doctor, on direct, I think you agreed that it's

15   important -- whether you said it on direct or not, you agree

16   that it's important to obtain a medical history from your

17   patients; correct?

18   A    Correct.

19   Q    And let's take a look at one of your intake forms that is

20   included in the plaintiff's exhibit, so this is Plaintiff's

21   Exhibit 9, Bates numbered page SJIPS-4.

22           If you can take a look at the bottom of the page.

23   This was discussed with you on direct, the patient history form

24   that Mr. Triolo completed when he first came to your practice

25   for treatment; correct?

```
 1    A    Correct.
 2    Q    Okay.  You were asked on direct about -- about a
 3    particular issue, and I just want us to talk about this
 4    question.
 5          The last question on this page, would you just read
 6    that out to me, please, beginning with the:  "Have you."
 7    A    Have you had any injuries, other auto injuries, falls,
 8    sport injuries, et cetera, in the past that were significant or
 9    required medical evaluation or treatment?  And he answered no.
10    Q    What is the reason for having this question on your form?
11    A    It's just part of the history, to know if there were any,
12    as it says, significant injuries that would point to causation.
13    Q    Okay.  Is it fair to say that you would never discourage a
14    patient from giving you a complete medical history; correct?
15    A    Correct.
16    Q    You would want them to give you an accurate history so
17    that you as a physician could determine what's relevant; right?
18    A    Correct.
19    Q    And on direct, you testified that you used this
20    information to establish a differential diagnosis?
21    A    Correct.
22    Q    This history given by the patient might help you rule
23    certain things out; right?
24    A    Right.
25    Q    And the history might also cause you to put something
```

1   higher on your differential than others; right?

2   A    Correct.

3   Q    So on direct you testified that part of what you are doing

4   here is considering whether there is an association with a

5   condition; right?

6   A    That's correct.

7   Q    In other words, you're thinking about whether the symptoms

8   that the patient is presenting with are consistent with him

9   having sustained an injury; right?

10  A    Right.

11  Q    With respect to Mr. Triolo, you did not have to determine

12  when the pars fracture occurred in order to treat him; correct?

13  A    Did not have to determine -- I could treat it even if I

14  didn't know exactly when it occurred; correct.

15  Q    Okay.  And the same thing with the spondylolisthesis,

16  right, you could treat him even without knowing exactly when it

17  occurred?

18  A    Yes.

19  Q    And the treatment that you provided to him would not have

20  changed if that spondylolisthesis had happened a week before

21  the accident, for example?

22  A    The consecutive number or procedures done would probably

23  be in a different order if it was an old injury versus a recent

24  injury.

25  Q    Okay.  And you talked a fair amount on direct about there

1    being a facet injury.  But you would agree that the surgery was

2    not to address a facet injury; right?

3    A     Correct.

4    Q     The medial branch nerve block injection that you did on

5    July 20th, 2017, that we have discussed -- you had discussed on

6    direct -- and I'm happy to bring up the page if you'd like to

7    look at the procedure -- but that injection done at L2, L3, L4,

8    and L5, was, like the other prognostic medial branch nerve

9    block, not effective in relieving his pain; correct?

10   A     The patient reported having persistent pain.  And at that

11   time, I believe it was the spondylolisthesis and lysis and

12   nerve root compression that was so painful that -- that that --

13   that pain took -- was generating the majority of his pain.

14   That injury was causing the majority of his pain.  To the point

15   that it might have not allowed the relief from the prognostic

16   block to be revealed.

17         Because the patient's nerve root compression was so

18   severe that even the epidural -- when normally it would have

19   relieved some of the symptoms, his injury was so severe in

20   terms of nerve root compression that only surgery would have

21   provided that relief at the time.

22         So it's hard for me to say that it was totally

23   negative.  No, it didn't seem to provide relief because it

24   wasn't the main pain generator at the time.

25   Q     Okay.  So the facet joint -- your conclusion from what

TRIOLO v USA                    September 23, 2020  Vol II-
155

1    Mr. Triolo reported to you about that procedure was that the

2    facet joints were not the main pain generator?

3    A    Right, not at that moment.  And with an unstable segment,

4    that L5 vertebra is going to continue to be unstable and move

5    forward and back, causing impingement to the nerve root, and

6    that is definitely a severe form of pain.

7    Q    From a sort of terminology standpoint, when you say "facet

8    injury," you're using that term simply to mean something that

9    is abnormal in the facet joint, in other words --

10   A    A traumatic arthropathy, that's what we're referring to

11   when -- in this case.

12   Q    All right.

13   A    To the point that it fractured the pars, which is the base

14   of the facet joint.  The facet joint is connected to the pars.

15   And so that injury of the pars caused traumatic injury to, not

16   only the interarticular aspect of it, the cartilage that we

17   spoke of earlier, but also the base of the bony structure was

18   fractured.

19   Q    Okay.

20   A    At least at L5, maybe not at L4 or L3.  But at L5, the

21   trauma was so severe that it caused a fracture.  And in one

22   image, there was bony swelling, edema, bony edema.  That's how

23   severe the traumatic injury to the bone was.

24   Q    So -- and we will come back to some of these topics, but

25   in the -- in your view, there's one image in the MRI that

1    demonstrates that; is that your testimony?

2    A    I remember seeing one image of the end plate of L5, and it

3    showed bony edema.

4    Q    Okay.  Now, your -- so your opinion about this issue is

5    based upon your review of the MRI; correct?

6    A    And the physical exam and the history.  It's all one

7    composite, you know, one -- everything points to the facets as

8    being part of the pain generation.

9    Q    Okay.  So the -- let me step back for a second.  With

10   respect to the accident portion -- and, I'm sorry, you can take

11   that down, please -- you are relying on the patient to report

12   to you what happened in the accident; correct?

13   A    I'm relying?  Is that what you said?

14   Q    Yes, sir.

15   A    Yes.

16   Q    You don't know the speeds the vehicles were going?

17   A    No.

18   Q    You've never looked at any of the photographs of the cars

19   that were involved in the accident?

20   A    No.

21   Q    You've never spoken with an accident reconstructionist

22   about the forces involved?

23   A    No.

24   Q    You haven't spoken to a biomechanical expert to see if

25   those forces were sufficient to cause a fracture to

1   Mr. Triolo's lumbar spine; right?

2   A    No, I have not.

3   Q    You agree, to the best of my knowledge, from what we've

4   seen in the records, you didn't have a copy of the record from

5   the Emergency Department?

6   A    No, I did not.

7   Q    All right.  And so, to the best of my knowledge, you

8   didn't have any prior medical records for Mr. Triolo that

9   predate the accident?

10  A    Right, I did not have it.

11  Q    Okay.  And you don't have any of the records from

12  Dr. McDaniels, the chiropractor who treated him?

13  A    No.

14  Q    You don't have any of the records from the office of

15  Dr. Asad, the neurologist who treated him?

16  A    No.

17  Q    So you were truly relying upon what the patient presents

18  to you with?

19  A    Correct.

20  Q    And in spite of not knowing all of those things, you're

21  still able to treat Mr. Triolo; yes?

22  A    Yes.

23  Q    And, in fact, you know on your very first visit with him,

24  without the benefit of any prior medical record, you ordered

25  him -- or ordered him to take -- or at least authorized

1  prescriptions for medication; right?

2  A    Correct.

3  Q    And you did an epidural steroid injection that first

4  visit; right?

5  A    Yes.

6  Q    With respect to the first visit, your note from that first

7  visit, which I think has already been looked at, it makes it

8  sound like you had a copy of the MRI report from the April 4th

9  of 2017 MRI.  Is that your recollection?

10  A    I described the report, I did, on that -- on that

11  visit's --

12  Q    Right.

13  A    -- record.

14  Q    So if we take a look at Plaintiff's Exhibit 9, page 10,

15  Bates Nos. 10, SJIPS-10.  This is your note from the encounter

16  date on July 11th, 2017.  At the very bottom there's an imaging

17  section.

18           If we could just blow that up, please.

19           THE COURT:  I'm going to need pain management by the

20  end of this because of these notebooks and you-all switching

21  back and forth.

22           Go ahead.

23  BY MS. CUNNINGHAM:

24  Q    Okay.  Sir, at -- the part that's blown up here is the

25  imaging section referencing the MRI scan of the lumbar spine.

```
 1              Do you see that?

 2   A    Yes.

 3   Q    This language came directly from the MRI report; right?

 4   A    Correct.

 5   Q    And this is referencing -- and I -- the plaintiff asked

 6   you some detailed questions about this, because I think it's

 7   going to be discussed with the next expert so I'm going to do

 8   my best to do the same, okay?

 9              But one of the things that's addressed here is the

10   degenerative spondylolysis; do you see that?

11   A    Spondylosis, uh-huh.

12   Q    Pardon me, yes, the spondylosis.

13              All right.  Do you remember, when you looked at the

14   films, observing the degenerative spondylosis?

15   A    Yes.

16   Q    All right.  And the -- let's just sort of step back for

17   another second.

18              You're not a Board Certified radiologist; right?

19   A    Correct.

20   Q    I understand that you, like many doctors, like to read

21   your own films; right?

22   A    It's an important part of our practice.

23   Q    But do you have privileges at any hospital or MRI imaging

24   center to give the formal interpretation of an MRI of the

25   lumbar spine?
```

TRIOLO v USA                    September 23, 2020  Vol II-
160

1    A    No.

2    Q    Did you talk to the radiologist about this imaging?

3    A    No.

4    Q    Do you, while you are going to look at films, because

5    that's what doctors tend to do -- in your practice, do you

6    typically rely on or defer to the interpretation of the reading

7    radiologist?

8    A    I base it on my reading.

9    Q    I'm sorry, you base what on your reading?

10   A    My treatment goes -- is mainly based on what I see on the

11   image, and I corroborate my perception or my impression, I

12   should say, by looking at the radiology report.

13        If I see a discrepancy, I will pick up the phone and

14   call the radiologist, and ask them to review the image again.

15   Or I've sent images to other radiologists when I disagree with

16   the report of a particular radiologist.

17   Q    But that was not something you did in this instance;

18   correct?

19   A    In this case, no, I agree with the report.

20   Q    All right.  So you agreed that there was a degenerative

21   spondylosis at the L5-S1 level; correct?

22   A    Yes.

23   Q    Okay.  Did you review the film to see -- well, let me ask

24   you this a different way.

25        What sequences were done on this MRI?

| | | |
|---|---|---|
| 1 | A | What sequences? |
| 2 | Q | Yes, what imaging sequences. |
| 3 | A | You mean T1, T2? |
| 4 | Q | Yes. |
| 5 | A | Uh-huh. |
| 6 | Q | Do you remember what the full spectrum of sequences was? |
| 7 | A | No, I don't. |
| 8 | Q | All right.  Do you remember the one image you saw where |

9  you believed there was evidence of edema?  Do you remember what

10  sequence that was?

11 A    No, I don't.

12 Q    Do you understand that there's differences in sequences in

13  terms of what is better able to show bone edema and what is

14  not?

15 A    Yes, correct.

16 Q    In the sequence of how this typically progresses, there's

17  typically a -- Your Honor, I'm -- pardon me.

18        I suspect we're going to get into this in length with

19  the next witness, so I don't know that it makes the most sense

20  to go through this with you.

21        So let's move on and we may circle back to it.  Okay?

22 A    Okay.

23        THE COURT:  Seeing counsel get up makes me -- do we

24  have water up there for you?

25        THE WITNESS:  That's okay.  I'm okay.

```
 1                Okay.  I'll grab it.

 2                Thank you.  Appreciate it.

 3    BY MS. CUNNINGHAM:

 4    Q    All right, sir.

 5                And we can take that record down, please.

 6                There was no reference to acute trauma in that MRI

 7    report; agreed?

 8    A    Not that I remember.

 9    Q    All right.  So --

10    A    Actually, I should say I don't remember if there was

11    reference to trauma in the report.

12    Q    Do you know how the plaintiff was referred to you?

13    A    No, I don't.

14    Q    Did you know that Dr. Asad had referred him to see

15    Dr. Kramarich?

16    A    No.

17    Q    All right.  Did you ever talk -- I assume, then, the

18    answer to this question will be no, but did you ever talk to

19    Dr. Kramarich about this patient?

20    A    No.

21                THE COURT:  I think it's Kramarich.

22                MS. CUNNINGHAM:  Oh, Kramarich.

23                Thank you, Your Honor.

24    BY MS. CUNNINGHAM:

25    Q    Did you ever talk to Dr. Asad about this patient?
```

TRIOLO v USA                    September 23, 2020  Vol II-
163

1   A     No.

2   Q     You have treated at least two patients who were

3   represented by Mr. Kinney in litigation; isn't that true?

4   A     Probably.

5   Q     Did Mr. Kinney ask you to see Mr. Triolo?

6   A     I don't remember.

7   Q     Your first visit with Mr. Triolo was five months after the

8   motor vehicle accident; right?

9   A     Roughly, yeah.

10  Q     And when he started treating with you, he was not taking

11  any pain medication, was he?

12  A     I think he --

13  Q     If you're not sure, I can give you a record that you can

14  take a look at.

15        So let's took a look at Plaintiff's Exhibit 9, Bates

16  No. page 5, so it's SJIPS-5.

17  A     He was taking gabapentin and Methocarbamol.

18  Q     All right.  Do you see the handwritten note next to that?

19  A     Not taking any more meds, not working.

20  Q     So in terms of an active medication list, he's not listing

21  anything here when he began seeing you; correct?

22  A     Correct.

23  Q     On that very first visit -- and we're going to have to

24  flip back to Defendant's Exhibit 20.  Let's pull up the --

25  Defendant's Exhibit 20, SJIPS-15.

 1          All right, sir.  This is a document captioned
 2   Assignment of Benefits Policy Rights.  It appears to have been
 3   signed by Mr. Triolo on July 11th, 2017.  Is that correct?
 4   A    Yes.
 5   Q    What -- do you know what this document is?
 6   A    Do I know what?
 7   Q    Do you know what this document is, sir?  The document in
 8   the medical records that were produced to us in the subpoena,
 9   do you know what this is?
10   A    No, I do not.  I would have to call my front desk manager.
11   She's the one that usually handles anything regarding payments
12   and benefits.  But I assume it's just saying that we're allowed
13   to bill, but I'm not sure.
14   Q    So this particular form is what people sometimes refer to
15   as letters of protection.  Have you heard that term?
16   A    Yes, I've heard of the term.
17   Q    Okay.  And are you aware that Mr. Triolo entered into a
18   letter of protection with your office?
19   A    No, I didn't know that.
20   Q    Is it your understanding that -- what is your present
21   understanding as to whether or not -- well, do you have any
22   understanding as to how Mr. Triolo's medical care has been paid
23   for?
24   A    No.
25   Q    The cases that you had previously with Mr. Kinney, did

```
 1   they also involve letters of protection?
 2   A    I don't know if there was any letter of protection in any
 3   of my cases.
 4            MS. CUNNINGHAM:  Thank you.  We can take that down.
 5   BY MS. CUNNINGHAM:
 6   Q    So let's go back to defendant's -- pardon me, Plaintiff's
 7   Exhibit 9., back to that first encounter date.  So this is
 8   SJIPS-11.
 9            And so before you enlarge anything, the top part of
10   the page is actually a continuation of excerpts from the MRI
11   report.
12            Do you see that?
13   A    I do.
14   Q    In the center section of the page is Assessment,
15   Diagnosis, and on forward.
16            MS. CUNNINGHAM:  Ms. Sabino, can you pull up from the
17   Assessment section on down, please.
18   BY MS. CUNNINGHAM:
19   Q    All right.  These were the assessments that you reached at
20   the end of your first visit with Mr. Triolo; correct?
21   A    Yes.
22   Q    All right.  The first one, driver injured in collision
23   with other motor vehicle, that's based on the patient's report;
24   right?
25   A    Yes.
```

 1   Q    The second one, low-back pain, that's based upon -- or you

 2   would agree that's a nonspecific finding?

 3   A    Correct.

 4   Q    Let's stop here for one moment.

 5        The timing of receipt of the MRI was something that

 6   you were asked about on direct.  And my memory of that

 7   testimony was that you did not think that you had reviewed the

 8   MRI, the film itself, at the time of his first visit; is that

 9   right?

10   A    That's right.

11   Q    Okay.  So as we move forward, these remaining diagnoses

12   are perhaps a combination of your MRI -- reading the radiology

13   report from the MRI; right?

14   A    The physical examination and history.

15   Q    And the physical examination and history; right?

16   A    Right.

17   Q    Okay.  So the arthropathy -- so, Doctor, I think, in all

18   fairness, I'm going to pull up the MRI report so that you can

19   see these two things, or I can give you have a copy so that you

20   have it in front of you.

21        THE COURT:  Why don't you just give him a copy of the

22   MRI report.

23        MS. CUNNINGHAM:  All right.  Thank you, Your Honor.

24   BY MS. CUNNINGHAM:

25   Q    So it's in your plaintiff's exhibits that are in front of

```
 1  you.
 2             I believe it's Plaintiff's Exhibit 3.
 3             THE COURT:  Plaintiff's 3 is Baymeadows MRI and
 4  report.
 5             MS. CUNNINGHAM:  Doctor, did you pull that out of a
 6  folder?
 7             THE WITNESS:  Yes.
 8             THE COURT:  Okay.  So the doctor has it.
 9             Go ahead with your question, please.
10             MS. CUNNINGHAM:  Thank you.
11  BY MS. CUNNINGHAM:
12  Q    Okay.  Sir, so when we're looking back at your diagnoses
13  in this section -- and just to be clear, Plaintiff's Exhibit 3,
14  Baymeadows MRI, BMRI, page 1 -- just for the record, Doctor, do
15  you still have your note in front of you so that you can look
16  at both together?
17  A    Yes.
18  Q    All right.  So the arthropathy was a mild facet-joint
19  arthropathy, which was noted at L4-L5.
20             Do you see that?
21  A    Yes.
22  Q    Okay.  And here, this indicates -- the MRI report
23  indicates that otherwise -- it's noted bilaterally, otherwise
24  unremarkable with no disc herniation or nerve root impingement
25  noted.  Spinal canal and neural foramina are well maintained.
```

TRIOLO v USA                    September 23, 2020  Vol II-
168

1              Do you see that?

2    A    I do.

3    Q    You'll agree with me that facet arthropathy is a

4    degenerative finding, isn't it?

5    A    It can be traumatic or degenerative.

6    Q    But at this point in time, you hadn't yourself looked at

7    the films; right?

8    A    Right.

9    Q    So as you were just indicating --

10            THE COURT:  I don't know the answer to that question.

11   We have a double negative.  I don't know if he says, no, that's

12   not right, or, no, he didn't.

13            MS. CUNNINGHAM:  I'll rephrase the question, Your

14   Honor.

15   BY MS. CUNNINGHAM:

16   Q    Had you looked at the MRI report when you made these

17   diagnoses?

18   A    No.

19   Q    And that was a poor question because I asked it wrong.

20            Had you looked at the MRI itself, the film, at the

21   time you made these diagnoses?

22   A    No.

23   Q    Thank you, sir.

24            Okay.  Four was the sprain of ligaments and cervical

25   spine.

1           That is a temporary finding; correct?

2    A    Correct.

3    Q    No. 5, the sprain of the muscle, fascia, and tendon at

4    neck level.

5           That is a temporary finding; correct?

6    A    Temporary.  Most of the time it does heal, but sometimes

7    it can become chronic, and patients suffer from trigger points

8    in those muscles for many, many years.

9    Q    All right.

10   A    But I'll agree that it's relatively temporal in most

11   patients.

12   Q    All right.  And with respect to Mr. Triolo, it's my

13   understanding that his cervical complaints resolved; is that

14   correct?

15   A    Eventually, after about a year, year-and-a-half.

16   Q    Okay.  The sixth item, No. 6, the spondylolisthesis,

17   that's something that came from the MRI report?

18   A    That's right.

19   Q    Item No. 7, the other intervertebral disc degeneration,

20   that was something that came from the MRI report?

21   A    Correct.

22   Q    8, the other spondylosis, that's something that came from

23   the MRI report?

24   A    That's right.

25   Q    Spinal stenosis, that's something that came from the MRI

TRIOLO v USA                    September 23, 2020  Vol II-
170

1    report?

2    A    Correct.

3    Q    The radiculopathy, lumbar region, that's something that

4    came from your exam?

5    A    That's right, in the history and the complaint.

6    Q    And 11 is the spondylolysis.  That's something that came

7    from the radiology report; right?

8    A    That's right.

9    Q    All right.  We can take that down.  Thank you.

10            So over the course of time that you were treating

11   Mr. Triolo, his pain reports didn't change much from sort of

12   the time he began seeing you until that January 2019 time frame

13   or end of 2018 time frame that you talked about on direct; is

14   that fair?

15   A    Didn't change -- what didn't change, his symptoms?

16   Q    His pain reports.  So as he's filling out these monthly --

17   A    Yeah.

18   Q    -- indications of his pain -- and, I'm sorry, I'll finish

19   the question and give you an opportunity.  You agree that he

20   was reporting basically the same amount of pain all the way

21   through until that January 2019 period?

22   A    Up until the date of his surgery, which was March of '18,

23   and then the pain significantly changed.

24   Q    But from a pain number standpoint, if we look at those

25   sort of pain numbers that he's completing as he comes to see

1    you --

2    A    Yes.

3    Q    -- his grading of his pain stayed in that kind of same --

4    same --

5    A    Range.

6    Q    -- sort of range; is that fair?

7    A    Up until April of 2018, around the time I saw him after

8    the surgery, then it changed significantly on the right side.

9            And there were variations, according to the relief of

10   pain by the opioid medication, which we had to increase to

11   provide some degree of relief.  So there were variations in the

12   pain intensity given that we were treating the pain with very

13   strong opioid painkillers.

14           But he rated it, on the intake form, probably between

15   7, 8, or 9, on a monthly basis because there were still -- and

16   that's a very generic way of following the pain intensity.

17   Pain is variable, you know.  There's moments of relief, and

18   then with activity it can shoot up to a 9 over 10.  And so

19   patients do their best to give us a range of pain at its best,

20   pain at its worst.

21   Q    And I think you just explained something that's probably

22   key in a pain management practice.  Pain is subjective; right?

23   A    Well, it's reported by the patient.  Pain is a very

24   unpleasant physical and emotional sensation, you know.  It's

25   definitely sensory.

1   Q    But, in other words, you're relying on the patient to tell
2   you what their pain is?
3   A    Well, until we have a way to connect our brain with theirs
4   and then feel what they're feeling, we have to rely on the
5   patient's report of pain and then confirm it by an examination
6   that finds that there actually is a concordant finding.
7            You know, I have many patients over the 30 years that
8   I've done work that have tried to fake having back pain, and
9   they don't make it into the practice because their complaints
10  don't match the exam and the findings in the -- the limitations
11  that I would expect in the palpation and the range of motion.
12  And there's many provocative testings that we can do to
13  determine whether a certain area is actually generating pain or
14  not.
15           And so based on that, yes, we have to rely on the
16  patient's report of pain intensity.  I mean, the pain
17  discipline has tried to find a way to rate pain.  It's been
18  very difficult over the years.  But we no longer just say mild
19  to moderate or severe.  We actually have a numerical rating and
20  it appears to be the best way to at least follow that change in
21  intensity.
22           When it goes from a 9 to an 8, it is a decrease in
23  the pain intensity.  As minimal as it may be, 9 is, you know,
24  lots stronger and more intense than 8, and so on.
25           So we have a ten-point scale now instead of just

1    three points.  And so we follow that.  And as we saw in the

2    note, it went from 9 to 6 at one point, or 8 to 6.  And so it

3    gives us an idea if we're going in the right direction or not.

4    Q    Okay.  And when you talk about, you know, correlating, I

5    think you would agree that looking at an imaging study alone

6    doesn't tell you whether someone has pain or not; right?

7    A    No.  You can pretty much agree that if you see a fractured

8    bone, a comminuted fracture, you can probably suspect that the

9    patient is going to have a great deal of pain.

10          And so images do sometimes -- you know, cause and

11   effect.  I mean, you see something happen all the time; you're

12   going to expect it to be causing pain.

13          You know, you throw a baseball through a window,

14   before it even happens, you know it's going to break the

15   window.  It's just this cause and effect is going to be

16   something that, with experience, you will be able to determine

17   this man is in a lot of pain simply by looking at an image.

