1

1    IN THE UNITED STATES DISTRICT COURT
      MIDDLE DISTRICT OF FLORIDA
2    JACKSONVILLE DIVISION

3
      CASE NO:  3:18-cv-919-J-34JBT
4

5   RICHARD A. TRIOLO,              Jacksonville, Florida

6           Plaintiff,             Date:  September 24, 2020

7   v.                             Time:  8:40 a.m. - 10:06 a.m.

8   UNITED STATES OF AMERICA,      Courtroom:  10B

9           Defendant.
   _____

10

11                    **BENCH TRIAL**
                      **(Volume III)**
12       BEFORE THE HONORABLE MARCIA MORALES HOWARD
                UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20  OFFICIAL COURT REPORTER:

21  Cindy Packevicz Jarriel, RPR, FCRR
    221 N. Hogan Street, #128
22  Jacksonville, FL  32202
    Telephone:  904.301.6843
23  e-mail:  cindyrprfcrr@gmail.com

24       (Proceedings reported by stenography; transcript
    produced by computer.)
25

1

2                        A P P E A R A N C E S

3

4    COUNSEL FOR PLAINTIFF:

5    **PHILIP KINNEY, ESQ.**
     **BENJAMIN MOORE, ESQ.**
6    Kinney & Sasso, PLLC
     191 RG Skinner Parkway, Suite 703
7    Jacksonville, FL  32256-9678

8

9    COUNSEL FOR THE DEFENDANT:

10   **COLLETTE CUNNINGHAM, ESQ.**
     **KYESHA MAPP, ESQ.**
11   United States Attorney's Office
     300 North Hogan Street, Suite 700
12   Jacksonville, FL  32202

13

14                          -    -    -

15

16

17

18

19

20

21

22

23

24

25

T A B L E   O F   C O N T E N T S

Proceedings:

Plaintiff's Witnesses:

**BRIAN SCHMUCKER**
Direct Examination by Mr. Kinney..........Page  5
Cross-Examination by Ms. Mapp.............Page 18
Redirect Examination by Mr. Kinney........Page 23


**BRUCE SCHMUCKER**
Direct Examination by Mr. Moore...........Page 25
Cross-Examination by Ms. Mapp.............Page 40
Redirect Examination by Mr. Moore.........Page 51


E X H I B I T S

Received in Evidence                        Page

Plaintiff's Exhibit 48.....................65

Defendant's Exhibit 51.....................66

Defendant's Exhibit 52.....................66


- - -

TRIOLO v USA              September 24, 2020    Vol III- 4

```
 1                P R O C E E D I N G S
 2   September 24, 2020                           8:39 a.m.
 3                        -  -  -
 4            COURT SECURITY OFFICER:  All rise.
 5            The United States District Court, in and for the
 6   Middle District of Florida, is now in session.  The Honorable
 7   Marcia Morales Howard presiding.
 8            THE COURT:  We are back on the record in Case
 9   3:18-cv-919-J-34JBT, Richard Triolo versus the United States of
10   America.
11            Mr. Moore and Mr. Kinney are here, along with
12   Mr. Triolo.
13            Ms. Cunningham and Ms. Mapp are here on behalf of the
14   United States.
15            And we are continuing this morning with the evidence.
16            Who is up, Mr. Moore or Mr. Kinney?
17            MR. KINNEY:  Your Honor, I'll be taking on calling
18   Brian Schmucker as our first witness.  Bruce Schmucker will be
19   the second witness; that will be Mr. Moore.  And that's the
20   only evidence testimony we're going to present today.
21            Last night I informed defense counsel that
22   Dr. McDaniels was not going to testify today.
23            THE COURT:  Okay.
24            MR. KINNEY:  He's out in the hall.  Is he able to
25   come in?
```

```
 1              THE COURT:  Yes, sir.
 2              Sir, if you'll just go up to the witness stand.  And
 3      you can go ahead and remove your face mask while you're
 4      testifying.
 5              COURTROOM DEPUTY:  And please raise your right hand.
 6              Do you solemnly swear that the testimony you're about
 7      to give before this Court will be the truth, the whole truth,
 8      and nothing but the truth, so help you God?
 9              THE WITNESS:  So help me God.
10              COURTROOM DEPUTY:  You may have a seat.
11              And if you could please state your name for the
12      record and spell your last name.
13              THE WITNESS:  Brian Lee Schmucker.
14      S-c-h-m-u-c-k-e-r.
15              THE COURT:  And do you spell Brian within an "i" or
16      with a "y"?
17              THE WITNESS:  With an "i."
18              THE COURT:  Okay.  Go ahead.
19          BRIAN LEE SCHMUCKER, PLAINTIFF'S WITNESS, SWORN
20                      DIRECT EXAMINATION
21      BY MR. KINNEY:
22      Q    Mr. Schmucker, first of all, tell us how you know this
23      gentleman here, Richard Triolo.
24      A    He's my brother.
25      Q    And this is going to sound odd, but how are you related --
```

1  how are you brothers?

2  A    He's my step -- my half step -- sorry, half brother.  My

3  mom remarried and we had Rich.

4  Q    All right.  And how old were you when Mr. Triolo came

5  along?

6  A    Five.

7  Q    I'm sorry, I didn't hear you.

8  A    I think somewhere around five.

9  Q    Five years old.

10        Did you live with Mr. Triolo in New York?

11  A    For a little bit.  A real short period of time.

12  Q    All right.  And do you remember how old you were when you

13  moved to Florida?

14  A    9, 10.  I think I was going into fifth, so, yeah.

15  Q    Okay.  And tell me, what do you do for work,

16  Mr. Schmucker?

17  A    I'm currently unemployed.

18  Q    And prior to being unemployed, what did you do for work?

19  A    I was a technical manager for Single Source Incorporated.

20  Q    What is that?

21  A    We sold automotive paint to all the dealerships -- well, a

22  good most of the dealerships around Jacksonville.

23  Q    And is it -- when you moved to Florida in fifth grade, did

24  Mr. Triolo stay back in New York?

25  A    Yes.

1  Q    Did your relationship with him become a long-distance

2  relationship or was there a lot of frequency to it?

3  A    It was -- it was long distance.

4  Q    How often would you see him on a yearly basis?

5  A    When he was still in New York, my mom had him during the

6  summer initially when he was young.

7  Q    How old are you now?

8  A    I am 54.

9  Q    54.  All right.  So about ten years older than Mr. Triolo?

10  A    Yeah.

11  Q    And do you remember -- do you remember having sort of an

12  intervention with Mr. Triolo around Christmastime of 2010 or

13  '11?

14        Well, do you remember talking to Mr. Triolo about

15  moving to Florida?

16  A    Sure.  We were -- we tried to get him down here for

17  several years.

18  Q    Okay.  Do you remember what year he moved down?

19  A    I couldn't tell you exactly.

20  Q    All right.  Do you know how many years he's been in the

21  Jacksonville area?

22  A    Ten plus.  I don't know exactly what year he moved here,

23  so I would say ten plus.  He's been here a while now.

24  Q    Did your relationship with Mr. Triolo become closer once

25  he moved to Jacksonville?

TRIOLO v USA          September 24, 2020    Vol III- 8

1   A    Oh, yes.

2   Q    What would you say on a monthly basis, how many times --

3   first of all, are you married, kids?

4   A    Yes, married with two kids.

5   Q    And do you live here in Jacksonville?

6   A    Yes, I do.

7   Q    How long have you lived in the Jacksonville area?

8   A    We moved back down here when he was young, so I've been

9   here pretty much ever since, except for some time in the

10  military.

11  Q    How often -- you know, since Mr. Triolo moved to

12  Jacksonville or moved to the Jacksonville area -- is that

13  Middleburg he lives in?

14  A    Yes.

15  Q    So how -- on a monthly basis, how many times will you see

16  Mr. Triolo on a monthly basis since he moved to this area?

17  A    I would say it would vary anywhere from three to maybe

18  even five.

19  Q    Okay.  What types of things would you do when you get

20  together?

21  A    Most of the time we're coming over to watch the sports.

22  There's a game on.

23  Q    And what about any type of physical activities?

24  A    He come over.  We probably play -- sometimes we go out in

25  the front yard.  We play basketball.  I had a hoop in my

TRIOLO v USA          September 24, 2020    Vol III- 9

1    driveway.

2    Q    Did you -- are you a motorcycle rider?

3    A    I am not.

4    Q    Okay.  Is your brother?

5    A    Bruce?

6    Q    Mr. Triolo.

7    A    Yes.

8    Q    Do you see him riding on Harleys?

9    A    Yes.

10   Q    When he would come to your house before the car crash

11   we're going to talk about on February 11, 2017, would he come

12   over to your house on his motorcycle or would he drive a car?

13   A    If the weather was good, you can guarantee he was on his

14   motorcycle.

15   Q    And -- well, going back to the younger -- the younger

16   years before he transferred down to the Jacksonville area, did

17   you get an opportunity to see Mr. Triolo play any high school

18   sports or compete in any activities?

19   A    No.  He pretty much finished up his high school in New

20   York and I never got to see him play any high school sports.

21   Q    Did you talk to him on a regular basis?

22   A    We talked occasionally.

23   Q    Did you ever -- you ever hear him or do you recall ever

24   hearing him talk about any injuries that he had prior to moving

25   down to Florida?

TRIOLO v USA          September 24, 2020    Vol III- 10

1   A    No.

2   Q    Okay.  Do you remember him ever complaining about back

3   pain whatsoever before coming down to Florida?

