1                IN THE UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                      JACKSONVILLE DIVISION

3
                 CASE NO:  3:18-cv-919-J-34JBT
4

5   RICHARD A. TRIOLO,              Jacksonville, Florida

6              Plaintiff,           Date:  September 28, 2020

7   v.                             Time:  11:06 a.m. - 1:12 p.m.
                                          2:33 p.m. - 2:57 p.m.
8
    UNITED STATES OF AMERICA,       Courtroom:  10B
9
               Defendant.
10  _____

11

12                         **BENCH TRIAL**
                          **(Volume IV)**
13          BEFORE THE HONORABLE MARCIA MORALES HOWARD
                  UNITED STATES DISTRICT JUDGE
14

15

16

17

18

19

20

21  OFFICIAL COURT REPORTER:

22  Cindy Packevicz Jarriel, RPR, FCRR
    221 N. Hogan Street, #128
23  Jacksonville, FL  32202
    Telephone:  904.301.6843
24  e-mail:  cindyrprfcrr@gmail.com
         (Proceedings reported by stenography; transcript
25  produced by computer.)

1

2                          A P P E A R A N C E S

3

4     COUNSEL FOR PLAINTIFF:

5     **PHILIP KINNEY, ESQ.**
      **BENJAMIN MOORE, ESQ.**
6     Kinney & Sasso, PLLC
      191 RG Skinner Parkway, Suite 703
7     Jacksonville, FL  32256-9678

8

9     COUNSEL FOR THE DEFENDANT:

10    **COLLETTE CUNNINGHAM, ESQ.**
      **KYESHA MAPP, ESQ.**
11    United States Attorney's Office
      300 North Hogan Street, Suite 700
12    Jacksonville, FL  32202

13

14                                -   -   -

15

16

17

18

19

20

21

22

23

24

25

1

2                      T A B L E   O F   C O N T E N T S

3    <u>Proceedings:</u>

4    <u>Plaintiff's Witness:</u>

5    **GIL SPRUANCE**
     Direct Examination by Mr. Moore...........Page  5
6    Cross-Examination by Ms. Mapp.............Page 30

7


8    <u>Defendant's Witness:</u>

9    **JEANETTE SIGOUIN**
     Direct Examination by Ms. Mapp...........Page 50
10   Cross-Examination by Mr. Kinney..........Page 67
     Redirect Examination by Ms. Mapp.........Page 78
11   Recross-Examination by Mr. Kinney........Page 82

12

13                         E X H I B I T S

14   <u>Received in Evidence</u>                        <u>Page</u>

15   Defendant's Exhibit 10.....................65
     Plaintiff's Exhibit 27.....................85
16   Defendant's Exhibit 16.....................90
     Defendant's Exhibit 19.....................90
17   Defendant's Exhibit 22.....................91
     Defendant's Exhibit 25.....................91
18   Defendant's Exhibit 26.....................91
     Defendant's Exhibit 27.....................92
19   Defendant's Exhibit 29.....................92
     Defendant's Exhibit 41.....................92
20   Defendant's Exhibit 28.....................93
     Defendant's Exhibit 43.....................96
21   Defendant's Exhibit 44.....................98

22

23

24                          -   -   -

25

```
 1                    P R O C E E D I N G S
 2    September 28, 2020                              11:06 a.m.
 3                         -  -  -
 4              COURT SECURITY OFFICER:  All rise.
 5              The United States District Court, in and for the
 6    Middle District of Florida, is now in session.  The Honorable
 7    Marcia Morales Howard presiding.
 8              Please be seated.
 9              THE COURT:  Good morning.  We are continuing this
10    morning with the evidence in Case No. 3:18-cv-919-J-34JBT,
11    Richard Triolo versus The United States of America.
12              Mr. Kinney and Mr. Moore are here on behalf of
13    Mr. Triolo.  Mr. Triolo is in the courtroom.
14              Ms. Cunningham and Ms. Mapp are here on behalf of the
15    United States, along with Ms. Sabino.
16              And, Mr. Moore, are you ready to call your next
17    witness?
18              MR. MOORE:  I am, Your Honor.
19              THE COURT:  All right.
20              MR. MOORE:  The plaintiff would like to call Mr. Gil
21    Spruance at this time, a life care plan expert.
22              THE COURT:  Mr. Spruance, if you will come forward
23    and be sworn, please.
24              COURTROOM DEPUTY:  Do you solemnly swear that the
25    testimony you're about to give before this Court will be the
```

 1   truth, the whole truth, and nothing but the truth, so help you

 2   God?

 3              THE WITNESS:  I do.

 4              COURTROOM DEPUTY:  Thank you, sir.

 5              Please be seated.

 6              THE COURT:  And you may remove your mask during your

 7   testimony.

 8              THE WITNESS:  Thank you.

 9              THE COURT:  Go ahead, Mr. Moore.

10              MR. MOORE:  Thank you, Your Honor.

                 **GIL SPRUANCE, PLAINTIFF'S WITNESS, SWORN**
11

                          **DIRECT EXAMINATION**
12

13   BY MR. MOORE:

14   Q    Good morning.  Go ahead and state your name, please.

15   A    My name is Gil Spruance.

16   Q    And, Mr. Spruance, where is your office located?

17   A    My office is at 4604 Atlantic Boulevard, Suite 1B,

18   Jacksonville.

19   Q    What's the name of your office?

20   A    The business is called Spruance & Associates,

21   Incorporated.

22   Q    And what is your profession?

23   A    I am a rehabilitation counselor and a life care planner.

24   Q    Okay.  What's a life care planner?

25   A    A life care planner -- well, a life care plan is prepared

 1    to -- it's like an extensive rehabilitation plan.  It projects

 2    the cost of future expenses that one is likely to incur as a

 3    result of the onset of disability or a serious injury.

 4              A life care plan can be quite -- quite exhaustive.

 5    It can include not only the cost of future medical treatment,

 6    but it can include the cost of transportation solutions,

 7    architectural renovations at home, even vocational planning if

 8    training in this case is required for one to reenter the

 9    workforce.

10    Q    In your capacity, in addition to life care plans and

11    vocational rehabilitation, what else do you do?

12    A    Well, I -- for over 20 years, I was also a representative

13    for people with disabilities who were applying for Social

14    Security disability, so over 20 years of doing that.  I retired

15    from that in April of 2019.

16              As a rehabilitation counselor, I performed vocational

17    evaluations, vocational testing.  I have certifications -- a

18    number of certifications in the field of rehabilitation, life

19    care planning.  I also have a certification as a Medicare

20    set-aside specialist.

21    Q    How many years have you been preparing life care plans?

22    A    I actually started doing life care plans, I want to say,

23    the early to mid-1990s.  I went through an extensive

24    postgraduate course in life care planning training.  When I

25    completed that course, it was being sponsored by the University

1    of Florida, Intellicus at the University of Florida.  And

2    shortly thereafter, I sat for the life care planning

3    certification.  And I have maintained that national

4    certification since that time.

5    Q    Beginning with college, tell us about your formal

6    education.

7    A    So I have a B.S. degree in psychology from Fairfield

8    University.  I earned that in 1976.  I then attended North

9    Texas State University, and graduated in 1980 with an M.S.

10   degree, master's of science degree, in counseling, psychology,

11   and rehabilitation.

12           After graduating, I did obtain a number of

13   certifications, national certifications, that are important to

14   my field, including CRC, Certified Rehabilitation Counselor;

15   CVE, Certified Vocational Evaluator; CCM, Certified Case

16   Manager; and the life care planning certification I mentioned

17   earlier, as well as the certification for providing Medicare

18   Set-Asides.

19   Q    Have you -- are you familiar with Mr. Triolo?

20   A    Yes, I am.

21   Q    What were you retained to do in this case?

22   A    Well, I was retained to do an evaluation.  The result of

23   the evaluation -- I met with Mr. Triolo April 1st, 2019, and I

24   conducted my traditional interview, which includes a review of

25   education and work history, Mr. Triolo's ability to continue

1    working.

2              We reviewed his medical treatment, what he understood

3    was his injury, and what he understood his physicians were --

4    how the treatment was going, the results of the treatment, and

5    what the physicians were telling him would be the treatment

6    needed in the future.

7    Q    And what -- what would you say a life care plan is?  How

8    would you basically describe a life care plan?

9    A    Well, a life care plan is a dynamic document.  It is a

10   case management tool.  I tell my evaluees, my clients -- I tell

11   them it is a projection of future expenses that they're likely

12   to incur as a result of the onset of disability or serious

13   injury.

14             The life care plan requires a review of medical

15   records.  In cases where there's a vocational component, we

16   review vocational information and wage history, et cetera.

17             It also includes, of course, the interview with the

18   individual, the evaluee, and consultation with the primary

19   treating physicians, the physicians that are involved in the

20   ongoing care.

21             I tell people that a life care plan is a document

22   that does require update from time to time, as it is a

23   projection based on the opinions obtained at the time that the

24   life care plan is completed.

25             So it is a projection of what type of treatment is

1    more likely than not to be needed as time goes on.  The only

2    thing I put in the life care plan is treatment that is more

3    likely than not.

4          Oftentimes I talk to providers who give me a list of

5    treatment that's possible, but that can be an endless list, so

6    I try -- I just focus on things that are more likely than not

7    in the opinion of the treaters.

8    Q    What treaters did you interview in preparation of this --

9    Mr. Triolo's life care plan?

10   A    In this case I spoke with Dr. Topp, April 23rd of 2019,

11   and Dr. Pardo, April 25th of 2019.

12   Q    And did you review Mr. Triolo's medical records as well?

13   A    I did.

14   Q    Did you prepare a report in relation to your life care

15   plan?

16   A    We did.  We prepared a narrative report and a life care

17   plan dated April 29, 2019.

18   Q    All right.  And does that report assist you in explaining

19   your testimony today in relation to Mr. Triolo's life care

20   plan?

21   A    Yes, it would.

22          MR. MOORE:  Your Honor, we had previously marked

23   Exhibit 44, which is Mr. Spruance's life care plan, and at this

24   time I'd like to publish it.

25          I've got a copy if Your Honor would like to see it.

1          THE COURT:  I can look at it on the screen.

2          MR. MOORE:  Okay.  Thank you, Your Honor.

3          And at this time, Madam Clerk, if you would not mind

4    turning that on.

5    BY MR. MOORE:

6    Q    Mr. Spruance, you have a copy of your life care plan up

7    there; correct?

8    A    I do.

9    Q    Okay.  How long did you initially interview Mr. Triolo?

10   A    It was pretty much my traditional interview, which lasts

11   right at two hours to go through all of the information that we

12   gather.

13   Q    Are you aware of Mr. Triolo's injuries and his treatment

14   to those injuries -- for those injuries?

15   A    Yes.

16   Q    And what were those injuries?

17   A    Well, the primary injury was the lumbar injury.  He

18   ultimately underwent surgery for that lumbar injury and then

19   subsequently pain management treatment.

20   Q    And did you make a determination as to Mr. Triolo's life

21   expectancy?

22   A    Yes, I did.  On the report, date of birth of October 19,

23   1974, he was 44 years of age at that time.  Life expectancy was

24   35.2 years.

25   Q    And how did you determine -- how did you make the

1  determination as to his life expectancy?  What source did you

2  use?

3  A    Well, we use the U.S. Life Tables published by the U.S.

4  Department of Health, Centers for Disease Control.  We used the

5  Table 5 for U.S. white males.

6          And you simply look down the chart, get to the

7  appropriate age, and you read across, 35.2 years.

8          MR. MOORE:  I believe, Your Honor, that's Exhibit 38,

9  which was previously admitted.

10          THE COURT:  All right.

11  BY MR. MOORE:

12  Q    And you said Life Table 5; is that correct?

13  A    Yes, sir.

14  Q    Okay.  How do you determine which life table to use for

15  someone like Mr. Triolo?

16  A    Well, there's a number of tables that they publish: the

17  population as a whole, males, females, white, African

18  Americans, Hispanics.  And so we use the U.S. white males

19  chart.

20  Q    And what is Mr. Triolo's life expectancy at the time of

21  this report?

22  A    35.2 years.

23  Q    Now, when you prepared this report, that was his life

24  expectancy at that time; correct?

25  A    Correct.

1   Q    So you have not since modified the report to update it in
2   relation to his current age; correct?
3   A    I have not.
4   Q    Is one of the things you do in preparation of a life care
5   plan to prepare a med rec summary of Mr. Triolo's records?
6   A    Yes.
7   Q    Why do you do that?
8   A    Well, we prepare the medical records summary so that I can
9   have a good understanding, not only of the injury, but the
10  historical treatment.
11         Knowing that historical treatment puts me in a much
12  better position to be able to have a meaningful consultation
13  with the treating physician.
14         If I know what the diagnosis is and I know what the
15  treatment has been, then I can ask the appropriate questions
16  about treatment going forward.
17         I'm certainly not in a position -- I'm not an M.D.
18  I'm not trying to forecast what the diagnosis is or I'm not
19  forecasting what the future treatment is going to be.  I simply
20  need to have a good understanding of what that treatment has
21  been so that I can have a meaningful conversation with the
22  physician.
23  Q    I'd like to turn your attention to the life care plan page
24  on the resources.
25         These particular resources, how did you use them in

1    preparing your life care plan?

2    A    Well, the two primary resources that we use are medical

3    fees in the United States and Physician Fee Reference.

4           So these two publications are revised annually.  They

5    come out typically in February.  And they provide price points,

6    price data, based on CPT codes.

7           So we can look up a CPT code in the reference and it

8    will give us a usual and customary price, but it gives this

9    price at the 50th, 75th, and 90th percentile.

10          So for the Jacksonville -- for the Northeast Florida

11   area, we use the 50th to 75th percentile to get a range for the

12   usual and customary cost for a particular CPT code.

13          Now, the reason we use two references are just kind

14   of a way to double-check.  I find that the references provide

15   data points that are very close together but not exactly the

16   same.  So we will use the reference that provides the lowest

17   number, the 50th percentile, and the highest number at the 75th

18   percentile, so we've captured basically both references for

19   that range.  Then each reference provides a geographic modifier

20   to further tweak that number a little bit for the Northeast

21   Florida area.

22   Q    So you're looking in relation to the Northeast Florida

23   area instead of applying, let's say, the Manhattan area;

24   correct?

25   A    Correct.

1    Q    And why is that?

2    A    Well, you know, the cost of medical care does vary from

3    region to region.  One of the references provides data based on

4    ZIP code.  So the 322 ZIP code, for example, is the range that

5    we'll look at in one reference.  The other reference provides

6    data in Florida based on South Florida and the rest of Florida,

7    so we'll use the rest of Florida for that data.  That's why

8    maybe the price points aren't exactly the same, but they're

9    very close.

