# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE

RICHARD A. TRIOLO

       Plaintiff,

                       CASE NO.: 3:18-cv-00919-MMH-JBT

vs.

UNITED STATES OF AMERICA,

       Defendant.

_____/

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

      The Plaintiff, Richard A. Triolo, by and through his undersigned counsel hereby submits his post-trial proposed findings of fact, and submits as follows:

I.      The rear-end collision was caused by USPS.

      On February 11, 2017, Richard Triolo was the driver of his Ford Mustang when he was rear-ended by a United States Postal Service ( "USPS") vehicle. [1]  The vehicle was driven by USPS employee Marsha Rentz who was in the course and scope of her employment. [2]  The crash occurred while Mr. Triolo was stopped at a red light on Old St. Augustine Road at the intersection of Loretto Road, in Jacksonville, Florida. [3]  Mr. Triolo did not see it coming. [4]  The impact was "hard". [5]  Hard enough to force his backrest to "totally recline" [6] and he felt his back "twinge". [7]

      Immediately on impact he looked in the review mirror and saw Ms. Rentz with one hand

---

[1] See Pretrial Statement, Stipulations at pg. 11 (Doc # 54).
[2] Id.
[3] Id.
[4] See Trial Transcript Vol I, p. 41, ln 6 - 7 (hereinafter, "TT Vol I, p.__, ln__").
[5] Id.
[6] See TT Vol, p. 40, ln 5 – 8.
[7] TT Vol I, p. 40, ln 8 – 9.

on the steering wheel, the other holding a cellphone to her face, with a shocked "look of disbelief".[8] It is logical to conclude that the use of the cellphone distracted the USPS employee resulting in the rear-end collision. Photos taken at the scene of the vehicles show damage to the front of the USPS truck and to the rear of the Plaintiff's vehicle.[9]

The USPS' driver claimed that her foot supposedly "slipped" off the brake.[10] For many reasons, this statement is suspicious. First, it is a direct violation of USPS policy for a driver to use a cell phone while operating a postal vehicle.[11] Further, the USPS investigator, Jeanette Sigouin, was on scene shortly after the crash and confirmed that the driver is required to wear "slip-proof shoes"[12] and "didn't see anything that would indicate a cause for a foot to slip off the brake."[13] The USPS driver, who is no longer an employee[14], could not be located and did not appear at the trial.

II.    It is undisputed that the Plaintiff did not have any pre-existing injuries.

This trial of this matter focused primarily on the injuries and treatment to the Plaintiff's lumbar spine. There was no evidence or testimony that indicated that the Plaintiff had a pre-existing lumbar injury. The Plaintiff testified that he never had problems with his back prior to collision.[15] Both of his brothers testified at trial that they had never heard the Plaintiff complain of having back problems prior to the collision.[16]

Each of the parties hereto submitted their own set of exhibits which included voluminous

---

[8] TT Vol I, p. 40, ln 11 – 9 – 23.
[9] PL's Ex. 34 and 35; TT Vol I, p. 46, ln 5 – p.
[10] TT Vol IV, p 69, ln 6 – 7.
[11] TT Vol IV, p. 70, ln 10 – 11.
[12] TT Vol IV, p 69, ln 13 – 16.
[13] TT Vol IV, p 70, ln 17 – 19.
[14] TT Vol IV, p 78, ln 16 – 17.
[15] TT Vol I, p. 51, ln 22 – p. 52, ln 11.
[16] TT Vol III, p. 9, ln 23 – p. 10, ln 4.

medical records.  Absent from each of the parties' medical record exhibits is any indication that

the Plaintiff had a pre-existing condition in his lumbar spine.  By way of example, the Plaintiff's

primary care records were entered into evidence as Plaintiff's Ex. No. 4.  On August 6, 2015,

which is approximately 16 months before the subject collision, the Plaintiff was seen at his primary

care  doctor's office.  The Plaintiff was questioned about his overall health and instructed to

disclose any symptoms that he was experiencing.  The primary care office specifically questioned

the Plaintiff as to whether he was experiencing any "back pain" and if so to state "Yes" by circling

the phrase "back pain."[17]

**2. Are you experiencing any of the following symptoms in relation to your main concern?**
**(Answer 'yes' by circling the appropriate symptom.)**

…

**Musculoskeletal:** joint pain, muscle weakness, back pain

The evidence and testimony presented at trial overwhelmingly demonstrates that the Plaintiff was

<u>not</u> experiencing back pain prior to the subject motor vehicle collision.[18]  Further, throughout the

course of the trial, there was no evidence introduced or testimony received which indicated that

from the date of the October 2015 primary care visit through the date of the collision, that the

Plaintiff had been involved in any other event which would have produced a symptom of back

pain.  It was not until immediately after the collision that the Plaintiff sought medical attention for

back pain.

Bruce Schmucker is the Plaintiff's older stepbrother.[19]  His testimony was significant on

this matter.  Mr. Schmucker testified that before the collision, the Plaintiff was physically active,

---

[17] PL's Ex. 4, p. 25.
[18] <u>Id</u>.
[19] <u>TT. Vol. III.</u> p. 26, ln. 5-12

played sports and worked out practically every day.[20]   After the collision, he testified that his

brother was no longer active in sports, and on many occasions he observed him on his knees on

the floor stretching out his back due to pain.[21]   As well, he noticed that since the collision, the

Plaintiff walked with a stiffness in his back, took smaller steps, waddled side-to-side and groaned

from the pain.[22]

III.     The Plaintiff began experiencing back pain at the scene of the collision.

After they moved their vehicles from the intersection to a nearby parking lot, Mr. Triolo

climbed out of his car and stated that he could feel that his "back wasn't right."[23]   The parties

waited at the scene for the police to arrive.   During that time, Mr. Triolo's back "started to get

worse" and his neck was hurting too.[24]

While waiting for the police to arrive, Mr. Triolo called his brother, Brian Schmucker, who

lived nearby.   After receiving the call, his brother went to the intersection and found him in the

parking lot of the nearby Catholic Church.[25]   He observed that the front of the postal truck was

