UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

RICHARD A. TRIOLO,

        Plaintiff,

v.                            Case No. 3:18-cv-919-MMH-JBT

UNITED STATES OF AMERICA,

        Defendant.

_____/

## UNITED STATES OF AMERCIA'S POST-TRIAL
## <u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

THIS CAUSE is before the Court for entry of findings of fact and conclusions of law. This action arises out of a minor, rear-end motor vehicle accident that occurred in Jacksonville, Florida between Plaintiff Richard Triolo and Marsha Rentz, who was an employee of the United States Postal Service and was driving a Postal vehicle owned by the United States. As a result of the accident, Plaintiff filed the instant action against the United States seeking compensation under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

The Court finds that it has subject matter jurisdiction of the instant action. As stipulated by the Parties, and the Court accepts, Rentz was an employee of the United States acting within the scope of her federal employment with the Postal Service at the time of the accident on February 11, 2017. *See* Doc. 59 (Pretrial Statement) at ¶ 9(j). The Parties have further stipulated, and the Court accepts, that

Plaintiff timely submitted an administrative claim to the Postal Service and the Postal Service denied his claim. After exhausting his administrative remedies, Plaintiff timely filed the instant action. *See* Doc. 59 at ¶¶ 9(m) and (n).

The United States did not dispute that Rentz's negligence was the sole cause of the accident, and the evidence supports such a finding. The United States does dispute that this minor motor vehicle accident caused the injuries for which Plaintiff is seeking recovery. Thus, the issues to be determined are whether the accident is the legal cause of Plaintiff's asserted injuries and, if so, the extent of his damages. Plaintiff's property claim was resolved administratively, thus Plaintiff no longer seeks to recover for damage to his vehicle. Doc. 59 at ¶ 10(i).

This Court conducted a bench trial spanning September 22-24 and 28, 2020 and October 6, 2020. *See* Docs. 79-81, 83, 85 (Minute Entries). Plaintiff called the following witnesses to testify in person: Richard Triolo, Reynaldo Pardo, M.D., Raymond Topp, M.D., Brian Schmucker, Bruce Schmucker, and Gil Spruance. The United States called Jeanette Sigouin to testify in person and presented the deposition testimony of Marsha Rentz. Additionally, the Court reviewed evidence introduced by the parties including Plaintiff's medical records and photographs of the vehicles. At the close of the evidence, the parties filed proposed findings of fact and conclusions of law.

Having reviewed the pleadings, examined the evidence, observed the witnesses, and considered the arguments of counsel, as well as the remainder of the record, the

2

Court makes the following findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  PROPOSED FINDINGS OF FACT

### The accident

1.  This action arises out of a minor motor vehicle accident that occurred in Jacksonville, Florida on Saturday, February 11, 2017, at approximately 1:00 pm. The accident occurred in the rightmost southbound lane of Old St. Augustine Road approaching the intersection at Loretto Road. *See* Doc. 59 (Pretrial Statement) at ¶¶ 9(a)-(d) (admitted facts); Vol. I, 35:16, 35:20-21, 36:22-23, 38:2-3; Doc. 82, Rentz Tr. 14:13-15.

2.  Plaintiff Richard Triolo and USPS employee Marsha Rentz were both at a complete stop at the red light at Loretto Road; Plaintiff was directly in front of Rentz. *See* Doc. 59 at ¶¶ 9(a)-(c); Rentz Tr. 15:2-5, 18:20-22, 19:11-14, 20:24-21:2. Plaintiff was driving his 2016 Ford Mustang. Vol. I, 35:10; Def Ex 58. Rentz was driving a mail truck (a 1992 Grumman LLV). *See* Doc. 59 at ¶ 9(a); Def. Ex. 9, USPS_0049.

3.  Rentz testified that traffic light turned green, she stepped off the break, the mail truck rolled forward, and the front bumper of the mail truck hit the rear bumper of the Mustang. Rentz Tr. 15:2-5, 38:24-39:7; Def. Ex. 8, USPS_47. On impact, Rentz's body made a small jerk forward. Rentz Tr. 21:22-22:1, 40:11-14. She testified that she did not suffer any injuries and that it was "just basically a fender bender." *Id.* at 39:8-10, 40:7-10. She testified that she never put her foot on the gas; she

3

just could not get her foot back on the brake in time to prevent the accident. *Id*. at 15:2-5.

4.     Plaintiff testified that he had been stopped at the traffic light for 5-10 seconds, and that he was 3-4 cars back from the light, when he was "rammed from behind." Vol. I, 35:8, 38:2-9, 160:19-20. He described the impact as "hard." *Id*. at 41:6. He testified that his car "surged forward" on impact, although he did not know how far. He did not hit the car in front of him. *Id*. at 38:17-18, 38:25-39:13.

5.     Plaintiff's dog—a small dog that was captured in Plaintiff's photographs, *see* Pl. Ex. 24, CP-TRIOLO Vehicle 0017—was sleeping in the passenger seat at the time of the accident. Vol. I, 160:8-13. When asked if the dog fell off the seat when the accident occurred, Plaintiff testified that he was "not sure." *Id*. at 160:14-16.

6.     Plaintiff testified that his seat back reclined on impact. *Id.* at 38:17-18. He elaborated that it "was totally reclined" and testified that he was a little amazed by this, given that it was an electrically powered seat. *Id.* at 40:5-10; *see also id*. at 41:7-8 ("Just stopped at a traffic light and just bam -- and the seats reclined.").[1] Plaintiff

---

[1] This seatback allegation appeared for the first time in Plaintiff's Trial Brief (Doc. 75). The allegation does not appear in any medical record, was not asserted in Plaintiff's answers to interrogatories (Def. Ex. 12, nos. 7-8), and was not included in the Pretrial Statement (Doc. 59). There was no witness testimony corroborating Plaintiff's account. *See, e.g.*, Vol. IV, 56:13-15 (Sigouin testified that Plaintiff did not mention his seat suddenly reclining or causing an injury); Vol. III, 22:24-23:1-3 (Brian Schmucker did not look inside the vehicle and did not observe anything regarding the seat). Plaintiff's car was a new car, only 4-5 months old; the seat was not repaired after this accident and Plaintiff has had no problems with it since. Vol. I, 159: 3-6. Vol. I, 294:9-23. Having considered all the relevant evidence, the Court has determined that Plaintiff's description of his seatback reclining upon impact is not due to be credited.

testified that he "immediately…felt the twinge in [his] back, and … sat up into the seat, looking into the rearview mirror, to see who and what hit [him]." *Id.* at 40:5-10. He explained that he looked in the rearview mirror "within seconds" of the impact and saw the USPS driver holding a phone up to her face with a look of disbelief.[2] *Id.* at 40:11-41:4.

7.     Plaintiff also testified that he hit his head on the headrest. *Id.* at 68:2-3, 80:14-16.

8.     Plaintiff motioned for Rentz to follow him and the drivers moved their vehicles to a nearby parking lot, where they parked next to one another. *Id.* at 39:19-21; Rentz Tr. 15:7-10; Def. Ex. 6, USPS_0024.

9.     Rentz called USPS supervisor Jeanette Sigouin from the parking lot to report the accident. Def Ex. 8; Rentz Tr. 15:7-15, 23:13-24:12. During the call, Rentz asked Plaintiff if he was okay, and he replied that he was. Def. Ex. 8; Rentz Tr. 15:7-15. Plaintiff disputes this and testified that he told Rentz that he was not okay. Vol. I., 49:12-13.

10.     Plaintiff reported the accident to the police at 1:08 pm. Doc. 59 at ¶ 9(g); Vol. I, 50:5, 11-13; Def. Ex. 58, USPS_0019. Plaintiff had been on the way to the house of his brother, Brian Schmucker, so Plaintiff called his brother to let him know about the accident. Vol. I, 51:5-14; Def. Ex. 8; Def Ex No. at 12(c). Schmucker came to the

---

[2] Plaintiff testified he did not see Rentz prior to the accident. Vol. I, 161:23-25.

scene; upon his arrival, he asked Rentz if she was okay and she said yes. Rentz Tr. 33:23-34:11.

11.    Both Sigouin and Crystal Thomas, a USPS manager, came to the scene. Rentz Tr. 16:6-13. They asked Plaintiff if he was okay and he said that he was. Rentz Tr. 16:21-17:6; 24:23-25:2. Vol. IV, 54:10-16. Sigouin testified that the entire time she was on the scene she did not observe anything that would cause her to think Plaintiff was in pain: he did not appear to be in any pain, did not appear to be dazed, was not holding his back, and did not lean against his car for support. Vol. IV, 55:22-55:12. Instead, Sigouin testified that Plaintiff was visibly upset and angry at the damage done to his vehicle. Vol. IV, 56:2-15.[3]

12.    Plaintiff testified that he told the USPS employees that his back and neck were hurting and that he was having spasms in his mid or low back. Vol. I, 163:7-12, 164:1-3.

13.    Plaintiff took a number of photographs at the scene using his cell phone. Pl. Ex. 34; Def. Ex. 12, interrogatory no. 11. These photographs document the minor damage sustained by the Mustang's rear bumper.[4] *See, e.g.*, Pl. Ex. 34, CP-TRIOLO VEHICLE 1. Plaintiff also took pictures documenting what he believed to be damage to the mail truck (Vol. I, 43:25-44:3), although the Postal Service employees did not

---

[3]  While Officer Chase completed his investigation, Sigouin waited with Rentz near the Postal vehicle beside the Mustang. Vol. IV, 57:2-9.

[4]  Plaintiff testified that his rear bumper was "barely hanging" after the after accident (Vol. I, 48:7-8), but his own photographs belie this testimony. Plaintiff did not take any photographs of his seat. *See generally*, Pl. Ex. 34.

think that the Postal vehicle had been damaged in the accident. Def. Ex. 9, USPS_0049; Vol. IV, 76:4-5, 83:4-5; Rentz Tr. 22:20-22.

14.    Officer M.L. Chase arrived on the scene at 1:25 pm and prepared a traffic crash report. Doc. 59 at ¶ 9(g); Def. Ex. 58, USPS_0019. No ambulance was called, and Officer Chase cleared the scene at 1:48 p.m. Def. Ex. 58, USPS_0019.

15.    Plaintiff testified that he was on the scene of the accident for two hours. Vol. I., 50:15. He testified that "it took the sheriff forever to get there" and that, "after he got there, it took forever to get the police report." Vol. I, 51:2-3. Plaintiff testified that, during the time he was on the scene, his "back just started getting worse," and that "[t]here was pain that started going all the way up into [his] neck, and it was getting worse by—it was getting worse by the hour." *Id*. at 50:17-19.

16.    Schmucker also testified that they were on the scene for a long period of time, estimating that, from the time he arrived at the scene until the time they left the scene, it was "probably over an hour." Vol. III, 20-22.

17.    Schmucker testified that, a couple of minutes after he arrived on the scene, Plaintiff told him something did not feel right in his back. *Id*. at 12:9-11. He testified that Plaintiff had his hand over his lower back. *Id*. at 12:13-14. He testified that Plaintiff was moving around a lot, trying to feel his back out. *Id*. at 13:3-4. Schmucker testified that he encouraged his brother to get checked out, but he did not drive him to the emergency department or accompany him to the emergency department. *Id.* at 13:17-20.

7

18.    Plaintiff testified several times that once he received the accident report from the officer on the scene, he drove himself straight to the emergency department, which he said was a 10-minute drive. *See* Vol. I., 52:16-18, 169:8-12, 295:24-296:6. He was strangely insistent on this version of events, even though the accident report form shows that Officer Chase cleared the scene at 1:48 p.m., and Plaintiff did not arrive at the Baptist Medical Center emergency department until an hour later. Def. Ex. 16, BMCSOUTH_0140; Vol. I., 169:4-7.

19.    On June 28, 2017, the Postal Service issued payment in the amount of $1,136.61 to State Farm for the property damage to Plaintiff's vehicle, which included Plaintiff's deductible. Doc. 59 at ¶ 9(k); Def. Ex. 4. Although Plaintiff contented at trial that a "bunch of things" were replaced in the rear of the car (Vol. I, 157:2-5), on cross-examination he acknowledged that the only items replaced were the bumper cover and reverse sensor. Def. Ex. 3, USPS_0013; Vol. I, 158:17-24. He acknowledged there was no damage to the frame of his vehicle. Vol. I, 158:25159:2.

### Emergency department

20.    Plaintiff presented to the Emergency Department at Baptist Medical Center at 2:46 p.m. Pl. Ex. 2, BMC 12. This is the hospital at which Plaintiff is employed. *See* Def. Ex. 39. He was seen by Dr. Christina G. Caro. Pl. Ex. 2, BMC 2. Dr. Caro's note was electronically signed at 4:15 p.m. (*id*. at BMC 5) and she added an addendum at 4:22 p.m. (*id*. at BMC 2).

21.     According to the medical records, Plaintiff reported that "he was a restrained driver at a stoplight when a mail truck rear ended his vehicle at a moderate speed." *Id.* at BMC 3. He denied hitting his head, any loss of consciousness, or any bleeding. *Id.* He reported having neck pain and lower back pain. *Id.* He reported that the degree of pain was moderate at onset and continued to be moderate in the ED. *Id.*; *see also id.* at 173:12-13.

22.     Dr. Caro's physical examination noted that Plaintiff's neck was supple but that it was tender to palpation to midline. Pl. Ex. 2, BMC 2, 4. Dr. Caro ordered a CT of the cervical spine, which showed only chronic degenerative changes. *Id.* at BMC 4, 20 ("multilevel disc osteophyte complexes").

23.     Dr. Caro's physical examination also noted that Plaintiff's back was nontender with normal range of motion, had normal alignment, and had no step-offs (*id.* at BMC 4); in short, the back exam was normal. Notwithstanding what Plaintiff later told his providers, there is no indication that he had tightness or spasms in his back, that he had pain in his thigh and leg all the way to the sole of his foot, or that he was dazed and confused.[5]

---

[5] During cross-examination, Plaintiff admitted that he "probably didn't" report spasms when in the emergency department. Vol. I, 200:5-11.

24.    Plaintiff was given Tylenol 650 mg and a prescription for eight Lortab 5/325 mg and was discharged at 4:20 p.m. *Id*. at BMC 36-37; Vol. I, 57:18-25, 175:7-13.[6]

25.    Plaintiff asserted that no one at the Emergency Department did any type of physical exam on his neck or on his low back (Vol. I, 5:18-23, 173:6-9, 297:11-298:16), but this allegation was contradicted by the medical records. When asked whether he would have advocated for himself to get lumbar imaging if he was having severe back pain, he said: "I'm going by what the Emergency Room doctor at this point feels I need." *Id*. at 174:11-16. It seems unlikely that Plaintiff would have deferred to the physician in this way if he felt she did not do a thorough evaluation of his complaints.

26.    Plaintiff testified that when he left the ER, his neck and back were still hurting and that, over the following week, his pain got worse. *Id*. at 59:1-8. He testified that he thought he needed to see someone, so he wanted to get in touch with a chiropractor. *Id*. at 59:13-14. He denied having been to a chiropractor before. *Id*. at 176:10-17.

---

[6] He also was directed to follow up with his primary care provider regarding this blood pressure, which was elevated during the visit. Pl. Ex. 2, BMC 5.

## Jacksonville Sport & Spine – Chiropractor Michael McDaniels

27.    On February 16, 2017, five days after the accident, Plaintiff began treating with Michael McDaniels, a chiropractor at Jacksonville Sport & Spine. Pl. Ex. 6.[7] Plaintiff treated with that practice until July 20, 2017. *Id*.

28.    Dr. McDaniel's records reflect the following about the accident: "Patient was at a traffic light, traffic started to move forward, tapped brakes, hit the horn, patient's vehicle was struck in the rear by a mail truck. The truck was travelling at approximately 30-40 mph. Entire rear end of the truck has to be replaced." *Id*. at JSS 10.[8] There was no reference to Plaintiff's seatback reclining.

29.    In the forms completed the day of the initial visit, Plaintiff described his primary health complaint as "upper neck pain, upper and lower back pain, shooting pain into the lower right glut[e] [and] into the lower right hamstring." *Id*. at JSS 1; Vol. I, 60:20-21. He said the pain had gotten much worse since the collision. Vol. I, 60:25.

---

[7] On a form completed at the time of the initial visit, Plaintiff indicated that he was referred by Phillip Kinney, but Plaintiff testified that he did not become a client of Mr. Kinney's until a week later. Vol. I, 62:7-11; Pl. Ex. 6, JSS 1.

[8] This report about the accident is reflected in both a typewritten "Initial Examination" note (Pl. Ex. 6, JSS 10) and a handwritten encounter form that appears to have been written by Dr. McDaniels (*id*. at JSS 2). During cross-examination, Plaintiff disavowed parts of this history, such as the traffic moving forward, him tapping his break, and him hitting the horn (Vol. I, 177:13-16) but he affirmed others. For example, regarding the speed of the Postal Service vehicle, he stated that "she hit me hard, so it could be 30, 40 miles an hour." *Id*. at 177:20-25. During re-direct examination, Plaintiff disavowed the entire description of the accident. Vol. II, 18:6. He testified that he did not know whether it was accurate that the Postal Service vehicle was traveling at 30-40 miles per hour. Vol. II, 19:3-6. Plaintiff testified that he did not know where Dr. McDaniels got the inaccurate information from but that it did not come from Plaintiff. Vol. II, 19:7-12.

He indicated he was taking the pain medications prescribed by the ER and ibuprofen. Pl. Ex. 6, JSS 1.

30.    The form asked Plaintiff to review a list of conditions and indicate which were current and which, if any, were conditions he had experienced in the past. For current conditions, Plaintiff listed hip pain, trouble concentrating, trouble sleeping, pain with coughing and sneezing, difficulty breathing, and headaches. *Id.* at JSS 1. He did not list any past conditions. *Id.* Plaintiff also reported a variety of other issues, including being in a lot of pain, waking up at night, not being able to sit or stand for long, being dizzy, having ringing in the ears, experiencing anxiety and sleep problems, and limping at work. *Id.* at JSS 2, 10.

31.    He completed a Pain Disability Questionnaire reflecting numerous severe effects allegedly from the accident that had occurred only 5 days previously. *Id.* at JSS 3. On a scale of 0 to 10, with 10 being the most severe, he endorsed scores of 10 on seven different measures, including the negative effect his pain had on his ability to see people who are important to him and his ability to engage in recreational activities. *Id.* He also completed a "loss of enjoyment / duties under duress summary" in which he reported increased pain for almost every activity listed. *Id.* at JSS 4.

32.    During his testimony, Plaintiff asserted: "So my pain was getting worse by the day. It was getting harder to walk. It was getting harder to stand. And at that point in time, you know, my job demands that. And with the amount of pain that I was in, it was hard to concentrate. I was constantly thinking about what was going on

12

with my back and neck." Vol. I, 63:18-23. He testified that he was feeling more depressed, tense, and anxious, and that his back was killing him. *Id.* at 75:19-25. "I was starting to be concerned about my job at this point. I really didn't know if I was going to be able to work 12-hour shifts at all. It was starting to get to me." *Id.* at 76:4-6.

33.    Notwithstanding all his expressed concerns about his condition, Plaintiff never saw Dr. McDaniels's practice as frequently as was recommended. *Id.* at 179:8-12. Dr. McDaniels initially recommended that Plaintiff return for treatment 3 times per week for 2-4 weeks. *Id.* at 178:21-24; Pl. Ex. 6, JSS 12. Instead, Plaintiff returned for only one visit in February. He returned for four visits in March, but only went twice in each of April, May, June, and July. Pl. Ex. 6, JSS 9; Vol. I, 179:18-180:25.

34.    According to the medical records, Dr. McDaniels made a number of other recommendations at the initial visit that Plaintiff did not follow. Dr. McDaniels prescribed a back brace but Plaintiff did not wear it, asserting that it did not help. Pl. Ex. 6, JSS 12; Vol I, 181:8-22. Dr. McDaniels referred Plaintiff for a lumbar MRI, but Plaintiff did not get one until April, when a subsequent physician recommended it. Pl. Ex. 6, JSS 14; Vol. I, 184:1-4.

35.    Dr. McDaniels recommended that the Plaintiff take some time off work (Pl. Ex. 6, JSS 13), but Plaintiff did not follow this recommendation either. When asked why, he stated: "I wouldn't stop my job. I love my job. You know, I need to pay bills like anybody else." Vol. I, 66:4-5. On cross-examination, he admitted that he took

13

time off not to recuperate from the accident but instead to go to the Daytona 500 (discussed further, below), stating: "I never said I didn't have any leave time to take off." *Id.* at 183:17-19. He admitted that if he was physically unable to work, he would not have. Vol. II, 40:18-20. He worked 47.93 hours at Baptist Medical Center in the week following the accident. Def. Ex. 51 (2/12 - 2/18/2017); Vol. I, 153:24-25.

36.     At no time did Dr. McDaniels prescribe medications for Plaintiff. Vol. I, 198:6-8; Pl. Ex. 6, JSS 52.

37.     One of the things that seemed to help Plaintiff was using a simple "runners roller" which was documented to help him with "hip/leg pain." Pl. Ex. 6, JSS 52; Vol. I, 198:14-199:13. Plaintiff testified that it helped with the tension and the knots but did not eliminate the radiating pain. Vol. II, 23:10-19. He also reported that a "tens unit" helped "a lot." Pl. Ex. 6, JSS 52. He testified that he used that only on his neck. Vol. II, 23:3-9.

38.     On the whole, Plaintiff testified that Dr. McDaniels's treatment provided minimal relief for his neck and only very minimal and very temporary relief from his back pain and that the radiating pain was never relieved. Vol. I, 77:22-78:9.

### Universal Neurological Care – Dr. Syed Asad & Lindsay Chason

39.     Dr. McDaniels referred Plaintiff to Dr. Syed Asad, a neurologist at Universal Neurological Care. Plaintiff treated with Universal Neurological Care from March 16, 2017 to May 25, 2017. *See* Pl. Ex. 13, UNC 1.

40.    Plaintiff told Dr. Asad that he was rear-ended while stopped at a stop light. *Id*. at UNC 2. He reported that "[h]e felt his head jerk back and forth and the back of his head hit the headrest." *Id*. He reported that, "[i]mmediately after the accident, he was experiencing tightness and spasms in the mid and low back." *Id*.

41.    Plaintiff reported a litany of complaints that he attributed to the accident: cognitive deficits (including attention and concentration deficits and forgetfulness at work), difficulty with balance, walking into walls, his legs sometimes feeling like jello, 10/10 back pain, difficulty sleeping, ringing in the ears, mood changes, headaches, muscle weakness, and involuntary movements. *Id*. at UNC 2-8.