18   Q    Well, I think you would agree, though, that simply because

19   someone has, for example, an image that shows something --

20   let's say someone has a herniated disc; right?  The fact that

21   they have a herniated disc showing up on an image does not mean

22   that they are experiencing pain; right?

23   A    Most likely they are, I would say.  And especially if

24   there's -- you know, if we can measure the size of that hernia,

25   like some scanners allow us to do, well, yeah, we can

 1   definitely suspect that the patient's in a great deal of pain.

 2           There are very small herniations that most likely are

 3   not causing pain.  But depending on the size, yes, you can

 4   almost predict that the patient is going to be in some form of

 5   radicular pain.

 6   Q    Are you familiar with the research involving primary and

 7   secondary gain?

 8   A    We use that in medicine quite a bit.

 9   Q    Okay.  And what does that mean?

10   A    If there is other gains besides just being treated and

11   having the relief of pain.  Well, secondary gain would mean

12   just wanting to attract the attention of family members.

13           I'm in pain.  You know, the old lady that always

14   complains simply because she needs attention.  Nobody pays

15   attention to her, so that would be a form of secondary gain.  I

16   gain the attention and care of my loved ones.  That's an

17   example of secondary gain.

18   Q    Okay.  And another example of secondary gain is when

19   patients are engaged in litigation; right?  In other words,

20   there's research that has established that --

21   A    I haven't read that recently.

22   Q    Okay.  All right.  Well, thank you, then.

23           All right.  So you initially referred the plaintiff

24   to see Dr. Toumbis; correct?

25   A    Yes.

TRIOLO v USA                    September 23, 2020  Vol II-
175

1   Q    And when we look in your file at the very first page of

2   the record -- it's Plaintiff's Exhibit 9 at SJIPS-1.

3           All right.  So you did a formal referral to

4   Dr. Toumbis; correct?

5   A    Yes.

6   Q    Okay.  There's no equivalent letter in your file for

7   Dr. Topp.  Did you do a letter referring this patient to

8   Dr. Topp?

9   A    I think we did.  I asked my front line manager.  This is

10  written by either Tammy or David and the front manager, and I

11  just sign it.

12          And so when Dr. Topp came to the scene, we asked them

13  to write one for Dr. Topp.

14  Q    Okay.

15  A    It was probably -- probably the same letter -- exactly the

16  same letter, just sent to Dr. Topp.

17  Q    Do you have any recollection of the -- the timing or

18  manner in which you made the referral?

19  A    No, I don't.

20  Q    When did you learn that Dr. Topp had recommended surgery?

21  Pardon me.  I misspoke.

22          When did you learn that Dr. Toumbis had recommended

23  surgery?

24  A    I believe that Mr. Triolo came to the office, and on one

25  of the visits, he said that the doctor had agreed.

TRIOLO v USA                    September 23, 2020  Vol II-
176

1   Q    And was it -- is it your memory that you got that

2   information through Mr. Triolo in a normal office visit --

3   A    Yes.

4   Q    -- as opposed to the information being sent to you by

5   Dr. Toumbis?

6   A    I don't recall any report from Dr. Toumbis.

7   Q    Do you recall ever seeing the medical records from

8   Dr. Toumbis' office?

9   A    No, I do not.

10  Q    All right.  Did you provide any treatment for headaches

11  for Mr. Triolo?

12  A    Other than the medications, we never made it to procedures

13  in the neck.  It would have been similar, epidural, followed by

14  an MRI scan, and then prognostic blocks, because he appears to

15  have -- at that time he appeared to present with cervical facet

16  arthropathy.  We were focused on the area of most pain, so that

17  was the lumbosacral area, and never -- never actually had the

18  opportunity to treat with interventions to treat the cervical

19  spine with intervention.

20         But the anti-inflammatories and the opioid medication

21  also is a form of medical therapy for the cervical spine.

22  Q    When you saw him after his surgery, you recommended that

23  he engage in postop rehabilitation therapy.  Do you recall that

24  recommendation?

25  A    No.  Is that written in my note?

1   Q    It is.  So let's just take a look at Plaintiff's Exhibit

2   9, Bates No. page 58.

3   A    It's usually the surgeon that recommends that, you know,

4   the rehab therapy, postoperative rehab therapy.  I would simply

5   agree that after having surgery, you have to have a period of

6   rehab.

7   Q    All right.  We don't have to pull anything close up on

8   this first page just to show the encounter date is April 5th of

9   2018.

10           Do you see that at the top?

11  A    I have it here.

12  Q    Okay.  Thank you, sir.

13           And then the third page of that note, which is

14  SJIPS-60, has the continuation of the care plan on top, and

15  that Item No. 2 there, let's just expand that so that's

16  visible.

17           All right.  So patient should participate in

18  postoperative rehabilitation therapy.

19           So this is you basically agreeing with what the

20  surgeon typically recommends; right?

21  A    Correct.

22  Q    Okay.  And that's something that is important for a

23  patient to do to ensure they have the best outcome from

24  surgery; right?

25  A    Typically, yeah.  They're highly recommended.

 1              MS. CUNNINGHAM:  We can take that down.

 2    BY MS. CUNNINGHAM:

 3    Q    Did you ever receive any information about whether or not

 4    Mr. Triolo participated in postop rehabilitation?

 5    A    Not that I recall.

 6    Q    The -- and do you have any knowledge about whether or not

 7    Mr. Triolo has engaged in any kind of chiropractic therapy over

 8    the time that you've been treating with him?

 9    A    I don't remember.

10    Q    All right.  You mentioned, with respect to the advice that

11    you give patients, that you give them advice to make sure

12    they're not doing things that might lead to them reinjuring

13    themselves; right?

14    A    Yes.

15    Q    And one of the things that's on your questionnaires that

16    the patients fill out on a monthly basis is a question asking

17    the patient whether they have had any kind of intervening

18    injury; right?

19    A    The intake form, yes.

20    Q    All right.  So let's just take a look at the same

21    plaintiff's exhibit, SJIPS page 123.

22    A    Okay.

23    Q    Okay.  And this is just an example of one of these forms.

24    And this Item No. 1, you ask:  Have you had any falls, traumas,

25    hospitalizations, or surgeries since your last visit?

1        You ask the patient to indicate whether they have or
2   not; right?
3   A    Yes.
4   Q    Please flip forward to the next one, which is for the end
5   of March visit, SJIPS-128.
6        THE COURT:  March?
7        MS. CUNNINGHAM:  I'm sorry, Your Honor.  March 28,
8   2019.  And it's page 128.
9   BY MS. CUNNINGHAM:
10  Q    All right.  In this visit, the plaintiff, in the form
11  again, answers Question 1, that there's been no falls, traumas,
12  or hospitalizations.  Do you see that?
13  A    Yes, I do.
14  Q    All right.  Were you aware -- and we can take this record
15  down.  Thank you.
16       Were you aware that on March 14th of this year, of
17  2019, that Mr. Triolo had actually presented to a podiatrist
18  for issues that he was having after stepping off a ladder?
19  A    No, I don't.
20  Q    Were you aware of that?
21  A    I don't recall that.
22  Q    All right.  I'm going to just ask a few things that are
23  related to this.  And we can bring up the record, if need be.
24       All right.  Defendant's 32 is in evidence.  If we can
25  just bring up Bates number page 3.

TRIOLO v USA                    September 23, 2020  Vol II-
180

1         All right.  So let's just look at the top part of

2    this so we can capture the date in the history of present

3    illness.

4         So in this appointment, Mr. Triolo reported to the

5    podiatrist that he stepped off the ladder.  Immediate pain in

6    the Achilles.  Now having shooting pains into his calf and up

7    his leg.  He feels like he is walking funny and is now

8    irritating his spinal fusion.

9         Had you heard anything about this incident during

10   your treatment of Mr. Triolo?

11   A    I don't recall.

12   Q    Okay.  So after this -- and we can take that record down.

13        In fact, during this visit, the podiatrist prescribed

14   a CAM walker for Mr. Triolo.

15        Do you know what that is?

16   A    No.

17   Q    That's the boot that people wear --

18        MR. KINNEY:  Objection.  Counsel is now testifying to

19   the doctor.

20        MS. CUNNINGHAM:  I'll withdraw the question, Your

21   Honor.

22   BY MS. CUNNINGHAM:

23   Q    Are you aware that Mr. Triolo sustained an Achilles tendon

24   tear?

25   A    I don't remember.  I'm trying to remember if I saw him

1    come in with any kind of device, you know.  And if he did, I

2    probably wasn't impressed about the significance in relation to

3    his back pain, but I truly don't recall.

4    Q    Okay.  There's no indication in your medical records that

5    I've been able to see that he was wearing one of those boots to

6    your office.

7            Do you have any recollection of seeing him in one?

8    A    No, that's what I mean.  I don't have -- I'm trying to

9    remember if he came in -- and he could have come in with a boot

10   and he would have explained to me what it was for, and I would

11   have probably dismissed it as unrelated to the back pain, the

12   facet arthropathy that we're trying to treat.  But I truly

13   don't recall seeing him with the device or hearing that he had

14   stepped off a ladder.  No, I don't recall that.

15   Q    Okay.  In this period of time right before this is when

16   his pain had dropped down to a 2; right?

17   A    Well, by this date, it went back up.

18            3-28-19, it was the previous visit that it was -- he

19   reported a 2.  And then he -- because we had just done the

20   radiofrequency on the left side, and that gave him very good

21   relief.

22            November of '18 -- well, what date are we looking at?

23   Yeah, so November of '18, he had the radiofrequency on the left

24   side, and that gave him significant relief.  It was the pain

25   that he developed after undergoing the lumbar fusion.  And it

1    was the left-sided pain.

2             He even said:  My pain seems to have gone from the

3    right side to the left.  My right side, which was the original

4    pain, has no pain at all.  Everything moved to the left side

5    after the surgery.  That's what he reported.

6             And that's when I really suspected the facet

7    arthropathy, and that's why we did the radiofrequency and

8    that's when we did the rating of 2 over 10.

9             And then unfortunately he comes back on this date, I

10   think, and he reports bilateral pain.  But it's the right side

11   that there's -- the posterior lateral structure pain on the

12   right side is what's bothering him now.

13   Q    With respect to the procedure that was done in November of

14   2018, your expectation was that would give a longer period of

15   relief.  Is that fair to say?

16   A    Typically six months to a year is what we see that the

17   procedure will provide relief for.

18   Q    Okay.  And so six months from November '18 would have been

19   May?

20   A    Yes.  But we're talking about the right side here, not the

21   left side.  The left side still had relief.  It's the right

22   side that he now complains of pain after I treated the left

23   side.

24   Q    You agree --

25             Your Honor, may I have just one moment?

 1           MR. KINNEY:  Your Honor, you want to hear a little
 2   update on the scheduling?  I've got some news.
 3           THE COURT:  Well, she can't listen to you and talk at
 4   the same time.
 5           MR. KINNEY:  Got you.
 6           THE COURT:  Go ahead, Mr. Kinney, with regard to the
 7   update.
 8           MR. KINNEY:  I was just going to mention we have the
 9   surgeon standing by as well.  So we're ready to wrap up the
10   whole medical testimony today.
11           THE COURT:  Go ahead.
12           MS. CUNNINGHAM:  Your Honor, thank you.
13   BY MS. CUNNINGHAM:
14   Q    Dr. Pardo, if Mr. Triolo felt like this Achilles injury
15   was irritating his spinal fusion, that's something that you
16   would have wanted to know; right?
17   A    Yeah, but he didn't mention it to me.  So I don't believe
18   it was that relevant.
19   Q    All right, sir.  The St. Joseph interventional pain
20   management is your practice; correct?
21   A    Correct.
22   Q    And your practice accepts both private insurance and
23   Medicare?
24   A    Some, not all.
25   Q    Some private insurance?

```
 1   A    Yeah.

 2   Q    Okay.  Some but not all?

 3   A    Yeah, correct.

 4   Q    And as a Medicare provider, when you are treating a

 5   Medicare patient, you agree to treat them under the Medicare

 6   rates; right?

 7   A    Yes.

 8   Q    Okay.  And many practices kind of key their rates for

 9   other patients based off of what the Medicare rate is, may give

10   you a certain percentage over it.  Do you --

11             MR. KINNEY:  Objection.  Calls for speculation.  He's

12   being asked to testify now to other practices and what they're

13   doing.

14             THE COURT:  I think you need to turn that into a

15   question.

16             MS. CUNNINGHAM:  I will, Your Honor.

17   BY MS. CUNNINGHAM:

18   Q    In your practice, sir, do you set any of your fee

19   schedules based off of a certain percentage over the Medicare

20   rate?

21   A    I don't think so.

22   Q    There -- I can tell you that we have gone through the

23   bills that you provided, and they are located -- someone can

24   remind me the plaintiff's exhibit number?

25             THE COURT:  28.
```

 1              MS. CUNNINGHAM:  Thank you, Your Honor.
 2    BY MS. CUNNINGHAM:
 3    Q    All right, sir.  Do you have the exhibit -- Plaintiff's
 4    Exhibit 28 in front of you?
 5              We don't need to bring it up on the screen, but if
 6    you can take a look at it.
 7              All right.  You agree with me that these billing
 8    statements lists have a column for Procedure.  Do you see that
 9    column?
10    A    Yes.
11    Q    And there's just a series of numbers there?
12    A    Yes.
13    Q    It's my understanding that those numbers are the CPT
14    codes.
15              Do you know what that is?
16    A    Yes, I do.
17    Q    Okay.  Just very briefly, what is that?
18    A    Current procedural therapy, I think it stands for.  And
19    it's a -- the center for Medicare/Medicaid, I think,
20    establishes those codes to -- for each procedure or visit type,
21    whether it's in-house, whether it's in-office, whether it's
22    initial or follow-up, so it's just the procedure or visit type
23    that the patient had.
24    Q    Okay.  And you -- your practice uses those in your billing
25    as well; right?

```
 1    A    Yes.

 2    Q    The Medicare prices for these items, these CPT codes, are

 3    published and available by Medicare.  Are you aware of that?

 4    A    I believe so.

 5    Q    Okay.  I know I'm going to draw an objection, but I'll

 6    introduce it and -- or ask for it and then we can discuss it.

 7              I'd like to just briefly look at Defendant's

 8    Exhibit 54, which is a demonstrative exhibit.

 9              I'll explain to you what this is and we'll provide a

10    copy to you.

11              I can bring it up on the screen or we could use the

12    version -- the court version of the demonstrative.

13              MR. KINNEY:  Your Honor, may I be heard on the

14    objection?

15              THE COURT:  Sure.

16              MR. KINNEY:  So my understanding is that this is not

17    being moved into evidence.  It was never presented on an

18    exhibit list.  It was never presented in initial disclosures,

19    never made a part of an expert disclosure.  And essentially

20    what they have done is they have somehow put together Medicare

21    rates and decided to now make them basically an expert report

22    by comparing one rate to another rate, the other rate being the

23    rates of St. Joseph interventional pain management.

24              Well, that was never brought up prior to the trial.

25    That was never brought up in disclosures or expert witness
```

1    disclosures.  These rates aren't even in evidence.  There's no

2    basis for allowing Medicare rates for a non-Medicare recipient

3    in this case.

4           THE COURT:  Ms. Cunningham, what is -- what is the

5    basis of allowing the Court to consider something as a

6    demonstrative aid that is not otherwise in evidence in any way?

7           MS. CUNNINGHAM:  So, Your Honor, the -- the date and

8    service, the CPT code, and provider charge are all from the

9    billing that plaintiffs have provided.  The Medicare

10   nonfacility price is all available on the Internet as indicated

11   at the cite below.

12          And the brief -- pretrial brief cited to Florida

13   statutes that makes the 200 percent of Medicare amount a

14   benchmark of reasonableness for providers who are billing PIP.

15   This provider billed PIP for two services, no more than two,

16   but two services, and so it is really just to try to provide

17   a -- another benchmark that the Court can look to to

18   determining reasonableness.

19          We obviously understand that Mr. Triolo is not a

20   Medicare provider -- or, pardon me, a Medicare patient, but

21   just using that 200-percent number as what providers are

22   permitted to bill when they're billing PIP.

23          And -- and that's really all it is, Your Honor, just

24   to try and give another -- another framework to the

25   reasonableness of the billing that's being sought in the case.

TRIOLO v USA                    September 23, 2020  Vol II-

```
 1              MR. KINNEY:  Your Honor, what she's saying ultimately
 2    is that Dr. Pardo's office charged something different than
 3    Medicare, or 200 percent of Medicare, and thus, his rates must
 4    be unreasonable.  But they've never put those rates into
 5    evidence.  All they've done is present an Excel spreadsheet
 6    that nobody is going to testify as to, except for defense
 7    counsel, who has asserted that she has pulled these from the
 8    Internet somewhere.  But just because things exist on the
 9    Internet or even if they're published doesn't mean that they
10    automatically become evidence.
11              If this was the path that they were into, the
12    defendant gave to us, they should have presented expert
13    witness, obtained proper code, obtained proper pricing, for not
14    just Medicare, but for the community of what Dr. Pardo's
15    practice does.
16              Putting in Medicare rates is not -- one, it's not the
17    correct rate; and, two, it's not even in evidence to do it
18    with.
19              THE COURT:  Yeah, Ms. Cunningham, I don't think you
20    responded to what -- I understand that you're saying that these
21    rates are available on the Internet, but I don't have a witness
22    to testify about them.  I don't have -- they're not in evidence
23    in this case.
24              A demonstrative aid isn't usually used to bring in
25    something that is not otherwise in evidence.
```

1          So absent some other basis to lay the foundation for

2     the admissibility of that additional data, I don't think I can

3     consider the demonstrative.

4          MS. CUNNINGHAM:  I understand, Your Honor.

5          If I may use the first part of it, just the date of

6     service, the CPT code, and the provider charge, which all is in

7     evidence.

8          THE COURT:  I don't see any problem with that.

9          Did you hear that, Mr. Kinney?

10         MR. KINNEY:  We're just going to redact columns 4, 5,

11    6, 7, and 8?

12         MS. CUNNINGHAM:  Your Honor, I just --

13         MR. KINNEY:  So his bills are currently in front of

14    him as Exhibit No. -- I don't know the number.

15         THE WITNESS:  28.

16         MR. KINNEY:  28 or 26 with this same information, but

17    now you have to use this demonstrative which has all the

18    information that shouldn't be coming in.

19         MS. CUNNINGHAM:  Your Honor, I can use his bills to

20    ask some of the other questions I was going to ask about that

21    issue.

22         THE COURT:  Okay.

23    BY MS. CUNNINGHAM:

24    Q    So, Dr. Pardo, I just want to look at a couple of these

25    codes.  Okay?

 1          THE COURT:  So she's back to Exhibit 28 now, to

 2    Plaintiff's Exhibit 28.

 3          THE WITNESS:  Thank you.

 4          MS. CUNNINGHAM:  Thank you.

 5    BY MS. CUNNINGHAM:

 6    Q    All right.  So with Exhibit 28, the -- if we look at the

 7    date of service on 7-20-2017, there's CPT code 99214, if you

 8    can find that.

 9    A    I did.

10    Q    Okay.  On this particular date, the charge for that was

11    $269.23.

12          Do you see that?

13    A    I do.

14    Q    All right.  And that code appears a number of times

15    throughout your billing chart.

16          Do you agree with that?

17    A    I do see it repeatedly.

18    Q    All right.  If you move forward in the billing, on

19    February 6th, 2018, that same code is billed, but now it's

20    being billed at $645.

21          Do you see that?

22    A    I do.

23    Q    Okay.  Do you have any knowledge as to the reason for the

24    increase?

25    A    I think it wasn't entered correctly on the first visit.

1  Q    Well, let's --

2  A    That's my thought, that the 99214 was not appropriately

3  billed.  That is a very -- that's my thought.  I really don't

4  know, because I don't get involved with any part of the

5  billing.  I let my front desk be in charge of anything that has

6  to do with payments, with receivables, with payables.  I like

7  to take care of the medical aspect of my practice, and the

8  front desk has done a good job so far.

9          So I would say that's a typo, and instead of the 600

10 and change, we only billed the smaller amount.  That's what I

11 think.

12         But the fee schedule -- we only have one fee

13 schedule, and that was established many years ago.  And as far

14 as I know, it hasn't changed in many years.  And the only

15 reason I know -- I didn't do the fee schedule.  We had a

16 consultant that helped the front desk establish it according to

17 what the community is charging.  And I -- I know that that fee

18 schedule -- I had to sign on it because it's my business, but

19 other than that, I don't get involved in any aspect of the

20 billing.

21 Q    Dr. Pardo, just one or two quick follow-ups because of

22 what you just indicated.

23         So if you look at this first page of the billing

24 statement, there's actually six occurrences of that code 99214

25 at the $269.23 amount.

TRIOLO v USA                    September 23, 2020  Vol II-
192

1              Do you see that?

2    A    I do see that.

3    Q    Okay.  And so your thought is that those are all errors?

4    A    I believe so.  You'd have to ask the front desk.

5              I'm certainly going to ask them.

6    Q    All right.  There's one last thing, and this is also on

7    your billing statement.

8              If you see the entry for December 7th of 2017, do you

9    see there's -- on all of these charts that there's one place

10   where there's an insurance payment.

11             Do you see that?

12   A    December 7.  Yeah, I do see it.

13   Q    Okay.  Do you see the amount of that insurance payment?

14   A    Yes.

15   Q    Okay.  And that's $172.30; right?

16   A    Yes, ma'am.

17   Q    For that same code that we've been talking about?

18   A    Correct.

19   Q    And in this case, there was an adjustment of $96.39;

20   correct?

21   A    Yes.

22   Q    Okay.  And from other records, we understand that that was

23   the amount that PIP paid for this particular code.

24             Do you see that?

25   A    Yes.  I assume it's right.

1          MS. CUNNINGHAM:  All right, Your Honor.  No further

2    questions.

3          MR. KINNEY:  Your Honor, may I stay right here?  This

4    is going to be super brief.

5          THE COURT:  As long as you speak into a microphone so

6    my court reporter can hear you.

7          MR. KINNEY:  Yes, Your Honor.

8                    REDIRECT EXAMINATION

9    BY MR. KINNEY:

10   Q    If you would, on that same billing statement, would you

11   scroll down to page 2.

12          And the charge for the 99214, do you see July 24th,

13   2018, on page 2?

14   A    Yes.

15   Q    What's the amount that was billed for the 99214 code?

16   A    645.

17   Q    Scrolling through the rest of the bills, all the way

18   through September of 2020, isn't 99214 billed at that same

19   rate, at the 645 rate?

20   A    Yeah, I'm trying to find it.

21          Okay.  Yes, okay.

22   Q    So that's well -- that's over two years of billing at that

23   rate, the 99214?

24   A    Yes, I see what you're saying.

25          So, yeah, my impression is that those initial charges

1   were --

2   Q    There was a little bit of questioning involving --

3   A    -- typographical --

4           THE COURT:  Mr. Kinney, you got to let him finish the

5   sentence.  He's still talking.

6           THE WITNESS:  I was just saying that it might have

7   been an error of an entry by the front desk.

8   BY MR. KINNEY:

9   Q    There was some --

10  A    I'm sorry, I did it again, didn't I?

11          I just keep talking.  I'm sorry.

12  Q    There was some discussion on cross about fakers, people

13  coming into the practice and faking.

14          Is there anything you believe -- the total number of

15  visits for you and Mr. Triolo are 48 visits.  Over the course

16  of those 48 visits, from July of 2017 all the way through

17  September of 2020, have you seen any indication that Mr. Triolo

18  is faking his pain?

19  A    No.

20  Q    Have you seen any indication that he has been presenting

21  to you for secondary gain?

22  A    No.  On the contrary, if it was even the opioid, he

23  himself took himself off and went through a difficult period

24  because he did not want to take opioids.  He got rid of the

25  morphine on his own, went through some withdrawal, and limited

1   himself to very few of the Percocets, which is a big change,

2   and so there's no secondary gain there.

3   Q    Dr. Pardo, if you had learned that one of your patients

4   had been stopped for a DUI 15 -- 10, 15 years before coming to

5   see you, would that change the course of your willingness to

6   treat that patient?

7   A    I would be concerned of addictive behavior, the

8   recklessness of drinking and driving.  And so handling opioids

9   that are, you know, quite dangerous, yeah, I would be reluctant

10  to treat him with opioid medications.