4   A    No.

5   Q    Do you recall when he was in a motor vehicle collision in

6   2017?

7   A    I do.

8   Q    Do you know the intersection where the collision happened?

9   A    I do.

10  Q    Can you tell us the intersection?

11  A    It's Loretto and St. Augustine Road.

12  Q    Okay.  And did you go to the accident scene?

13  A    I did.

14  Q    Okay.  How did you know to come to the accident scene?

15  A    My brother gave me a phone call.

16  Q    All right.  And do you remember approximately what type

17  of -- time of day it was?

18  A    It was early afternoon, maybe mid-afternoon.

19  Q    When you got to the accident scene, were the vehicles

20  still in the roadway?

21  A    No.  They had pulled off into a Catholic church on the

22  right side of the road.

23  Q    Do you remember what type of vehicle was involved in the

24  collision other than your brother's?

25  A    It was one of those postal mail trucks.

TRIOLO v USA            September 24, 2020    Vol III- **11**

1  Q    Do you remember seeing the other driver?

2  A    I did.

3  Q    Did you have any conversation with the driver of the

4  postal truck?

5  A    No, I didn't.

6  Q    When you saw the postal truck driver, what was he or she

7  doing?

8  A    She was outside of her vehicle, talking on the phone.

9  Q    Did you take any pictures of the vehicles?

10  A    I did not.

11  Q    Did you take any video?

12  A    No.

13  Q    Did you observe any damage to either the postal truck --

14  well, first of all, did you go look at the postal truck?

15  A    I never walked over and looked at it, but you could see

16  that it was caved in in the front.

17  Q    And did you see any damage to your brother's -- I think it

18  was a Mustang?

19  A    Yes, it was a Mustang.  He had rear-end damage.

20  Q    And did you see -- well, did you talk to your brother at

21  the scene?

22  A    Yes.

23  Q    Okay.  And did you have an opportunity to observe him --

24  strike that.

25        When you got there, were the police there?

1    A    No.

2    Q    Do you remember whether the police arrived quickly or do

3    you remember having to wait around awhile?

4    A    Yeah, we had to wait awhile for them to show up.

5    Q    Okay.  And while you were waiting around awhile for the

6    police, did you have the opportunity to observe your brother?

7    A    Yes.

8    Q    How was he acting at the scene?

9    A    Well, probably -- I wasn't there for maybe a couple

10   minutes and he told me that something didn't feel right in his

11   back.

12   Q    Did he say where in his back?

13   A    He didn't say where, but he had his hand over his back,

14   over his lower back.

15   Q    And how long were you with Mr. Triolo before he went to

16   Baptist South Emergency Department?  If you could give us an

17   estimate.  In other words, from the time you came up to the

18   accident scene until he left and went to the Emergency

19   Department.

20   A    I would probably say it was probably -- by the time the

21   police officer was totally done and we totally left, probably

22   over an hour.

23   Q    Okay.  The -- during that time, for that hour that you

24   observed him, did he -- was he doing anything else other than

25   putting his hand on his back?

1   A    Yes.

2   Q    What else was he doing?

3   A    He was moving around a lot, you know, trying to feel his

4   back out.  Eventually he was leaning on his car.  And I think

5   it got worse as we waited longer and longer.

6   Q    How was he leaning on his car?

7   A    He just had two hands on there.  Sometimes he was on his

8   elbows and just leaning forward.

9   Q    Did it look like he was trying to stretch something?

10  A    He was trying to find, I think, a comfortable position.

11  Q    Had you ever seen your brother like this before in that

12  condition?

13  A    No.

14  Q    Had you ever heard your brother complain at all about back

15  pain prior to February 11th, 2017?

16  A    No.

17  Q    Did you encourage your brother to get checked out?

18  A    Yes, I did.

19  Q    Did you go to the Emergency Department with your brother?

20  A    I did not.

21  Q    Prior to the motor vehicle collision of February 11th,

22  2017, was your brother an active person?

23  A    Very active.

24  Q    Do you know what activities that he was involved in?

25  A    He was always going.  If it wasn't playing sports or

TRIOLO v USA          September 24, 2020     Vol III- 14

1    basketball at my house, he was on his motorcycle going to bike

2    rallies either in Daytona, Panama City.  You name it, he's been

3    to all of them.  That was his lifestyle.  That's what he loved

4    doing.

5    Q    How about sports activities other than basketball?  Do you

6    know whether he was somebody that would work out?

7    A    Oh, extremely, extremely work out.  That was his regimen.

8    Q    What type of workout?  Are we talking about jogging a 5K

9    or in the gym?

10   A    No.  He had weights -- he's got one of those -- I forget

11   what they call it, but he's got one of those machines that will

12   do everything, and that's what he used.

13   Q    Did you ever hear him complain about any type of pain from

14   these activities that he did?

15   A    No.

16   Q    And when I ask that, I meant prior to the motor vehicle

17   collision.

18   A    No.

19   Q    I want to talk to you about after the motor vehicle

20   collision.

21        Have you been in regular contact with your brother

22   since February 11th, 2017?

23   A    Yes.

24   Q    Have you observed any changes about your brother?

25   A    Yeah.  He's not active anymore.

1  Q    Can you -- can you tell us what you've noticed as far as

2  him not being active.  Can you give us a description of how you

3  made that determination.

4  A    Well, he's just out of shape.  I know he doesn't work out

5  anymore.  I know that we haven't played hoops in forever.  As a

6  matter of fact, I done took it out of my driveway.  It's on the

7  side of my house on the ground now.  I mean, he's just -- so he

8  doesn't -- I don't know what else to say.

9  Q    Did you -- before you mentioned that he comes to the house

10  and would watch sports with you.  Did that continue to go on

11  after the collision?

12  A    Oh, yeah.  We always watch sports.

13  Q    Did you hear him or see him -- did you notice anything

14  different about him when he would come over and watch sports

15  with you?

16  A    Yeah.  After the accident?

17  Q    Yes, sir.

18  A    I would say that, yeah, he was always -- he could never

19  get comfortable.  It was like he was always fidgeting on the

20  couch.

21         If he wasn't standing, he'd be laying on the floor,

22  you know, stretching out.  When we eat dinner, he put a cushion

23  on the chair.  So, I mean, he would just be always constantly

24  fidgeting and stuff like that.

25  Q    What was the reason why -- you understood why your brother

1  put cushions on the chair at the dinner table?

2  A    To make it easy.  You know, sitting on a hard chair -- my

3  chairs are hardwood.

4            MS. CUNNINGHAM:  Objection.  Calls for speculation.

5            THE COURT:  Sustained.

6  BY MR. KINNEY:

7  Q    Did your brother discuss with you -- well, let me ask you,

8  did you know your brother had a surgery on his back?

9  A    Yes.

10 Q    Could you tell us about that period of time from the motor

11 vehicle collision till the surgery?  What was your perception

12 of, you know, the pain he was in and what he was going through?

13 A    He was -- he was feeling pain.  I mean, he was

14 definitely -- it was a long time.  It was a hard time for him.

15 Q    Did you talk to him about any of the changes after the

16 surgery?

17 A    As far as his lifestyle?

18 Q    About how his -- how the surgery helped or didn't help

19 him.

20 A    I mean, I guess it's ongoing.  I mean, I know he still has

21 pain.  I know he still has to go see the doctor.  So I guess,

22 yeah, I noticed.

23 Q    When you get together with your brother, does he -- even

24 to this day, does he still talk about having issues with his

25 back?

1    A    Yes.

2    Q    What is it that he tells you?

3    A    He says he can still feel it.  He says it just ain't

4    right.

5    Q    I used -- do you still see him having to do the stretching

6    out when he comes over -- do you go over to his house or does

7    he come to your house?

8    A    Most of the time he comes to my house, but occasionally

9    I'm over at his house.

10   Q    Has there ever been a time since the motor vehicle

11   collision where the issues with his back have not come up when

12   he's in your presence?  In other words, when you get together,

13   has there ever been a time when he didn't say something about

14   his back?

15   A    I would say initially it was every time, because it was

16   just part of the conversation we'd have.  Hey, how you doing?

17            But as -- you know, it's been a long time now, so I

18   would say the chances of us not talking about it a few times,

19   yeah, it does probably.

20   Q    After the motor vehicle collision, did you notice anything

21   about your brother's walk?

22   A    Oh, yeah.

23   Q    What did you notice?

24   A    Yeah, he's -- he walks a little slower, like he's thinking

25   about the steps he takes.

TRIOLO v USA          September 24, 2020    Vol III- 18

1   Q    Had you ever seen that before, prior to the motor vehicle

2   collision?

3   A    No.  He used to walk like an ape.

4              MR. KINNEY:  All right.  Thank you, Your Honor.

5              THE COURT:  Ms. Mapp?

6              MS. MAPP:  Yes, Your Honor.

7                        CROSS-EXAMINATION

8   BY MS. MAPP:

9   Q    Good morning, Mr. Schmucker.

10             You testified on direct that you live less than 5

11  minutes away from the accident scene; correct?

12  A    Yes.

13  Q    And you also live less than 15 minutes away from the

14  Baptist Medical Center; correct?

15  A    Yes.

16  Q    And you -- when you arrived at the scene, the police were

17  not there?

18  A    Yes.

19  Q    Did you see -- were you there when the postal employees

20  arrived?

21  A    No.

22  Q    You were not at the scene when U.S. --

23  A    I don't -- it's been awhile.  I don't recollect any postal

24  employee showing up.