10   Q    Why not just call the doctors and ask them how much their

11   office charges for each particular treatment?

12   A    Well, there's a couple of reasons why -- why my

13   methodology doesn't do that.

14        Number one, a particular physician might be charging

15   well above the range or well below the range, and I don't think

16   it's really fair to use the price of a single individual

17   provider when we have data on the average cost for service in

18   Northeast Florida.

19        Plus, people typically don't stay with the same

20   provider over a long period of time.  There's usually a change

21   in providers and I wouldn't know how to predict that.

22   Q    Why not just call Blue Cross Blue Shield or Medicare or

23   United and just ask them what their charges are for, like, a

24   surgery or pain management injection?

25   A    Yeah.  So there's a lot of reasons for not doing that.

1                    For example, I'll start with the Medicare issue.

2                    Well, first of all, Mr. Triolo is not eligible for

3       Medicare and won't be eligible for another 20 years, but I

4       never use Medicare because of the Secondary Payor Act.

5                    So, for example, if -- if it's adjudicated that there

6       is a responsible party for the injuries, then the Secondary

7       Payor Act suggests that Medicare is not going to be responsible

8       for paying for that treatment.  And I did a lot of Medicare

9       Set-Asides in Florida under the workers' comp arena for that

10      reason.

11                   But as far as, you know, contractual health

12      agreements, health, you know, whatever the companies are,

13      Humana, Blue Cross Blue Shield, Aetna, those prices are -- it's

14      just a -- it's really just kind of a moot area.  I don't use

15      that in Florida.

16                   Number one, I'm typically not allowed to talk about

17      ancillary services to provide those numbers, but I -- there is

18      a -- if you were to use those numbers, then it's a whole

19      different analysis.  You have to get into cost of premiums, the

20      cost of the deductibles, and then a projection of the cost, not

21      only for the increase of premiums over the years, but the

22      increase in premiums as one ages.  So it's a whole different

23      analysis.

24                   And I don't do any projections or discounts for

25      contractual agreements.  We simply provide the usual and

1   customary data for these -- for these services.

2   Q    I'd like to turn your attention to the page -- the life

3   care plan that says Future Medical Care Aggressive Treatment.

4   Let's start there first.

5         Why do you use the term "aggressive" versus

6   "routine"?

7   A    Well, routine is supposed to suggest, for example,

8   noninvasive treatment: routine office visits, going in for

9   checkups, medication management, for example, routine checkups.

10  But aggressive care means more of an invasive type of

11  treatment: surgery, injections, those kinds of -- those kinds

12  of treatments.

13  Q    When you met with Dr. Pardo -- let's look at this first

14  segment here -- what treatment did he tell you he believed

15  Mr. Triolo would need in the future?

16  A    Well, when I talked with Dr. Pardo -- and this was

17  April 25th of last year -- what he was projecting was the

18  bilateral three-level lumbar RFAs, radiofrequency ablations.

19  And he was predicting -- suggesting that that would occur once

20  a year.  He does them separately.  He does the left side and

21  then does the left [verbatim] side or vice versa, but one side

22  at a time.  And he projected that both sides would be done once

23  a year.

24  Q    And what did you determine the cost was for -- well, let

25  me ask you this.  Did you determine the cost bilaterally or did

1   you break the cost down for each side?

2   A    Well, we do the bilateral cost.

3            So there's a -- when you're looking up the cost for

4   radiofrequency ablations, there's a CPT code for the first

5   level, then there's another CPT code for an additional level,

6   so you use that second CPT code twice.  And then -- so that's

7   per side, so you have to multiply that by two.

8            So we did calculate the cost for the bilateral

9   three-level RFAs, and the cost would range between $6,034 and

10  $15,142.  And, again, that range is based on the 50th to 75th

11  percentile for these costs.

12  Q    What do you mean when you say 50th to 75th percentile?

13  A    So, yeah, the two references that we use provide data

14  points at both 50th and 75th, and also the 90th percentile, but

15  I think that's a little high for Jacksonville.  So we use the

16  50-to-75th percentile.  And so that range -- because it's once

17  a year, that range is -- is spread out based on the 50th and

18  75th percentile.

19  Q    So if it's 90th percentile, it's going to be a lot higher

20  rate; correct?

21  A    Correct.

22  Q    Like a Manhattan or Chicago or something.

23  A    90th percentile for North Florida, but it's still

24  higher -- when I look at the 90th percentile, those numbers

25  just seem a little higher than what I typically see in

1    Northeast Florida.  I see a lot of medical bills in Florida.

2    Q    Why prepare a low, a mid, and a high annual cost range?

3    A    Well, the low and the high, as I said, covers the

4    50th-to-75th percentile.  The midpoint is just an arithmetic

5    middle.  It has no real statistical purpose.  It's just kind of

6    like an FYI.  Here's the middle of these two numbers.

7    Q    Okay.  And did you determine the total cost per year of

8    the three-level lumbar radiofrequency ablation?

9    A    Yes.

10   Q    Okay.  What were those total costs per year?

11   A    Per year, the low end would be $6,034; the high end,

12   $15,142.

13   Q    Now, did you take those costs and multiply them by his

14   life expectancy?

15   A    I did not.

16   Q    Okay.  Would that be in your summary table?

17   A    No.  I usually don't project those out for life

18   expectancy.  I just show the annual figures, is usually how I

19   do that.  But it's just a matter of multiplying by life

20   expectancy.

21   Q    Okay.  Got you.

22        All right.  Let's look at future medical care,

23   aggressive treatment, same page.  Dr. Topp, let's look at the

24   next section right under that for Dr. Topp.

25        You have with you Exhibit 38, the National Vital

1   Statistics Report based on his life expectancy; correct?

2   A    Correct.

3   Q    All right.  Let's look at Dr. Topp.

4        And did you speak with Dr. Topp?

5   A    I did.  I spoke with Dr. Topp April 23rd of 2019.

6   Q    Okay.  And what did Dr. Topp tell you in relation to

7   Mr. Triolo's future surgery or future treatment?

8   A    Well, he did believe that that L5-S1 fusion would likely

9   have to be -- undergo further surgery, more likely than not an

10  extension of that -- of that fusion.

11       He quoted some statistics while I was speaking with

12  him.

13       MS. MAPP:  Objection.  Hearsay.

14       MR. MOORE:  I mean, he's an expert, Your Honor, a

15  certified life care planner, going and obtaining this

16  information.  It's in medical records.  All of it's in

17  evidence.

18       MS. MAPP:  Further, Your Honor, this new information

19  was not disclosed to defendant as to statistics that Dr. Topp

20  informed the expert witness of.

21       THE COURT:  Well, to the extent there's a hearsay

22  objection, I think that the -- he can discuss what he, as an

23  expert, relied on.

24       As far as -- so I don't think that hearsay is a

25  problem.  But as far as this being a new opinion, is this in

1   his life care plan or not?

2              MR. MOORE:  In relation to statistics from Dr. Topp?

3              THE COURT:  Yes.

4              MR. MOORE:  I don't believe it is, Your Honor.

5              THE COURT:  I think Dr. Topp testified about those

6   matters.  I recall his testimony about that, so why don't we

7   just move on.

8              MR. MOORE:  Okay.

9   BY MR. MOORE:

10  Q    What did Dr. Topp tell you in relation to Mr. Triolo's

11  need for future treatment?

12  A    Well, he did predict that additional surgery, a fusion

13  extension, was more likely than not, based on not only the

14  nature of the surgery that was done, but the age, life

15  expectancy, so it was his opinion that certainly at some point

16  in his life that extension would be required.

17  Q    And at this point, what was Mr. Triolo's life expectancy

18  when you made this report?

19  A    Yeah, at that this point it was 35.2 years.

20  Q    And what was the cost for that potential future lumbar

21  extension?

22  A    So the cost for that surgery is -- again, the low -- the

23  low range would be $155,552; high range, $176,257.

24              And we used the same reference, as I mentioned

25  before, Physician Fee Reference and Other Fees of the United

 1    States, but we also used an additional reference, and that's

 2    where we get the surgery center cost.  We used American

 3    Hospital Directory.

 4            And the American Hospital Directory provides, again,

 5    usual and customary data.  Well, actually, it's actual data

 6    from regional hospitals.  It provides a database on DRG codes,

 7    diagnostic-related groupings.

 8            We print off the actual costs from the hospitals

 9    around the city, around Northeast Florida, that have a large

10    enough sample size to be reported, and so we add that cost,

11    together with the surgeon's costs, the CPT code costs, and

12    that's the range that we did.

13    Q    Have you seen additional records from Dr. Pardo as to

14    whether Mr. Triolo is getting these radiofrequency ablations?

15    A    I did receive some updated records.

16            MS. MAPP:  Objection.  This information is not -- has

17    not been provided to defendant, and the witness did not provide

18    an updated life care plan referencing this additional

19    information.

20            MR. MOORE:  It's his updated medical records from

21    Dr. Pardo, Your Honor.  It was provided to defense.

22            We had this argument already, I believe, Your Honor.

23            THE COURT:  Well, it was provided before trial.

24            If you're just planning to ask him whether Mr. Triolo

25    has gone and gotten it, I've already heard that and I have the

```
 1   records.  So why don't --
 2            MR. MOORE:  I'll move on, Your Honor.
 3            THE COURT:  I don't think it's objectionable.  But I
 4   also -- as I told you-all, remember that you're not dealing
 5   with a jury, and I am listening, and we don't have to re-cover
 6   things that we have already heard testimony about.  Okay?
 7            MR. MOORE:  Thank you, Your Honor.
 8   BY MR. MOORE:
 9   Q   Mr. Spruance, I would like to turn your attention back to
10   two pages before that, the future medical care routine.
11            And since we're on Dr. Topp, let's talk about that
12   bottom section there where it says:  Orthopedic follow-up with
13   X-ray.
14            Why did you indicate there would need to be
15   orthopedic follow-ups with X-rays?
16   A   Well, that was Dr. Topp's recommendation when I spoke to
17   him, follow up on the condition on an annual basis with X-rays,
18   just to see how -- the stability of the fusion, et cetera.
19   Q   And you had that at one time a year or one time annually;
20   is that correct?
21   A   That's correct.
22   Q   Okay.  All right.  And what was that cost, low-to-high
23   cost?
24   A   Well, that cost for the visit with the X-ray is between
25   $294 and $370, once per year.
```

1   Q    And does it have to be Dr. Topp specifically that he would

2   have to follow up with?

3   A    Well, no.  I mean, he could follow up with any orthopedic

4   that he chose.  Our numbers wouldn't change.  I mean, like I

5   said, you know, we're using the reference material to provide

6   these data -- data points.

7   Q    All right.  And let's look at Dr. Pardo, the two sections

8   above, the middle section.

9        Urine drug screen.  Did you obtain this information

10  from Dr. Pardo?

11  A    I did.

12  Q    And why would we need a urine drug screen four to

13  six times every year?

14  A    That goes hand in hand with the office visits.  So

15  Dr. Pardo was prescribing some very strong pain medication that

16  required -- according to protocol, it required monthly office

17  visits and urine drug screens four to six times a year just to

18  monitor the medication usage.

19        And so that's -- those are nontreatment office

20  visits, but simply follow-up and medication management and

21  planning for the aggressive treatment.

22  Q    And what's the cost per urine drug screen, cost estimate?

23  A    So we have -- we've looked that up, and the cost of the

24  urine drug screen is somewhere between $52 and $146 per test.

25  Q    And what was the low to high annually?

 1    A     The low to high for that would be $208, and that's if it

 2    occurred four times a year at the $52 price; up to $876 per

 3    year, and that would be if it occurred six times at the higher

 4    $146 per test.

 5           So that's why that range is a little bit -- little

 6    bit bigger.  You have two different variables, frequency and

 7    price.  So annually the cost for the urine drug screen is

 8    between $208 and $876 per year.

 9    Q     All right.  And then above that, you have Office Visits

10    for Pain Management.

11           How many times a year?

12    A     12 times a year.

13    Q     And what's the average cost per visit?

14    A     Well, the cost per visit is going to be between 125 and

15    $155 per visit.  So annually, that calculates out to between

16    1500 per year and $1,860 per year.

17    Q     Was this information obtained by -- well, was the

18    information in relation to the number of visits he would need

19    obtained from Dr. Pardo?

20    A     Yes.

21    Q     Okay.  And then it looked like at the bottom, you totaled

22    it up, total annual low costs, mid costs, and high costs?

23    A     Yes.

24    Q     Okay.  What were those costs?

25    A     So annually, the cost for the routine treatment would be

1    somewhere between $2002 and $3,106.

2    Q    Okay.  Let's go to the next page, which would be

3    medications.

4            You obtained this information from Dr. Pardo as well?

5    A    I did.

6    Q    What was the medication he would need?

7    A    So Dr. Pardo was prescribing the Percocet, or the generic

8    name would be oxycodone/acetaminophen, for pain relief, and at

9    the time, the prescription was 45 pills per month.

10           We look up these costs from -- we use a website

11   called GoodRx that provides data from a number of different

12   retail outlets, and we use the range of the cash price for

13   these medications.  So that runs between $2.47 per pill and

14   2.57 per pill.  So based on 45 per month, that annualizes to

15   $1,333.80, up to a high of $1,387.80 per year.

16           And I do tell people when it comes to life care

17   plans, the medication page is the most likely page to change

18   from time to time, as medications are tried and discontinued,

19   or frequencies changed, dosages changed.  So that page is more

20   likely to change than the other pages.

21   Q    And, Mr. Spruance, I'd like to turn your attention to a

22   couple pages before that, the life care plan summary sheet.

23           And why did you prepare this page?

24   A    It's -- again, it's just an FYI summary of the subsequent

25   pages.  So there are four line items on this summary, and there

1   are four corresponding pages behind the summary.

2   Q    In the first column that says "low," are you totaling up

3   the annual low costs for all the treatment?

4   A    Yes.

5   Q    Okay.  And I guess the same would be for the high; is that

6   correct?

7   A    That's correct.

8   Q    Okay.  And then why do you separate the one-time costs?

9   A    I guess just to make sure it's understood that the

10  one-time costs were not annual reoccurring costs.

11          Sometimes we'll separate, like, if there's a

12  treatment that's forecast to occur three times over the

13  lifetime, we'll put that in a one-time cost column, as opposed

14  to the annual reoccurring costs.  We try to separate those --

15  those items.

16  Q    So for purposes of annual costs, what would the total low

17  cost be per year?

18  A    The total low cost would be $14,649.80.

19  Q    And what would the total high cost be?

20  A    $26,355.80.

21  Q    Okay.  Mr. Spruance, are you able to -- I know you

22  prepared this report back in 2019.  Are you able, using

23  Exhibit 38, *The National Statistics Life Care*, are you able to

24  determine his current life expectancy?