"caved in" and his brother's car had damage to the rear-end.[26]   They remained in the parking lot

waiting for the police to arrive.[27]   Mr. Triolo felt like they had to wait "forever"; and his brother

described it as having to "wait around a while."[28]   While they waited for the police, the Plaintiff

told his brother "that something didn't feel right in his back."[29]   He watched the Plaintiff hold his

---

[20] TT. Vol. III. p. 28, ln. 22 – p. 29, ln 2; p. 30, ln. 7-8 – p. 31, ln. 1-20
[21] TT. Vol. III. pp. 37-38
[22] Id.
[23] TT Vol. I, p. 49, ln 8 – 12.
[24] TT Vol. I, p. 50, ln 16 – 19.
[25] TT Vol. III, p. 10, ln 8 – 15.
[26] TT Vol. III, p. 11, ln 13 – 19.
[27] TT Vol. III, p 11, 25 – p. 12, ln 4.
[28] TT Vol. I, p. 51, ln 2; and  TT Vol III, p. 12, ln 2 – 4.
[29] TT Vol. III, p. 12, ln 8 – 11.

hand over his lower back and move around a lot trying to find "a comfortable position".[30]

## IV. The overwhelming weight of the testimony and evidence presented at the trial establishes that the rear-end collision caused permanently injuries to the Plaintiff's lumbar spine.

### A. Baptist Medical Center South - Emergency Room.

The rear-end collision occurred at approximately 1:00 p.m.[31]  The Plaintiff drove himself to the emergency room at nearby Baptist Medical Center South.[32]  The ER records indicate that he was checked in at 2:56 p.m. on the day of the crash.[33]  The Plaintiff reported neck and back pain to the ER.[34]  The ER recorded the "chief complaint [is] back pain".[35]  The ER records indicate that a neck exam was not performed.[36]  Only a CT of his neck was performed.[37]  His low back was not examined,[38] and the ER provided no diagnostic tests for his low back.[39]   At 4:20 p.m. that same day, the Plaintiff was discharged with a couple of days of pain medicine and a neck collar.[40] Further, he was given written instructions to follow up if new or worsening symptoms arose.[41]

### B. Jacksonville Sport & Spine: Chiropractic Care.

The crash occurred on a Saturday.  Four days later, Thursday, February 16, 2017, the Plaintiff was evaluated by Nathan McDaniels, DC at Jacksonville Sport & Spine.[42]  The Plaintiff reported that since the crash he had been experiencing:

---

[30] TT Vol. III, p. 13, ln 2 – 10.
[31] TT Vol. I, p. 37, ln 17 – 19.
[32] TT Vol. I, p. 52, ln 17 18.
[33] TT Vol. I, p. 53, ln 12; and Ex. 2, p. 2.
[34] TT Vol. I, p. 54, ln 11 – 12.
[35] TT Vol. I, p. 54, ln 16 – 17; and PL's Ex. 2, p 3.
[36] PL's Ex. 2, p. 2.
[37] PL's Ex. 2.
[38] TT Vol. I, p. 55, ln 18 – 23.
[39] TT Vol. I, p 56, ln 14 – 18.
[40] TT Vol. I, p. 57, ln 16 – 25.
[41] TT Vol. I, p. 58, ln 8 – p. 59, ln 11; and PL's Ex. 2, pg. 38 – 39.
[42] PL's Ex. 6, p. 1.

> Upper neck pain, upper and lower back pain, shooting pain into lower right glut into lower right hamstring.[43]

Dr. McDaniel's performed a physical examination which revealed: reduced range of motion of the neck; reduced range of motion of the lumbar spine; altered gait; and sensory deficits of the S1 and L5 nerve roots. As well, Mr. Triolo failed several orthopedic tests performed to his lumbar spine.[44] After taking a history and physical, Dr. McDaniel's working diagnosis included: sleep disturbance, muscle spams of the neck, muscle spasm of the piriformis, muscle spasm of the thorasic spine, sprain of the thorasic spine, lumbago-sciatica, cervical radiculopathy, post-traumatic headache, concussion, cervicobrachial syndrome and cervicalgia.[45] Dr. McDaniels recommended continued chiropractic care for 2 to 4 weeks, and gave a permanent restriction to avoid aggravations/exacerbations and to lift no more than 15 lbs.[46] Over the course of five months following the collision, the Plaintiff was seen by Dr. McDaniels 14 times for the injuries to his neck and back.[47] At the request of Dr. McDaniels, Mr. Triolo was referred to a neurologist for further evaluation.[48]

    C.    <u>Universal Neurological Care</u>.

On March 16, 2017, Mr. Triolo was seen by neurologist, Dr. Syed Asad at Universal Neurological Care.[49] Mr. Triolo advised Dr. Asad that since the rear end motor vehicle collision he experienced neck and back pain, and described his legs feeling like "Jello".[50] As well, he

---

[43] Id.
[44] PL's Ex. 6, p 10 – 11.
[45] PL's Ex. 6, p. 11 – 12.
[46] PL's Ex. 6, p. 12.
[47] PL's Ex. 6, pp 1 – 58.
[48] PL's Ex. 13, p. 2.
[49] PL's Ex. 13, p. 2 – 8.
[50] Id.

experienced "sharp stabling pains radiating into the back of his right leg and buttocks."[51]  On a

pain scale of 1 – 10, his neck was an 7 - 8, and his back was a 10, and that he had been tripping

over his right foot.[52]  Dr. Asad performed a physical examination and diagnosed Mr. Triolo with

the following: (i) lumbar radiculopathy; (ii) cervicalgia (neck pain); (iii) abnormal gait and

mobility; (iv) impaired cognition; and (v) post-concussion syndrome.[53] Dr. Asad ordered an MRI

of his lumbar spine, and amongst other things an electromyography (EMG) study.[54]  On April 4,

2017, Mr. Triolo had an MRI of his lumbar spine.[55]  The EMG was performed on May 10, 2017.