42.    These (and other) complaints led to Dr. Asad diagnosing lumbar radiculopathy, postconcussion syndrome, neck pain, cognitive disorder, headache, insomnia, mood swings, and hypertensive disorder. *Id*. at UNC 5-7. [9]

43.    Dr. Asad ordered, *inter alia*, a MRI of the lumbar spine; an EMG/nerve conduction study; medications and supplements to address the reported sleep issues, neck pain, headaches, and back pain; a referral to Dr. Russ Addeo for neuro-psychometric testing; a referral to Casey Harlow for a Balance Master assessment; and trigger point injections (abbreviated as TPis) for neck pain. *Id*. Plaintiff declined or indicated that he preferred to "hold off" on most of these. *Id*. He never saw Dr. Addeo

---

[9] Plaintiff did not recall if he reported his prior history of headaches to Dr. Asad (Vol. I, 200:23-201:4) and there is no indication in the records that he did. Plaintiff had elevated blood pressure at the visit and Dr. Asad recommended that he monitor and follow up with his primary care provider. Pl. Ex. 13, UNC 7-8.

15

or Ms. Harlow,[10] and he never had the trigger point injections for neck pain. He did
have the lumbar MRI and EMG. The lumber MRI was performed on April 4, 2017
and is discussed in the following section.

44.    The nerve conduction studies were performed on May 10, 2017. *Id*. at
UNC 16. According to Dr. Asad's report, "[n]erve conduction studies of the bilateral
lower extremities revealed responses that are within normal limits." *Id*. at UNC 17.
He also noted findings that "likely represent chronic proximal pathology such as
radicular disease at the right L5-S1 level." *Id*. The Court did not have the benefit of
Dr. Asad's testimony to discuss these findings. It does not appear that Plaintiff saw
Dr. Asad again.

45.    On May 25, 2017, Plaintiff saw Lindsay Chason, PAC, another provider
at Universal Neurological Care. *Id*. at UNC 20. With respect to lumbar radiculopathy,
Ms. Chason referred Plaintiff to see pain management physician Dr. Scott Kramarich
(at Riverside Pain Physicians) for pain management and neurosurgeon Dr. Andrew
Cannestra (at Lyerly Neurosurgery) for a surgical option. *Id*. at UNC 24. With respect
to postconcussion syndrome, it was noted that Plaintiff did not start the recommended
supplements and that he preferred to hold off on an MRI of the brain, as with the other

---

[10] Plaintiff indicated on direct examination that he was given a balance test and he "failed that
balance test miserably" (Vol. I, 82:9-13), but Plaintiff never had formal balance testing (*id*. at 203:15-
17). The only balance test in the records is the one Dr. Asad did in the March 16, 2017 office visit
that caused him to make the referral to Casey Harlow. Pl. Ex. 13, UNC 5.

recommended referrals. *Id*. This was Plaintiff's last visit to Universal Neurological Care.

46.    Plaintiff denied that he was referred to see Dr. Kramarich and Dr. Cannestra; indeed, he testified that he had never heard of these physicians. Vol. I, 202:5-10; Vol. II, 28:22-25. He denied receiving any messages or phone calls from their practices. Vol. I, 256:6-9; Vol. II, 29:1-9. Nonetheless, there is a letter in the medical records sent by Lyerly Neurosurgery to Dr. Asad, dated June 7, 2017, stating that Lyerly Neurosurgery was unable to make contact with Plaintiff after several attempts. Def. Ex. 19, UNC_0038. Similarly, Plaintiff did not recall being referred to Dr. Addeo or Ms. Harlow and did not remember hearing their names. Vol. I, 203:1-14. Instead, Plaintiff testified Dr. Asad referred him to see Dr. Pardo. 204:21-205:2.

### April 4, 2017 lumbar MRI

47.    On April 4, 2017, Plaintiff had an MRI of the lumbar spine at Baymeadows MRI that was read by radiologist Dr. Soheil Sooudi. Pl. Ex. 4, BMRI 1-2. Dr. Sooudi is a board-certified radiologist. *Id*. at BMRI 2. The findings on the MRI are central to Plaintiff's case, yet Plaintiff did not call Dr. Sooudi to testify. With respect to L5-S1, the report reflects as follows:

17

**FINDINGS:** The vertebral bodies are intact demonstrating normal marrow signal intensity. The conus medullaris is at L1-2 level. There is bilateral L5 spondylolysis. There is grade 1 spondylolisthesis at L5-S1 level with about 5 mm anterior subluxation of L5 vertebral body over S1. There is degenerative spondylosis with disc desiccation and moderate to severe disc space narrowing at L5-S1 level and moderate disc space narrowing at T12-L1 level.

L5-S1 - There is a circumferential disc bulge resulting in bilateral foraminal stenosis in combination with anterior L5 subluxation encroaching upon the L5 nerve roots bilaterally. Clinical correlation is recommended to rule out L5 nerve root impingement. There is no central canal stenosis.

48.    Other portions of the lumbar spine (L4-5, L3-4, L2-3, L1-2, T12-L1) also are addressed in the report. For example, at L4-5, "[m]ild facet joint arthropathy is noted bilaterally" but the level is noted to be otherwise unremarkable. *Id*. At L3-4, the report notes "mild facet joint arthropathy, predominantly on the right side" with "annular bulge encroaching upon foramina with no spinal stenosis or nerve root impingement." *Id*.

49.    In the impression section of the report, the radiologist stated as follows:

**IMPRESSION:**
1. Bilateral L5 spondylolysis with grade 1 spondylolisthesis at L5-S1 level.
2. Degenerative spondylosis with disc desiccation and disc space narrowing at L5-S1 level with circumferential disc bulge resulting in bilateral foraminal stenosis in combination with anterior L5 subluxation encroaching upon the L5 nerve roots.
3. Disc desiccation with disc space narrowing at T12-L1 level with protruding posterior disc herniation indenting the anterior thecal sac with spinal canal narrowing and no cord impingement.
4. Annular bulge at L2-3 and L3-4 levels encroaching upon foramina with no spinal stenosis or nerve root impingement.

50.    In sum, the radiologist indicated, in addition to other findings, that Plaintiff had a bilateral L5 spondylolysis with a grade 1 spondylolisthesis at the L5-S1 level. Nowhere in the report does the radiologist state that he observed bone marrow edema or any other evidence of acute injury. Rather, there are multiple references to

18

degenerative processes, such as a finding of "degenerative spondylosis with disc

desiccation" at L5-S1 and disc desiccation at T12-L1. *Id.*

### Dr. Reynaldo Pardo – St. Joseph Interventional Pain Specialists

51.    On July 11, 2017, five months after the motor vehicle accident, Plaintiff

began seeing Dr. Reynaldo Pardo. Dr. Pardo is a solo practitioner who operates St.

Joseph Interventional Pain Specialists. Vol. II, 57:22-25.[11] He has a specialty in

anesthesiology and a subspecialty in interventional pain management. *Id.* at 55:24-

56:1. Plaintiff continues treating with Dr. Pardo to the present.

52.    In the "auto injury – patient history form" that Plaintiff completed, he

stated that he was rear ended while at a traffic light. Pl. Ex. 9, SJIPS 3. He listed his

top three symptoms as lower back pain (radiating down glute into hamstring and

across hip flexor), neck pain, and headaches. *Id.* In response to the question, what

makes your pain worse, he wrote: "Sometimes it feels like anything does." *Id.* at SJIPS

4.[12] In response to a question asking if he had "had any injuries (other auto injuries,

falls, sports injuries, etc.) in the past that were significant OR required medical

evaluation or treatment" he answered "no." *Id.* He indicated that since the accident,

---

[11] Dr. Pardo did not know how the Plaintiff was referred to him. Vol. II, 162:12-13. He
acknowledged that he had "probably" treated at least two patients who were represented by Mr.
Kinney in litigation. *Id.* at 163:2-4. He did not remember if Mr. Kinney asked him to see Plaintiff. *Id.*
at 163:5-6. He denied knowing that he had a letter of protection with Plaintiff. *Id.* at 164:1-19. He
testified that he did not have any understanding as to how Plaintiff's medical care had been paid. *Id.*
at 164:20-24.

[12] Plaintiff also reported to Dr. Pardo that aggravating factors included prolonged sitting, prolonged
standing, going from sitting to standing, and long car rides. Pl. Ex. 11, SJIPS 9; Vol. I, 211:4-7.

he had experienced fatigue, memory loss, headaches, depression, being irritable, and difficulty with sleep. *Id.* at SJIPS 5, 9. He did not list any past medical problems other than sleep apnea. *Id.* at SJIPS 5.[13] Under a question about prior surgeries, he listed a left forearm/compound fracture. *Id.* He indicated he was not taking any medications. *Id.* He reported that he was not on any current work restrictions but that he did "not help in heavy lifting anymore." *Id.* at SJIPS 6. Plaintiff signed the history form, below the following statement: "To the best of my knowledge, the questions on this form have been accurately answered. I understand if I provide incorrect information, it can lead to a misdiagnosis. It is my responsibility to inform doctor's office of any change in my medical status." *Id.* On a separate medical history form, Plaintiff indicated that he was experiencing lightheadedness or dizziness, anxiety/panic attacks, chest pain or angina, and a possible stomach ulcer. *Id. at* SPIPS 8.[14]

53.    Dr. Pardo's new patient forms include a background check authorization with three questions: have you ever been to an addiction specialist/attended a rehab program, have you ever been arrested, have you ever been convicted of a drug related offense. Def. Ex. 20, SJIPS_0013. Plaintiff answered "no" to each of these questions. *Id.* Dr. Pardo testified that he asks these questions because "[m]ost likely it will determine whether I'm going to initiate morphine or any other narcotic opioid

---

[13] Dr. Pardo testified that "apparently [Plaintiff] doesn't suffer from severe sleep apnea. I don't believe he uses a CPAP machine." Vol. II, 80:22-23.

[14] Plaintiff testified about his insomnia (Vol. I, 91:7-24), lightheadedness/dizziness (*id.* at 92:2-12), anxiety and panic attacks (*id.* at 92:16-21), chest pain or angina (*id.* at 93:2-4), and possible ulcer (*id.* at 93:6-10).

therapy." Vol. II, 149:6-7. He explained that, if a patient has these types of prior offenses, typically he would not prescribe narcotics. *Id*. at 149:7-10. He testified that he would want to know if a patient had a DUI arrest in the past. *Id*. at 149:15-17.

54.     Plaintiff reported to Dr. Pardo that, in the February 2017 accident, he suffered "blunt trauma" and "was dazed." Pl. Ex. 9, SJIPS 9. Plaintiff testified that "the blunt trauma was being rammed from behind." Vol. I, 210:11. Dr. Pardo was aware that Plaintiff was seen the day of the accident at Baptist South emergency department "and underwent CT scan images" (Pl. Ex. 9, SJIPS 9), but Dr. Pardo never received a copy of those records. Vol. II, 157:4-6. Similarly, Dr. Pardo never received records from Jacksonville Sport and Spine, the records from Universal Neurological Care, or any medical records pre-dating the accident. *Id. at* 157:7-10-16. He relied on what Plaintiff reported to him. *Id. at* 157:17-19.[15]

55.     At the time of the first visit, Dr. Pardo did have a copy of the radiology report from the April 4, 2017 lumbar MRI. Dr. Pardo did not recall when he first reviewed the MRI itself but testified that it was "in the first three or four [visits], most likely." Vol. II, 96:15-16. He had not looked at it when he made the diagnoses reflected in his July 11, 2011 encounter note. *Id*. at 168:20-22; Pl. Ex. 9, SJIPS 11.

---

[15] Plaintiff apparently reported to Dr. Pardo that "[c]hriopractic adjustments began in February 2017 and continue at two session[s] per week" (Pl. Ex. 9, SJIPS 9), but that was not an accurate report. Vol. I, 211:10-25.

56.    Dr. Pardo testified that, based upon Plaintiff's reported symptoms and physical exam, he thought Plaintiff could have nerve root compression and/or facet arthropathy. *See, e.g.*, Vol. II, 76:24, 77:15, 88:4-5, 88:19-20, 90:15-25.

57.    Dr. Pardo performed a lumbar epidural steroid injection at L5-S1. Pl. Ex. 9, SJIPS12. Plaintiff reported that this injection did not relieve his pain. *Id. at* SJIPS 15 (describing pain as "same"), SJIPS 1 (reflecting that the injection resulted in "minimal and transient relief"); Vol. II, 112:21-22 ("There was no significant relief.").

58.    Plaintiff was not taking any medications when he started treating with Dr. Pardo.[16] Vol. I, 207:14-16; Vol. II, 163:20-22. Dr. Pardo prescribed Percocet at that first visit, along with other medications. Pl. Ex. 9, SJIPS 14; Vol. I, 157:23-158:4.

59.    On July 20, 2017, Dr. Pardo performed a prognostic medial branch nerve block, *i.e.*, a nerve block with local anesthetic to take the sensation away from the facet joints. Vol. II, 113:3-7. Dr. Pardo described this as "a diagnostic treatment" to confirm the diagnosis of facet arthropathy as the main pain generator." *Id.* at 113:11-21. It was performed at L2, L3, L4, and L5, on the right side. Pl. Ex. 9, SJIPS 16; Vol. II, 113:23-24, 114:1. Plaintiff "reported no significant relief" from this procedure. Pl. Ex. 9, SJIPS 20; *see also id.* at SJIPS 1 ("no relief"); Vol. II, 114:7-8. At trial, Dr. Pardo testified that

---

[16] Dr. McDaniels did not prescribe any medications. Vol. I, 207:17-18. Dr. Asad prescribed a muscle relaxant (methocarbamol) and a nerve pain medication (gabapentin) but neither worked. *Id.* at 207:20-208:4; Pl. Ex. 9, SJIPS 5. Thus, aside from eight pills from the ER, Plaintiff had no narcotic pain medication from the day of the accident to when he started seeing Dr. Pardo. Vol. I, 208:11-14.

this indicated to him "[t]hat there was another area causing the majority of the pain." Vol. II, 114:12-13.

60.    In this same timeframe, Plaintiff took 60 hours of leave from work and went to the Florida Keys for a vacation. Vol. I, 217:10-18.

61.    On August 3, 2017, Plaintiff returned for an office visit. Dr. Pardo recommended proceeding with a transforaminal steroid injection at L5. His note stated that if the injection was ineffective, he would "consider referral to the spine surgery service for evaluation and possible surgical decompression and fusion." Pl. Ex. 9, SJIPS 21. The injection was performed on August 11, 2017, but Plaintiff reported increased pain intensity after the procedure. *Id.* at SJIPS 26; Vol. II, 115:24-25; *see also* Pl. Ex. 9, SJIPS 1.

62.    On August 31, 2017, Dr. Pardo prescribed extended release morphine; on October 3, 2017, Plaintiff reported that he was taking it. Pl. Ex. 9, SJIPS 28, 29, 31.[17]

63.    Also, on October 3, 2017, Dr. Pardo referred Plaintiff to Dr. Constantine Toumbis for a surgical evaluation. Pl. Ex. 9, SJIPS 1, 32; Vol. I, 117:12-13; Vol. II,

---

[17] The Walgreens pharmacy records contained only one record of an extended-release morphine being dispensed, on October 31, 2017, which was after Plaintiff reported he had started taking it. Pl. Ex. 14, at WALGREENS 9. There were no other prescription records in evidence showing this medication was dispensed to Plaintiff. On direct examination, Plaintiff testified that he did not recall when he started taking it, but that he took it after his surgery until approximately late summer 2019. Vol. I, 103:20-104:6. On cross examination, he testified that Walgreens did not have the medication so he obtained it from another pharmacy, although he could not remember the pharmacy's name. Vol. I, 268:23-268:17.

174:23-25. Dr. Pardo did not perform any additional injections prior to Plaintiff's March 2019 surgery.

### Dr. Constantine Toumbis – Orange Park Spine Institute

64. Dr. Pardo referred Plaintiff to see Dr. Constantine Toumbis, an orthopedic spine surgeon with the Orange Park Spine Institute. Pl. Ex. 9, SJIPS 1. Dr. Pardo's referral letter noted the lack of success of the various injections. *Id.* As such, Dr. Pardo explained that he was referring Plaintiff for evaluation and treatment and to consider a surgical therapeutic approach. *Id.*

65. Plaintiff saw Dr. Toumbis once, on October 20, 2017. Def. Ex. 21, OPSI_003. Plaintiff filled out a number of forms in connection with his visit. *Id.* at OPSI_0012-24. Among these was a 4-page "auto accident injury questionnaire" with detailed questions about the accident. *Id.* at OPSI_12.[18] In response to a question asking what the vehicle that hit him was doing just before impact, Plaintiff wrote that it was "stopped at a traffic light." *Id.* On the stand, Plaintiff stated that he had simply misread the question. Vol. I, 224:1-15. The questionnaire asked for his approximate speed and the approximate speed of the vehicle that hit him. For his speed he put,

---

[18] On this form, Plaintiff checked that he was dazed and confused following the impact. Def. Ex. 21, OPSI_0021. Dr. Toumbis's note reflects that Plaintiff reported that, at the ER, he "complained of pain in the right lower extremity as well, in the S1 dermatomal distribution, in the posterior aspect of the thigh and leg all the way to the sole of his foot." *Id.* at OPSI_003. This, of course, is not what is reflected in the ER records. Similarly, he told Dr. Toumbis that muscle relaxants were prescribed in the ER, which was not the case. *Id.* at OPSI_0003.

zero. *Id*. at 225:3-4. For the other vehicle speed, he put a question mark. *Id*. at 225:5-7. He testified: "I have no idea, offhand, how fast she was going." *Id*. at 225:9.

66.    Plaintiff testified that he brought the MRI report and disc to the visit with Dr. Toumbis and that, after reviewing the MRI, Dr. Toumbis recommended that he would need surgery. Vol. I, 108:2-4, 12-13. Dr. Toumbis's encounter note from this visit contains the following diagnosis:

> MRI of the lumbar spine is significant for pathology at the L5-S1 segment. There is a grade 1 spondylolisthesis of 5 mm of L5 onto S1 caused by bilateral pars interarticularis defect. **This is a degenerative spondylolisthesis as there is no evidence of bone marrow edema surrounding the pars interarticularis. The anterolisthesis has caused significant disc degeneration at this level** and has contributed to severe neural foraminal narrowing on the right and moderately severe neural foraminal narrowing on the left. The rest of the MRI is largely unremarkable.

Def. Ex. 21, OPSI_004 (emphasis added). Anterolisthesis is the specific term for the type of spondylolisthesis; that term refers to the forward motion of L5 over S1. Vol. II, 285:11-14.

67.    In short, Dr. Toumbis found significant disc degeneration at L5-S1. He found no evidence of bone marrow edema surrounding the pars interarticularis that would suggest that the pars fracture was acute.

68.    Plaintiff testified that, at that time, he was not committed to having a back surgery. Vol. I, 108:22-24, 109:2-4. He had a cousin who had back surgery and it did not work out well for him. *Id*. at 105:14-15. (He got addicted to his pills after back surgery and took street drugs and overdosed on heroin. *Id*. at 105:15-16.) Also, Plaintiff

25

had a neighbor in New York who had back surgery and had to move to a warmer climate. *Id*. at 109:6-7. Plaintiff did not associate back surgeries with something positive. *Id*. at 109:3-9.

69.    Plaintiff explained that, once he decided to have the surgery, he did not reach out to Dr. Toumbis about doing it because he learned Dr. Toumbis was no longer located in Orange Park. *Id*. at 112:111-24. Plaintiff did, however, stay in touch with Dr. Toumbis's office. For example, in October 2018, Plaintiff reached out to the office to obtain a second opinion on an MRI, and he dropped off a disc to the practice in November 2018. Def. Ex. 21, OPSI007; Vol. I, 231:17-232:6.

### Primary care visit

70.    On October 26, 2017, Plaintiff finally had his first visit to his primary care provider since the accident. Pl. Ex. 4, BPC 03; Vol. I, 232:16-25. He did not report the accident or Dr. Caro's (or Dr. Asad's) recommendation that he follow up with his primary care provider about his elevated blood pressure. Instead, he presented for an issue with his left eye. Pl. Ex. 4, BPC 03. He reported recently feeling symptoms of a chest cold with fatigue, but no other complaints. *Id*. When asked about this visit, Plaintiff stated "I spoke to him about what I was there for that day." Vol. I, 233:24.

### Dr. Raymond Topp – Topp Spine & Orthopaedics

71.    On November 8, 2017, nine months after the motor vehicle accident, Plaintiff had an orthopedic spine consultation with Dr. Raymond Topp, with Topp Spine & Orthopaedics.

26

72.    Dr. Topp thought Plaintiff was referred to him by one of the neurologists, perhaps Dr. Asad. Vol. II, 297:25-298:10. Plaintiff listed Dr. Asad as the referring physician on the intake form, but Plaintiff testified that that was a mistake, and that it was his understanding that Dr. Pardo referred him. Pl. Ex. 11, TOPP 1; Vol. I, 234:19, 22-23.[19] Plaintiff signed a letter of protection with Dr. Topp's office at the time of his initial visit. Def. Ex. 22, TSO_3.

73.    In contrast to the lengthy forms required at Dr. Toumbis's office, the new patient forms at Dr. Topp's office sought little information about Plaintiff's prior medical history or the accident. Pl. Ex. 11, TOPP 2. Plaintiff indicated that he had a motor vehicle accident in February 2017 in which he was stopped a traffic light and rear-ended. *Id*. He reported that he had treated for a left forearm/compound fracture in 2001. *Id*.

74.    Dr. Topp's notes from the visit reflect that Plaintiff reported his pain began after the motor vehicle accident. *Id*. at TOPP 4, 6. Plaintiff reported that he had no pre-accident lumbar injuries or treatment. *Id*. He reported that the epidural steroid injections Dr. Pardo performed provided no relief and worsened his symptoms. *Id*. The brief physical examination revealed a "negative straight leg raise bilaterally, leads to back tenderness, no pathologic reflexes." *Id*. at TOPP 5, 7; *see also* Vol. II, 303:3-11.

---

[19] Dr. Pardo testified that he did refer Plaintiff to Dr. Topp although he did not recall the timing. Vol. II, 118:4-6, 175:17-19. The medical records do not contain a written referral from Dr. Pardo to Dr. Topp.

75.    Plaintiff testified that he brought the MRI report and the CD with images to the appointment and that Dr. Topp went through the films with him. Vol. I, 109:19-110:2.

76.    Dr. Topp's assessment was "spondylolisthesis of L5-S1 bilateral L5 pars fracture." Pl. Ex. 11, TOPP 5. The plan was as follows: "Surgical correction including a PLIF with instrumentation at L5-S1 **is necessary to stabilize the spine due to spondylolisthesis** present. Patient failed conservative treatment (medication and ESIs). Patient requires narcotic pain medication to control pain from accident. I recommend an inpatient surgery ASAP." *Id.* at TOPP 7 (emphasis added); *see also* TOPP 5.