11  Q    And if Mr. Triolo had gotten stopped for a DUI 10, 15

12  years before, and nothing in between until coming to see you in

13  July of 2017, would you refuse to treat him based on that?

14  A    You know, every case is -- is a different case, and every

15  case is individualized, you know.  And so it would be -- I

16  would definitely consider it, you know.

17          But if I see someone in severe pain and they've gone

18  through maybe rehab therapy and they demonstrate they're a

19  legitimate patient, I might consider to use some medication

20  that is reasonable, especially if there is other people in the

21  household that can also be checking to see if the medication is

22  being taken properly, the way it's ordered.  But, in general, I

23  am concerned about anyone having any type of behavior that is

24  reckless or -- you know.

25  Q    In the three-and-a-half years that you've been treating

1   Mr. Triolo, have you observed any reckless behavior?

2   A    No, no.

3   Q    Has he come into your office intoxicated?

4   A    Never.

5   Q    You've sat through quite a bit of direct and, I believe,

6   about an hour or so of cross-examination.  At any point have

7   you heard anything or thought through anything that caused you

8   to change any of the opinions that you've testified to today?

9   A    No.

10             MR. KINNEY:  Thank you, Your Honor.

11             THE COURT:  Anything, Ms. Cunningham?

12             MS. CUNNINGHAM:  No, Your Honor.

13             THE COURT:  Thank you, Doctor.  If you wouldn't mind

14   grabbing that microphone cover and throwing it away.  And

15   you'll have to put your mask back on to exit the courthouse.

16             Thank you.

17             THE WITNESS:  Oh, thank you.  I can just leave all

18   these documents?

19             THE COURT:  Yes.  We're going to clean it up and wipe

20   down the witness stand before the next witness.

21             THE WITNESS:  And the model.  I touched the model up

22   and down too.

23             THE COURT:  I'll let Mr. Kinney or Mr. Moore take

24   care of wiping down the model.

25             MR. KINNEY:  I will, Your Honor.

1            MR. MOORE:  We have Dr. Topp here, Your Honor.

2            THE COURT:  Yes -- I think I told him that.

3            Give Madam Deputy a moment to collect the exhibits

4    and to wipe down the witness stand.

5            We're going to take a recess.

6            Come back in about five minutes.

7            COURT SECURITY OFFICER:  All rise.

8        (Recess taken at 3:03 p.m.)

9            COURT SECURITY OFFICER:  All rise.  This Honorable

10   Court is back in session.

11           Please be seated.

12           THE COURT:  Go ahead, Mr. Moore.

13           MR. MOORE:  Thank you, Your Honor.

14           Your Honor, for clarification purposes, I know it's,

15   I believe, 3:16 right now.  Are we -- still need to shut down

16   at 5:00 or can we go to 6:00?

17           I'm going to be as brief as possible.  I just want

18   to --

19           THE COURT:  We need to shoot for 5:30.  I get in

20   trouble when I keep the entire courthouse -- because when I

21   keep us here, they have to keep extra CSOs and marshals, and so

22   let's shoot for 5:30 and see what -- what we do.

23           MR. MOORE:  Sounds good, Your Honor.

24           At this time the plaintiff would like to call

25   Dr. Raymond Topp for its next witness.

 1          THE COURT:  And remind me what exhibit number

 2   Dr. Topp is so I can get the right notebook out.

 3          Come on up to be sworn, sir.

 4          MR. MOORE:  It's Exhibit 11.  It's Topp Spine and

 5   Orthopedics, and then there's a Jax Beach Surgery Center,

 6   Exhibit 5.

 7          THE COURT:  Those are in two different notebooks.

 8          MR. MOORE:  But it's mainly -- there's only one

 9   record from Jax Beach Surgery Center, so it's primarily

10   Exhibit 11, Your Honor.

11          THE COURT:  Okay.  Sir, you may take your mask off

12   while you're testifying.

13          And we should have a -- that's a new microphone cover

14   that we placed there for you.

15          And, Madam Deputy, would you please swear this

16   gentleman.

17          COURTROOM DEPUTY:  Please raise your right hand.

18          Do you solemnly swear that the testimony you're about

19   to give before this Court will be the truth, the whole truth,

20   and nothing but the truth, so help you God?

21          THE WITNESS:  I do.

22          COURTROOM DEPUTY:  You may have a seat.

23          And if you could state your name for the record and

24   spell your last name.

25          THE WITNESS:  My name is Raymond Francis Topp,

1   T-o-p-p.

2       **RAYMOND FRANCIS TOPP, M.D., PLAINTIFF'S WITNESS, SWORN**

3                           **DIRECT EXAMINATION**

4   BY MR. MOORE:

5   Q    Good afternoon, Dr. Topp.

6           MR. MOORE:  Are you ready, Your Honor?

7           THE COURT:  Yes.

8   BY MR. MOORE:

9   Q    Go ahead and tell us about your occupation and profession.

10  A    I am an orthopedic spine surgeon, which means I perform

11  orthopedic surgeries but specialize in spinal surgeries.

12  Q    And what is the name of your orthopedic group?

13  A    I have a group, Topp Spine and Orthopedics, that I split

14  time between Georgia and Florida.

15  Q    And where in Florida is your office?

16  A    It's in Jacksonville Beach.

17  Q    Do you perform surgeries in Jacksonville Beach?

18  A    Yes, I do.

19  Q    And where do you perform those surgeries?

20  A    Predominantly in Jax Beach Surgery Center, but I also have

21  privileges at Touchton Surgery Center, and also UF Shands

22  North, near the airport.

23  Q    Tell us a little bit about your background.

24          Where did you grow up, Doctor?

25  A    I grew up in Virginia, in Newport News specifically.  Went

TRIOLO v USA                    September 23, 2020  Vol II-

1   to high school -- grade school and high school in Williamsburg,

2   and then I attended the University of Virginia, where I

3   graduated in 1987.

4   Q    And that was where you graduated -- your undergrad,

5   college?

6   A    Yes, that's correct.

7   Q    Okay.  And what was your degree that you obtained?

8   A    Biology, premed.

9   Q    And, Doctor, were you in the military?

10  A    Yes.  So after I graduated from Virginia, I went into the

11  military and spent five years as an armor officer before going

12  to medical school.

13  Q    Were you in ROTC in college?

14  A    I was.

15  Q    Is that how you got your officer commission?

16  A    That's correct.

17  Q    And how long were you in the military?

18  A    Overall, I was in the military for 24 years until I

19  retired in 2012.

20  Q    And where did you first report to duty in the military?

21  A    That was Fort Knox, Kentucky, in 1988, where I went to

22  officer basic course and learned about being an armor officer.

23  Q    Did you do any tours overseas while you were in the

24  military?

25  A    My first station was in Germany, north of Frankfurt,

TRIOLO v USA                    September 23, 2020  Vol II-
201

```
 1    Germany.  And then while I was in Germany, my division was
 2    called in support of Desert Storm and Desert Shield.
 3    Q    Did you actually serve in Iraq?
 4    A    I did.
 5    Q    And what did you do in Iraq?
 6    A    I was a company executive officer.  We had 14 tanks.  And
 7    I was second in command of that company of 72 people.  And
 8    that's what we did in support of Desert Storm/Desert Shield.
 9    We were in the 3rd Armored Division.
10    Q    Did you actually drive a tank?
11    A    I was a tank commander.  There's four members of the crew,
12    and I was the tank commander of my own tank but second in
13    command of 14 tanks.
14    Q    How long were you in your tour in Iraq?
15    A    It was about eight months.
16    Q    Did you do any other tours after that?
17    A    Not as an armor officer.  I redeployed back to Germany,
18    finished my tour, and went back to Fort Knox where -- went to
19    the Armor Officer Advanced Course and then to the Aviation
20    Officer Advanced Course.
21    Q    When you were in Iraq, did you receive any awards?
22    A    Yes.  I was awarded the Bronze Star and Purple Heart.
23    Q    And why were you awarded the Bronze Star and Purple Heart?
24    A    The Bronze Star was for meritorious service during the --
25    the length of Desert Shield and Storm while we were there.  The
```

1    Purple Heart, I was injured when my tank came in contact with a

2    mine.

3    Q    What was your injury?

4    A    I had a head injury and blast injury to my face and eye.

5    Q    Where did you end up getting treated for the head and the

6    eye injury?

7    A    At that time, in the early 1990s, there was no advanced

8    imaging in Iraq.  It was a foreign battlefield.  So I was

9    evacuated to Landstuhl, Germany, and then recovered there

10   before going back to Iraq and finishing my tour with my

11   soldiers.

12   Q    When you retired from the military, what was your rank?

13   A    I was a lieutenant colonel, promoted to colonel.

14   Q    Did you attend medical school while in the military?

15   A    Yes.  After I was -- I became a captain, an armor captain,

16   and then I applied to medical school and went to University --

17   Uniform Services University of Health Sciences in Bethesda,

18   Maryland, near the National Institutes of Health and National

19   Navy Medical Center.

20        You're actually on active duty while you're a medical

21   student, and that's how I kind of switched over to the medical

22   field.

23   Q    Why did you decide to attend medical school?

24   A    Well, obviously I had a -- I did a -- my undergraduate

25   degree was biology/premed.  I always had an inkling for it, but

1    obviously when I was injured, I saw that side of the military

2    and I thought I'd be -- reestablished my desire to do it.

3    Q    What rank did you graduate in your class?

4    A    From medical school, I was No. 19 out of 162.

5    Q    Where did you -- did you do a residency while in medical

6    school?

7    A    I did.  After you graduate medical school, you're assigned

8    an internship and residency, and I went to Brooke Army Medical

9    Center.  I did an internship in general surgery there.  And

10   there's a break between your internship and residency.  I went

11   to Korea for a year where I commanded a medical company, and

12   then I came back and I did a four-year -- finished my four-year

13   residency in orthopedic surgery in 2003.

14   Q    When you were in Korea, did you see -- were you doing

15   surgeries then?

16   A    Not surgeries.  I was a general medical officer.  I would

17   do minor procedures, like just minor outpatient type of

18   surgical things, but not orthopedic surgery nor spine surgery.

19   Q    When did you start performing orthopedic and spine

20   surgeries?

21   A    Well, that starts in your residency, and I did that for --

22   until I graduated in 2003.

23        Internship and residency is under the tutelage of

24   other surgeons, so you're performing the surgeries but under

25   the guise of, you know, board certified surgeons.

1   Q      Did you also do a fellowship?

2   A      So after I finished my residency, I was assigned to -- for

3   three years -- I'm just trying to give the chronological

4   order -- for three years to the Army Trauma Training Center.

5   Because of my experience in trauma at Brooke Army Medical

6   Center, I was an instructor in orthopedic trauma at the

7   University of Miami, the Ryder Trauma Center.  It's a special

8   Army program where we teach foreign surgical teams before

9   deploying to the battlefield on penetrating trauma and severe

10  blunt trauma.  And so I was assigned to Miami for three years.

11         After I finished that tour is when I was accepted for

12  fellowship in spine surgery.

13  Q      Where was that fellowship in spine surgery?

14  A      That was in Minneapolis, Minnesota, from 2006 to 2007.

15  It's called the Twin City Spine Center.

16  Q      Is that a difficult fellowship to get into?

17  A      Some would regard it as the top fellowship in the country.

18  It was the original scoliosis center for the United States of

19  America, so it's very competitive, and I was fortunate.

20  Q      You had mentioned you were a trauma surgeon in a Miami

21  hospital.  What hospital was that in Miami?

22  A      It's the University of Miami.  It's Jackson Memorial

23  Hospital in downtown Miami.  It's the large regional trauma

24  center for South Florida.

25         Specifically they have a separate trauma center

TRIOLO v USA                    September 23, 2020  Vol II-
205

1   that's called the Ryder Trauma Center that's separate from the

2   big main hospital complex.

3   Q    The University of Miami Trauma Center, is that a Level I?

4   A    Yes.

5   Q    And what does that mean, that it's a Level I?

6   A    It's the highest level of capability for a trauma center.

7   Each region usually has one Level I trauma center, but it means

8   that it's capable of performing and taking care of all forms of

9   trauma.

10  Q    Would that be comparable to, let's say, Shands here in

11  Jacksonville?

12  A    Well, it's just bigger and many more trauma -- much more

13  trauma.

14  Q    How many years were you there?

15  A    I was there for three years.

16  Q    And approximately how many trauma patients did you have a

17  day when you were on duty?

18  A    Well, the reason the Army sends the forward surgical teams

19  down there to train is that there are 20 major traumas per day

20  that come through that trauma center: high velocity motor

21  vehicle collisions; penetrating trauma, which gunshot wounds

22  are for many people; knife wounds.  Severe trauma, 20 per day.

23  Q    About how many yourself would you say you have treated, on

24  average, when you were working that three-year period?

25  A    We would kind of divide and conquer, and so I would

TRIOLO v USA                         September 23, 2020  Vol II-

1    usually take care of about three to four per day.

2    Q    You mentioned a couple of surgeries you were performing.

3    Were you regularly performing spine surgeries?

4    A    During the -- at Ryder Trauma Center, I was not a spine

5    surgeon as of yet.  I was performing orthopedic trauma, like

6    severe pelvic injuries, or the lower spine near the sacrum

7    injuries, mostly extremity trauma, long bones that are broken

8    or femur fractures and open-ankle injuries or gunshot wounds

9    that result in a broken bone.

10   Q    And were you treating several auto crashes per week?

11   A    Yes.  That's the predominance.  I would say 75 to

12   80 percent of what is seen in that trauma center is motor

13   vehicle collisions.

14   Q    And when did you start Topp Spine?

15   A    When I came to -- after retiring from the military, I came

16   to Southeast Georgia and joined a group, and then I branched

17   out in about 2015 and started Topp Spine to help out with some

18   of the needs down here for a spine surgeon in Jacksonville.

19   Q    So you've been doing spine surgeries here in Jacksonville

20   since around 2015?

21   A    Yes, sir.

22   Q    How often currently are you performing surgeries each

23   week, total, between your Brunswick office and your

24   Jacksonville office?

25   A    Five days a week unless I'm on call during the weekend or

1    performing surgeries between both locations.  Some days are

2    just clinic, but typically I operate three days a week.

3    Q    I know I asked you specifically about spine surgeries, but

4    was that surgeries in general?

5    A    Predominantly now, as a spine surgeon, I'm about

6    75 percent of spine.  When I'm on call, I take care of all

7    orthopedic injuries, mostly geriatric hip fractures and things

8    like that that come from the Emergency Department.

9    Q    And when you would be on call, is that normally like at

10   Shands North or Touchton Surgery Center, or where are you on

11   call at?

12   A    I'm on call at Southeast Georgia Health System in

13   Brunswick, Georgia.

14   Q    When did you officially become a spine surgeon?

15   A    In 2007.

16   Q    And you also perform surgeries on extremities still?

17   A    Yes -- yes, sir.

18   Q    Dr. Topp, how often do you do fusions and decompressions?

19   A    That's the mainstay of spine surgery in my practice, so I

20   would say every week there are several.

21   Q    And you're here testifying today, and I believe you came

22   up yesterday; is that correct?

23   A    Yes, sir.

24   Q    Are you taking time away from your practice today and

25   yesterday?

1    A    Yes, I am.

2    Q    If you were not here, what would you be doing yesterday

3    and this afternoon?

4    A    It would be clinic yesterday and today.

5    Q    Did you have to shut your clinic completely down?

6    A    To be here, yes, sir.  There's -- yes, sir.

7    Q    Dr. Topp, I'm going to transition into the Richard Triolo

8    file, and ask you some questions in relation to your medical

9    chart.

10         I believe you have some of those exhibits in front of

11   you, which would be -- Exhibit 11 is the medical chart, and

12   then Exhibit 29 would be your medical bill record.

13         I'll give you a second to grab those.

14   A    Okay.  I have them.  I have them.

15   Q    Okay.  And are you familiar with your treatment on Richard

16   Triolo?

17   A    Yes, I am.

18   Q    And did you treat him at Jax Beach Surgery Center?

19   A    Yes, I did.

20   Q    Is your office at Jax Beach Surgery Center or is it

21   separate from Jax Beach Surgery Center?

22   A    It's separate, but it's co-located within the same

23   building, for ease of the patients coming in, where they have

24   their surgeries predominantly is where they see me in clinic,

25   both preoperatively and postoperatively and for consultations.

1   Q    I believe there's Exhibit 5 and 20.  I don't need you to

2   grab it right now, but that would be the Jax Beach Surgery

3   Center records and bills.

4        And were those -- was the treatment from the Jax

5   Beach Surgery Center related to the treatment you did on

6   Mr. Richard Triolo?

7   A    That's where I treated Mr. Triolo.

8   Q    And I believe also you looked at some MRIs prior to the

9   surgery from Baymeadows MRI in April 17, 2017; is that correct?

10  A    That's my recollection, yes.

11  Q    And then I believe you looked at at least one more MRI

12  dated August 30, 2018, from a Precision Imaging, which would

13  have been the postsurgical MRI; is that correct?

14  A    I often use Precision.  That's where patients obtain their

15  MRIs, yes, sir.

16  Q    And ultimately -- we'll talk about it in a second -- did

17  you rely on your interpretation of the MRI imaging itself to

18  perform your surgery?

19  A    It's my common practice, and it was no different for this

20  case, that I look at the imaging myself prior to performing

21  surgery.

22  Q    And, Doctor, there was also some records that had been

23  provided, I believe, referenced in your records to an Omni

24  Medical.

25        Was there someone present during the surgery of

1   Richard Triolo from Omni Medical?  That would be Exhibit 10.

2           I don't need you to grab it, but if you recall.

3   A    It most likely is -- excuse me.  That probably refers to

4   the neurological monitoring company that is subcontracted from

5   Jacksonville Beach Surgery Center.

6           Yes, that's what it is.

7   Q    And do you normally have a person there monitoring the

8   neurological -- the nerves and the neurological system during

9   the surgery?

10  A    Yes.  To increase safety, we have a technician in the room

11  that is -- prior to surgery has placed needles within the

12  patient, and so he can monitor the nerves and muscular function

13  while we're performing the surgeries.  And then virtually, or

14  behind that technician, there is typically a neurologist that

15  reads the tracings from the surgery itself.

16  Q    Doctor, I'm going to turn your attention to Exhibit 11,

17  and I'm going to pull it up here on the screen, but you'll also

18  have it in front of you.

19          Exhibit 11 will have stamped in the bottom right-hand

20  corner the page numbers from your file.  And, in particular,

21  we're going to go three pages in to page 3, the November 3rd,

22  2017, record.

23  A    Yes, sir.

24  Q    Do you have that record in front of you, sir?

25  A    I do.

1    Q    I note in your record it says:  Bringing films.

2              Would that -- what kind of films would that have

3    been?

4    A    What we typically ask the patient when they're referred to

5    us is to bring all the films that they have.  Not just records,

6    I actually want to see the images.  So we ask every patient to

7    bring all of the imaging, the actual discs with the images,

8    with them.

9    Q    Now, in your initial visit with Mr. Triolo, is that

10   something you would have normally discussed with him?

11   A    What would that be, sir?

12   Q    The films, your interpretation of the imaging and the

13   X-rays?

14   A    Absolutely.  That would be the point to have them bring it

15   in, so I could go -- after I perform the history and physical,

16   I would want to review the imaging and kind of explain

17   everything to the patient, what I'm seeing and what my

18   recommendations are.

19   Q    How long do you normally meet with a patient on that first

20   visit?

21   A    It's extensive, just getting the story and performing the

22   physical examination.  Then MRI images, there's all different

23   kinds of cuts.  Typically about an hour.

24   Q     Is it you or a nurse or a PA that's in the room with you

25   and the patient?

1   A    I typically have an administrative assistant with me, and

2   then my physician assistant often accompanies me in the clinic.

3   Q    Okay.  I'm going to back up and I'm going to turn your

4   attention to page 1, Doctor, which is November 8, 2017.

5        I will have it up in the screen, too, but you're

6   welcome to use the record in front of you.

7        And November 8, 2017, was this the first time you saw

8   Mr. Triolo as a patient?

9   A    Yes.  This would be the intake questionnaire that he fills

10  out when he arrives at the office.

11  Q    And what, in general, would you discuss with Mr. Triolo in

12  this initial meeting?

13  A    Well, we talk about specifically what brings him into the

14  office, which would be the chief complaint, and then I would

15  get the story about what he felt led to his injury and what's

16  causing the pain and what makes it worse, what makes it better.

17  That's the history.  That's a lot of the talking that a patient

18  and physician do initially.

19  Q    Are you familiar with Mr. Triolo's occupation?

20  A    I am.

21  Q    And what was that?

22  A    A respiratory therapist.

23  Q    The next page, page 2., top of page 2, Doctor, what

24  brought Mr. Triolo in to see you?

25  A    Mr. Triolo stated that he was in a motor vehicle collision

TRIOLO v USA                    September 23, 2020  Vol II-
213

1    in February of 2017 when he was rear-ended when he was stopped

2    at a traffic light.

3    Q    Doctor, I notice that you have on this form a past or

4    current history of the following; is that correct?

5    A    Yes, sir.

6    Q    Okay.  And on the initial intake, did Mr. Triolo provide

7    his medical history?

8    A    He did.

9    Q    Okay.  What was his significant medical history that he

10   provided?

11   A    Speaking orthopedically, he stated that he was injured in

12   2001, which resulted in a severe left forearm fracture or a

13   compound comminuted fracture.

14   Q    Were there any prior surgical procedures listed, Doctor?

15   A    There are none listed.

16   Q    All right.  Let's turn your attention to page 4.  Who

17   fills out this particular form?

18   A    What I typically have is I talk to the patient, and rather

19   than being distracted with paperwork, I often have a recorder

20   in the room.  This would be my medical assistant who would be

21   in the room, kind of recording down as I go through this

22   template.

23        This is a very standard template.  It always starts

24   with chief complaint, goes through history of present illness,

25   just collecting information before going on through physical

1    examination.

2    Q    What does HPI stand for at the top of the page there?

3    A    That stands for history of present illness.

4    Q    What was Mr. Triolo's chief complaint when he presented to

5    you that day?

6    A    His chief complaint was that he had lumbar spine or

7    low-back pain, secondary to being involved in a motor vehicle

8    accident in February of 2017.

9    Q    And, once again, there's a notation right below that for

10   medical history.  And what does that say under it?

11   A    None.

12   Q    And are you talking through with Mr. Triolo about his

13   medical history while this form is being filled out?

14   A    I'm actually asking him:  Hey, what are your current

15   medications, for instance, and what are your medical problems.

16   And he reported that he doesn't have any medical problems

17   previously.

18   Q    The information pertaining to prior medical history, is

19   this something you as a surgeon would want to know before

20   treating -- before diagnosing and then treating Mr. Triolo?

21   A    Yes, sir.

22   Q    Why is that?

23   A    Well, it factors into your decision-making of the

24   differential diagnosis and eliminating different diagnoses as

25   you're trying to help the patient.  It helps you formulate a

 1   plan and see what's possible.

 2          For instance, a very elderly patient, as well

 3   intentioned as a physician and surgeon is, can't often help

 4   someone because they're too medically frail.  So collecting

 5   information on the general medical status of a patient gives a

 6   surgeon insight in what's possible in their treatment pathway.

 7   Q    Is it your practice, as an orthopedic spine surgeon, to

 8   ask each patient that comes into your office this information?

 9   A    Especially on the initial visit, yes, sir.

10   Q    And are all these forms the same that you provide to each

11   patient?

12   A    Yes, sir.  They change slightly over the years, but

13   they're all intake questionnaires, and it's the basic format

14   that I would say every physician typically goes through as

15   we're all trained very similarly in medical school.

16   Q    And do you normally, while you're in that initial meeting

17   with Mr. Triolo, ask questions like:  Have you been in any car

18   crashes before where you've had any significant injuries?

19   A    Yes, sir.  I would ask:  Have you ever been hurt before?

20   That's where I've elicited that he hurt his forearm.  What

21   other things have happened to you before?

22          Any trauma, fall off a building, fall off a ladder,

23   anything.

24   Q    Knowing that Mr. Triolo had reported the lumbar pain,

25   would you have also asked him about preexisting or prior lumbar

1   pain before the crash?