25  Q    And you testified that Mr. Triolo was in pain?

TRIOLO v USA               September 24, 2020      Vol III- 19

1    A    Yes.

2    Q    You observed him in pain at the accident scene?

3    A    Uh-huh.

4    Q    And he was holding his back and bending over?

5    A    Yeah, he was leaning on the car, walking around.

6    Q    Yet, despite observing him in pain, you did not drive him

7    to the hospital?

8    A    No.

9    Q    Despite living less than 15 minutes away from the

10   hospital, you did not invite him to stay overnight at your home

11   after he left the hospital?

12   A    No.

13   Q    You had him drive or he drove over 40 minutes away to

14   Middleburg after leaving the hospital?

15   A    Yes.

16   Q    You also testified that during your adolescence you lived

17   in Florida while Mr. Triolo lived in New York; is that correct?

18   A    Yes.

19   Q    And that you had never seen him participate in any high

20   school sports?

21   A    Yes.

22   Q    And it was a long-distance relationship and you only spoke

23   occasionally?

24   A    Yes.

25   Q    You also stated that Mr. Triolo, prior to the accident,

1    was very active and engaged in weightlifting; is that correct?

2    A    Yes.

3    Q    Where did he engage in weightlifting?

4    A    At his house.

5    Q    So not in your presence?

6    A    He would mess around at my house, but for -- his primary

7    weightlifting was at his house.

8    Q    So you've never seen him -- you also testified that

9    Mr. Triolo would often ride his motorcycle; is that correct?

10   A    Yes.

11   Q    Before the accident; correct?

12   A    Yes.

13   Q    And he continued to ride his motorcycle after the

14   accident; correct?

15   A    It was awhile.  He barely rides it now.

16   Q    You're aware that your -- Mr. Triolo rode his motorcycle

17   to and from Daytona Beach for Bike Week on the same day?

18   A    Before?

19   Q    After the accident.

20   A    No, I'm not aware of that.

21   Q    You also stated that Mr. Triolo is often uncomfortable and

22   has to lay down on the floor when he comes to visit you to

23   watch sports on television; that's correct?

24   A    Yes.

25   Q    Were you aware that after the accident, Mr. Triolo

1  traveled to the Daytona 500 and was there for a number of

2  hours?

3  A    I believe he did go down to the Daytona 500.

4  Q    Were you invited to go with him to the Daytona 500?

5  A    No.

6  Q    Were you aware that Mr. Triolo traveled to Key West,

7  Florida, in 2017?

8  A    I don't remember.

9  Q    Were you aware that Mr. Triolo took a cruise trip in 2017,

10  after the accident?

11  A    This is all after?  I think he went on the cruise.

12  Q    But you have no recollection of that?

13  A    No.  I remember we talked about it.  I just don't know

14  about the time frame.

15  Q    Were you aware that Mr. Triolo drove to Port Charlotte,

16  Florida, after the accident as well?

17  A    No.

18  Q    How often before the accident would Mr. Triolo come to

19  visit your home?

20  A    Probably somewhere between three to five times a month.

21  Q    And how many times after the accident would he come to

22  visit your home?

23  A    Well, he -- it's dropped a lot because he works a lot now

24  these days.  So I might see him every two, three weeks.

25  Q    You had mentioned previously that Mr. Triolo, after the

1  accident, was out of shape; correct?

2  A    After the accident?

3  Q    Yes.

4  A    Yes, he's definitely -- he's out of shape these days.  I

5  know he doesn't look like it, but he's...

6  Q    And were you aware that Mr. Triolo's medical records state

7  that he was obese prior to the accident?

8  A    No, I wasn't.

9  Q    When you arrived at the accident scene, you stated you did

10 not approach the postal vehicle, but did you approach

11 Mr. Triolo's vehicle?

12 A    Yes.  We walked around and looked at his vehicle.

13 Q    What damages, if any, did you notice of Mr. Triolo's

14 vehicle?

15 A    He was hit in the rear of his car, and he had damage to

16 the bumper, the quarter panel.  It was kind of pushed in.

17 Q    Was the rear panel the only place on Mr. Triolo's car

18 where you noticed damage?

19 A    Visible, probably.  I mean, it's been awhile.  I imagine

20 there was probably his bumper, his quarter panel.  It was

21 pushed in, so it probably had inner damage.  I mean, the

22 trunk -- not tail, the trunk, I believe, had damage.  It's been

23 awhile.

24 Q    Did you look inside of Mr. Triolo's vehicle?

25 A    I did not.

TRIOLO v USA          September 24, 2020      Vol III- 23

1    Q    So you didn't notice his seat being reclined or not

2    reclined?

3    A    No.

4    Q    Have you ever -- so Baptist Medical Center South is, as we

5    said, 15 minutes from your home; correct?

6    A    Yes.

7    Q    Have you ever visited Mr. Triolo at that location?

8    A    While he's working?

9    Q    Yes.

10   A    I think we met outside once or twice.

11   Q    Have you ever driven Mr. Triolo to any of his medical

12   appointments?

13   A    No.

14   Q    And you did not take him to the surgery center on the day

15   of the surgery?

16   A    Oh, I did take him to that one.

17   Q    You took him to the surgery center on the day of the

18   surgery?

19   A    For his back?

20   Q    Yes.

21   A    No, I did not.

22              MS. MAPP:  No, further questions, Your Honor.

23              MR. KINNEY:  I'm curious about that last answer.

24                    REDIRECT EXAMINATION

25   BY MR. KINNEY:

1    Q    Did you take him to have his surgery done or -- if you

2    remember?

3    A    I don't remember.

4    Q    Was there a pain management procedure that you drove him

5    to?

6              I can see you thinking.

7              Do you recall having to drive him to some medical

8    appointments in the last three-and-a-half years?

9    A    I mean, I don't think -- I don't think I helped him at all

10   through this whole back thing.

11   Q    Okay.  All right.  I was confused about that answer.

12             Have you been to Daytona for the races at all?

13   A    I have not.

14             MR. KINNEY:  All right.  So that's all the questions

15   I have, Your Honor.  Thank you.

16             THE COURT:  Sir, you can step down.

17             I'll ask you to remove that microphone cover and

18   throw it in the garbage can that's on your left there.

19             THE WITNESS:  Okay.

20             THE COURT:  And thank you very much.  You're free to

21   go.

22             Madam Deputy, if you could wipe down the witness

23   stand.

24             And do you want to call and fetch your next witness?

25             MR. MOORE:  Your Honor, our next witness is going to

TRIOLO v USA                September 24, 2020    Vol III- 25

```
 1  be Mr. Bruce Schmucker.
 2          COURTROOM DEPUTY:  Come on up here for me, please.
 3  Yes, right up to the witness stand.
 4          THE COURT:  You can take your mask off while you
 5  testify, sir.
 6          Thank you.
 7          COURTROOM DEPUTY:  Raise your right hand.
 8          Do you solemnly swear that the testimony you're about
 9  to give before this Court will be the truth, the whole truth,
10  and nothing but the truth, so help you God?
11          THE WITNESS:  I do.
12          COURTROOM DEPUTY:  You may have a seat.
13          If you could please state your name for the record
14  and spell your last name.
15          THE WITNESS:  Bruce Schmucker, S-c-h-m-u-c-k-e-r.
16          THE COURT:  Go ahead.
17          MR. MOORE:  Thank you, Your Honor.
18          BRUCE SCHMUCKER, PLAINTIFF'S WITNESS, SWORN
19                      DIRECT EXAMINATION
20  BY MR. MOORE:
21  Q    Good morning, Mr. Schmucker.
22          How do you know Mr. Richard Triolo?
23  A    He's my brother.
24  Q    How old are you?
25  A    I'll be 57 in four more days.
```

1    Q    Congratulations.  Early happy birthday.

2          And how much older are you than Mr. Triolo,

3    approximately?

4    A    Maybe 13, 14 years, something like that.

5    Q    Do you live with Mr. Triolo?

6    A    Uh-huh.

7    Q    And if you could just speak in the microphone.  I know

8    it's a little hard but we have a court reporter who's trying to

9    type.  I appreciate it.  Okay.

10          And what's his relationship to you as far as

11   stepbrother, half brother, biological brother?

12   A    Stepbrother.  Same mother, different father.

13   Q    And when did he become your stepbrother?  About how old

14   were you?

15   A    I believe I was 7 or 8 at the time.

16   Q    So you're about -- okay.  Got you.

17          And -- okay.  You were 7 or 8?

18   A    7 or 8 is when our mother married his father, I believe,

19   yes.

20   Q    Okay.  So you've known him since his birth?

21   A    Uh-huh.

22   Q    Is that a yes?

23   A    Yes.

24   Q    Okay.  Thank you.

25   A    Sorry.

1  Q    And from the birth, how long did you live with him?

2  A    Probably a good -- it was seven years continuously and

3  then there was a separation.

4  Q    Did you go to college or did you leave the house?

5  A    Did I go to college?

6  Q    Yeah.  What was the separation?

7  A    There was a divorce.

8  Q    Okay.  And how long were you apart from Mr. Triolo -- or

9  were you apart from Mr. Triolo at that point?

10 A    We obviously -- our mother lived on a separate part --

11 different location, but we were always together on weekends.

12 Q    And when you say "different location," was it within the

13 same town or within close proximity?

14 A    Same town, sometimes different towns.

15 Q    All right.  And when you said you were together on the

16 weekends, what did you mean by that?