25  A    I could, but I don't think I have that exhibit.

1              MR. KINNEY:  May I?

2              THE COURT:  You may.

3              THE WITNESS:  34.3.

4    BY MR. MOORE:

5    Q    Okay.  34.3 years.

6              All right.  And, Mr. Spruance, for purposes of your

7    report, I have not asked you about projected therapeutic

8    modalities; correct?

9    A    Correct.

10             MR. MOORE:  All right.  And, Your Honor, that's

11   something we are not seeking at this time.

12   BY MR. MOORE:

13   Q    So these numbers for projected therapeutic modalities

14   would basically need to be subtracted from that total annual

15   number.  That would be correct, right, Mr. Spruance, if we're

16   not relying on that?

17   A    That's correct.

18   Q    So once that -- those numbers are subtracted out,

19   basically would the correct way to determine the annual cost be

20   to multiply that total number by 34.3 years?

21   A    Yes, after -- after subtracting the cost of projected

22   therapeutic modalities, yes.

23   Q    Okay.  And, Mr. Spruance, are your opinions you just gave

24   within a reasonable degree of probability as it relates to the

25   field of life care planning?

 1  A     Yes.

 2            MR. MOORE:  No further questions, Your Honor.

 3            THE COURT:  I think you have to say out loud how much

 4  those totals were for projected therapeutic modalities.

 5            MR. MOORE:  Okay, Your Honor.

 6            THE COURT:  He has to testify to that for me to --

 7            MR. MOORE:  To subtract it out?

 8            THE COURT:  Correct.

 9            MR. MOORE:  Okay.  No problem, Your Honor.  My

10  apologies.  And I'm sorry we didn't resolve this before.

11  BY MR. MOORE:

12  Q     Okay.  Mr. Spruance, for purposes of projected therapeutic

13  modalities, what was your low annual cost?

14  A     The low annual cost for projected therapeutic modalities

15  was $5,280.

16  Q     What was your mid costs?

17  A     $6,000.

18  Q     And what was your high costs?

19  A     $6,720.

20  Q     Okay.  Let's go ahead and do the math.

21            Do you have a calculator up there?

22  A     Yes, sir, I do.

23  Q     Mr. Spruance, if you subtracted the total annual low cost

24  of $14,649.80, if you took that 5280 number from projected

25  therapeutic modalities, what's your total at that point?

```
1    A     So I'm getting $9,369.90.

2    Q     Okay.  Can you repeat that one more time just to make sure

3    we have it clear on the record.

4    A     $9,369.90.

5    Q     And what -- same calculation for the mid costs, taking the

6    $20,502.80, minus the $6,000?

7    A     I get $14,502.80.

8    Q     And finally for the high range, taking that total

9    $26,355.80 and subtracting out the projected therapeutic

10   modalities, high range of $6,720, what would that total be?

11   A     That range, the total would be down to $19,630.19.

12   Q     And just for purposes of the record, your one-time cost,

13   what was the total low one-time cost for the surgery?

14   A     $155,552.

15   Q     What was the one-time high cost for the surgery?

16   A     $176,257.

17             MR. MOORE:  Okay.  Thank you, Mr. Spruance.

18             At this time, Judge, I don't have any further

19   questions.

20             THE COURT:  What was the midpoint, Mr. Spruance?

21             THE WITNESS:  The midpoint of the surgery?

22             THE COURT:  Yes.

23             THE WITNESS:  Was $165,904.50.

24             THE COURT:  All right.

25             MR. MOORE:  Your Honor, can I just sum up one thing
```

TRIOLO v USA          September 28, 2020     Vol IV- 30

```
 1    while she's waiting?  It's not any more -- I'm sorry.
 2              THE COURT:  What were you saying?
 3              MR. MOORE:  Yes, Your Honor.  I had just asked the
 4    reasonable probability question at the end, but then he
 5    testified to that.  Can I ask him?
 6              THE COURT:  Go ahead.
 7    BY MR. MOORE:
 8    Q    Would your revised opinions of those within a reasonable
 9    degree of probability in relation to a life care plan expert?
10    A    Yes, they are.
11              MR. MOORE:  Thank you, Mr. Spruance.
12              Thank you, Your Honor.
13              THE COURT:  Go ahead, Ms. Mapp.
14              MS. MAPP:  Thank you, Your Honor.
15                         CROSS-EXAMINATION
16    BY MS. MAPP:
17    Q    Good morning, Mr. Spruance.
18    A    Good morning.
19    Q    You completed this life care plan on April 29, 2019;
20    correct?
21    A    Correct.
22    Q    And prior to completing the plan, you only spoke with
23    Dr. Topp once on April 23rd?
24    A    Correct.
25    Q    And you only spoke with Dr. Pardo once on April 25th?
```

1   A    Correct.

2   Q    You only spoke with Mr. Triolo once on April 1st?

3   A    Correct.

4   Q    During direct examination, you testified that your low,

5   mid, high costs, you came to those numbers by using the

6   50th and 75th percentile; is that correct?

7   A    Correct.

8   Q    Why did you not use the 25th percentile?

9   A    It's not -- it's not published.  The publishing -- the --

10  both references start at the 50th percentile, and then include

11  75thth and 90th, but there's no lower percentile available, no

12  lower percentile published by these two references.

13  Q    So it's available; it's just not -- there is a 25th

14  percentile, but it's just not available to you?

15  A    Well, I'm sure there is a 25th percentile.  Statistically

16  there must be, but it's not -- I've not seen it published.

17  Q    You also reference CPT codes in structuring the cost for

18  your life care plan; correct?

19  A    Correct.

20  Q    But you do not actually reference the specific CPT code

21  utilized in your life care plan?

22  A    Not in the charts; in our worksheets, we do.  We have the

23  CPT codes identified.  But I don't -- I don't include those in

24  the charts, no.

25  Q    And you also have an estimated life expectancy for

 1   Mr. Triolo; correct?

 2   A    Correct.

 3   Q    The recommended cost does not indicate the length of time

 4   Mr. Triolo will need each of the various treatments

 5   recommended?

 6   A    Well, it does as far as the surgery goes.  That's a

 7   one-time event over his life expectancy.  And then the pain

 8   management treatment is anticipated to be annually for -- for

 9   life expectancy.  In other words, there's no curative date for

10   this treatment.  It's not a curative type of treatment.  It's

11   pain management.  It's palliative.  So the anticipation was --

12   my understanding is the anticipation was that this would be

13   repeated annually.

14   Q    Back to your anticipation, the doctors themselves did not

15   tell you this?

16   A    No.  Dr. Pardo did tell me that this would be ongoing for

17   *ad infinitum*.

18   Q    Let's refer to your life care plan.

19        You reviewed Mr. Triolo's medical records through

20   September 13th, 2018; correct?

21   A    Correct.

22   Q    And your life care plan assumes that all of Mr. Triolo's

23   injury complaints were caused by the February 11, 2017,

24   accident?

25   A    It does.

1    Q     And it would only be appropriate to include items in your

2    life care plan related to that February 11, 2017, accident;

3    correct?

4    A     Yes.  In the life care plan, we try to capture the

5    expenses for treatment as a result of a specific incident, and,

6    in this case, February 11, 2017.

7    Q     And you testified that you are not a medical doctor; is

8    that correct?

9    A     That's correct.

10   Q     And you did not conduct any independent analysis to

11   determine whether or not Mr. Triolo's injuries were actually

12   the result of the February 11, 2017, accident?

13   A     No, not -- that would be above my expertise -- beyond my

14   expertise.

15   Q     You also did not create a vocational rehabilitation plan

16   for Mr. Triolo; is that correct?

17   A     That's correct.

18   Q     Now, Mr. Triolo is still able to pursue his current career

19   as a respiratory therapist?

20   A     Correct.

21   Q     And he is not -- Mr. Triolo is not currently on a modified

22   disability work plan?

23   A     I don't know about currently, because I haven't spoken

24   with him.

25   Q     At the time you created your life care plan, Mr. Triolo

1  was not on a modified disability work plan?

2  A    As far as I know, he was not.

3  Q    On your life care plan --

4        Ms. Sabino, if you could pull up the life care plan,

5  please, at the first page with the life care plan summary.

6        At the upper right-hand corner of this page, you

7  indicate primary impairment as orthopedic injuries; is that

8  correct?

9  A    Yes.

10 Q    However, your report does not specify which or what

11 orthopedic injury?

12 A    No.  We try to keep -- on the title page and every

13 subsequent page where that's repeated, we try to keep that very

14 vague and generic on purpose.

15 Q    Your report or life care plan also does not include a

16 specific list of injuries or diagnoses to which your life care

17 plan relates?

18 A    We talked about it a little bit in the narrative part of

19 the report, but we're just projecting -- regardless of what the

20 injuries were in the past, because oftentimes people suffer

21 multiple injuries but recover from some of them.  So for the

22 purpose of a life care plan, of course, we're just projecting

23 the need for future treatment for this lumbar injury, so I did

24 not -- I think I mentioned it in the narrative, the type of

25 injuries that he received, but the focus of the life care plan

 1   is the lumbar.

 2   Q    And just to be clear, there is no specific list of

 3   injuries or diagnoses within the actual life care plan?

 4   A    Other than that lumbar injury, no.

 5            MS. MAPP:  If we could turn, Ms. Sabino, to the next

 6   page with the future medical care routine treatment.

 7   BY MS. MAPP:

 8   Q    On this page, you recommend urine drug screening four to

 9   six times annually; is that correct?

10   A    Well, yeah.  It's not my recommendation.  That's what

11   Dr. Pardo had suggested.  That's their protocol.

12   Q    Yes, I apologize.  You recommend costs for urine drug

13   tests being conducted four to six times annually?

14   A    Yes.  We identify those costs associated with that

15   projection.

16   Q    And this was recommended by Dr. Pardo?

17   A    Yes.

18   Q    Are you aware that Dr. Pardo's medical records do not

19   indicate that a single urine drug test has been conducted of

20   Mr. Triolo throughout his treatment?

21   A    I don't know if -- sometimes they're not captured in the

22   narrative part of the report; sometimes they're captured on the

23   billing report, so I can't say one way or the other.

24   Q    Your chart next mentions an orthopedic follow-up with

25   X-ray.  Is that correct?

 1    A    Yes.

 2    Q    And this is recommended by Dr. Topp?

 3    A    Yes.

 4    Q    Are you aware that Mr. Triolo has not had a visit with

 5    Dr. Topp since September of 2018?

 6    A    That's the last record I have from Dr. Topp,

 7    September 2018.

 8    Q    Are you also aware that Mr. Triolo has not seen any other

 9    orthopedist since his last visit to Dr. Topp exactly two years

10    ago today?

11    A    I mean, that's the only record I have.  That's the only

12    orthopedic record -- or the most recent orthopedic record I

13    have is September 13, 2018.

14            MS. MAPP:  I'd like to turn to the next page.  I'm

15    sorry, the -- the page titled Future Medical Care, Aggressive

16    Treatment.

17    BY MS. MAPP:

18    Q    On this page, you recommend costs for bilateral

19    three-level lumbar radiofrequency ablation, as recommended by

20    Dr. Pardo.  Is that correct?

21    A    Yes.

22    Q    Did Dr. Pardo inform you that as an individual ages, the

23    frequency of radiofrequency ablations decreases?

24    A    No, he did not.

25    Q    I think you testified earlier that you were specifically

1   retained to give your opinion in this case; is that correct?

2   A    Well, I was retained to do an evaluation and to provide a

3   vocational opinion and a life care plan opinion, if applicable,

4   yes.

5   Q    And you were paid for your services?

6   A    Yes.

7   Q    How were you paid?

8   A    Well, we -- we obtain a retainer to initiate every case, a

9   $2,000 retainer, and then we bill as the case goes on.

10  Q    And you created a fee schedule; is that correct?

11  A    Yes, we do have a fee schedule.

12  Q    And your fee schedule makes clear that your fees are not

13  contingency based; is that correct?

14  A    That's correct.

15  Q    Why are your fees not contingency based?

16  A    Well, it just really would be an ethical violation of my

17  profession as a CRC and a certified life care planner.

18         So we charge an hourly fee, and it doesn't fluctuate

19  based on, maybe, you know, the outcome of a case or anything.

20  We just -- we charge for our services.

21  Q    So from an integrity standpoint, it's important that your

22  opinion as an expert not be perceived as biased due to your

23  payment arrangement.  Is that a fair statement?

24  A    I mean, that's -- that's my objective, yes.

25         MS. MAPP:  Thank you, Your Honor.  No further

 1  questions.

 2          MR. MOORE:  I don't have any follow-up, Your Honor.

 3          THE COURT:  All right.  You may step down.

 4          I'll ask you to remove that microphone cover and

 5  throw it in the garbage can that's to your left.

 6          THE WITNESS:  Thank you, Your Honor.

 7          THE COURT:  And you'll also need to put your mask

 8  back on to exit the courthouse.

 9          Thank you, sir.

10          All right.  Mr. Moore and Mr. Kinney, does that

11  complete the plaintiff's case?

12          MR. KINNEY:  That completes the plaintiff's case,

13  Your Honor.

14          THE COURT:  Okay.  Ms. Cunningham, do you have your

15  witness?

16          MS. CUNNINGHAM:  We do, Your Honor.

17          There are -- the witness is here and ready.  There

18  are a few exhibit-related issues that need to be addressed.

19          There's two that might be helpful to address before

20  the witness; the rest we could certainly address after.

21          THE COURT:  Okay.

22          MS. CUNNINGHAM:  We've attempted to resolve these

23  with plaintiff's counsel, but it's my understanding that we are

24  not in agreement.

25          So -- all right.  The first that I'll bring up, Your

 1    Honor, is Defendant's Exhibit 10.  This is an Accident Report

 2    that our next witness created and can lay the foundation for,

 3    if need be.

 4            It was the one report from the Postal Service that

 5    was not based on -- may I take my mask off?

 6            THE COURT:  Yes.

 7            MS. CUNNINGHAM:  That was not stipulated to by

 8    plaintiff's counsel.

 9            The objection was based upon relevance, and they also

10    cited Federal Rules of Civil Procedure 803.  The document,

11    again, is Defendant's Exhibit 10.  It's the PS Form 1769.  It's

12    an Accident Report.  The document is clearly relevant.  It

13    pertains to the February 2017 accident.

14            Ms. Sigouin completed it as part of her duties at the

15    Postal Service.  As I indicated, she can lay a foundation for

16    it if necessary, and it integrates information that has already

17    been stipulated into evidence such as the other Postal Service

18    report and evidence, as well as providing some additional

19    information.

20            THE COURT:  And what was the objection?

21            MR. KINNEY:  Yes, Your Honor.

22            THE COURT:  Wait, wait.  Let me get a copy of it so I

23    know what we're talking about.