The MRI revealed bulges and herniations.[56]  Further, the EMG identified radicular deficits at L5-

S1 on the right side of the Plaintiff's lumbar spine.[57]  The results of the EMG are consistent with

the Plaintiff's description of his right sided back pain.  On May 25, 2017, Mr. Triolo returned to

Dr. Asad's office for further evaluation and review of diagnostic tests.  With regard to his lumbar

spine, Dr. Asad's chart note indicated that Mr. Triolo's condition included: (i) bulges and

herniations; and (2) chronic potentials in muscles inervated by L5-S1 nerve root.  Mr. Triolo was

advised that he was to continue with chiropractic care and would be referred to a pain management

physician and a surgeon for further evaluation.[58]

---

[51] Id.
[52] Id.
[53] Id. at p. 5.
[54] Id. p. 6 – 7.
[55] PL's Ex. 3, p. 2.

[56] Id.
[57] PL's Ex. 13, p. 17.
[58] PL's Ex. 13, p. 24

D.    Unrebutted trial testimony of Dr. Reynaldo Pardo establishes that the motor vehicle
collision caused permanent injuries to the Plaintiff's lumbar spine and the Plaintiff
will require ongoing pain management treatment for the rest of his life.

Dr. Pardo is board certified in anesthesiology with a subspecialty in interventional pain
medicine.[59]  He has been practicing medicine since 1987.  He practiced as a general surgeon for
two years and then switched to anesthesiology.[60]  Beginning in 1992, he fully dedicated his practice
to pain medicine.[61]

Before providing treatment, Dr. Pardo has to determine what are the symptoms and what
is the cause of the symptoms.  Dr. Pardo has his patients complete a questionnaire.[62]  Thereafter,
he personally meets with the patient and conducts an interview.[63]  As part of his practice, Dr. Pardo
obtains a history from his patients, including the patient's perception of what has occurred that
caused any symptoms.[64]  Dr. Pardo uses the information provided by patients to establish a
differential diagnosis.[65]  A differential diagnosis is "all the possible diagnoses given a set of
symptoms and physical findings."[66]

Prior to commencing any treatment, it is important to Dr. Pardo to "develop an
understanding of what caused the injuries."[67]  A mere report of a symptom alone could lead Dr.
Pardo to a misdiagnosis and improper treatment.[68]  Dr. Pardo does not need to know every detail

---

[59] TT Vol. II, p. 55, ln 22 – p. 56.
[60] TT Vol. II, p 56, ln 4 – 19.
[61] TT Vol. II, p. 58, ln 1 – 6.
[62] TT Vol. II, p. 64, ln 5 – 7.
[63] TT Vol. II, p. 65, ln 6 – 18.
[64] TT Vol. II, p. 65, ln 19 – p. 66, ln 1.
[65] TT Vol. II, p. 66, ln. 4 – 11.
[66] TT Vol. II, p. 66, ln 13 – 14.
[67] TT Vol. II, p. 66, ln 21 – 24.
[68] TT Vol. II, p. 67, ln 23 – p. 69, ln 2.  As a basis for why Dr. Pardo determines causation of injury as part of
his medical treatment, Dr. Pardo provided the example of a patient who comes to his practice and complains of
shoulder pain. Without knowing anything more, tests are performed on the shoulder, and all tests come back
negative.   Thereafter, it is revealed that the patient was in a rear-end collision, which leads to a
hyperextension/hyperflexion injury to the cervical spine with referred pain to the shoulder.  Thus, knowing what

of a patient's past life.  His focus is on the pertinent matters.  For example, he will investigate whether the pain is more prevalent in the morning because this is indicative of joint pain.[69] Conversely, he does not need to know about a car accident that occurred more than 20 years ago in which his patient was not injured.[70]  Knowing what led to the start of the symptoms, helps Dr. Pardo rule out other causes.[71]

The Plaintiff was first seen by Dr. Pardo on July 11, 2017.[72]  On that date, he recorded the pertinent history of the Plaintiff.[73]  He then recorded the current list of complaints/symptoms.[74] Amongst other things, Dr. Pardo recorded that the Plaintiff suffered from:

> severe back pain referred to the right lower extremity, the right linguinal area, the right groin, that the pain was referred down the back of the thigh to the knee.  Lower back pain and right lower extremity pain was rated a 9 to 10 over 10 on the visual analogue scale.[75]

Dr. Pardo testified that the significance of the Plaintiff's self-reported symptoms is that it pointed to "nerve root compression."[76]  But it also indicated that the Plaintiff's lumbar facet joints were injured as well.[77]  The facet joints are part of the basic unit of the human spine.[78]  The facet joints "allow the spine to have range of motion; so extension, flexion, rotation."[79]  The facet joints are subject to becoming injured in a rear-end motor vehicle collision due to "excessive extension,

---

caused the symptoms to begin helps to establish a differential diagnosis and prevent misdiagnosis.
[69] <u>TT Vol. II</u>, p. 71, ln 19 – p. 72, ln 14.
[70] <u>TT Vol. II</u>, p. 73, ln 19 – p. 74., Ln 2
[71] <u>TT Vol. II</u>, p. 87, ln 9 – p. 88, ln 1.
[72] <u>TT Vol. II</u>, p. 75, ln 11 – 12.
[73] <u>TT Vol. II</u>, p. 75, ln 13 – 18.
[74] <u>TT Vol. II</u>, p. 75, ln 19 – p. 13.
[75] <u>TT Vol. II</u>, p. 75, ln 24 – p. 76, ln 3.
[76] <u>TT Vol. II</u>, p. 76, ln 21 – 24.
[77] <u>TT Vol. II</u>, p. 77, 11 – p. 78, ln. 12.
[78] <u>TT Vol. II</u>, p. 62, ln 1 – 5.
[79] <u>TT Vol. II</u>, p. 62, ln 10 – 12.

flexion, and rotation or even lateral tilt of the joints ....."[80]

In addition to taking the questionnaire and conducting an interview to obtain a complete pertinent medical history, Dr. Pardo conducted a physical examination of the Plaintiff.[81] Included was an examination of the Plaintiff's lumbar spine.[82] As well, Dr. Pardo reviewed the Plaintiff's lumbar MRI film.[83] Dr. Pardo described the most significant findings from the lumbar MRI films as follows:

> Q. And is there anything that you're seeing on the lumbar MRI that is consistent with his subjective reports to you from that first visit on July 11, 2017?
>
> …
>
> A. Most evident is the spondylolisthesis at L5-S1.
>
> Q. Tell us all, what is spondylolisthesis?
>
> A. So the body of the vertebra, and that is – that's this body right here – is sliding forward in relation to the sacrum which is right here.
>
> …
>
> So L5 is slipped forward. There's an alignment that you should have. ... And it's supposed to follow – it's like a stack of blocks that you have lined up perfectly. And when you have one block that's slightly slipping forward, you have listhesis, anterolisthesis. And you can see that at L5. This is L5. And you can see on the back of it how, right here, there's a lot of disc material from the L5-S1 disc that there's a void right here. The posterior edge is slipping forward. So L5 is slipping forward in relation to S1. So this is L5 and it's slipping forward in relation to the bottom, S1.
>
> …
>
> This is moderate, I would say. Moderate – mild to moderate, because it's slipping forward. Unfortunately, the most severe cases, patients can't walk. 50 percent or greater of listhesis comes with practical disability, not being able to stand or walk, because the compression on the nerve root is

---

[80] <u>TT Vol. II</u>, p. 79, ln 6 – 8.
[81] <u>TT Vol. II</u>, p. 81, ln 13 – p. 83, ln 24.
[82] <u>TT Vol. II</u>, p. 84, ln 1 – p. 86, ln 1.
[83] <u>TT Vol. II</u>, p. 95, ln 20 – 24.

> severe. … This is a 5 millimeter – it looks like 5 millimeter
> grade 1 spondylolisthesis. So that's sufficient to compress
> the nerve roots.  So here's L5 and here's S1. And if this is
> sliding forward – this is slipping forward, the little tiny
> opening called the neuroforamina is constricted by that
> motion forward of the vertebra. … In his case, it was more
> right side than left. But spondylolisthesis is an area of
> instability.  So there's not a stable structure holding the
> vertebra at that point.[84]

As a result of this misalignment (spondylolisthesis) of the lumbar spine, the symptoms it

produces are "[b]ack pain, leg pain, leg weakness, numbness, tingling.[85]"  Further, Dr. Pardo

testified that the Plaintiff's spondylolisthesis was a direct result of a "fracture" of a bone located

at L5 in the Plaintiff's lumbar spine referred to as the "pars interarticularis".[86] The pars

interarticularis is located below the facet joints and "just posterior to the nerve root."[87]

The forces of the crash were severe enough to fracture the pars and cause bony edema in

the Plaintiff's lumbar spine at L5.

> Q.   From a sort of terminology standpoint, when you say 'facet
> injury,' you're using that term simply to mean something
> is abnormal in the facet joint in other words –
>
> A.   A traumatic arthropathy, that's what we're referring to
> when – in this case.
>
> Q.   All right.
>
> A.   To the point that it fractured the pars, which is the base of
> the facet joint.  The facet joint is connected to the pars. And
> so that injury of the pars caused traumatic injury to, not
> only the interarticular aspect of it, the cartilage that we
> spoke of earlier, but also the base of the bony structure
> fractured.

---

[84] <u>TT Vol. II</u>, p. 98, ln 16 -  p. 100, ln 19
[85] <u>TT Vol. II</u>, p. 101, ln 1 – 3
[86] <u>TT Vol. II</u>, p. 101, ln 1 – 3
[87] <u>TT Vol. II</u>, p. 108, ln 7 - 14

Q.  Okay.

A.  At least at L5, maybe not at L4 or L3. But at L5, the trauma
was so severe that it caused a fracture. And in one image,
there was bony swelling edema, bony edema.  That's how
severe the traumatic injury to the bone was.[88]

Finding the fractured pars interarticularis assisted Dr. Pardo with determining what caused the
Plaintiff's facet joints to become injured in the crash.[89]  Because "without a pars, the vertebra has
nothing stopping it from moving forward."[90]  Dr. Pardo testified that the forces of the rear-end
collision caused the fracture of the pars.[91]

With regard to the lumbar facet joint injuries, the diagnosis was made via the subjective
symptoms, physical examination, location of the pars fracture, along with lumbar medial branch
prognostic nerve blocks.[92]  The nerve block use a local anesthetic to numb the facet joint to
"confirm the diagnosis of facet arthropathy.[93]"  To gain confirmation, the patient must have at least
50 percent relief that lasts four to six hours.[94]  The nerve blocks conclusively demonstrated that
the collision not only caused the fracture of the pars interarticularis and spondylolisthesis, but it
also caused injuries to the Plaintiff's lumbar facet joints.[95]

Q.  What is your opinion with regard to his facet joints?

A.  That they were injured during the motor vehicle collision.

Q.  Can you tell us which facet joints?

A.  L3-4, L4-5, and L5-S1,

---

[88] <u>TT Vol. II</u>, p. 155, ln 7 – 23
[89] <u>TT Vol. II</u>, p. 108, ln 20 – 22.
[90] <u>TT Vol. II</u>, p. 108, ln 23 – p. 109, ln 13.
[91] <u>TT Vol. II</u>, p. 109, ln 14 – 22.
[92] <u>TT Vol. II</u>, p. 113, ln 3 – 21.
[93] <u>TT Vol. II</u>, p. 113, ln 6 – 21.
[94] <u>TT Vol. II</u>, p. 121, ln 1 – 7.
[95] <u>TT Vol. II</u>, p. 121, ln 8 – p. 122, ln 14.

12

Court:   I'm sorry can you repeat that.
A.       L3-4, L4-5, and L5-S1. This is the view that also
         shows the spondylosis [fracture] – that's
         spondylolysis. That's an injury also to the facet.

During the course of his treatment, Dr. Pardo determined that the pars injury and resulting

spondylolisthesis which was causing nerve compression "was severe enough that it needed a

surgical approach."[96] Dr. Pardo referred the Plaintiff to Dr. Constantine Toubmis for a surgical

evaluation, and thereafter to Dr. Raymond Topp for a second opinion.[97]

The Plaintiff had his lumbar spine fused by Dr. Raymond Topp on March 22, 2018.