77.    Dr. Topp defined "spondylolisthesis" as "a slippage of one vertebrae over the other"—"spondylo meaning spine, and listhesis meaning slippage." Vol. II, 218:19-21. In Plaintiff's spine, his L5 vertebra slipped forward over the sacral 1 vertebra, *i.e.*, anterolisthesis. *Id.* at 218:22-23, 285:11-14.

78.    Dr. Topp defined "bilateral L5 pars fracture" as "a traumatic injury to the L5 vertebra, which leads to a broken bone." *Id.* at 218:25-2.[20] He elaborated: "The pars is a portion of the bone, the pars interarticularis, which is a very special portion of the bone that connects the front of the L5 vertebra to the back, and it's that back side

---

[20] Dr. Topp explained that "when a bone breaks, it's always the result of trauma. It's either repetitive trauma or a single, isolated incidence of trauma." Vol. II, 276:4-8. Dr. Topp acknowledged that a pars fracture can be congenital. *Id.* at 275:8-9.

of the bone that hooks over sacral 1. So if that portion of bone is broken, the front

portion of the bone is disconnected from the back portion of the bone, and the bone

can slip forward." *Id*. at 219:1-8. Dr. Topp explained that "spondylolysis" is the name

for the broken pars interarticularis; "Spondylo still meaning spine, but the lysis is the

fracture of the pars." *Id*. at 222:25-223:3.

79.    Dr. Topp explained that "PLIF is a general term, posterior lumbar

interbody fusion, meaning that the approach to the spine would be from behind or

posteriorly. Lumbar is the area, lumbar spine. Interbody is between the named bones.

Interbody, between one body of bone and the other, which is L5-S1. And then the

fusion would be to fuse lumbar 5 to sacral 1." *Id*. at 239:8-15.

80.    Plaintiff did not see Dr. Topp again until February 21, 2018, when he

decided to "proceed with surgical correction including PLIF L5-S1 at UF Health on

3/7/18." Pl. Ex. 11, TOPP 10.

## March 22, 2019 surgery

81.    Plaintiff's surgery ultimately took place on March 22, 2019 at the

Jacksonville Beach Surgery Center, over 4 months after his initial visit with Dr. Topp,

and over 13 months from the motor vehicle accident. Vol. II, 241:15-17. It was a same

day surgery; Plaintiff was discharged to home afterwards. Vol. I, 115:23, 253:13-19

82.    Dr. Topp's operative report listed the preoperative diagnoses as: (1) acute

trauma, L5 spondylolysis, (2) spondylolisthesis, L5-S1, and (3) severe radiculopathy,

bilateral lower extremities. Pl. Ex. 5, JBSC 09. The postoperative diagnoses were the same. *Id*.

83.    When Plaintiff's counsel asked Dr. Topp to explain why a postoperative diagnosis is included in the operative report, Dr. Topp replied as follows: "Well, . . . the main reason is to confirm what your preoperative diagnosis is. But sometimes things are evident in the operation that are not evident preoperatively." Vol. II, 243:22-244:1. "So you would want to list all those things which you saw, and you have additional diagnoses after you actually looked inside the patient." *Id*. at 244:7-9.

84.    The Jacksonville Beach Surgery Center records include a document entitled "progress/discharge notes." Pl. Ex. 5, JBSO 24; Vol. II, 278:15-25. The document includes Dr. Topp's handwritten notes regarding the procedure. Vol. II, 279:1-4. Dr. Topp noted two surgical findings: degenerative disc disease (abbreviated as DDD) and spondylosis. *Id*. at 279:8-9.

85.    Defense counsel asked Dr. Topp why he did not add the findings of degenerative disc disease and spondylosis into the postoperative diagnoses included in the operative report; indeed, he did not mention them anywhere in his report. *Id*. at 305:14-306:3; Pl. Ex. 5, JBSC 9. He explained by stating: "It's not really pertinent to what I'm trying to tell a story about with my operative notes. My operative note's purpose is to demonstrate to the patient in medical records what I did to him for two-and-a-half-hours." Vol. II, 306:4-7.

30

86.     Dr. Topp acknowledged that his operative note discussed finding an osteophyte at L5-S1 that he had to remove in order to gain access to the disc. Pl. Ex. 5, JBSC 11; Vol. II, 278:1-10. An osteophyte is also called a bone spur. Vol. II, 278:11-12. Dr. Topp agreed that is "most assuredly" a degenerative finding. *Id*. at 278:13-14.

87.     Dr. Topp acknowledged finding "degenerative changes within the spine" but asserted that they were due to the February 2017 collision. *Id*. at 306:9-13.

88.     Dr. Topp admitted that after his surgery, he did not go back and review the MRI to see if there was a correlation between his findings during surgery and what the MRI had shown. *Id*. at 282:11-14. He did not observe whether the bone spurs at L5-S1 were visible on the April 4, 2017 MRI. *Id*. at 282:15-17. As he explained, "I haven't look at it recently, but I've looked at it to see that there's an acute fracture at L5 pars interticularis." *Id*. at 282:17-19.

89.     To the extent Dr. Topp was asserting that the degeneration he observed had occurred in the period of time between the MRI and his surgery, this is undermined by an Attending Physician's Statement that he signed on February 21, 2018. Def. Ex. 43, LINCOLN_0102. In his objective findings, he stated: "MRI include disc herniation at L5-S1 with degeneration." *Id*. The April 4, 2017 lumbar MRI was the only one performed between the accident and the surgery. *See, e.g.*, Vol. II, 311:21-23 (Dr. Topp acknowledging that he did not order a new MRI prior to surgery).

## Post-surgery

90.     Prior to surgery, Dr. Topp wrote a letter to Plaintiff's employer advising them Plaintiff would need to be off work for 10 weeks, until May 30, 2018. Pl. Ex. 11, TOPP 11; Vol. II, 242:4-6; Vol. I, 115:7-9.

91.     Dr. Topp explained that the surgery was only part of the equation: "I always tell the patients the surgery is not the most important part. The recovery and therapy and the healing process, that's going to take some time, so you have to really dedicate yourself to it." Vol. II, 241:25-242:3.

92.     Particularly in light of the fact that Plaintiff knew two people who had bad outcomes after back surgery, Plaintiff testified that he understood he needed to do everything in his power to make sure his surgery was successful, including following the directions of his health care providers "[a]s best as [he] could." Vol. I, 235:24-236:6.

93.     After Plaintiff's surgery, he was provided with home health care, which included a plan for skilled nursing "to instruct patient on nonpharmacologic pain measures, including relaxation techniques, massage, stretching, and positioning." Pl. Ex. 12, THH12; Vol. I, 239:11-18. Plaintiff cancelled their services. Def. Ex. 25, Triology_0072. He acknowledged that home health typically helps with postsurgical recovery. Vol. I, 239:19-240:8. He explained that after the surgery, he was able to take care of himself. *Id.* at 116:4-7.

94.     Plaintiff's surgery was successful in that the fusion did fuse. *Id*. at 131:20-132:2. He did, however, begin to develop left sided pain.

95.     During Plaintiff's first post-surgery office visit with Dr. Topp, on March 28, 2018, Dr. Topp noted "Patient is having usual post-operative pain and is improving." Pl. Ex. 11, TOPP 20.

96.     On April 5, 2018, Plaintiff reported to Dr. Pardo "near-complete relief of his right paralumbar pain and lower extremity pain." Pl. Ex. 11, SJIPS 58. But he reported "the onset of left paralumbar, left parasacral, and left lower extremity pain following the procedure." *Id*. Dr. Pardo directed him to "participate in postoperative rehabilitation therapy." *Id*. at SJIPS 60. Dr. Pardo testified that it is "highly recommended" for a patient to do postoperative rehabilitation therapy to ensure the patient has the best outcome from surgery. Vol. II, 177:22-25.

97.     During the second post-surgery office visit with Dr. Topp, on April 11, 2018, Plaintiff reported "some numbness in the left toes." Pl. Ex. 11, TOPP 22. Dr. Topp noted that Plaintiff was doing well and that they would "start up PT to encourage left leg strengthening." Pl. Ex. 11, TOPP 22; *see also* Vol. II, 308:4-16, 308:24-309:2.

98.     Plaintiff testified that he spoke to Dr. Topp about the pain shifting from the right to the left leg: "[H]e seemed to feel that there was -- my nerves had been compressed for so long that I needed to start stretching and kind of pulling my nerves to home, is what he called it, get them back home, that they were so compressed. So he, at that time, after that visit and seeing the MRI and everything was fused, he went

33

ahead and said that I could do -- start stretching, start some stretching exercises." Vol. I, 132:5-12.

99.    On April 12, 2018, Dr. Topp wrote a prescription for Plaintiff to have post-operative physical therapy Pl. Ex. 11, TOPP 58. The order indicated it was to occur 2-3 times a week for 4 weeks. *Id*. The requested therapy included stretching, strengthening, and a low back program (extension, abdominal, hamstring stretch, SI joint mobilization). *Id*.

100.    Dr. Topp's expectation was that formal physical therapy would assist Plaintiff's recovery. Vol. II, 309:13-16. Dr. Topp explained: "I would have given him a prescription for physical therapy so he can stretch out his hamstrings and stretch the nerve and try to have that nerve move around and not get scarred down." *Id*. at 309:9-12. "I feel like what was best for Mr. Triolo [was] to perform hamstring stretches and to get the nerve moving. That's what I wanted him to do. And I described to him like that." *Id*. at 309:3-301:1.

101.    Dr. Topp tried to send Plaintiff to Heartland Rehabilitation but they did not accept letters of protection. *Id*. at TOPP 59. Dr. Topp let Plaintiff know he would send the referral to another location of Plaintiff's choosing. *Id*.[21] At trial, Plaintiff admitted that Dr. Topp referred him to Heartland Rehabilitation for therapy but could

---

[21] Dr. Topp did not recall this series of events but did not disagree that it occurred. Vol. II, 306:20-307:6.

not remember why he had not gone. Vol. I, 242:3-25. He denied that it had anything to do with letters of protection. *Id*.

102.    During a May 2, 2018 office visit, Dr. Topp released Plaintiff to work on May 31, 2018 with no limitations. Pl. Ex. 11, TOPP 24. Plaintiff went back to work "sometime near the end of May." Vol. I, 246:14-15.[22]

103.    In a June 14, 2018 office visit with Dr. Topp, Plaintiff reported that he was "feeling good, but ongoing pain down his left side." Pl. Ex. 11, TOPP 25. Dr. Topp noted, "I think he is having SI joint dysfunction secondary to his surgery." *Id*. at TOPP 26.

104.    In a June 29, 2018 visit, Dr. Pardo recommended that Plaintiff "continue chiropractic adjustment therapy." Pl. Ex. 9, SJIPS 72. There is no indication in the record that Plaintiff had any chiropractic adjustment therapy after July 20, 2017, which was Plaintiff's last visit to Jacksonville Sport and Spine.

105.    On July 5, 2018, Dr. Pardo noted Plaintiff's continued reports of left sided pain and stated that this was "consistent with lumbar radiculopathy." Pl. Ex. 9, SJIPS 75-76. He performed a transforaminal steroid injection on the left side. *Id*. at

---

[22] Plaintiff resumed working at Orange Park Medical Center during the pay period that covered 5/13/2018 to 5/26/2018. *See* Def. Ex. 40, OPMC_0115 (reflecting 4.75 hours of work). Plaintiff resumed working at Baptist Medical Center during the pay period that covered 5/27/2018 to 6/2/2018. *See* Def. Ex. 39, BMCSOUTH-HR_0123 (reflecting 24.21 hours of work). Information about the quantity of hours he was working from that point forward is contained within those records.

SJIPS 77.[23] Plaintiff reported near-complete relief for two days, after which the pain returned to baseline. *Id.* at SJIPSS 81.

106.    Plaintiff finally had an initial physical therapy evaluation at Select Physical Therapy on August 2, 2018—16 weeks after Dr. Topp had made the referral to Heartland Rehabilitation. Vol. I, 244:3-8; Pl. Ex. 8, SPT 7; Pl. Ex. 11, TOPP 58.

107.    According to the records from Select PT, the therapist thought Plaintiff's overall rehabilitation potential was excellent and recommended therapy twice a week for four weeks. Pl. Ex. 8, SPT 7, 10. But Plaintiff never did this therapy; instead, he discharged himself after the initial evaluation. *Id.* at SPT 15 ("[S]killed rehabilitative services at this site are no longer required due to the patient's request for discharge."). Plaintiff testified that the staff at Select PT told him not to have his therapy there because he could have it done at Baptist Medical Center for free. Vol. II, 245:18-246:1.[24]

108.    Plaintiff did not, however, receive physical therapy at Baptist. "[B]ecause of what I was learning from them and all the questions that I asked them, and what I needed to do, I ended up doing that on my own." Vol. I, 246:4-6. Plaintiff admitted that Dr. Topp wanted him to do formal physical therapy after surgery and

---

[23] For the first time in Dr. Pardo's records, this "operative report" references a diagnosis of "s/p MVC, Hyperflexion/Hyperextension Spinal Injury." Pl. Ex. 9, SJIPS 77.

[24] The Select PT records state it was anticipated that Plaintiff would transfer his therapy to Baptist "where his current medical benefits are anticipated to cover physical therapy services at 100% per benefits verification." Pl. Ex. 8, SPT 15-16. But the record does not support Plaintiff's suggestion that Select PT initiated the discharge.

acknowledged that he never did. Vol. I, 243:4-12, 246:11-13. Dr. Topp was not aware

that Plaintiff did not do the prescribed therapy. Vol. II, 307:11-15.[25]

109.    On August 16, 2018, Plaintiff reported to Dr. Topp that the injection Dr.

Pardo gave him resolved his leg pain. Pl. Ex. 11, TOPP 27.[26]

110.    By August 30, 2018, Dr. Topp had concluded that Plaintiff had "neural

stretching or scar tissue." Vol. II, 267:6-9; *see also* Pl. Ex. 11, TOPP 30 ("neural

stretching is the likely etiology for the patient's post op leg pain"). For that reason, he

performed an epidural steroid injection on September 13, 2018 which gave excellent

pain relief. Vol. II, 267:9-13. Plaintiff has not treated with Dr. Topp since that date.

111.    On October 17, 2018, Dr. Pardo thought Plaintiff's presentation was

"consistent with lumbar facet arthropathy" and thus performed a prognostic medial

branch nerve block at L2, L3, L4, and L5, all on the left side. Pl. Ex. 9, SJIPS 95, 96.

Plaintiff reported complete relief of his lumbar axial pain for the rest of that procedure

day. *Id*. at SJIPS 100. Dr. Pardo testified that "axial" meant the pain in his back, the

lumbar spine midline, maybe the sacrum, but not the leg. Vol. II, 121:12-13. Dr. Pardo

testified that this told him "[t]he left side of the facet joints were a major pain

generator." *Id*. at 121:17-18.

---

[25] Similarly, Dr. Topp presumed that Plaintiff had physical therapy or some equivalent before
having surgery. Vol. II, 295:7-9.

[26] The "history of present illness" section of this note had an enlarged description of the motor
vehicle accident, compared with prior visits. Some of the additions included: "Patient's car was
equipped with headrest which was positioned even with the top of the head," that he "felt dazed" at
the time, and that he "immediately experienced lower back pain." Pl. Ex. 9, TOPP 27. Even in this
new version of the accident, there was no reference to Plaintiff's seatback reclining.

112.    Dr. Pardo performed a second block at all of the same levels on October

25, 2018 "to confirm the facetogenic nature" of Plaintiff's lumbar axial pain. Pl. Ex.

9, SJIPS 101, 102. Plaintiff reported obtaining near complete relief again. *Id.* at SJIPS

106. Dr. Pardo testified that this led him to conclude that "the facet injury" was one

of the principal pain generators. Vol. II, 122:2-14. Dr. Pardo's medical records do not

use the term facet injury; instead they say "arthropathy, lumbar facet joint" or "lumbar

facet joint arthropathy." *See, e.g.,* SJIPS 101, 102. At trial, Dr. Pardo testified that facet

arthropathy can be traumatic or degenerative. Vol. II, 168:3-5. The April 4, 2017 MRI

report, quoted selectively in Dr. Pardo's medical records, referenced mild facet joint

arthropathy bilaterally at L4-5, and mild facet joint arthropathy predominantly on the

right side at L3-4. Pl. Ex. 3, BMRI 1; *see, e.g.*, SJIPS 11.

113.    On November 8, 2018, Dr. Pardo performed a radiofrequency ablation

at L2, L3, L4, and L5, on the left side. Pl. Ex. 9, SJIPS 106-108. Dr. Pardo explained

this procedure as one that strips the outer layer of the nerve (the myelin sheath) in an

attempt to desensitize the lumbar facet joints. Vol. II, 122:4-12. According to Dr.

Pardo's notes, Plaintiff "reported significant relief of his left paralumbar and parasacral

pain with relief from the radicular symptoms to the left side." Pl. Ex. 9, SJIPS 117. Dr.

Pardo expected the relief to last 6-12 months. Vol. II, 122:17-21. Also on this date,

there is a note reflecting a report of "slight right lumbar pain." Pl. Ex. 9, SJIPS 117.

114.    On January 22, 2019, Plaintiff reported to Dr. Pardo that he was doing

much better. Pl. Ex. 9, SJIPS 119; Vol. II, 128:11-13. He reported lower left back pain

38

of only 2/10 and he had improved range of motion. Pl. Ex. 9, SJIPS 119, 120; Vol. II, 128:16-18. Dr. Pardo testified that was the best report Plaintiff had given since starting to see him. Vol. II, 129:1-3. There was no report of right-sided pain at this visit. Pl. Ex. 9, SJIPS 119, 120. Nonetheless, Dr. Pardo thought there was persistent facet arthropathy in the right lumber area and was considering a radiofrequency ablation on that side. *Id.* at SJIPS 121.

115.    On February 28, 2019, Plaintiff again reported 2/10 pain. *Id.* at SJIPS 123. But now, his chief complaint was "pain on the right side of my lower back." *Id.* at SJIPS 124. On that date, Dr. Pardo recommended radiofrequency ablation of the lumbar medial branch nerves on the right side. Dr. Pardo testified that he thought the pain Plaintiff was exhibiting on the right side was also due to the "facet joint injury." Vol. II, 129:6-15.

116.    When Plaintiff returned on March 28, 2019, he reported 7/10 pain; specifically, "increased pain intensity in the lower back, bilaterally, with referred pain to the lower extremities, buttock, posterior thigh, and calf bilaterally, right side greater than left." Pl. Ex. 9, SJIPS 129; *see also id.* at SJIPS 128.

117.    On April 1, 2019, Plaintiff again reported left and right lower back pain, except now he was rating his pain as 9/10. Pl. Ex. 9, *Id.* at SJIPS 132. Dr. Pardo performed a radiofrequency ablation at L2, L3, L4, and L5, on the right side. *Id.* at SJIPS 135. Apparently, Plaintiff reported near complete relief of the lumbar pain on

the right side, but a recurrence of pain on his left side, even though it was not yet 6 months from his left-sided ablation. *Id*. at SJIPS 141.

118.    On April 29, 2019, Dr. Pardo performed a radiofrequency ablation on the left side, but this time it did not resolve the pain; instead, Plaintiff was rating it a 6/10. *Id*. at SJIPS 143, 145. Dr. Pardo testified that this was not an acceptable level of pain relief. Vol. II, 131:25-132:8.

119.    In subsequent notes, Dr. Pardo considered doing a repeat MRI and starting physical therapy. SJIPS 149. He ultimately ordered a new MRI (Pl. Ex. 9, SJIPS 154) and then tried a steroid injection at L5 (*id*. at SJIPS 162). Plaintiff reported only moderate relief (*id*. at SJIPS 164). On September 25, 2019, Dr. Pardo performed another radiofrequency ablation on the left side (*id*. at SJIPS 170); this was only 5 months after the last one and, in the follow up visit, Plaintiff reported 10/10 pain (*id*. at SJIPS 171) due to pain in his left hip. Dr. Pardo performed a steroid injection for suspected left trochanteric bursitis (*id*. at SJIPS 176, 177). Plaintiff reported no significant relief of his hip pain. *Id*. at SJIPS 180. Dr. Pardo recommended that Plaintiff return to see his neurosurgeon (*id*. at SJIPS 181, 186) but Plaintiff did not.

120.    On August 7, 2020, Plaintiff's chief complaint was low back pain with radiating pain to the left leg, glutes, hamstrings, and calves. *Id*. at SJIPA 200. These were the type of symptoms that Plaintiff had been reporting for the preceding year.[27]

---

[27] *See, e.g.*, Pl. Ex. 9, SJIPS 163 (left lower back, radiating into glute down into calf), SJIPS 167 (left lower back pain radiating down into hip flexor glute to calf), SJIPS 171 (left lower back pain

Preventing these type of symptoms was precisely why Dr. Topp had referred Plaintiff to post-operative rehabilitation therapy. Dr. Pardo concluded that Plaintiff's presentation was "consistent with lumbar radiculopathy secondary to nerve root impingement" (*id.* at SJIPS 202) and performed a transforaminal steroid injection at L4, on the left side. *Id.* at SJIPS 203. Plaintiff reported obtaining complete relief on the third day after the injection, but the pain recurred. *Id.* at SHIPS 205.

121.   On September 14, 2020, the week before trial, Plaintiff returned to Dr. Pardo for an office visit and a procedure. *Id.* at SJIPS 208. In the note from that visit, Dr. Pardo stated that Plaintiff's presentation was "consistent with post-lumbar fusion facet arthropathy." *Id.* This is the first occurrence of this term in Dr. Pardo's medical records. Dr. Pardo did another radiofrequency ablation at L2, L3, L4, and L5, on the left side. SHIPS 210. At trial, Plaintiff testified that procedure was "[p]robably the best procedure yet." Vol. I, 97:16. Plaintiff testified that two of the prior radiofrequency ablations on the left side did not work at all. Vol. I, 96:23-97:10.

### Ladder incident

122.   Unbeknownst to Dr. Pardo, Plaintiff injured himself in early 2019. On February 28, 2019, Plaintiff went to his primary care doctor and reported having "felt twinge coming down off ladder a few days ago and getting worse since." Pl. Ex. 4,

---

radiating into hip flexor down to hamstring and calf), SJIPS 174 (left lower back pain, pain radiates into hip flexor down into glute and hamstrings and calf), SJIPS 179 (left lower back radiating to hip flexor, glute down into calf), SJIPS 183 (lower left back radiating down into hip flexor into glute), SJIPS 189 (left hip, left calf), SJIPS 196 (lower back with left hip, left calf).