2   A    Yes, sir.

3   Q    Again, why is this information important to you?

4   A    It helps me, once again, develop a differential -- or

5   eliminate from the differential diagnosis.  You always start

6   with, you know, a whole multitude of potential problems that

7   could be causing his back pain, whether they are acute or

8   chronic, but then asking these questions helps you to eliminate

9   diagnoses that are in the differential.

10           For instance, low-back pain could be caused by an

11  infection.  I would ask:  Do you have any fevers?

12           So it's less likely if he says no that it's an

13  infection.

14           Do you have any rheumatologic conditions?

15           It's not likely that he has an inflammatory condition

16  in his lower back.

17           So it helps you eliminate and keep in to differential

18  diagnoses so that you're trying to help the patient.

19  Q    And from your records, are you aware of any prior

20  treatment that Mr. Triolo had when he came to present himself

21  to you since the car crash but before he saw you?

22  A    He had some pain management techniques, yes, sir.

23  Q    Okay.  And you had -- I believe it was noted an ESI after

24  accident.  What is an ESI?

25           Again, looking at page 4 at the top.

1    A    ESI stands for an epidural steroid injection.  It is a

2    space that's outside of the sac of nerves in the lower back,

3    but steroid is deployed in that space to help reduce pain and

4    inflammation.

5    Q    Are you aware of whether the pain management modalities

6    were successful at relieving Mr. Triolo's pain at that time?

7    A    He said that it was no relief, but actually got somewhat

8    worse after the injection.

9    Q    And did he describe to you the location of that pain?

10   A    He stated that the pain would radiate down on the back

11   side of his thigh, posteriorly down the thigh, but sometimes

12   it's in the front, near the hip.

13   Q    Did he say when, according to your records, when the onset

14   of that condition was?

15   A    It's all related, in his mind, to the motor vehicle

16   collision from February of 2017.

17   Q    And you noted current medications of Norco, tizanidine,

18   and diclofenac.  What are those medications?

19   A    Norco is hydroxycodone; that's a portion of the pill.  And

20   the other portion of the pill is acetaminophen.  So that's

21   what's meant by 10 milligrams of hydrocodone and then

22   325 milligrams, which is a standard Tylenol pill.

23        Tizanidine is a muscle relaxer.  It has a lot of good

24   pain-relieving qualities, so a lot of spine surgeons like to

25   use that medication.  And that was a 4-milligram formulation,

 1  which is the highest dose.

 2          And then the diclofenac is an anti-inflammatory.

 3  It's a nonsteroidal anti-inflammatory.  So steroids are

 4  anti-inflammatories, nonsteroidals are a bit safer.  So things

 5  like Motrin and Naprosyn fall into this category.

 6          Diclofenac is the 75-milligram formulation that's

 7  taken twice a day.

 8  Q    And what was his pain level at that day when he presented

 9  to you?

10  A    He reported that there was 7 to 9 out of 10.

11  Q    Okay.  And, Doctor, I'd like you to flip to the next page,

12  No. 5.  You ask about an assessment.

13          What are you asking there?

14  A    The assessment is my -- after I gather information from

15  the history and physical examination, and then I couple that

16  with the objective studies like an MRI and radiographs or

17  X-rays, then I come up with what I feel is the diagnosis of

18  what's causing the problem.

19  Q    What is spondylolisthesis at L5-S1?

20  A    Spondylolisthesis is a term that -- it's a medical term

21  that -- spondylo meaning spine, and listhesis meaning slippage.

22  So it's a slippage of one vertebrae over the other.  In this

23  case, his L5 slips forward over the sacral 1 vertebra.

24  Q    I'm going to ask you about that a little more in a minute.

25  What is a bilateral L5 pars fracture?

TRIOLO v USA                    September 23, 2020  Vol II-
219

1    A    A bilateral L5 pars fracture is a traumatic injury to the

2    L5 vertebra, which leads to a broken bone.  The pars is a

3    portion of the bone, the pars interarticularis, which is a very

4    special portion of the bone that connects the front of the L5

5    vertebra to the back, and it's that back side of the bone that

6    hooks over sacral 1.  So if that portion of bone is broken, the

7    front portion of the bone is disconnected from the back portion

8    of the bone, and the bone can slip forward.

9    Q    Okay.  Doctor, was there another injury that was later

10   identified after the surgery?

11   A    It's my recollection that I also was concerned about the

12   sacroiliac joint in Mr. Triolo.

13   Q    SI joint dysfunction?

14   A    Yes, sir.

15   Q    Before we move on, I want to briefly -- there's a spine

16   model right next to you to your left there, and I'd like for

17   you to pick that up, if that's all right with Your Honor.

18          And, again, I'm not going to go -- have you go into a

19   ton of detail.  As fellow counsel pointed out, Judge has heard

20   this many times.  But just for the sake of what you're looking

21   at on a lumbar L5-S1 injury, get us familiar with that L5-S1,

22   what part you're looking at on that spine model.

23   A    Of this whole spine --

24   Q    And, I'm sorry, talk to the judge when you're doing that.

25   A    Of the whole spine we're talking about, this is the

1    cervical portion or the neck, the rib cage portion.  So the

2    lumbar spine is the lower back portion.  The very lowest

3    vertebra is lumbar 5, which is down here.  The top of the

4    sacrum is sacral 1.  So the injury occurred to the lumbar 5

5    vertebra down at the bottom.

6    Q    From a mechanics standpoint, when there's an impact, how

7    would those vertebrae spread apart and cause that particular

8    fracture?

9    A    Well, this particular fracture is caused -- an acute pars

10   fracture is always caused by a hyperextension.

11           The pars interarticularis, Your Honor, is this

12   portion that connects this front part of the bone way up here

13   to the back.  So it's this little portion right here.  And

14   there's one on each side.

15           So during the hyperextension, in Mr. Triolo's case,

16   rear-ended, his back is hyperextended and it causes this bone,

17   lumbar 4, to act like a hammer on an anvil, and it pushes this

18   lumbar 4 into lumbar 5 and cracked the bone, and that's what

19   led to the fracture that ultimately leads to the bone slipping

20   forward.

21   Q    Okay.  Is that ultimately the source of the pain?

22   A    Well, the fracture initially causes some pain.  But then

23   usually, as time goes on, the nerves become impinged.  As the

24   bone slips forward, the nerves get dragged.  The spaces that

25   they live within get smaller and they get pinched and that

 1   leads to pain.

 2   Q    Where are the location of those particular nerves?  I know

 3   you can't necessarily see all the nerves on that model, but

 4   where would they be?

 5   A    Well, they exit through these little windows on the side.

 6   You can see them at higher levels.  They come out these little

 7   windows.  And as the bone slips forward, these little windows,

 8   or neural foramina, gets smaller.

 9            And a patient with spondylolisthesis always has

10   neural foraminal stenosis from the nerves.  There's also

11   pinching of the nerves within the canal because the bones slip

12   forward, and so the entirety of the nerves will have to go

13   around the corner.

14   Q    You mentioned stenosis.  What's stenosis?

15   A    Stenosis is a general medical term that's used when we

16   have a conduit within the body, whether it's a blood vessel or

17   a tube, a conduit in the spine.  It means that that tube has

18   gotten smaller.

19            In this case, we use the term "spinal stenosis" in

20   that the tube that carries nerves behind the spine has gotten

21   smaller.

22   Q    Doctor, this vertebra fracture and this slippage, does

23   that ultimately affect or impact the stability of the lumbar

24   spine?

25   A    Well, by its very nature, we use the term instability, and

TRIOLO v USA                        September 23, 2020  Vol II-
222

1    that means it's unstable.  So a spondylolisthesis that is

2    dynamic in nature -- it's moving around -- is unstable.  And

3    it's that instability that leads to neural impingement and

4    pain.

5    Q    What is it that is actually compressing the nerves?

6    A    Well, as the bone slips forward, it drags the nerve with

7    it.  The disc from below becomes exposed and the nerve gets

8    pushed over this exposed hump in the disc which appears to be a

9    herniation.

10            There's also portions of the bone from above and

11   below where it just pinches on the nerves.

12   Q    Doctor, can the force of an impact from a rear-end car

13   collision cause this vertebra slippage of spondylolisthesis

14   from L5-S1?

15   A    Well, the -- in my mind, the hyperextension leads to the

16   fracture.  When the back portion of lumbar 5 disconnects from

17   the front portion of lumbar 5, it sets up a condition where the

18   bone can slip forward, and it's that slippage of bone forward

19   that pinches on the nerves, leading to pain.

20   Q    Does spondylolisthesis at L5-S1 cause pain?

21   A    The condition, yes, causes pain, because of neural

22   impingement.

23   Q    What about the spondylosis -- I'm sorry, spondylysis at

24   L5-1 -- L5-S1?  Can that cause pain?

25   A    A spondylysis is the actual term of the broken pars

TRIOLO v USA                    September 23, 2020  Vol II-

1   interarticularis.  The words -- the vocabulary is very similar

2   but somewhat different in medical terms.  Spondylo still

3   meaning spine, but the lysis is the fracture of the pars.

4           Initially when the bone breaks, like any bone, it has

5   nerve endings that causes pain.  But as time goes on, the bone

6   doesn't hurt anymore, but it's that slippage forward that leads

7   to the neural impingement and the spinal stenosis that causes

8   pain, continued pain.

9   Q    If that hyperextension fracture at L5 was present before

10  the crash, would Mr. Triolo have experienced pain before the

11  crash?

12  A    He would have had certainly some pain in his back if he

13  had sustained that injury prior.

14  Q    And just with that spine model, SI joint dysfunction,

15  where is the SI joint located?

16  A    Well, the sacroiliac joint, Your Honor, is very close.

17  The sacroiliac is the joint between the sacrum, as I mentioned

18  before, and this iliac.  So it's the connection from the axial

19  skeleton or the central portion to the appendicular skeleton.

20  And that's the iliac wing, so we call that the sacroiliac

21  joint, these little joints that don't move much, normally,

22  unless they become dysfunctional.

23  Q    Thank you, Doctor.

24          And you can set the spine model down for a minute.

25          Doctor, what is a differential diagnosis?

1    A    I think I was alluding to it before.  It's when somebody

2    comes in with a complaint, the doctor, whether it's cardiology,

3    pediatrics, any form of specialty, starts developing all the

4    potential possibilities of what's causing this problem.

5            And then you use your interview, history that you

6    obtain from the patient, coupled with your physical exam, and

7    then the objective findings to start eliminating and start

8    reinforcing all those different possibilities until you narrow

9    it down to what you feel is the ultimate problem.

10   Q    Is it normally your routine -- is it your normal routine

11   as an orthopedic spine surgeon to perform a differential

12   diagnosis on each of your patients that come in?

13   A    Yes, sir.

14   Q    Is this one of the reasons you asked for the medical

15   history?

16   A    Yes, sir.

17   Q    Ultimately, did you perform a differential diagnosis on

18   Mr. Triolo to determine the cause of his injury?

19   A    Yes, sir.  We perform it on every patient.

20   Q    Does knowing the cause of that injury assist you in

21   determining the treatment of that injury?

22   A    Absolutely.

23   Q    Okay.  And how so?

24   A    Well, you know, knowing the cause allows you to, once

25   again, eliminate or reinforce aspects of that differential

1   diagnosis, and it's been the cause that leads you to the

2   diagnosis that helps you formulate the plan.  So I would say we

3   use that on every patient.

4   Q    Did knowing the cause of Mr. Triolo's lumbar injury assist

5   you in determining his proper treatment?

6   A    Yes, sir.

7   Q    In Mr. Triolo's case, after doing the differential

8   diagnosis, were you able to rule out other causes of a lumbar

9   injury?

10  A    Yes.  I mean, there's so many to rule out.  There was not

11  a tumor; there was not an infection.  It wasn't a degenerative

12  condition.  It was an acute injury that we were left with.

13  Q    Doctor, get back to the records here.

14          I want to -- well, actually, I want to ask you about

15  the April 4th, 2017, Baymeadows MRI.  It's marked as Exhibit 3.

16          I'm going to put the actual image up here.  You don't

17  need to turn to anything, Doctor.

18          Before I do that, Doctor, I believe I had asked

19  you -- you had mentioned that one of the images was a

20  Baymeadows -- was the lumbar image that you reviewed prior to

21  the surgery; correct?

22  A    Yes, sir.

23  Q    Okay.  Did you rely on that particular image in your

24  diagnosis of Mr. Triolo?

25  A    Yes, sir.

TRIOLO v USA                    September 23, 2020  Vol II-
226

1   Q    Did you rely on that particular image during your surgery

2   of Mr. Triolo?

3   A    It's my practice that I like to have the MRIs because I

4   see so many patients I want to see the MRI that led to my

5   decision-making in the OR with me.

6   Q    When patients come in for orthopedic spine surgery, do you

7   normally -- is it your routine to look at -- make your own

8   interpretation of the MRI?

9   A    Yes.  I mean, I think what you're alluding to maybe is

10  that we don't want to leave that to a radiologist who has never

11  met a patient, never spoke to them.  He's just looking at a

12  picture to try to determine what's going on.  Otherwise

13  radiologists would indicate surgeries, and that's just not how

14  it's done.

15  Q    Are you using the -- are you correlating the MRIs in your

16  medical history with your actual feeling a patient's injury

17  with what happened to make the determination as to a diagnosis?

18  A    That's exactly how it's done.  Regardless of the

19  specialty, you always couple the history with the physical

20  examination and then the objective studies, and all three of

21  those things need to line up.

22        When you use all three of the things to establish the

23  proper diagnosis and then perform surgeries, you're very likely

24  to be successful.

25  Q    Doctor, I believe this April 4th, 2017, lumbar MRI was

 1 | taken about six weeks after the crash.  I'd like to -- Sagittal
 2 | Image 213, I'd like to ask you some questions about that
 3 | particular image.
 4 |         Do you recall reviewing this particular image in
 5 | diagnosing Mr. Triolo's injury?
 6 | A    Well, this is his injury -- I can't recall the exact date
 7 | that I -- you know, but this is the one that I looked at in
 8 | helping me establish his diagnosis, yes, sir.
 9 | Q    Okay.  And, Doctor, why not just rely solely on the
10 | radiologist's interpretation?
11 | A    Well, because, as I was saying, you can't just look at a
12 | picture and say that's the diagnosis.
13 |         When we turn 40 years old, 40 percent of our MRIs
14 | demonstrate some sort of abnormality.  So it's really important
15 | to couple what the patient tells you, that history, with what
16 | you get with the physical exam and the imaging.  Otherwise we
17 | would just rely on the picture.  And I like to tell my
18 | residents, we don't operate on pictures, we operate on people.
19 | So you have to put all three of them together.
20 | Q    Doctor, at T2 Image 13, what does this image show you in
21 | relation to the end plate at L5-sacral 1?
22 | A    I don't know if I can point, but L5 --
23 | Q    I think if you touch the screen, I believe --
24 | A    Drag that over.
25 | Q    There you go.

1   A    So in this area --

2   Q    I'm sorry, Doctor, just talk into the microphone just so

3   the court reporter can hear you.  Thank you.

4   A    I'm sorry.  So trying to put this cursor on the disc

5   between lumbar 5 and sacral 1.

6         And you can see the bone of lumbar 5 here right above

7   the disc is lighter in color than it is, let's say, right up

8   here, which is gray, and this is lighter gray.  And then below

9   it is the same.  We call those modic changes.  Those are

10  indicative that there's increased blood flow to the area, that

11  there's inflammatory changes, and we believe that it's

12  indicative of a particularly painful area.

13        And if you were to look at each one of the other

14  bones, those discs appear to be normal.  They are tall.  They

15  are somewhat light color within them.  They are not completely

16  black.  They have good water content, good height.

17        At two discs levels above it, which is right here,

18  you can see that disc has a nice black streak.  It kind of

19  looks like a hamburger.  That is exactly what a disc should

20  look like.  Nice and flat in the back where it's not protruding

21  backwards, and good signal indicates that it's good water

22  content.

23        But when you come down here and see this one at

24  L5-S1, it's dark.  It's not tall.  And then the bones around it

25  are inflamed.

Q    I believe, Doctor, you can clear that red out if you hit
that little arrow in the top right-hand corner.

     There you go.

     And then hit the word "clear" at the very bottom.

     What I'll do is I'll point with my mouse.

A    All right.

Q    I wouldn't color everything red here.

A    All right.

Q    What does the increased signal at the end plate at lumbar
5 and sacral 1 represent?

A    Well, it indicates inflammation.

     So an MRI is a big magnet.  So as soon as a patient
enters the room, they're subjected to the magnet.  Anything in
the room is subjected to the magnet.  That's why metal objects
are not allowed in the room where the big magnet is.

     Our bodies are made of about 75-, 80-percent water.
As soon as we get into that room, the water molecules in our
body -- which you may remember from chemistry, are polarized.
There's two hydrogens and one oxygen.  Hydrogen is positive;
the oxygen side of that molecule is negative, so it's
polarized.  It has electrical charge.  And so the water
molecules face the magnet.

     And what the radiology technician does for the next
30 minutes, which is typically how long an MRI takes, is they
send -- they shoot pulse radio waves at the patient.  And what

TRIOLO v USA                    September 23, 2020  Vol II-

1    it does is it takes those water molecules which are facing the

2    magnet and throws them off balance and makes them teeter.  They

3    can pulse them fast; they can pulse them slow; they can take

4    long pauses.  They do all different kinds of things.

5            But, in essence, the water molecules are teetering

6    back and forth, and it's that teetering of moving electrical

7    charge that generates a signal, which is picked up by the

8    computer and generates this image.

9            So whatever you see that is bright, we call,

10   actually, high intensity on an MRI.  Bright, you can see here,

11   is the subcutaneous fat, which has lots of water.  Within the

12   canal, you can see that there is cerebrospinal fluid; that's

13   white.

14           If it doesn't have a lot of water in it, it's going

15   to be darker.  Like the ends of the bones and the end plates,

16   you know, muscle has a lot of protein substance but not a lot

17   of water content.

18           So wherever you see water, it's high intensity.  So

19   these changes that you see in the end plates of lumbar 5 and

20   sacral 1 just over down here indicate that, number one, the

21   disc is small.  It's lost its water content because it's been

22   injured and it's degenerating.

23           It's a shock absorber.  Because it's not tall, just

24   like bad shock absorbers on a car, it's going to let the

25   two objects come in contact with one another.  So lumbar 5 is

1   banging into sacral 1, and that's leading into inflammation,

2   and the changes in the bone, the increased signal, that are the

3   motor changes.

4   Q    Okay.  Can you actually see the fracture in this image?

5   A    You can.  Let me clear it so I can be specific.  You can

6   see the fracture, which is right there.

7   Q    Okay.  How do you know it's a fracture?

8   A    Well, because if you compare it to the level above there,

9   that bone is in continuity, whereas this bone is not.  There's

10  a space.  And, in fact, there's an increase signal within it.

11  And so as you're switching to the images, you can actually see

12  the space.  You can actually see that the bone is two pieces

13  rather than one.

14  Q    Okay.  And, Doctor, in relation to the end plate, would

15  that signal normally be there six to eight weeks after a crash?

16  A    This end plate changes -- or anything inflammatory can be

17  there as long as there's inflammation.  So with repetitive

18  trauma, it could be there.  It could still be there several

19  months.

20        Because those -- those bones are moving abnormally,

21  so lumbar 5 is moving on top of sacral 1 every time the patient

22  gets up out of a chair or bends forward.  And so it's a

23  continual insult that continues after the conditions are set

24  where that bone is broken.  So those end plate changes can be

25  there for a long time.

1   Q    Doctor, I want to turn your attention to Image 3.

2          What are we looking at here, Doctor?

3   A    Well, this is -- so what the computer allows you to do is

4   way up here is the top.  It's here and here, on the way to the

5   head.  Down here is on the way to the feet.  This is front.

6   This is back.

7          And so what this allows you to do is scan from side

8   to side through the patient's spinal column.

9          And so we're looking on the margins or on the

10  periphery.  And you can clearly see that -- in this one that

11  the -- this little piece of bone here is not attached to the

12  front.  It's laying on the other side.

13  Q    Clear that out, if you don't mind.

14  A    So this little bone here, right there, is broken.  It's

15  laying on the other side of the bone.  It's not in continuity

16  with the front portion.

17  Q    What's the condition of the disc between lumbar 1 and

18  sacral -- sorry, sacral 1 and lumbar 5?

19  A    As I was pointing out before, it's lost its signal

20  content; it's lost its height.  It has lost its full capacity

21  to act as a shock absorber.

22  Q    Is there any indication whether this disc would have been

23  symptomatic before the car crash?

24  A    There is no way to tell if the disc was symptomatic, but

25  there's other signs on here that would make it hard for me to

TRIOLO v USA                    September 23, 2020  Vol II-

1    believe that the patient had this for a long time.

2    Q    What are those signs?

3    A    Well, if you look into the -- there's probably other

4    images if you scan through.  If you look at the neural foramina

5    where the nerve exits -- that's a great image right there.

6    Q    That would be Image 5 of Sagittal 2.

7    A    So if you look down here, I'm going to -- can I circle

8    this?

9         This is the neural foramina, and that little dot in

10   the middle is the nerve.  And if you compare it to other levels

11   here, here, you can see how these keyholes are very large.

12   Keyhole very large.  And within it is a little dot has plenty

13   of room.  It's like a piece of spaghetti that has a big pot

14   that's floating around in it.

15        Down here, at L5-S1, that nerve is being smashed

16   between the bone of lumbar 5 and the disc below it, that

17   portion of the disc that's herniated up.

18   Q    Is that the spondylysis where that's occurring?

19   A    The spondylysis is the fracture; the spondylolisthesis

20   drags the bone forward, and then it's the neural foraminal

21   stenosis -- it's that nerve -- the lumbar 5 nerve root within

22   it that's being smashed.

23        It should be circular, but it's ovoid.  That's a

24   condition that's not going to be comfortable for a patient at

25   all.

TRIOLO v USA                    September 23, 2020  Vol II-
234

1   Q    Okay.  Just on the spine model real quick, can you point

2   where the pars interarticularis is located.

3   A    As we were saying before, Your Honor, the pars

4   interarticularis is between -- it is this portion that connects

5   the front to the back --

6              THE COURT:  I can't actually see what you're pointing

7   at.

8              THE WITNESS:  Yes, ma'am.  So the pars

9   interarticularis is this portion here.  It is between that

10  joint and that joint.

11             Articularis means articulation or joint.

12  Interarticularis means between the two, so the pars

13  interarticularis is the bone between that joint and that joint

14  of this portion right here, Your Honor.

15  BY MR. MOORE:

16  Q    When there's an acute injury, does the blood begin to flow

17  to that particular area immediately?

18  A    Yes.  With any injury, the first thing that happens is

19  inflammation.  And inflammation is -- a tissue is disturbed or

20  destroyed, the cells leak cytokines which leak into the air and

21  causes an inflammatory response.  That drags blood into the

22  area to start the process of cleaning out debris, initially,

23  cleaning out necrotic tissue, and then laying down the

24  foundation for healing.

25  Q    Ultimately, looking at this image or these images, Doctor,

TRIOLO v USA                    September 23, 2020  Vol II-
235

1   is there concern or was there concern on your part with lumbar

2   spine stabilization?

3   A    Well, you can clearly see on these images that the bone is

4   slipping forward and it's causing lumbar 5 and sacral 1 to be

5   irritated, and so it is an instability issue.

6         If it were solid and it weren't rocking around, I

7   wouldn't see any of those inflammatory issues with regard to

8   the bone in lumbar 5 and sacral 1.  You wouldn't see a nerve

9   being pinched.  That's a condition that -- when I look at it, I

10  see pain.  You know, that poor patient must be in a lot of

11  pain.

12  Q    Lastly --

13        MS. CUNNINGHAM:  Your Honor, pardon me.  Before we --

14  it occurred to me that I probably should have made the same

15  objection beginning with this witness's testimony that -- to

16  the extent there are opinions being offered outside the scope

17  of his expert disclosures, that would also be something not

18  being raised.

19        THE COURT:  And that's -- that's preserved then.

20        MS. CUNNINGHAM:  Okay.  Thank you.

21        THE COURT:  Okay.  Go ahead.

22  BY MR. MOORE:

23  Q    The last image I'm going to ask you about is Image 14 on

24  Sagittal 2, Doctor.

25        What does this image show in relation to the nerves

TRIOLO v USA                    September 23, 2020  Vol II-
236

1    around lumbar 5 and sacral 1?