17 A    We had -- my mother had custody of Rich on the weekends,

18 so we went and we picked him up every weekend.

19 Q    All right.  Were you familiar or did you hang out with

20 Mr. Triolo during his high school years?

21 A    No.

22 Q    Okay.  And where -- why is that?

23 A    Because I lived in Florida at the time.

24 Q    Where was he at the time?

25 A    Long Island.

1    Q    Was there -- how long were you apart when you were in

2    Florida and he was in Long Island?

3    A    Long time.  Up until about -- I guess somewhere around

4    eight to ten years ago, when he finally came down.

5    Q    I'm sorry?

6    A    When he finally came down to Florida about eight to ten

7    years ago.

8    Q    During his high school and college-age years, were you

9    familiar with Mr. Triolo's activities?

10   A    Yes.

11   Q    Okay.  And how is that?

12   A    He would always come down, you know, during the

13   summertimes.  And he was a big sports fanatic.  Played a lot of

14   football.  He was quarterback for a varsity team.

15   Q    Were you aware of whether he sustained any injuries while

16   he was a quarterback for a varsity team?

17   A    I remember vaguely about him getting into an accident, but

18   I don't know the details of it.

19   Q    Were you aware of any prior back injuries before this

20   crash?

21   A    Huh-uh, no.

22   Q    What other sports did Mr. Triolo like to play when he was

23   in high school in his college years, that you're familiar with?

24   A    From what I hear, played a lot of hoops, a lot of

25   basketball, and a lot of football.  And I guess he played some

1    baseball, too, if I remember, vaguely, but mostly football and

2    basketball.

3    Q    Did you go and see -- well, during the high school and

4    college -- excuse me, during the high school and college years

5    when you were in Florida and he was in New York, how often

6    would you go see him or he come to see you?

7    A    He would come down every summer.  We never went there.

8    Q    How long would y'all hang out in the summer?

9    A    He would spend the summer.

10   Q    Would he live with you or live with -- how would that

11   work?

12   A    At the time we were living all together, our mother.  We

13   were still siblings and we lived in the same house together.

14   Q    And during those summers that y'all spent together, what

15   were some of the activities he liked to do?

16   A    He'd definitely be out there playing hoops.  He'd just go

17   to the park and meet up with a bunch of people and just go in

18   and start playing hoops or start playing football.  He'd go to

19   the gym a lot at the time.

20          When he came down during the summer, he would

21   actually just run to the gym.  Sometimes he'd ride the bike,

22   yeah.

23   Q    You had mentioned a car accident some years ago.  Do you

24   recall whether he was injured in that car accident?

25   A    I believe that's where the scar from his arm came from.  I

TRIOLO v USA          September 24, 2020      Vol III- 30

1    can't be too sure, but I'm pretty sure that's where it came
2    from.
3    Q    In those years of hanging out with him and those years of
4    knowing him, and prior to this crash, do you recall him
5    sustaining or complaining of any other back injury?
6    A    Prior to the crash?
7    Q    Yes, sir.
8    A    No.  He was very active prior to the crash.
9    Q    Let's get to the present day.  Well, before we get there,
10   when did -- when did y'all move in together?
11   A    About eight years ago, eight to ten years.  About
12   eight years ago.
13   Q    And what do you do for a living?
14   A    I'm a registered therapist.
15   Q    Where do you work?
16   A    I work at Shands Hospital downtown.
17   Q    When you say a registered therapist, what kind of
18   therapist?
19   A    I'm a neonatal intensive care therapist.  I take care of
20   premature babies.
21   Q    How long have you done that?
22   A    I've been working as a therapist now since 1992.
23   Q    And so Mr. Triolo's been living with you, I'm sorry,
24   eight years?
25   A    Eight to ten years now.

TRIOLO v USA              September 24, 2020      Vol III- 31

 1   Q    Okay.  And prior to this crash in February of 2017, what
 2   kind of activities were you aware that Mr. Triolo liked to do?
 3   A    Prior to the crash?
 4   Q    Yes, sir.
 5   A    The same activities as I stated before.  He played a lot
 6   of hoops.  He had a lot of friends.  Do a lot of touch
 7   football.
 8   Q    Did he like to work out?
 9   A    Me?
10   Q    No.  Did he like to work out?
11   A    He would work out, yes.
12   Q    Do you like to work out?
13   A    No.
14   Q    When he worked out, where would he work out?
15   A    In the garage.  We have a weight bench, like a Pro Form or
16   something like that, whatever it's called.
17   Q    And how often would Mr. Triolo work out before the crash?
18   A    Prior to the crash?
19   Q    Yes, sir.
20   A    He'd be out there practically every day.
21   Q    How often did he play basketball -- or do you know how
22   often he played basketball?
23   A    I know he played basketball and football quite a bit, but
24   as far as how often he played, I don't know, because I work
25   two full-time jobs, so, you know, when I see him is when I see

1  him.

2  Q    And did he play -- do you know if he played pickup

3  basketball?

4  A    Pickup basketball.  I'm not sure what that term is.

5  Q    Three on three or four on four at the park?

6  A    I have no idea.  Just hoops.  They would meet out there at

7  the local park playing hoops.

8  Q    While living with him, did y'all ever play any sports

9  together, throw the football around?

10  A    No.  Occasionally we might have thrown a football around,

11  but that was about it.

12  Q    You have another brother; correct?

13  A    Correct.

14  Q    Brian?

15  A    Yes.

16  Q    Are you the oldest?

17  A    Yes.

18  Q    Did he -- were there any other sports or activities

19  Mr. Triolo engaged in or participated in while living with you

20  before the crash: golf, basketball -- we mentioned basketball.

21  Anything else?

22  A    Like I said, prior to the accident, he would be with his

23  friends.  They would all get together.  They would play hoops.

24  They would play a lot of touch football, sports, just -- that's

25  all I can tell you.

1    Q    During the time frame that he lived with you up to the

2    point of the crash, had -- were you aware of any injuries that

3    he was in, that he was involved with?

4    A    Prior to?

5    Q    Yes, sir.  Prior to the crash.

6    A    Huh-uh.

7    Q    Is that a no?

8    A    Just -- just vaguely maybe that one accident that

9    happened -- occurred up in New York.  But like I said earlier,

10   I don't know the details of it.

11   Q    And that was in relation to the arm, I think you

12   mentioned?

13   A    Yes.

14   Q    Okay.  The day of the crash, how did you find out about

15   the crash?

16   A    I came home that morning and the car was in the driveway.

17   The rear end of it was pretty well smashed in, and at that

18   point in time I knew he had gotten into an accident.

19   Q    Now, you work the night shift?

20   A    I work the night shift.

21   Q    And does Mr. Triolo work the day shift?

22   A    He works the day shift.

23   Q    Okay.  How often do you see Mr. Triolo during the week or

24   cross paths?

25   A    Not that often.  We do cross paths, but it's very rare

1    that it's an everyday thing.

2    Q    What about days off during the week?

3    A    Yes, days off.

4    Q    Y'all have the same day off?

5    A    Uh-huh.

6    Q    I'm sorry?

7              THE COURT:  You have to answer yes or no.

8              THE WITNESS:  Do I see him during days off?

9    BY MR. MOORE:

10   Q    Yes, correct.

11             Just for the purpose of the court reporter there,

12   just speak into the microphone.  Thank you.

13   A    Yes.

14   Q    Okay.  And days off, do y'all hang out together, watch

15   sports?  What do you guys do?

16   A    We're normally at the house together, yes.

17   Q    And what days -- how many days a week are you off?

18   A    One day off a week.

19   Q    Okay.  All right.  So the day of the crash, you said -- I

20   believe you were saying you came back home to the driveway; is

21   that correct?

22   A    The car was in the driveway, yes.

23   Q    What did you observe about the car?

24   A    The rear of the car, the metal panels were smashed in.

25   Q    All right.  And how do you know that?

TRIOLO v USA               September 24, 2020      Vol III- 35

```
 1   A     Because I saw it.

 2   Q     What did you do after you saw it?

 3   A     I went to see if I could move it.

 4   Q     Why did you do that?

 5   A     Just to see if -- how tough of a panel it was.

 6   Q     And what did you observe when you went to see if you could

 7   move it?

 8   A     I could not move it.  It's a solid -- it's solid metal on

 9   the car.  It's not like the thin skins that they put on cars

10   today where a shopping cart can hit it and put a ding in it.

11   The panels that were on this car were solid steel.  I don't

12   know how much mill it was, but I could not move it whatsoever.

13   It was solid.

14   Q     What kind of car was it?

15   A     It was a Mustang GT.

16   Q     When you said you tried to move it, what do you mean by

17   that?

18   A     Just pull on it, yank on the fender where it was smashed

19   in.

20   Q     Why were you trying to do that?

21   A     Just to see if I could move it.

22   Q     What did you do after that?

23   A     I went into the house.

24   Q     And then what -- at what point did you see Mr. Triolo?

25   A     I know I seen him sometime during that time frame, but I
```

 1   just do not recall.

 2   Q    All right.  I mean, was there a point where you asked him

 3   about the car or what happened to the car?

 4   A    I had asked him -- I do remember asking him what happened,

 5   and basically he said he was just sitting there --

 6              MS. MAPP:  Objection.  Hearsay.

 7              THE COURT:  Sustained.

 8   BY MR. MOORE:

 9   Q    Okay.  Was there a point later that day that you talked to

10   Mr. Triolo?

11   A    I'm sure there was.

12   Q    Okay.  And when you talked to Mr. Triolo, what did y'all

13   discuss?