24            Oh, it would be in that little --

25            MS. CUNNINGHAM:  Yes, Your Honor.

 1            MR. KINNEY:  I'll be referring in part to Exhibit 9

 2    and 10 during my presentation, Your Honor.

 3            THE COURT:  All right.  Go ahead.

 4            MR. KINNEY:  Your Honor, my concern with -- in

 5    wanting to let -- ask this witness to lay a foundation is that

 6    Exhibit 10, to me, I believe this was prepared in anticipation

 7    of litigation.

 8            Because if you look at paragraph -- excuse me,

 9    Exhibit 9, this is their accident investigation worksheet that

10    appeared to be filled out at the scene.  It has the diagram of

11    the accident, pertinent information, and then -- typical of

12    almost like a police report type accident investigation done by

13    the Postal Service worker on scene.

14            This document, Exhibit 10, or proposed Exhibit 10,

15    looks like something done after the fact, and it, to me, looks

16    like it was done for purposes of or in anticipation of

17    litigation.  If that's the case, then I don't believe it falls

18    within the hearsay exception.

19            THE COURT:  I think those are questions that we need

20    to ask of the witness.  If you --

21            MS. CUNNINGHAM:  Well, Your Honor, I can say that

22    this particular articulation of the objection I have not heard

23    before, and I can tell you that both of these documents were

24    prepared at the same time on the same date by the witness.  So

25    if she needs to testify to that, then we can certainly have her

 1  do that.

 2          But even on the Defendant's Exhibit 10, it indicates

 3  on the bottom, date submitted, February 11, 2017.  And her

 4  signature indicates on the first page of the document,

 5  USPS0051, the date submitted is February 11, 2017.

 6          THE COURT:  I mean, to the extent your objection is

 7  based on it being prepared in anticipation of litigation,

 8  unless -- unless that's the evidence, I don't think there's a

 9  basis for that objection.

10          So is there another objection, Mr. Kinney?

11          MR. KINNEY:  No, that's my objection.  I know it says

12  date submitted.  Is that referring to the back of this other

13  document?  Because if you look at date printed, that's a

14  different day.

15          So my objection is the -- it appears to me that this

16  is something prepared in anticipation of litigation, but that's

17  why I was wanting to hear the foundation from the witness.

18          THE COURT:  Well, we'll hear that from the witness

19  and you can move it in once you've gotten -- once you've laid

20  the foundation.

21          MS. CUNNINGHAM:  All right.  Thank you, Your Honor.

22          And Ms. Mapp will be presenting that testimony.

23          The one other item that might be prudent to address

24  before Ms. Sigouin testifies is there had been an objection

25  earlier in the week last week to the submission of the Florida

  1  Traffic Crash Report, and I don't believe we ever circled back
  2  to that.
  3          Plaintiff had objected that it was inadmissible under
  4  Florida Statutes 316.0664.  The -- I've presented this
  5  information to plaintiff's counsel, but it's my understanding,
  6  based upon the way the statute is written and the applicable
  7  case law, that the privilege found there applies to statements
  8  made by a person involved in a crash to a law enforcement
  9  officer for the purpose of completing a crash report, but it
 10  does not apply to the information that the officer observes or
 11  records independently.  And there's been, you know, a number of
 12  cases addressing this, and I'm happy to provide the Court with
 13  citations.
 14          Judge Adams ruled on it in a prior FTCA case, *Gitr*
 15  *versus United States*, G-i-t-r.  That's Case No. 3:08-cv-622.
 16  The Westlaw cite is 2009 WL 10670817, Middle District of
 17  Florida, October 29, 2009.
 18          In the Gitr case, Judge Adams cited the *Hendricks*
 19  *versus EvenFlow Incorporated* case out of the Northern District
 20  of Florida.  That cite is 255 F.R.D. 568, at page 579, note 19.
 21          And there, the Court found -- rejected an argument
 22  that -- that the Accident Report may not be used in a trial,
 23  found that argument meritless.
 24          Both of the cases point out that the privilege
 25  applies only to the statements or reports provided by the

 1   drivers of the vehicles.

 2          And there is an underlying Florida State Supreme

 3   Court case, *Brackin*, B-r-a-c-k-i-n, *versus Boles*, B-o-l-e-s, at

 4   4 -- pardon me.  That citation is 452 So.2d at 540, which is a

 5   1984 case.

 6          And in that case, they held that the purpose of the

 7   statute was to clothe -- clothe with statutory immunity only

 8   such statements and communication as the driver, owner, or

 9   occupant of the vehicle is compelled to make in order to comply

10   with the statutory duty under the statute.

11          There's a section of the statute that requires

12   individuals to make their own crash report and provide it to a

13   police department if an officer is not present at the scene to

14   make a crash report.  And so that is explained in these cases.

15          There also, I saw this morning, is an

16   Eleventh Circuit case that's a more recent case, *Cardona*,

17   C-a-r-d-o-n-a, *versus Mason and Dixon Line*, 737 Fed.Appx. 978.

18   That's a 2018 case that basically echos the same issues.

19          Here, we believe the report is relevant because

20   plaintiff has testified regarding the length of time he waited

21   for the officer to arrive on the scene of the accident, and the

22   length of the time it took for the officer to finish his work

23   on the scene.  The traffic crash report reflects the time the

24   officer arrived and cleared the scene.  The times reflected

25   there are consistent with the United States Postal Service

TRIOLO v USA          September 28, 2020     Vol IV- 44

```
 1    documentation, and I expect it will be consistent with the
 2    testimony that we'll hear later today.
 3              We have provided plaintiff's counsel with a redacted
 4    version of the report that redacts everything that appears to
 5    be a statement or report provided by the drivers.
 6              We've asked them to identify anything else that they
 7    think should be redacted.  They have not identified anything
 8    else at this time and I understand that to be because
 9    plaintiff's counsel objects to its admission even in the
10    redacted form.
11              THE COURT:  All right.  Mr. Kinney?
12              MR. KINNEY:  Yes, Your Honor.  So I'm not sure
13    what -- in the cases that she just read off to you, I'm not
14    sure what the purpose of submitting the traffic crash report
15    was, what witness testified about it, what was it used to
16    refresh the memory.
17              In this case, they're not going to bring the officer
18    to testify to refresh his memory today, they're going to bring
19    their own accident investigator because it's her own report,
20    and she's going to testify based on that.
21              But it appears that she wants to bring in just the
22    report alone without anything to corroborate or even to refresh
23    a witness's memory.  So what's its purpose for at this point?
24    No one is going to testify about it.
25              And even the times alone, Judge, would be a
```

 1   representation from the parties to the crash.

 2          For instance, the date -- excuse me, the time that

 3   the collision happened would have had to have been reported by

 4   Mr. Triolo or Ms. Rentz.  It couldn't have been reported by the

 5   police because they weren't there at the accident scene when it

 6   happened.

 7          So the officer's observations, I believe, are

 8   correct.  If there's independent officer observations, that

 9   could be included, such as the officer observed the VIN number.

10   He observed the type of the vehicle, whether it had four doors,

11   two doors, red color, blue color, that sort of thing.

12          It could identify the intersecting street, the county

13   it's in, all those things the officer observed.

14          But the other information, the times, which I think

15   what she's doing is trying to say:  Well, Mr. Triolo is not

16   being accurate with the times, but the times in the report

17   would have had to have been -- at least the start time has to

18   be reported by Mr. Triolo, which under the statute should not

19   be admitted.

20          And again, Your Honor, who is going to testify about

21   this document?  It's just being proposed to be submitted and

22   that's it.

23          THE COURT:  Yeah, I guess -- well, first of all --

24   sorry.  I too have to have the microphone.

25          I'm trying to see where those times that you're

 1   talking about -- not the accident time, the --

 2               MS. CUNNINGHAM:  Yes, Your Honor.

 3               THE COURT:  -- when he arrived and when he cleared.

 4               MS. CUNNINGHAM:  At the very top of the first -- the

 5   very first section says:  Time of crash, and down below that

 6   there's a section called Crash Identifiers.  And the second

 7   line in that section says:  Time on scene and time cleared

 8   scene.

 9               Those are the two pieces of information that would

10   have been from the officer and not from the drivers.

11               THE COURT:  Is this Exhibit 7?

12               MS. CUNNINGHAM:  Your Honor, this was Exhibit 5.

13   When the plaintiffs had originally objected to it, the only

14   basis of the objection was that it was inadmissible under the

15   statute.

16               I told them that we had briefed this issue in other

17   cases, but when I looked back at report, it didn't seem to me

18   there was anything we were going to need to rely on or utilize

19   it for.  So we actually took it off the exhibit list.

20               And then when in the plaintiff's -- when Mr. Triolo

21   testified, he made representations about the length of time he

22   had to wait for the police officer to arrive, and then

23   representations about the length of time he waited on the scene

24   for the police officer to complete his work, thus making this

25   relevant in a way that I hadn't anticipated it would be

 1  relevant.

 2          But the original objection was simply based upon the

 3  statute.  It was not based on any other reason.

 4          THE COURT:  All right.

 5          MR. KINNEY:  Your Honor, I'm sorry.

 6          THE COURT:  Go ahead.

 7          MR. KINNEY:  Yes, Your Honor.  I believe on the third

 8  row of information, the time cleared scene, that's the problem

 9  with not bringing a witness to testify about a report or about

10  their recollection, then I get no cross-examination about:

11  Well, how well is your typing?

12          You put 1:48, twenty minutes after you arrived on

13  scene, but, you know, is your report accurate?  Did it take an

14  hour?  Is your own memory that you were there about an hour, at

15  the scene out there about an hour?  Like Mr. Triolo's brother

16  testified, like Mr. Triolo testified.

17          So it's not something that, you know, in my -- in the

18  plaintiff's view that this should just be admitted in and of

19  itself, by itself.

20          THE COURT:  I guess, Ms. Cunningham, what witness are

21  you going to get this document in through?

22          MS. CUNNINGHAM:  Well, Your Honor, two things.  The

23  original objection, as I understood it, was never that we

24  needed a witness to authenticate it or do something of that

25  nature simply based on the privilege.

 1          Second of all, the Postal Service witness who will be
 2   testifying did obtain a copy of this report in the ordinary
 3   course of her work, and it corroborates her recollection of
 4   when the scene was cleared, and also is consistent with the
 5   Postal Service documentation about when she arrived on the
 6   scene and whether or not the police were there at that time.
 7          So it is not without, you know, anchoring testimony.
 8   I did not think it was going to be necessary to bring the
 9   officer to testify to those two things, so we did not -- he was
10   not called to testify today.
11          THE COURT:  All right.  Just hold on a minute.
12          I was trying to find the -- what the stated
13   objections had been to the exhibit, and I'm not finding that
14   copy in my notebook.
15          MS. CUNNINGHAM:  Your Honor, it was Document 68.
16          THE COURT:  Here it is, yeah.
17          MS. CUNNINGHAM:  And it's -- it was listed in that
18   document as Defendant's Exhibit 5.
19          THE COURT:  All right.  So the only objections listed
20   in the objections was to the -- was based on the Florida
21   Statutes, which if the -- if the cases that Ms. Cunningham
22   described stand for the proposition which she stated, it would
23   seem to me that the document -- that the crash report would be
24   admissible so long as any statement by the individuals was
25   removed from it.

1          And I would agree that the time the accident occurred
2    is included in that, because the officer could not have known
3    that.  But to the extent we're talking about the time he
4    arrived and the time it was cleared, that -- that wouldn't, to
5    me, in any way be dependent on statements from the individuals,
6    and so I would think that it would be admissible.
7          Now, if the objection is that the officer needs to be
8    called in order to authenticate the exhibit, then I suppose,
9    given that that is a new objection, that I could allow the
10   Government to call the officer out of time to do so if that's
11   what we need to do, but I don't think it would be a basis to
12   exclude the evidence entirely, particularly based on the
13   objection that was originally raised.
14         So I'm not sure that it can otherwise come in through
15   the postal worker witness, though.  You would have to explain
16   to me how she can introduce it, but I think the officer could.
17         So I'll let you-all think about how you want to do
18   that.
19         Are there other exhibits that we need to address
20   before you bring the witness in?
21         MS. CUNNINGHAM:  Your Honor, the other issues could
22   wait until after the witness.
23         THE COURT:  Okay.
24         MS. CUNNINGHAM:  Should we go get the witness, Your
25   Honor?

```
 1              THE COURT:  Yes, yes.
 2              MR. KINNEY:  Your Honor, they did list the officer on
 3     their witness list for defendant's witnesses.
 4              THE COURT:  That's why I said I would allow him to be
 5     called out of time.
 6              COURTROOM DEPUTY:  Do you solemnly swear that the
 7     testimony you're about to give before this Court will be the
 8     truth, the whole truth, and nothing but the truth, so help you
 9     God?
10              THE WITNESS:  I do.
11              COURTROOM DEPUTY:  Thank you, please be seated.
12              THE COURT:  Ma'am, you can remove your mask while
13     you're testifying.  Go ahead.
14              JEANETTE SIGOUIN, DEFENDANT'S WITNESS, SWORN
15                         DIRECT EXAMINATION
16     BY MS. MAPP:
17     Q    Good morning.  Can you please state your name and spell it
18     for the record.
19     A    Jeanette, J-e-a-n-e-t-t-e, S-i-g-o-u-i-n.
20     Q    Good morning, Ms. Sigouin.
21     A    Good morning.
22     Q    Where are you currently employed?
23     A    United States Postal Service.
24     Q    And how long have you been with the United States Postal
25     Service?
```

 1    A    Almost 24 years.

 2    Q    What is your current position with the Postal Service?

 3    A    Supervisor of the Postal Service.

 4    Q    How long have you held this position?

 5    A    Since 2004.

 6    Q    And what are your duties of this position?

 7    A    In charge of the stamp stock.  I schedule the clerks.  I'm

 8    there at night as a closer, so when the carriers come back,

 9    clear all the parcels and assist customers in the lobby,

10    numerous -- I have numerous jobs there.

11    Q    Are you also responsible for supervising carriers?

12    A    Yes.  We are rural and city carriers.

13    Q    What is the difference between a rural and city carrier?

14    A    Rural carriers are paid based on their evaluated route.

15    City carriers are paid hourly.

16    Q    Are you familiar with Marsha Rentz?

17    A    Yes.  She was an RCA at our Mandarin location.

18    Q    And RCA stands for?

19    A    Rural Carrier Assistant.  She was not a full-time employee

20    with regular benefits.

21    Q    As a customer service supervisor in charge of supervision

22    over carriers, have you ever been called to an accident scene?

23    A    Yes.

24    Q    How many times prior to February 11, 2017, would you say

25    you've been called to an accident scene?