Following the surgery, Dr. Pardo continued to treat the Plaintiff for low back pain.[98] The surgery

addressed the "spondylolisthesis … and nerve root compression that needed to be relieved."[99]

However, Dr. Pardo's continued pain management treatment relates to the Plaintiff's injuries to

the facet joints.[100] The accepted treatment for lumbar facet joint injury is radiofrequency

ablation.[101]

The ablation procedure desensitizes the facet joint by exposing the medial branch nerve to

radiofrequency energy.[102] The energy "coagulates or strips the myelin sheath from the exterior of

the nerve." The myelin sheath regenerates over time; however, the procedure will provide long

lasting relief of six to twelve months before the procedure is repeated.[103] Following

radiofrequency ablation, the Plaintiff reported "near complete relief of the lumbar pain on the right

---

[96] TT Vol. II, p. 118, ln 17 – 18.
[97] TT Vol. II, p. 117, ln 7 – 18; and p. 118, ln 1 – 6.
[98] TT Vol. II, p. 118, ln 21 -
[99] TT Vol. II, p. 125, ln 23 – p. 126, ln 2.
[100] TT Vol. II, p. 126, ln 6 – 20.
[101] TT Vol. II, p. 122 ln 12 - p. 123, ln 10.
[102] TT Vol. II, p. 122, ln 23, ln p. 123, ln 1.
[103] TT Vol. II, p. 123, ln 13 – 21.

side."[104]    As well, the radiofrequency ablation performed on the left side produced "significant

relief from his left paralumbar and parascral pain ….[105]"

At trial, Dr. Renaldo Pardo was pointedly asked whether the February 11, 2017 rear-end

motor vehicle collision caused any injuries to the Plaintiff's lumbar spine.  Dr. Pardo testified:

> [The Plaintiff] suffered injury to his facet joints, facet joint
> arthropathy, suffered an injury to his pars interarticularis,
> spondylolysis, that resulted in slondylolithesis of L5-S1; and
> developed herniated disc protrusion at L5-S1; that compressed the
> L5 nerve root on the right side, which needed inter – the posterior
> lumbar fusion.[106]

Further, Dr. Pardo opined that within a "reasonable degree of medical probability" each of the

above-identified injuries to the Plaintiff's lumbar spine are "permanent".[107]

E.    The unrebutted testimony and evidence presented at trial, establishes the
Plaintiff's injuries require lifetime palliative care to relieve the pain symptoms.

Since Mr. Triolo's initial visit with Dr. Pardo on July 11, 2017 through the trial of this

matter, Dr. Pardo has continued to manage Mr. Triolo's palliative pain management care.  In total,

Dr. Pardo has seen Mr. Triolo in his office on 48 separate occasions over the course of the three

years since the collision.[108]

Over the three years, Dr. Pardo has performed fourteen (14) interventional procedures on

Mr. Triolo's lumbar spine to help manage his severe symptomology.  The procedures included:

| Date: | Procedure: |
|---|---|
| 7/11/2017 | Lumbar Epidural Steroid Injection [SJIPS000012] |
| 7/20/2017 | Medial Branch Block @ L2, L3, L4 L5 on R side [SJIPS000016] |
| 8/11/2017 | Transforaminal steroid injection @ L5, Right side |

---

[104] TT Vol. II, p. 131 ln 10 – 11.
[105] TT Vol. II, p. 124, ln 5 – 11.
[106] TT Vol. II, p. 136, ln 12 – p. 136, Ln. 17.
[107] TT Vol. II, p. 136, ln 12 – p. 138, ln 18.
[108] PL's Ex. 9, pp. 1 - 211

14

|  | [SJIPS000023] |
|---|---|
| 7/5/2018 | Transforaminal steroid injection @ L5, Left side [SJIPS000077] |
| 10/17/2018 | Medial Branch Block @ L2 L3 L4 L5, Left side [SJIPS000096] |
| 10/25/2018 | Medial Branch Block @ L2 L3 L4 L5, Left side [SJIPS000102] |
| 11/8/2018 | Radio Frequency Ablations @ L2, L3, L4 and L5 Left side [SJIPS000108] |
| 4/1/2019 | Radio Frequency Ablations @ L2, L3, L4, and L5 Right side [SJIPS000135] |
| 4/29/2019 | Radio Frequency Ablations @ L2, L3, L4 and L5 Left side [SJIPS000143] |
| 8/20/2019 | Transforaminal steroid injection @ L5, Left [SJIPS000162] |
| 9/25/2019 | Radiofrequency Ablations @ L2, L3 L4, and L5 Left side [SJIPS000170] |
| 10/24/2019 | Greater Trochanteric Bursal Corticosteroid and local anesthetic injection (left hip) [SJIPS000177] |
| 8/7/2020 | Transforaminal corticosteroid injection @ L4, Left side [SJIPS000203] |
| 9/14/2020 | Radio Frequency Ablations @ L2, L3, L4, and L5 Left side [SJIPS000210] |

In addition to the interventional procedures, throughout the past three years Dr. Pardo has prescribed medications at different phases of his treatment to include:

      b.   Percocet (pain reliever)

      c.   Diclofenac (anti-inflammatory)

      d.   Arymo ER (a/k/a Morphine)

      e.   Doxepin (sleep)[109]

Based on his examinations, his review of the diagnostic films, his response to medical treatments, the surgical results, and the permanency of the Plaintiff's injuries, Dr. Pardo testified

---

[109] PL's Ex. 9, pp. 1 – 211

that he recommends that the Plaintiff have the following treatment for his lumbar spine on a yearly

basis for the remainder of his life:

        a.   twelve pain management office visits per year;

        b.   forty-five doses of Percocet per month;

        c.   four to six urine drug screenings per year; and

        d.   bilateral three-level lumbar radiofrequency ablation procedure one
            time per year.[110]

      F.    Unrebutted Testimony of Raymond Topp, M.D.

The Plaintiff was referred by Dr. Pardo to Dr. Raymond Topp, M.D. for a second surgical

opinion with regard to his lumbar spine.  Dr. Topp is an orthopedic surgeon who maintains an

office in Jacksonville, Florida.[111]  At the initial visit on November 8, 2017, Dr. Topp interviewed

Mr. Triolo who reported that following the rear-end collision in February 2017, he continuously

suffered severe lumbar spine pain.[112]  Consistent with the Plaintiff's other medical providers, Dr.