BPC 1. He reported that he had a 20-year old injury to his right foot that got better
with rehab, that he had recent back surgery, and that he developed right Achilles
discomfort a few weeks ago walking differently secondary to back problems. *Id.* He
also reported that he worked as a respiratory therapist at two hospitals and was on his
feet a lot. *Id.*[28] The primary care physician referred him to see a podiatrist.

123.    Plaintiff also saw Dr. Pardo on February 28, 2019, but Plaintiff did not
report the ladder incident to him. Ex. 4, BPC 2 ("pt saw back doc today"); Pl. Ex. 9,
SJIPS 123, 124. In connection with each of his visits to Dr. Pardo's office, Plaintiff
completed a "pain assessment form" where he was asked if he "had any falls, trauma,
hospitalizations or surgery" since his last visit. On this occasion, as with every other
occasion, Plaintiff circled no. Pl. Ex. 9, SJIPS 123.

124.    On March 24, 2019, Plaintiff had a podiatry consultation with Dr. Emily
Ernst at JE Foot and Ankle Associates. Def. Ex. 32, JEFAA_003-4. The note states
that Plaintiff "presents today as a new patient with complaints of right achilles tendon
pain. **Relates stepping off of a ladder on 2/19/2019 with immediate pain in the
achilles**. Did not seek treatment and states that the pain is getting worse. Relates that
he is now having shooting pains into his calf and up his leg. **Relates that he feels like
he is walking funny and is now irritating his spinal fusion**." *Id.* at JEFAA_003

---

[28] The note contains a typographical error in that it says "21 hospitals." Pl. Ex. 4, BPC 1.

(emphasis added). Plaintiff reported to Dr. Ernst that he was "currently not taking medications." *Id.*[29]

125.    Dr. Ernst directed Plaintiff to wear a Cam Walker and referred him for a STAT MRI of the right ankle. *Id.* The MRI showed that Plaintiff had a right Achilles tendon tear as well as midfoot osteoarthritis and evidence of an old ankle sprain with a chronic appearing partial tendon tear. Def. Ex. 28, PIC_0003-04.[30]

126.    Plaintiff saw Dr. Pardo on both March 28 and April 1, 2019. Plaintiff still did not report the ladder incident. Dr. Pardo's note from the March 28 visit specifically states that "[t]he patient denies recent injuries." Pl. Ex. 9, 129. This is not a line that appeared in prior notes, suggesting that Dr. Pardo specifically questioned Plaintiff on this point. Plaintiff's pain was 7/10 on March 28 and 9/10 on April 1, and a radiofrequency ablation of the right lumbar area was performed on the latter date. *Id.* at SJIPS 128, 132, 133.

127.    During a follow up visit with Dr. Ernst on April 5, 2019, Plaintiff reported that he had been wearing the CAM boot as instructed until two days ago, which would be April 3, 2019. Def. Ex. 32, JEFAA_05. He also reported that "he was

---

[29]  Plaintiff testified that since July 11, 2017, there has never been a day when he has not taken a Percocet. Vol. I, 103:6-13. This is either not accurate, or he did not provide an accurate report to Dr. Ernst.

[30]  The Precision Imaging Center bill proffered by Plaintiff as a trial exhibit was altered to remove this MRI. Pl. Ex. 26, PIC-BILL 1. The Court asked to see an unaltered version of the bill, which then also revealed a second ankle MRI, done on October 24, 2019, ordered by Dr. Ernst. It seems unlikely that a repeat MRI would have been performed if Plaintiff had not returned to Dr. Ernst reporting continued problems, but October 24, 2019 was after the close of discovery, and the only provider for whom Plaintiff supplemented the medical records was Dr. Pardo.

feeling better and went to work. Relates now being a bit sore, but not like before." *Id.*
Dr. Ernst directed him to "continue CAM walker for ambulating and gradually transition into a sneaker as tolerated." *Id.* at JEFAA_06. This note also indicates that Plaintiff was not taking medications. *Id.* at JEFAA_05.

128.    During cross-examination, Plaintiff denied that he had fallen off the ladder. He said it was "just kind of a coming down off the ladder." Vol. I, 274, 3-4. He admitted that he stepped down off the ladder in a way that caused immediate pain in his Achilles. *Id.* at 274:1-7.

129.    Plaintiff admitted that he did not report this incident to Dr. Pardo. As he explained, "I'm not there to see Dr. Pardo for a hurt foot." *Id.* at 275:16. "I'm there for my back and what's going on for my back." *Id.* at 277:1-5. "This is a foot doctor, so that's why I gave her that description there." *Id.* at 277:6-7. He admitted the issue with his foot was causing irritation in his back. "At that particular time it started to, yes, because of the limping. So I was starting to overcompensate." *Id.* at 277:10-11. "So it started irritating the right side." *Id.* at 277:13.

130.    He admitted that the doctor gave him a CAM walker to wear. *Id.* at 277:17-18. He described it as something that keeps your ankle stable, and he acknowledged that it raises one leg a little bit higher than the other. *Id.* at 277:17-25.

131.    Even though he had two visits with Dr. Pardo during the period when he told Dr. Ernst that he was wearing the CAM walker—on March 28 and April 1—he did not remember if he wore it when he went to see Dr. Pardo. *Id.* at 278:9-15. When

44

asked if he told him about the injury or about the CAM walker, Plaintiff stated: "I
wouldn't discuss another injury with Dr. Pardo . . . in my mind, when I go to see Dr.
Pardo, it's for the symptoms and the pain that I'm having right now, and that's why
I'm seeing him, for that. I'm not seeing him for my Achilles or my foot. He's not a
foot doctor, so I wouldn't relay that injury to him. That would be my reason why I
didn't say anything to him." *Id.* at 278:16-279:3.

132.    For Dr. Pardo's part, he did not recall hearing anything about this ladder
incident during his treatment of Plaintiff. Vol. II, 179:16-21. He did not recall hearing
that Plaintiff thought he was irritating his spinal fusion. *Id.* at 180:9-11. He did not
remember knowing that Plaintiff sustained an Achilles tendon tear. *Id.* at 180:23-25.
He did not recall seeing Plaintiff with a boot on his foot. *Id.* at 181:8-14. Dr. Pardo
agreed that if this Achilles injury was irritating Plaintiff's spinal fusion, he would have
wanted to know "but he didn't mention it to me. So I don't believe it was that relevant."
*Id.* at 183:14-18.

133.    Prior to the ladder incident, Plaintiff's post-surgical pain complaints were
on the left side, and one radiofrequency ablation had been done on the left side, on
November 8, 2018. Pl. Ex. 11, SJIPS 108. No right-sided ablations were performed
until after the Achilles tendon tear. *Id.* at SJIPS 135. In addition, the left-sided
ablations performed after the Achilles were not noted to be as effective as the one done
prior to the Achilles tear, except for the one administered on the eve of trial.

## Plaintiff's employment

134.   Since March 2014, Plaintiff has worked full-time as a respiratory therapist at Baptist Medical Center South. Vol. I, 32:10-14, 101:1-2, 142:8-15; Def. Ex. 39.[31] From January 12, 2015 until April 28, 2019, he also worked part-time at the Orange Park Medical Center. Vol. I, 32:17-18.; Def. Ex. 40, OPMC_0166.

135.   During the period of time between the February 2017 accident and his March 2018 surgery, Plaintiff worked at both hospitals and worked all his normal shifts. Vol. I, 142:19-21, 115:13-16. During that period, he did not take time off for any medical treatment. *Id.* at 115:10:12. At Baptist Medical Center, Plaintiff works 12-hour shifts, from 7 a.m. to 7 p.m.; he works a total of seven days over the course of two weeks. *Id.* at 100:18-20, 101:11, 102:15-17.

136.   Plaintiff explained the role of a respiratory therapist in a hospital setting. 31:5-21. The physical requirements of the job are substantial. *See* Def. Ex. 39, BMCSOUTH-HR_0039-40; Def. Ex. 40, OPMC_0057-58; Vol. I, 129:14-151:16. Plaintiff asserted that it was not "physically demanding" work "compared to being in construction for . . . 13 years and loading the docks at UPS." *Id.* at 33:5-7. But he did acknowledge that it is not a job where he is sitting at a desk all day. *Id.* at 151:19-21.

---

[31] Plaintiff moved to Jacksonville from New York in March 2012, at the urging of his brother Bruce Schmucker (who lives in Middleburg) and his brother Brian Schmucker (who lives in Mandarin). Vol. I, 27:2-23. He moved in with Bruce and began an 18-month respiratory program at the Concorde Career College. *Id.* at 29:9-10. He completed the program in October 2013 and then took the exam to become a licensed therapist. *Id.* at 29:24-25; 30:10-11.

He is on his feet throughout his shift, only sitting when charting or planning. *Id*. at 151: 22-25.

137.   Defendant introduced demonstrative exhibits summarizing the number of hours Plaintiff worked between the February 1, 2017 accident and the March 22, 2018 surgery. *See* Def. Ex. 51; Def. Ex. 52. There were 19 pay periods between the accident and surgery where Plaintiff worked 90 or more hours in a two-week period. Vol. I, 155:4-9; Def. Ex. 51, Def. Ex. 52; *see also* **Attachment A**.[32] There were 13 pay periods where he worked 100 hours or more in a two-week period. Vol. I, 155:10-14; Def. Ex. 51, Def. Ex. 52; *see also* Attachment A.

138.   Plaintiff's job responsibilities have not been altered since the accident; that is to say, he is not working under a disability accommodation. Vol. I, 152:9-12. He testified that he no longer helps in heavy lifting and that he imposed that restriction on himself. *Id*. at 292:14-293:1, 293:10-12. He testified that before his surgery, he would always help the nurses slide the patients up into bed, but that he no longer does that. *Id*. at 137:3-7. He does not wear a back brace while working; he states that he does not need it. *Id*. at 152:13-23. [33]

---

[32] For the Court's convenience, Defendant has created a chart (enclosed as Attachment A) so the Court can more readily identify the pay periods in which Plaintiff worked 90 or more hours in two-week period. The chart simply pairs and adds the information contained in Defendant's Exhibit 51 and Defendant's Exhibit 52 for the relevant pay periods.

[33] Plaintiff testified that he wore the back brace for the 4-5 months after surgery. Vol. I, 152:13-23.

### Lack of candor

139.    One of the most concerning aspects of this trial was Plaintiff's lack of candor, which manifested in various ways.

### Lack of candor: Out of town trips

140.    Plaintiff painted an extreme picture of the effect this accident had on his life. Within 5 days of the accident, he reported "severe" emotional problems caused by his pain that interfered with his "family, social, and or work activities." Pl. Ex. 6, JSS 3. He repeated a litany of symptoms to his physicians that left them with the impression that he was in debilitating pain. On direct examination, he asserted that his "life has drastically been changed." Vol. I. 126:9-11. He testified that he has missed out on doing things with friends and family because of his injuries and gave, as one example, a trip to Disney that he declined. *Id*. at 126:24-127:1-7. He testified that his injuries affect his personal adult relationships and his ability to go out socially. *Id*. at 133:14-17, 133:23-134:4. He testified that he has suffered from depression as a result of the accident (Vol. I, 127:16-17, 127:24-128:1) even though he has never sought counseling for depression or treated with any anyone for anxiety (*id*. at 208:23-209:4). When asked on direct examination if he had "gone on any cruises or . . . vacations or that sort of thing," he testified that he went on a cruise with a couple friends. *Id*. at 134:5-11. No other vacations or out of town trips were mentioned.

141.    On cross-examination, after repeated questioning, Plaintiff admitted to a litany of out-of-town trips and activities. He was shown employment records that

evidenced 20 hours taken off during the pay periods that included the end of February 2017. *Id.* at 191:24-192:8. Plaintiff stated he had no memory of what he did during that time off. *Id.* at 192:9-11. When asked if he went to the Daytona 500 on February 26, 2017—approximately two weeks after the motor vehicle accident—he admitted that he had. *Id.* at 192:12-18. He testified that he drove down and back by himself (a 90-minute drive, one way) and met a friend there. *Id.* at 193:9-11; Vol. II, 42:4-6. After being shown a record that reflected his car was hit in a parking lot at 11:00 a.m. (Def. Ex. 48, GEICO_80; 195:18-20), he acknowledged that he had arrived a few hours before the race, spent time looking at the cars, and then took his seat in the stands to watch the race. Vol. I, 196:5-20; Vol. II, 42:11-14. He testified that "It was a good day." Vol. I, 196:22. After the race was over, he and his friend left and got something to eat. Vol. I, 196:15-197:2.

142.    Defense counsel asked if Plaintiff took any vacations or out of town trips in the period of time Plaintiff was starting to see Dr. Pardo and getting injections from him. Plaintiff testified that he did not take any vacations or out-of-town trips between the accident and having surgery, other than going to the Daytona 500. *Id.* at 214:1-14.

143.    Plaintiff then was asked if he had gone to the Florida Keys in 2017, and he admitted that he had. *Id.* at 214:255. He explained that he went to Marathon with a group of acquaintances, including a woman he was interested in romantically. *Id.* at 216:1-9. They drove down in one day and back in one day. *Id.* at 216:21-25. While there, they went on a boat ride and went to restaurants. *Id.* at 217:4-6. When asked

about the trip on re-direct examination, he described it as "[p]ure relaxation." Vol. II, 22:14.[34] Plaintiff initially testified that the trip was "a couple days" but then was shown employment records reflecting that he took 60 hours of leave from July 16-July 27, 2017. Vol. I at 216:13, 217:10-18. He did not remember the exact dates of the trip but did believe it was around that time. *Id.* 271:23-24.

144.    When questioned about going to Port Charlotte in 2017, he admitted that, yes, he went to visit a friend that he had not seen in 30 years. Vol. I, 215:5-7. He drove himself there and back (an approximately 4 hour 15 minute drive) and he stayed 2-3 days. *Id.* at 215:4-12. While there, they went out to eat and spent time at the house of the friend's mother. *Id.* at 291:13-18.[35]

145.    Plaintiff was asked if he had taken any out-of-town trips since his surgery, other than the cruise.[36] He stated that he went to his twentieth high school reunion in New York, in July 2019. *Id.* at 247:9-13. He said he did not recall any other out-of-town trips since his surgery.

---

[34] On direct examination, Plaintiff attempted to downplay the enjoyment of the trip: "I was able to go out of town, yes, with a bunch of breaks in between." Vol. I, 218:15-15.

[35] On re-direct examination, Plaintiff testified that there was nothing about the Daytona 500 trip, Keys trip, or Port Charlotte trip that was more arduous or caused further injuries than staying in Middleburg. Vol. II, 22:7-3-14.

[36] Even regarding the cruise, Plaintiff said little about it on direct. He testified that he took an excursion that included a boat ride to a zoo and then they went to a beach. Vol. I, 134:15-17. He said it was "pretty much peaceful." 134:21-22. On cross, it was revealed that this cruise was in July/August 2018; that it was a 5-day cruise, including stops in Honduras, Belize, and Cozumel; and that he went with four other friends. Vol. I, 214:15-19, 246:22-247:6.

146.   Defense counsel then asked him whether he had gone to Biketoberfest, in Daytona Beach, Florida. *Id.* at 247:16. Plaintiff recalled having gone to Biketoberfest in October 2019, on his bike. *Id.* at 248:5-6. He testified that he rode his motorcycle from his home in Middleburg to Daytona Beach down and back in one day. *Id.* at 249:10-14, 249:24-250:1. He then stated that the occasion he went on his bike was actually for Bike Week in March 2019. *Id.* at 251:4-9. He clarified that he also went to Daytona another time in 2019 to meet some friends there. *Id.* at 250:9-10.

147.   He was confronted with evidence that he also went to Biketoberfest in October 2018. He ultimately admitted that he must have gone although he did not recall it. *Id.* at 252:4-254:8.[37] Plaintiff admitted that he does ride Harley Davidson motorcycles and he still does. *Id.* at 254:9-12; *see also* Plaintiff's Ex. 39, PHO-BEFORE 03 (picture of Plaintiff with motorcycle).

148.   Plaintiff did not remember if he told Dr. Pardo or any of his other physicians about these trips. Vol. I, 219:25-220:2. There is no evidence that he did, as none of these trips or activities are referenced in Plaintiff's medical records.

149.   Plaintiff's brothers also seemed generally unaware of many of his activities. For example, neither brother was aware that Plaintiff had been to the Keys

---

[37] Initially, Plaintiff testified to going to Biketoberfest in October 2018 in his car. Vol. I, 247:16-18. He then stated that he did not remember going in 2018. *Id.* 250:6-8. Defense counsel then showed him a printout of a post on his Facebook page from October 2018 that included a conversation with a friend about meeting up at Biketoberfest, including a comment from Plaintiff stating: "I'm leaving soon." After seeing this, Plaintiff admitted that ""I guess I did" go in October 2018 and that if he went "I didn't go in a car." But he did not recall being there. *Id.* at 252:4-254:8.

or Port Charlotte. Vol. III, 21:6-17, 50:10-51:1. His brother Brian Schmucker was not aware that Plaintiff had ridden his motorcycle to Daytona Beach since the accident. Vol. III, 16-20. His brother Bruce Schmucker said Plaintiff had not ridden his motorcycle "at all," but then acknowledged that he had. *Id.* at 46:14-47:11. Brian acknowledged that he does not see Plaintiff as much as he did before the accident because Plaintiff "works a lot now." *Id.* at 21:23-24.

### Lack of candor – Prior car accidents

150.    On direct examination, Plaintiff's counsel asked Plaintiff this question: "Had you ever been in an auto accident where somebody hit you before or you hit them before?" Vol. I, 41:9-10. In response, Plaintiff said "Not where I've hit them or I hit them or they hit me, but I've been in an auto accident before, yes." *Id.* 41:11-12. Plaintiff then explained that he had an accident on Long Island, in January 2000, when he was heading to work on the highway, and he hit black ice. *Id.* at 41:13-25. He said that his truck spun out of control and went off the side of the road and hit a fence. *Id.* at 42:3-5. He said the fence broke through his window and he put his hand up and it hit his left arm, causing a compound fracture in two places. *Id.* at 42:6-13. He testified that he still has the scar. *Id.* He testified that he did not sustain any other injuries in this accident. *Id.* at 41:19-42:16.

151.    Additional detail about the accident was elicited on cross-examination. When asked how fast his vehicle was going at the time of the accident, Plaintiff said: "It was a highway, so 45, 50. Going to be flying in the morning in January in New

York." *Id.* at 221:20-22. He was transported by ambulance from the scene and had

surgery the same day. *Id.* at 221:23-222:1. He testified that he did not have any medical

records from his treatment as a result of this car accident. *Id.* at 222:19-21.

152.    Plaintiff's counsel then asked this question:

> Q:  So returning back to February 11th of 2017, other than that
> one accident, any other accidents of any kind whatsoever? And I
> mean motorcycles, horseback riding, car accidents, anything
> whatsoever, parachuting out of a plane, anything whatsoever
> other than that time you got your hand broke by the fence?
>
> A:  No.

*Id.* at 43:4-10.

153.    Defendant's First Set of Interrogatories posed a similar question: "Have

you ever been involved in any accident or incident of any kind, either before or after

the accident described in the amended complaint?" Def. Ex. 12, page 10, interrogatory

no. 22. Plaintiff answered yes, referencing the black ice incident resulting in a

compound fracture to his left arm (which he stated took place in March 2002). *Id.* On

cross-examination, defense counsel asked Plaintiff: "Have you been involved in any

other motor vehicle accidents other than the one at issue in our case and the one in

March of 2002 in Long Island? "March of 2002 in Long Island and then that accident,

not that I recall ma'am. Not that I recall. I don't recall." Vol. I, 260:6-10.

154.    Plaintiff then was asked about a car accident that occurred on October 2,

1995, in Mastic Beach, New York. Plaintiff admitted that he was in an head-on

collision, where both vehicles suffered extensive front-end damage, where his air bag

deployed, where the vehicles collided with enough force that the passenger in the other

vehicle died as a result of the injuries sustained in the accident. *Id*. at 260:17-261:10.

When asked why Plaintiff had not disclosed this accident in his interrogatories, he said

"I didn't feel it was relevant." *Id*. at 261:13. He testified that he was not injured, and

he denied receiving any medical care. *Id*. at 261:13-14, 23-25. It was clear that he had

not forgotten about the accident. He acknowledged that he did not report this accident

to any of his medical providers. *Id*. at 262:17-19. He stated he did not have any medical

records from that time frame. *Id*. at 260:17-262:22.

155.    On re-direct examination, Plaintiff explained that he did not list the 1995

accident in his interrogatories because he "never sought any medical treatment or had

any injuries from that accident." Vol. II, 33:4-5. On re-cross examination, defense

counsel reminded Plaintiff that "[u]nder oath in this courtroom yesterday, your

attorney asked if you had ever been in any motor vehicle accident other than the black

ice incident and the 2017 incident, and you answered no. Isn't that what your

testimony was yesterday?" Vol II, 49:20-23.[38] Plaintiff answered yes. *Id*. at 50:7-21.

### Lack of candor – Workers' compensation injuries

156.    Defendant's Interrogatory No. 24 asked if Plaintiff had ever made a claim

under any state or federal workers' compensation laws, and he answered no. Def. Ex.

---

[38] Plaintiff's counsel objected to this question, asserting that his question had been limited accidents
in which Plaintiff had been injured. Vol. II, 50:12-15. The court allowed the question and
subsequently reviewed the transcript and determined that the question was proper cross. *Id*. at 53:4-
19.

12, page 10, interrogatory no. 24. Defense counsel asked the same question on cross and Plaintiff testified that he did not remember if he had ever made any such claims. Vol. I, 263:5-263:7. After further questioning, Plaintiff admitted that, while he was working for United Parcel Service, he broke / crushed his foot, and that this was an injury covered by workers' compensation coverage. *Id.* at 263:12-19. Plaintiff also admitted that, while working for Master Cooling and Heating, he broke his hand and sprained his ankle, both of which were injures covered by workers' compensation. *Id.* at 263:25-264:12.[39] He agreed that all of these were orthopedic injuries. *Id.* at 264:13-15. He explained that he did not report any of this to his medical providers: "I didn't remember them, to be honest with you, but they didn't have anything to do with what was going on with me at that particular time." *Id.* at 264:16-20.

## Lack of candor – DUI conviction

157.   Interrogatory No. 25 asked if Plaintiff he had ever been convicted of a felony or a misdemeanor or a crime involving dishonest or false statement, and he answered no. Def. Ex. 12, page 10, interrogatory no. 25. Defense counsel asked the same question on cross and Plaintiff testified with less certainly. "I don't believe I was convicted of a misdemeanor, no. It was 1996, maybe. It was a driving under the influence. That's about the only time I've ever had trouble with the law." Vol. I,

---

[39] On cross-examination, Plaintiff testified "I believe so" when asked if the broken hand was covered by workers' compensation. Vol. I, 264:6. On re-direct, he testified that he did not remember if he made the claim or not. Vol. II, 34:24-25.