2    A    So this definitely demonstrates what I was talking about,

3    is that the neural foramina is closed down and the nerve within

4    that neural foramina or space where it lives is closed down to

5    such an extent that it's being pinched.

6              This would be a normal spot here.  And you can see

7    that there's a very large keyhole.  The black dot has white

8    surrounding it.  Lots of room.  Whereas, the level below it,

9    down here, that nerve, you can clearly see, is being pinched

10   between the bone below and below, and the bone above.  And it

11   happens to be the area of that nerve called the dorsal root

12   ganglion, which is within that hole, and that carries all the

13   pain centers and pain fibers as well as the motor nerves.

14   Q    Doctor, what is subluxation?

15   A    Subluxation is a general term in medicine for -- in

16   specifically orthopedics, where it's out of place, like, a

17   joint can sublux.  It's not a located joint.  The bones don't

18   articulate properly.  So if something subluxes, it means that

19   it's out of place.

20   Q    Is that ultimately the source for the pain in Mr. Triolo's

21   situation, according to this MRI, or one of the sources?

22   A    Well, the spondylolisthesis or lumbar 5 slipping over

23   sacral 1 is causing the nerves to be placed in positions that

24   they're not normally used to.  So it's the spondylolisthesis

25   that's causing the nerves to become pinched, and the nerve

1  pinching causes the pain.

2  Q    Thank you.  What's a grade I spondylolisthesis?

3  A    The grading system was established by a Dr. Myerding.

4  Where you take the vertebral body and use that as 100 percent,

5  you just kind of measure it that one vertebral body slips over

6  the other.

7        If it's one-quarter of the way, it's grade I; if it's

8  half the way, it's II; III is 75 percent.  If it slips all the

9  way is grade IV, or 100 percent.  If it falls completely off,

10  which often can happen as time goes on, that's called

11  spondyloptosis, and that's a grade V.

12  Q    Can you clear that out and just point out the location of

13  where those nerves were being compressed.

14  A    In the neural foramina, right there (Indicating.)

15  Q    Okay.  When nerves are being compressed in the neural

16  foramina, in the area that you marked, where is the pain going

17  to be felt when correlating the pain physiologically to the

18  person's body?

19  A    Well, that's what spine surgeons -- why we know anatomy.

20  So this is the lumbar 5-sacral 1 neural foramina.  We know,

21  anatomically, that the lumbar 5 nerve root is in that space.

22        The lumbar 5 nerve root innervates the toe extensors

23  from a motor standpoint.  It travels down the back and side of

24  the leg, goes below the knee, and ultimately wraps around the

25  skin between the great toe and the second toe, is the

 1  culmination of the lumbar 5 dermatome, or the skin that is
 2  innervated by that nerve from a sensory standpoint.
 3  Q    And were you able to correlate the -- your review of this
 4  image or this MRI, correlate it with the pain description
 5  Mr. Triolo gave you?
 6  A    Yes.  That's what I meant previously when I said you
 7  correlate the history.  You ask the patient:  Where
 8  specifically are you hurting?
 9           And if he would point to anything other than the
10  distribution of the L5 nerve root, I would say that's an
11  interesting picture, but that's not correlating with his pain.
12           So there's other findings on the MRI that don't seem
13  to correlate with his pain.  It's the L5-S1 region that
14  correlates with what the patient told me the pain was on the
15  back of his leg and radiated down the back of the leg, down
16  towards the foot and calf.
17  Q    Thank you.
18           One last -- one last question, Doctor.  Were you able
19  to see the fractured piece of bone pushing into the spinal
20  column?
21  A    At what time?
22  Q    On this MRI.
23  A    You can see the fractured piece of bone displaced
24  posteriorly, that piece there.  And you can see that because
25  that hook is not connected to the front.  This bone, lumbar 5,

```
 1   has slipped forward and is causing pinching of that nerve right
 2   there.
 3   Q    And would that cause pain?
 4   A    Absolutely.
 5   Q    Back to your records.
 6        Doctor, you had mentioned -- on page 5, again, in the
 7   treatment area, looks like you mentioned "PLIF."  What's PLIF?
 8   A    PLIF is a general term, posterior lumbar interbody fusion,
 9   meaning that the approach to the spine would be from behind or
10   posteriorly.
11        Lumbar is the area, lumbar spine.
12        Interbody is between the named bones.  Interbody,
13   between one body of bone and the other, which is L5-S1.
14        And then the fusion would be to fuse lumbar 5 to
15   sacral 1.
16   Q    Okay.  What's the purpose of the fusion?
17   A    The fusion would stabilize the spine.
18        So if the bones are mended together, you know, in a
19   more appropriate position, it will keep them from sliding over
20   one another, causing the neural impingement.
21   Q    In your opinion, according to this record, did Mr. Triolo
22   fail conservative treatment at this point?
23   A    Yes, sir.
24   Q    All right.  Let's go to page 7 -- yeah, page 7.
25        And I'll point your attention to this last sentence
```

1   of that.  The last sentence:  I recommend an inpatient surgery

2   ASAP.

3            Why ASAP?

4   A    Well, because the patient is having severe pain.  There's

5   not many patients who say 7 out of 10 pain all the time, or 9

6   out of 10 pain at its worse.  That's pretty severe.  It doesn't

7   hardly get much worse than that, although it can.  10 out of 10

8   is the worst.

9            So I would say to alleviate the pain, the only thing

10  left to offer is a surgery that needs to be done as soon as

11  possible to relieve his pain.

12  Q    What's the danger of delaying that surgery?

13  A    Well, just continual pain.  My concern is always for

14  narcotic dependence.  If the only thing that's allowing a

15  patient to get control of his pain is the use of pretty heavy

16  narcotics, he's going to become dependent on them.  They'll

17  stop working.  He'll need increasing doses.  Cause him a

18  dependency problem.

19           And so all of these concerns.  He's failed

20  nonoperative management.  He has an operative condition.  I

21  have a pretty good sense of what the problem is.  The only

22  thing in my mind that's going to work from this point on is the

23  surgery.

24  Q    Is there also a concern of spine stability?

25  A    Well, the instability, as I said, it could slip forward,

TRIOLO v USA                    September 23, 2020  Vol II-
241

1    and as the disc continue to degenerate.  It could continue to

2    slip forward further, and so it would make the surgery more

3    difficult certainly.

4    Q    Doctor, on -- page 8 indicates that a brace was given.

5         Why did you give him a brace?

6    A    This is part of my preoperative.  What I always give

7    patients who are going to have fusion surgery is a brace.  A

8    brace is good for pain control right after the surgery.  It

9    helps their soft tissues.  It gives additional stability, takes

10   pressure off the muscles that I've had to operate through, and

11   so can alleviate pain and discomfort.

12   Q    Doctor, page 10.

13        Again, is this part of your preop?

14   A    Yes, sir.

15   Q    It looks like you had scheduled a surgery, I believe, for

16   March 22nd of 2018 at this point?

17   A    Yes, sir.

18   Q    Next, Doctor, is page 11.

19        Why did you write this letter?

20   A    If I could just read it real quick.

21   Q    Sure.  My apologies.

22   A    So I was writing it on behalf of Mr. Triolo to his

23   workplace to just tell them what was coming is that he's going

24   to have a pretty big surgery which will take several hours.

25   But the mainstay of the surgery -- I always tell the patients

TRIOLO v USA                    September 23, 2020  Vol II-
242

1  the surgery is not the most important part.  The recovery and

2  therapy and the healing process, that's going to take some

3  time, so you have to really dedicate yourself to it.

4  Q    And I believe you indicated he would need to be off until

5  May 30th of 2018; is that correct?

6  A    Yes, sir.

7  Q    And that was approximately ten weeks from the March 22nd

8  surgery; is that correct?

9  A    Yes.

10  Q    In your experience as an orthopedic surgeon, is that how

11  long it normally takes to heal to return to work?

12  A    It really depends on the type of work.  But it's going to

13  take a full three months for the fusion to become absolutely

14  solid.  Typically you'll pass the soft-tissue healing in about

15  6 to 8 weeks.  So in about 2 months, the patient can start

16  returning to some form of active work and active lifestyle at

17  home.

18  Q    Doctor, on the next page, page 12, you had mentioned the

19  C-arm and making a hardware implant vendor request.

20        What's that about?

21  A    On page?

22  Q    12.  I'm sorry.

23  A    12.  This is my posting sheet.

24        What we typically do is we plan out the surgery, so I

25  tell the surgery center or the hospital, wherever I'm doing

 1  this, what kind of things that I would need.

 2          The vendor that I requested is Ken Giddins, where I

 3  get my instrumentation.  The instrumentation is the screws, the

 4  rods, the metal implants that are left behind in the patient.

 5  And that we would need fluoroscopy to help us implant

 6  everything in a safe manner.

 7  Q    Okay.  And is that something y'all are renting, a C-arm,

 8  or is it your own Topp Spine Orthopedic C-arm?

 9  A    It comes with the operating room.

10          THE COURT:  I don't know what a C-arm is.

11  BY MR. MOORE:

12  Q    I'm sorry.  What is a C-arm?

13  A    The C-arm is a -- it's a fluoroscopy machine, which is a

14  real-time radiograph, so we can take X-rays as we're implanting

15  and putting things or taking things away, to make sure we're in

16  the proper anatomic position.

17  Q    That occurs during the surgery; correct?

18  A    Yes -- yes, sir.

19  Q    Okay.  All right.  Page 13, Doctor, the date of the

20  operation, March 22nd, 2018.  I'm going to try to get you to

21  walk me through this quickly.

22          We talked about the preoperative diagnosis already.

23          Why list a postoperative diagnosis as well?

24  A    Well, sometimes -- well, the main reason is to confirm

25  what your preoperative diagnosis is.  But sometimes things are

```
 1    evident in the operation that are not evident preoperatively.
 2            For instance, the patient may have had another
 3    fracture that you don't appreciate, or you may have a tumor.
 4    Or there may be an actual injury to the nerves that lead to
 5    spinal fluid leakage, which actually can occur with some
 6    fractures.
 7            So you would want to list all those things which you
 8    saw, and you have additional diagnoses after you actually
 9    looked inside the patient.
10    Q    You noted acute trauma.  Why did you note acute trauma?
11    A    Because that led to the fracture.  That's what the
12    diagnosis was.
13    Q    Okay.  Doctor, was there a point in time in the initial --
14    in the initial visit with Mr. Triolo where you actually
15    performed hands-on range-of-motion tests and tried to feel
16    around for the injury?
17    A    With the patient preoperatively?
18    Q    Yes, sir.
19    A    Yes.  That's part of the exam.  You really can't feel the
20    spine; you can only feel the skin, which is about six inches
21    away.
22    Q    All right.  Doctor, you give a -- looks like a summary
23    under the procedures of the surgery itself, and then the
24    subsequent pages, pages 14, 15, 16, actually discuss the
25    detail -- the surgery in detail.
```

1          So walk me through this a little bit.

2          Doctor, Procedure No. 1, what is minimally invasive

3    transforaminal lumbar interbody fusion?

4    A    Minimally invasive means you try to use small incisions

5    and less trauma to the patient's body to accomplish the

6    surgery.

7          In this case, minimally invasive is I was working

8    through small tubes, which will act as your retractor of the

9    soft tissues, and so I could visualize the bone at the bottom

10   of the tube.

11         The transforaminal, as I said before, the neural

12   foramen is the area where the nerve was being pinched, to get

13   access to the disc.

14         You can remove the broken portion of the bone and go

15   right through the neural foramen to get to the disc.  You take

16   out the disc, and then that's where you would do the interbody

17   fusion.

18         The lumbar, as I said before, the interbody is

19   between L5-S1, and then the fusion is the procedure that we've

20   done.

21   Q    Is Mr. Triolo at this time actually under anesthesia?

22   A    He's under general anesthesia, yes, sir.

23   Q    So he's completely out?

24   A    Completely asleep and facedown.

25   Q    Do you also have an anesthesiologist present with you

1    during the surgery?

2    A    Yes, sir.

3    Q    Do you have the neural monitoring technician with you

4    present during the surgery?

5    A    Yes.

6    Q    Is there also a neurologist off-site monitoring the neural

7    technology?

8    A    Yes, sir.

9    Q    Okay.  Let's turn to the next page, page 14, please.

10          You mentioned implants.  What are you describing

11   implants?  Again, give us kind of the brief summary.

12   A    The implants are all those things that I am putting into

13   the patient, or implanting.

14          And so No. 1 refers to 6.5-millimeter by

15   45-millimeter pedicle screws.  Those are screws that go into

16   the portion of the bone that can hold down.

17          Then there is the interbody cage, which is that

18   spacer that we put within the bone to maintain the height or to

19   push the bones away from one another and maintain that space.

20   It's packed with bone graft, which is No. 3, which is the

21   allograft.  That's donated bone.  We use some of the patient's

22   bone, which is local autograft.  We morselized it together and

23   grind it up and put it with donated bone, and we put that into

24   the interbody space where we've taken out the disc, and then

25   the -- it sets up a condition such that the bone above will

TRIOLO v USA                    September 23, 2020  Vol II-

```
 1  mend to the bone below and fuse together.
 2  Q    So you're essentially using a cadaver bone and combining
 3  it with bone from the interarticular particle that you've
 4  pulled out?
 5  A    Yes, sir.
 6  Q    Okay.  Got you.
 7          So you're grafting those together and then putting it
 8  in like a cage; is that correct?
 9  A    Yes, sir.  The cage is the spacer.  And so the interbody
10  cage, you can pack with bone graft, and you can pack bone graft
11  in the space between the bones but outside the cage, that whole
12  space we're trying to get to mend together where the disc used
13  to be.
14  Q    What's a hemilaminectomy, Doctor?
15  A    A hemilaminectomy means that you're removing half of the
16  lamina, or the covering of the bone, to gain access to the
17  spinal canal.
18  Q    All right.  Okay.  Doctor, I want to turn your attention
19  to page 15.
20          At the top, you mention palpating very easily the L5
21  transverse process and pars interarticularis, as well as L5-S1
22  joint.
23          What does that mean?
24  A    Those are the anatomic landmarks that I'm working with, so
25  I would want to identify them visually through the tube under
```

 1  utilization with my magnifying loupes or binoculars that I use.

 2  So those are areas that I am palpating.

 3  Q    And so are you using fluoroscopic evaluation when you're

 4  doing it with the glasses you have on -- equipment you have on?

 5  A    I'm using fluoroscopy to line myself up externally so I

 6  can create an incision in the right spot.  Then I reach down

 7  through the tissue, trying to keep the incision small, and I

 8  can palpate, and I can look down through the tube and identify

 9  the -- identify the anatomy both with X-ray fluoroscopy machine

10  and then also by direction visualization.

11  Q    Where are you making your incisions?  If you can just

12  point to the area on your body where you're making your

13  incisions to go in.

14  A    You would make incisions --

15          THE COURT:  I can't see.

16  BY MR. MOORE:

17  Q    I'm sorry, you have to stand, Doctor.

18  A    I'm making incisions on each side of the spine in the back

19  to get to the sides of the spine to the middle, L5-S1.

20          THE COURT:  I guess for purposes of the record, he's

21  indicating, I guess, lower back, but the upper part of his

22  lower back on either side of the spine.

23          MR. MOORE:  Thank you, Your Honor.

24  BY MR. MOORE:

25  Q    Is this just occurring on one particular vertebra or

1    two vertebrae?

2    A    Well, we're going to mend lumbar 5 to sacral 1, so each

3    side through each incision, I can see lumbar 5 and I can see

4    sacral 1 vertebrae.

5    Q    Is it similar to building like a little tower between the

6    two vertebrae?

7    A    It's working between those two bones and putting in a

8    spacer and creating almost like a ladder between the two.

9    Q    Okay.  Thanks.

10           Doctor, let's look down in the second paragraph of

11   page 15.  Looks about four lines down, it says:  We could also

12   palpate the fracture site of the parse as well.

13           And then two sentences under that, it says:  We

14   visualized through the tube.

15           Did you actually see the fractured particle?

16   A    Yes, sir.  You could look directly down at the fracture or

17   the crack in the bone for the broken portion.

18   Q    And where you actually saw it physically with your eyes,

19   did that correlate back to what you saw on the MRI?

20   A    Yes, sir.

21   Q    When you're looking at that bone, the vertebra and the

22   disc, are you having to remove muscle and tissue to be able to

23   see that bone?

24   A    On the minimally invasive portion, you try to work between

25   the muscle fibers and remove as little muscle as possible.

1   That helps with postoperative pain relief.  That's a newer

2   technique that's been developed over the last several years.

3              But, yes, you inadvertently work through muscle,

4   remove some muscle fibers so you can gain access and visualize

5   what you're working with.

6   Q    And then almost at the end in the last paragraph,

7   four sentences down, it says:  With fluoroscopic assistance, we

8   were able to gain access to the disc.

9              So why were you gaining access to the disc?

10  A    Again, we're going to take out the disc that's injured.

11  We're going to create a space.  In that space, which is between

12  lumbar 5 and sacral 1 where the disc used to be, we're going to

13  put bone graft and spacer to fill up that space and create a

14  condition that's successful for fusion.

15  Q    How many pieces of the bone did you remove?

16  A    We removed several pieces, but primarily I removed the

17  portion that was broken of -- the pars interarticularis is

18  broken in the middle and we removed everything below it or

19  distal to it.

20  Q    And, Doctor, let's turn to page 16.

21             At the very top, you mention neurological monitoring

22  was established.

23             Why is it important to maintain the safety of the L5

24  and S1 nerve roots?

25  A    Well, our -- what we're trying to do is alleviate pain but

1    preserve function.

2            The lumbar 5 nerve root, as I said before, innervates

3    the toe extensor, so if that nerve root were permanently

4    injured, the patient wouldn't be able to extend their toes up,

5    would drag their toes as they walk and eventually trip over

6    their feet.  They would have loss of sensation in that area

7    that's innervated by the nerve, so the back of the leg.

8            Sacral 1 is innervated by -- or it goes to the muscle

9    that's the calf muscle, so that's the muscle and the movement

10   that you would use, like, when you push down on the gasoline of

11   a car or the brake.  So if those nerves are cut, we weaken

12   those muscular functions and, in effect, not be able to move

13   your ankle.

14   Q    Would you have performed the surgery without having neural

15   monitoring present?

16   A    I could do so, but to increase safety, I prefer to have it

17   there, present with me.

18   Q    Further down the page, towards the end of that second

19   paragraph, probably about six lines up, it says:  The

20   distraction on the left side of the spine was not relieved.

21            I'm putting my mouse on it here, Doctor.

22            What -- I'm sorry:  The distraction on the left side

23   of the spine was not only relieved but we also compressed the

24   left of the spine to compress against the implant.

25            What does that mean?

TRIOLO v USA                    September 23, 2020  Vol II-
252

1   A    So we work our way into the space between lumbar 5 and

2   sacral 1.  I placed the screws into lumbar 5 and sacral 1,

3   above and below the disc space.  And then I can distract or

4   push those screws apart, which pulled the bone up and down, and

5   then that gives me a bigger space to work with.

6          As I'm finishing doing the discectomy, taking out the

7   disc and putting in the cage and the bone graft, I then relax

8   that distraction.  Then I -- to help it heal -- the bone heals

9   under compression -- I would actually push those bones over the

10  cage together, over that spacer, so it adds compression,

11  because bone heals well when it's under compression.

12  Q    What's the result -- when you complete that fusion, what's

13  going to be the result of the motion on that lumbar spine?  In

14  other words, what does the fusion enable -- how does that

15  enable the motion to function in the lumbar spine?

16  A    Well, there's numerous vertebral levels that you would be

17  taking away the motion from one of those levels.  You would

18  take away the abnormal motion, is the way I explain it to the

19  patient, that's causing the pain that's leading to that nerve

20  pinching.

21         So if you lock it down and don't let it move

22  abnormally, then, in fact, don't let it move at all, with a

23  successful fusion, it alleviates pain, the nerves shouldn't be

24  pinched, and you wouldn't have continual pain.

25  Q    On the bottom of this note on page 16, it looks like

1    Valium was provided due to having muscle spasms.
2            What's going on here?
3    A    Well, he woke up in the OR, and so we assessed the patient
4    neurologically and say:  How are you doing?
5            And oftentimes, because we've gone through all that
6    muscle, they start having some spasms, and we provide them with
7    some Valium or muscle relaxer that helps with the pain.
8    Q    Would he have been fitted with another brace at this
9    point?
10   A    Prior to being discharged that day, he would put on the
11   brace that he's already been fitted far.
12   Q    Okay.  Got you.
13           As far as you can tell, up from that day, did the
14   surgery appear successful?
15   A    Yes.  To this point, what we're trying to do is make sure
16   the patient didn't have complications from surgery and was able
17   to be discharged to home, same day of surgery, and was able to
18   get the pain under control with oral medications such that he
19   could be discharged without complication.
20   Q    Doctor, turn your attention to page 18, and it looks like
21   fluoroscopic images.
22           What are these pictures showing?
23   A    Well, I take numerous fluoroscopic images throughout the
24   surgery, but these last two I use for documentation purposes to
25   show where I've put screws, rods, and the implants.

 1          So the top image is a picture that's taken from the

 2   side.  There are screws into lumbar 5 and above it, and then

 3   screws in the S1 below.  It actually appears that there's one

 4   screw in 5 and one in S1, but that's because from an x-ray

 5   standpoint you're looking directly above the two screws, so

 6   they appear as one.

 7          You can appreciate when you look down below, there's

 8   a screw on each side of the bone, so four total screws.

 9   There's rods connecting them.

10          If you look very -- faintly, you can see these little

11   markers, here and here.  Those are within the interbody spacer.

12   Those are Tantalum markers or metal markers that I can see

13   where the front and back side of the cage is by taking an X-ray

14   in the operating room.

15   Q    Okay.  Doctor, I'm going to refer your attention

16   continually to the screen while I go over Exhibit 5, which was

17   admitted into evidence as Jax Beach Surgery Center.

18          I'm going to ask you one question from one page and

19   double-check the Bates stamp.  It's Bates stamp page 4.

20          Was this your physician's order?  Looks like a preop

21   physician's order.

22   A    Yes.  It's a standard set of orders that I use for preop

23   and postop instructions.

24   Q    And at this point, what are you telling Mr. Triolo in

25   relation to healing and wound care?

1  A    Well, so above there's a preop.  You know, before the

2  surgery, I'm asking the anesthesiologist to give the patient

3  some antibiotics.  That's the 2 grams of Ancef is written in.

4        Below it, I'm instructing the nurses on what to tell

5  the patient, or what to do for the patient, elevate and ice the

6  area.  You can give him morphine.  You can give him some

7  Tylenol.  You can give him some Phenergan, which is an

8  anti-nausea medication.

9        He can start eating regularly.  We didn't do anything

10  with his bowels, so you can give him some food as he's in the

11  immediate postop area.

12        If everything's going well, PO, meaning per oral,

13  that means the nurse can take out the IV, and discharge the

14  patient home when the vital signs are stable, tolerating his

15  diet, and he starts walking.  And then I give him a preop

16  instruction sheet and then the appropriate medication

17  prescriptions.

18  Q    Did you recommend or do you normally recommend home health

19  therapy after a surgery like this?

20  A    I often do that, yes, sir.

21  Q    Is it up to the patient or is it something that's

22  mandatory?

23  A    I offer it to every patient.  Some patients have a lot of

24  help at home.  They have a spouse that may or may not be in the

25  medical field that can help them and assist them.  Oftentimes

1   some people don't have help at home so we can provide them home

2   health assistance.

3   Q    Doctor, I want to turn your attention back to the medical

4   records.  We're going to be looking at page 20, which is

5   March 28, 2018, postop.

6        That last paragraph under Plan, that first sentence

7   at the end says:  Continue daily activities.  Limit lifting and

8   twisting.

9        Why was it important for Mr. Triolo to continue his

10  daily activities only a few days after the surgery?

11  A    Well, the only defense that we spine surgeons have against

12  the deep-vein thrombosis or blood clotting in areas that we

13  don't want it to clot is to keep the patient moving.

14       There are blood thinners, but when the spine is open,

15  we can't use blood thinners because then the blood would get

16  thin and collect right around the nerves and cause more pain

17  right after surgery.