14   A    I'm sure we talked about the accident and what happened.

15   Q    All right.  And what do you recall said about the

16   accident?

17   A    That he was sitting there and --

18              MS. MAPP:  Objection.  Hearsay.

19              THE COURT:  Sustained.

20   BY MR. MOORE:

21   Q    Did you ever go to the accident scene?

22   A    No.

23   Q    Did you -- did Mr. Triolo or did you observe any injuries

24   that he experienced that day after you saw the vehicle?

25   A    He stated -- I know he stated that his back was sore.

1          MS. MAPP:  Objection.  Hearsay.

2          THE COURT:  Sustained.

3          Come on.

4          MR. MOORE:  I -- okay.

5  BY MR. MOORE:

6  Q    After -- after that particular day, did you -- did you

7  observe Mr. Triolo going to any doctor's appointments or

8  doctor's visits?

9  A    I know he had doctor's appointments or doctor's visits

10 further down the line.  I'm not sure -- I'm not -- I don't

11 recall that particular day that it actually happened.

12         The only thing that I do recall is that he was on his

13 knees on the floor sometimes just trying to stretch out his

14 back because he was in a lot of pain.

15 Q    Did you observe the -- when you say he was stretching out

16 his back, what do you mean by that?

17 A    He was basically in the fetal position, trying to stretch

18 his back out.

19 Q    After the car crash, did you observe any changes in

20 relation to activities -- in relation to your brother's

21 activities?

22 A    Uh-huh.  There was no activities after the crash.

23 Q    Okay.  What do you mean there were no activities?

24 A    There was no more basketball, no more football, no more --

25 no more of anything, really, and no -- no nothing.  He just

1    stayed at home and stretched out and, you know, had his

2    doctor's appointments, and that was it.

3    Q    Did you observe -- are you aware of whether Mr. Triolo

4    worked out after the car crash?

5    A    No.

6    Q    You did not observe or he did not work out?

7    A    He did not work out.  I did not observe him working out.

8    Q    Were you aware of Mr. Triolo's surgery?

9    A    Yes.

10   Q    Okay.  Did you take him to the surgery?

11   A    No.

12   Q    Are you aware of whether that surgery fixed his pain?

13   A    It has not fixed his pain.

14   Q    Did you ever observe Mr. Triolo sleeping in different

15   positions around the house?

16   A    He would be laid up in the La-Z-Boy a lot, in the

17   recliner, yeah.

18   Q    Prior to the car crash, would you see Mr. Triolo sleeping

19   in the La-Z-Boy?

20   A    He would sometimes sleep in it, but nowhere near the

21   amount of times that he sleeps in it now after the crash.

22   Q    Before the crash, did Mr. Triolo like to play golf?

23   A    Yeah.  Yeah, he did.

24   Q    Since the crash, has Mr. Triolo played golf; are you

25   aware?

1   A    No.  There's no way.

2   Q    Since the crash, have you observed Mr. Triolo and the

3   manner in which he walks or carries himself around the house?

4   A    Uh-huh.

5   Q    Is that a yes?

6   A    Yes.  Sorry.

7   Q    That's okay.

8        Have you noticed anything different in relation to

9   how he walks since the crash?

10  A    Yeah.  Early in the mornings, he -- you can tell he's

11  really stiff in his back because he doesn't walk fluid.  He

12  just kind of like takes small steps and he kind of waddles side

13  to side.  And when he leans over, he groans and moans, just

14  trying to pick something up off of a table.

15  Q    Prior to the crash, do you recall him walking in that

16  manner?

17  A    No.

18  Q    Who does the yardwork at the house?

19  A    I used to, but Rich does the yardwork now.

20  Q    Do y'all have a big yard?

21  A    For me, yeah; for him, maybe.  He's younger than me,

22  probably not.

23  Q    Okay.  All right.  Y'all ever go out to eat together?

24  A    No.  We usually order out.  We'll eat in.

25  Q    Y'all watch a lot of football together on the weekends?

TRIOLO v USA          September 24, 2020     Vol III- 40

1    A    Used to.  Used to until I stopped watching football
2    personally.
3    Q    All right.  Are y'all still able to go to, like, family
4    events together?
5    A    Yeah, yeah.  We go to our brother's house.  That's about
6    the only family event that we do.
7    Q    Are you aware of whether Mr. Triolo likes his job that he
8    does?
9              MS. MAPP:  Objection.
10             THE COURT:  Sustained.
11             MR. MOORE:  It goes to his perception, Your Honor.
12             THE COURT:  If you want to ask him what he's
13   observed, but "do you know" would call for hearsay in terms of
14   if he's testifying to what he told him.  So he can testify to
15   what he's observed, but that's it.
16             MR. MOORE:  I'll withdraw the question, Your Honor.
17             Thank you, Mr. Schmucker.  I appreciate your time.
18             THE WITNESS:  Thank you.
19                       CROSS-EXAMINATION
20   BY MS. MAPP:
21   Q    Good morning, Mr. Schmucker.
22   A    Good morning.
23   Q    So you basically grew up in Florida; correct?
24   A    Correct.
25   Q    And you purchased your home in Middleburg, where you

1    currently reside, in 2003?

2    A    I believe so, yes.

3    Q    And Mr. Triolo moved down to Florida to live with you in

4    2012?

5    A    That could be a pretty good year, yes.

6    Q    Earlier this week, Mr. Triolo testified that prior to

7    moving down to Florida, you and your other brother, Brian

8    Schmucker, staged an intervention.

9         Can you tell me about that?

10   A    I'm sorry, what -- repeat the question.

11   Q    Mr. Triolo testified earlier this week that prior to

12   moving down to Florida in 2012, that in 2011, you and your

13   other brother, Brian Schmucker, staged an intervention.

14        Do you recall that?

15   A    Staged an intervention?

16   Q    Yes.

17   A    I don't know what you're talking about.

18   Q    You stated that you work two full-time jobs; is that

19   correct?

20   A    Correct, yes.

21   Q    And that you work nights -- you work night shift?

22   A    Yes.

23   Q    And that you only have one day off a week?

24   A    Correct.

25   Q    And is it -- Mr. Triolo previously testified that you

1   worked the night shift and sleep during the days.  Is that an

2   accurate representation of your days?

3   A    That's very accurate.

4   Q    Okay.  So since you are -- and you also stated that when

5   you returned home the morning of -- I believe it would have

6   been the day after the accident, so February 12, 2017, is when

7   you noticed the damage on Mr. Triolo's vehicle?

8   A    I noticed the damage when I came home and saw the car in

9   the driveway and the back end was smashed in.

10  Q    You're aware that Mr. Triolo's vehicle was involved in

11  another motor vehicle collision in February of 2017, are you?

12  A    I know somebody backed up into it or something like that.

13  Q    Yes.

14       And you earlier testified that you noticed the damage

15  to the side panel; is that correct?

16  A    On the first accident -- well, on both accidents, yes.

17  There was significant.

18  Q    But you don't recall -- do you recall -- do you have a

19  memory in your head of when you saw Mr. Triolo's vehicle after

20  the second accident?

21  A    It was significant as well.  It was smashed in to the

22  point where I believe when I was talking to my brother he said

23  that the rear tire wouldn't even turn.  That's how hard it was

24  hit from the side.

25  Q    And that was not the accident that occurred on

1    February 12th?

2    A    That one, no, somebody backed up into him on that one and

3    hit him in the corner of the vehicle, from what I remember.

4    Q    And you previously stated that you used to do the yardwork

5    on your home before Mr. Triolo moved in; is that correct?

6    A    Yes, when I was also younger and in better shape.

7    Q    And who did the yardwork on your home when Mr. Triolo was

8    unable to do so?

9    A    I believe we actually -- I hired somebody to come in, you

10   know.  Once a month we'd have somebody come over possibly to

11   cut the yard.  I know that we did that.

12   Q    And you also testified today that you constantly observed

13   Mr. Triolo groaning and moaning anytime he has to pick up heavy

14   items from the table; is that correct?

15   A    When he would -- yes, absolutely.

16   Q    So despite exhibiting such pain signals for doing everyday

17   tasks, as lifting objects from the table, Mr. Triolo still

18   continued to maintain your lawn?

19   A    He would stretch out early morning and try to loosen

20   everything up, and that was the only way he was able to get up

21   and function during the day, like cutting the yardwork.  He

22   wouldn't be able to cut the yardwork if he doesn't stretch out

23   in the morning times.

24   Q    I don't believe you answered my question so I'll ask it in

25   a different way.

1    A    Okay.

2    Q    Mr. Triolo maintained your lawn despite being in pain

3    where you noticed him moaning and groaning?

4    A    Not immediately after the accident, no.  This is months

5    later, he would -- he would get out there and mow the yard.

6    Q    So he was no longer moaning and groaning months after the

7    accident?

8    A    That's not correct, no.  He still moans and groans.  Just

9    the other day I walked into the living room and he was moaning

10   and groaning and walking side to side, like waddling.  He went

11   to lean over and pick up the remote control to the TV, and he

12   was moaning and groaning.

13   Q    And you would agree that prior to this last week,

14   Mr. Triolo had mowed your lawn after the accident?

15   A    He mowed the lawn this past week, yes.

16   Q    And that includes edging the lawn with a weed whacker;

17   correct?

18   A    Sure.

19   Q    That includes bending to use a leaf blower to blow the

20   clippings into the grass?