1    A    Probably more than ten.

2    Q    What do you do when you arrive at an accident scene?

3    A    When we arrive to the accident scene, we verify all people

4    involved are okay.  We take pictures of the scene, find out

5    what happened.  Prior to normally us getting there, the police

6    officer has already arrived on scene, so we wait till the

7    person does all their investigation, and that's basically them.

8    You know, we make sure we take pictures of both vehicles

9    involved, and that's basically it.

10   Q    If any injuries are reported, what do you do?

11   A    We would call an ambulance.

12   Q    Is that information reported anywhere?

13   A    Yes.  It's on the Accident Report that we have to fill

14   out.

15   Q    What was your duty location on February 11, 2017?

16   A    Mandarin Post Office, 4411 Sunbeam Road, Jacksonville,

17   Florida 32257.

18   Q    And how long have you been stationed at the Mandarin

19   station?

20   A    September of 2014.

21   Q    That's when you began your --

22   A    I transferred to the Jacksonville post office then, yes.

23   Q    And on February 11th, how did you first come to hear of

24   the accident?

25   A    Marsha called me.

1   Q    Do you know where Ms. Rentz was when she called you?

2   A    She had called me from the parking lot of the church where

3   the incident -- right after the incident happened, because I

4   wasn't understanding where she was, so I had to ask her "where

5   are you," because there's numerous entrances to that church, to

6   the parking lot.  So I had to verify where I needed to go to

7   get in.

8   Q    And what time did you receive Ms. Rentz's phone call?

9   A    1:03 p.m.

10  Q    What did you do after you received Ms. Rentz's phone call?

11  A    I contacted the manager at the time, Crystal Thomas, via

12  the phone, and informed her of what happened.

13  Q    Why did you need to call Ms. Thomas?

14  A    Because I was the only supervisor in the building at the

15  time, and carriers are not allowed to drive a postal vehicle

16  after an accident, so someone else needed to be there to drive

17  the vehicle.

18  Q    How close from the Mandarin station was the church parking

19  lot?

20  A    Probably like 15-minute ride, depending on traffic.

21  Q    And so you said you contacted Ms. Thomas.  Did Ms. Thomas

22  go with you to the accident scene?

23  A    Yes, she did.

24  Q    What time did you and Ms. Thomas arrive at the scene?

25  A    Probably after 1:30, so 1:20.  I had to wait for her to

 1   come to the post office.

 2   Q    When you arrived in the church parking lot after the

 3   accident, did you park next to the postal vehicle?

 4   A    No.  I parked off to the left.  They were in parking

 5   spots, and the sheriff's car was blocking the other entrance,

 6   so I would have gotten stuck.  So I parked off to the left.

 7   Q    So when you arrived at the church parking lot after the

 8   accident, the sheriff officer was already on the scene?

 9   A    Yes.

10   Q    And after you parked the vehicle and you and Ms. Thomas

11   exited, what did you do?

12   A    We walked over to the parked vehicles.  They were parked

13   next to each other.  And Ms. Thomas asked Mr. Triolo if he was

14   okay.  And she [verbatim] said he was okay.  And Marsha, she

15   was okay, she was okay.  And we just waited for the officer to

16   finish with his investigation.

17   Q    If Mr. Triolo had said he was not okay, would you have

18   called an ambulance?

19   A    Yes.

20   Q    Would you have made any documentation of this?

21   A    Yes.

22   Q    Where would you have made this documentation?

23   A    On the accident form that I have to fill in on the

24   computer.

25   Q    Other than Ms. Rentz and Mr. Triolo and the sheriff's

1   officer, was there anyone else present in the parking lot at

2   the time you arrived?

3   A    There was another gentleman there.

4   Q    Did you speak with the officer?

5   A    I'm sorry?

6   Q    Did you speak with the officer?

7   A    No.  There was another gentleman other than the officer

8   there.

9   Q    Did you speak with the other gentleman?

10  A    No.

11  Q    Did you notice any animals at the scene?

12  A    There was a little dog.

13  Q    Did the dog appear to be injured?

14  A    No.

15  Q    Did -- while you were at the scene, did you engage in any

16  conversation with Mr. Triolo?

17  A    No.

18  Q    Why not?

19  A    He seemed upset due to the fact his vehicle was damaged.

20  Q    Why do you believe he was upset?

21  A    Because he looked angry.

22  Q    At any time while you were at the scene, did Mr. Triolo

23  tell you that he was injured?

24  A    No.

25  Q    Did he appear to you to be in any pain?

1  A    No.

2  Q    Did he appear dazed?

3  A    No.

4  Q    Did he appear to be in any need of medical attention?

5  A    No.

6  Q    Did you observe anything that would cause you to think

7  that Mr. Triolo was in any pain?

8  A    No.

9  Q    Was Mr. Triolo holding his back?

10 A    No.

11 Q    Did Mr. Triolo ever lean against his car for support?

12 A    No.

13 Q    Did Mr. Triolo ever tell you that his seat reclined in

14 such a way that caused him injury?

15 A    No.

16 Q    Did he tell this to Ms. Thomas?

17 A    No.

18 Q    Were you able to see the postal vehicle and Mr. Triolo's

19 vehicle in the parking lot?

20 A    Yes.  They were parked side by side.

21 Q    Did you observe any damages to the vehicle?

22 A    The Mustang had damage on the back bumper.

23 Q    Did you notice any damage to the postal vehicle?

24 A    No.

25 Q    After Mr. Triolo told Ms. Thomas he was okay, what did you

 1    do?

 2    A    I stood and waited with Ms. Marsha Rentz.

 3    Q    Where did you wait?

 4    A    Over by the other side of the postal vehicle.

 5    Q    When you say "the other side of the postal vehicle" --

 6    A    Sorry.  They were parked -- the postal vehicles are

 7    right-side drive.  That was where it was next to the Mustang.

 8    I was over by the back rear bumper, so it was right next to the

 9    vehicles, right there.

10    Q    Were you able to see Mr. Triolo the entire time that you

11    were present in the church parking lot?

12    A    Yes.

13    Q    Where was Ms. Thomas while you were waiting with

14    Ms. Rentz?

15    A    Ms. Thomas was taking pictures of the vehicles.

16    Q    Did you ever have an opportunity to review the pictures

17    that Ms. Thomas took?

18    A    Yes.

19    Q    Did you notice in the pictures Ms. Thomas took of the

20    postal vehicle that it appears the front grille is dented in?

21    A    Yes.

22    Q    Was that caused by the accident?

23    A    No.

24    Q    When did you leave the church parking lot after the

25    accident?

1    A    After the officer gave us the exchange-of-information

2    forms.

3    Q    And what is an exchange-of-information form?

4    A    General information about the two drivers, the information

5    on the vehicles, the insurance information.

6    Q    Approximately how long were you in the church parking lot

7    before you were able to leave?

8    A    Probably 20 minutes.

9    Q    Did you also receive a traffic crash report?

10   A    That, we picked up, after it was completed, from the

11   substation.

12   Q    Did you pick up the traffic crash report?

13   A    Yes.

14   Q    Do you recall when you would have done so?

15   A    It probably would have been a few days after the incident.

16   It's not ready -- immediately available the next day, and where

17   this was a Saturday, it would have been the following week.

18   Q    When you left the church parking lot after the accident,

19   who drove the postal vehicle?

20   A    Ms. Thomas.

21   Q    Why did Ms. Thomas -- where did Ms. Thomas go after

22   leaving the church parking lot?

23   A    She started the delivery of the route.

24   Q    Why did she have to do that?

25   A    Because it was -- she hadn't started the route yet, so the

1    mail had to get delivered that day.

2    Q    And who drove Ms. Rentz from the church parking lot?

3    A    Me, in my vehicle.

4    Q    And where did you go?

5    A    Back to the post office.

6    Q    What did you and Ms. Rentz do once you returned to the

7    post office?

8    A    She filled out the SF-91, which is the Accident Report for

9    her to fill out, and also a statement.

10   Q    Did you fill out any forms when you returned to the

11   station?

12   A    I fill out the bottom half.  She fills up to the sign on

13   the SF-91, I fill out the rest, and then I have to log on to

14   the computer and report it into the accident system.

15   Q    Are these forms something you normally fill out after an

16   accident?

17   A    Yes.

18        MS. MAPP:  I'd like to now refer to the SF-91, which

19   is Defendant's Exhibit No. 7 that's been entered into evidence.

20        Ms. Sabino, if you could please put it on the screen.

21   BY MS. MAPP:

22   Q    Ms. Sigouin, is this the form that Ms. Rentz filled out

23   upon your return to the postal station?

24   A    Yes.

25   Q    And if you could turn to -- you'll notice at the bottom

 1  right-hand corner, there is a notation that says USPS,

 2  underscore, with numbers following.  Those -- I will refer to

 3  those numbers when referring to pages.

 4          So if you could turn to USPS_0045.

 5          And if you could enlarge the bottom portion of the

 6  form, please.

 7          Ms. Sigouin, is that your signature on this form?

 8  A    Yes.

 9  Q    Why did you sign the form?

10  A    Because I was the one that responded to the scene.

11  Q    The first two pages of this form were -- who filled out

12  the first two pages of this form?

13  A    Marsha fills up to -- all the way up to 72.  Looks like

14  there's a black line through it, but looks like 72.

15  Q    So that's line 72?

16  A    71, I'm sorry.  She stops at 71, she signs, then the rest

17  down, I can't -- I think it's 72 where it says:  Details of

18  trip during which accident occurred.

19          From that point on, it's the supervisor that fills

20  that information out.

21  Q    And in this case, you were the supervisor?

22  A    Correct.

23  Q    If you could turn to the next page, USPS_0046.

24          Do you see the first question under Section 11 where

25  it states:  Did the investigation disclose conflicting

1   information?

2   A    Uh-huh.

3   Q    You checked the box "no."  Correct?

4   A    Yes.

5   Q    What would have caused you to check the box?  Well, I

6   guess, what is the purpose of this question?

7   A    To see if there's any indication that the employee is

8   reporting something other than what occurred.

9   Q    And what would have caused you to check the "yes" box?

10  A    Basically if the information that she's telling me doesn't

11  seem with what -- in line with what she's -- what happened.  If

12  there's any variation or story, then that's when that would be

13  checked off as yes.

14          THE COURT:  What box is this, what number?

15          MS. MAPP:  It's the top of USPS0046.  I believe --

16  you can't quite see the number, but it's the first section, 11.

17          THE COURT:  I see it.

18  BY MS. MAPP:

19  Q    So you checked the "no" box that indicates that

20  Ms. Rentz's -- why did you check the "no" box?

21  A    Because the information that I was provided by Ms. Rentz,

22  it coincided with what happened on the scene.

23  Q    Okay.  Now we're going to look at Defense Exhibit No. 8

24  that has already been entered into evidence.

25          Ms. Sigouin, have you seen this document before?

 1    A    Yes.

 2    Q    And what is it?

 3    A    This is Marsha Rentz's statement on the incident that

 4    happened.

 5    Q    And was this the statement you were referencing in the

 6    last exhibit when you stated it coincided with what you believe

 7    occurred?

 8    A    Yes.

 9    Q    And when was this statement completed?

10    A    Right after we arrived back at the post office on the same

11    day.

12    Q    Now I'd like to turn to Defendant's Exhibit No. 9.  This,

13    I believe, is the Form 1700; is that correct?

14    A    Yes.

15    Q    So this is a form filled out entirely by you?

16    A    Yes.

17    Q    When did you fill out this form?

18    A    After I received the SF-91 and her statement, I go off the

19    information to put it into the computer.

20              MS. MAPP:  Ms. Sabino, if you could enlarge the

21    bottom half of the page, beginning with line 13.

22              THE COURT:  Well, have you moved it into evidence?

23              MS. MAPP:  It's already in evidence, Your Honor.

24    It's Defendant's Exhibit No. 9.

25              THE COURT:  Was the objection only to 10?

TRIOLO v USA          September 28, 2020     Vol IV- 63

```
 1                    MS. MAPP:  That is my understanding, Your Honor.

 2                    MR. KINNEY:  That's correct.

 3                    THE COURT:  Okay.

 4    BY MS. MAPP:

 5    Q    Do you see line 14, where it indicates travel direction,

 6    Ms. Sigouin?

 7    A    Yes.

 8    Q    There is also a line that says:  Distance Traveled After

 9    Impact.

10                    Did you fill this portion in?

11    A    Yes.

12    Q    You indicated 15 feet.

13                    What does that mean?

14    A    From the time that the incident happened and then she

15    drove and parked in the parking lot, I was estimating that was

16    the distance.

17    Q    So the 15 feet indicates the distance between the impact

18    to the church parking lot?

19    A    Yes.

20    Q    Having reviewed the information today, do you have any

21    reason to change the distance traveled after impact?

22    A    Yes.

23                    MR. KINNEY:  Objection, Your Honor.  This was never

24    disclosed to us pretrial at all.  It's not a trial brief.

25    There's no foundation for this.  Now she's coming up with a new
```

 1  mechanical opinion as to the distance traveled of the vehicles?
 2  This has never been disclosed to us.
 3          THE COURT:  I'm going to hear the answer and you'll
 4  cross-examine her on it.
 5          Go ahead.
 6  BY MS. MAPP:
 7  Q    So, Ms. Sigouin, do you have any reason to believe the
 8  distance traveled from the traffic light to the church parking
 9  lot is any greater or less than the 15 feet?
10  A    I'm not a good estimate with feet.  I was guessing that
11  that was the distance that she drove from the point of impact
12  to drive to the parking lot.
13  Q    Thank you.
14          Now, if we could turn to the next page, USPS_0049.
15          And if you could enlarge the top half of that page,
16  Ms. Sabino, please.
17          Ms. Sigouin, do you see line 28 where it indicates
18  Time of Call?
19  A    Yes.
20  Q    What time is that?
21  A    It's 1:03 -- 1303, 1:03.
22  Q    And is that the time you received Ms. Rentz's phone call?
23  A    Yes.
24  Q    Do you see the box where it says Arrived at Scene?
25  A    Uh-huh.

1    Q    What time does that state?

2    A    1:31.

3    Q    And was that the time that you arrived at the church

4    parking lot following the accident?

5    A    Yes.

6    Q    Just to clarify again, when you arrived at 1:31, the JSO

7    officer was already at the scene?

8    A    Yes.

9    Q    You are also responsible for filling out a Form 1769; is

10   that correct?

11   A    Yes.  That's all electronic.

12   Q    When did you fill out the form 1769?

13   A    It's generated -- when I put all the information from the

14   SF-91 in, the statement is generated automatically on the

15   computer at the same time.

16   Q    Okay.  So -- all right.  So when you -- I refer to --

17         MR. KINNEY:  Your Honor, based on that, withdraw the

18   objection.

19         THE COURT:  All right.  Then Government's or

20   Defendant's 11 -- or 10 is admitted.

21     (Defendant's Exhibit 10 was admitted in evidence.)