Topp's medical history indicated the Plaintiff had no prior injuries or treatment to his lumbar

spine.[113]  That same day, Dr. Topp performed a physical exam on Mr. Triolo[114], reviewed the

lumbar MRI of April 4, 2017.[115]

Dr. Topp testified that he took a medical history of Mr. Triolo, as he does all patients, in

order to ascertain the cause of the symptoms.[116]  Determining the cause of the symptoms is an

---

[110] <u>TT Vol. II</u>, p. 138, ln 19 – pg. 140, ln 3.
[111] <u>TT Vol. II</u>, p. 208, ln. 18-25 - p. 209, ln. 4-7
[112] <u>TT Vol. II</u>, p. 214, ln. 4-8; p. 217, ln 9-16; PL's Ex. 11, pp. 2-5
[113] <u>TT Vol. II</u>, p. 212, ln. 13-18; p. 213, ln 6-15; p. 214, ln 9-21; p. 215, ln 16-23; PL's Ex. 11, pp. 4, 10, 27
[114] <u>TT Vol. II</u>, p. 218, ln. 13-18; p. 244, ln. 13-21
[115] <u>TT Vol. II</u>, p. 209, ln. 8-21; PL's Ex. 11, pp. 34-38
[116] <u>TT Vol. II</u>, p. 214, ln. 18 – p. 215, ln. 9.

important tool in arriving at a diagnosis and recommending a treatment plan for the patient.[117] As part of the process of arriving at a diagnosis, he is able to rule out other possible causes of the Plaintiff's lumbar symptoms.[118]

> Q.  In Mr. Triolo's case, after doing the differential diagnosis, were you able to rule out other causes of a lumbar injury?
>
> A.  Yes.  I mean, there's so many to rule out. There was not a tumor; there was not an infection. It wasn't a degenerative condition. It was an acute injury that we were left with.[119]

Dr. Topp testified the impact from the motor vehicle collision caused the following injuries to Mr. Triolo's lumbar spine: (i) a fracture of the bone at L5 (spondylolysis); (ii) severe misalignment and slippage of the vertebrae at L5-S1 (spondylolisthesis); and (iii) pain symptoms shooting down his leg (radiculopathy).[120]  Further, he opined that the injuries are permanent in nature.[121]

Following the first appointment, based on the injuries, the Plaintiff's medical history, the physical examination, failure of conservative care, and his review of the lumbar MRI, Dr. Topp recommended surgical intervention at L5-S1 to stabilize the lumbar spine.[122]  The reason for the surgery was to resolve acute trauma from the February 11, 2017 motor vehicle collision.[123] It was clear to Dr. Topp, the type of injury the Plaintiff suffered would cause significant pain.

> Q.  Ultimately, looking at this image or these images, Doctor, is there concern or was there concern on your part with lumbar spine stabilization?

---

[117] Id.
[118] TT. Vol. II, p. 225, ln. 4-12; p. 226, ln. 15-24
[119] TT Vol. II, p 225, ln 7 – 12.
[120] TT. Vol. II, p. 218, ln. 19 – p. 219, ln 8; p. 220, ln. 22-25; p. 222, ln. 12-19; pp. 236-239; PL's Ex. 11, p. 13
[121] TT. Vol. II p. 269, ln. 17-21  The permanent injuries to his lumbar spine included the pars fracture which led to the spondylolisthesis, which led to the degenerative disc disease and post-traumatic arthritis at L5-S1, and which ultimately led to neural foramina impingement and continual nerve pain.
[122] TT. Vol. II, pp. 239-240
[123] TT. Vol. II, p. 225, ln. 7-12; p. 244, ln. 10-12; p. 292, ln. 19 – p. 293, ln. 1.

A.    You can clearly see on these images that the bone is slipping
forward and it's causing lumbar 5 and sacral 1 to be irritated,
and so it is an instability issue.  If it were solid and it
weren't rocking around, I wouldn't see any of those
inflammatory issues with regard to the bone in lumbar 5 and
sacral 1.  You wouldn't see a nerve being pinched.  That's a
condition that – when I look at it, I see pain.  You know, that
poor patient must be in a lot of pain.[124]

On February 21, 2018, the Plaintiff returned to Dr. Topp's practice for a follow up

appointment and at that time agreed to proceed with a surgical repair.[125]  On March 22, 2018, Dr.

Topp performed a transforaminal lumbar interbody fusion of L5-S1 on Mr. Triolo at Jacksonville

Beach Surgery Center.[126]    During the surgery Dr. Topp located the acutely fractured pars

interarticularis.[127]    This fracture is what caused the spondylolisthesis (misalignment of the

vertebrae) and radiculopathy.[128]    The fracture was fused by implanting rods, screws and a PEEK

cage at L5-S1.[129]  As part of the surgery, Dr. Topp harvested bone from Mr. Triolo to mix with

allograft material.[130]  Doing so allows for better osteointegration of the PEEK cage placed between

the vertebrae at L5-S1.[131]    The surgical hardware is visible on the live digital x-rays taken during

the surgery.[132]    The hardware consists of a PEEK cage, rods and screws will forever stay in the

Plaintiff's spine.[133]

Because two of the Plaintiff's vertebrae (L5-S1) are permanently fused together, the

---

[124] TT Vol. II, p. 234, ln 25 – p. 235, ln 11.
[125] PL's Ex. 11, pp. 9-10
[126] TT. Vol. II, p. 241, ln. 15-17; p. 255-255.
[127] TT. Vol. II, p. 249, ln. 15 – p. 250, ln. 19; PL's Ex. 11, pp. 13-16
[128] Id.
[129] Id. and PL's Ex. 5, pp. 10 – 13.
[130] TT. Vol. II, p. 252, ln. 1 – p. 254, ln. 14; PL's Ex. 11, p. 16
[131] Id.
[132] TT. Vol. II, p. 253, ln. 23-25; PL's Ex. 11, pp. 18, 22
[133] TT. Vol. II, p. 239, ln. 6-23