265:16-18. He testified that he did not remember if it was a misdemeanor and could
not remember if his license had been suspended, but he remembered having to see a
counselor so he could accumulate points to drive to and from work. *Id.* at 265:20-
266:10.

### Lack of candor – Past medical history

158.    Plaintiff acknowledged that to provide the best care to his patients, he
needs them to provide an accurate medical history, and that he wants his patients to
follow his advice so their outcome is as good as it can be. Vol. I, 155:19-156:3. He
acknowledged that he needs to give his own providers an accurate medical history and
follow their advice. *Id.* at 156:8-9. He stated that he knows how important it is for
patients to engage in therapy that they are being directed to do; and that, when people
do therapy, their chances of recovery generally improve. *Id.* at 156:10-16.

159.    Nonetheless, there are numerous instances in which Plaintiff did not
follow his providers' recommendations (as discussed in preceding sections) and in
which he did not provide complete and accurate history to his medical providers.

160.    One of the allegedly accident-related symptoms that Plaintiff reported to
Dr. McDaniels, Dr. Asad, and Dr. Pardo was headaches. He did not report to his
physicians that he had previously treated for headaches. He acknowledged, on direct
examination, that he had previously "experienced headaches" but asserted that the
pre-accident headaches were in the back of the eyes and said the post-accident
headaches were totally different. *Id.* at 63:3-6, 63:9-11. He asserted that the post-

accident headaches started "at the neck and just kind of radiat[ed] over to the head,
front of the head." *Id*. at 63:13-15.

161.    On cross examination, Plaintiff was shown a medical record from August
6, 2015, where he reported having migraine type headaches 2-3 times per week. Pl.
Ex. 4, BPC 5; Vol. I, 185:1-187:13. According to the medical record, he reported:
"Location often behind both eyes, but seem to start at the back of the head and neck
and work its way up." Pl. Ex. 4, BPC 5. The assessment was that he was having a mix
of migraine headaches and tension headaches. *Id*. at BPC 6. Plaintiff denied that the
prior headaches were the same and asserted that they were associated with his sleep
apnea. Vol. I, 186:5-7, 300:2-22. When asked why he did not reference this on Dr.
McDaniels's intake form: "I think I was just there for what was going on at that time.
. . I don't know how that was relevant to what was going on with me then." *Id*. at
184:12-18.[40] There is no indication that he reported his history of headaches to Dr.
McDaniels, Dr. Asad, or Dr. Pardo, all of whom were attempting to treat the
headaches.

162.    Other symptoms that he reported to Dr. McDaniels as being accident-
related included trouble sleeping and difficulty breathing. On direct examination, he

---

[40] At trial, it was noted that the records from the August 6, 2015 visit (Pl. Ex. 4, BPC 5-7) do not
reflect any complaints of back pain. Vol. II, 17:17-23. What is clear throughout Plaintiff's records,
though, was his tendency to only report what he was "there for." The August 6, 2015 visit concerned
his complaints of headaches and migraines. Pl. Ex. 4 at BMC 5. Indeed, even when he first saw his
primary care doctor after the February 2017 car accident, there was no reference to the accident or
the symptoms that he was reporting to other physicians. *Id*. at BPC 3-4.

testified that any prior problems sleeping were due to him having "central sleep apnea," but he asserted that he "took care of that once [he] got [his] benefits through work." Vol. I, 64:9-10.[41] He asserted that he has a CPAP machine that he uses every night. *Id*. at 64:24; *see also* 187:24; Vol. II, 29:20-22. He testified that his migraines and sleep problems "subside a lot" when he uses his CPAP machine. Vol. I, 65:10.[42] When asked why he did not report his history of sleep apnea to Dr. McDaniels, Plaintiff stated: "I don't know how that was relevant to what was going on with me then." *Id*. at 184:16-18.

163.   Contrary to Plaintiff's assertions, he has not continuously used his CPAP/APAP machine since the motor vehicle accident. The encounter note from a March 21, 2019 visit to the Respiratory Care and Sleep Medicine Group reflects that Plaintiff had stopped using APAP for a period of time due to lack of supplies and that "he feels great to be back on it." Def. Ex. 31, RESP-0013; Vol. II, 46:12-14. Plaintiff thought he was off the APAP for less than a year, perhaps less than 6 months, but he was not sure of the dates. Vol. I, 280:18-281:21. He agreed that when he is on it he feels better: "Oh yes, most definitely." *Id*. at 282: 5-7.[43]

---

[41]  Plaintiff treated with Respiratory Care and Sleep Medicine Center in October 2015 and was diagnosed with a moderate sleep apnea. Vol. I, 187:17-22; Def. Ex. 31, RESP_10-12.

[42]  On re-direct examination, he testified that the CPAP machine is what helped him recover from the migraines. Vol. II, 29:20-22.

[43]  In this March 21, 2019 encounter, there is a review of systems that reflects the following as present: daytime sleepiness, headaches, sleep disturbances. Def. Ex. 31, RESP_0013. The review of systems indicates that "back pain, joint pain, muscle pain" are "not present." *Id*.

164.    During the period of time in August 2015 when Plaintiff did not have a CPAP or APAP machine, he was assessed as having fatigue, poor sleep, snoring, migraine headaches, tension headaches, and insomnia with sleep apnea. Pl. Ex. 4, BPC 6; Vol. I, 187:2-13.

165.    Similarly, Plaintiff had previously treated with Pointe Medical Services for fatigue that was moderately limiting his activities and that was triggered by exertion, stress, and work. Vol. I, 190:1-9. He complained of poor memory, poor sleep, decreased muscle mass, fatigue, malaise, weight gain, and decreased concentration. Def Ex. 15, POINTE_0021. Plaintiff acknowledged that he did not report to Dr. McDaniels that he had experienced these symptoms previously. Vol. I, 191:12-15.

166.    Plaintiff asserted, during re-direct examination, that getting testosterone injections helped resolve the fatigue symptoms he was feeling. Vol. II, 26:5-14. In re-cross examination, he admitted that he did not disclose this treatment to any of his post-accident providers and thus did not give them the opportunity to evaluate its relevance. *Id.* at 46:12-47:2. Moreover, there is no evidence that he has had any testosterone injections since October 2017. Def Ex. 15, POINTE_004.

167.    With respect to Plaintiff's past medical history generally, Defendant did not present a medical record reflecting that Plaintiff had reported neck or back pain to a medical provider prior to the February 11, 2017 accident. However, Plaintiff was not particularly forthcoming about his past medical treatment. Defendant's Interrogatory No. 17 asked Plaintiff to identify each health care provider and health care facility

where he received medical care in the past ten years. *See* Def. Ex. 12, page 6. The interrogatories were verified on May 28, 2019. *Id.* at page 11. As such, Plaintiff should have disclosed any providers/facilities with whom he treated from May 2009 to onward. The only pre-accident medical provider that Plaintiff disclosed was Baptist Medical Center South, and those records begin in August 2015, which was after Plaintiff started working as a full-time respiratory therapist, and thus had health insurance.[44] Plaintiff did not disclose any providers who he saw in the 2009-2015 time frame. For most of that period, he was living in New York.[45] When asked if he saw any medical providers when he lived in New York he said, "I'm sure I went to a clinic, you know, kind of like a walk-in type of clinic from time to time, sure." Vol. I, 266:13-267:13.

### History of intensive sports and physically demanding work

168.   At the time of trial, Plaintiff was 45 years old. Vol. I, 6:23. Plaintiff testified that he was very active as a younger person. He "was the epitome of a jock" growing up. *Id.* at 8:21. He played football, basketball, baseball, and he wrestled when he was in middle school. *Id.* at 9:22-24. He particularly excelled at football and joined the varsity team in tenth grade; he was on special teams because he was fast and could tackle. *Id.* at 9:5-22. He played quarterback as a junior and a senior. *Id.* at 9:24-25.

---

[44] For example, Plaintiff testified that took care of his sleep apnea "once [he] got [his] benefits through work." Vol. I, 64:9-10
[45] At trial he testified that he moved to Florida in March 2012. Vol. I, 27:21-24. In his interrogatory answers, he stated that he moved in 2013. Def. Ex. 12 at page 1.

While acknowledging that football was a "pretty violent sport," he said he never missed a practice or a game due to injury. *Id.* at 10:12-18. He denied ever suffering injuries in baseball or basketball that caused him to miss a practice or a game. *Id.* at 10:19-22. He was recruited to play college football but did not get to that level due to his grades. *Id.* at 10:25-11:5.

169.    Plaintiff testified at length on direct examination about the work he did prior to becoming a respiratory therapist. He testified that he did physically demanding work for both United Parcel Service and an electronics department store, including unloading trucks. *Id.* at 12:5-13:18. He testified that he did physically demanding work while working in the heating, ventilation, and air conditioning (HVAC) industry, first as an installer and then as a fabricator. *Id.* at 16:9-11, 17:7-13, 18:14-21. He denied hurting his back or his neck, ever getting hurt on the job, or taking time off work because he felt he had been injured or hurt in any way in any of these jobs. *Id.* at 13:19-14:1, 16:14-17, 18:5-11.

170.    While working these jobs, Plaintiff testified that he continued to play in sports leagues such as football, basketball, and softball. He acknowledged that "you roll an ankle from time to time" but denied suffering any neck or back injuries "whatsoever." *Id.* at 19:8-19. He testified that when he was in New York, he was a dedicated gym member and was in the gym "just about every day" but had no problems with his neck or back. *Id.* at 34:17-20.

171.    Indeed, Plaintiff testified that February 11, 2017 was the first time in his "entire life" that he "had felt any pain" in his neck or in his back. *Id.* at 51:24-52:4; *see also id.* at 35:2-4, 267:14-22, 301:18-25. He testified that, prior to this accident, he had never sought medical treatment of any nature for neck pain or back pain. *Id.* at 52:5-11.

172.    Plaintiff demonstrated that he was not an accurate historian; therefore, it is difficult for the Court to credit his testimony that he had no prior neck or back pain and no prior relevant injuries, particularly given the combination of Plaintiff's lack of candor, his age, the degenerative conditions present on radiological studies, and the testimony that was provided about Plaintiff's past activities.

### Plaintiff's current condition

173.    Plaintiff asserted that he still has pain in the lower back and a radiating pain that goes across the hip flexor to the glute, hamstring, and down into the calf, all on the left side. Vol. II, 37:24-38:1.[46] He said that mornings are the worst time of the day for him and that he gets up at 4 am so he can stretch and take a hot shower before work. Vol. I, 100:2-9. He testified that he still sleeps in a recliner a couple of times a month. *Id.* at 132:13-21. After 3.5 hours on the stand, he stated "I'm a little uncomfortable." *Id.* at 137:12-13.

---

[46] Plaintiff testified that the symptoms in his neck went away less than a year after the accident and that he is not asserting a permanent injury to his neck. Vol. I, 34:21-35:1, 88:16-23, 89:24-90:1.

174.   Plaintiff asserted that he is no longer able to be as physically active as he was before the car accident; however, it had been many years since he worked out intensively and participated in team sports. Once he came to Florida, he did not continue to participate in recreational sports; his focus was on school. Vol. I, 33:15-20. He testified that, in the period prior to the accident, he did not belong to a gym but instead worked out at home, running on his brother's treadmill about three times a week, and using dumbbells and medicine balls to simulate a "boot camp" style gym class. *Id*. at 34:1-6. He did not testify that he does not work out now, just that it is "inconsistent." Vol. I, 282:12-13; *see also* Def. Ex. 12, page 9 ("I can't really work out like I used to."). He testified that Dr. Topp cleared him to start doing some training, but that he stopped doing it. *Id*. at 133:3-13. While there are activities that Dr. Topp recommended Plaintiff not engage in, post-back surgery (such as "dead lifts and squats"), Dr. Topp encouraged Plaintiff to "maintain a level of fitness and health." Vol. II, 271:19-20.

175.   Plaintiff lives with his brother Bruce Schmucker. Vol. II, 135:5-7. Bruce works the night shift, and Plaintiff works the day shift, so they do not see one another that often. Vol. III, 33:23-341. (Indeed, Bruce testified that he has never driven Plaintiff to any medical treatments and did not assist him after the surgery. *Id*. at 51:8-18.) The two of them divide up the indoor chores and Plaintiff takes care of the yardwork. Vol. I, 135:12-15, 136:11-12. Plaintiff testified that he does regular cleaning inside, such as

vacuuming and dusting. *Id*. at 136:20-23. He does laundry. *Id*. He did not indicate that there are any chores that he can no longer do.

176.    Surveillance was shown from July 18, 2019. Vol. I, 286:16-288:16. Throughout the clips, Plaintiff was mowing the lawn with a push mower with no indication of difficulty. The video showed two instances of him bending completely over, once to pick up a paver and once to do something with another piece of equipment. *Id*. at 287:6-9, 288:1-2; Vol. II, 45:13-21. It also showed him hosing off the lawnmower, lifting it up with one hand so the water would drain out. Vol. I, 287:13-22. He casually checked his phone a few times; for one of these he explained he was probably just switching the music that he was listening to. *Id*. at 288:1-7. There was no outward manifestation of him being in pain or discomfort. He admitted that he had no difficulty with bending or range of motion. *Id*. at 288:13. He thought he looked like he was sore and stiff when he was walking back into the garage at the end of the video. *Id*. at 288:14-16. He acknowledged that he has told medical providers that he had restricted range of motion in his back. Vol. II, 45:8-12.

## Plaintiff's expert witnesses

177.    In the pretrial statement, Plaintiff listed seven "non-retained treating physicians" that Plaintiff expected to call at trial, including Dr. McDaniels, Dr. Asad, and Dr. Sooudi. Doc. 10, pages 4-10. Only Drs. Topp and Pardo testified; notably, the only two experts with letters of protection. The opinions offered by Dr. Topp and Dr. Pardo at trial are analyzed in the Conclusions of Law section, below.

64

178.    Gil Spruance was retained by Mr. Triolo to prepare a life care plan, *i.e.*, a plan that projects the cost of future medical expenses. Vol. IV, 5:25-6:3. In creating the plan, Mr. Spruance conducted interviews with Plaintiff (on April 9, 2019), Dr. Topp (on April 23, 2019), and Dr. Pardo (on April 25, 2019), and he reviewed medical records. Vol. IV, 7:22-24; 8:2-6; 9:10-11. He created a life care plan dated April 29, 2019. Pl. Ex. 44.

179.    Mr. Spruance testified that Dr. Pardo recommended Plaintiff undergo one left-sided and one right-sided bilateral three-level lumbar radiofrequency ablation (RFA) each year. Vol. IV, 16:13-23. Mr. Spruance prepared cost estimates for these procedures. *Id*. at 12. The life care plan assumes these will be done for remainder of Plaintiff's life expectancy. Pl. Ex. 44 at page 5; Vol. IV, 18:13-20. Dr. Pardo testified, however, that RFAs are done less frequently in older patients. The procedure strips the myelin sheath from the exterior of the nerve and, for patients in Plaintiff's age group, the myelin regenerates after six months to a year; with older patients, the procedure lasts up to eighteen months. Vol. II, 123:6-10, 123:17-21. The life care plan does not account for the decrease in the frequency of RFAs that would occur over Plaintiff's lifetime, even if such could be related to the accident.

180.    Further, based on Dr. Topp's recommendations, Mr. Spruance projected the costs associated with another lumbar fusion extension for Mr. Triolo. Vol. IV, 20:10-16; Pl. Ex. 44 pg. 5. Dr. Topp testified that there is only a 30% likelihood that Plaintiff will need another spinal surgery during the next 10 years. Vol. II, 268:23-

269:1. He testified that if Plaintiff were to live another forty years, he was "very sure" that Plaintiff would need to undergo another spinal surgery. Vol. II, 269:4-10. However, Plaintiff's life expectancy, at the time the life care plan was created, was 35.2 years. Vol. IV, 11:20-22. Even if Plaintiff lived past his life expectancy, it is unlikely that a fusion surgery would be performed while he was in his 80's. Vol. I., 6:21-23; Vol. II., 215:2-4 (noting that surgeons consider if a patient is "too medically frail" to undergo a surgical procedure).

181.    The life care plan also included costs for annual orthopedic follow-up with x-ray, urine drug screening 4-6 times a year, and physical therapy/chiropractic treatment 24 times a year, all projected to occur annually throughout the remainder of Plaintiff's life. *See* Pl. Ex. 44. However, in the nearly 18 months between the time Mr. Spruance prepared the life care plan and trial, Plaintiff had not had an orthopedic follow up, urine drug screening, or any physical therapy or chiropractic treatment. *See, e.g.*, Def. Ex. 22, TSO_0011-12; Vol. II, 150:19-151:10. At trial, Plaintiff chose not to seek recovery of the projected physical therapy/chiropractic treatments. Vol. IV, 27:6-20.[47]

---

[47] Gil Spruance, Plaintiff's one retained expert witness, testified that his fees are not contingency based. He explained that "would be an ethical violation of my profession as a CRC and a certified life care planner." He explained that his hourly fee does not fluctuate based on the outcome of a case. He stated that his objective is to ensure that his opinions not be perceived as biased due to his payment arrangement. Vol. IV, 37:12-24.

66

## II.    PROPOSED CONCLUSIONS OF LAW

Based upon the foregoing findings of fact, the Court reaches the following conclusions of law:

### A.    Applicable law

Plaintiff filed this tort action against the United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Pursuant to the FTCA, the United States can be held liable in tort in the same manner and only to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674.

Richard Triolo timely presented an administrative claim to the United States Postal Service, and his claim was denied, Plaintiff has exhausted his administrative remedies. Further, after having received a denial of his administrative claims, Plaintiff timely filed suit for purposes of bringing an action pursuant to the FTCA, 28. U.S.C. §§1346 (b)(1) and 2671-2680.

In considering claims brought under the FTCA, the Court applies the substantive law of the place where the claim arose. *See* 28 U.S.C. § 2674. The substantive law of the State of Florida is applicable in this case. To sustain a negligence cause of action under Florida law, Plaintiff bears the burden to prove, by the greater weight of the evidence, all four elements of negligence: duty, breach, causation, and damages. *Jeffries v. Amery Leasing, Inc.*, 698 So.2d 368, 370-71 (Fla. 5th DCA 1997); *see also Gonzalez v. United States*, No. 3:14-cv-419-J-34JBT, 2017 WL 1756476, *1 (M.D.

67

Fla. May 5, 2017) (same). To prevail on a claim of negligence, a plaintiff must establish

the following:

> (a) A duty, or obligation, recognized by the law, requiring defendant to
>     conform to a certain standard of conduct, for the protection of others
>     against unreasonable risks.
> (b) A failure on the defendant's part to conform to the standard
>     required: a breach of the duty.
> (c) A reasonably close causal connection between the conduct and the
>     resulting injury, which is commonly known as "legal" or
>     "proximate" cause and which includes the notion of cause in fact.
> (d) Actual loss or damage.

*Gonzalez*, 2017 WL 1756476, at *1-*2.

I find that Rentz was at fault for the accident and that her negligence was the

legal cause of the accident. However, a finding of fault does not automatically establish

a right to recovery; therefore, this Court will next address the causation element, as it

is dispositive. *See Jeffries*, 698 So. 2d. at 3710-71; *see also Gooding v. University Hospital

Bldg., Inc.*, 445 So.2d. 1015, 1018 (Fla. 1984) (concluding that a failure to establish

causation bars recovery).

Under Florida law, Plaintiff must "prove by a preponderance of evidence, with

'reasonable medical probability,' that [Defendant's] alleged negligence was the

proximate cause of [Plaintiff's] injuries." *Wolicki-Gables v. Arrow Int'l, Inc.*, 641 F. Supp.

2d 1270, 1287 (M.D. Fla. 2009), *aff'd*, 634 F.3d 1296 (11th Cir. 2011). Because

Plaintiff's alleged injuries are beyond the common experience of the trier of fact, expert

witness testimony is required to establish causation. *Greene v. Flewelling*, 366 So.2d 777,

780 (Fla. 2d DCA 1979). "A mere possibility of such causation is not enough; and

68

when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Gooding*, 445 So.2d. at 1018.

Stating that a symptom is "consistent with" traumatic causes is little more than saying it is possible that it has traumatic causes. Indeed, not only does expert testimony stating an injury is "consistent with" a traumatic injury fall far short of the *Gooding* standard, it is insufficiently plausible at the earliest stages of the case. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.").

As the trier of fact in this case, the Court may make judgments regarding the credibility of the witnesses that come before it. *See Caro–Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1504 (11th Cir.1993) (*citing Chris Berg, Inc. v. Acme Mining Co.*, 893 F.2d 1235, 1238 n. 2 (11th Cir.1990) (recognizing that the court must weigh the evidence and make credibility determinations)). A witness's testimony may be believed in full, in part, or entirely discounted. *See Moore v. Chesapeake & Ohio Ry. Co.*, 340 U.S. 573, 576, 71 (1951).

"As the fact-finder, the Court 'is free to determine the reliability and credibility of expert opinions and, if conflicting, to weigh them as the finder sees fit.'" *Gonzalez*, 2017 WL 1756476, *8 (quoting *Dep't of Ag. & Consumer Servs. v. Bogorff*, 35 So. 3d 84, 88 (Fla. 4th DCA 2010)); *see also* Fla. Std. Jury Instr. (Civ.) 601.2b ("You may accept

such [expert] opinion testimony, reject it, or give it the weight you think it deserves, considering the knowledge, skill, experience, training, or education of the witness, the reasons given by the witness for the opinion expressed, and all the other evidence in the case.").

A fact-finder's decision to reject expert testimony "must be founded on some reasonable basis in the evidence." *See Boyles v. A&G Concrete Pools, Inc.*, 149 So. 3d 39, 48 (Fla. 4th DCA 2014). Such a basis for rejecting expert testimony can include, for example: "conflicting medical evidence; evidence that impeaches the credibility or basis for an expert's opinion; the lack of candor of the plaintiff in disclosing prior accidents, prior medical treatment, and prior or subsequent similar injuries; conflicting lay testimony or evidence that disputes the injury claim; or the plaintiff's overall credibility relating to conflicting statements regarding the alleged injury." *Id.* A trial judge may reject even unrebutted expert testimony with an accompanying reasonable explanation. *Rementer v. United States*, No. 8:14-cv-642-T-17MAP, 2017 WL 1095054, *19 (M.D. Fla. Mar. 21, 2017).