18       So one of the things that we really counsel the

19  patients before surgery and right after is to keep moving, keep

20  your legs moving.  Let's keep clots from developing in your

21  legs the best we can.

22  Q    Also notes on the Assessment -- did it appear the lumbar

23  incision had been healing well?

24  A    Yes, sir.

25  Q    Turn your attention, please, to April 11, 2018, page 22,

1   that second paragraph there:  Patient returns today.

2   A    Yes, sir.

3   Q    I believe notes:  Patient's having usual postoperative

4   pain.  Reporting some numbness in the left toes.

5          Is that common to have numbness in your left toes a

6   couple weeks after surgery?

7   A    It is.  Again, we're working in an area where we're moving

8   nerves out of the way to get to the disc.  And so the nerve,

9   lumbar 5, has already been pinched, squashed before surgery,

10  and it's already irritated.  We know that because that's

11  causing him pain.  That's why we're doing the surgery.  But

12  then we have to move it out of the way so we can get to the

13  disc.  So putting a little more traction on it can actually

14  make it have a numb feeling.

15         What we want to make sure is that the other parts of

16  the nerves are intact, and that's why we used the neurologic

17  monitoring as we discussed before.  We want to make everything

18  as safe as possible.

19         We wouldn't expect the patient one week after surgery

20  to have absolutely no pain.  So I often write in the notes

21  they're having their usual postoperative pain.  Nothing out of

22  the norm.  Not pain-free but normal postoperative discomfort.

23  Q    The instrumentation, were there any problems with that

24  that you noticed?

25  A    I had a radiograph or an X-ray that was obtained that he

1  brought with him that showed everything was in place as I had
2  placed it during surgery.
3  Q    Do you normally recommend physical therapy subsequent to
4  the surgery?
5  A    Yes, sir.
6  Q    Do patients -- are they able to do home therapy as well?
7  A    Well, many patients are already educated on physical
8  therapy.  They've had it for many months before their surgery,
9  so they know the exercises.  They've been educated.  And so we
10 don't need to waste resources or funds or have them, you know,
11 pick up and find a ride to physical therapy because they're
12 taking narcotics.
13       So if they can do physical therapy at home, it's
14 certainly acceptable.  I like physical therapy as an
15 outpatient, the machines and it's supervised.  So oftentimes we
16 start with home health physical therapy, physical therapy at
17 home, and I like to determine it as we graduate to a bigger
18 form of physical therapy.
19 Q    Okay.  Doctor, next we're going to -- just for the sake of
20 time, we're going to go to June 14, 2018, page 25.
21       Last sentence in that first paragraph under History
22 of Present Illness.
23       Doctor --
24       THE COURT:  I'm sorry, I missed the page number.
25       MR. MOORE:  I apologize, Your Honor.

1          THE COURT:  No, you said it.

2          MR. MOORE:  Page 25.  It's the last sentence, Your

3    Honor, in the history of present illness.

4    BY MR. MOORE:

5    Q    Doctor, it says:  Patient reports he's feeling good but

6    ongoing pain down the left side.

7          What -- tell me what was going on in this situation.

8    A    Well, once again, what we'd like to see is -- if we've hit

9    a grand slam, we'd like to see the patient come back in by this

10   point, which is several months after surgery, with absolutely

11   no pain, no problems, no issues.  It rarely happens, but in

12   his -- overall, he's feeling good, but he was having continual

13   pain down the left side, down the left leg.

14         Presurgical pain that he had, he said, seems to be

15   resolving, but he continues to have this nagging pain down his

16   left side or on his left side.

17   Q    Doctor, next page, page 26, under Plan, towards the

18   bottom, notes:  You would continue physical activity as

19   tolerated, but then you note something about SI joint

20   dysfunction secondary to surgery.

21         Why are you noting SI joint dysfunction?

22   A    Well, once again, I'm -- the patient presents -- he says

23   overall he's feeling very well, but he's having some left-sided

24   pain.  So I'm looking for the source of why would he have some

25   left-sided pain.

TRIOLO v USA                    September 23, 2020  Vol II-

1          I start with that why differential, and I start

2   narrowing things down.  We initially look for complications.

3   We look for infection.  We look for if the instrumentation has

4   moved.  We look for something that's changed that is causing

5   issues which would lead to pain down the left side.

6          On the physical examination, I tested his sacroiliac

7   joint, and he has a positive test that indicates sacroiliac

8   dysfunction called the FABER flexion abduction external

9   rotation of the thigh, and so I was starting to think that this

10  patient has an element of sacroiliac joint dysfunction.

11  Q    Was your surgery designed to address his SI joint

12  dysfunction?

13  A    No, sir.

14  Q    Was your surgery designed to address his facet injury or

15  facet pain?

16  A    At L5-S1, yes.

17  Q    What about other areas?

18  A    Not the other areas, no, sir.

19  Q    All right.  And, I believe, Doctor, your plan was to

20  follow up with him in two months for the SI joint dysfunction;

21  is that correct?

22  A    Yes, sir.

23  Q    Let's turn to page 27, which is August 16th, 2018.

24         The bottom of that, under History of Present Illness,

25  and I'm pointing my mouse on it here, Doctor.

TRIOLO v USA                    September 23, 2020  Vol II-
261

 1          It says:  Patient experiencing SI joint dysfunction,

 2   secondary to his surgery.

 3          And then the next page, page 28, you go into it a

 4   little more on the musculoskeletal section.  I'd like you to

 5   take a look at that and I'll ask you the question.

 6   A    Yes, sir.

 7   Q    All right.  On this particular visit, when you performed

 8   the physical exam, how did you determine there was this

 9   diffused tenderness across the lumbar spine focused at the SI

10   joint?

11   A    During the physical examination, you would palpate.  By

12   now, the surgical incisions have healed, so he's really not

13   going to be tender unless he's having a complication at the

14   incision site.  So you could palpate the area, which is at the

15   lower back near the incision sites.  Approximately 1 inch or

16   2 inches away is the sacroiliac joint.  We palpated in that

17   area, and he seemed to be localizing pain from the left side.

18   Q    Okay.  Is that the area of the SI joint?

19   A    Yes, sir.

20   Q    Down -- look down to Plan, and, you know, towards the

21   middle.

22   A    Yes, sir.

23   Q    I'll put my mouse on it.  That the -- you had mentioned

24   the patient reported to you about Dr. Pardo --

25   A    Yes, sir.

1   Q    -- gave him an injection at L5-S1.

2            And you talked again about the pain in his leg

3   resolving, but not -- unsure about the pain in his back.

4            What was your understanding about the difference

5   between the pain in his leg and the pain in his back?

6   A    Well, the -- you know, things are very close in that area,

7   so oftentimes pain can overlap.  Continual pressure on the

8   nerve and continual inflammation around the nerve can cause

9   some back pain, which could radiate down the leg.  Or it could

10  be the sacroiliac joint which is causing pain.

11           If you have the two together, you could have back

12  pain and leg pain, but you could have both.

13           The fact that Dr. Pardo put an epidural steroid

14  injection in and he's still having pain indicates maybe there's

15  something else going on there, because Dr. Pardo has placed an

16  injection right around the nerve that could potentially be

17  inflamed.

18  Q    In that Plan area, you mention recommending an ESI, or an

19  epidural steroid injection.  Why would you recommend an

20  epidural steroid injection if Dr. Pardo is already doing

21  fluoroscopic injection?

22  A    There's usually a series of three; you just don't provide

23  one.  If the patient has good result from the first, they can

24  be additive.

25           In other words, one injection could be good; a second

1    injection would be better than the first; and a third injection

2    would be better than the first two.  But you can't give too

3    many steroids.  So typically we surgeons recommend three within

4    about a year's time.

5    Q    Doctor, looks like you referred him out for another MRI;

6    is that correct?

7    A    Yes, sir.

8              MR. MOORE:  One second, Your Honor.  I'm going to

9    switch out computers for the other MRI.

10             THE COURT:  What number is the other MRI, for

11   purposes of the record?

12             MR. MOORE:  Yes, Your Honor, it is the Precision MRI.

13             MR. KINNEY:  Plaintiff's Exhibit 7.

14             MR. MOORE:  Thank you, Mr. Kinney.

15             THE COURT:  I assume you're close to wrapping up?

16             MR. MOORE:  Yes, Your Honor, I am doing my best.

17             And -- my apologies, Your Honor.  Move on?

18             THE WITNESS:  You can do that if you put your cursor

19   on it and drag it down to the big screen.  It probably will do

20   that.

21   BY MR. MOORE:

22   Q    All right.  Doctor, what is neural stretching?

23   A    Neural stretching is a term that I use when a nerve is

24   stretched.

25   Q    Okay.  And how does a nerve stretch?

TRIOLO v USA                    September 23, 2020  Vol II-
264

1  A    If you put a spacer in -- for the context we're talking

2  about, you put the spacer in and you're pushing those bones

3  away from one another.  The nerves have taken on a scarred-down

4  position after a certain amount of time, and then you quickly

5  change their position.  So you put that spacer in, it could

6  stretch the nerves, leading to pain or discomfort for some

7  time.

8  Q    And, Doctor, on page -- Bates stamp page 30, looks like

9  you discussed the results of the MRI of the 8-30-17 Precision

10 Imaging lumbar spine.

11 A    Yes, sir.

12 Q    Was this your own interpretation?

13 A    Yes, it is.

14 Q    Okay.  And what were your findings, Doctor?

15 A    Well, I'm looking for a whole multitude of things.

16 Looking, once again, for infection; looking to see if

17 instrumentation has moved; looking to see if bone graft has

18 shifted which is pushing on the nerve which is causing the

19 continual pain that Mr. Triolo is complaining of.

20        Given the fact that Dr. Pardo has put an epidural

21 steroid right next to the nerve and he got better, so I'm

22 thinking something potentially is still wrong with his nerve.

23 So I'm trying to eliminate all the bad things in my mind.

24        And so after I reviewed the MRI results, to me, it

25 seems like it's still inflammation and scar tissue, and that he

```
 1   would benefit from another epidural steroid injection.  If a
 2   screw is pushing on the nerve, well, you have to do something
 3   about that.  A shot's not going to do it.  Or a bone graft, you
 4   have to do something about that.
 5              So I'm saying that I've looked at the MRI and it
 6   appears that he has a good decompression.  The nerve is still
 7   inflamed and irritated, but nothing is pushing on it.  He would
 8   benefit from shots.
 9   Q    Doctor, looking at Sagittal Image 1 on the August 30 MRI,
10   2018, are you able to see the compressed nerve?
11   A    Well, I -- looking at this nerve here, firstly you notice
12   the disc -- if we all remember the images that we were looking
13   at previously, the disc here is much taller because I put the
14   spacer in.  In the space for the nerve, you can see that that
15   nerve is no longer touching the disc.  That little black dot
16   there is not down pushing against the disc.  It's not being
17   pinched above and below, and so it's decompressed.
18              THE COURT:  Can you clear that so I can see it.
19              THE WITNESS:  Yes, ma'am.
20   BY MR. MOORE:
21   Q    So does this MRI image indicate that your surgery actually
22   worked and did what it was supposed to do?
23   A    Once again, I'm -- being the doctor, trying -- the surgeon
24   that did the surgery, I'm looking for things that potentially
25   are wrong and I'm pleased to see that the nerve is
```

TRIOLO v USA                    September 23, 2020  Vol II-
266

1    decompressed.  The instrumentation is in the right spot.  The

2    cage is not backing out.

3              Some issues that could potentially happen to that

4    nerve -- there's no sign of infection.  Once again, that's that

5    differential diagnosis I was talking about.  What could

6    potentially be all these things that are leading to his

7    problems, and I'm eliminating them by looking at this MRI.

8    Q    All right.  Doctor, last record, September 13, 2018.  It's

9    page 31.

10             Doctor, on this particular date, according to the top

11   of your record, it looks like he tried the epidural; is that

12   correct?

13   A    Yes, sir.

14   Q    And looking at page 32, what was the outcome ultimately of

15   your epidural at L5-S1?

16   A    Well, the operative note indicates that I placed the

17   epidural at L5-S1.

18   Q    And what are you injecting into L5-S1 with an epidural?

19   A    It's to the space around the nerves.  Once again, that

20   epidural space outside the sac of the nerves, outside of the

21   bone, you're injecting steroid in a small amount of marking.

22   Q    And then next page, page 33, at the very bottom of

23   page 33.  Putting my mouse over the third of the last sentence

24   from the bottom.  You indicate:  Full -- he had full strength

25   of his lower extremities bilaterally, had some relief --

TRIOLO v USA                    September 23, 2020  Vol II-

1    excellent relief of his pain.

2            What pain did he have relief of that particular day?

3    A    Once again, the reason we were performing that injection

4    is because the patient was saying that he's having continual

5    leg pain, continual sciatic pain.

6            And after reviewing the MRI, seeing that there's

7    nothing that needed to be done surgically, I -- inferring or

8    coming up with a diagnosis that the patient has neural

9    stretching or scar tissue, and so I want to put some epidural

10   steroid around it, an anti-inflammatory, to soothe the nerve.

11   And then right afterwards, I'm examining the patient in the

12   postoperative area and he says he has excellent pain relief and

13   is doing well.

14   Q    Would that epidural have relieved pain from the facet

15   joints?

16   A    No, sir.  I mean, the facet joints are now fused.  They're

17   not moving anymore.  And so I wouldn't -- if you're referring

18   to other facet joints that I did not operate on, no, sir, they

19   wouldn't.

20   Q    What about the SI joint dysfunction?  Would that relieve

21   pain from SI joint dysfunction?

22   A    No.  The injection was not placed at the SI joint nor any

23   facet.

24   Q    For the purpose of the epidural, would discogenic pain be

25   pain coming from the source of the disc itself?

1    A    It's -- the purpose of the epidural steroid is from the

2    neurogenic pain, the pain coming from the nerve that's

3    continually inflamed.

4    Q    Okay.  Thank you.

5         Doctor, I want to ask you quickly about Exhibit 29,

6    and I believe it's your medical bills.

7         Do you have that in front of you?

8    A    Yes, sir.

9    Q    Are those the medical bills from Topp Spine and

10   Orthopedics?

11   A    It appears that they are, yes.  I haven't looked through

12   them all.

13   Q    And are those -- those medical bills related to the

14   treatment of Mr. Triolo?

15   A    Well, I don't see any other bills in here, so they are all

16   for Mr. Triolo's treatment.

17   Q    Doctor, do you have an opinion as to whether Mr. Triolo

18   will need a future surgery?

19   A    Yes.

20   Q    What is that?

21   A    I do have an opinion.  Given his young age, he most likely

22   will require a surgery over his lifetime.

23        The data that we have, statistically speaking, is

24   that over the next ten years, another level of the spine will

25   require an operation, so that that rate would be 30 percent

 1    over the next ten years.

 2            So the following ten years will be another 30 percent

 3    on the original 30 percent, so that will be another maybe

 4    40 percent chance and then the next ten years.  And it just

 5    keeps adding up, so if he were to live another 40 years, a high

 6    likelihood -- I'm very sure he's going to need another surgery.

 7    Q    What type of surgery?

 8    A    The surgery that I'm speaking of is another level.

 9    Requires an operation, either a fusion or a decompressive

10    fusion.

11    Q    And is this opinion within a reasonable degree of medical

12    probability from you as an orthopedic surgeon?

13    A    Yes, sir.

14    Q    Will he require future medical treatments, future office

15    visits with you or another ortho surgeon in the future?

16    A    Yes, sir.

17    Q    Doctor, in your opinion, within a reasonable degree of

18    medical probability, did Mr. Triolo sustain a permanent injury

19    in his lumbar spine as a result of the February 11, 2017,

20    automobile crash?

21    A    Yes, sir.

22    Q    Okay.  In summary, what are those permanent injuries that

23    Mr. Triolo sustained from the automobile crash?

24    A    He sustained the pars fractures we've spoken about.  The

25    pars fractures led to his spondylolisthesis.  It led to

1  degenerative disc disease and post-traumatic arthritis at

2  L5-S1, led to neural foramina impingement, most likely

3  continual nerve pain at L5-S1 that most likely will remain in

4  some form or fashion.

5  Q    Dr. Topp, do you have an opinion as to what -- strike

6  that.

7          Do you have an opinion as to what caused Mr. Triolo's

8  SI joint dysfunction?

9  A    Well, the SI joint dysfunction, I have no way to determine

10  now.  I can't tell you if it was injured at the time of the

11  accident or if it was injured as a result of fusing the L5-S1

12  vertebra.

13          The sacroiliac joint dysfunction is very common after

14  L5-S1 fusions.  Oftentimes when patients present, they have

15  some aspects of pain that outweigh other aspects of pain.  It

16  could be very likely that he had SI joint dysfunction as a

17  result of the accident.  But in either case, it's either a

18  result of the motor vehicle collision or it's a result of the

19  surgery that I was required to perform.

20  Q    Doctor, in relation to Mr. Triolo's future limitations,

21  what could happen to the surrounding vertebra and discs?

22  A    They could continue to degenerate.  As you, you know, fuse

23  one level, theoretically, the other levels have more stress, so

24  that could lead to the other levels requiring surgeries in the

25  future.

TRIOLO v USA                    September 23, 2020  Vol II-

271

1    Q    Could he experience limitations in relation to weight he
2    can lift?
3    A    If he were to develop pain, yes, absolutely.
4    Q    Could he experience limitations in relation to loss of
5    sleep in the future?
6    A    Yes.
7    Q    Could he experience limitations in relation to lifting
8    weights, working out?
9    A    Yes, but he has that currently.  I've actually counseled
10   him that for all intents and purposes, he has a bad back.  It's
11   a permanently injured back and he needs to take care of his
12   back.  So he really doesn't need to be doing dead lifts and
13   squats, all the things that he used to enjoy to preserve the
14   remaining, for lack of a better term, tread life on his spine.
15   Q    Dr. Topp, would it be beneficial for Mr. Triolo to sit at
16   home and not move?
17   A    Actually not.  That's one technique, but that's -- would
18   be bad for his health.  He would gain weight.  That would
19   increase the pressure on his back.  It's best for all of us to
20   maintain a level of fitness and health.
21   Q    Before his surgery, Dr. Topp -- a couple more questions.
22   Before his surgery, a TENS unit was prescribed by his
23   chiropractor.
24        Would a TENS unit fix his lumbar spine injury?
25   A    The TENS unit is there to alleviate pain but would not fix

```
1   the fracture.

2   Q    He was also prescribed by his chiropractor -- or

3   recommended a runner's roller.

4        Would this fix his back or would this -- strike that.

5   Would this fix his lumbar injury?

6   A    No, sir.  That's similar to a TENS.  It's for pain that

7   was caused by the original injury, but is -- it's not the --

8   it's not addressing the root cause.

9   Q    Doctor, during plaintiff's testimony, the defense showed

10  some short surveillance clips of Mr. Triolo mowing his lawn.

11       Would this fusion prevent Mr. Triolo from doing

12  something like mowing the lawn or doing basic yardwork?

13  A    No.  That's a form of walking.  Walking behind a powered

14  mower would actually be a very good form of exercise.

15       He could push some things, but we want to minimize

16  the lifting and the heavy lifting and the pressure from the top

17  down and from the bottom up on his spine.

18  Q    Dr. Topp, have all your opinions today that you've

19  provided been within a reasonable degree of medical

20  probability?

21  A    Yes, sir.

22            MR. MOORE:  I have no further questions, Your Honor.

23            THE COURT:  Ms. Cunningham?

24            MS. CUNNINGHAM:  Yes, Your Honor.

25                      CROSS-EXAMINATION
```

1    BY MS. CUNNINGHAM:

2    Q    Good afternoon, Dr. Topp.

3         Sir, are you board certified in radiology?

4    A    No, sir -- no, ma'am.  Excuse me.

5    Q    Do you have privileges at any hospitals or MRI imaging

6    centers to give the formal interpretations of an MRI of the

7    lumbar spine?

8    A    No, ma'am.

9    Q    When was the first time you reviewed the MRI that was done

10   on April 4th, 2017?

11   A    The first visit that Mr. Triolo presented to my clinic.

12   Q    All right.  Did you review all of the images on the MRI at

13   that time?

14   A    Yes, ma'am.

15   Q    Do you recall the sequences that are included in this MRI?

16   A    I'm not sure what you mean by -- like the T1 and the T2

17   sequences?

18   Q    Yes.

19   A    Yes, ma'am.

20   Q    Can you tell me what they are, please.

21   A    The T1 sequence, that's a sequence that -- as I was

22   talking about the pulsed radio waves before, that's the type of

23   sequence that would --

24   Q    I'm sorry, sir.  I'm going to interrupt you only because

25   it was maybe not a good question on my part.

 1           Literally, if you can just tell me not a description
 2    of them but the type, the name of them, the different images
 3    that were done.
 4    A    Yes, ma'am.  There was a -- there is a localizing view,
 5    then there's a frontal image, there's a sagittal T1, sagittal
 6    T2, axial T1, and axial T2.
 7    Q    And which of these were you using during your direct
 8    examination?
 9    A    I was using the T2 image.
10    Q    Okay.  Let's bring up Plaintiff's Exhibit 3, please, the
11    first pages of the MRI.
12           All right, sir.  So I'd like to expand the Findings,
13    first section of Findings.  This is the April 4th, 2017, MRI
14    that's already been discussed.
15           While that's being pulled up.  I want to look
16    specifically at the sentences that pertain to L5-S1, okay?
17    That was the level where you performed the surgery; right?
18    A    Yes, ma'am.
19    Q    Okay.  And your surgery was performed to address
20    spondylolisthesis at that level; correct?
21    A    Yes, ma'am, and neural impingement.
22    Q    All right.  The -- you've used the -- you've used
23    different words.  Let's just take a quick look at them in the
24    report here.
25           So we've got the term spondylolysis,

1  spondylolisthesis, and then spondylosis; correct?

2  A    Yes, ma'am.

3  Q    Let's talk just briefly about what these different things

4  mean.

5        So the spondylolysis is the weakness or fracture,

6  also sometimes referred to as the pars defect; correct?

7  A    It is the pars fracture, yes, ma'am.

8  Q    And a pars defect or fracture can be congenital; right?

9  A    It could be, yes, ma'am.

10  Q    But most commonly, it's due to repetitive stress on the

11  vertebral bone; isn't that true?

12  A    I -- it could -- it's a stress on the bone that leads to a

13  fracture.

14  Q    Right.

15  A    Most commonly?  I couldn't answer that question.

16  Q    Okay.  So the -- would it surprise you that the literature

17  on this condition says that it is due to repetitive stress most

18  commonly, as happens with sports that involve frequent

19  overstretching or hyperextension of the lumbar spine, such as

20  football, weight-lifting, and wrestling?

21  A    Yes, ma'am.  Those are very common causes.

22        MR. MOORE:  Objection, Your Honor.  Lack of

23  foundation.

24        We don't have -- if he's referring to medical

25  literature, none's been presented to the doctor.

```
 1              THE COURT:  I'm going to overrule it.
 2              Go ahead.
 3    BY MS. CUNNINGHAM:
 4    Q    All right.  A pars fracture due to trauma is rather
 5    uncommon; isn't that true?
 6    A    When a bone breaks, it's always the result of trauma.
 7    It's either repetitive trauma or a single, isolated incidence
 8    of trauma.
 9    Q    Okay.  And so perhaps my phrasing could have been better
10    in terms of there's a difference there, right, between acute
11    trauma --
12    A    Yes, ma'am.
13    Q    -- and this repetitive stress over time on the vertebra;
14    right?
15    A    Yes, ma'am.
16    Q    So in this process, you have the -- well, we'll sort of
17    keep that thought and we're going to move on for a second and
18    then circle back to this.
19              The report talks about degenerative spondylosis;
20    correct?
21    A    It does say that, yes, ma'am.
22    Q    Okay.  And you agree that there was degenerative
23    spondylosis in Mr. Triolo's spine; correct?
24    A    I don't disagree with that term, "degenerative
25    spondylosis."
```

TRIOLO v USA                    September 23, 2020  Vol II-
277

1   Q    All right.  When you operated, you, in fact, observed

2   degenerative changes in Mr. Triolo's lumbar spine; isn't that

3   true?

4   A    I observed a fracture.  I think that's what I spoke to.

5   Q    Okay.  Well, let's take a look at your operative report.

6        So this is -- if you don't mind, we're going to go to

7   Plaintiff's Exhibit 5, which is the surgery center records,

8   because there's a couple things I would like to look at there.