21   A    Sure.

22   Q    And that includes washing down and lifting up the mower

23   after the job's complete?

24   A    Uh-huh.

25   Q    And he was able to do --

```
 1              THE COURT:  Is that a yes?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Go ahead.

 4    BY MS. MAPP:

 5    Q    And he was able to do all of those things successfully?

 6    A    He was, yes.

 7    Q    You earlier testified that before the motor vehicle

 8    accident in February of 2017, Mr. Triolo would -- was very

 9    active with his friends and would go out and socialize with his

10    friends playing sports; correct?

11    A    Correct.

12    Q    But you never went out with his friends?

13    A    No.

14    Q    And you don't know the activities he and his friends --

15    you never observed the activities he and his friends got up to

16    while they were out?

17    A    I never went with him to the activities.

18    Q    And you also stated that after the accident, you would see

19    Mr. Triolo laying and sleeping in the recliner more often than

20    he did before the accident; is that correct?

21    A    Uh-huh.  He spends a lot of time in the recliner.

22    Q    Did your work schedule change after Mr. Triolo's accident?

23    A    No.

24    Q    So you still only have one day off a week?

25    A    Providing I'm not canceled, and then I'll have maybe
```

1  two or three days off a week.  But it happens occasionally.
2  But normally if I'm working full-time and there is work to be
3  done, I only have that one day a week off.
4  Q    You stated Mr. Triolo could no longer socialize with his
5  friends; is that accurate?
6  A    I don't know if he's -- if I said he can no longer
7  socialize with his friends.  What I think I said is that he
8  doesn't get into -- he doesn't catch up with his friends to go
9  out and do sports anymore.  He doesn't go play basketball
10 anymore.  He doesn't go play football anymore.  And he did play
11 golf -- I'm sorry, I forgot about the golf clubs.  He actually
12 bought golf clubs and I forgot all about them.  He would go out
13 and he'd play golf all the time.
14        And he's also got this beautiful Harley Davidson
15 sitting in the garage that he just put on -- and hasn't ridden
16 at all.
17        I told him, I said:  Look, if you don't ride it, I'm
18 going to ride it.  But it's still on the rack.
19 Q    So you are a motorcycle rider; correct?
20 A    I'm sorry?
21 Q    You are a motorcycle rider?
22 A    I have a license to ride a motorcycle but I do not ride.
23 Q    So you are aware of what Biketoberfest is?
24 A    Yeah.  Everybody should be.
25 Q    And are you aware that after this February 2017 collision,

TRIOLO v USA          September 24, 2020      Vol III- 47

1    Mr. Triolo went to Biketoberfest?

2    A    I remember him saying that he went to a Biketoberfest or

3    something like that, yes.

4    Q    And you also said just now that Mr. Triolo no longer rode

5    his Harley; however, Mr. Triolo testified that postaccident, he

6    rode his Harley to and from Daytona on the same day for Bike

7    Week.  Were you aware of that?

8    A    That one day out of eight months?  Sure, why not?

9    Q    Were you aware that he rode his motorcycle to and from

10   Daytona?

11   A    I was aware of that, yes.

12           THE COURT:  Only one of you can talk at a time.

13           THE WITNESS:  That one time, yes.

14   BY MS. MAPP:

15   Q    And as we previously stated, most of the time you are at

16   work, so you don't know if he did or did not ride the

17   motorcycle while you were away.

18   A    The motorcycle usually stays in one position in the garage

19   and doesn't move, because I go into the garage just about every

20   time I come home to do the laundry or taking garbage out or

21   whatever.  It does not move.

22   Q    And you also testified that Mr. Triolo, early in the

23   mornings, he is stiff and takes small steps?

24   A    Right.  Yeah, he waddles.

25   Q    However, you're coming -- you're working in the early

1    mornings, aren't you?

2    A    I am working, but these are times when we actually cross

3    paths and I might have time off.  I would get canceled.

4    Q    And prior to the accident, you never observed Mr. Triolo

5    using the equipment in your garage?

6    A    Prior to the accident?

7    Q    Yes.

8    A    Prior to the accident, Rich was a very active athletic

9    individual.  He loved to work out.  It was part of his daily

10   routine to work out every day.  Since the accident he has -- to

11   my knowledge, has not been out there.  He does not work out.

12   Q    Thank you.  But my question was:  Have you ever observed

13   him working out?

14   A    No.

15   Q    And this is before the accident.  You did not observe him

16   working out before the accident?

17   A    After the accident I did not observe him working out.

18   Q    Did you observe him --

19   A    Prior to the accident, he would always be working out and

20   I would see him.

21   Q    Were you aware that after -- sometime after this

22   February 2017 accident, Mr. Triolo tore his Achilles?

23   A    I vaguely remember something going on with his Achilles,

24   yes.

25   Q    And that would have caused pain; correct?

1          MR. MOORE:  Objection.

2          THE COURT:  Sustained.

3          You can reask your question, but the way you asked it

4    would be improper.

5    BY MS. MAPP:

6    Q    Did you observe Mr. Triolo in any pain after he tore his

7    Achilles?

8    A    It was -- it was tender, yes.

9    Q    And have you ever observed Mr. Triolo wearing a back

10   brace?

11   A    I don't remember.

12   Q    Have you ever observed Mr. Triolo wearing a medical boot

13   on his foot?

14   A    Yes.

15   Q    You mentioned previously that you recall Mr. Triolo being

16   involved in a motor vehicle accident while he was living in New

17   York and you were in Florida; is that correct?

18   A    Correct.

19   Q    And that was where he broke his arm?

20   A    I assume so, yes.

21   Q    Were you aware that Mr. Triolo was involved in a head-on

22   collision while he was still in New York as well?

23   A    I vaguely remember something about an accident, another

24   accident.

25   Q    And were you aware that that accident resulted in a

TRIOLO v USA          September 24, 2020       Vol III- 50

```
 1  fatality for the other driver?
 2  A    Yes.
 3  Q    Okay.  And we talked earlier about Mr. Triolo's ability to
 4  socialize and hang out with his friends.  Were you aware that
 5  Mr. Triolo, post-February 11, 2017, went on a cruise with his
 6  friends?
 7  A    Yes.
 8  Q    And you did not accompany him on that cruise?
 9  A    No.
10  Q    Were you aware, post-February 11, 2017, that Mr. Triolo
11  drove to Port Charlotte?
12  A    I'm not sure what Port Charlotte is.
13  Q    Port Charlotte, Florida, is on the west coast of Florida.
14  A    Okay.  I'm not sure he would --
15  Q    So you did not know Mr. Triolo drove himself to Port
16  Charlotte, Florida?
17  A    Why would he drive himself to Port Charlotte?  I don't
18  know.
19          THE COURT:  Sir, if you don't know the answer to the
20  question, you can say I don't know.
21          THE WITNESS:  I don't know.
22          THE COURT:  Move on.
23  BY MS. MAPP:
24  Q    Were you aware that Mr. Triolo, with his friends, drove to
25  Key West, Florida, post-February 11, 2017?
```

TRIOLO v USA                September 24, 2020    Vol III- 51

```
 1   A    I don't recall.
 2   Q    Okay.  You stated earlier that you and Mr. Triolo would
 3   sometimes cross paths.
 4        How often do your days off and his days off align?
 5   I'm sorry, your day off and his days off.
 6   A    They aligned pretty good.  Yeah, we usually winded up
 7   having the same days off.
 8   Q    And during your day off, did you ever drive Mr. Triolo to
 9   his medical treatments?
10   A    No.
11   Q    Post-surgery, there was a home health aide in the home;
12   correct?
13   A    I don't recall.
14   Q    Did you assist Mr. Triolo after the surgery?
15   A    Physically assisting him to get up and pick him up or
16   whatever, no.
17   Q    Did you assist him in any way?
18   A    I left him alone.  No.
19             MS. MAPP:  I have no further questions, Your Honor.
20             MR. MOORE:  I have a brief redirect, Your Honor.
21             THE COURT:  Go ahead.
22                      REDIRECT EXAMINATION
23   BY MR. MOORE:
24   Q    Mr. Schmucker, you were asked about an intervention.
25        Did you at any point try and talk Mr. Triolo into
```

1    moving to Florida?

2    A    Yes.

3    Q    Who paid for his plane ticket to move to Florida?

4    A    I don't recall.

5    Q    You were also asked on cross about a crash involving a

6    fatality.

7    A    Uh-huh.

8    Q    When did you first learn of this crash involving a

9    fatality?

10   A    I -- I don't recall when I first heard about it.  I'm not

11   sure.

12   Q    Did you ever see Mr. Triolo having problems picking up a

13   TV remote before the motor vehicle crash of February 11, 2017?

14           MS. MAPP:  Objection.  Leading.

15           THE COURT:  Overruled.

16   BY MR. MOORE:

17   Q    You can answer the question.

18   A    No.

19   Q    Let me ask it -- okay.  Did you ever see Mr. Triolo have

20   any problems picking up a TV remove before the motor vehicle

21   crash of February 11, 2017?