22         THE COURT:  What's your question?

23         MS. MAPP:  Thank you, Your Honor.

24   BY SPEAKER 3:

25   Q    If you could please turn to Defendant's Exhibit No. 10.

 1                 And, Ms. Sabino, could you enlarge the bottom portion
 2      of the page, beginning with No. 1, Involved Persons.
 3                 Ms. Sigouin, do you see line 20 where it references
 4      involved person role?
 5      A    Yes.
 6      Q    It also indicates no injury or no fatalities existed on
 7      the accident?
 8      A    Yes.
 9      Q    How did you come to that conclusion?
10      A    Because when we got to the scene and inquired if anyone
11      was hurt, no one was hurt.
12      Q    And you also have -- turn to the next page, USPS0042.
13                 And if you could enlarge the page.
14                 So, Ms. Sigouin, who does that section refer to?
15      A    Mr. Triolo.
16      Q    It also indicates no injury; correct?
17      A    Yes.
18      Q    How did you come to that -- come by that information?
19      A    Because he stated there was no injury.
20      Q    If we could turn to the next page, USPS0053, and enlarge
21      the bottom page of that beginning with Accident Follow-up.
22                 Now, Ms. Sigouin, what follow-up, if any, did
23      Ms. Rentz receive after the accident?
24      A    She was not allowed to drive a postal vehicle until she
25      completes a four-hour online training course.

1    Q    Did Ms. Rentz complete this course?

2    A    Yes.

3    Q    Was Ms. Rentz able to drive a postal vehicle thereafter?

4    A    Yes.

5         MS. MAPP:  Thank you, Your Honor.  I have no further

6    questions.

7         THE COURT:  Mr. Kinney?

8         MR. KINNEY:  Yes, Your Honor.

9                        CROSS-EXAMINATION

10   BY MR. KINNEY:

11   Q    Ms. Sigouin, how are you?  I'm Philip Kinney.  I represent

12   Richard Triolo.

13        We've never met before; right?

14   A    No.

15   Q    And you have met defense counsel before today; correct?

16   A    Yes.

17   Q    Ma'am, could you estimate for me -- what's the distance

18   between me and you right now?

19   A    I don't know.  5 feet?

20   Q    All right.  Do you still have all those exhibits in front

21   of you?

22   A    Yes.

23   Q    Thank you.

24        Looking at Exhibit No. 10, that's your PS Form 1769,

25   is that -- all of the information in that form taken from

```
 1    Exhibit No. 9, which is the Form 1700?

 2    A    That, and -- along with the statement that the carrier

 3    writes.

 4    Q    Okay.

 5    A    And all -- yes.

 6    Q    All right.

 7         You went to the scene of the collision; right?

 8    A    Yes.

 9    Q    And you went there with a woman named Ms. Thomas?

10    A    Yes.

11    Q    And she was your supervisor or your coworker?

12    A    She was the manager of the building at the time.

13    Q    Okay.  And so you both went, got to the scene.

14         When you got to the scene, was it raining outside?

15    A    No, it was clear.

16    Q    Did it appear it had rained earlier that day?

17    A    No.

18    Q    Did you examine the postal vehicle?

19    A    I looked at the front of the vehicle.

20    Q    Did you look inside the vehicle?

21    A    Yes.

22    Q    Did you look at the floorboards?

23    A    The floorboards of the inside of it?

24    Q    Of the postal vehicle, yes.  The floorboards.

25    A    Where her feet are or the mail?
```

 1   Q     Both.  Did you look at --

 2   A     I stood by the door and looked in the inside.

 3   Q     Did you happen to notice the brake pedal?

 4   A     No.

 5   Q     Okay.  Do you recall -- in the carrier report, it explains

 6   that her foot slipped off the brake pedal; right?

 7   A     Yes.

 8   Q     Okay.  And so you didn't do any type of investigation to

 9   look at the brake pedal?

10   A     No.

11   Q     Did you look at her shoes?

12   A     No.

13   Q     Okay.  Well, if her foot slipped off the brake pedal, why

14   didn't you investigate that?

15   A     Well, she is required to wear specific shoes for the post

16   office that are slip-proof shoes.

17   Q     So she's wearing -- was she wearing her -- was she wearing

18   the required shoes that day?

19   A     Yes, I would assume she would.  I would not take -- I

20   didn't take pictures of it, though.

21   Q     If she wasn't wearing them, you would have noted that in

22   your report?

23   A     Yes.

24   Q     And when she told you that you -- that her foot just

25   merely slipped off the brake pedal, you did not do anything to

1    verify that; correct?

2    A    No.

3    Q    Mr. Triolo, at the time, reported to you that the postal

4    employee, Ms. Rentz, had the phone in her hand, up to her face,

5    at the time of impact.

6            Do you recall that?

7    A    No.

8    Q    Okay.  You don't recall Mr. Triolo telling you that?

9    A    No.

10   Q    Okay.  If Ms. Rentz was on her phone at the time of

11   impact, would that have been a violation of the driving rules?

12   A    Postal employees are not allowed to use a cell phone while

13   driving a postal vehicle.

14   Q    So if she was on her phone like Mr. Triolo saw it, that

15   would have been a violation; correct?

16   A    Yes.

17   Q    And you didn't see anything that would indicate a cause

18   for a foot to slip off a brake; right?

19   A    No.

20   Q    In your report on -- I think we're back on Exhibit 9.

21           Do you still have that in front of you?

22   A    Uh-huh.

23   Q    If you would, look down at page 48.  The Bates stamp is 48

24   I'm on.  And then line 14.  Do you see where it says Direction

25   of Travel?

 1    A    Yes.

 2    Q    And it says Straight Ahead.  What should I take that to

 3    mean?

 4    A    Well, which direction was she traveling when the incident

 5    happened?  Was she turning?  Was she going right, left?  Was

 6    she backing up?

 7              That's what that means.

 8    Q    Okay.  So does this mean she was traveling straight ahead

 9    at the point of impact?

10    A    What direction was she driving?  Was she driving straight?

11    Was she turning right, left, or going backwards?

12              That's what it was asking me when I fill out the

13    report.  So she would have been going straight.

14    Q    Maybe we're saying the same thing.

15              When the impact happened, if I wanted to know if she

16    was going straight, I see on line 14 the words "straight

17    ahead."  Does that mean she was driving straight ahead at the

18    point of impact?

19    A    She was stopped and she was heading straight in that

20    direction, so, yes, straight ahead.

21    Q    Okay.  You would agree with me she couldn't have been at a

22    stop if an impact occurred; right?

23    A    Not if her foot slipped off the brake, then she would have

24    gone forward.

25    Q    So her vehicle was traveling forward at the time of

1   impact; right?

2   A    After she had stopped and her foot slipped off the brake,

3   then she did travel forward.

4   Q    Okay.  Based on Exhibit 9, at the time of impact, was

5   her -- was the travel direction straight ahead?

6   A    She did go straight ahead.

7   Q    Okay.

8   A    Yes.

9   Q    All right.  So at the time of impact, she's going straight

10  ahead.  And then right next to it, it's seeking to know how far

11  her vehicle traveled after the point of impact; correct?

12  A    Yes.

13  Q    And her vehicle traveled 15 feet after the point of

14  impact; correct?

15  A    Yes.  But when I put in the information, I always

16  interpreted it as from the time that she -- the incident

17  happened until the time that she stopped and drove, was into

18  the parking lot.

19  Q    Ma'am, that's not what this form is asking, is it?

20  A    Okay.  Well, then that's my misunderstanding on the form,

21  but I -- that's the way I interpreted it.  If she had hit him

22  15 feet, it would have been in the middle of the intersection.

23  Q    Ma'am, that would just be -- well, since you said it, do

24  you know how many --

25  A    This is --

 1  Q      Hold on.

 2             THE COURT:  Whoa, whoa, whoa.  One at a time, please.

 3             THE WITNESS:  Okay.

 4  BY MR. KINNEY:

 5  Q      Since you said it, do you know how many vehicles back he

 6  was at the red light before she hit him?

 7  A      I believe he was at the front.

 8  Q      So you don't know, do you?

 9  A      No, I don't.

10  Q      It's not in your report either, is it?

11  A      I don't believe it is.

12  Q      You were speculating when you said that; right?

13  A      Well, I'm not speculating.  When I put in this 15 feet,

14  it's the distance that she drove from the point of impact to

15  where she went to the parking lot.  This is where I -- that's

16  why I put that in there.  That's what that means to me.

17  Q      When you said he was at the front of the line at this red

18  light, you were just speculating; right?  You have no

19  information --

20  A      That, I do not know.

21  Q      And you would agree with me, the point of impact, if he

22  was -- if he was several vehicles back stopped, waiting at the

23  red light, the distance traveled from there to the parking lot

24  where you met up with him is much greater than 15 feet;

25  correct?

 1   A    I'm honestly -- I am a bad judge of character for feet,

 2   but if that was the case, then all the vehicles in front of

 3   Mr. Triolo, he would have rear-ended.  It would have been a

 4   chain --

 5            MR. KINNEY:  Move to strike.  There's no --

 6            THE COURT:  Whoa, whoa, whoa, whoa.

 7            What are you moving to strike, Mr. Kinney?

 8            MR. KINNEY:  There was no question pending about what

 9   his vehicle would have done.  She would only be able to

10   speculate as to the forces necessary to drive Mr. Triolo's

11   ahead, with a foot with a brake applied, into other vehicles.

12            THE COURT:  All right.  I'm going to disregard that

13   portion of her testimony.

14            Go ahead and ask your next question.

15   BY MR. KINNEY:

16   Q    In Exhibit No. 9, nowhere in here did you indicate that

17   there was preexisting damage to the postal vehicle, did you?

18   A    No.

19   Q    And you acknowledged that there was damage to the front

20   end of the postal vehicle at the scene of the collision;

21   correct?

22   A    No, there was no damage to the vehicle.

23   Q    Have you seen the pictures lately?

24   A    Yes, I have.

25            MR. KINNEY:  Madam Clerk, may I have the screen,

```
 1    please.

 2    BY MR. KINNEY:

 3    Q    I'm going to put in -- I'm going to put up on the board

 4    page 1 from Plaintiff's Exhibit 35.

 5             Do you have that in front of you, Ms. Sigouin?

 6    A    Yes.

 7    Q    Okay.  Are you testifying that there's no damage to the

 8    front of that vehicle?

 9    A    The front bumper has white marks on it, but there's no

10    damage to the vehicle.

11    Q    Do you see any other damage to the front of that vehicle?

12    A    I see no damage to that vehicle.

13    Q    We're on page 3 of Plaintiff's Exhibit 35.

14             Ms. Sigouin, are you testifying there's no damage to

15    the front of the postal vehicle?

16    A    Which page are you on?

17    Q    I'm on page 3.  It's on the screen in front of you.  The

18    computer screen.

19             You don't have the -- oh, that one's blank?

20    A    Yeah.

21    Q    Okay.  We can turn it on.

22             Well, I tell you what, for expediency, if you look

23    over your right shoulder, this is page 3 from Plaintiff's

24    Exhibit 35.

25             Are you testifying there's no damage to the front of
```

 1   that vehicle?

 2   A    No.

 3   Q    No, there is no damage?

 4   A    No, there's no damage that I noticed when I went to the

 5   scene related to that, no.

 6   Q    That's a different answer.

 7        I'm asking you, looking at Plaintiff's Exhibit 35,

 8   page 3, are you testifying there's no damage to the front of

 9   that vehicle whatsoever?

10   A    Scratch marks on the bumper.

11   Q    And that's all you see?

12   A    Scratch marks.

13   Q    And that's all you see, ma'am?

14   A    Yes.

15   Q    Okay.  How much accident scene -- strike that.  How much

16   motor vehicle accident investigation training do you have?

17   A    We go through a training at the post office that's

18   probably a few-hour training, a few hours' worth.

19   Q    Three hours?

20   A    It's probably like four.

21   Q    Three to four hours?

22   A    Yes.

23   Q    What year did you do that?

24   A    2005.

25   Q    What about anything since 2010?

 1   A    No.

 2   Q    All right.  Is the entire -- was the entire communication

 3   between you and Mr. Triolo limited to the words "okay"?

 4            When you came to the scene and you asked him:  How

 5   are you?  And you testified he said, Okay, was that the sum

 6   total of that conversation?

 7   A    Yes.

 8   Q    And you did see him.  You said that he looked angry?

 9   A    Yes.

10   Q    Okay.  And would you agree with me that one of the

11   emotions that people exhibit when they're hurt and in pain is

12   anger?

13   A    It could.

14   Q    Are you aware that Mr. Triolo drove from the scene to

15   Baptist Medical Center Emergency Department on -- at Baptist

16   South?

17   A    No.

18            MS. MAPP:  Objection.  Outside the scope.

19            THE COURT:  Overruled.

20   BY MR. KINNEY:

21   Q    You had some training back in 2005 for accident scenes.

22            What about medical training?  Do you have any medical

23   training?

24   A    No.

25   Q    Okay.  All right.  Did you perform any type of physical

```
 1   exam on Mr. Triolo at the scene?
 2   A    No.
 3   Q    Are you aware, through your training or through other
 4   sources, that people are in auto accidents and that they can
 5   feel completely fine and then wake up the next morning not
 6   feeling fine?
 7   A    Possible.
 8   Q    And did you call Mr. Triolo or reach out to him in any way
 9   in the days after the collision to check on his health?
10   A    You don't contact them.
11   Q    Is that a no?
12   A    No -- yes, we do not contact them.
13   Q    Now you confused me.
14         Okay.  Which is it?  Did you call him or not?
15   A    No.
16   Q    Is Ms. Rentz still an employee?
17   A    No.
18         MR. KINNEY:  Okay.  Your Honor, thank you.
19         MS. CUNNINGHAM:  One moment.
20                   REDIRECT EXAMINATION
21   BY MS. MAPP:
22   Q    Ms. Sigouin, you were asked on cross-examination about
23   damage to the postal vehicle.  Do you recall that?
24   A    Yes.
25   Q    And you were shown a picture of it?
```

```
 1                THE COURT:  Pages 1 and 3.
 2                MS. MAPP:  I believe it was Plaintiff's Exhibit --
 3     page No. 1 and 3, Ms. Sabino, if you could pull it up on the
 4     screen, please.
 5                MR. KINNEY:  I think I'm the one that's going to have
 6     to do that.  It's exhibit 35.
 7                MS. MAPP:  We have it as well.
 8                MR. KINNEY:  You want 1 or 3?
 9                THE COURT:  I don't know who -- is that going from
10     the -- okay.
11     BY MS. MAPP:
12     Q    Looking at this picture, Ms. Sigouin, do you see where the
13     front grille of the vehicle is bent slightly inward?
14     A    Yes.
15     Q    Did you think that was caused as a result of the accident?
16                MR. KINNEY:  Objection.  Calls for speculation.
17                This was covered both on direct and cross, and she
18     clearly testified she saw nothing when looking at this picture.
19                THE COURT:  All right.  I'm going to allow the
20     question, but you need to rephrase it.
21     BY MS. MAPP:
22     Q    You did see where it's bent inward; correct?
23     A    Yes.
24     Q    Having seen that, why did you say there was no damage to
25     the postal vehicle?
```

1    A    Because where the bumper protrudes out, it's not far

2    enough to strike -- it hit the bumper of the vehicle, the

3    Mustang.  It protrudes out.  It wouldn't have touched the

4    Mustang, the upper portion, in the -- that's, you know -- I

5    don't know how to explain that.