Plaintiff will forever suffer loss of range of motion.[134]  This is true because the Plaintiff's spine at

L5-S1 previously articulated in a normal flexion, extension and lateral movement.[135]  However,

the fusion is designed to stabilize L5-S1 and prevent movement at that level.[136]  In similar fashion

to Dr. Pardo, Dr. Topp testified that one of the known long-term side effects of an L5-S1 fusion is

that it causes adjacent disks to become subject to additional loading and wear due to the inability

for L5-S1 to articulate as previously designed.[137]  Further, according to Dr. Topp, the Plaintiff will

continue to experience ongoing limitations due to his injury including limitations related to

working out, loss of sleep, and ongoing back pain.[138]

     G.    <u>The Plaintiff will require at least one more surgery during his lifetime as a result
of the crash</u>.

As a result of the additional loading experienced by the disk adjacent to the surgery site,

the disk will be subject to abnormal wear leading to disk degeneration.[139]  The fusion of one level

causes stress on the other levels of the lumbar spine, and Dr. Topp testified as a result Mr. Triolo

will need surgery on the other levels of his lumbar spine.[140]  Accordingly, based upon the injury,

his age and the fusion, the Plaintiff will require at least one additional future fusion.[141]

     H.    <u>The Defendant's attempt to characterize the Plaintiff's lumbar injury
as a result of a long-standing degenerative condition was
successfully refuted</u>.

USPS did not have any experts testify to rebut any of opinions of the Plaintiff's medical

providers.  Rather they attempted to rely on their crosses of the Plaintiff's treaters.  During cross-

---

[134] <u>TT. Vol. II.</u> p. 252, ln. 12-24
[135] <u>Id</u>.
[136] <u>Id</u>.
[137] <u>TT. Vol. II.</u> p. 268, ln. 17 – p. 269, ln. 16
[138] <u>TT. Vol. II.</u> p. 271, ln. 1-14
[139] <u>TT. Vol. II.</u> p. 270, ln. 20-25
[140] <u>Id.</u>
[141] <u>TT. Vol. II.</u> pp. 268-269

examination of Dr. Topp, defense counsel attempted to paint a picture that the disk at L5-S1 was not acutely injured in the collision, but rather was the result of longstanding disk disease/degeneration.  The following exchange took place between Dr. Topp and defense counsel:

> Q    All right. So your opinion, if I understand it correctly, is that he suffered the pars fracture the day of the car accident; is that right?
>
> A    Yes, ma'am.
>
> Q    And that at some point between the car accident and between when that MRI was done, the spondylolisthesis developed?
>
> A    Yes, ma'am.[142]
>
> …
>
> Q    When you were talking on direct about the disc having lost its water content; do you recall that testimony?
>
> A    Yes, ma'am.
>
> Q    You were explaining that a disc had degenerated. And just making sure I'm clear, the loss of the water content and the desiccation that you were talking about on direct, that's what you're saying occurred in the 7 weeks from the car accident?
>
> A    Yes, ma'am, that certainly can occur. When we study disc degeneration -- and maybe this will clarify it for you. When we study disc degeneration, we use rabbit models. And the way we induce degenerative disc disease is we poke a big needle into a rabbit's disc, and within three or four weeks, it's a degenerative disc with disc desiccation and loss of height and it has all the signs of a degenerative disc. So, yes, ma'am, it can occur in those weeks.[143]
>
> …
>
> **his nerves were severely pinched, which told me he couldn't have been living like this for very long**.  He wouldn't be able to

---

[142] <u>TT. Vol. II.</u> p. 288, ln. 8-15
[143] <u>TT. Vol. II.</u> pp. 304, ln. 18 – p. 305, ln. 8

exist like this because the nerves were squashed."[144] [Emphasis Added.]

V.   **Damages.**

   A.   Past Medical Expenses.

In the three years since the motor vehicle collision, Mr. Triolo has incurred medical bills of $327,854.62. The medical bill charges and actual balances include the following:

| Provider | Total Charge | Plaintiff's Stipulated Balances after Reductions/Setoffs |
|---|---|---|
| Baptist Medical Center: | $2,521.20[145] | $378.18 |
| Baymeadows MRI: | $1,300[146] | $232.98 |
| Jacksonville Sport & Spine: | $6,046[147] | $951.91 |
| Orange Park Spine: | $1,600[148] | $1,600 |
| Precision Imaging: | $3,346.21[149] | $291.38 |
| MBB Radiology: | $223[150] | $0 |
| Emergency Resources Group: | $683[151] | $136.60 |
| Universal Neurological Care: | $1,310[152] | $259.29 |

---

[144] TT. Vol. II, p. 293, ln. 6-20
[145] See, PL's Ex 16
[146] See, PL's Ex 17
[147] See, PL's Ex 22
[148] See, PL's Ex 25
[149] See, PL's Ex 26
[150] See, PL's Ex 23
[151] See, PL's Ex 19
[152] See, PL's Ex 31

Case 3:18-cv-00919-MMH-J_T    Document 101    Filed 01/25/21    Page 22 of 26 PageID 3684


| | | |
|---|---|---|
| Topp Spine & Orthopedics: | $71,466[153] | $71,466 |
| Black Diamond Medical: | $19,000[154] | $19,000 |
| Jax Beach Surgery Center: | $99,578.85[155] | $99,578.85 |
| Triology Home Healthcare: | $450[156] | $450 |
| Omni Medical: | $10,200[157] | $10,200 |
| Advanced Diagnostics: | $95.79[158] | $15.98 |
| Jax Beach Anesthesia: | $6,100[159] | $3,507.65 |
| St. Joseph Interventional Pain Spec: | $98,809.17[160] | $98,540.48 |
| Select Physical Therapy: | $230[161] | $0 |
| Walgreens (Out of Pocket): | $4,895.40[162] | $4,895.40 |
| Totals: | $327,854.62[163] | $312,113 |

The total amount for Past Medical Expenses the Plaintiff is entitled to recover from the Defendant is $312,113.