If a party wishes to present expert testimony from a witness who is not retained or specially employed to provide expert testimony, the party must provide a disclosure that states: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." *See* Fed. R. Civ. P. 26(a)(2)(C). The disclosure should include the opinions to be offered by the expert witnesses and

70

"the facts supporting those opinions." Advisory Committee Notes, Rule 26(a)(2)(C)
(December 2010). If a party fails to provide information required by Rule 26(a) or (e),
the party is not allowed to use that information to supply evidence at trial, unless the
failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

With respect to a treating physician or healthcare provider disclosed pursuant
to Fed. R. Civ. P. 26(a)(2)(C), such testimony typically is limited "to matters within
the scope of observation, diagnosis, and treatment." *Muzaffarr v. Ross Dress for Less, Inc.*,
No. 12-61996-Civ., 2013 WL 3850848, at *1 (S.D. Fla. July 26, 2013) (citing *In re
Denture Cream Prod. Liability Litig.*, No. 09-2051-MD, 2012 WL 5199597, at *4 (S.D.
Fla. Oct. 22, 2012) and *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th
Cir. 2011)). The opinions offered by Plaintiff's non-retained physicians thus should be
limited to those opinions developed during their treatment of Plaintiff, based on their
personal observations of Plaintiff, and necessary to Plaintiff's treatment. *See, e.g.,
Zalimeni v. Cooper Marine and Timberlands Corp.*, Civ. Action 1:19-00245, 2020 WL
6533393, *3 (S.D. Ala. Nov. 5, 2020) (finding that treating physician's "testimony is
limited, *i.e.*, any testimony, opinion, statements, and/or reports regarding causation
or hypotheses for same, are excluded unless a determination of causation was
necessary for treatment"). Fed. R. Civ. P. 26(a)(2)(C) witnesses may not testify to
opinions developed for the purpose of litigation and thus any such opinions should be
excluded. *See, e.g., In re Denture Cream Prod. Liability Litig.*, 2012 WL 5199597, at *4
(holding that treating physicians offering opinions beyond those arising from

treatment—including opinions formed in anticipation of litigation—are experts from whom full Rule 26(a)(2)(B) reports are required).

The current version of Fed. R. Civ. P. 26 makes clear that if a treating physician is presenting evidence under Federal Rule of Evidence 702, 703, or 705, that physician is offering expert testimony, not lay testimony. *See* Fed. R. Civ. P. 26(a)(2)(A) and (C)(i); *see also* Fed. R. Evid. 701(c) (limiting opinion testimony of a lay witness to that "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702").[48]

The admissibility of opinion testimony of expert witnesses is governed by Rule 702 of the Federal Rules of Evidence. The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), explained that Rule 702 requires the trial court to act as a gatekeeper to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Daubert,* 509 U.S. at 589. The party presenting or offering the expert testimony bears the burden of establishing the expert's qualification and reliability and helpfulness of such opinions. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005). *See also Morrow v. Brenntag Mid-South, Inc.*, -- F.Supp.3d --, No. 8:19-cv-3190-T-33AEP, 2020 WL 7229712 (M.D. Fla. Dec. 8, 2020) (excluding treating physician's testimony as to causation).

---

[48] Cases that pre-date the December 2010 amendments to Rule 26 (and subsequent citing cases) frequently discuss treating physicians testifying as "lay" witnesses, but lay testimony from expert witnesses should, under the current rule, be relatively narrow. For example, testimony about something a lay witness can perceive (*e.g.*, that an ankle is swollen) would be appropriate lay witness testimony. Testimony based on scientific knowledge is appropriately considered expert testimony.

Guided by *Daubert* and other Supreme Court decisions, the Eleventh Circuit has established a three-prong test to determine the admissibility of expert testimony: "To fulfill their obligation under *Daubert*, district courts must engage in a rigorous inquiry to determine whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005). When the district court is the trier of fact, "the district court may allow challenged expert testimony to be presented and then later determine issues of admissibility and reliability." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 616 F. Supp. 2d 1250, 1256 (M.D. Fla. 2009).

When considering a Plaintiff's course of treatment, "[i]t is well settled that failure to follow medical advice may constitute comparative negligence on the part of the plaintiff." *Healthsouth Sports Medicine and Rehab. Center of Boca Raton, Inc., v. Roark*, 723 So. 2d 314, 315 (Fla. 4th DCA 1998); *Nordt v. Wenck*, 653 So.2d 450 (Fla. 3d DCA 1995) (finding that the defendant appropriately raised the issue of comparative negligence by asserting the plaintiff failed to follow her physician's instructions.). If plaintiff's injuries are in part attributable to his comparative fault, that fault

"diminishes proportionately the amount awarded as economic and noneconomic

damages." Fla. Stat. § 768.81(2).

###### B.      The testimony of Plaintiff's experts went beyond the scope of Plaintiff's expert disclosures, included opinions not formed during the course of their treatment, and included opinions not necessary to their treatment.

Very little of what Drs. Topp and Pardo said on the stand—particularly the

parts Plaintiff is relying on to prove his case—was contained in Plaintiff's expert

disclosures.[49]  The affidavit from Dr. Topp included with Plaintiff's expert

disclosures stated, in relevant part:

> 7. It is my opinion within a reasonable degree of medical probability the impact from the automobile accident dated February 11, 2017 caused an injury to Mr. Triolo's Lumbar spine which required the PLIF surgery.
>
> 8. It is my opinion within a reasonable degree of medical probability the impact from the automobile accident dated February 11, 2017 caused the following injuries to Mr. Triolo's lumbar spine:
> a.   2 mm protruding disc herniation indenting the anterior thecal sac with spinal canal narrowing at T12-L1;
> b.   Annular bulge encroaching upon foraminal at L2-3;
> c.   Mild facet joint arthropathy, predominantly on the right side at L3-4;
> d.   Bilateral facet joint arthropathy at L4-5;
> e.   Circumferential disc bulge resulting in bilateral foraminal stenosis in combination with anterior L5 subluxation encroaching upon the L5 nerve roots bilaterally; and
> f. SI joint dysfunction secondary to surgery

---

[49]  Plaintiff's Rule 26(a)(2) Expert Witness Disclosures included a discovery pleading and affidavits from Drs. Topp and Pardo. Doc. 14-1; *see also* Doc. 23-1 (Pardo Aff.) and Doc. 23-2 (Topp Aff.). The text from the discovery pleading was reproduced in the Pretrial Statement. *See* Doc. 59, pages 4-10.

Doc. 23-2, ¶¶ 6-7. Dr. Pardo's affidavit was identical except it did not include the language in paragraph 7 or the language in 8.f. *See* Doc. 23-1. Notably absent from both affidavits were the terms L5-S1, spondylolysis, spondylolisthesis, spondylosis, pars interarticularis, or many of the other terms that were foundational to the physicians' trial testimony.[50] Indeed, the language from the affidavits appears to have been merely cut and pasted from Dr. Sooudi's report from the April 2017 MRI, specifically excluding sections of the report that referenced L5-S1. *Compare* Doc. 23-1 and Doc. 23-2 *with* Pl. Ex. 3. Indeed, the affidavits' language was largely irrelevant to the testimony that was elicited on direct examination.

Plaintiff's expert disclosures did not include Dr. Topp's and Dr. Pardo's opinion that the April 2017 lumber MRI showed bone marrow edema at L5-S1, Dr. Topp's opinion that Plaintiff had post-traumatic arthritis at L5-S1, Dr. Pardo's opinion that Plaintiff had facet joint arthropathy at L5-S1, or Dr. Pardo's opinion that facet arthropathy can occur following an injury and then can be aggravated or made worse by lumbar fusion. To have the experts' trial testimony turn on so many issues that were not included in Plaintiff's expert disclosures violates the letter and the spirit of Rule 26(a)(2).

---

[50] The portion of the expert disclosure discovery pleading pertaining to Dr. Topp used the term L5-S1 but not spondylolysis, spondylolisthesis, spondylosis, or pars interarticularis. *See* Doc. 59, pages 4-5.The portion of the disclosure pertaining to Dr. Pardo stated that he performed an injection at L5-S1 and that he "diagnosed" plaintiff with lumbar spondylolisthesis and spondylosis, but there the disclosure did not include the specific opinions offered at trial. *Id.* at 6-7.

Furthermore, it is far from clear that Drs. Topp's and Pardo's opinions were formed during the course of their treatment of Plaintiff and whether they were necessary to that treatment. For example, whereas Dr. Toumbis's note specifically noted the lack of bone marrow edema, neither Dr. Topp nor Dr. Pardo ever addressed that issue in their medical records.[51] Dr. Topp's assertion that Plaintiff had "post-traumatic arthritis" appears nowhere in his medical records.[52] Dr. Pardo's notes reflect an assessment of facet arthropathy but not specifically at L5-S1.

Dr. Topp did not have to determine that the L5 pars fracture was acute, or that it was definitely caused by the February 2017 accident, in order to perform surgery. His assessment, documented in his medical records, was that "[s]urgical correction including a PLIF with instrumentation at L5-S1 is necessary to stabilize the spine due to spondylolisthesis present." Pl. Ex. 9, TOPP 7. Dr. Topp agreed that the ultimate purpose of the surgery was to stabilize the spine. Vol. II,297:14-16; 239:16-17. He conceded that to perform the surgery, he did not need to know the exact date of Triolo's injury. *Id.* at 293:2-5. Dr. Topp resisted admitting that he would have done the same surgery even if Plaintiff had the pars defect prior to the

---

[51] No medical record was shown during either Dr. Topp's or Dr. Pardo's direct examinations documenting that they had reviewed the MRI and concluded that bone marrow edema was present, and defense counsel has not seen such a reference.

[52] The term was used for the first time during his direct examination—after Dr. Pardo and Plaintiff already had testified—but was not described or elaborated on at that time. Only on cross-examination did Dr. Topp explain his theory that the "degenerative spondylosis" identified Dr. Sooudi's radiology report was really "post-traumatic arthritis" that developed in the 7-week period after the accident. This is far too late in the case for such an opinion to be proffered for the first time. Moreover, this explanation defies credulity, as is discussed further below.

motor vehicle accident, yet that seemed to be the rational conclusion from his testimony. *See, e.g.*, *id.* at 293:21-294:4. Indeed, Dr. Toumbis determined that the facture was not acute, yet he recommended the same surgery performed by Dr. Topp. Def. Ex. 21, OPSI_04.

Similarly, it was not necessary for Dr. Pardo to determine what caused the pars fracture or how long it had existed in order to treat Plaintiff. On the very first visit, without having reviewed the MRI film (*see* Vol. II, 166:5-10), Dr. Pardo performed an epidural steroid injection and prescribed medications. Vol. II, 157:23-158:4.[53] Dr. Pardo thought he "most likely" reviewed the lumbar MRI in the first three or four visits (Vol. II, 96:15-16), yet he did not administer injections past the fourth visit. After those three injections, the remainder of Dr. Pardo's treatment until the day of the surgery involved referring Plaintiff to a surgeon and prescribing medication, actions which required neither reviewing the MRI nor a determination of whether the L5 pars fracture was acute. As none of Dr. Pardo's opinions regarding the MRI were necessary to his treatment, none may be relied upon by this Court.

Moreover, it is clear that what Dr. Pardo relied upon was not the MRI, but the MRI report. He did apparently have that at the time of the first visit because he selectively quoted from it in his note, and the majority of his 11 assessments were

---

[53] Indeed, even through the date of trial, Dr. Pardo had not seen any medical records from Plaintiff's treatment at the emergency department, Jacksonville Sport and Spine, or Universal Neurological care. Vol. II, 157:4-19. Similarly, he did not have any information about the accident beyond what Triolo reported to him. *Id.* at 156:11-157:2. In spite of not knowing all of those things, he was still able to treat Triolo. *Id.* at 157:20-22.

drawn from it. Vol. II, 158:24-159:4; Pl. Ex. 9, SJIPS 10. These assessments

remained the same throughout Plaintiff's treatment. 165:19-170:8; *compare* Pl. Ex. 9,

SJIPS 11 (first visit) with SJIPS 54 (March 6, 2018, the visit immediately prior to

surgery) and SJIPS 199 (July 21, 2020 visit). There is no indication that Dr. Pardo's

eventual review of the MRI report altered his treatment of Plaintiff in any material

way.

Indeed, Dr. Pardo acknowledged that he did not have to determine when the

L5 pars fracture occurred in order to treat Triolo. "I could treat it even if I didn't know

exactly when it occurred; correct." Vol. II, 153:11-14. "And the same thing with the

spondylolisthesis . . . you could treat him even without knowing exactly when it

occurred? Yes." *Id.*, 153:15-18. He asserted that the treatment provided would

probably have been "in a different order" if it was an old injury versus a recent injury."

*Id.*, 153:19-24.[54]

With respect to Dr. Pardo's opinions about Plaintiff's post-surgical condition,

Plaintiff's expert disclosures did not include an opinion about a facet injury at L5-S1.

---

[54] Dr. Pardo testified that in one image "of the end plate of L5" there was "bony edema." Vol. II,
155:21-156:3. This assessment appeared nether in his medical records nor in the expert disclosures.
Dr. Pardo is not a board-certified radiologist. *Id.* at 159:18-19. He does not have privileges at any
hospital or MRI imaging center to give the formal interpretation of an MRI of the lumbar spine. *Id.*
at 159:23-160:1. He did not talk to any radiologist about this imaging. *Id.* at 160:2-3. He recognized
that "radiologists are specialists in doing the film" and that he is "not a radiologist" but that he's
"had enough, you know, instruction . . . over the years on how to read a lumbar spine MRI." *Id.* at
92:3-11. Yet he himself characterized this as a "remarkable MRI" that was "not usual" (*id.* at 96:23-
24), suggesting that he had limited, if any, prior experience interpreting an MRI of a
spondylolisthesis.

Indeed, the expert disclosures stated that "Dr. Pardo will testify that the Plaintiff received little to no relief from" the pain management procedures that were designed to determine whether in fact there was a facet injury at that level. Doc. 14-1 at page 5; Doc. 59 at page 6. The new opinions Dr. Pardo offered at trial about there being a facet injury at L5-S1 that was masked by the pre-surgery pain, that then was aggravated or made worse by the lumbar fusion, were not disclosed in advance of trial. Even if Dr. Pardo formed this opinion during the course of treating Plaintiff, and even if he viewed that opinion to be necessary to his treatment, the failure to disclose the opinion in advance of trial (and, indeed, seeming to disclose the opposite) means that Plaintiff cannot rely on it now.

Moreover, it seems highly unlikely that this theory was necessary to Dr. Pardo's treatment. This theory did not make an appearance in Dr. Pardo's medical records until September 14, 2020, the week prior to trial. There, for the first time, Dr. Pardo included a line stating that Plaintiff's presentation was "consistent with post-lumbar fusion facet arthropathy." *See* Pl. Ex. 11, SJIPS 208. To the extent this phrase was alluding to the theory that Dr. Pardo offered at trial, adding a theory to a medical record on the eve of trial suggests that the theory we developed for the purposes of trial and not for the purpose of treating the patient.

In sum, Plaintiff's experts testified to a wide variety of opinions that should have been properly disclosed through either a more precise Rule 26(a)(2)(C)

disclosure or through a Rule 26 (a)(2)(B) report. The Court may properly exclude all such testimony. *See, e.g.*, Doc. 44, n.4.

### C.   Plaintiff did not prove causation of his lumbar injuries by a preponderance of the evidence.

Plaintiff did not prove, more likely than not, that this accident caused his L5 pars fracture, need for surgery, or subsequent sequelae.

### 1.   This was a minor accident.

First, this was a minor accident. The evidence showed minor damage to the bumper of Plaintiff's vehicle and no damage to the frame. The version of the accident reflected in Dr. McDaniels's medical records (that Plaintiff was hit by a vehicle going 30-40 miles per hour, and that the entire back end of Plaintiff's vehicle needed to be replaced) was simply not correct. No accident reconstructionist testified to the forces involved or the likely speed of the Postal vehicle but the testimony and photographs, taken together, suggest that it was a very low speed accident.

### 2.   There is no credible evidence that this accident caused a hyperextension of Plaintiff's lumbar spine.

Second, there is no credible evidence that this accident caused a hyperextension of Plaintiff's lumbar spine.

Dr. Topp testified that "an acute pars fracture is always caused by a hyperextension." Vol. II, 220:9-10. Dr. Topp did not endorse the idea that "the force of an impact from a rear-end car collision [can] cause this vertebra slippage." *Id.* at 222:12-16. Instead, he said "the hyperextension leads to the fracture." *Id.* Dr. Topp

recognized that pars fractures are very commonly caused by repetitive stress, as happens with sports that involve frequent overstretching or hyperextension of the lumbar spine, such as football, weightlifting, and wrestling. *Id.* at 275:16-21.

Dr. Topp acknowledged that he was assuming that some kind of injury occurred in the motor vehicle accident that was sufficient in nature to cause the fracture. *Id.* at 290:14-17. Dr. Topp relied on what the plaintiff reported to him about how the accident occurred. He did not have any forms from the accident. *Id.* at 289:12-18. He did not know what speed the vehicles were traveling. *Id.* at 289:19-20. He had not reviewed photographs of the cars. *Id.* at 289:22-23. He had not spoken with an accident reconstructionist about the forces involved or the speeds. *Id.* at 289:25-290:2. He had not spoken with a biomechanical expert to see if the forces were sufficient to cause a fracture to Triolo's lumbar spine. *Id.* at 290:3-6. He admitted that he would not qualify as an expert witness on the kinetics required to create spinal injuries. *Id.* at 290:7-13. Similarly, Dr. Topp did not recall ever seeing the records from Triolo's visit to the emergency department. *Id.* at 290:21-291:4. Dr. Topp did not have any recollection of reviewing the CT performed on the day of the accident that showed degeneration in the cervical spine. *Id.* at 298:17-25

Dr. Pardo testified that "if you take a joint and you hyperextend it, you can . . . . injure the joints . . . you can even fracture the joint. If I take my elbow and somebody . . . puts it on . . . a point and then hyperextends my elbow, I'm going to have a fracture. In the same way, that can happen with facet joints, any joint that has

a limited extension. If you take your head and throw it all the way back, there's a certain point you don't want to extend it any further, but if something comes and hits you on the head very hard, you're going to hyperextend beyond the point where it's limited, and that can cause injury." *Id.* at 79:9-21. He testified that it was important for him to understand the mechanism of the injury before providing treatment to facet joints because "it could determine that the hyperextension I was talking about actually took place." *Id.* at 86:21-87:2. Dr. Pardo acknowledged, however, that he did not have any objective information about this accident or the mechanism of injury. *Id.* at 156:11-157:2. Dr. Pardo was relying on Mr. Triolo's report to him about what happened. *Id.*

Unlike Drs. Topp and Pardo, the Court was provided with detailed information about the accident. There is no evidence that anything occurred similar to what Dr. Pardo described in his elbow and cervical spine examples. Plaintiff's attempt to manufacture a hyperextension through the story of his electric seatback reclining was not credible and will not be credited.

In short, there is no credible evidence demonstrating that Plaintiff's back was hyperextended in this accident in a manner that could have fractured his lumbar spine.

### 3. Based on Plaintiff's reports to them, Drs. Topp and Pardo assumed that the spondylolisthesis had to be a new occurrence, but they did not have a complete picture of Plaintiff's life.

Drs. Topp and Pardo both assumed that what they saw on MRI was a recent occurrence. Dr. Topp testified it was hard for him to believe the patient had this for a long time because he thought it would not be comfortable for the patient, that it would be causing pain. *Id.* at 232:24-233:1; 235:9-11. Dr. Pardo opined that the nerves were severely pinched, "which told me [Plaintiff] couldn't have been living like this for very long." *Id.* at 293:15-16.

Yet Plaintiff did not provide his physicians with accurate information about the accident or his life. He painted a picture of being seriously injured but, in the meantime, he was working more than 80-hour work weeks in a non-sedentary job.[55] He went to the Daytona 500 shortly after reporting to Dr. McDaniels that his pain had a 10/10 negative effect on his ability to see people who are important to him. He went to the Florida Keys with a group of friends for a trip that he testified was "pure relaxation" shortly after reporting to Dr. Pardo that doing "anything" made his pain worse. Drs. Topp and Pardo assumed Plaintiff could not function with the condition shown on the MRI, yet his activities in the year between the accident and his surgery demonstrated otherwise.

---

[55] In the over thirteen months between the accident and the surgery, Plaintiff did not take time off for any type of medical treatment. Vol. I, 115:10:12. During that same period, there were 19 pay periods where he worked 90 or more hours in a two-week period and 13 pay periods where he worked 100 hours or more in a two-week period. *Id.* at 155:4-14; Def. Ex. 51, Def. Ex. 52; *see also* Attachment A.

Dr. Topp and Dr. Pardo also assumed that Plaintiff's level of pain required immediate attention, but Triolo did not act with similar urgency. For example, Dr. McDaniels originally recommended that Plaintiff receive treatment three times a week, but Plaintiff never did, even though he had leave time that would have allowed him to do so. Dr. McDaniels referred Plaintiff for a lumber MRI on February 16, 2017, but Plaintiff did not obtain one until April 4, 2017. Ms. Chason referred Plaintiff to a surgeon in May 2017, but he did not see one until October 2017. Dr. Toumbis recommended surgery in October 2017, but he did not have it until March 2018, over a year after the accident. Plaintiff's slowness in investigating the cause of his symptoms undermines his doctors' assumption that his condition was new and of serious concern to him.

### 4. Plaintiff's testimony regarding his lack of prior neck and back pain must be considered in the context of his overall lack of veracity.

Drs. Topp and Pardo both relied on Plaintiff's report to them that he did not have any prior neck or back pain, but Plaintiff proved not to be credible on so many issues, as was evidenced throughout the trial. In some instances the omissions seemed deliberate. For other instances, it appeared he truly had no memory of certain events. Whether purposeful or not, there were countless examples of Triolo not providing accurate information. The continued insistence that he had never experienced neck or back pain, despite years of physically demanding jobs, intensive sports (including football and wrestling), intensive workouts, and at least two prior

84

serious motor vehicle accidents was simply not credible. Moreover, Plaintiff disclosed only limited information about his pre-accident medical care, leaving it unknown what records might exist to disprove his assertions. From the records that were admitted into evidence, it was clear that he was selective in what he told providers, not giving any provider a complete or accurate picture of his medical history.

Regarding his differential diagnosis, Dr. Topp testified that "There was not a tumor; there was not an infection. It wasn't a degenerative condition. It was an acute injury that we were left with." Vol. II, 225:10-12. This is a good example of why a differential diagnosis does not rise to the level of a legal causation opinion. A differential diagnosis is a series of possibilities. *Id.* 295:11-14. The physician hears a patient report of new pain after an auto accident, does not find a mass or an infection, and thus "acute injury" rises to the top of the differential. The physician assumes that this is the case and proceeds with treatment. It does not mean the physician is correct in his assumptions.