9        Okay.  So if we can please go to JSBC-09.  That is

10  the first page of the operative note in these records, and it's

11  the same note we were looking at -- that you were looking at on

12  direct.

13  A    Yes, ma'am.

14       MS. CUNNINGHAM:  Okay.  So then let's flip forward to

15  page JBSC0011, and then expand at the bottom of the page,

16  please.

17       Ms. Sabino, if we could please go to Plaintiff's

18  Exhibit 5, page 11.

19       And if you can pull up just the last four lines or

20  so, that should be enough.

21  BY MS. CUNNINGHAM:

22  Q    All right.  Dr. Topp, this part of your operative note,

23  you are talking about what you are doing within your surgery at

24  the L5-S1 level; correct?

25  A    Yes, ma'am.

1   Q    All right.  And you note here that there was an osteophyte

2   in the area; correct?

3   A    Yes, ma'am.

4   Q    Okay.  And you -- just for sort of understanding here, you

5   mention an osteo, and that's just an instrument for cutting

6   bone; right?

7   A    Yes, ma'am.

8   Q    And you indicate that you removed the osteophyte in order

9   to gain access to the discs; correct?

10  A    Yes, ma'am.

11  Q    An osteophyte is also called a bone spur; right?

12  A    Yes, ma'am.

13  Q    And that's a degenerative finding; correct?

14  A    It most assuredly is.

15  Q    All right.  So let's take another look at another note

16  from the surgery.

17          This is in the same record, Plaintiff's Exhibit 5 at

18  JBSC-24.

19          MS. CUNNINGHAM:  Okay.  So before we go in,

20  Ms. Sabino, let's leave it large for just a moment.

21  BY MS. CUNNINGHAM:

22  Q    Sir, at the top of this note it indicates:  Progress

23  Discharge Note.

24          Do you see that?

25  A    I do.

TRIOLO v USA                    September 23, 2020  Vol II-
279

```
 1   Q    All right.  This looks to me like handwritten notes that
 2   you prepared and signed off for the operation.  Is that what it
 3   is?
 4   A    Yes, sir -- yes, ma'am.  I'm sorry.
 5          MS. CUNNINGHAM:  If we could please expand the
 6   Findings section, Ms. Sabino.
 7   BY MS. CUNNINGHAM:
 8   Q    All right.  Tell me what the findings are there.
 9   A    It says:  Degenerative disc disease and spondylosis.
10   Q    All right.  And obviously those are both -- spondylosis is
11   also a degenerative finding; right?
12   A    It is a finding that occurs after injury over a certain
13   amount of time, yes.
14   Q    All right.  And it -- as you just said, over a certain
15   amount of time; right?
16          So in the context of this particular series of
17   occurrences, there is sort of a typical sequencing here; right?
18          So we talked about these three different "S" terms
19   that we've talked about.  Typically you would first have the
20   pars fracture; right?  That's what happens first?
21   A    Yes, ma'am.
22   Q    And then you get the slippage?
23   A    Yes, ma'am.
24   Q    And then you get the spondylosis?
25   A    Yes, ma'am.
```

TRIOLO v USA                    September 23, 2020  Vol II-
280

1  Q    Okay.  So the fact here, we -- Mr. Triolo's spine already

2  had the spondylosis; right?

3  A    No, ma'am.  I can't answer that.

4  Q    Why not?

5  A    It had it in the MRI in April of 2017.

6  Q    Right.  So in April of 2017, at the time the MRI was

7  done --

8  A    Yes, ma'am.

9  Q    -- Mr. Triolo already had spondylosis at the L5-S1 level.

10 Isn't that true?

11 A    He had post-traumatic arthritis at the L5-S1 level.  This

12 is --

13 Q    Well, I don't think you said that previously.

14 A    That's a form of spondylosis.  Post-traumatic arthritis is

15 absolutely what he had.

16 Q    Did you mention that on direct?  I don't recall that term

17 being used during your direct.

18 A    I don't think anyone asked me that question.

19 Q    So -- and I don't believe that term is reflected anywhere

20 in your medical records.

21 A    It's degenerative disc disease.  That's arthritis.  That's

22 a general term, just like spondylosis is a general term, ma'am.

23 Q    All right.  The spondylosis -- is it your testimony that

24 the spondylosis that was present on the April 2017 MRI was a

25 type of degeneration that occurred between the car accident and

TRIOLO v USA                    September 23, 2020  Vol II-
281

1    the MRI?

2    A    Yes, ma'am.  That's very possible, yes.

3    Q    So you understand that there's a seven-week time period

4    there; right?

5    A    Uh-huh.

6    Q    Yes, sir?

7    A    I do.

8    Q    You have to answer verbally for it to be recorded in the

9    transcript.

10   A    I'm sorry.  Yes, ma'am.

11   Q    That's okay.

12        So the spondylosis, as we've just gone through, comes

13   after the pars defect or fracture and after the slippage;

14   right?

15   A    Simultaneously it starts to occur.  Yes, ma'am, I see what

16   you're getting at.

17   Q    Right?

18        So if we have any kind of degenerative finding

19   seven weeks after the car accident, you have to agree with me

20   that there's no possible way that that fracture could have

21   occurred in the car accident.

22   A    No, ma'am, I disagree with you.

23        THE COURT:  Did I understand your testimony to be

24   that post-traumatic arthritis is the same as degenerative disc

25   disease?

 1          THE WITNESS:  It's one of the many subsets of
 2   degenerative disc disease.
 3          Degenerative discs disease, like spondylosis, is a
 4   general term for a disc that's degenerated.  It can be
 5   degenerated because of inflammatory arthritis.  It could be
 6   degenerated because of a traumatic injury to the spine, and it
 7   sets off a cascade that leads to degeneration in the future.
 8          THE COURT:  Go ahead.
 9          MS. CUNNINGHAM:  Thank you, Your Honor.
10   BY MS. CUNNINGHAM:
11   Q    After your surgery, did you go back to review the MRI to
12   see the correlation between your findings in the operation and
13   what the MRI had showed?
14   A    No, ma'am.
15   Q    Okay.  Did you observe that the April 4th, 2017, MRI had
16   bone spurs at L5-S1?
17   A    I didn't.  I haven't looked at it recently, but I've
18   looked at it to see that there's an acute fracture at L5 pars
19   interarticularis.
20   Q    All right, sir.  I'd like you to take a look at
21   Plaintiff's Exhibit 21, which we're going to pull it up on the
22   screen but I can also bring you a binder.
23          MS. CUNNINGHAM:  Your Honor, may I approach?
24          THE COURT:  Yes.
25          MS. CUNNINGHAM:  It will be up on the screen, but,

 1   sir, it's also in this binder, Exhibit 21.

 2   BY MS. CUNNINGHAM:

 3   Q    All right.  Did you know, Dr. Topp, that the plaintiff saw

 4   another surgeon before he saw you?

 5   A    No, ma'am.

 6   Q    All right.  These are records, Defendant's Exhibit 21,

 7   items -- my understanding is they are already in evidence.

 8   These are records from the Orange Park Spine Institute, and

 9   if -- let's -- Ms. Sabino, if we can go to OPFI-3, please.

10   A    I'm sorry.  Over here?

11   Q    It will be both on the screen for you and then it will be

12   in the binder in front of you if you'd like to look there as

13   well.  But we'll try to blow things up so you can see it.

14   A    That's fine.  Yes, ma'am.

15            MS. CUNNINGHAM:  So let's start, Ms. Sabino, just

16   with the top part so that we're able to see the date, the

17   encounter date.  Thank you.

18   BY MS. CUNNINGHAM:

19   Q    We'll just go through this so you can see the upper

20   right-hand corner has an encounter date of service of

21   October 20, 2017.

22            Do you see that?

23   A    I do.

24   Q    All right.  So this is approximately two-and-a-half weeks

25   before your visit with Mr. Triolo; is that right?

TRIOLO v USA                    September 23, 2020  Vol II-
284

1   A    I'd have to read -- can I just take your word for it?

2            I'd have to look at the record.

3            THE COURT:  Let's just assume that I can create a

4   chronology.

5            MS. CUNNINGHAM:  Yes, that's fine.

6            Let's go ahead and move to the second page of this

7   record, which -- pardon me, stop on pages OPFIO04, the second

8   page of the note.

9            And if we could blow up the Assessment and Diagnosis

10  section, please.

11  BY MS. CUNNINGHAM:

12  Q    Okay.  So Dr. Toumbis -- this is Dr. Toumbis' note,

13  Dr. Constantine Toumbis.  And this is the surgeon the plaintiff

14  saw first before he came to see you.  And I just wanted to take

15  a look at what his diagnosis was after reviewing the MRI.

16  Okay?

17            Have you ever seen this report before?

18  A    I don't believe I have, no, ma'am.

19  Q    All right.  So let's just take a look at this.

20            Dr. Toumbis' note here indicates there is a grade I

21  spondylolisthesis of 5 millimeters at L5 onto S1 caused by a

22  bilateral pars interarticularis defect.  This is a degenerative

23  spondylolisthesis, as there's no evidence of bone marrow edema

24  surrounding the pars interarticularis.  The anterolisthesis has

25  caused significant disc degeneration at this level and has

TRIOLO v USA                    September 23, 2020  Vol II-
285

1    contributed to severe neural foraminal narrowing on the right

2    and moderately severe neural foraminal narrowing on the left.

3    The rest of the MRI is largely unremarkable.

4           That's what it says; right?

5    A    Yes, ma'am.

6    Q    Okay.  So let's just talk about this a little bit.

7           The plan articulated here is that there was

8    significant disc generation [verbatim] at the L5-S1 level.

9           That's what this reflects; right?

10   A    Yes, ma'am.

11   Q    And anterolisthesis is just the specific term for the type

12   of spondylolisthesis; right?  That's just the forward motion of

13   L5 over S1; right?

14   A    Yes, ma'am.

15   Q    So Dr. Toumbis articulates here that there's no evidence

16   of bone marrow edema on the MRI.

17          So let's just -- let's just talk about this for a

18   minute.

19          Let's assume that a person has an MRI done the day

20   they sustain a fracture.  Okay.

21          When you have an injury, you have swelling, edema,

22   and blood that surrounds the area of the injury; right?

23   A    Yes, ma'am.

24   Q    And if you are looking at an MRI -- for the purposes of

25   our example here, we'll stick with an MRI done that day --

TRIOLO v USA                    September 23, 2020  Vol II-
286

```
 1    there are going to be indications of that on the MRI; right?

 2    A    Yes, ma'am.

 3    Q    You can see the fracture itself; right?  You'll be able to

 4    see the fracture line?

 5    A    Yes, ma'am.

 6    Q    Okay.  And with an acute fracture, you'd expect to see

 7    sharp edges on the fracture; right?

 8    A    You wouldn't be referring to an MRI where you actually

 9    don't visualize the bone very well.  You would just see, as I

10    said before, intensity.

11    Q    All right.  Looking at a CT scan, you would see sharp

12    edges on the fracture; right?

13    A    Yes, ma'am.

14    Q    And looking at the MRI, you would see that bone marrow

15    edema; right?

16    A    Yes, ma'am.

17    Q    It's the physical manifestation of the swelling that's

18    going to occur within a few inches; right?

19    A    Yes, ma'am.

20    Q    And you'd agree that when you're looking at an MRI, that

21    T2 sequence is the best of the sequences to use.

22             Do you agree with that?

23    A    There would be another image that I -- if it were

24    available, the spindown version ratio where they fat-suppressed

25    images, that shows information the best.
```

1   Q    Okay.  But in the T2 image, it actually lights up when

2   there's edema in the area; right?

3   A    Yes, ma'am.

4   Q    Okay.  And the length of time that the evidence of bone

5   marrow edema shows up on an MRI is dependent on the type of the

6   injury; right?

7   A    Yes, ma'am.

8   Q    In other words, if there's a soft-tissue injury, it might

9   show up that day and some period of time after, but it's not

10  going to be there six months later?

11  A    Unless there's repetitive injury, that's correct.

12  Q    Okay.  But with a fracture, you'd expect to see evidence

13  of bone marrow edema on an MRI done two months after an acute

14  fracture; right?

15  A    Fractures, especially at the pars interarticularis, don't

16  really have a very good blood supply, so you wouldn't see it

17  forever, but I would say you would see it for up to two months.

18  It would be very bright at first, and then it would dwindle out

19  very quickly over two months.

20  Q    All right.  Is it your testimony that there is bone marrow

21  edema present on the April 2017 film?

22  A    Yes, ma'am.  I pointed that out before when we were --

23  when I showed you.

24  Q    And the images that -- that you're pointing to, you're

25  confident that those are -- strike that.

 1              So if I understand -- and you're welcome to take that

 2      down, Ms. Sabino.  Thank you.

 3              If we look back at your operative report, so that is

 4      back at Plaintiff's Exhibit 5, JBSC-9 is the first page, and

 5      let's go ahead and move to JBSC-10.

 6              And if we could please blow up the Indication

 7      section.

 8              All right.  So your opinion, if I understand it

 9      correctly, is that he suffered the pars fracture the day of the

10      car accident; is that right?

11      A    Yes, ma'am.

12      Q    And that at some point between the car accident and

13      between when that MRI was done, the spondylolisthesis

14      developed?

15      A    Yes, ma'am.

16      Q    All right.  Can you pinpoint -- do you have an opinion as

17      to when that happened?

18      A    Well, the typical mechanism is that the fracture occurs

19      and then the slippage starts immediately and continues over

20      time.  By the time he saw -- had the MRI, he was a grade I

21      spondylolisthesis, and that seemed to hold there until he saw

22      me later.  So he developed the spondylolisthesis and it stopped

23      at the grade I, which often happens.

24      Q    So it had not moved from the April MRI; the location of

25      the vertebra had not slipped further?

TRIOLO v USA                    September 23, 2020  Vol II-
                                                          289

1   A    I didn't appreciate that it had slipped any further, no,

2   ma'am.

3   Q    And so if we can go back, then, to the -- this spondylosis

4   portion, okay, it is your opinion that the fracture occurred,

5   the slippage occurred, and the spondylosis developed all in

6   seven weeks?

7   A    Yes, ma'am.

8   Q    Okay.  So let's talk a little bit about the car accident.

9        Actually -- and we can take this down.  Thank you.

10       And, I apologize, but, yes, we'll talk about the car

11  accident.

12       So you are assuming -- you are relying on what the

13  plaintiff has reported to you about how this accident occurred;

14  correct?

15  A    I don't have any other forms.  Oftentimes I do look at

16  Accident Reports, but most of the time, ma'am, it's from the

17  history of present illness and the interview that I get from

18  the patient of what happened.

19  Q    Okay.  So you don't know what speed the vehicles were

20  going, do you?

21  A    I don't recall seeing that in the record, no, ma'am.

22  Q    You've never looked at the photographs of the cars

23  involved?

24  A    No, ma'am.

25  Q    You've never spoken with an accident reconstructionist

 1  about the forces involved or the speeds?

 2  A    No, ma'am.

 3  Q    You've never spoken with a biomechanical expert to see if

 4  the forces were sufficient to cause a fracture to his lumbar

 5  spine?

 6  A    No, ma'am.

 7  Q    You're not an expert on the kinetics required to create

 8  spinal injuries, are you?

 9  A    Only that that has been presented to me within my

10  training.

11  Q    Okay.  But, in other words, you wouldn't be qualified as

12  an expert witness in that field?

13  A    No, ma'am.

14  Q    You are assuming that some kind of injury occurred that

15  day that was sufficient in nature that it caused the fracture.

16         Is that fair?

17  A    Yes.  And that, coupled with my viewing of the MRI which

18  showed the edema in the bone that I visualized myself, it

19  seemed to line up with -- to be the right time period for that

20  sort of injury.

21  Q    You don't have a copy of the Emergency Department record,

22  do you?

23  A    I don't see it in front of me, ma'am, no.

24  Q    I don't mean in front of you; I mean within your medical

25  records.  I can tell you it was not something that was within

1   the medical records that were provided to us.

2          Have you ever seen it?

3   A    I don't recall.  I have seen some before.  I don't recall

4   if I saw it or not with Mr. Triolo.

5   Q    Okay.  Would you expect that if an acute fracture occurred

6   that there would be particular types of pain complaints that

7   would go along with that?

8   A    I would think that the patient would have back pain -- at

9   least back pain, yes, ma'am.

10  Q    All right.  Would you expect that the pain would be severe

11  enough that it would be tender to palpation, for example?

12  A    Not necessarily, ma'am.

13         As I said before, the spine is about several inches

14  down.  You can palpate a person's back and you may not actually

15  be touching the bone or shifting the bone or eliciting

16  tenderness.

17  Q    Would you expect that the findings would be significant

18  enough that -- that a board certified emergency medicine

19  physician would request lumbar imaging to explore the

20  complaints?

21         MR. MOORE:  Objection, Your Honor.  Findings as to

22  what?

23         I'm not sure what findings we're referencing here.

24         THE COURT:  Can you rephrase.

25         MS. CUNNINGHAM:  I can, Your Honor.

```
 1   BY MS. CUNNINGHAM:

 2   Q    Would you expect that the pain would be severe enough or

 3   that there would be other symptoms of a nature sufficient to

 4   cause lumbar imaging to be done if a patient presented through

 5   the MRI -- pardon me, presented to the emergency room?

 6   A    Oftentimes, right after an accident or shortly after an

 7   accident, there are endorphins released.  There are many

 8   patients who don't even go to the Emergency Department on the

 9   day of an injury.  Without me examining the patient and seeing,

10   I wouldn't be able to really comment.

11   Q    Okay.  That's fair enough.  Thank you.

12          All right.  Now, in spite of not knowing all of these

13   facts about the accident, you were still able to treat

14   Mr. Triolo; correct?

15   A    Yes, ma'am.

16   Q    Okay.  And, indeed, you did not have to determine when the

17   pars fracture occurred in order to treat him, did you?

18   A    I'm not sure what you mean by that.

19   Q    I'll rephrase or ask in a better way.

20          When you saw that there was the spondylolisthesis at

21   L5-S1, that being present on the film told you, in part, that

22   he needed surgery at that level; correct?

23   A    As I was saying before, the images themselves don't tell

24   the whole story.  The history provided by the patient with the

25   physical examination, coupled with what I felt to be an acute
```

1    injury on the MRI told me that he needed surgery.

2    Q    Okay.  But to perform the surgery, you did not need to

3    know when that slippage occurred; correct?

4    A    To perform the surgery -- to actually perform the surgery,

5    no, I wouldn't have to know the exact date of his injury.

6    Q    Right.  I mean, in other words, if he had this a week

7    prior to the car accident, an issue in our case, that wouldn't

8    have changed the surgery that you performed; right?

9    A    That's not correct.  When I talked about the differential

10   diagnosis that I developed initially, one of them was chronic

11   back problem; one was acute spine trauma resulting in fracture;

12   one is inflammatory arthritis, tumors, et cetera.

13        The fact that he required surgery was based on my

14   history and physical exam and by me looking at the MRI and

15   seeing that his nerves were severely pinched, which told me he

16   couldn't have been living like this for very long.  He wouldn't

17   be able to exist like this, because the nerves were squashed.

18        That coupled with the edema and the bone, I felt like

19   this was all a new injury, and that's why he required treatment

20   and surgery, as he had failed nonoperative management.

21   Q    But the surgery you performed did not change in nature;

22   correct?

23        In other words, you wouldn't have done a fusion at a

24   different level; you wouldn't have done a different surgery.

25   You would have done that PLIF procedure regardless of when the

1    fracture occurred.

2    A    If we performed surgery on a spondylolisthesis with spinal

3    stenosis, the gold standard solution is posterior lumbar

4    interbody fusion.  However, in this case of offering surgery to

5    Mr. Triolo was because there was an acute spine trauma and he

6    had failed nonoperative management and treatment of that acute

7    spine trauma.

8    Q    So you're talking about him having failed preoperative

9    management.  You're -- when you were being asked about physical

10   therapy, you indicated that patients typically have had a

11   course of physical therapy prior to a surgery; right?

12   A    Yes, ma'am.

13   Q    And so that may factor in to your decision-making about

14   what people need post-surgery, because if they've been doing

15   physical therapy a lot --

16   A    Yes, ma'am.

17   Q    -- they may know already kind of what they need to do;

18   right?

19   A    Yes, ma'am.

20   Q    Okay.  In this instance, are you aware that Mr. Triolo

21   never had formal physical therapy prior to coming to see you?

22   A    It's my understanding he had home health physical therapy

23   and was performing physical therapy through chiropractic care,

24   et cetera.

25   Q    There's a difference, you'd agree, between chiropractic

TRIOLO v USA                    September 23, 2020  Vol II-
295

1  care and massages being performed by a chiropractor and

2  physical therapy that a licensed physical therapist would

3  provide; correct?

4  A    Well, I think you're assuming that a chiropractor only

5  does massages.  The chiropractic care, in our literature, is

6  found to be equivalent to physical therapy outcomes.

7  Q    All right.  Is it your presumption that Mr. Triolo had

8  some kind of physical therapy equivalent prior to having

9  surgery?

10  A    Yes, ma'am.

11  Q    Okay.  And to go to the issue of the differential

12  diagnosis, the differential diagnosis is a series of

13  possibilities, essentially; right?

14  A    Yes, ma'am.

15  Q    And it's not a causation determination.

16        Do you agree with me?

17  A    I'm not sure what you mean by a differential diagnosis is

18  that what you just said -- excuse me, that which you just said,

19  all the possibilities that you -- a physician starts with, a

20  surgeon starts with, and as he collects information, from the

21  history, the physical, and the objective testing, starts

22  eliminating and finally arrives at a final diagnosis.

23  Q    And in this instance, the final diagnosis was that he was

24  experiencing pain that you felt would be resolved by the

25  surgery.  Is that fair?

TRIOLO v USA                    September 23, 2020  Vol II-

1    A    Yes, ma'am.

2    Q    Okay.  And we know that the surgery actually led to a

3    host, seemingly, of other problems on the other side; correct?

4              MR. MOORE:  Objection.  Form, Your Honor.

5              THE COURT:  Can you rephrase?

6              MS. CUNNINGHAM:  Yes, Your Honor.

7              The -- from -- I'm actually going to strike the

8    question and move on to something.  I know we're short on time.

9    BY MS. CUNNINGHAM:

10   Q    All right.  You would agree with me, sir, that the MRI

11   report -- and you're welcome to review the whole thing before

12   answering this question if you'd like, but the MRI report from

13   the April 2017 MRI never once uses the word "acute;" agreed?

14   A    I would look at it, but I could take your word for it,

15   yes, ma'am.  What I said before, that's why I don't rely on the

16   radiologist's interpretation.  I'm the surgeon.  I look at the

17   images myself and make my own determination.

18   Q    Did you ever talk to this radiologist about his report?

19   A    No, ma'am.

20   Q    Did you ever call him and say:  Sir, I think you've made a

21   big mistake.  I see an acute fracture here?

22   A    He didn't make a big mistake; he just didn't mention the

23   word "acute."  But I evaluated the MRI myself and I felt that

24   Mr. Triolo's story correlated well with the MRI.

25              I would never look at a radiologist -- as I've said

1   before, they've never had an opportunity to speak with

2   Mr. Triolo, so they don't know his story.  So, as I said

3   before, you line up the story with the physical examination and

4   the MRI.  That gets you the most accurate information in order

5   to indicate surgery.

6   Q    But I think you would agree with me that the patient's

7   story shouldn't influence the interpretation of what is or is

8   not on an MRI.

9   A    I wouldn't -- I didn't say that it did.  But from what I

10   interpreted from the images myself, it correlated very well

11   with his story.  And I felt the history of acute injury that he

12   reported, the physical exam, and the findings that I observed

13   myself all led up to acute spine trauma.

14   Q    Okay.  And the ultimate purpose of the surgery was to

15   stabilize the spine; right?

16   A    Yes, ma'am.

17   Q    And your first visit with the plaintiff was nine months

18   after the car accident; right?

19   A    Yes, ma'am.

20   Q    You hadn't talked to him before that, had you?

21   A    No, ma'am.

22   Q    You haven't talked to any of the physicians that treated

23   him in that time frame?