22   A    No.

23           MR. MOORE:  No further questions.

24           Thank you, Mr. Schmucker.

25           THE COURT:  You may step down, sir.

```
 1              I'll ask you to take that microphone cover off and
 2    throw it in the garbage can over on your left, and wear your
 3    mask when you exit the courthouse.
 4              Thank you, sir.
 5              You can head right out the door.  There you go.
 6              I know the Jaguars are bad, but swearing off all
 7    football.
 8              MR. KINNEY:  Great story.  I don't know why he didn't
 9    tell it.
10              THE COURT:  I was tempted to ask, but any other
11    witnesses?
12              MR. KINNEY:  That's it for witnesses today.  We have
13    the life care plan expert, Mr. Spruance, on Monday and that is
14    it for plaintiffs.
15              THE COURT:  Okay.  Ms. Cunningham?
16              MS. CUNNINGHAM:  Your Honor, we have -- we've been in
17    touch with the Postal Service witness who had a COVID test, and
18    I believe we're still waiting for the test result; however,
19    assuming a negative result comes back this week, she would be
20    able to come Monday if the Court has time before Mr. Spruance's
21    testimony.
22              THE COURT:  Let me look at my calendar.
23         (The Court confers with courtroom deputy.)
24              THE COURT:  Okay.  I'm going to move some stuff
25    around and we should be able to do Mr. Spruance and then the
```

 1    other witness.

 2            We've got Mr. Spruance starting at 11:00, and so

 3    we -- we'll see if we get all that done before lunch.  If not,

 4    I'm going to take my afternoon sentencing and put it on Tuesday

 5    so we can go ahead and finish with the evidence on Monday.

 6            If you don't have a negative COVID test by, like,

 7    3:00 tomorrow, if you can advise that you're still waiting for

 8    that or that it was positive, whatever it is, so that --

 9    because -- well, we'll see what we do at that point.

10            MS. CUNNINGHAM:  Yes, Your Honor.

11            THE COURT:  Anything else, then, at this time?

12            MS. CUNNINGHAM:  Your Honor, just in terms of your

13    Monday calendar, will you just let us know what time -- in

14    other words, you'll let us know what time you would want us to

15    have the witness here, or do you want us to try for her to be

16    here in the morning?

17            THE COURT:  Yeah, I mean, I think the idea is we'll

18    hear Mr. Spruance and then we'll hear that witness.  I don't

19    know how long Mr. Spruance's testimony is.

20            I know when you-all filed the notice of conflict, you

21    said you expected him to be about an hour.

22            MR. KINNEY:  The direct might -- I've seen him done

23    on direct 30 minutes and less.  It's not a big life care plan.

24    So I'm worried about the cross, but -- taking a long time.

25            THE COURT:  Well, I mean, that would probably be

1    about an hour.  We'll see.

2              But you should have your witness here, you know, no

3    later than 11:30.

4              MS. CUNNINGHAM:  All right.

5              THE COURT:  In terms of when we -- when we finish the

6    testimony, I will ask you-all to prepare findings of fact and

7    conclusions of law, proposed.

8              They need to be based on what the actual testimony

9    was, not what you anticipated the testimony would be.

10   Sometimes I get the same thing that was presented pretrial, and

11   that's not often very helpful.  So if you'll just make sure

12   that you're looking at what the actual evidence was.

13             I will ask -- let me think about a deadline.

14             I'm going to ask you to submit your proposed findings

15   30 days after you-all have received the transcripts.  And as

16   far as when you'll get the transcripts, that's going to be up

17   to you-all in terms of what you order.

18             Anything else, Mr. Kinney?

19             MR. KINNEY:  Yes, your Honor.  So do we come in and

20   do a closing after that or is that --

21             THE COURT:  Your written findings will be -- there's

22   no need to do an oral closing because you're going to give me

23   the written findings of fact and conclusions of law, so your

24   argument will be in that.

25             MR. KINNEY:  Yes, Your Honor.

1            THE COURT:  So nothing further from the plaintiff?

2            MR. KINNEY:  Nothing further from the plaintiff.

3            THE COURT:  Okay.  Ms. Cunningham, anything further

4    from the United States?

5            MS. CUNNINGHAM:  Your Honor, only if you wanted us to

6    address today the admissibility of the deposition under Rule

7    804.  Is that something you want to address today?

8            THE COURT:  Well, yeah.  I assumed that you had

9    decided you weren't using it when you didn't mention it.  But,

10   yeah, I think that's -- we would have to address that now if

11   you're wanting me to consider it.

12           MS. CUNNINGHAM:  I do, Your Honor.

13           I believe the testimony is admissible under

14   804(a)(5)(A).  (a)(5)(A) indicates declarant would be

15   unavailable as a witness if the declarant is absent from a

16   trial or a hearing and the statement's proponent has not been

17   able, by process or other reasonable means, to procure

18   declarant's attendance, in the case of a hearsay exception,

19   under Rule 804(b)(1).

20           804(b)(1) is -- the first is former testimony given

21   by a witness at a deposition offered against a party who had an

22   opportunity and similar motive to develop by direct -- pardon

23   me, direct, cross-, or redirect examination.

24           In this instance, we have had the Marshals Service

25   attempt to serve a subpoena on the witness.  The Marshals

 1   Service has tried four different addresses with no success.

 2   They are placing a return of the subpoena in our box that

 3   apparently was just placed in our box this morning, so I'll

 4   obtain a copy of that and provide it to plaintiff's counsel.

 5           The deposition was taken on June 10th of 2019 by

 6   plaintiff's counsel.  They had the opportunity -- in this

 7   litigation, they had the opportunity to ask whatever questions

 8   they felt were appropriate of the witness, so I believe it

 9   meets the -- sort of the clear parameters of the rule and

10   should come in.

11           THE COURT:  Mr. Kinney?

12           MR. KINNEY:  Yeah, I agree.

13           I'm concerned about relevance as -- if we're dealing

14   with a rear-end motor vehicle collision, what it's being

15   offered for.  So we don't have any designations yet.

16           THE COURT:  I think she's offering the entire

17   deposition; right?

18           MS. CUNNINGHAM:  Yes, Your Honor, I am.

19           MR. KINNEY:  Okay.  I'll do some counter-designations

20   and --

21           THE COURT:  If she's offering the entire deposition,

22   what would be the counter-designation?

23           MR. KINNEY:  When you asked that, I took it to mean

24   that you were asking her about the testimony that was given

25   when she inquired.  But, yes, I understand what you're saying.

1           Yes, if she's offering the whole thing, then, right.

2    I don't need to do counter-designations.

3           THE COURT:  Okay.  Well, then, is the deposition -- I

4    don't think has been filed yet; right?

5           MS. CUNNINGHAM:  It has not, Your Honor.  We have

6    copies here.  We can file it.  We'll do whatever the Court

7    would prefer.

8           THE COURT:  I'll ask you to do both.  I'll ask you to

9    give me a paper copy and please file it on the court record and

10   then I will read that deposition.  We won't read it out loud.

11   The theatrics aren't necessary, but I'll read that.

12          MR. KINNEY:  Is there anything we need to retrieve

13   from you or the Court?  I know we dropped off several copies of

14   things when we came in.  Are you keeping those materials?  Are

15   we hauling them out of here?

16          THE COURT:  Well, there's nothing you need to

17   retrieve, I don't think.  But what you do need to do is confer

18   with Madam Deputy.

19          You will have to provide us an electronic copy of

20   anything admitted into evidence, because we have to submit it

21   electronically to the Court of Appeals.

22          So -- and that means -- I think it was less in your

23   exhibits, but in Ms. Cunningham's exhibits a couple times --

24   y'all can't listen to each other and me at the same time.

25          MR. MOORE:  I know.  I'm sorry, Your Honor.

1           THE COURT:  Y'all -- you'll have to confer with one

2  another and make sure that things that you thought were coming

3  into evidence that didn't, like certain pages of things, get

4  pulled out, and what is given to us on the electronic disc is

5  accurate.

6           MR. KINNEY:  There was -- in a submission from the

7  defense of a summary that the Court didn't allow.  And I didn't

8  know if that had made its way to the clerk or -- it was a --

9  where they -- they were going to try and put in Medicare

10 pricing.

11          THE COURT:  Right.

12          MR. KINNEY:  I didn't know if that had made its way

13 to the clerk or the record.  I thought the Court disallowed

14 that.

15          THE COURT:  I did disallow it, although for purposes

16 of the record on appeal, anything that -- well, actually, that

17 was used --

18          MR. KINNEY:  It was a proposed demonstrative aid.

19          THE COURT:  Right.

20          Well, demonstratives probably should all be taken

21 back, because they wouldn't normally go back to the jury.  So I

22 wouldn't normally look at them at the end of the trial.

23          MR. KINNEY:  It was No. 51, if I remember right.

24          Not 51?

25          Was it 54, then?  What number was it?

 1              MS. CUNNINGHAM:  The documents --

 2              MR. KINNEY:  It would be 54.

 3              MS. CUNNINGHAM:  Anything that we had as a

 4    demonstrative is not included in the binders that the Court

 5    has.  We provided them in a separate manila folder.

 6              MR. KINNEY:  I'd remembered that a set had been

 7    passed up, but if it hasn't, it hasn't.

 8              MS. CUNNINGHAM:  Yes.  Just in a manila folder so it

 9    was distinct from the binders.

10              THE COURT:  So that's not something that I'll be

11    considering.

12              MS. CUNNINGHAM:  Although there are demonstratives in

13    that that we did show that did come in.

14              The work record charts are both -- were both things

15    that I did show and that did -- were used.

16              MR. KINNEY:  My understanding is that demonstratives

17    don't go -- well, this is my first bench trial in a case like

18    this, so I don't ever remember sending demonstratives back to a

19    jury, but, quite frankly, I'm not sure how it works.

20              THE COURT:  If something isn't in evidence, I can

21    assure you-all that I'm not going to consider it.

22              So I don't think there's anything else we need to do

23    with regard to that matter.