6    Q    Okay.  So let me just see if I understand you correctly.

7         Is it your testimony that you don't believe -- is it

8    your testimony that the bumper of the postal vehicle was the

9    only object of that vehicle to hit the Mustang?

10         MR. KINNEY:  Objection.  Relevance.

11         What she believes means nothing in this case.

12         THE COURT:  Well, I think it calls for speculation.

13    So...

14         MR. KINNEY:  That's it.

15         THE COURT:  I'm going to sustain the objection.

16         It is possible that you can rephrase it, but the way

17    you're asking it is improper.

18         MS. MAPP:  Yes, Your Honor.

19    BY MS. MAPP:

20    Q    Ms. Sigouin, you were responsible for filling out Form

21    1700 in Exhibit 9; is that correct?

22    A    Yes.

23         MS. MAPP:  And, Ms. Sabino, if you can pull up page

24    USPS_0049.  And if you could enlarge the top half, lines 24

25    through 26 -- or, I'm sorry, 23 to 26.

```
 1   BY MS. MAPP:

 2   Q    So you stated that pictures of the vehicles were taken at

 3   the accident scene; is that correct?

 4   A    Yes.

 5   Q    And did you review those pictures before you filled out

 6   this form?

 7   A    Yes.

 8   Q    Okay.  And so you would have seen the picture that was

 9   previously on the screen prior to filling out this form?

10   A    Yes.

11   Q    Okay.  Having seen that picture, why did you indicate no

12   damage to the postal vehicle?

13   A    Because there's no visible damage at that time.

14   Q    Was the bent grille visible at the time you filled it out?

15   A    The postal vehicles are so old, they -- none of them are

16   in perfect condition.  That did not look like an issue that had

17   been -- occurred at that accident.

18   Q    And you were also asked about distance traveled after

19   impact.

20             Do you recall that?

21   A    Yes.

22   Q    Do you have any knowledge of the distance Mr. Triolo's

23   vehicle traveled after impact?

24   A    No.

25             MS. MAPP:  No, further questions, Your Honor.
```

```
 1              MR. KINNEY:  Your Honor, may I inquire?
 2              THE COURT:  You may recross.
 3                          RECROSS-EXAMINATION
 4    BY MR. KINNEY:
 5    Q    Ms. Sigouin, you changed your testimony here today; do you
 6    agree?
 7    A    No.
 8    Q    Ms. Sigouin, when I asked you about the two pictures,
 9    pages 1 and 3 of Exhibit 35, you told us that there was no
10    other damage than to that rubber bumper.
11              Do you remember that?
12    A    That is not damage.
13    Q    Okay.  And when defense counsel got up there and showed
14    you page 3, you then changed your testimony that now you do see
15    damage to the grille?
16    A    It's still not -- it's not considered damage to me from
17    that incident.
18    Q    Ma'am, when I asked you about the picture, you said there
19    was no damage other than you saw paint on the rubber bumper;
20    correct?
21    A    I would still look at that picture and say that there's no
22    damage.
23    Q    Nowhere in your Accident Report does it say that there was
24    any damage from any other prior incident; correct?
25    A    I wouldn't indicate that.  It doesn't ask me that.
```

1   Q    There's no place on your forms to put any note, any

2   comments?

3   A    No.  There's a section to put notes.  It asks me if

4   there's any vehicle damage -- there was no vehicle damage from

5   that accident.

6   Q    And you could have put on there that there was

7   pre-existing damage, couldn't you have?

8   A    In the notes section, I guess I could have.

9   Q    And you also did no investigation as to whether the damage

10  to the grille, from the bent-in grille, was caused by hitting

11  Mr. Triolo's back bumper, did you?

12  A    The glass on the headlights and all that would have been

13  shattered.

14  Q    You did not do any investigation as to what caused that --

15  the front bumper -- excuse me, the front grille of the postal

16  vehicle --

17  A    The way the bumper extends out and it matched the vehicle,

18  to me, in my opinion, it did not hit it.  It wouldn't have been

19  enough reach.

20  Q    Did you measure the height of the bumper?

21          MS. MAPP:  Your Honor --

22          THE COURT:  Mr. Kinney, you're interrupting the

23  witness.  Let her finish her sentences, please.

24          MR. KINNEY:  Yes, Your Honor.

25  BY MR. KINNEY:

1    Q    Did you measure the height of the bumpers of each vehicle?

2    A    No.

3    Q    Did you measure the distance between the bottom of

4    Mr. Triolo's vehicle, as far as the angle -- the angle that it

5    slides into the frame of the vehicle?

6    A    No.

7    Q    You're aware vehicles can -- when they hit each other,

8    they don't have to stay perfectly parallel.  One can slide

9    under the other; correct?

10              MS. MAPP:  Objection.  Calls for speculation.

11              THE COURT:  Overruled.

12   BY MR. KINNEY:

13   Q    Did you understand my question?

14   A    I'm sorry, no.

15   Q    You understand, from your accident training, one

16   vehicle -- when two vehicles bump, they don't have to meet

17   bumper to bumper and stay that way, one could slide under the

18   other; correct?

19   A    It could.

20   Q    And as you sit here right now, your testimony is that

21   there's no damage to the front of that postal vehicle; correct?

22   Excuse me, to the front grille of that postal vehicle; correct?

23   A    Yes.

24              MR. KINNEY:  Okay.  That's it.

25              THE COURT:  You may step down, ma'am.  I'll ask you

```
 1   to -- that microphone cover that's on there, I'll ask you to
 2   pull it off and throw it in the garbage can to the left, and
 3   you will need to replace your mask to exit the building.
 4           All right.  And I have Ms. Rentz's deposition.  I
 5   have not yet read it, but I will read it this afternoon.
 6           What else do we have, Ms. Cunningham?
 7           MS. CUNNINGHAM:  All right, Your Honor.  We just have
 8   a few last exhibits.
 9           THE COURT:  Okay.  Before we do that, my courtroom
10   deputy is out today, but she left a note about Plaintiff's
11   Exhibit 27, that -- something you-all thought was in evidence
12   but wasn't.
13           MR. KINNEY:  I have it here, Your Honor.  Apparently
14   we didn't move it in for some reason.  It's a one-time visit to
15   a physical therapy office.
16           THE COURT:  Is there an objection to that,
17   Ms. Cunningham?
18           MS. CUNNINGHAM:  No objection, Your Honor.
19           THE COURT:  All right.  Plaintiff's 27 is admitted.
20   And if you'll tender that to the courtroom deputy.
21        (Plaintiff's Exhibit 27 was admitted in evidence.)
22           THE COURT:  And then, Ms. Cunningham, with regard to
23   Defendant's Exhibit 5, are you going to -- well, I guess
24   I'll -- I'll let you confer with Mr. Kinney and Mr. Moore, if
25   they are in agreement to the admission of that or if you need
```

TRIOLO v USA          September 28, 2020      Vol IV- 86

```
 1    to call the officer to authenticate it.

 2          But because it was -- because the authentication

 3    objection hadn't been raised, and because he was on the witness

 4    list, if you need to call him out of time to do that, I think

 5    it's appropriate.

 6          But I'll let you-all confer and you can file a notice

 7    advising me of your agreement on that.

 8          MS. CUNNINGHAM:  Okay.  Thank you, Your Honor.

 9          THE COURT:  What are the other exhibit issues that we

10    need to address?

11          MS. CUNNINGHAM:  Yes, Your Honor.

12          There were a number of exhibits where plaintiff

13    stipulated to certain pages but not other pages.  And we had

14    not yet moved those into evidence.  So the first part of this

15    is we'd like to move those pages in.

16          There are also a handful of pages that have not been

17    stipulated to that we believe are relevant that we do seek to

18    admit.

19          I've conferred with plaintiff's counsel over the

20    weekend regarding the specific pages and articulating why I

21    thought it was appropriate to admit them.

22          It's my understanding that they object to the

23    admission of them.

24          We can go through them, but to give the Court an

25    overview, most of the documents in issue concerned PIP
```

 1   payments, insurance payments, and other items related to the
 2   billing.
 3          The plaintiff has not yet provided any information to
 4   the defendant regarding what they view as the PIP payments,
 5   insurance setoffs, and insurance adjustments that are
 6   applicable to Mr. Triolo's bills.
 7          THE COURT:  Why don't you wait until --
 8          MS. CUNNINGHAM:  So I -- I simply do not know yet if
 9   the parties are going to be in agreement on those issues.
10          I'm aware of at least one prior FTCA case where the
11   court found that the defendants were to present evidence to the
12   fact-finder as to the amount of those types of things, the PIP
13   payments and insurance setoffs.
14          We do typically include these in the exhibits that
15   are admitted.  I've never had anyone object to them before.
16   They certainly admitted them in the last FTCA trial we had with
17   Judge Corrigan.  And mostly I wanted to make sure that in the
18   event of a dispute, we have evidence in the record regarding
19   all of those matters.
20          That covers the bulk of the pages, and then there are
21   just a handful of other pages that are medically related, and I
22   can be specific about what those are.
23          MR. KINNEY:  Your Honor, it was my understanding,
24   posttrial, we were going to handle the setoffs for any
25   collateral sources in that I was going to provide them with an

 1  updated spreadsheet to include the columns that would show any

 2  collateral source payment.

 3           So I wasn't prepared to deal with collateral source

 4  today, but as far as when she said that I hadn't provided any

 5  updates, I thought we were doing that posttrial and we would

 6  get with you posttrial on those issues.

 7           Because we could come to agreement and then have an

 8  understanding as to what those setoffs are or are not.

 9           MS. CUNNINGHAM:  Your Honor, if I may.  I just don't

10  want to end up in a situation where -- where there's not an

11  agreement and we don't have evidence in the record about it.

12           Because, as I said, I'm aware of at least one prior

13  FTCA trial where the defendant had not introduced evidence

14  about those items into the record and the court found that it

15  was the defendant's burden to do that.

16           MR. KINNEY:  Your Honor, the plaintiff would

17  stipulate that we'll handle those matters post-trial via an

18  evidentiary hearing, if necessary, and that I will not seek to

19  object to offsets based on not introducing collateral sources

20  during the trial.

21           THE COURT:  Ms. Cunningham, was that -- that would

22  seem to address your concern and preserve the issue.  Does it?

23           MS. CUNNINGHAM:  I suppose it would, Your Honor.  It

24  just seems unduly complicated.  This is a bench trial.  We

25  already have exhibits marked.  There are some pages that are

 1   stipulated to but other pages that can easily be added in,

 2   things like PIP logs and things like the loss from Blue Cross

 3   and Blue Shield that reflect the payment.  They don't seem

 4   to -- I can't truly envision a situation where we would need

 5   another evidentiary hearing to go through all of that.  Seems

 6   like the simpler course would be to...

 7           THE COURT:  And your objection, Mr. Kinney, is just

 8   on relevance at this time?

 9           MR. KINNEY:  There's quite a few they have, so I

10   think I would need to go through each one, Your Honor.

11           THE COURT:  All right.  Why don't we do this.  It's

12   almost 1:15.  Why don't we go ahead and break for lunch.

13           I'll let you-all talk and see if you can -- over the

14   lunch hour, see what you-all can resolve.

15           Because it is a bench trial, and rather than

16   complicating this any further, I think my inclination would be

17   to simply let it in, and if there are arguments on relevance or

18   arguments about that the Court shouldn't consider it, I can

19   address that in the findings of fact and conclusions of law.

20   But we'll talk about that at, let's say -- it's 1:15.  How

21   about if we come back about 2:30.

22           All right.

23           COURT SECURITY OFFICER:  All rise.

24      (Recess taken, 1:12 PM  - 2:34 p.m.)

25           THE COURT:  All right.  So what did we work out?

1          MS. CUNNINGHAM:  We have a number of exhibits and

2    pages and a very small number of disagreements at this point.

3          So I can read into the record what we are agreed

4    upon.

5          THE COURT:  Okay.

6          MS. CUNNINGHAM:  With Defendant's Exhibit 16, we move

7    into evidence these stipulated pages: 1 through 37; 87 to 103;

8    106 to 169; 181; 183 to 186.

9          MR. KINNEY:  That's correct, those are stipulated to.

10         THE COURT:  Okay.  Just so I'm clear, it was 181 then

11   183 through 86?

12         MS. CUNNINGHAM:  Yes, Your Honor.

13         THE COURT:  Okay.

14         MS. CUNNINGHAM:  That takes care of that exhibit,

15   Defendant's Exhibit 16.

16         THE COURT:  Okay.

17       (Defendant's Exhibit 16 was admitted in evidence.)

18         MS. CUNNINGHAM:  The next exhibit is Defendant's

19   Exhibit 19.  The defendant seeks to move the following pages

20   that are stipulated: 1 through 28; 35; 41 to 44; and 46 to 47.

21         MR. KINNEY:  Plaintiff so stipulates.

22       (Defendant's Exhibit 19 was admitted in evidence.)

23         THE COURT:  Next?

24         MS. CUNNINGHAM:  For the sake of the record, Your

25   Honor, with respect to Defendant's Exhibit 19, page 38 was

 1   already admitted.

 2          THE COURT:  All right.

 3          MS. CUNNINGHAM:  With respect to Defendant's

 4   Exhibit 22, defendant seeks to move in the following stipulated

 5   pages: 1 through 3; 5 through 62; 66 through 80; 82 to 95; 97

 6   to 101; 104; 105; and 106 through 115.

 7          MR. KINNEY:  So stipulated.

 8      (Defendant's Exhibit 22 was admitted in evidence.)

 9          MS. CUNNINGHAM:  With respect to Defendant's

10   Exhibit 25, defendant seeks to move in the following stipulated

11   pages: pages 1 through 3; 5 through 7; and 11 through 91.

12          MR. KINNEY:  So stipulated.

13          There's additional three pages associated with that

14   exhibit that the plaintiff is in agreement that we will deal

15   with as post-trial collateral sources and that the plaintiff

16   will not object to using those in a subsequent evidentiary

17   hearing if needed.