B.    Past Lost Wages.

The Plaintiff missed 10 weeks of work as a result of the collision.[164]   His average weekly

---

[153] See, PL's Ex 29
[154] See, PL's Ex 18
[155] See, PL's Ex 20
[156] See, PL's Ex 30
[157] See, PL's Ex 24
[158] See, PL's Ex 15
[159] See, PL's Ex 21
[160] See, PL's Ex 28
[161] See, PL's Ex 27
[162] See, PL's Ex 14 and 32
[163] See, PL's Exs. 15 – 32, and 48 (medical bill summary).
[164] TT. Vol. I. p. 115, ln. 7-19; p. 117, ln. 3-4

22

wage was $936.86.[165]  His employer provided him with 2 weeks of paid time off for which Mr.

Triolo is not seeking compensation.[166]  As well, prior to trial, Mr. Triolo received collateral source

payments totaling 60% of his average weekly wage for 6 of the 10 weeks, for which subrogation

is not being claimed.[167]  Accordingly, the Plaintiff suffered damages of past lost wages of 2 weeks

for which he did not receive any compensation, and 6 weeks at 40%.[168]

The Plaintiff's past lost wage damages are:

$$\begin{array}{ll} \$936.86 & \$936.86 \\ \text{x}\quad\underline{\quad 2\quad} \quad + \quad & \text{x}\quad\underline{\quad 40\%} \\ \$1,873.72 & (\$374.74 \ \text{x 6 weeks}) = \$2,248.46 \end{array}$$

Total: $4,122.18

The Plaintiff is entitled to recover from the Defendant the total amount of $4,122.18 for

past lost wages.

C.    Future Medical Damages.

Both Mr. Triolo's spine surgeon and pain management physician have concluded that he

was permanently injured from the collision and will require ongoing medical care for the remainder

of his life to manage his lumbar injuries.[169]

Gil Spruance, a certified life care planner, prepared a Life Care Plan based on his review

of the medical records, medical bills and interviews with both Drs. Topp and Pardo.[170]

Based upon Mr. Triolo's age, injuries and need for continuing medical treatment, the only

evidence presented at trial established the following:

---

[165] TT. Vol. I. p. 118, ln. 3-6
[166] TT. Vol. I. p. 117, ln. 5-16
[167] TT. Vol. I. p. 117, ln 17 – p. 118, ln. 12
[168] TT. Vol. I. p. 118, ln. 13-15; p. 119, ln. 2-10
[169] TT Vol II. p. 138, ln 19 – pg. 140, ln 3; p. 268; ln. 17-22; p. 269, ln. 17-21;
[170] TT. Vol. IV. pp. 4-5; 7-9

### Annual Future Medical Costs[171]

| Description of Medical Care | Low Range | Mid Range | High Range |
|---|---|---|---|
| Office Visits (Pain Management) | $1,500 | $1,680 | $1,860 |
| Drug Screen (Monitor Medications) | $208 | $542 | $876 |
| X-Ray (Monitor lumbar) | $294 | $332 | $370 |
| Prescriptive Medication | $1,333.80 | $1,360.80 | $1,387.80 |
| Radiofrequency Ablations | $6,034 | $10,588 | $15,142 |
| Total Annual: | **$9,369.80** | **$14,502.80** | **$19,630.19** |

### One Time Future Medical Costs

| Description of Medical Care | Low Range | Mid Range | High Range |
|---|---|---|---|
| Lumbar Fusion Extension | **$155,552** | **$165,904.50** | **$176,257** |

Mr. Triolo is 46 years old. According to Table 5 of the National Vital Statistics Report, as of the date of the trial the Plaintiff's remaining life expectancy is 34.3 years.[172] Thus, the predictable cost of his future medical expenses over the remaining course of his life ranges from a low of $476,936.14, to a high of $849,572.52 with the midpoint at $663,350.54.[173]

The Plaintiff is entitled to recover from the Defendant $663,350.54 as damages for future medical expenses.

D.    <u>The Plaintiff is entitled to an award of both past and future non-economic damages</u>.

The medical records and testimony for the over 3 years since the collision overwhelmingly

---

[171] <u>TT. Vol. IV.</u> pp. 17-29
[172] <u>TT. Vol. IV.</u> p. 26, ln. 21 – p. 27, ln. 5; <u>See</u> PL's Ex. 38
[173] <u>TT. Vol. IV.</u> pp. 27-30

document objective findings and subjective reports of the significant pain, discomfort, disability, loss of sleep, and general changes and loss of enjoyment of life that Mr. Triolo has endured as a result of his injuries.  The injuries to him are permanent and based on the past 3 ½ years of treatment there is overwhelming support to determine that he will continue to suffer in the future. Perhaps one of the most somber statements about the Plaintiff's condition heard at trial was from his back surgeon:

> For all intents and purposes, he has a bad back. It's a permanently injured back and he needs to take care of his back.  So he really doesn't need to be doing dead lifts and squats, all the things he used to enjoy to preserve the remaining, for lack of a better term, tread on his spine.[174]

An award of $2.00 per hour to compensate Mr. Triolo for his non-economic damages both in the past and in the future is fair and reasonable.

Since the collision, 1,320 days have elapsed which equates to 31,680 hours.  Accordingly, the Plaintiff is entitled to an award of $63,360 for past non-economic damages.

As stated above, the Plaintiff's life expectancy is 34.3 year.  That equates to 12,519.5 days or 300,468 hours.  Accordingly, the Plaintiff is entitled to an award of future non-economic damages in the amount of $600,936.

The Clerk shall enter judgment for Plaintiff Richard Triolo against the Defendant United State of America in the amount of $1,500,000.00 and shall close the file.

DONE AND ENTERED  at Jacksonville, Florida, this _____ day of _____, 2021.

_____
Marcia Morales Howard
United States District Judge

---

[174] TT Vol. II, p. 271, ln 10 – 14.