Both Dr. Topp and Dr. Pardo testified about the importance of gaining an accurate medical history from the patient. Dr. Topp testified that he asked Plaintiff about his medical history at the initial visit because it is something he wants to know as a surgeon. Vol. II, 214:9-21. He explained that it factors into the decision-making of the differential diagnosis and helps him formulate a plan. 214:23-215:1; 303:22-23. He elaborated: "I would ask: Have you ever been hurt before? . . . What other things

have happened to you before?" *Id*. at 215:19-21. He wants to know about "any
trauma, fall off a building, fall off a ladder, anything." *Id*. at 215:16-23. He relies on
the patient to give an accurate history. *Id*. at 303:19-21. He does not want patients to
withhold information about their past medical history because it would cloud his
judgment in establishing a differential diagnosis. *Id*. at 304:11-17.

Similarly, Dr. Pardo agreed that it was important to obtain a medical history
and to know about a patient's other medical conditions. Vol. II, 151:15-17, 65:19-23,
80:5-7. He wants patients to give an accurate history so that he, as a physician, can
determine what is relevant. *Id*. at 152:16-18. He uses this information to establish a
differential diagnosis. 152:19-21. History can help him rule certain things out and
might cause him to put something higher on the differential than others. *Id*. at
152:19-153:2.[56]

Plaintiff kept the report of his medical history to a bare minimum. He did not
disclose the 1995 car accident, the details of the car accident that led to his left arm
fracture, his broken hand, his crushed foot, the degeneration in his cervical spine, his
Achilles tendon tear, his past history of headaches, the severity of his sleep apnea, his
past treatment with testosterone, and an unknown number of other incidents or
conditions that Drs. Topp and Pardo might have considered relevant to their

---

[56] When asked if Dr. Pardo considered Triolo's medical history prior to the motor vehicle collision
of February 11, 2017, he answered no. He stated that he did consider the medical history as Triolo
reported it to him on the initial visit. Vol. II, 137:20-25.

differential. But they did not need a perfect history to treat him. They were able to

treat him, regardless. Vol. II, 157:20-22, 291:12-15. That is because they were not

reaching causation opinions sufficient to prove legal causation; they were merely

developing a differential diagnosis to help guide their treatment decisions.

>    5.    **Having symptoms consistent with an acute injury does not rise
>    to the level of proving, more likely than not, that the February 2017
>    accident caused said symptom or finding.**

Drs. Topp and Pardo testified that Plaintiff's symptoms were "consistent

with" Plaintiff having sustained an acute injury, but that does not rise to the level of

Plaintiff proving, more likely than not, that the February 2017 car accident caused

said symptom or finding.

Dr. Pardo testified that he considers whether there is an association with a

condition. Vol. II, 153:3-6. When he sees a patient, he is thinking about whether the

symptoms that the patient is presenting with are consistent with him having

sustained an injury. *Id.* at 153:7-10. Dr. Pardo explained that if his findings are

"consistent with" the event that the patient was involved in (*e.g.*, a car accident,

generally), then "that limits or focuses my treatment." *Id.* at 87:22-88:1. If a patient

reports that symptoms began right after a motor vehicle collision, then he looks into

that. *Id.* at 66:4-5. If there is a history that suggests one condition is more relevant

than another, he focuses his workup on that. *Id.* at 66:18-20. Dr. Pardo concluded

that Plaintiff's subjective reports were consistent with the existence of the

spondylolisthesis at L5-S1. But the pertinent issue at trial was not whether Plaintiff

had a spondylolisthesis; the pertinent issue was whether it was caused by the subject motor vehicle accident.

The testimony of Drs. Topp and Pardo shows the danger of being inclined to a particular result. Plaintiff's experts, both of whom were operating under letters of protection, and both of whom began seeing the patient without a documented referral from another physician, listened to Plaintiff's report of new pain since a car accident and reviewed his MRI to see if they could find evidence for this newly reported pain. They found it in their reading of the MRI. But this is precisely why board-certified radiologists exist; it is their job to read the film itself, without the patient influencing the findings.[57]

Regarding MRI interpretations, Dr. Topp had particularly interesting testimony, stating that "we don't want to leave that to a radiologist who has never met a patient, never spoken to him. He's just looking at a picture to try to determine what's going on." *Id.* at 226:6-14. Dr. Topp denied meaning that the patient's story should influence the interpretation of what is or is not on an MRI (*id.* at 296:25-297:9) but that was the general impression left by his testimony. This desire to correlate the read of the MRI with the story of the patient calls into question the

---

[57] Neither Dr. Topp nor Dr. Pardo is board-certified in radiology. Vol. II, 159:18-19, 273:2-4. Neither has privileges at any hospitals or MRI imaging centers to give the formal interpretation of an MRI of the lumbar spine. *Id.* at 159:23-160:1, 273: 5-8.

reliability of Drs. Pardo's and Topp's testimony about the radiographic evidence of acute injury.

### 6. Topp/Pardo both made significant concessions during their testimony that prevent Plaintiff from proving his case.

Most importantly, Dr. Topp and Dr. Pardo made significant concessions during their testimony that prevent Plaintiff from proving his case.

### a. Dr. Topp

First, Dr. Topp acknowledged that the radiology report from the April 4, 2017 MRI stated that there was degenerative spondylosis at L5-S1. Pl. Ex. 4, BMRI 1.[58] Dr. Topp did not disagree with the radiologist using the term "degenerative spondylosis." Vol. II, 276:19-25. Dr. Topp stated that spondylosis is a finding that occurs after injury over a certain amount of time. *Id.* at 279:10-11. Dr. Topp agreed that Mr. Triolo's spine had spondylosis at L5-S1 at the time of the MRI in April 2017. *Id.* at 280:1-5.

Dr. Topp then acknowledged that there is a typical sequence of events that occurs in connection with a pars fracture, to wit: the pars fracture (the spondylolysis) occurs first, then the slippage occurs (the spondylolisthesis), and then the spondylosis

---

[58] There are two pertinent lines in Dr. Sooudi's radiology report. The first, in the findings section, states: "There is degenerative spondylosis with disc desiccation and moderate to severe disc space narrowing at L5-S1 level and moderate disc space narrowing at T12-L1 level." The second, in the impression section, states: "Degenerative spondylosis with disc desiccation and disc space narrowing at L5-S1 with circumferential disc bulge resulting in bilateral foraminal stenosis in combination with anterior L5 subluxation encroaching upon the L5 nerve roots." Notably, neither of these lines were referenced in Plaintiff's expert affidavits.

develops. *Id.* at 279:16-25. Dr. Topp then seemed to have a bit of an "a-ha" moment on the stand when he realized this sequence of events did not line up well with the facts of this case.

Dr. Topp asserted that the degenerative spondylosis at L5-S1 was actually "post-traumatic arthritis," which he said was a form of spondylosis. *Id.* at 280:9-15. He said: "It's degenerative disc disease. That's arthritis. That's a general term, just like spondylosis is a general term." *Id.* at 280:21-22. In response to a question from the Court ("Did I understand your testimony to be that post-traumatic arthritis is the same as degenerative disc disease?" *Id.* at 281:12-25), he asserted: "It's one of the many subsets of degenerative disc disease. Degenerative discs disease, like spondylosis, is a general term for a disc that's degenerated. It can be degenerated because of inflammatory arthritis. It could be degenerated because of a traumatic injury to the spine, and it sets off a cascade that leads to degeneration in the future." *Id.* at 282:3-7.

It should be noted that this assertion that Triolo had "post-traumatic arthritis" appears in no medical record in this case, or any other document for that matter. The term was used once during Dr. Topp's direct examination (*id.* at 270:1), but it was not repeated, elaborated on, or discussed in his direct or re-direct.

The period of time between the February 11, 2017 motor vehicle accident and the April 4, 2017 MRI was seven weeks. *Id.* at 281:3-7. When asked during cross-examination if it was his testimony that "the spondylosis that was present on the April

2017 MRI was a type of degeneration that occurred between the car accident and the MRI" he said "That's very possible, yes." *Id.* at 280:23-281:2. Possible, however, is not the same as probable.

On direct examination, Dr. Topp testified that the disc at L5-S1 was "small" and that it had "lost water content because it's been injured and it's degenerating." *Id.* at 230:21-22. On cross-examination, Dr. Topp agreed that when a disc is desiccated, that means it has lost some of its water content. *Id.* at 301:16-18. He agreed that when the disc space has narrowed, that means the vertebral space between the upper vertebra and lower vertebra has decreased. *Id.* at 301:19-22. He agreed that both disc desiccation and disc-space narrowing are degenerative processes. *Id.* at 301:23-25. Later, when asked whether it was his testimony that "the loss of the water content and the desiccation . . . occurred in 7 weeks from the car accident" he testified that "[y]es, that certainly can occur." For support, he explained that studies have been done in rabbits by poking needles into their discs. *Id.* at 304:22-305:8. No other support was provided for this opinion.

When asked about the timing of the spondylolisthesis, Dr. Topp asserted that "the typical mechanism is that the fracture occurs and then the slippage starts immediately and continues over time. By the time he . . . had the MRI, he was a grade I spondylolisthesis, and that seemed to hold there until he saw me later. So he developed the spondylolisthesis and it stopped at the grade I, which often happens." *Id.* at 288:18-23; *see also id.* at 312:24-312:2 (stating that the spondylolisthesis occurred

sometime in the 7-week period and became stable and stayed in place until the surgery).[59]

In sum, it is Dr. Topp's opinion that Triolo suffered the L5 pars fracture the day of the car accident, that that the spondylolisthesis developed, and that between the date the spondylolisthesis developed and the MRI on April 4, 2017, Triolo's disc degenerated. Vol. II, 288:8-15; 289:4-7.

The Court simply cannot credit Dr. Topp's theory characterizing the degenerative spondylosis noted in the MRI report at L5-S1 as post-traumatic arthritis that occurred in the 7 weeks between the motor vehicle accident and the MRI. First, this theory was not disclosed in advance of trial. It was not included in Plaintiff's expert disclosures, it was not included in Dr. Topp's expert affidavit, it was not included in Dr. Topp's medical records (not even the operative notes, which reflected his finding of degenerative disc disease and spondylosis). As such, the defendant was deprived of the opportunity to prepare cross-examination on this issue.

Second, Plaintiff did not demonstrate that the theory had sufficient reliability to be accepted by this Court. Dr. Topp asserted that it was "possible" to have this level of degenerative spondylosis appear in 7 weeks and that disc desiccation "certainly can occur" in 7 weeks, referencing an animal study. But stating that something is possible

---

[59] This is not quite how Dr. Topp's framed the issue in his operative report, which referred to the spondylolisthesis as an unfortunate occurrence rather than a preordained one: "[Mr. Triolo] was involved in acute trauma and suffered an L5 spondylolysis. He has been treated with all forms of nonoperative therapy but, unfortunately, he has developed a grade 1 spondylolisthesis and severe radicular pain after the acute trauma." Pl. Ex. 5, JBSC 10.

or can occur does not equate with a statement that, more likely than not, it did occur in this instance. Dr. Pardo's testimony also shed further light on this issue, as discussed below.

Moreover, the presence of degenerative findings at other levels of Plaintiff's lumbar spine, and elsewhere in his body, calls Dr. Topp's theory further into question. For example, Dr. Sooudi's MRI report included a finding of "disc desiccation with disc space narrowing at T12-L1 level." Pl. Ex. 3, BMRI 2. Dr. Topp did not contest that this was a correct finding; indeed, he acknowledged that disc desiccation and disc-space narrowing are degenerative processes. Vol. II, 301:9-25. There is no allegation that this accident caused a fracture at T12-L1.[60] Similarly, there is evidence in the record of degeneration in Plaintiff's cervical spine and osteoarthritis in his right foot. *See, e.g.*, Def. Ex. 2, BMC 4 (describing cervical CT as showing only chronic degenerative changes); BMC 20 (radiology report from cervical CT referencing "multilevel disc osteophyte complexes"); Def. Ex. 28, PIC_0003-04 (MRI of right ankle showed midfoot osteoarthritis). Dr. Topp apparently was not provided with those images and thus did not have the opportunity to consider them in rendering his opinions.

---

[60] Dr. Topp's affidavit included one line about T12-L1 ("2 mm protruding disc herniation indenting the anterior thecal sac with spinal canal narrowing at T12-L1") but Dr. Topp did not discuss this level during his direct examination. Moreover, this language appears to have been taken from the MRI report findings (*see* Pl. Ex. 3, BMRI 1) but without the elaboration included in the "impression" section of the report. *Id.* at BMRI 2.

### b.  Dr. Pardo

When asked how the disc at L5-S1 looked on the April 4, 2017 MRI, Dr. Pardo

testified that the disc was "desiccated," which means that "[i]t's dried up." The

following exchange then occurred:

> Q:   Dr. Pardo, do you have an opinion as to whether that disc was
> injured in the motor vehicle collision?
> A:   I think that it could have been degenerated, but the motor vehicle
> collision aggravated the condition.
> Q:   Let me clear that up, then. **Prior to the motor vehicle collision, is
> it more likely than not that L5-S1 had desiccation?**
> **A:   It's likely, yeah.**
> Q:   And then did the motor vehicle collision from February 11, 2017,
> did that do anything to aggravate the disc at L5-S1?
> A:   I believe so.

Vol. II, 102:4-102:14 (emphasis added). At the time, the Court noted that this

testimony was problematic for the Plaintiff, and that was before Dr. Topp's testimony.

103:11. On cross-examination, Dr. Pardo agreed that the April 4, 2017 MRI shows a

degenerative spondylosis at the L5-S1 level, as set out in Dr. Sooudi's radiology report.

Vol. II, 160:20-22; *see also* Vol. II, 159:13-15; Pl. Ex. 9, SJIPS-10; Pl. Ex. 3, BMRI 1

("There is degenerative spondylosis with disc desiccation and moderate to severe disc

space narrowing at L5-S1 level and moderate disc space narrowing at T12-L1 level.").

If it is more likely than not that the L5-S1 disc had degeneration prior to the

motor vehicle accident, and if that degeneration is the third step in the sequencing

(following the pars fracture and the spondylolisthesis), then Plaintiff cannot prove,

more likely than not, that the motor vehicle accident caused the spondylolysis and

spondylolisthesis. That, in essence, is the end of the analysis, and the Court need not go further.

To the extent Plaintiff is attempting to change his theory of the case to allege aggravation of a pre-existing condition, such is not permissible.[61]

For the sake of completeness, the Court will continue its analysis by addressing Plaintiff's post-surgical complaints.

> 7. **Plaintiff did not prove, more likely than not, that his post-surgical symptoms were caused by the motor vehicle accident.**

Plaintiff did not prove, more likely than not, that his post-surgical symptoms were caused by the motor vehicle accident.

### a. The alleged facet injury

With respect to the alleged facet injury, the diagnostic tests that Dr. Pardo performed pre-surgery did not identify the facets as a pain source. Dr. Pardo described the July 20, 2017 procedure in particular as "a diagnostic treatment" "to confirm the diagnosis of facet arthropathy as the main pain generator" (Vol. II, 113:11, 19-20) yet Plaintiff reported no significant relief from this procedure. At trial, Dr. Pardo resisted conceding that the result was "totally negative," postulating that

---

[61] As articulated by government counsel at trial: "This case has never been an aggravation case. In interrogatory responses, they expressly state that there [are] no preexisting conditions, that they're not making a case that this is an aggravation case. The affidavits of both physicians say there are no preexisting conditions. The pretrial statement says that. The trial brief says that." 102:15-22. The Court agreed: "That's my understanding as well, that it was very clear that this was not an aggravation case." 102:23-25; *see also* Def Ex 12 (Plaintiff's Answers to Defendant's First Set of Interrogatories) at No. 16; Doc. 23-1 (Pardo Aff.), at ¶ 9; Doc. 23-2 (Topp Aff.), at ¶ 10; Doc. 59 (Pretrial Statement); Doc. 75 (Plaintiff's trial brief).

"it didn't seem to provide relief because it wasn't the main pain generator at the time" (Vol. II, 154:4-24) but this theory was not disclosed previously. Also, while that might have been Dr. Pardo's theory at trial, in his October 3, 2017 letter to Dr. Toumbis, Dr. Pardo stated that that the lumbar prognostic medial branch nerve block resulted in no relief. Pl. Ex. 9, SJIPS 1.

If Triolo was experiencing accident-related pain in his facet joints, the injections should have relieved his pain, but they did not. Dr. Pardo did not perform any additional procedures in 2017, instead referring Triolo for a surgical consult to address the spondylolisthesis. Dr. Pardo agreed that the surgery was not to address a facet injury. Vol. II, 154:1-3.

Next, Dr. Pardo testified that facet arthropathy can be traumatic or degenerative. *Id.* at 168:3-5. He said that when he uses the term "facet injury" he means a "traumatic arthropathy" "to the point that the trauma fractured the pars, which is the base of the facet joint." *Id.* at 155:7-14. He testified that the "injury of the pars caused traumatic injury to, not only the interarticular aspect of it, the cartilage that we spoke of earlier, but also the base of the bony structure was fractured." *Id.* at 155:15-18. Dr. Pardo then made a significant concession: "At least L5, maybe not at L4 or L3. But at L5, the trauma was so severe that it caused a fracture." *Id.* at 155:20-21.

In other words, Dr. Pardo's opinion is that the pars fracture in turn caused the facet injury at L5. The existence of a pars fracture at L5-S1 does not explain how the

motor vehicle accident caused the asserted facet injuries at L3-4 and L4-5; indeed, Dr. Pardo did not provide any explanation for this. Particularly given the other evidence of degeneration in Plaintiff's spine, Plaintiff has not proven, more likely than not, that any facet arthropathy was traumatically induced, much less induced by the motor vehicle accident in issue in this case. As such, the need for the radiofrequency ablation procedures that Plaintiff continues to receive from Dr. Pardo that reportedly address his pain at L3-4, L4-5, and L5-S1, cannot be causally related to the accident.

### b. Plaintiff's failure to engage in post-operative therapy

As discussed in the fact section, above, Plaintiff did not follow Drs. Pardo's and Dr. Topp's instructions to engage in postoperative rehabilitation therapy. Dr. Dr. Topp was particularly concerned about the need to stretch the nerves and prevent scar tissue from developing, but Plaintiff did not do the therapy and continues to report symptoms down his left leg. To the extent Plaintiff's existing pain derives from Plaintiff's failure to engage in the recommended postoperative therapy, such cannot be causally related to the accident.

### c. Plaintiff's Achilles injury

In early 2019, Plaintiff was reporting only 2/10 pain to Dr. Pardo, until he injured his right Achilles while stepping off a ladder. After this incident, he reported to his podiatrist that he was "walking funny and is now irritating his spinal fusion." Def. Ex 32, JEFAA_003. He reportedly wore a medical boot for some period of

time, and there is evidence in the records suggesting that his ankle issues continued

(including an MRI in October 2019 for which the associated podiatry records were

not disclosed). However, Plaintiff did not report his Achilles injury to Dr. Pardo,

despite completing forms in connection with his visits to Dr. Pardo that asked him to

report any new injuries. Plaintiff's explanation for this was troubling, at best. Due to

Dr. Pardo's lack of information about Plaintiff's Achilles injury, Dr. Pardo's

testimony attributing the recurrence of Plaintiff's right-sided back pain to the

accident cannot be credited. Similarly, because Dr. Pardo was not appraised of this

injury, he did not have the opportunity to evaluate what role it might have played in

Plaintiff's subsequent reports of left-sided pain.

### 8. Plaintiff did not prove, more likely than not, that any expected future medical care can be linked to the motor vehicle accident.

Based on the Court's findings that the March 2018 surgery cannot be causally

related to the motor vehicle accident, an award for a future surgery is not warranted.

In addition, Plaintiff did not prove, more likely than not, that a future surgery is

needed. Dr. Topp testified that there is a 30% likelihood that Plaintiff will need

another surgery during the next 10 years. Vol. II, 268:23-269:1. In other words, more

likely than not, a surgery will not be needed in the next 10 years. The Court declines

to award damages for a surgery that is not likely to take place within the next decade.

In addition, it would seem incongruous to award damages for a surgery when the

Plaintiff did not do the important work of rehabilitation required to make the first

one successful.

There was a great deal of testimony about future occurrences that were

"possible" or what "could" be. But possible and could do not mean probable.

Plaintiff has the burden to prove causation more likely than not and he has not met

his burden of establishing that an award of future medical care is warranted here.

> 9.    **Plaintiff asserted that this accident dramatically changed his
> life, but this was undermined by the information, drawn out on cross, about
> his employment and his out of town trips and activities.**

As detailed in the fact section, Plaintiff has taken a wide variety of out-of-town

trips since this accident. Between the accident and his surgery date, he went to the

Daytona 500 and took trips to the Florida Keys and Port Charlotte. Between the

surgery and trial, he took a cruise to Central America (July/August 2018); went to

Biketoberfest (October 2018) and Bike Week (March 2019) in Daytona Beach; went

to his high school reunion in New York (July 2019); and went to Daytona Beach on

another undisclosed date.

The mere occurrence of these trips is relevant to Plaintiff's claims, but the

Plaintiff's failure to be forthcoming about them is of even greater importance to the

Court. On direct examination, Plaintiff testified that the only trip he had taken from

the date of the accident to the date of trial was "a cruise with a couple friends." On

cross-examination, he gradually admitted to trip after trip, but only after considerable

questioning and impeachment by defense counsel. Indeed, the Court was left with

the impression that there might have been other trips and activities that remained undisclosed, only due to defense counsel not being aware of them. This lack of candor and forthrightness is of great concern to the Court.

Plaintiff's employment also is relevant to this analysis. Plaintiff continued to work two jobs for the bulk of period from the accident to the present. The only time he took off work was following his surgery. He continues to be employed in the same full-time position as a respiratory therapist and testified to only a self-imposed limitation to avoid moving patients. It is commendable that Plaintiff has continued to work; however, it distinguishes his case from one in which a person is physically incapacitated as a result of an accident, thus causing them to be unable to work.

**10. Conclusion**

In conclusion, the Court finds that Plaintiff has not proved, by a preponderance of the evidence, that the accident caused a permanent injury to Plaintiff's lumbar spine. Plaintiff had surgery to address a spondylolisthesis at L5-S1, but Plaintiff has not established, by the greater weight of the evidence, that the accident caused this condition. In addition, after having the surgery, Plaintiff did not engage in the recommended rehabilitation necessary to ensure his surgery's success. As such, Plaintiff did not prove that the need for surgery can be causally related to the motor vehicle accident, or that Defendant is liable for any symptoms or medical care that occurred post-surgery.