24   A    No, ma'am.

25   Q    How was Mr. Triolo referred to you?

1    A    My recollection is that he was referred by one of the
2    neurologists that he had seen before me.
3    Q    Okay.  Do you remember who that was?
4    A    I'd have to refer to the record.  I don't want to speak
5    incorrectly, but maybe Dr. Asad, but I don't know him
6    personally.
7    Q    All right.  Did you ever talk to Dr. Asad about this
8    patient?
9    A    I don't recall ever speaking to Dr. Asad about the
10   patient.
11   Q    Have you had -- well, let me ask this.  Prior to the day
12   that Mr. Triolo came to see you, which was November 8th of
13   2017, had you had any conversations with plaintiff's lawyers
14   about him?
15   A    I had not met the plaintiff's lawyers until very recently.
16   I met Mr. Triolo first.
17   Q    All right.  There's a lot -- did you have the opportunity
18   to look at the CT of the cervical spine that was done on
19   Mr. Triolo?
20   A    CT of the cervical spine?
21   Q    Yes, sir.
22   A    I may have looked at it.  I haven't looked at it recently.
23   Q    Okay.  Do you have any recollection of looking at it?
24   A    No, ma'am, because I was focused on his low back, as that
25   was his chief complaint.

```
 1   Q    Okay.  Would it surprise you that there are degenerative
 2   findings on the CT scan of the neck as well?
 3              MR. MOORE:  Objection, Your Honor.  There's no
 4   foundation for a CT of the cervical spine.  We talked to
 5   Dr. Topp here about the lumbar injury.
 6              I mean, there's no MRI up there.  She said cervical
 7   spine, so I'm just trying to...
 8              THE COURT:  Wasn't there a CT done at Baptist South?
 9              MR. MOORE:  Lumbar spine.
10              THE COURT:  I thought the CT was of the cervical.
11              MS. CUNNINGHAM:  It was, Your Honor, the day of
12   the -- the day of the, yes.
13              MR. MOORE:  Judge, he hasn't reviewed it.  He's here
14   only for the lumbar.  He's only treated the lumbar.
15              THE COURT:  Well, but -- you can still ask that
16   question.
17              No, Mr. Kinney, he's got the floor.
18              Go ahead.
19              MR. MOORE:  Yes, thank you, Your Honor.  I'm removing
20   my mask.
21              Basically just to restate what I was saying is that
22   he did not review the findings of the CT of the cervical spine,
23   so there was no foundation laid, Your Honor, to be asked
24   questions about it if he didn't review it.
25              THE COURT:  Well, the question is still -- if he
```

 1  wants to look at it, she can show him the record.

 2          MR. MOORE:  Okay, Your Honor.  Thank you.

 3          THE COURT:  Go ahead.

 4          MS. CUNNINGHAM:  Thank you, Your Honor.

 5  BY MS. CUNNINGHAM:

 6  Q   I think I'm going to have to, just in the interest of

 7  time, ask you a bit of a hypothetical question here.

 8          If there is degeneration in the cervical spine, that

 9  would make it more likely that there's also degeneration in the

10  lumbar spine; is that fair?

11          MR. MOORE:  Objection, Your Honor.  It's outside the

12  scope of direct.

13          MS. CUNNINGHAM:  All right.  I can -- I'll go about

14  this a different way.

15          THE COURT:  Go ahead.

16  BY MS. CUNNINGHAM:

17  Q   So if we can pull back up Plaintiff's Exhibit 3, which is

18  the Baymeadows MRI.  Ms. Sabino, it's BMRI-1; it's the first

19  page.

20          All right.  Let's just take a look at the L5-S1

21  findings on this report.

22          Thank you.

23          Okay.  One of the findings was that there is a

24  circumferential disc bulge.  And I will not read the entire

25  thing.  It's in the record.

TRIOLO v USA                    September 23, 2020  Vol II-
                                                                    301

1          Did you agree with this finding?

2   A    Looking at it now, it's not wrong.

3   Q    All right.  A circumferential disc bulge means that the

4   disc has bulged out evenly into a circle or, like, the

5   circumference of a circle; right?

6   A    Yes, ma'am.

7   Q    And if we look at the second page of this MRI report,

8   which is BMRI-2, and we kind of blow up the Impressions

9   section, in Impression 3 -- well, Impression 2, it references

10  again degenerative spondylolisthesis.

11         Do you see that?

12  A    Yes, ma'am.

13  Q    And Impression 3 references disc desiccation at T12-L1; do

14  you see that?

15  A    Yes, ma'am.

16  Q    So when a disc is desiccated, that means it's lost its

17  water, losing some of its water content; correct?

18  A    Yes, ma'am.

19  Q    And when the disc space has narrowed, that means the

20  vertebral space between the upper vertebra and lower vertebra

21  has decreased; correct?

22  A    Yes, ma'am.

23  Q    And both disc desiccation and disc-space narrowing are

24  degenerative processes; right?

25  A    Yes, ma'am.

TRIOLO v USA                    September 23, 2020  Vol II-
302

1   Q    And the combination of disc desiccation and disc-space

2   narrowing is what causes a disc to bulge circumferentially;

3   correct?

4   A    It can be one of the reasons, yes, ma'am.

5   Q    Okay.  So here, there is an indication of a

6   circumferential disc bulge at L5-S1 that is essentially

7   degenerative in nature.

8           Do you agree with that?

9   A    It is post-traumatic degenerative arthritis, yes, ma'am.

10  Q    Okay.  That's your opinion; correct?

11  A    Yes, ma'am.

12  Q    And if we go back to the first -- pardon me.  Before you

13  take it down, let me see if I can do it from here.  I can do it

14  from here.

15          So this radiologist's read, as represented in this

16  report, is that it was that disc desiccation and disc-space

17  narrowing with the bulge that resulted in the foraminal

18  stenosis; right?

19  A    I'm just reading his words.  There's all of these things

20  present.  I don't know if he has a chronology in his mind, but

21  all of those words are there, yes, ma'am.

22  Q    Okay.

23          So we can take that down.  Thank you.

24          All right.  So you talk about the importance of

25  correlating things clinically before you proceed to having

1   surgery; correct?

2   A    Yes, ma'am.

3   Q    And one of the things that you do to test for a patient

4   that has radicular pain is a straight-leg raise; correct?

5   A    Yes, ma'am.

6   Q    All right.  Now, for Mr. Triolo, you did a straight-leg

7   raise, didn't you?

8   A    Yes, ma'am.

9   Q    All right.  And do you remember the results of that?

10  A    I just looked at it recently in this testimony and it was

11  negative.

12  Q    Right.  So that was one indication -- well, we can leave

13  it at that.

14          MS. CUNNINGHAM:  Your Honor, if I could have just a

15  moment to see if there's anything else.

16          THE COURT:  Yes.

17  BY MS. CUNNINGHAM:

18  Q    I'll try to run through this as quickly as I can.

19          Sir, when the patient is -- you're relying on your

20  patient to give you an accurate history; correct?

21  A    Yes, ma'am.

22  Q    Okay.  And you want to know about prior history because it

23  helps you formulate a plan; right?

24  A    Yes, ma'am.

25  Q    It's going to help you with that differential?

```
 1   A    Yes, ma'am.

 2   Q    And you would never want a patient to withhold things

 3   about their medical history from you; is that fair to say?

 4   A    No, ma'am.

 5   Q    In other words, you're the physician; right?

 6            THE COURT:  It's not fair to say or you don't agree

 7   with the statement?

 8            THE WITNESS:  Could you repeat the question.

 9   BY MS. CUNNINGHAM:

10   Q    Yes, I can repeat the question.

11            Do you want patients to withhold information from you

12   about their past medical history?

13   A    No, ma'am.

14   Q    Okay.  Why not?

15   A    Because it would cloud my judgment in establishing a

16   differential diagnosis and allowing me to eliminate and do all

17   those things that we've been speaking about before.

18   Q    When you were talking on direct about the disc having lost

19   its water content; do you recall that testimony?

20   A    Yes, ma'am.

21   Q    You were explaining that a disc had degenerated.

22            And just making sure I'm clear, the loss of the water

23   content and the desiccation that you were talking about on

24   direct, that's what you're saying occurred in the 7 weeks from

25   the car accident?
```

1    A    Yes, ma'am, that certainly can occur.  When we study disc
2    degeneration -- and maybe this will clarify it for you.
3          When we study disc degeneration, we use rabbit
4    models.  And the way we induce degenerative disc disease is we
5    poke a big needle into a rabbit's disc, and within three or
6    four weeks, it's a degenerative disc with disc desiccation and
7    loss of height and it has all the signs of a degenerative disc.
8    So, yes, ma'am, it can occur in those weeks.
9    Q    Okay.  If we go back briefly to your operative report --
10   and I apologize.  It was -- all right.  Plaintiff's Exhibit 5
11   and -- at JBSC-09.  If we can pull back up just that first page
12   and your -- blow up, Ms. Sabino, the postoperative diagnosis.
13   Pre and post, actually.  Thank you.
14         Okay.  So when -- we looked at your handwritten notes
15   indicating that you had a finding of degenerative disc disease
16   and spondylosis.
17         Do you recall that?
18   A    Yes, I do.
19   Q    Okay.  You did not add that in to your postoperative
20   diagnosis, did you?
21   A    This dictation, I usually would say preoperative
22   diagnosis, and I would say postoperative diagnosis the same, as
23   it's essentially the same.
24   Q    Okay.  Go ahead.
25   A    I'm sorry.

1  Q    Okay.  But in this instance, you had findings of

2  degenerative disc disease that are not -- those words do not

3  appear in your operative note.  Do you agree with that?

4  A    It's not really pertinent to what I'm trying to tell a

5  story about with my operative notes.  My operative note's

6  purpose is to demonstrate to the patient in medical records

7  what I did to him for two-and-a-half hours.

8           And so I put in preoperative diagnosis what his

9  problem was; postoperative diagnosis, same.  I found

10  degenerative changes within the spine during my operative note,

11  yes, ma'am, but I believe that they were due to a motor vehicle

12  collision from February of 2017.  And by the time I operated on

13  him, it was a year later.

14  Q    All right.  Just very briefly.

15           You had -- you were asked about the home health care

16  on direct, so we don't need to discuss that.  But you also had

17  referred Mr. Triolo to formal outpatient physical therapy;

18  correct?

19  A    Yes, ma'am.

20  Q    Okay.  You had referred him to Heartland Rehabilitation;

21  do you recall that?

22  A    That is one of the many sources.  I don't disagree with

23  it.  I don't recall.

24  Q    Okay.  In the interest of time, I will not pull up the

25  record.  It's already been looked at with other witnesses.  But

1  in your medical records, it indicates that Mr. Triolo contacted

2  you after the surgery and said he did not want to go to

3  Heartland because they would not accept a letter of protection?

4          Do you recall that?

5  A    I don't recall that, but I wouldn't disagree with what

6  you're saying.

7  Q    Okay.  So Mr. Triolo, not until August 2nd, 2018, did he

8  finally have an initial PT evaluation.  And I believe that is

9  in your records.  You might recall that; yes?

10 A    Yes, ma'am.

11 Q    Okay.  But what isn't in your records is that he

12 discharged himself after one session from that therapy.

13          Were you aware of that?

14 A    Not until you bring it up now.  I may have seen that, but

15 that's not surprising.

16 Q    And Mr. -- it's not surprising?  Why is that not

17 surprising?

18 A    I see it often when patients go to physical therapy, and

19 if they feel like they need to invest their money in a physical

20 therapist, they will spend the money.  But if they feel they

21 can get the same treatment at home, they will often say:  I can

22 do this at home.  I know how to do this.  I've done it many

23 times before.  I've been to a chiropractor; I've been to PT

24 before.

25          You know, I can't make a patient go to physical

1    therapy, but they can determine the value of their own time and

2    what they're getting out of something.  So it's not surprising

3    that patients make decisions like that on their own.

4    Q    With respect to Mr. Triolo, there was a very specific

5    reason you wanted him to go to physical therapy.

6            Do you remember what that reason was?

7    A    I'd have to look at the records.

8    Q    Okay.  I can tell you that in your appointment on

9    April 11, after the surgery, he was referring to numbness in

10   the left toes, and that was addressed on your direct.

11           Do you recall that?

12   A    Yes, ma'am.

13   Q    Okay.  And so your plan was for him to start physical

14   therapy to encourage left-leg straitening.

15           Do you remember that?

16   A    Yes, ma'am, yes.

17           MR. MOORE:  Your Honor, objection.  I know we're --

18   run out of time, but she's asking him these questions from a

19   record with no record in front of him, and I just...

20           THE COURT:  I'm confident that if the doctor wanted

21   to see the record, he would ask for it.

22           MR. MOORE:  Thank you, Your Honor.

23   BY MS. CUNNINGHAM:

24   Q    All right.  So there was something very specific going on

25   with Mr. Triolo in the postoperative period that caused you to

TRIOLO v USA                        September 23, 2020  Vol II-
309

1    want him to go have that therapy; right?

2    A    Yes, ma'am.

3    Q    Okay.  And you already knew that he was a respiratory

4    therapist and worked in a hospital; right?

5    A    Yes, ma'am.

6    Q    And so if you thought that it was enough for him to just

7    go home, you would have given him an exercise sheet and told

8    him to go home and do it; right?

9    A    That's correct, ma'am.  I would have given him a

10   prescription for physical therapy so he can stretch out his

11   hamstrings and stretch the nerve and try to have that nerve

12   move around and not get scarred down.

13   Q    Right.  And so your expectation was that surgery was --

14   or, pardon me, that physical therapy would assist his recovery;

15   right?

16   A    Yes, ma'am.  I always recommend the best that I feel for

17   my patients.

18   Q    Okay.  And if a patient doesn't do that kind of therapy,

19   that can actually lead to what you just mentioned, some kind of

20   scar tissue or things like that that cause other problems;

21   correct?

22   A    I only prescribe what's best for my patients.  It may not

23   make a difference at all, but I feel like what was best for

24   Mr. Triolo is to perform hamstring stretches and to get the

25   nerve moving.  That's what I wanted him to do.  And I described

1  | it to him like that.

2  | Q    One very last piece of business, Defendant's Exhibit 22.

3  | I -- we -- I agreed with counsel that we would -- there were --

4  |          MS. CUNNINGHAM:  This is one of those exhibits, Your

5  | Honor, that was objected to, a number of pages on relevance

6  | grounds, and others were stipulated to.  There is only one page

7  | that I'm going to ask the doctor about, and it's Defendant's

8  | Exhibit 22, page 3, which is TSO-3, and I believe that

9  | plaintiff's counsel is going to -- has already stipulated to

10 | that page.

11 |          THE COURT:  Mr. Moore?

12 |          MR. MOORE:  Yes, Your Honor.  We did.  We discussed

13 | it.

14 |          THE COURT:  Okay.  So is it in evidence or do I need

15 | to --

16 |          MS. CUNNINGHAM:  It needs to be moved in, Your Honor.

17 |          THE COURT:  Okay.  I've got this on the evidence --

18 | tell me the document number again.

19 |          MS. CUNNINGHAM:  Defendant's Exhibit 22, Your Honor.

20 |          THE COURT:  And it's the whole exhibit?

21 |          MS. CUNNINGHAM:  No, Your Honor.  There's just one

22 | page, TSO-03.

23 |          THE COURT:  Okay.

24 |          THE WITNESS:  Is what you're saying that means it's

25 | not here?

 1              THE COURT:  It just showed up on your screen.

 2              THE WITNESS:  Okay.  That's where it would be, yes,

 3    ma'am.

 4              THE COURT:  Defendant's 22, page 3, is admitted.

 5         (Defendant's Exhibit 22 was admitted in evidence.)

 6    BY MS. CUNNINGHAM:

 7    Q    Okay.  Sir, do you know what this is?

 8    A    Yes.  It's a medical provider's lien and assignment of

 9    benefits.

10    Q    Okay.  What -- is this what is sometimes referred to as a

11    letter of protection?

12    A    Yes, ma'am.

13    Q    All right.  And Mr. Triolo signed this on November 8th of

14    2017; is that correct?

15    A    Yes, ma'am.

16              MS. CUNNINGHAM:  All right.  We can take that down.

17    Thank you.

18    BY MS. CUNNINGHAM:

19    Q    All right.  One last little series of questions here.

20    The -- you mentioned that you used the MRI -- or pardon me.

21              You did not order any new -- a new MRI of Mr. Triolo

22    prior to surgery, did you?

23    A    No, ma'am.

24    Q    And so it's your testimony that the spondylolisthesis that

25    occurred in that -- sometime in that seven-week period then

1   stopped and became essentially stable and stayed in place until

2   your surgery?

3            MR. MOORE:  Objection, Your Honor.  Asked and

4   answered.

5   A    That's what typically happens with spondylolisthesis.  It

6   slips to a point and then stops.

7            MS. CUNNINGHAM:  Okay.  No, further questions, Your

8   Honor.  Thank you.

9            MR. MOORE:  Your Honor, I only have like one or two.

10           THE COURT:  Okay.  Because we need to go.  I've

11  stayed late because I'm trying to -- I understand he has a

12  medical procedure tomorrow, but we need to be done.

13           MR. MOORE:  Thank you.  Thank you, Your Honor.

14           THE COURT:  Very quickly, Mr. Moore.

15                    REDIRECT EXAMINATION

16  BY MR. MOORE:

17  Q    Dr. Topp, do you recall when defense counsel -- the

18  defense counsel showed you the lumbar MRI report of April 4th,

19  2017?

20  A    Yes.

21  Q    And you recall we discussed that in your direct?

22  A    Yes.

23  Q    Did you see anywhere on that report where the radiologist

24  stated that the injury to Mr. Triolo's lumbar spine was not

25  from the motor vehicle crash?

```
 1    A      No, I didn't see that.

 2              MR. MOORE:  No further questions.

 3              Thank you, Your Honor.

 4              Thank you, Doctor.

 5              THE COURT:  All right.  Thank you, sir.  You may step

 6    down.

 7              And if you'll pull that microphone cover off and

 8    throw it -- yeah, the trash, not in the bowl of clean

 9    microphone covers.

10              THE WITNESS:  Thank you.

11              THE COURT:  All right.  Thank you, sir.

12              You'll need your mask to be escorted out.

13              And if you can radio down to the front and let them

14    know that we're leaving.

15              So who wants to inform us of the -- what you have in

16    store for us tomorrow?

17              MR. MOORE:  Brian Schmucker, Bruce Schmucker, and

18    Nathan McDaniel.

19              THE COURT:  Will that be the conclusion?

20              MR. MOORE:  That will conclude the plaintiff's case,

21    Your Honor.

22              THE COURT:  I assume the two Schmucker brothers are

23    going to be relatively brief?

24              MR. KINNEY:  Yes.

25              THE COURT:  I'm sorry?
```

 1              MR. KINNEY:  Yes, Your Honor.

 2              THE COURT:  And how long with Mr. -- how long with

 3    McDaniel?

 4              MR. KINNEY:  After this trial, I don't even know how

 5    to guess at that anymore.

 6              THE COURT:  Both sides have been taking longer.

 7              MR. KINNEY:  I wasn't looking at them -- too much,

 8    anyway.

 9              30 minutes, my direct.

10              Really, he only saw him a handful of visits.

11              THE COURT:  I think we were told 14; right?

12              MR. MOORE:  Correct, Your Honor.  Right.

13              MS. CUNNINGHAM:  Pardon me, Your Honor.

14              Just to clarify.  I'm thinking it's Michael

15    McDaniels?

16              MR. MOORE:  Yes, Dr. McDaniels.

17              MS. CUNNINGHAM:  Dr. McDaniels.  Okay.

18              MR. KINNEY:  Dr. McDaniels.

19              THE COURT:  That's what I thought.

20              MS. CUNNINGHAM:  He said Nathan.  I just wanted to

21    make sure.

22              MR. KINNEY:  McDaniels, Jacksonville Sport and Spine.

23              THE COURT:  Okay.  All right.  And, Ms. Cunningham,

24    what is it that you would anticipate for us tomorrow?

25              MS. CUNNINGHAM:  So, Your Honor, the one witness

TRIOLO v USA                    September 23, 2020  Vol II-

1    we're still waiting for a negative test, so we don't have that

2    yet.

3            The other witness, either both parties have served or

4    attempted to serve and service has not been accomplished.  I

5    think at this point there is a deposition that was taken.  I

6    think under Rule 804(a)(5), the deposition should be

7    admissible.  And then we'll just have to schedule the one

8    witness whenever the Court has availability.

9            THE COURT:  All right.

10            MR. KINNEY:  Your Honor, we're not in agreement with

11    the admission of the deposition.  We wanted to face that

12    witness at trial.

13            We didn't take a videotaped deposition.  There's no

14    way for the Court to evaluate the answers.  Candidly, I'll tell

15    you the issue that I'm concerned about is her denying she was

16    on her phone and Mr. Triolo visibly seeing her on the phone at

17    the point of impact.  And so I don't know how the Court would

18    evaluate her testimony without being able to see her since it

19    wasn't a videotaped deposition.

20            THE COURT:  Can I -- I'm going to show my ignorance

21    here.  But what difference does that make?  I mean, I don't --

22    if she is the rear-end driver, there hasn't been given any

23    indication in any of the evidence that Mr. Triolo did anything.

24            I didn't really think negligence -- I didn't think

25    negligence and driving was an issue that we were trying.  I

1    thought we were trying causation and damages.

2            A.m. I wrong about that?

3            MS. CUNNINGHAM:  No, Your Honor.

4            I don't think -- I mean, if anything, not having

5    testimony about that, I guess, could hurt us somehow, but

6    not -- I don't see how that would hurt the plaintiff because

7    they have unrebutted testimony.  So I don't -- I don't think

8    that that's...

9            MR. KINNEY:  What's the purpose of introducing the

10   written deposition testimony, then?

11           THE COURT:  I don't know what else is in the

12   deposition.  I'm just responding to your specific thing about

13   whether she was on the phone or not.

14           MS. CUNNINGHAM:  There is --

15           MR. KINNEY:  That's the thing that comes to the

16   forefront of my mind.  I haven't read that in probably

17   six months or so, but there is a problem there that without a

18   videotape we can't even evaluate --

19           THE COURT:  Well, then I think what you-all need to

20   do is look at the *Federal Rules of Civil Procedure* and Rule 804

21   and determine whether it permits the admissibility or not.

22           MR. KINNEY:  Yes, Your Honor.

23           THE COURT:  So I'll -- and we'll address that

24   tomorrow.

25           MS. CUNNINGHAM:  Thank you.

1          THE COURT:  Because the question is has -- is whether

2    or not counsel has established that the witness is unavailable.

3          So I'll let you-all -- and there may be other

4    arguments.  That's just the one that pops to my brain when you

5    cite 804.

6          I was just trying to short-circuit that one issue,

7    because, again, unless -- and that's why I'm saying out loud,

8    unless I've missed something, the rear driver is going to be

9    responsible; the question is for what.  So...

10          All right.  We'll start again at 8:30 tomorrow

11    morning.  I'm going to remind you-all that I do have a hard,

12    hard break -- really, I'm being aggressive by not ending till

13    3:00.  I probably need to stop at quarter of 3:00 to do a good

14    job on what I'm supposed to do next.

15          Yes, sir?

16          MR. KINNEY:  We do a lot of deposition testimony, but

17    are we actually going to read it to you or are we just going

18    to --

19          THE COURT:  No.  No, no.

20          MR. KINNEY:  Then we should be wrapped up by

21    lunchtime, anyway.

22          THE COURT:  Okay.  Well, that's great.

23          But, no, reading depositions is painful, and I will

24    happily -- if it's admitted, I will read it all by my lonesome.

25          MR. KINNEY:  I was going to hire two actors.

1              THE COURT:  You've got two actors right up there.

2    Future legal scholars.

3              All right.  Then be here at 8:30 and we will get

4    going.

5              Have a good night.  Take your temperatures before you

6    come to the courthouse tomorrow -- I think I forgot to say that

7    yesterday -- and don't come to the courthouse if you have COVID

8    symptoms.

9              COURT SECURITY OFFICER:  All rise.

10        (Proceedings concluded at 6:05 p.m.)

11                        -  -  -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA  )

     I hereby certify that the foregoing transcript is a true
and correct computer-aided transcription of my stenotype notes
taken at the time and place indicated herein.



          Dated this 2nd day of November 2020.




               /s/Cindy Packevicz Jarriel
               Cindy Packevicz Jarriel, RPR, FCRR