24              All right.  So we'll finish up.

25              You're going to file and give Madam Deputy a copy of

 1   the depo, Ms. Cunningham?

 2              MS. CUNNINGHAM:  I will, Your Honor.

 3              But before we move off the demonstrative, and this

 4   may have just been a -- maybe it wasn't clear, but my

 5   understanding was that those -- the two work record

 6   demonstratives were not objected to.  And because they hadn't

 7   been stipulated to, we didn't move them into evidence at the

 8   time, because --

 9              THE COURT:  All right.  Do you want --

10              MS. CUNNINGHAM:  I would like to move those

11   demonstratives.

12              THE COURT:  -- to move them into evidence as 1006

13   summaries?

14              MS. CUNNINGHAM:  Yeah, I do, Your Honor.  We put them

15   on the exhibit list that was provided to the Court the day the

16   trial started so we would have a number for them.

17              It was Defendant's Exhibit 51, the summary of the

18   Baptist Medical Center employment records, and Defendant's

19   Exhibit 52, which was the summary of the Orange Park Medical

20   Center records.

21              THE COURT:  Any objection to 51 and 52, Mr. Kinney?

22              MR. KINNEY:  I'm looking.  51, no.  52, no.

23              Your Honor, I'd also like to move in as a summary the

24   plaintiff's med bill summary.

25              THE COURT:  What number that is?

1          MR. KINNEY:  It's -- it was -- it's not marked as a

2    number, but it's one that was on our list -- wait, I'm sorry.

3    It's No. 48 on our list.

4          THE COURT:  Any objection, Ms. Cunningham?

5          MS. CUNNINGHAM:  I don't object to it coming in.  I

6    don't believe the -- I don't obviously -- well, two things.  I

7    don't agree to the accuracy of it.  It's the plaintiff's

8    summary of what they're claiming.  I don't agree that

9    everything on that is something they would be entitled to.

10          One of the things that had been discussed with

11    counsel, although I don't believe it had been discussed with

12    the Court, is that the -- to the extent there were -- to the

13    extent there were insurance set-offs and things of that nature,

14    they are not reflected in that chart.  And so the plaintiff's

15    counsel had previously asked if that was something that they

16    could do posttrial if that became necessary, although I don't

17    believe that issue had been addressed with the Court.

18          So that chart is simply a chart of the amounts billed

19    without any reflection of what was paid by insurance to the

20    extent that insurance did pay for some of those bills.

21          MR. KINNEY:  Yes, Your Honor.

22          This is something that we provided to them prior to

23    the trial and told them that this is the gross charges.

24    There's been payments from his auto insurance for PIP, and

25    there was some -- at least I think, one or two instances where

1    his health insurance had paid.

2          So my understanding is that all the offsets are done

3    and set-offs are done after trial.  So this summary is a list

4    of all of the medical bills, the gross charges of what he was

5    charged.

6          In vast majority, it's actually what his owed amounts

7    are.  There are a couple of instances of where that's not true,

8    but this is a summary of all the individual charges from the

9    bills that were admitted into evidence.

10          THE COURT:  And when you're saying "after trial," I

11    think you mean postverdict?

12          MR. KINNEY:  Yes, Your Honor.

13          THE COURT:  All right.  So I think it is correct that

14    we would generally address set-offs post verdict, so the

15    Court's determination would be based upon whatever's been paid

16    and then set-offs would be done afterwards.

17          MS. CUNNINGHAM:  I do know that in at least one prior

18    bench trial, Your Honor permitted the parties or had asked the

19    parties, I'm not sure which, to file something on that issue

20    prior to or contemporaneous with the pretrial briefs -- pardon

21    me, the posttrial findings.

22          THE COURT:  Yeah.  So I think that when we do it with

23    a jury, it's all done post verdict.  It is easier and makes

24    more sense when it is a non-jury trial to go ahead and -- go

25    ahead and submit that information so that when you get a

```
 1   verdict, we're done.
 2              MR. KINNEY:  Your Honor --
 3              THE COURT:  So that when you get the -- pardon me --
 4   when you get -- because it's not a verdict when it comes from
 5   me -- when you get my findings of fact and conclusions of law,
 6   we address all of that.
 7              I'll have to look back at what I required in Gonzalez
 8   and I'll do the same thing as in the Gonzalez case.
 9              MS. CUNNINGHAM:  My recollection there is that the
10   parties stipulated to it.  They were able to reach an agreement
11   on what all the set-offs were and they provided you with a
12   joint chart that was agreed in terms of what all of the
13   set-offs and payments and adjustments were.
14              THE COURT:  Okay.  That would make sense to me.  And
15   it sounds like you're -- and you just went through what they
16   were, like you're aware of what they are, the PIP and the few
17   times that the insurance --
18              MR. KINNEY:  Yes.  We actually have the same chart
19   with more columns to the right that identify those and show the
20   actual balances.  But my experience in trial is you're only
21   allowed to present this.
22              THE COURT:  Yeah.
23              MR. KINNEY:  It is not brought to trial.
24              THE COURT:  Right.  But I think that's just the
25   difference between jury trials and bench trials.
```

1        Why don't we do this.  You said there's no objection
2   to 48; right?
3        Plaintiff's 48, which is the chart with the
4   two columns that he's showing --
5        MS. CUNNINGHAM:  Yes, Your Honor, with all these
6   caveats that we discussed, yes.
7        THE COURT:  Right.  Those -- the issues that you
8   address go to the weight, not the admissibility.
9        MS. CUNNINGHAM:  Yes.
10        THE COURT:  So there's no objection to the
11   admissibility.
12        MS. CUNNINGHAM:  Correct, Your Honor.
13        THE COURT:  Okay.  So I'll accept 48 into evidence.
14   And then I'll ask you-all to confer on the additional chart
15   that shows what the set-offs would be.  And if you-all can
16   reach an agreement on that, I'll ask you to just file a
17   stipulated exhibit.  If you can't reach agreement on it, then
18   you will include in your findings, in your proposed findings,
19   your arguments as to what they should be.
20        MR. KINNEY:  Thank you, Your Honor.
21     (Plaintiff's Exhibit 48 was admitted in evidence.)
22        THE COURT:  Okay.  All right.  Is there anything else
23   I need to address?
24        MR. KINNEY:  Not from the plaintiff.
25        MS. CUNNINGHAM:  Your Honor, did we -- I just want to

1   make sure I didn't miss it.  Did we get a response from the
2   plaintiff as to any objection to Defendant's 51 and 52?

3               THE COURT:  They said no objection.  So 51 and 52 are
4   admitted.  And they will be considered as substantive evidence,
5   not just as demonstrative aids.

6          (Defendant's Exhibits 51 and 52 were admitted in
7   evidence.)

8               MS. CUNNINGHAM:  Your Honor, between now and Monday,
9   if we maybe can get a copy of Ms. Wiles' records of what is and
10  isn't in, and we can just confirm that everything is in that
11  needs to be.  And Monday morning, if there's anything else that
12  needs to be addressed, we can maybe bring it up then.

13              THE COURT:  The Court's minutes reflect -- I don't
14  know that the minutes reflect when there was a page or
15  something.

16              COURTROOM DEPUTY:  I do include that, Your Honor.

17              THE COURT:  You do, okay.

18              COURTROOM DEPUTY:  But I would like to, just when
19  we're done and before you-all leave, go through the exhibits
20  today.

21              MR. KINNEY:  Your Honor, I'm sorry, I did leave
22  something out.

23              The last person that testified, he mentioned to us
24  this morning that if he could get an order or letter from the
25  clerk, because he needed to show something to his employer of

```
 1   why he was not there today.

 2              He was under subpoena.  I guess the subpoena was for

 3   yesterday.  We intended to have him testify yesterday.

 4              Can we get a minute order or something to the effect

 5   that Mr. Bruce Schmucker appeared in court today and should be

 6   excused for those purposes?

 7              THE COURT:  The clerk's minutes will reflect that he

 8   testified today.  Is that enough?

 9              MR. KINNEY:  I don't know.  He works at Shands.

10              THE COURT:  What if we -- the plaintiff's witness --

11   what if we -- instead of just putting Bruce Schmucker, put

12   Bruce Schmucker testified pursuant to subpoena.

13              MR. KINNEY:  Sounds good.

14              THE COURT:  And if that's not good enough, just let

15   us know and I will be happy to send something else.

16              MR. KINNEY:  All right.  Thank you.

17              THE COURT:  Just for purposes of the -- cleaning up

18   the record, plaintiff's expedited motion to preclude new expert

19   opinions is denied as moot because we addressed it during the

20   trial.

21              MR. KINNEY:  Yes, Your Honor.

22              THE COURT:  All right.

23              All right.  Seeing nothing else, we will be in

24   recess.

25              COURT SECURITY OFFICER:  All rise.
```

1        (Proceedings adjourned at 10:06 a.m.; to be continued on

2   Monday, September 28, 2020.)

3                          -   -   -

4

5                    C E R T I F I C A T E

6

7   UNITED STATES DISTRICT COURT)

8
    MIDDLE DISTRICT OF FLORIDA  )
9

10       I hereby certify that the foregoing transcript is a true

11   and correct computer-aided transcription of my stenotype notes

12   taken at the time and place indicated herein.

13

14

15          Dated this 2nd day of November 2020.

16

17

18

19              /s/Cindy Packevicz Jarriel

20              Cindy Packevicz Jarriel, RPR, FCRR

21

22

23

24

25