18          THE COURT:  All right.

19      (Defendant's Exhibit 25 was admitted in evidence.)

20          MS. CUNNINGHAM:  With respect to Defendant's

21   Exhibit 26, defendant seeks to move the following stipulated

22   pages: 1 through 5; 21, 22, 23; 27 to 28; 33 to 35; 40; 44 to

23   56; and 58.

24          MR. KINNEY:  So stipulated.

25      (Defendant's Exhibit 26 was admitted in evidence.)

 1              MS. CUNNINGHAM:  With respect to Defendant's
 2    Exhibit 27 --
 3              MR. KINNEY:  Did we deal with page -- I'm sorry.
 4              MS. CUNNINGHAM:  That's okay.
 5              MR. KINNEY:  26, you're correct.  Never mind.
 6              MS. CUNNINGHAM:  With respect to Defendant's
 7    Exhibit 27, defendant seeks to move into evidence pages 1
 8    through 3; 5; and 8 through 10.
 9              MR. KINNEY:  So stipulated.
10         (Defendant's Exhibit 27 was admitted in evidence.)
11              MS. CUNNINGHAM:  We have an objection with 28, so
12    I'll come back to that, Your Honor.
13              With respect to Defendant's Exhibit 29, defendant
14    seeks to move into evidence pages 1 through 4, and 6 through
15    22.
16              MR. KINNEY:  Stipulated.
17         (Defendant's Exhibit 29 was admitted in evidence.)
18              MS. CUNNINGHAM:  With respect to Defendant's
19    Exhibit 41 --
20              THE COURT:  I'm sorry, 31 or 41?
21              MS. CUNNINGHAM:  Pardon me, Your Honor, 41.
22    Defendant seeks to move into evidence the following stipulated
23    pages: 1 through 12, 13 through 61, and 90 to 92.
24              MR. KINNEY:  So stipulated.
25         (Defendant's Exhibit 41 was admitted in evidence.)

 1                THE COURT:  To be clear, 1 through 12, and 13 through

 2    61, is that --

 3                MS. CUNNINGHAM:  Yes, Your Honor.  So 1 through 61.

 4                THE COURT:  Okay.  So 1 through 61, and then what?

 5                MS. CUNNINGHAM:  90 through 92.

 6                MR. KINNEY:  Plaintiff stipulates.

 7                MS. CUNNINGHAM:  Okay.  The last three have

 8    partial -- have either objections or partial objections, so I

 9    can go through those now.

10                With respect to Defendant's 28, the following pages

11    are stipulated to: 1 to 2, and 5 to 10.

12                MR. KINNEY:  So stipulated.

13          (Defendant's Exhibit 28 was admitted in evidence.)

14                MS. CUNNINGHAM:  Defendant also seeks to move in 3 to

15    4, which is the report that corresponds with the MRI of the

16    right ankle that was done in March of 2014 that was discussed

17    during the testimony.

18                THE COURT:  I'm trying to find it.

19                MS. CUNNINGHAM:  That's okay.  So Defendant's 28.

20                MR. KINNEY:  We have an extra copy if you'd like me

21    to hand it up.

22                THE COURT:  There it is.

23                And what's the objection to pages 3 and 4?

24                MR. KINNEY:  On the plaintiff's behalf, I've objected

25    on relevance grounds.  This is an MR report of his right ankle.

 1   The date of the exam was March 14th of 2019.

 2          No doctor testified as to the findings.  There was no

 3   testimony on behalf of the plaintiff as to a claim of an injury

 4   from the motor vehicle collision relating to his ankle.  And so

 5   without any medical testimony or any claims for seeking an

 6   injury to his right ankle, I don't think this is relevant.

 7          THE COURT:  Ms. Cunningham?

 8          MS. CUNNINGHAM:  Yes, Your Honor.

 9          During the cross-examination of Mr. Triolo, I asked

10   him about the ankle injury and the treatments that he received

11   for it.

12          I also asked Dr. Pardo about his awareness of the

13   ankle injury and whether or not it's something that he would

14   have wanted to know about.

15          This certainly goes along with the other medical

16   records that are in evidence about the treatment for the ankle

17   that was provided.  It was an exam requested by Dr. Ernst, the

18   podiatrist, and her records are in evidence already.

19          THE COURT:  I'm going to overrule the relevance

20   objection.

21          MR. KINNEY:  That's pages 3 and 4 of 28, if I'm --

22          THE COURT:  Yes.  So I guess now all of 28 is in

23   evidence.

24          MS. CUNNINGHAM:  Yes, Your Honor.

25          All right.  The next exhibit with some stipulations

1    and some objection is Defendant's Exhibit 43.

2              Plaintiff has stipulated to only page 106.

3              Defendant seeks to introduce one additional page,

4    page 102, which is an attending physician's statement signed by

5    Dr. Topp on February 21st of 2018, in connection with the

6    submission of -- for the -- prior to surgery to the insurance

7    company that provided the disability benefits.

8              THE COURT:  Hold on.

9              So you said plaintiff stipulates to page 106?

10             MS. CUNNINGHAM:  106, Your Honor.

11             THE COURT:  Okay.  And which page is --

12             MS. CUNNINGHAM:  102 is the additional page that

13   we're seeking to admit.

14             THE COURT:  Mr. Kinney?

15             MR. KINNEY:  I'm actually -- I'm drawing a blank as

16   to whether -- I know I did not -- I know my partner did not ask

17   Dr. Topp any questions about this report, and I'm drawing a

18   blank as to whether it was asked on cross-examination.  I

19   actually don't remember one way or another, but...

20             THE COURT:  What's the objection to it?

21             MR. KINNEY:  Well, this is -- my objection is as to

22   hearsay of the -- he did talk about it?

23             Well, when I look at paragraph 8 on here, he did

24   discuss that objective finding on cross-examination and

25   discussed what he meant by degeneration, so I will not object

 1   to the entry of page 102 now.

 2              THE COURT:  All right.  102 of Exhibit 43 is

 3   admitted.

 4        (Defendant's Exhibit 43 was admitted in evidence.)

 5              MS. CUNNINGHAM:  All right.  The last one, Your

 6   Honor, is -- the last exhibit, Your Honor, is Defendant's

 7   Exhibit 44.

 8              Plaintiff is stipulating to a number of pages, some

 9   of which they want redacted, which at this point I am willing

10   to do.  So we may be in agreement to some extent on this.

11              So this is a -- Blue Cross Blue Shield records.  I

12   forgot to ask -- although I'm not sure I clearly asked

13   Mr. Kinney if he would consent to 1 through 4, this is the

14   initial pages on a business records certification.

15              MR. KINNEY:  Yes.  Pages 1 through 4, and then pages

16   1 through 6, we stipulated to.

17              MS. CUNNINGHAM:  All right.  Just for clarity of the

18   record here, so it's the Blue Cross Blue Shield Bates Nos. 1

19   through 4, and then 5 through 10?

20              MR. KINNEY:  Correct.

21              MS. CUNNINGHAM:  Which are pharmacy claims records.

22              The next set of documents within this exhibit at Blue

23   Cross Blue Shield_0017 -- pardon me.  The plaintiff is

24   agreeable to introducing a redacted version of this page that

25   redacts medical care that predates Mr. Triolo seeing

1   Dr. McDaniels.  So they are in agreement with the care that

2   begins on February 16 of 2017 forward, through the end of this

3   document.  So that is Bates number page 17 to 23.

4           MR. KINNEY:  That's correct.

5           We discussed about doing the offsets and admitting

6   the evidence now due to the offsets related to PIP and the

7   copays, and that would encompass those pages 7 through 13.

8           MS. CUNNINGHAM:  And then, Your Honor, with respect

9   to the intervening pages, the 11 through 16, for this to make

10  any sense, we probably -- there's two ways to do this, Your

11  Honor.

12          They're asking that we redact this.  I'm happy to do

13  that if the Court would prefer it that way.  Or we can just

14  have the chart in as-is, and know that Dr. McDaniels' care

15  starts at Blue Cross Blue Shield page 17.

16          THE COURT:  So I -- I'm not quite following what

17  you're...

18          MS. CUNNINGHAM:  That's okay.  Let me try and

19  explain -- do a little bit of a better job explaining this.

20          So Bates No. page BCBS-11 is the start of a medical

21  claims history chart.

22          Plaintiff is objecting to roughly the first half of

23  the chart as containing medical care that predates the motor

24  vehicle accident and are asking that we either redact it or not

25  provide it to the Court.

 1              At page 11, there's a heading that probably needs to

 2      be included just for the Court's understanding of what the

 3      document shows.

 4              So we can either just allow the whole thing in over

 5      plaintiff's objection or we can redact the care that predates

 6      the first date where Mr. Triolo received postaccident medical

 7      care.

 8              THE COURT:  And, Mr. Kinney, the objection to the

 9      preaccident medical care is what?

10              MR. KINNEY:  It's relevance.  This is just a ledger

11      of payments related to Blue Cross Blue Shield for treatment

12      unrelated to his injuries that predated the accident.

13              MS. CUNNINGHAM:  Your Honor, at this point, I -- I am

14      fine if -- just for a way of resolving this, we can redact

15      the -- sort of the first page of this BCBS0011 to leave the

16      headers so the Court can see what this is and where it comes

17      from, and then either redact or just not include the pages

18      prior to BCBS-17.

19              THE COURT:  Why don't we just redact page 11 and then

20      leave out pages 12 through 16?

21              MS. CUNNINGHAM:  Okay.  That's fine, Your Honor.

22          (Defendant's Exhibit 44 was admitted in evidence.)

23              MR. KINNEY:  And you were going to discuss 48 as

24      well --

25              MS. CUNNINGHAM:  Oh, sure.

 1           MR. KINNEY:  Well, it's up to you.

 2           MS. CUNNINGHAM:  We had discussed Defendant's

 3    Exhibit 48, Your Honor, but I'm not going to seek to introduce

 4    it at this time.  And Mr. Kinney had already indicated that

 5    this pertains to a third party that may or may not have a lien,

 6    and we will both address that if necessary.

 7           MR. KINNEY:  The same stipulation I made as to

 8    Defense Exhibit 25 with regard to a company called Med-Link

 9    will apply as well to Defendant's Exhibit 48.

10           THE COURT:  Okay.

11           MS. CUNNINGHAM:  I believe that's all, Your Honor.

12           THE COURT:  All right.  And what did you-all decide

13    about Defendant's 5?

14           Are you going to be calling the officer or where are

15    we on that issue?

16           MS. CUNNINGHAM:  All right.  Your Honor, plaintiff's

17    counsel has indicated that they will not stipulate to those

18    times of arrival and departure coming in without the officer's

19    testimony.  So we will call the officer for the very brief

20    purpose of having him testify to those two items.

21           We sought to reach him during the break.  They

22    indicated that he is off till Wednesday, but we will -- I also

23    have a cell phone number for him.  I left him a voicemail

24    message there.  As soon as I hear back from him, I can

25    determine his availability, but I think it will be very brief

 1   testimony.

 2           THE COURT:  All right.  Let me -- let me pull up my

 3   calendar.

 4           I'm going to get in trouble scheduling stuff without

 5   Jodi being here.  It's not good.

 6           Tuesday, October 6th, at 10:00 a.m.

 7           MS. CUNNINGHAM:  That's fine on my calendar, Your

 8   Honor.

 9           MR. KINNEY:  I will be in Mexico.

10           THE COURT:  Okay.  So how long are you in Mexico?

11           MR. KINNEY:  Well, we leave this Friday, and we fly

12   back on the 10th.

13           THE COURT:  How come you get to go on a vacation?

14           MR. KINNEY:  You know, can I submit that in my

15   post-trial brief?

16           I'll be happy to appear poolside if you'd like.

17           THE COURT:  Is this a witness that Mr. Moore can just

18   handle without you?

19           MR. KINNEY:  Oh, absolutely.  Absolutely.

20           Mr. Moore, can you be here on the 6th?

21           MR. MOORE:  I do have a deposition that day, but I'll

22   get it rescheduled, Your Honor.

23           THE COURT:  No, no, no.  Let me --

24           MR. MOORE:  My deposition is 10:00 to 12:00 that

25   morning.

 1                 THE COURT:  Okay.  How about if we just do 3:00 that
 2      afternoon?
 3                 MR. MOORE:  I can do that, Your Honor.
 4                 THE COURT:  Okay.  And, Mr. Triolo, I don't --
 5      wouldn't want you to have to schedule work around that.  It's
 6      perfectly fine -- I mean, you can talk to your attorneys, but
 7      it would be fine with me if Mr. Triolo didn't -- he doesn't
 8      have to be here for that short witness.  I hate to mess up work
 9      schedules for a witness that's going to take maybe 15 minutes.
10                 But I'll leave that up to you.  You're welcome to be
11      here if you want, but if you can't, I'm excusing you.
12                 MR. TRIOLO:  Thank you, Your Honor.
13                 MR. KINNEY:  His brother was the one that was asking
14      for a work note.  I didn't know if that had gotten entered yet.
15                 THE COURT:  The minutes?  Yeah, it did.
16                 MR. KINNEY:  It did, okay.
17                 THE COURT:  Madam Deputy, can you pull up -- hold on.
18      Let me -- so you-all can print off Document 81.
19                 Well, you can e-mail it to him probably.  E-mail the
20      PDF and present it.
21                 If you need something else, just contact my chambers.
22                 And as I said, the -- your conclusions of fact --
23      proposed findings of fact and conclusions of law will be due 30
24      days after you receive the transcript.
25                 I'm going to say 30 days after you get the

TRIOLO v USA                September 28, 2020      Vol IV-102

1    transcripts from the actual trial.  The short one from the

2    officer later, I'm not going to toggle up from that.  I'm going

3    to toggle up from when the court reporter files the transcript

4    to the last few days.  Okay?

5             All right.  Mr. Kinney, anything further on behalf of

6    Mr. Triolo?

7             MR. KINNEY:  None on behalf of the plaintiff.

8             THE COURT:  Okay.  Ms. Cunningham, anything further

9    from the defense?

10             MS. CUNNINGHAM:  No, Your Honor, nothing further.

11             THE COURT:  Okay.  You-all have a nice day.

12             COURT SECURITY OFFICER:  All rise.

13        (Proceedings concluded at 2:57 p.m.)

14                          -  -  -

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4    UNITED STATES DISTRICT COURT)

5
     MIDDLE DISTRICT OF FLORIDA  )
6

7        I hereby certify that the foregoing transcript is a true

8    and correct computer-aided transcription of my stenotype notes

9    taken at the time and place indicated herein.

10

11

12            Dated this 2nd day of November 2020.

13

14

15

16            /s/Cindy Packevicz Jarriel

17            Cindy Packevicz Jarriel, RPR, FCRR

18

19

20

21

22

23

24

25