### D.    Neck

The Court does find that Triolo suffered a temporary cervical injury as a result of the accident. Plaintiff testified that the symptoms in his neck went away less than a year after the accident and thus that he is not seeking recovery for a "permanent injury" to his neck. Vol. I, 88:16-23, 89:23-90:10. While his cervical complaints seemed exaggerated in his visits to Dr. McDaniels, Dr. Pardo, and particularly Dr. Asad, it does appear that he suffered some type of cervical sprain and/or strain. As such, the Court will award damages for the medical expenses associated with the treatment of this temporary injury.

### E.    Damages

With respect to Plaintiff's medical expenses, the Court will award an amount for the medical care associated with Plaintiff's temporary cervical injury.

As noted above, Plaintiff may not recover for his back surgery or any of his medical treatment post-surgery, including post-surgery pain management therapies, because he has failed to establish that his need for treatment was caused by the accident. The Court will award an amount for the expenses incurred for medical examinations and diagnostic testing reasonably necessary to determine whether the subject accident caused a lumbar injury. *See Plana v. Sainz*, 990 So. 2d 554, 556 (Fla. 3d Dist. Ct. App. 2008) ("It is generally true that even when a jury finds that the plaintiff was not injured as a result of the subject accident, the plaintiff is entitled to recover those expenses incurred for medical examinations and diagnostic testing

101

reasonably necessary to determine whether the subject accident caused the injuries."). The Court acknowledges that there are exceptions to this general rule, *see, e.g., Schwartz v. Wal- Mart Stores, Inc.*, 155 So. 3d 471, 473-74 (Fla. 5th Dist. Ct. App. 2015), but determines that, despite Plaintiff's lack of candor, some initial examinations and diagnostic testing were warranted.

In the six months following the accident, Plaintiff treated with Jacksonville Sport and Spine, treated with Universal Neurological Care, underwent a lumbar MRI and a nerve conduction study, began treating with St. Joseph Interventional Pain Specialists, and obtained prescription medications. Some of this treatment (the MRI and nerve conduction study) related solely to the alleged lumbar injury; other treatment was for a mixture of cervical and lumbar complaints. The only other care received between the accident and the surgery—one visit to Dr. Toumbis and two visits to Dr. Topp—was solely for his lumbar complaints. The visit to Dr. Toumbis could be seen as reasonably necessary to determine whether the subject accident caused a lumbar injury; the visits to Dr. Topp (the first for a second opinion and the second for a pre-operative visit) cannot be said to be reasonably necessary.

If the Court awarded the entire amount of the bills from the date of the accident to the day before surgery, it would amount to $22,408.27. *See* **Attachment B** (summarizing the medical bills for this period).

However, it is undisputed that Plaintiff received approximately $8,300.48 in benefits from his Personal Injury Protection (PIP) automobile coverage. *See* Pre-Trial

102

Statement (Doc. 59) at ¶ 9(l). (admitted facts). He received $8,077.18 from PIP for

medical care during the period of time from the accident to the day before surgery.

*See* Attachment B. Pursuant to section 627.736(3) of the Florida Statutes, "[a]n

injured party who is entitled to bring suit under the provisions of ss. 627.730-

627.7405, or his or her legal representative, shall have no right to recover any

damages for which personal injury protection benefits are paid or payable." As such,

the parties agree that Plaintiff's medical damages award must be reduced by the

amount of PIP benefits he received. In addition, the parties agree that this damage

award also is subject to reduction based on the amount of any contractual discounts.

The parties have agreed on the portion of Plaintiff's medical bills that were paid by

PIP, as well as the contractual discounts that Plaintiff received.

Thus, taking into account the PIP payments and contractual discounts with

respect to the recoverable medical expenses, and including the amounts that Plaintiff

paid out-of-pocket, the Court finds that Plaintiff is entitled to, at most, an award of

$12,698.17, which includes all the medical care from the date of the accident to the

day before surgery. *See* Attachment B. If the Court excludes Plaintiff's two visits to

Dr. Topp, Plaintiff is entitled to, at most, an award of $9,834.17. *See id.*

The Court would be justified in further reducing this amount due to Plaintiff's

failure to utilize his health insurance.[62] "It is well established that the plaintiff in a

---

[62] Plaintiff has BlueCross/Blue Shield health insurance, but he chose not to utilize it for the bulk of
the medical care in issue here. Vol. I, 225:22-226:1; Vol. II, 44:6-9. Instead, he entered into letters of

personal injury suit has the burden to prove the reasonableness and necessity of medical expenses." *Albertson's, Inc. v. Brady*, 475 So.2d 986, 988 (Fla. 2d DCA 1985). "Although some jurisdictions consider evidence of the amount of a medical bill to be sufficient proof of reasonableness, many, including Florida, require something more." *Id.*

Plaintiff's obligation is "not to pay whatever the provider demands, but only a reasonable amount." *A.J. v. State*, 677 So. 2d 935, 937 (Fla. 4th DCA 1996). Discounts associated with Medicare or Medicaid billing restrictions, discounts associated with insurance contracts, the usual and customary rates charged and payments received for these services, and what other similar medical providers in the relevant market charge for similar services are necessary factors to the analysis of whether a medical provider's charges are reasonable. *Lawton-Davis v. State Farm Mutual Auto. Ins. Co.*, Case No. 6:14-cv-1157-Orl-37DAB, 2016 WL 1383015, at *2 (M.D. Fla. Apr. 7, 2016).

In the context of the PIP statute, the Florida Legislature has defined a reasonable charge for medical services rendered for persons injured in automobile accidents to be no more than 200 percent of the allowable charges under Medicare

---

protection with several providers, including Drs. Topp and Pardo. Vol. I, 235:12-15. When asked why he did not utilize his health insurance, plaintiff said he did not see any reason to do so given that, in his view, his need for medical care was due to the car accident. *Id.* at 228:16-17, 229:1-6, 229:19. Plaintiff also testified that his insurance plan had a $6500 deductible and that paying out of pocket would not have been "good for his financials." Vol. II, 30:12-13, 31:1-2. Yet he acknowledged that he was a single man with no child support responsibilities, working two jobs, and living in a house with his brother. *Id.* at 43:23-44:5. He also acknowledged being able to afford the trips he took, such as the cruise and his trip to the Florida Keys. *Id.* at 43:11-22.

Parts A and B. *See* Fla. Stat. § 627.736(5). "Medical bills that are higher than normal can be presented to dispute the physician's testimony regarding the necessity of treatment and the appropriate amount of damages." *Worley,* 228 So. 3d at 24.

Also, the Court must reduce any award to the amount for which the plaintiff is actually liable to his medical providers after the providers reduces their bill by the amount received from the plaintiff's PIP insurer, the amount of any contractual discounts, and any write-offs or write-downs of the provider's bill. *Green v. United States*, No. 6:11-cv-1774, 2013 WL 6145530, *3 (M.D. Fla. Nov. 21, 2013) (citing Fla. Stat. § 768.76 and *Goble v. Forhman*, 901 So.2d 830, 832 (Fla. 2005)).

Here, Plaintiff did not utilize his health insurance for the care he received at Dr. Pardo's practice or Dr. Topp's practice. Instead, he entered into letters of protection with them. A letter of protection is signed when a provider agrees not to bill or collect from a patient while a suit is pending in exchange for the plaintiff agreeing to pay the provider out of an eventual recovery. "Florida courts have recognized that such letters of protection give a treating physician a 'financial interest in the outcome' of the litigation because a doctor's compensation can increase if he testifies favorably for the plaintiff." *Ledbetter v. United States*, 8:17-cv-646, Doc. 63 at 17 (M.D. Fla. Sep. 30, 2019) (citing *Carnival Corp. v. Jimenez*, 112 So. 3d 513, 520 (Fla. 2d DCA 2013)); *see also Worley v. Central Florida Young Men's Christian Ass'n*, 228 So. 3d 18, 23 (Fla. 2017) ("[B]ias on the part of the treating physician can be

established by providing evidence of a letter of protection (LOP), which may demonstrate that the physician has an interest in the outcome of the litigation.").

Letters of protection sometimes are utilized "when the client needs medical treatment, but does not have insurance." *Carnival Corp. v. Jimenez*, 112 So. 3d 513, 517 n. 3 (Fla. 2d DCA 2013). But such was not the case here. When, as here, the Plaintiff could have billed insurance but did not, the failure to utilize that insurance can be considered a failure to mitigate damages. *See, e.g., In re American Airlines Flight 331*, No. 10-20131-cv, 2014 WL 12809822, *2 (S.D. Fla. April 2, 2014) (denying motion in limine and holding that evidence of Plaintiff's insurance coverage was relevant to the jury's determination of damages).

While it is not known what Plaintiff' insurance would have paid for the medical care that was not submitted to it, and thus what discounts might have been applied, there is some relevant evidence in the record. For example, one of Dr. Pardo's bills was submitted under PIP, and PIP paid only 64% of the submitted bill (reducing it from $269.23 to $172.30).[63] It thus would be appropriate to apply a reduction to any awarded bills that were not submitted to insurance in recognition of Plaintiff's failure to mitigate.

---

[63] For example, throughout Plaintiff's care with Dr. Pardo, there are numerous occurrences of the CPT code 99214. For the four occurrences in the July 2017 to March 2018 time frame, Dr. Pardo charged $269.23. (He charged $645.00 for this code during the post-surgery period.) One of these was covered by PIP, but PIP paid only $172.30 for this code, representing an adjustment of $96.39, or a 36% reduction. Pl. Ex. 28, SJIPS-BILL 1; Vol. II, 192:8-25.

With respect to future medical expenses, there must be evidence in the record from which a fact finder can determine the amount of future medical expenses that are reasonably certain to be incurred. *See, e.g.*, *Walt Disney Co. v. Blalock*, 640 So.2d 1156, 1159 (Fla. 5th DCA 1994). It is Plaintiff's burden to establish that future medical expenses will, more probably than not, be incurred. *Kloster Cruise Ltd. v. Grubbs,* 762 So.2d 552, 556 (Fla. 3d DCA 2000). "That burden may only be met with competent substantial evidence." *Id.* Indeed, there must be "evidence in the record from which the [fact finder] could, with reasonable certainty, determine the amount of medical expense [plaintiff] would be likely to incur in the future." *DeAlmeida v. Graham,* 524 So.2d 666, 668 (Fla. 4th DCA 1987). "Some direct evidence of anticipated future medical expense is essential to a recovery because the amount of past medical expenses incurred does not—at least by itself—provide a reasonable basis for a jury to compute future medical expenses." *Volusia Cty. v. Joynt*, 179 So. 3d 448, 452 (Fla. 5th DCA 2015) (citing *DeAlmeida,* 524 So.2d at 668). Plaintiff has not proven entitlement to future medical expenses here. As such, the Court will not award any of the amounts included in Mr. Spruance's life care plan.

The Court next considers Plaintiff's claim for lost wages. Florida law permits the recovery of "[a]ny earnings ... lost in the past and any loss of ability to earn money in the future." Fla. Std. Jury Instr. (Civil) 501.3(b). Because the only time Plaintiff missed work was after the surgery, the Court finds that no award of lost wages is warranted.

107

Unless a plaintiff has suffered permanent injury within a reasonable degree of medical probability, he or she may not recover noneconomic damages for pain and suffering or mental anguish. *Green*, 2013 WL 6145530, *3 (citing Fla. Stat. § 627.737(2)(b)). In light of the foregoing, the Court concludes that Plaintiff suffered only non-permanent injuries as a result of the accident. Because Plaintiff was not permanently injured from the accident, Plaintiff may not recover noneconomic damages such as "pain, suffering, mental anguish, and inconvenience because of bodily injury, sickness, or disease . . . ." *See* Fla Stat. § 627.737(2).

In the alternative: Even if the Court were to find a permanent injury, only a small award of non-economic damages would be warranted. *See, e.g.*, *Robert Bell v. United States*, Case No. 3:17-cv-96-J-32JRK, Doc. 73 at 31 (M.D. Fla. Nov. 6, 2019) (awarding $20,000 for past and future pain and suffering).

## Conclusion

For the reasons discussed above, the Court holds that Plaintiff has failed to prove, by a preponderance of the evidence, that the accident is the legal cause of his asserted injuries, except as noted above.

Dated this 15th day of February, 2021.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

*/s/ Collette B. Cunningham*
COLLETTE B. CUNNINGHAM

108

Assistant United States Attorney
Florida Bar No. 0012737
KYESHA MAPP
Assistant United States Attorney
Florida Bar No. 0113006
Bryan Simpson U.S. Courthouse
300 North Hogan Street, Suite 700
Jacksonville, FL 32202-4270
Telephone No. (904) 301-6326/6300
Facsimile No. (904) 301-6310
Collette.Cunningham@usdoj.gov
Kyesha.Mapp@usdoj.gov
Attorneys for Defendant

cc:    Conny Davinroy Beatty, Esq.
       USPS National Tort Center
       United States Postal Service
       1720 Market Street, Room 2400
       St. Louis, MO 63155-9948

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2021, I electronically filed the foregoing
document with the Clerk of the Court by using the CM/ECF system, which will
send a notice of electronic filing to the following CM/ECF participants:

Kinney & Moore, PLLC
Philip S. Kinney, Esq.
Benjamin C. Moore, Esq.
9191 R.G. Skinner Pkwy., Suite 703
Jacksonville, FL 32256

*/s/ Collette B. Cunningham*
COLLETTE B. CUNNINGHAM
Assistant United States Attorney

109

# Attachment A

**Summary of weeks between 2/11/2017 MVA and 3/22/2018 surgery
where Plaintiff worked 90 or more hours in a two-week period**

| Date | Hours worked at Baptist Medical Center South | Hours worked at Orange Park Medical Center | Bates-numbers | Total per 2-week period |
|---|---|---|---|---|
| 03/19 - 03/25/2017 | 23.85 hours | 24 hours | BMCSOUTH-HR_0117; OPMC_0136 | 95.88 hours |
| 03/26 - 04/01/2017 | 48.03 hours | | | |
| 04/02 - 04/08/2017 | 24 hours | 47.75 hours | BMCSOUTH-HR_0118; OPMC_0135 | 120.01 hours |
| 04/09 - 04/15/2017 | 48.26 hours | | | |
| 04/16 - 04/22/2017 | 20.50 hours | 34.75 hours | BMCSOUTH-HR_0118; OPMC_0134 | 103.74 hours |
| 04/23 - 04/29/2017 | 48.49 hours | | | |
| 04/30 - 05/06/2017 | 35.94 hours | 24 hours | BMCSOUTH-HR_0118; OPMC_0133 | 108.02 hours |
| 05/07 - 05/13/2017 | 48.08 hours | | | |
| 05/14 - 05/20/2017 | 32.64 hours | 35.5 hours | BMCSOUTH-HR_0118; OPMC_0132 | 116.42 hours |
| 05/21 - 05/27/2017 | 48.28 hours | | | |
| 06/11 - 06/17/2017 | 35.87 hours | 36 hours | BMCSOUTH-HR_0118-119; OPMC_0131 | 115.41 hours |
| 06/18 - 06/24/2017 | 43.54 hours | | | |
| 07/09 - 07/15/2017 | 36.10 hours | 31 hours | BMCSOUTH-HR_0119; OPMC_0129 | 91.18 hours |
| 07/16 - 07/22/2017 | 24.08 hours | | | |
| 08/06 - 08/12/2017 | 32.13 hours | 24 hours | BMCSOUTH-HR_0119; OPMC_127 | 104.43 hours |
| 08/13 - 08/19/2017 | 48.30 hours | | | |
| 09/03 - 09/09/2017 | 43.63 hours | 0 hours | BMCSOUTH-HR_0120 | 105.2 hours |
| 09/10 - 09/16/2017 | 61.58 hours | | | |
| 09/17 - 09/23/2017 | 36.20 hours | 23.75 hours | BMCSOUTH-HR_0120; OPMC_0125 | 108.13 hours |
| 09/24 - 09/30/2017 | 48.18 hours | | | |
| 10/01 - 10/07/2017 | 36.23 hours | 22.5 hours | BMCSOUTH-HR_0120; OPMC_0124 | 107.09 hours |
| 10/08 - 10/14/2017 | 48.36 hours | | | |
| 11/12 - 11/18/2017 | 35.91 hours | 18.25 hours | BMCSOUTH-HR_0121; OPMC_0123 | 102.41 hours |
| 11/19 - 11/25/2017 | 48.25 hours | | | |

Page 1

| Date | Hours worked at Baptist Medical Center South | Hours worked at Orange Park Medical Center | Bates-numbers | Total per 2-week period |
|------|----------------------------------------------|--------------------------------------------|---------------|-------------------------|
| 11/26 - 12/02/2017 | 36.83 hours | 30 hours | BMCSOUTH-HR_0121; OPMC_0122 | 111.63 hours |
| 12/03 - 12/09/2017 | 44.80 hours | | | |
| 12/10 - 12/16/2017 | 36.54 hours | 23.75 hours | BMCSOUTH-HR_0121-122; OPMC_0121 | 96.07 hours |
| 12/17 - 12/23/2017 | 35.78 hours | | | |
| 12/24 - 12/30/2017 | 36.79 hours | 12 hours | BMCSOUTH-HR_0122; OPMC_0120 | 96.99 hours |
| 12/31 - 01/06/2018 | 48.20 hours | | | |
| 01/07 - 01/13/2018 | 37.00 hours | 23.25 hours | BMCSOUTH-HR_0122; OPMC_0119 | 108 hours |
| 01/14 - 01/20/2018 | 48.07 hours | | | |
| 01/21 - 01/27/2018 | 36.48 hours | 23.75 hours | BMCSOUTH-HR_0122; OPMC_0118 | 109.58 hours |
| 01/28 - 02/03/2018 | 49.35 hours | | | |
| 02/04 - 02/10/2018 | 36.60 hours | 11.50 hours | BMCSOUTH-HR_0122; OPMC_0117 | 96.18 hours |
| 02/11 - 02/17/2018 | 48.08 hours | | | |
| 02/18 - 02/24/2018 | 24.05 hours | 18.75 hours | BMCSOUTH-HR_0122-123; OPMC_0116 | 90.96 hours |
| 02/05 - 03/03/2018 | 48.16 hours | | | |

Page 2

Attachment B

**Medical Bills from 2/11/2017 up to day prior to 3/22/2018 surgery**

| Medical provider | Date of service | Total billed | PIP paid | BCBS paid | Adjusts | Out of pocket | Balance due |
|---|---|---|---|---|---|---|---|
| Baptist Medical South | 2/11/2017 | $2,521.20 | $1,512.72 | | $630.30 | | $378.18 |
| | | | | | | | |
| Emergency Resources Group | 2/11/2017 | $683.00 | $546.40 | | | | $136.60 |
| | | | | | | | |
| MBB Radiology | 2/11/2017 | $223.00 | $178.40 | | | $44.60 | $0.00 |
| | | | | | | | |
| Jax Sport & Spine | 2/16/2017 | $951.00 | $774.58 | $7.00 | | | $169.42 |
| | 2/21/2017 | $271.00 | $212.73 | | | | $58.27 |
| | 3/2/2017 | $271.00 | $212.74 | | | | $58.26 |
| | 3/7/2017 | $271.00 | $212.74 | | | | $58.26 |
| | 3/15/2017 | $271.00 | $212.74 | | | | $58.26 |
| | 3/30/2017 | $241.00 | $188.74 | | | | $52.26 |
| | 4/13/2017 | $125.00 | $95.94 | | $5.08 | | $23.98 |
| | 4/27/2017 | $432.00 | $313.81 | $15.00 | | | $103.19 |
| | 5/11/2017 | $191.00 | $148.74 | | | | $42.26 |
| | 5/19/2017 | $191.00 | $148.74 | | | | $42.26 |
| | 6/22/2017 | $191.00 | $148.74 | | | | $42.26 |
| | 6/30/2017 | $2,303.00 | $763.23 | | $1,390.00 | | $149.77 |
| | 7/11/2017 | $191.00 | $148.74 | | | | $42.26 |
| | 7/20/2017 | $146.00 | $116.80 | | | | $29.20 |
| | | | | | | | |
| Universal Neurological Care | 3/16/2017 | $420.00 | $334.40 | | $2.00 | | $83.60 |
| | 3/21/2017 | $50.00 | $33.71 | | $7.68 | | $8.43 |
| | 5/10/2017 | $620.00 | $496.00 | | | | $124.00 |
| | 5/25/2017 | $220.00 | $172.30 | | $4.62 | | $43.08 |
| | | | | | | | |
| Baymeadows MRI | 4/4/2017 | $1,300.00 | $931.94 | | $135.08 | | $232.98 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Medical provider | Date of service | Total billed | PIP paid | BCBS paid | Adjusts | Out of pocket | Balance due |
|---|---|---|---|---|---|---|---|
| St. Joseph's Interventional | 7/11/2017 | $1,076.71 | | | | | $1,076.71 |
| | 7/20/2017 | $1,361.09 | | | | | $1,361.09 |
| | 8/3/2017 | $269.23 | | | | | $269.23 |
| | 8/11/2017 | $773.75 | | | | | $773.75 |
| | 8/31/2017 | $269.23 | | | | | $269.23 |
| | 10/3/2017 | $269.23 | | | | | $269.23 |
| | 10/31/2017 | $269.23 | | | | | $269.23 |
| | 12/7/2017 | $269.23 | $172.30 | | $96.39 | | $0.54 |
| | 1/4/2018 | $280.03 | | | | | $280.03 |
| | 2/6/2018 | $645.00 | | | | | $645.00 |
| | 3/6/2018 | $378.34 | | | | | $378.34 |
| Orange Park Spine | 10/20/2017 | $1,600.00 | | | | | $1,600.00 |
| Topp Spine & Ortho | 11/8/2017 | $1,200.00 | | | | | $1,200.00 |
| | 2/21/2018 | $1,664.00 | | | | | $1,664.00 |
| Walgreens | 2/11/2017 - 3/19/2018 | | | | | $660.41 | $0.00 |
| | **Sub-totals** | $22,408.27 | $8,077.18 | $22.00 | $2,271.15 | $705.01 | $11,993.16 |
| | TOTAL OF BALANCE DUE AND OUT OF POCKET: | | | | | | $12,698.17 |
| | TOTAL WITHOUT TOPP SPINE & ORTHO: | | | | | | $9,834.17 |

Note 1: BMCSOUTH_0183 indicates a $1,008.48 adjustment, but Plaintiff asserts the adjustment applied was only $630.30.
Note 2: The Walgreens amounts are located at WALGREENS_0004-0006 & WALGREENS_0019-0022 & TRIOLO_0297.
Note 3: Plaintiff's other billing records are available at Plaintiff's Exhibits 15-32.