## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

RICHARD A. TRIOLO,

                Plaintiff,

v.                               Case No.  3:18-cv-919-MMH-JBT

UNITED STATES OF AMERICA,

                Defendant.

_____

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court for the entry of findings of fact and conclusions of law.  This action arises out of a motor vehicle accident that occurred in Jacksonville, Florida on February 11, 2017.  At the time of the accident, Plaintiff Richard A. Triolo was driving his 2016 Ford Mustang.  Triolo was stopped at a red light when he was rear-ended by a United States postal truck driven by Marsha Rentz, an employee of the United States Postal Service (USPS).  As a result of the collision, Triolo filed the instant action against the United States seeking compensation under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) (FTCA).

The United States has waived sovereign immunity in limited circumstances for claims for money damages against the United States for injury, death, or loss of property caused by the negligent or wrongful act or

omission of a federal employee while acting within the scope of his employment. See 28 U.S.C. § 1346(b)(1). The parties have stipulated that on February 11, 2017, Rentz was an employee of the United States, specifically the USPS, acting within the scope of her employment, and the Court accepts that Rentz was a federal employee for purposes of the FTCA. See Pre-Trial Statement (Doc. 59) at 12.

This Court has subject matter jurisdiction to hear properly filed FTCA claims arising in the Middle District of Florida. The accident at issue occurred within the Jacksonville Division of the Middle District of Florida. Prior to filing suit, Triolo submitted a timely administrative tort claim giving the United States notice of his claim. See id. at 12. The United States denied the claim. Having exhausted his administrative remedies, Triolo filed the instant action over which the Court finds that it has subject matter jurisdiction.

Pursuant to the FTCA, the United States can be held liable in tort in the same manner and only to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. In considering claims brought under the FTCA, the Court applies the substantive law of the place where the claim arose. See id. Thus, the substantive law of the State of Florida applies in this case. In Florida, a plaintiff bears the burden of proving all four elements of negligence by the greater weight of the evidence. See Jefferies v. Amery Leasing, Inc., 698 So. 2d 368, 370-71 (Fla. 5th Dist. Ct. App. 1997); Fla. Std. Jury Instr. (Civil)

401.2 & 401.3.  To prevail on a claim of negligence, a plaintiff must establish the

following:

> 1. A duty, or obligation, recognized by the law, requiring the
> [defendant] to conform to a certain standard of conduct, for the
> protection of others against unreasonable risks.
> 2. A failure on the [defendant's] part to conform to the standard
> required: a breach of the duty . . . .
> 3. A reasonably close causal connection between the conduct and
> the resulting injury.  This is what is commonly known as 'legal
> cause,' or 'proximate cause,' and which includes the notion of
> cause in fact.
> 4. Actual loss or damage . . . .

See Clay Elec. Co-op., Inc. v. Johnson, 873 So. 2d 1182, 1185 (Fla. 2003) (quoting

Prosser and Keaton on the Law of Torts 164-65 (W. Page Keeton ed., 5th ed.

1984)).

Triolo contends that Rentz negligently operated the USPS truck causing

it to strike the rear of his vehicle and legally causing him to sustain certain

injuries, most significantly permanent injuries to his lumbar spine.  The United

States does not dispute that Rentz's negligence was the sole cause of the

accident, and the undisputed evidence before the Court supports such a finding.

Nonetheless, the United States contends that the accident did not cause any

injury to Triolo's lumbar spine.  Thus, the sole issues in this case are whether

the collision can be considered a legal cause of Triolo's alleged injuries, and if so, the extent of his damages.[1]

The Court conducted a five-day bench trial spanning September 22-24, 2020, September 28, 2020, and October 6, 2020. See Minute Entries (Docs. 79-81, 83, 85).[2] During the bench trial, Triolo testified on his own behalf and called his treating physicians (Reynaldo Pardo, M.D. and Raymond Topp, M.D.), his half-brothers (Brian Schmucker and Bruce Schmucker), and a life care expert (Gil Spruance). The United States called USPS employee Jeanette Sigouin and presented the testimony of the driver, Marsha Rentz, via her deposition. Additionally, the Court reviewed evidence introduced by the parties, including Triolo's extensive medical records, and photographs of the vehicles at the scene of the accident. After the close of the evidence, the parties filed proposed findings of fact and conclusions of law. See Plaintiff's Proposed Findings of Fact (Doc. 101; Triolo Proposal), filed January 25, 2021; United States of America's

---

[1] Triolo's car was also damaged in the collision, but this loss was resolved administratively. See Pre-Trial Statement at 12. In addition, the United States does not dispute that Triolo sustained a "temporary cervical injury" in the accident. See United States of America's Post-Trial Proposed Findings of Fact and Conclusions of Law (Doc. 106; Gov't Proposal) at 101. According to Triolo, his neck pain resolved a little less than a year after the accident. Thus, the Court focuses its findings below on the treatment Triolo received for his lumbar pain.

[2] The exhibits admitted at trial are attached to the Exhibit Lists filed on October 6, 2020. See Pl.'s Exs. (Doc. 86); Def.'s Exs. (Doc. 87). Transcripts from the first four days of the bench trial are in the record at docket entries 88-91, which the Court will cite to as Transcript Volumes I-IV.

Post-Trial Proposed Findings of Fact and Conclusions of Law (Doc. 106; Government Proposal), filed February 15, 2021.

Having reviewed the pleadings, examined the evidence, observed the witnesses, and considered the arguments of counsel, as well as the remainder of the record, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure (Rule(s)).

## I.    Findings of Fact

### A. The Plaintiff

Plaintiff Richard Triolo is a respiratory therapist at Baptist Medical Center South (Baptist South).  He was forty-two years old at the time of the accident.  Triolo grew up in New York where he was the star quarterback on his high school football team.  After graduation, Triolo worked at UPS as a part-time pre-loader, and full-time as a "stock boy" at a local electronics store.  Both jobs by his own account involved physically demanding work.  After a few years, he entered the construction industry, first as a heating, ventilation, and air conditioning (HVAC) fabricator and then for over ten years as an HVAC installer.  During this time, Triolo continued to play sports in adult leagues, including football, basketball, and softball.  In March of 2012, Triolo moved to Jacksonville, Florida where his two half-brothers lived and enrolled in school to become a respiratory therapist.  He completed the program in 2013 and has been working at Baptist South since March of 2014.  Triolo's schedule at Baptist

South includes seven, 12-hour shifts every two-week period.  In 2016, to supplement his income, he began working at Orange Park Medical Center as well.[3]  Although not as strenuous as his prior jobs, Triolo's work as a respiratory therapist requires him to be on his feet and walking around the hospital throughout his shift.

While living in New York, Triolo was in two significant car accidents.  In 2000 or 2002, Triolo hit a patch of black ice and ran off the road into a fence.  The fence broke his window and fractured his left arm.  Additionally, in 1995, Triolo was in a head-on collision where both vehicles suffered extensive front-end damage and his air bag deployed.  Although Triolo was not injured, the driver of the other vehicle died.  Triolo did not disclose this accident during discovery.  See Def.'s Ex. 12 ¶ 22.  Troublingly, Triolo also failed to disclose this accident during his direct examination despite being asked whether he had been in any accidents, "of any kind whatsoever," other than the black ice incident and the accident precipitating this lawsuit.  See Tr. Vol. I at 43.  Indeed, despite multiple opportunities, he did not admit to having been in the 1995 accident until directly questioned about it on cross-examination at which time he insisted

---

[3] At the time of trial, Triolo was no longer working at Orange Park Medical Center. But, as relevant here, he was working for both hospitals at the time of the accident and at least through the date of his back surgery.

that he had failed to disclose it because he did not "feel it was relevant." <u>See</u> Tr. Vol. I at 261.[4]  Rather incredibly, despite being a former football player who was involved in two serious motor vehicle accidents and had worked for over a decade in labor-intensive jobs, Triolo testified that the accident at issue in this lawsuit was the first time in his entire life that he felt "any" pain in his neck or back.  <u>Id.</u> at 301.  Based on the foregoing, and as noted in the factual findings that follow, the Court did not find Triolo to be an entirely credible witness.

### B. The Accident

At one o'clock in the afternoon on February 11, 2017, Triolo was driving his 2016 Ford Mustang south on Old St. Augustine Road in Jacksonville, Florida on his way to his brother's house.  Triolo was wearing his seatbelt and his dog was sleeping unsecured in the passenger seat.  Rentz was also driving south on Old St. Augustine Road in a USPS mail truck owned by the United States.  The parties stipulated that: "<u>Both</u> [Triolo and Rentz] were stopped at a red light and

---

[4] Unfortunately, Triolo exhibited a pattern of failing to disclose information he did not believe was important.  In response to the government's interrogatory asking whether he had ever made a worker's compensation claim, Triolo answered no.  <u>See</u> Def.'s Ex. 12 ¶ 24. However, during the bench trial, Triolo conceded on cross-examination that he had at least three prior injuries that were covered by worker's compensation—a broken foot at UPS, as well as a broken hand and a sprained ankle while working for an HVAC company.  During discovery Triolo also responded that he had never been convicted of a felony or misdemeanor, <u>id.</u> ¶ 25, whereas at trial he conceded that he did have a driving under the influence adjudication, although he was not sure if it was classified as a misdemeanor.  Triolo's medical records also reflect incomplete information and inaccuracies in the forms Triolo completed which suggest to the Court that Triolo is not a reliable historian.

had been traveling in the rightmost lane." See Pre-Trial Statement (Doc. 59) at 11 (emphasis added).  Triolo was approximately three or four cars back from the light when he was hit from behind by the postal truck.  Triolo's car moved forward from the impact but did not hit the car in front of him.  Immediately after impact, Triolo and Rentz moved their vehicles to a nearby parking lot and Triolo contacted the police.

Pursuant to the parties' stipulation, "[t]he accident was reported to law enforcement at 1:08 p.m.," an officer "arrived on the scene at 1:25 p.m. and cleared the scene at 1:46 p.m." See id. at 12.[5]  Triolo's brother Brian Schmucker also came to the scene of the accident as well as two USPS employees, Jeanette Sigouin and Crystal Thomas.  Pictures of the vehicles reflect that Triolo's license plate was bent inward, there were significant paint scratches around the license plate and along the bumper, and the bumper was knocked loose and slightly ajar.  See Pl.'s Ex. 34.  Triolo's car did not sustain any structural damage.[6]  The

---

[5] Triolo testified that he was at the scene of the accident for about two hours, and indeed, he arrived at the nearby Baptist South Emergency Department at 2:56 p.m.  However, given the parties' stipulation regarding the officer's arrival and departure times, the Court rejects Triolo's explanation that he was on the scene for two hours because it took "forever" for the officer to arrive, and then "after he got there, it took forever to get the police report."  See Tr. Vol. I at 50-51.  It is unclear what Triolo was doing for the hour between when the officer cleared the scene and when Triolo arrived at the Emergency Department.

[6] Triolo had the Mustang repaired after the accident which required replacement of the bumper and reverse sensors, and repairs to the valance panel.  See Def.'s Ex. 3.

postal truck had what appeared to be paint marks along the large rubber front bumper.[7]  See Pl.'s Ex. 35.

According to Triolo, the impact from the USPS truck was "hard" and although he does not know how fast the truck was traveling, he testified that it "could" have been 30 or 40 miles an hour.[8]  Triolo testified that the impact caused his seat back to suddenly recline.  He also testified that immediately after the collision he looked in the rearview mirror and saw Rentz holding a cellphone with a surprised look on her face.  According to Rentz, she was at a stop waiting for Triolo's car to start moving after the light turned green when her foot slipped off the brake and she rolled into his car.  She estimated that the truck was rolling five miles per hour or less and described the impact as "medium."  She testified that she was not on her cell phone at the time of the accident and that she never pressed the accelerator.

---

[7] The pictures also show that the front grill of the postal truck is bent slightly inward. Based on the height of the grill, the size of the postal truck's bumper, and the location and degree of the damage to Triolo's car, the Court credits Sigouin's assessment that the dent in the postal truck's grill was preexisting and not a result of the accident.

[8] Triolo went to a chiropractor five days after the accident whose records include a summary of the accident with a notation that the USPS truck was traveling approximately 30-40 miles per hour.  See Pl.'s Ex. 6 at JSS_02.  When presented with this record on cross-examination, Triolo testified that he did not recall the exact speed, but Rentz "could" have been traveling that fast.  See Tr. Vol. I at 177.  Later, on redirect, Triolo testified that he does not know if that estimate is accurate and maintained that the chiropractor did not get that information from him.  See Tr. Vol. II at 19.

Upon review of the evidence, the Court is convinced that, regardless of whether Rentz was on the phone at the time, this was a low-speed accident. While the surprise of the impact likely felt "hard" to Triolo, especially given the size of the USPS truck, the Court finds that the mail truck rolled into the back of Triolo's car and was likely going around 5 mph. The damage to the vehicles is simply not consistent with an impact from a vehicle traveling at an accelerated rate of speed. Nor is it plausible that Rentz was traveling at a high rate of speed given the parties' stipulation that both vehicles were stopped at the red light. It is also significant that the impact did not cause Triolo to hit the car in front of him at the light.[9] Having determined that this was a low-speed accident, the Court rejects Triolo's testimony that the impact caused his power seat back to suddenly recline. Significantly, Triolo took pictures of the damage to his car after the accident but did not take a picture of the reclined seat.[10] The fact that his seat did not need to be repaired following the accident casts further doubt on Triolo's credibility and his version of the accident. And notably, this

---

[9] The fact that the unsecured dog sleeping in the passenger seat was apparently uninjured from the accident also supports the Court's finding that this was a low-speed impact.

[10] Brian Schmucker testified that he came to the scene of the accident and observed the damage to the outside of Triolo's vehicle but did not look inside Triolo's vehicle or notice whether the seat was reclined. Had the seat actually reclined in the sudden and surprising manner Triolo described, the Court finds it implausible that Triolo would not have shown it to his brother, especially given Triolo's testimony that he immediately began experiencing back pain at the scene of the accident.

detail would have been significant to his complaints of neck and back pain, yet it is not reflected in any of his medical records, nor did he mention it in his discovery responses.[11]

Triolo testified that immediately upon impact he felt a twinge in his back. According to Triolo, during the two hours he was on the scene of the accident, his back started getting worse, with the pain extending up into his neck. Likewise, Triolo's brother testified that he observed Triolo at the scene of the accident moving and stretching in a manner that indicated he was in pain. Triolo testified that he told Rentz, as well as the USPS employees that came to the scene that he was injured. In contrast, Rentz testified that Triolo told her he was okay. Jeanette Sigouin, the USPS supervisor who came to the scene of the accident, also testified that Triolo said he was "okay." According to Sigouin, Triolo did not appear to be in any pain. Sigouin filled out a USPS accident report the day of the accident and noted that Triolo had no injuries. Having heard the testimony of Triolo, his brother, and Sigouin, the Court finds that while Triolo

---

[11] The record of Triolo's visit to a chiropractor less than a week after the accident contains a description of the accident, including a note that his "entire rear end had to be replaced,"—a statement that is factually inaccurate and a significant exaggeration. Yet, Triolo did not mention his seat back suddenly reclining. In addition, in response to the government's interrogatory asking him to "describe in detail" how any part of his body contacted any portion of the car's interior, Triolo responded only that "[t]he back of my head hit my seat." See Def.'s Ex. 12 ¶ 8.

may have initially said he was "okay," he did begin experiencing some discomfort in his lower back at the time of the accident.

### C. Medical Care

#### i. Emergency Department

After the accident, Triolo drove himself to the Baptist South Emergency Department. Based on the Baptist South records, Triolo reported that he "was a restrained driver at a stoplight when a mail truck rear ended his vehicle at a moderate speed." See Pl.'s Ex. 2 at BMC_03. Triolo denied hitting his head, losing consciousness or any bleeding, but reported having neck and back pain that was moderate at onset, and moderate at the time of the exam. Id. Triolo received a CT scan of his neck which showed "[n]o acute process" and "chronic degenerative changes." Id. at BMC_04. He was discharged with a cervical collar and a prescription for a two-day supply (8 tablets) of Lortab. Id. at BMC_04-05. In the week following the accident, Triolo worked over 47 hours at Baptist South. Notably, the Baptist South records reflect that on March 4, 2017, Triolo requested more Lortab for his pain and was prescribed 28 additional tablets. See id. at BMC_02.

#### ii. Chiropractor

Five days after the accident, on February 16, 2017, Triolo began treating with Michael McDaniels, a chiropractor at Jacksonville Sport & Spine. See Pl. Ex. 6. In the forms completed the day of the initial visit, Triolo described his

primary health complaint as "upper neck pain, upper and lower back pain, [and] shooting pain into the lower right glut[e] [and] into the lower right hamstring." Id. at JSS_01.[12]  McDaniels noted the following subjective complaints: "In a lot of pain, waking up at night, sharp pains, can't sit for too long, can't stand for too long.  Experiencing headaches constantly, dizzy; ringing in the ears, anxiety." See id. at JSS_10.  According to the notes, Triolo reported right sided lower back pain, right lateral leg pain, constant neck pain and tightness, as well as pain in between his shoulder blades.  Id.  Triolo also told McDaniels that people he worked with had noticed he was limping.  Id.  On a Pain Disability Questionnaire, Triolo recorded that the pain was so severe he was unable to "lift objects off the floor, bend, stoop, or squat," run, or "see the people who are important to [him]."  Id. at JSS_03.  He also reported that his pain was causing "severe" emotional problems interfering with his "family, social and or work activities," as well as "severe depression/tension."  Id.

At this first visit, McDaniels referred Triolo for an MRI and a neurological evaluation with Syed Asad, M.D.  Id. at JSS_13-14.[13]   McDaniels also

_____

[12] The intake form indicates that Triolo was referred to Jacksonville Sport & Spine by Philip Kinney, who represents him in this action.  See id. at JSS_01.  Triolo testified that one of his coworkers knows Kinney and reached out to him on Triolo's behalf for information on chiropractors.  According to Triolo, he hired Kinney to represent him in this matter a week after this visit.

[13] Triolo had his first visit with Asad a month later, on March 16, 2017, and obtained his first MRI seven weeks after the accident, on April 4, 2017, upon Asad's referral.

recommended that Triolo take the following week—through February 24, 2017—off work.  Despite this recommendation, Triolo testified that he did not take any time off due to the accident.  At trial, Triolo explained that he loved his job and needed "to pay bills like anybody else."  <u>See</u> Tr. Vol. I at 66. Employment records show that Triolo did take 16 hours of leave the week of February 19-25, 2017, and 12 hours of leave the week of February 26 through March 4, but Triolo does not recall why he took that time off.  Notably, Triolo attended the Daytona 500 on February 26 of that year, which involved driving to Daytona in the morning, sitting in the stadium to watch the race in the afternoon, and driving home that same day.  Triolo recalls it being a "good day." <u>See</u> Tr. Vol. I at 196.

McDaniels initially recommended that Triolo continue with treatment three times a week for 2-4 weeks.  <u>See</u> Pl. Ex. 6 at JSS_12.  However, Triolo did not return to McDaniels for treatment until five days later, on February 21, 2017.  At that time, McDaniels decreased his recommendation to once a week for 2-4 weeks.  <u>Id.</u> at JSS_16.  Triolo saw McDaniels four times in March, and then twice a month in April, May, June, and July.  <u>See</u> <u>id.</u> at JSS_09.  According to Triolo, his treatment with McDaniels provided very minimal and only very

temporary relief to his neck and back pain, and no relief at all from the pain radiating down his right leg.[14]

### iii.   Neurologist

Triolo had his first appointment with a neurologist, Syed Asad, M.D., on March 16, 2017.  See Pl.'s Ex. 13 at UNC_02.  Asad's records reflect that Triolo told him he was "stopped at a stop light when a USPS truck hit the back of his car," and "[h]e felt his head jerk back and forth and the back of his head hit the headrest."  See id.  Asad also recorded that "[i]mmediately after the accident, [Triolo] was experiencing tightness and spasms in the mid and low back," and "noticed pain in the neck the day after the accident."  Id.  Triolo reported a variety of complaints to Asad including: neck pain; headaches; "achy, sharp and stabbing" low back pain rating 10/10 on a pain scale; radiating pain down his right side; and his legs sometimes feeling like Jell-O.  Id.  According to Asad's notes, Triolo stated that his pain was "worse when he is walking around and relieved when sitting" and that he "wakes up constantly in the middle of the night due to the pain."  Id.  Based on his examination, Asad diagnosed Triolo with lumbar radiculopathy, neck pain, insomnia, abnormal gait and mobility, impaired cognition, and postconcussional syndrome.  Id. at UNC_05.

_____

[14] Perplexingly, in contrast to this testimony, when Triolo saw a neurologist on March 16, 2017, he reported that he was receiving treatment from McDaniels twice a week and these treatments were helping his lumbar pain as well as his neck pain.  See Pl.'s Ex. 13 at UNC_24.

Asad ordered, inter alia, an MRI of the lumbar spine as well as an EMG/nerve conduction study.  Id. at UNC_06.  He referred Triolo for a Balance Master assessment[15] and prescribed various medications[16] and supplements to address the reported sleep issues, neck pain, headaches, and back pain.  Id. at UNC_06-07.  Asad also discussed other treatment options with Triolo including an MRI of his brain, a referral for neuro-psychometric testing, and trigger point injections (abbreviated as TPIs) for neck pain.  Id.  Triolo declined or indicated that he preferred to "hold off" on those.  Id.

Triolo underwent an MRI of his lumbar spine on April 4, 2017.  See Pl.'s Ex. 3.  The MRI was read by a board-certified radiologist, Soheil Sooudi, M.D. Id. at BMRI02.  Sooudi enumerated the following impressions:

1. Bilateral L5 spondylolysis with grade 1 spondylolisthesis at L5-S1 level.
2. Degenerative spondylosis with disc desiccation and disc space narrowing at L5-S1 level with circumferential disc bulge resulting in bilateral foraminal stenosis in combination with anterior L5 subluxation encroaching upon the L5 nerve roots.
3. Disc desiccation with disc space narrowing at T12-L1 level with protruding posterior disc herniation indenting the anterior

---

[15] There is no evidence that this assessment was ever performed and Triolo testified that he does not recall this referral.

[16] Over the course of his treatment with Asad, Triolo was prescribed a muscle relaxant, a nerve pain medication, a Medrol Dosepak, and lidocaine cream.  See id. at UNC_05, 17; see also Pl.'s Ex. 14 at WALGREENS_02-04.  According to Asad's records, Triolo reported that the Medrol and lidocaine cream were not helpful.  Id. at UNC_24.  Triolo testified at trial that the muscle relaxant and nerve pain medicine provided "very minimal" relief.  See Tr. Vol. I at 207-08.

       thecal sac with spinal canal narrowing and no cord impingement.

4. Annular bulge at L2-3 and L3-4 levels encroaching upon foramina with no spinal stenosis or nerve root impingement.

<u>Id.</u>  In his findings, Sooudi identified "mild facet joint arthropathy," bilaterally at L4-5, and predominately on the right side at L3-4.  <u>Id.</u> at BMRI_01.  Triolo underwent the nerve conduction study and EMG on May 10, 2017.  <u>See</u> Pl.'s Ex. 13 at UNC_17.  The nerve conduction study showed responses within the normal limits, however the EMG identified deficits "which likely represent chronic proximal pathology such as radicular disease at the right L5-S1 level."  <u>Id.</u>

Triolo's last visit to Asad's office was on May 25, 2017.  On that date, he was seen by Lindsay Chason PAC.  <u>See</u> Pl.'s Ex. 13 at UNC_24.  Chason's notes reflect that Triolo's headaches and short-term memory were improving.  <u>Id.</u> at UNC_25.  With regard to his lumbar pain, Chason instructed Triolo to continue with chiropractic care and planned to refer Triolo to a Dr. Kramarich for pain management and a Dr. Cannestra for a surgical option.  <u>Id.</u>  At trial, Triolo testified that he does not recall those referrals and did not see those doctors.  According to Triolo, Asad referred him to Reynaldo Pardo, M.D. for pain management.

### iv.   Pain Management

Pardo is a board-certified medical doctor with a specialty in anesthesiology and a subspeciality in interventional pain medicine.  He has

operated an interventional pain clinic as a solo practitioner since 2011.  Pardo began treating Triolo on July 11, 2017.  At this visit, Triolo entered into an assignment of insurance benefits agreement with Pardo's office.  See Def.'s Ex. 20 at SJIPS_15.  Although Triolo had incurred nearly $100,000 in medical fees at Pardo's practice by the time of trial, Pardo denied being aware of how Triolo's bills were to be paid.  Pardo has "[p]robably" treated at least two patients who were represented by the same legal counsel as Triolo.  See Tr. Vol. II at 163.

At his initial visit, Triolo reported to Pardo that he was "stopped at a traffic light when he sustained a rear end collision" and that he suffered "blunt trauma" and was "dazed."  See Pl.'s Ex. 9 at SJIPS_09.  Triolo complained of severe lower back pain, radiating down the right side, as well as neck pain. Triolo stated his pain was aggravated by "prolonged standing, prolonged sitting, going from sitting to standing position, [and] long car rides . . . ."  Id.  He also complained of "significant night pain which interrupts his sleep frequently, and severe morning pain and stiffness."  Id.  Notably, around this same time in the summer of 2017, Triolo went on a lengthy road trip to the Florida Keys for a vacation with friends.

Pardo performed an examination of Triolo including palpating his spine, testing the degree of flexion and extension in his spine, a Fortin finger test, and a sensory test.  The results of the physical examination indicated to Pardo that Triolo was suffering from facet joint injuries as well as nerve root compression.

Pardo opined that the MRI report was consistent with his findings from the physical examination of Triolo.[17]  Pardo testified at trial that Triolo's MRI film showed a 5-millimeter, grade 1, anterior spondylolisthesis at L5-S1, i.e., a vertebra slipping forward and compressing Triolo's nerve roots.   Pardo explained that the slippage was the result of a fracture to the pars interarticularis at L5.  In Pardo's opinion, the injuries to Triolo's facet joints at L3-4, L4-5 and L5-S1, as well as the pars fracture were caused by the motor vehicle collision.  Pardo also noted that the disc at L5-S1 was dried up and herniating.  Pardo opined that the disc likely had desiccation prior to the accident "but the motor vehicle collision aggravated the condition."  See Tr. Vol. II at 102.  However, according to Pardo, Triolo's pain was not caused by the disc desiccation.[18]

At the initial visit, Pardo gave Triolo a lumbar epidural steroid injection to alleviate his back pain.  Pardo also prescribed various medications to Triolo including an anti-inflammatory, an antidepressant and a mild narcotic pain

---

[17] Pardo testified that "[a]t some point," he reviewed the MRI film itself, most likely within the first three or four visits, although not at the time of this first visit.  See Tr. Vol. II at 95-96, 166.

[18] Significantly, Triolo has never claimed that the accident aggravated any pre-existing condition and that is not an issue in this case.

medication, hydrocodone (Narco).  See Pl.'s Ex. 9 at SJIPS_14.[19]  Triolo returned to Pardo on July 20, 2017, and reported that the injection had not provided any significant relief.  At that visit, Pardo performed a prognostic medial nerve block to determine whether the injuries to Triolo's facet joints were the main generator of his pain.  Because Triolo reported no significant relief from the procedure, Pardo concluded that Triolo's pain was coming from a different area, likely the nerve root compression from the slippage of his vertebra at L5-S1.

On August 11, 2017, Pardo attempted to relieve Triolo's pain with another steroid injection at a different location on his spine.  However, when Triolo returned on August 31, 2017, he reported that his pain had only increased. Pardo testified that the increase in pain was likely because the fluid in the injection increased the compression of the nerve root.  Given Triolo's significant pain, Pardo prescribed an additional narcotic painkiller, an extended-release morphine sulfate.[20]  Triolo next saw Pardo on October 3, 2017, and reported

-----

[19] At trial, Triolo testified that Pardo prescribed Percocet at this initial visit.  However, according to the records, Pardo initially prescribed Narco, which is hydrocodone.  Pardo did not prescribe Percocet, which is oxycodone, until March 19, 2018, around the time of Triolo's back surgery.  Compare Pl.'s Ex. 14 at WALGREENS_05 with id. at WALGREENS_13; see also Pl.'s Ex. 9 at SJIPS_11, 14, 55.

[20] Triolo testified that he took morphine every single day until the summer or fall of 2019, when he decided to stop taking it for fear of becoming addicted.  Pardo's records indicate that the last time he prescribed an extended-release morphine pill was November 12, 2018. Triolo said he stopped "cold turkey" and went through withdrawals for a month.  Pardo also recalled that Triolo independently decided to stop taking the morphine and went through withdrawals.

Notably, the only record that Triolo ever filled his prescription for morphine is a dispersal of 60 pills from a Walgreens pharmacy on October 31, 2017.  See Pl.'s Ex. 14 at

"moderate sustained relief" from the morphine.  <u>See</u> Pl.'s Ex. 9 at SJIPS_31.  At

that time, Pardo referred Triolo to Constantine Toumbis, M.D., an orthopedic

spine surgeon for an evaluation of his surgical treatment options.   <u>Id.</u> at

SJIPS_32.  Triolo continued to see Pardo about once a month following the

referral but, having determined that surgery was the next step, Pardo did not

perform any more interventions.

### v.   Surgery

Triolo saw Toumbis on October 20, 2017.  According to Toumbis's records,

he performed a physical exam of Triolo and noted that his spine was "nontender

to palpation" and his "[r]ange of motion throughout spine is within normal

limits."  <u>See</u> Def.'s Ex. 21 at OPSI_0003.  Triolo brought the MRI report and disc

to the visit with Toumbis.  According to the medical records, Toumbis made the

following diagnosis:

> MRI of the lumbar spine is significant for pathology at the L5-S1
> motion segment.  There is a grade 1 spondylolisthesis of 5 mm onto
> S1 caused by a bilateral pars interarticularis defect.  <u>This is a
> degenerative spondylolisthesis as there is no evidence of bone
> marrow edema surrounding the pars interarticularis</u>.   The
> anterolisthesis has caused significant disc degeneration at this
> level and has contributed to severe neural foraminal narrowing on

---

WALGREENS_09.  At trial, Triolo suddenly recalled that he had to use a separate pharmacy
to obtain the morphine pills because Walgreens did not provide that medication.  <u>See</u> Tr. Vol.
I at 267-68.  However, Triolo did not disclose the other pharmacy in discovery and could not
remember its name.  And, although Pardo testified that it is routine practice to conduct random
urinalysis on patients who are prescribed opioid medication, there is no indication in Pardo's
medical records that Triolo was ever subject to such screening.  The Court finds it unlikely
that Triolo was regularly taking the morphine pills.

the right and moderately severe neural foraminal narrowing on
the left. The rest of the MRI is largely unremarkable.

See id. at OPSI_0004 (emphasis added). Toumbis noted that Triolo had tried

significant conservative treatment modalities, and "[a]t the present time he

occasionally requires hydrocodone in order to manage his pain." Id. Due to "the

persistent and severe nature of his pain," Toumbis concluded that Triolo was a

"surgical candidate for a posteriorlumbar interbody fusion of L5/S1." Id. at

OPSI_0004.

Triolo was not prepared to commit to back surgery at that time and

wanted a second opinion. Pardo then referred Triolo to Raymond Topp, M.D.,

an orthopedic spine surgeon with an office in Jacksonville Beach, Florida. Triolo

had his first appointment with Topp on November 8, 2017, at which time his

chief complaint was lumbar spine pain. See Pl.'s Ex. 11 at TOPP_04. As with

Pardo, on his first visit with Topp, Triolo executed an assignment of benefits,

i.e., a letter of protection. See Def.'s Ex. 22 at TSO_03. Upon examination of

Triolo and after review of his MRI films and report, Topp also recommended

surgery. Specifically, Topp recommended a posterior lumbar interbody fusion

(PLIF) of the L5 and S1 vertebra to stabilize Triolo's spine and prevent the

slippage that was causing the neural impingement. See Pl.'s Ex. 11 at

TOPP_07. In his notes, Topp observed that Triolo had "failed conservative

treatment (medications and ESIs)" and "require[d] narcotic pain medication to

control pain from accident." Id. Triolo returned to Topp on February 21, 2018, at which time he decided to proceed with the recommended surgery. See id. at TOPP_10.

Triolo underwent the recommended spinal fusion surgery with Topp on March 22, 2018, at the Jacksonville Beach Surgery Center. See id. at TOPP_13.[21] The surgery proceeded without complication and Triolo was discharged to his home the same day. Following surgery, at Topp's recommendation, Triolo took ten weeks off work to recover.[22] Triolo was provided home visits from a skilled nurse for post-operation monitoring and wound care. See Def.'s Ex. 25 at TRIOLOGY_0018.[23] Although the surgery resolved Triolo's right-sided pain, particularly the pain radiating down his leg, Triolo soon began experiencing pain on his left side, radiating down into his left leg.

---

[21] Triolo testified that he did not return to Toumbis for surgery because Toumbis's practice had moved substantially farther away. Records reflect that Triolo did stay in contact with Toumbis's office because in the fall of 2018, he contacted Toumbis to inquire about having him review an updated MRI. See Def.'s Ex. 21 at OPSI_0007.

[22] Triolo had paid leave for the first two weeks and received six weeks of disability pay at 60% of his weekly wage. Triolo received no compensation for the last two weeks. Triolo's weekly wage at that time was $936.86. Thus, Triolo's lost wages following the surgery totaled $4,122.18. See Tr. Vol. I at 117-19.

[23] Although the referral provided for five visits, Triolo canceled the skilled nursing services after three visits. See Def.'s Ex. 25 at TRIOLOGY_0018, 60, 65, 70, 72.

### vi.    Post-Surgery Treatment

Following surgery, at Topp's referral, Triolo had a lumbar x-ray and lumbar CT scan which showed that Triolo had normal post operative changes and was healing well.  See Pl.'s Ex. 11 at TOPP_22, 24.  On April 5, 2018, Triolo had an appointment with Pardo at which time he complained of pain in his lower back radiating down his left leg.  Pardo recommended, inter alia, that Triolo "participate in postoperative rehabilitation therapy."  See Pl.'s Ex. 9 at SJIPS_60.  Triolo had an appointment with Topp on April 11, 2018, at which time Topp also recommended he start physical therapy.  See Pl.'s Ex. 11 at TOPP_22.  Topp referred Triolo to Heartland Rehab with a prescription for physical therapy 2-3 times a week for four weeks.  See id. at TOPP_58, 59.  According to Topp's records, Heartland Rehab did not accept letters of protection.  Id. at TOPP_59.  The records indicate that Triolo was to identify a different location that would accept a letter of protection and Topp would send the prescription there.  Id.

Ultimately, Triolo did not see a physical therapist until August 2, 2018, when he was evaluated at Select Physical Therapy.  See Pl.'s Ex. 8.  The physical therapist evaluated Triolo and opined that he "would benefit from skilled physical therapy services to improve flexibility of the piriformis muscles, improve active stabilization of the lumbar spine with neuromuscular re-education, and manual therapy with neural gliding to reduce compression upon

the left L5 nerve root and peripheral track." <u>See</u> <u>id.</u> at SPT_09. The records reflect a determination that Triolo's "[o]verall rehabilitation potential is excellent," and include a recommendation that he attend rehabilitative therapy for two visits a week over four weeks. <u>Id.</u> at SPT_09-10. Triolo never returned to Select Physical Therapy for any further rehabilitative therapy. Instead, Select Physical Therapy discharged Triolo so he could obtain therapy at Baptist Medical where his treatment would be at no cost to him. <u>See</u> <u>id.</u> at SPT_15. But Triolo did not obtain physical therapy at Baptist Medical either. At trial, Triolo explained that he had learned enough to be able to do the therapy at home.[24] As such, other than the initial evaluation at Select Physical Therapy, Triolo never received any formal physical therapy following his surgery.

Throughout the summer, Triolo continued to treat with Topp. At a May 2, 2018 follow-up appointment, Topp noted that Triolo was experiencing "usual post operative pain and is improving," and cleared Triolo to return to work on May 31, 2018, "with no limitations." <u>See</u> Pl.'s Ex. 11 at TOPP_24. At subsequent appointments, Topp determined that Triolo was experiencing

---

[24] The Court rejects this explanation as Triolo had only attended one physical therapy session when he decided to stop going. Notably, Pardo testified that post-operative therapy was "highly recommended," <u>see</u> Tr. Vol. II at 177, and Topp observed that "the surgery is not the most important part. The recovery <u>and therapy</u> and the healing process, that's going to take some time, so you have to <u>really dedicate</u> yourself to it," <u>see</u> <u>id.</u> at 242 (emphasis added). Indeed, to the extent Topp suggested that some patients can do home therapy instead, he did so in reference to patients that had been attending physical therapy "for many months before their surgery, so they know the exercises." <u>Id.</u> at 258. This scenario does not apply to Triolo.

sacroiliac joint dysfunction secondary to his surgery and recommended an MRI of his lumbar spine. See id. at TOPP_25-30. Upon review of the MRI, performed on August 30, 2018, Topp determined "neural stretching is the likely etiology for [Triolo's] post op leg pain," and recommended an epidural steroid injection at the L5-S1 level. Id. at TOPP_30. Triolo had the injection on September 13, 2018. According to Topp's records, Triolo reported "excellent relief of his pain" at the time, see id. at TOPP_33, but at an appointment with Pardo two weeks later, Triolo "denie[d] any significant relief" from the injection. See Pl.'s Ex. 9 at SJIPS_90. Triolo has received no further treatment from Topp.

Triolo also continued to treat with Pardo. To address his left-sided pain, Triolo received a transforaminal steroid injection on July 5, 2018, and reported two days of pain relief. Nevertheless, his pain persisted and at his appointments with Pardo in August, September, and October of 2018, Triolo rated his left lower back pain at levels 8 and 9. See Pl.'s Ex. 9 at SJIPS_85, 89, 93. Despite his significant pain, Triolo did ride his motorcycle to Biktoberfest in October of 2018.

Due to his continuing reports of significant back pain, Triolo underwent diagnostic medial branch blocks in October of 2018. The results of these procedures indicated to Pardo that the source of Triolo's pain was the left side of his facet joints at L3-4, L4-5, and L5-S1. According to Pardo, these facet joint injuries likely stem from the accident and were aggravated by the lumbar

fusion.  Based on this diagnosis, Pardo performed a left-sided radiofrequency ablation at those joints on November 8, 2018, which resulted in significant pain relief.  Nevertheless, when the left-sided pain improved, Triolo began to experience "slight right lumbar pain."  See Pl.'s Ex. 9 at SJIPS_117.  As such, Pardo recommended a radiofrequency ablation on the right side to relieve the facet joint pain.  Id. at SJIPS_125.

Triolo's pain generally continued to improve following the November 8, 2018 radiofrequency ablation, until March 28, 2019, when Triolo reported to Pardo that his pain was "worse" and stated that the pain was located on both the left and right side of his lower back, with pain radiating into his left hamstring.  See id. at SJIPS_128.[25]  Significantly, Pardo's records indicate that Triolo denied any recent injuries.  Id. at SJIPS_128-129.  However, this representation was not accurate.  A month earlier, Triolo had visited his primary care physician on February 28, 2019, complaining of Achilles discomfort on his right side.  See Pl.'s Ex. 4 at BPC_1.[26]  Triolo had been

_____

[25] Triolo rated his pain a level seven at this visit.  See Pl.'s Ex. 9 at SJIPS_128.  He reported that the pain is "aggravated with activity, lumbar flexion-extension and over the shoulder work."  Id. at SJIPS_129.  The Court notes that in March of 2019, Triolo was able to attend Bike Week, riding his motorcycle there and back.

[26] Triolo also had an appointment with Pardo on February 28, 2019, but appears to have said nothing about his difficulty walking, the ladder incident, or his fear that he was aggravating his back injury.  At this appointment, Triolo rated his pain at a level 2 and reported that it was "much better."  See Pl.'s Ex. 9 at SJIPS_123-24.

experiencing the discomfort for a few weeks which he attributed to walking differently from his back problems.  <u>Id.</u>  He also reported to his primary care physician that he had felt a "twinge coming down off [a] ladder a few days ago" and the pain had been getting worse ever since.  <u>Id.</u>  Triolo's primary care doctor referred him to a podiatrist who, on March 14, 2019, instructed Triolo to wear a CAM walker for all ambulating.  <u>See</u> Def.'s Ex. 32 at JEFAA_03.  On April 5, 2019, Triolo returned to the podiatrist at which time he reported that he had been wearing the boot as instructed "until two days ago."  <u>Id.</u> at JEFAA_05.  The podiatrist advised Triolo to continue wearing the CAM walker "for ambulating and gradually transition into a sneaker as tolerated."  <u>Id.</u> at JEFAA_06.

Although Triolo had <u>two</u> appointments with Pardo over that time, the records of those visits do not contain any reference to an Achilles injury or the use of a walking boot.  <u>See</u> Pl.'s Ex. 9 at SJIPS_128-134.  Indeed, to the contrary, the records indicate that Triolo affirmatively denied any injuries since his last visit.  <u>See</u> Pl.'s Ex. 9 at SJIPS_128-29.  At trial, Triolo explained that he did not notify Pardo of the injury to his Achilles because he sees Pardo for his back, not his foot.[27]  Neither Triolo nor Pardo could recall if Triolo wore the CAM walker to any appointments.

---

[27] The Court rejects this explanation as Triolo plainly understood the connection between his foot and his back given that he reported to the podiatrist that "he feels like he is walking funny and is now irritating his spinal fusion."  <u>See</u> Def.'s Ex. 32 at JEFAA_03.

In April, Triolo underwent radiofrequency ablations on the right and then the left side.  Over the remainder of 2019, and in 2020 through trial, Triolo underwent several more procedures with Pardo in an attempt to relieve his reoccurring pain: a steroid injection at L5 (August 20, 2019), a left-sided radiofrequency ablation (September 25, 2019), a steroid injection in the left hip (October 24, 2019), a steroid injection at L4 on the left side (August 7, 2020), and another left-sided radiofrequency ablation (September 14, 2020).  These procedures provided varying levels of pain relief both in degree and duration. Notably, although Triolo testified that two of the left-sided radiofrequency ablations he underwent had no effect on his pain at all, the left-sided radiofrequency ablation Triolo received just before trial was, in Triolo's words, "[p]robably the best procedure yet."  See Tr. Vol. I at 97.  Indeed, in the Court's observation, Triolo did not appear to be in any discomfort while seated in the courtroom throughout the trial, including during the lengthy period that he was on the witness stand.

Pardo opined that Triolo will need forty-five Percocet pills per month and annual, bilateral radiofrequency ablations at three levels for the remainder of his life to manage his pain.  According to Pardo, because of Triolo's continued need for narcotic pain medication, Triolo must continue with monthly office visits and participate in periodic drug screening.  Topp testified that there is "a high likelihood" given Triolo's age that he will need another surgery later in life,

either a fusion or a decompressive fusion at another level of his spine.  See Tr. Vol. II at 268-69.

### vii.   Current Condition

As a result of the accident, Triolo testified that he is never without pain. He states that he is no longer able to play golf, basketball, engage in weight-training, or run on the treadmill.  However, Triolo does continue to work as a respiratory therapist and testified that, other than the time off recovering from surgery, he had not missed a single shift because of the accident.  Triolo can perform the responsibilities of his job without accommodation, although he no longer helps the nurses with sliding patients into bed.  Notably, Triolo testified that he does not take narcotic pain medicine before work given his job responsibilities and for fear of losing his license.  Instead, Triolo takes Ibuprofen at work and Percocet in the evenings to help him sleep through the night.

Triolo testified that he gets uncomfortable when sitting for long periods of time, and that he still sleeps in a recliner "a couple times a month."  See Tr. Vol. I at 132.  He also wakes up extra early every morning to perform a stretching routine that improves his mobility.  Triolo is still able to do household chores, including mowing the lawn with a push lawnmower, but maintains that afterwards he is achy and sore.  Indeed, the government presented video surveillance evidence which showed Triolo mowing his lawn with a push lawnmower.  At one point, Triolo rinses off the lawnmower and then lifts it with

one hand to help it dry.  He also bends down to move a broken paver.  In the Court's view, Triolo exhibited no stiffness, soreness, or difficulty moving in the video.

Triolo's half-brothers also testified to his condition before and after the accident.  According to his brothers, before the accident Triolo lived a very active lifestyle, weightlifting, playing sports or riding his motorcycle.  Neither brother ever recalls Triolo complaining about back pain prior to the February 11, 2017 accident.  Both brothers testified that Triolo does not work out or play sports anymore.  Brian Schmucker testified that Triolo "barely rides" his motorcycle anymore, although he was unaware that Triolo had ridden his motorcycle to Daytona Beach for Bike Week after the accident.  Bruce Schmucker testified that he sees Triolo sleeping in the recliner a lot more now than he used to, and that Triolo will groan and moan when leaning over to pick something up. Consistent with Triolo's testimony, Bruce Schmucker also testified that Triolo engages in a lot of stretching early in the morning to loosen up.  Bruce Schmucker was aware that Triolo had attended Biktoberfest and Bike Week but maintained that otherwise Triolo does not ride his motorcycle anymore as it has stayed in the same position in the garage without moving.  Nevertheless, during his own testimony, Triolo affirmatively stated that he still rides his motorcycle.

## II.     Conclusions of Law

### A. Applicable Law

The evidence is undisputed, and it is not contested, that Rentz is at fault for the February 11, 2017 accident.  Rather, the central issue in this case is whether, and to what extent, Triolo's symptoms and conditions were caused by the accident.  "In negligence actions Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury."  See Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984).  In Gooding, the Florida Supreme Court explained the burden of proof as follows:

> "On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."

Id. (quoting Prosser, Law of Torts § 41 (4th Ed. 1971)).

Here, Triolo presents the opinions of his treating physicians on the cause of his ailments.  As the factfinder, the Court "is free to determine the reliability and credibility of expert opinions and, if conflicting, to weigh them as the finder sees fit."  See Dep't of Ag. & Consumer Servs. v. Bogorff, 35 So. 3d 84, 88 (Fla. 4th Dist. Ct. App. 2010); see also Fla. Std. Jury Instr. (Civ.) 601.2b ("You may

accept such [expert] opinion testimony, reject it, or give it the weight you think it deserves, considering the knowledge, skill, experience, training, or education of the witness, the reasons given by the witness for the opinion expressed, and all the other evidence in the case."). A fact-finder's decision to reject expert testimony "must be founded on some reasonable basis in the evidence." See Boyles v. A&G Concrete Pools, Inc., 149 So. 3d 39, 48 (Fla. 4th Dist. Ct. App. 2014). Such a basis for rejecting expert testimony can include, for example:

> conflicting medical evidence; evidence that impeaches the credibility or basis for an expert's opinion; the lack of candor of the plaintiff in disclosing prior accidents, prior medical treatment, and prior or subsequent similar injuries; conflicting lay testimony or evidence that disputes the injury claim; or the plaintiff's overall credibility relating to conflicting statements regarding the alleged injury.

Id.; see also Easkold v. Rhodes, 614 So. 2d 495, 498 (Fla. 1993) (finding jury could properly reject the expert testimony of plaintiff's doctors where jury also heard evidence that plaintiff did not accurately report her previous medical history to the doctors).

### B. Causation

Triolo maintains that he sustained permanent injuries to his lumbar spine in the accident and contends that because of these injuries he is suffering from chronic lower back pain which necessitated his back surgery and ongoing pain management therapies. Because of these injuries, Triolo asserts that he is no longer able to engage in the same active lifestyle he had before the accident.

As evidence of causation, Triolo presented the opinions of two of his treating physicians: Pardo and Topp.  The government, having failed to engage in discovery, did not present <u>any</u> expert testimony in opposition.

At trial, the government objected to several portions of Pardo and Topp's testimony as "new" opinions that were not previously disclosed.  For example, the government objects to both doctors' testimony that the MRI showed bony edema, Topp's opinion that the degeneration in Triolo's spine at L5 developed in the weeks between the accident and the MRI, and Pardo's opinion that Triolo had facet joint arthropathy at L5-S1 that was masked by pre-surgery pain.  Upon due consideration of the pre-trial disclosures and the testimony at trial, the Court finds that exclusion is not warranted here.

Topp and Pardo are non-retained treating physicians, and as such, Triolo disclosed these witnesses under Rule 26(a)(2)(C) by providing "a <u>summary</u> of the facts and opinions" to which these witnesses were expected to testify.  <u>See</u> Rule 26(a)(2)(C) (emphasis added).  Unlike the expert report required under Rule 26(a)(2)(B), Triolo was not obligated to provide "a <u>complete</u> statement of <u>all</u> opinions the witness will express" nor was he required to disclose "the basis and reasons" for those opinions.  <u>Compare</u> Rule 26(a)(2)(B) (emphasis added) <u>with</u> Rule 26(a)(2)(C).  Indeed, the Court is sensitive to the advisory committee's note that "[c]ourts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and may not be as

responsive to counsel as those who have." <u>See</u> Rule 26(a)(2)(C) advisory committee's note (2010 amend.).

Notably, Triolo's summary disclosures generally informed the government that Topp and Pardo would testify to the findings of the imaging and x-rays of Triolo's lumbar spine, and would opine that Triolo's injuries were caused by the accident and did not pre-exist the accident. The disclosures stated that Pardo would testify that he diagnosed Triolo "with lumbar facet joint pain arthropathy," as well as "lumbar spondylolisthesis," among other things. Topp's disclosures informed the government that he would testify to performing an L5-S1 posterior lumbar interbody fusion surgery which was "related to the injuries [Triolo] received from the subject accident." Thus, while the challenged details were not specifically mentioned in the disclosures, the testimony of the doctors did fall generally within the scope of the summaries provided. In the Court's view, to exclude the details discussed at trial as the government requests would risk transforming the "summary" requirement into that of a full expert report.

Moreover, even to the extent these details do constitute "new" facts or opinions that should have been disclosed, exclusion is not warranted. Under Rule 37(c)(1), when a "party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." "Factors relevant to the determination of whether

exclusion of a witness is warranted include 'the explanation for the failure to disclose the witness, the importance of the testimony, and the prejudice to the opposing party if the witness [is] allowed to testify.'"  See Izquierdo v. Certain Underwriters at Lloyd's London, No. 20-13772, 2021 WL 3197008, at *4 (11th Cir. July 29, 2021) (quoting Romero v. Drummond Co., Inc., 552 F.3d 1303, 1321 (11th Cir. 2008)).

Here, the testimony is important to Triolo's case and there is no indication that the omission of these details in the pre-trial disclosures was intentional. Indeed, the Court accepts that Triolo's counsel believes in good faith that he provided the level of detail required of a summary disclosure.  Most significantly, any prejudice to the government is entirely self-inflicted.  See Torres v. Wal-Mart Stores East, L.P., __ F.3d __, 2021 WL 3634632, at *18-19 (S.D. Fla. Aug. 17, 2021) (finding deficiencies in disclosure harmless because "[f]rom the very beginning of this case, then, [defendant] had all it would ever really need to understand the scope and character of [the treating physician's] testimony").  As discussed in the Court's November 5, 2019 Order (Doc. 42), the government failed to diligently engage in discovery prior to trial.  See Order (Doc. 42) at 2-4.  Despite ample notice that both Topp and Pardo would testify to causation, the government opted not to depose either witness.  Thus, to the extent the government suffered any surprise or prejudice by the details of the testimony at trial, the fault remains with the government for making a strategic

decision not to depose these treating physicians during the discovery period. See Chau v. NCL (Bahamas) Ltd., No. 16-21115-CIV-WILLIAMS/SIMONTON, 2017 WL 3623562, at *6 (S.D. Fla. May 3, 2017) (finding that although the summaries did not fully comply with Rule 26(a)(2)(C), any prejudice was cured when witnesses were deposed, and the physicians would be permitted to testify); see also Jones v. Discount Auto Parts, LLC, No. 6:16-cv-138-Orl-37KRS, 2017 WL 1396477, at *8-11 (M.D. Fla. Apr. 19, 2017) (explaining that defendant took a "calculated risk" by failing to depose plaintiff's experts or obtain its own expert, and that any prejudice suffered was at least, in part, a consequence of "pursuing exclusion of Plaintiff's testimony to the exclusion of all other alternatives").[28]

The government also argues that many of Topp and Pardo's opinions should be excluded because they were not developed within the course and scope of treating Triolo.[29]  However, the Court finds that Pardo and Topp adequately

---

[28] Rule 37(c)(1) provides, as an alternative to exclusion, that the court may "inform the jury" of a party's failure to properly disclose a witness.  See Rule 37(c)(1)(B).  As the finder of fact, the Court has considered the timing of when these treating physicians first expressed certain aspects of their opinions in determining the proper weight to give their testimony.

[29] As addressed extensively pre-trial, both parties have proceeded under the view that as non-retained treating physicians, Topp and Pardo may only testify to opinions formed in the course of Triolo's treatment.  See Plaintiff's Trial Brief at 17; United States of America's Trial Brief (Doc. 72) at 8; see also Order (Doc. 22); Order (Doc. 44).  However, the Court notes that there is some disagreement in the law as to whether, following the 2010 amendments to Rule 26, the testimony of a non-retained treating physician should be limited in this way. Compare Kondragunta v. Ace Doran Hauling & Rigging Co., No. 1:11-cv-01094-JEC, 2013 WL 1189493, at *9-13 (N.D. Ga. Mar. 21, 2013) ("[I]f a physician's opinion regarding causation or

testified that they developed their opinions regarding the cause of Triolo's injuries in the course of treating him and that determining the cause of his injuries was necessary to their treatment in order to rule out other potential causes. Indeed, both doctors testified that it is a routine and necessary part of their practice to determine and consider the cause of a patient's injury. As such, the Court will not exclude Topp and Pardo's causation testimony on that basis either.[30]

---

any other matter was formed and based on observations made <u>during the course of</u> treatment, then no Subsection B report is required . . . . If, however, the physician's opinion was based on facts gathered outside the course of treatment, or if the physician's testimony will involve the use of hypotheticals, then a full subsection B report will be required." (emphasis added) (internal citations omitted)) <u>with</u> <u>Torres</u>, 2021 WL 3634632, at *10-16 (discussing the issue at length and concluding that plaintiff's treating physician "can offer expert opinions on the question of causation, <u>regardless of when his opinions were formed</u>" because "there's <u>no</u> indication that [plaintiff] (or his legal team) <u>retained</u> [the treating physician] to provide testimony in this case"). Regardless, the Court need not resolve the issue as the Court is satisfied that all of Topp and Pardo's opinions were formed within the scope of Triolo's treatment.

[30] Prior to trial, the government also moved to exclude Topp and Pardo's opinions as unreliable under <u>Daubert v. Merrell Dow Pharms. Inc.</u>, 509 U.S. 579 (1993). <u>See</u> Defendant's Amended <u>Daubert</u> Motion to Exclude Opinions of Plaintiff's Non-Retained Expert Witnesses (Doc. 34; Motion to Exclude). The Court denied the Motion to Exclude without prejudice to renewal at trial. <u>See</u> Order (Doc. 44), entered January 7, 2020. The parties disagree on whether the causation opinions of these treating physicians, formed in the scope of treatment, are subject to the <u>Daubert</u> analysis. <u>See</u> <u>Wilson v. Taser Int'l, Inc.</u>, 303 F. App'x 708, 712-13 (11th Cir. 2008) (finding treating physician's causation opinion subject to <u>Daubert</u> where physician did not need to know cause of injury in order to treat him); <u>Chapman v. Procter & Gamble Distributing, LLC</u>, 766 F.3d 1296, 1316 n.23 (11th Cir. 2014) (noting that a treating doctor is providing expert testimony if it consists of opinions based on specialized knowledge regardless of whether opinions formed prior to litigation); <u>see also</u> <u>Jones</u>, 2017 WL 1396477, at *9 n.12; <u>Chau</u>, 2017 WL 3623562, at *7.

Notably, the government did not raise a <u>Daubert</u> objection at trial. Nevertheless, to the extent the government continues to maintain its <u>Daubert</u> challenge, <u>see</u> Government Proposal at 72-73; Pretrial Statement at 15, and assuming <u>arguendo</u> that <u>Daubert</u> applies, the Court finds that Topp and Pardo's opinions are sufficiently reliable as to be admissible in this case.

### i. Pardo

Pardo explained that determining the cause of a patient's symptoms is important to his practice because it allows him to rule out other possible sources of pain so he can focus his treatment appropriately. According to Pardo, the forces from the motor vehicle collision on February 11, 2017, caused a fracture to Triolo's pars interarticularis at L5. This fracture allowed the vertebra to slip forward at L5-S1, compressing Triolo's nerves and causing pain in his back and radiating down his right leg. Pardo stated that he observed swelling, i.e., bony edema, at L5 in the MRI, an indication of severe trauma. He also testified that it was unlikely someone with a vertebra slipping forward in that manner would have no symptoms. Pardo further opined that the accident caused permanent bilateral injuries to Triolo's facet joints at L3-4, L4-5, and L5-S1, and these

---

See Wilson, 303 F. App'x at 714 (explaining that a doctor "usually may primarily base his opinion as to the cause of a plaintiff's injuries on his history where the plaintiff 'has sustained a common injury in a way that it commonly occurs . . . .'" (quoting Bowers v. Norfolk S. Corp., 537 F. Supp. 2d 1343, 1353-54 (M.D. Ga. 2007))); see also Chau, 2017 WL 3623562, at *9-12; Brown v. NCL (Bahamas) Ltd., 190 F. Supp. 3d 1136, 1143-44 (S.D. Fla. June 6, 2016). Both doctors testified that the injuries causing Triolo's lumbar pain and radiculopathies are due to the hyperextension of his lumbar spine as can occur in rear-end collisions. The doctors performed a physical examination, took a medical history, reviewed the MRI imaging, and engaged in a differential diagnosis analysis to rule out other causes. Based on the foregoing, the doctors concluded that Triolo's injuries were the result of a new, acute trauma, most likely the rear-end collision on February 11, 2017. Significantly, this is not a case where there is evidence of pre-existing back pain, prior back injuries, or other, recent accidents that must be accounted for. Thus, the Court is satisfied that even if not strictly necessary for treatment, the doctors' causation opinions are sufficiently reliable to be admissible in this case. In the Court's view, the government's arguments, discussed below, go to the weight that should be given to these opinions, not their admissibility.

injuries were later aggravated by the lumbar fusion surgery. Pardo explained that the pain from the injury to the facet joints was initially masked by the pain stemming from the nerve root compression.

Pardo determined that the accident was the cause of these injuries based on Triolo's report of his medical history, Pardo's physical examination of Triolo, Pardo's review of the April 4, 2017 MRI, Triolo's need for treatment, and Triolo's responses to Pardo's treatment and the surgery. Pardo testified that Triolo's symptoms were consistent with the objective findings on the MRI. He also explained that the injuries to Triolo's spine are the type of injuries which are caused by hyperextension of the joint, as can occur in a rear-end motor vehicle collision. Pardo observed that Triolo likely had pre-existing disc desiccation at L5-S1 which was exacerbated by the motor vehicle collision but maintained that the desiccation was not the cause of Triolo's symptoms.[31]

### ii.   Topp

Topp also testified that Triolo's fracture was caused by a hyperextension of his back that occurred in the motor vehicle accident. According to Topp, while the initial fracture may have caused some pain, over time, the fracture allowed the vertebra to slip, and the space around the nerves got smaller allowing them

---

[31] As addressed at trial, it is undisputed that Triolo is not claiming the aggravation of a preexisting injury in this case.

to become pinched which caused the ongoing pain.  In addition, Topp testified that Triolo developed sacroiliac joint dysfunction either due to an injury at the time of the accident or as a result of the lumbar fusion surgery.

Topp explained that determining the cause of a patient's injury assists him in treating that injury because it allows him to eliminate or reinforce aspects of the differential diagnosis to reach a final diagnosis and formulate a treatment plan.  As such, Topp performed a differential diagnosis analysis on Triolo, as he does with every patient.  In doing so, Topp considered Triolo's account of the motor vehicle accident, his subjective reports of pain, his medical history, the MRI imaging, and Topp's physical examination of Triolo.  Topp testified that in conducting this analysis, he begins with "a whole multitude of potential problems that could be causing his back pain," including inflammatory conditions, infections, and tumors.  Topp explained that his differential diagnosis of Triolo ruled out tumor, infection, or a degenerative condition as the cause of Triolo's pain, leaving an acute injury as the diagnosis.

In support, Topp testified that his review of the MRI indicated to him that Triolo's nerves were severely pinched such that he could not "have been living like this for very long."  See Tr. Vol. II at 293.  Likewise, Topp opined that Triolo would "certainly" have had "some pain in his back" had he sustained the fracture at L5 prior to the motor vehicle collision.  Id. at 223.  Topp also testified that in reviewing the MRI he noted the presence of edema in the bone which was

indicative of an injury occurring at the time of the accident.  Topp conceded that Triolo's spine showed signs of degenerative processes, e.g., disc desiccation and disc space narrowing, but maintained that this degeneration occurred in the seven weeks between the accident that fractured the pars, and the MRI.  Thus, in Topp's opinion, it was "post-traumatic" degeneration.

### iii.    Findings

The government raises several arguments attacking the credibility of the doctors and the reliability of their opinions.  Among other things, the government notes that the doctors treated Triolo under letters of protection and thus have an interest in the outcome of this ligation.  The government points to aspects of Triolo's personal and medical history that he did not disclose to the doctors, as well as evidence that Triolo's pain may not have been as severe as he was reporting.  And the government expresses ample skepticism of Topp's opinion on the timeframe over which Triolo's spinal conditions developed. Nevertheless, on this record, absent any contrary expert testimony, the Court finds that Triolo satisfied his burden of demonstrating that it is more likely than not that the injuries to his lumbar spine were sustained in the February 11, 2017 accident.

Although Triolo lacked credibility in many regards, the Court is nonetheless convinced that he was not experiencing back pain before this accident.  The government fails to identify a single medical record indicating

42

that Triolo had previously complained of back pain.  Likewise, the only witnesses the Court heard on this point, Triolo's brothers, testified that they had never known Triolo to have back pain prior to the accident.  Indeed, Triolo's brothers maintained that before the accident Triolo was fit and physically active.  Although the government speculates about Triolo's failure to provide any medical records from his time living in New York, it is nevertheless notable that Triolo moved to Florida in March of 2012, almost five years before the accident, and had not pursued treatment for his back in that time.  In contrast, after he obtained benefits through work in 2015, Triolo did seek treatment for his chronic migraines and sleep apnea.  Given that Triolo was working long hours at a physically active job without the need for treatment of his back, the Court is persuaded that Triolo was not experiencing any significant back pain prior to the accident.

Moreover, according to Topp and Pardo, the injuries reflected in the MRI are consistent with hyperextension injuries that occur in rear end collisions. Both Topp and Pardo also noted the presence of swelling indicative of a traumatic injury.  Although the MRI report does identify degenerative changes in Triolo's spine, Topp explained that the degenerative findings in Triolo's spine are not inconsistent with an acute injury.  Significantly, the government did not present any expert testimony to support its theory that the presence of degenerative findings in Triolo's spine makes it more likely than not that the

43

pars fracture and slippage were preexisting.  Likewise, the government failed to present any actual evidence to rebut Topp's testimony on the timeframes in which degeneration can occur following trauma.[32]  While the Court in its own experience bears some reservations about Topp's opinion on this point, the Court declines to reject this testimony absent the presentation of expert testimony to the contrary.[33]

The government also attacks the reliability of Topp and Pardo's opinions as they are largely based on information obtained from Triolo.  However, the government fails to show that there were any <u>material</u> inaccuracies in the information Triolo provided to his doctors.  There is no evidence that Triolo told Topp or Pardo that his seat back had broken or that the USPS truck was traveling 30 miles per hour, factual contentions the Court has rejected.  While Triolo did not disclose his work history or car accidents from decades earlier,

---

[32] The Court notes the discrepancy between Pardo's testimony that the disc desiccation at L5-S1 was likely preexisting but unrelated to Triolo's pain, and Topp's testimony that the desiccation developed in the weeks following the fracture.  Despite this discrepancy, the testimony of the two doctors was consistent that the fracture likely occurred in the accident followed by the slippage that caused the nerve impingement given the presence of swelling and Triolo's lack of pain prior to the accident.  The Court does not give substantial weight to the government's contention that the fracture must have been preexisting given the presence of disc desiccation because the government did not present any expert testimony to support its theory.

[33] The government also points to the note in Toumbis's records that Triolo's injury was of a chronic nature, but the Court did not hear from Toumbis at trial and thus had no ability to explore the reasons for this opinion or assess his credibility.  As such, this isolated note is insufficient to rebut the testimony of Topp and Pardo.

there is no reason to believe that this information would have impacted Topp and Pardo's opinions given the length of time that had passed and Triolo's lack of any need for treatment in the years preceding the accident.  Indeed, Pardo testified that a motor vehicle collision from more than twenty years prior without injuries would not be pertinent to his diagnosis.[34]  Likewise, the Court is not convinced that Triolo's failure to disclose various other aspects of his medical history such as his testosterone treatments, sleep apnea, broken hand, or broken foot warrant rejection of Pardo and Topp's causation opinions.  This is especially true given the lack of any testimony that such information would have been relevant in assessing the cause of Triolo's back pain.

In sum, although the Court bears reservations about the value of Topp and Pardo's causation testimony, on the current record with no countervailing explanation for Triolo's pain following the accident, the Court finds, based on a preponderance of the evidence, that the accident caused permanent injuries to Triolo's spine.  Even discounting the weight given to Topp and Pardo's testimony, absent any other evidence, the Court is satisfied that Triolo has met his burden of proof.  Accordingly, the Court finds that Triolo sustained the

---

[34] Notably, the government did not inquire of either doctor whether Triolo's work history or prior accidents would impact their opinion on the cause of his injuries.  Nor did the government present any expert of its own to testify that these events are a more likely cause of Triolo's back pain.

fracture to his pars interarticularis as a result of the accident, leading to the nerve impingement that necessitated the surgery.  The Court also finds that Triolo sustained injuries to his facet joints that were exacerbated by the lumbar surgery and are the cause of his ongoing pain, as well as an injury to his sacroiliac joint. And, as previously noted, it is undisputed that Triolo sustained temporary injuries to his neck.

## C. Damages

For the reasons discussed, the Court finds that Triolo sustained permanent injuries to his lumbar spine as a result of the February 11, 2017 accident.  In addition, it is undisputed that Triolo sustained temporary injuries to his neck.[35]  To the extent there was an attempt to attribute Triolo's pain to preexisting degeneration in his neck and back, given the absence of any expert testimony in support, the Court rejects this contention.  As such, the Court accepts that Triolo is entitled to his past medical damages.[36]  In addition, Triolo

---

[35] Triolo did not require treatment for his neck injuries separate from the treatment he received for his back treatment.  Thus, a separate discussion of those damages is not necessary.

[36] Triolo tabulates his total past medical bills, after reductions and set offs, as $312,113.  See Triolo Proposal at 22.  However, the Court has reviewed the records and finds that the past medical bills total $307,504.86.  The discrepancy is largely because Triolo vastly over states his out-of-pocket costs from Walgreens.  The records provided indicate that Triolo only incurred $895.74 in prescription drug costs at Walgreens, rather than the $4,895.40 claimed.  See Pl.'s Exs. 14, 32.

The government argues that Triolo failed to mitigate his damages because he did not submit his medical bills to his medical insurance.  However, the government fails to provide any evidence of whether Triolo's insurer would have covered these treatments, or what it would have paid.  Without more information, the Court is not convinced that Triolo's decision not to

is entitled to his lost wages following the back surgery totaling $4,122.18.  See Fla. Std. Jury Instr. (Civil) 501.3(b) (allowing the recovery of "[a]ny earnings . . . lost in the past").

With regard to his future medical damages, Triolo presented the testimony of life care expert Gil Spruance.  Based on Pardo and Topp's opinions regarding Triolo's future medical care, Spruance opined on the future costs of: Triolo's prescription pain medication, monthly office visits, drug screening, annual x-rays to monitor his lumbar spine, and annual bilateral, 3-level radiofrequency ablations.  He also opined on the cost of a future lumbar fusion extension surgery.  Spruance testified that as of the date of trial, Triolo had a remaining life expectance of 34.3 years.

Upon review, the Court rejects any award for drug screening or x-ray monitoring of his lumbar spine as Triolo presented no evidence that he has ever

---

bill his insurance constitutes a failure to mitigate under the circumstances of this case. Moreover, with one small exception, the government does not specifically point to any bills or charges that it contends are excessive.  The government does identify one charge in Pardo's records that appears to reflect a discounted rate paid by PIP, but this evidence, standing alone, does not persuade the Court that the charges were unreasonable.  See Hillsborough Cnty. Hosp. Auth. v. Fernandez, 664 So. 2d 1071, 1072 (Fla. 2d Dist. Ct. App. 1995) (holding that evidence of "contractual discounts, standing alone, is insufficient to prove that [hospital's] charges were unreasonable"); see also Lawton-Davis v. State Farm Mut. Auto. Ins. Co., No. 6:14-cv-1157-Orl-37DAB, 2016 WL 1383015, at *2-3 (M.D. Fla. Apr. 7, 2016) (discussing a variety of factors that are relevant to the reasonableness of a medical provider's charges, including contractual discounts and the plaintiff's lack of control as to the amount of the charges, but cautioning that no single factor "can be solely relied on as the measure of reasonableness").

participated in drug screening during the three years that he had been treating with Pardo prior to trial. Likewise, at the time of trial, Triolo had not returned to Topp for a follow up appointment since September of 2018, and had not obtained any imaging of his lumbar spine in over a year. Thus, the Court is not convinced that Triolo will obtain routine x-ray screening going forward.[37] The Court accepts that Triolo will continue to see Pardo for pain management to include prescription medication and left-sided radiofrequency ablations and will therefore award the mid-range cost of that medical care. The Court does not accept that Triolo will continue to receive right-sided radiofrequency ablations. Significantly, the Court did not find Triolo's testimony regarding his ongoing pain to be entirely credible. Triolo's travels, work history, and continued motorcycle use, combined with the surveillance footage and his general lack of complete candor, convince the Court that Triolo's pain is more manageable than he describes. As such, and given that at the time of trial Triolo had only received one right-sided ablation, which was administered shortly after his Achilles injury, the Court finds it unlikely that he will need right-sided ablations in the future. Likewise, to the extent Triolo seeks damages for the cost of a future back

---

[37] Notably, although Spruance testified that Topp recommended annual x-ray screenings, the Court heard no testimony from Topp about the need for annual x-ray monitoring of Triolo's lumbar spine.

surgery, the Court is not persuaded that Triolo will, more likely than not, need such a surgery in his lifetime.  Although Topp testified that there was a "high likelihood" Triolo would need such surgery, the Court found Topp's testimony on this point to be too generalized and conclusory to support such a finding. Thus, the Court calculates Triolo's future medical damages as $285,883.64.[38]

Next, the Court finds it necessary to discount Triolo's medical damages due to a failure to mitigate.  Specifically, the Court finds that Triolo failed to mitigate his damages by declining to participate in the prescribed physical therapy following surgery.  Both Topp and Pardo testified to the importance of physical therapy following surgery and the records from Select Physical Therapy indicate that Triolo would likely have benefited from skilled rehabilitative therapy.   In addition, the Court finds that Triolo likely exacerbated his back injury when he injured his Achilles in February 2019.  The Court is convinced that Triolo's failure to participate in rehabilitative therapy and subsequent aggravation of his back injury have likely contributed to his ongoing need for pain management therapies both before trial and going forward.  As such, the Court will discount Triolo's past and future medical

---

[38] The math is as follows: $1,680 (Office visits) + $1,360.80 (medication) + $5,294 (left-sided RFAs) = $8,334.80 annually.  The annual amount over 34.3 years of life expectancy is $285,883.64.

49

damages by 10%.  Accordingly, the Court awards $276,754.37 in past medical damages, and $257,295.28 in future medical damages.

Last, having determined that Triolo sustained a permanent injury, Florida law permits an award of damages for pain and suffering experienced in the past and to be experienced in the future.  See Fla. Std. Jury Instr. (Civil) 501.3(d).  "There is no exact standard for measuring such damage.  The amount should be fair and just in the light of the evidence."  Id.  On this element, the Court finds that although Triolo does experience significant pain at times, overall his pain is less severe than described.  Triolo is able to continue his full employment in the career he loves, he still rides his motorcycle, maintains his home and yard, and enjoys his vacations.  Nevertheless, the Court does find it significant that Triolo underwent a painful surgery and will have a "bad back" for the remainder of his life.  See Tr. Vol. II at 271.  The Court accepts that Triolo sometimes has difficulty sleeping due to back pain, wakes up stiff and sore in the morning, has had to curtail his recreational activities, and experiences some discomfort throughout the day.  Based on these findings, the Court will award $45,000 in past pain and suffering and $100,000 in future pain and suffering.

Thus, the Court finds that Triolo is entitled to a total damages award as follows:

| | | |
|---|---|---|
| Past Medical Care: | $ | 276,754.37 |
| Lost Wages: | $ | 4,122.18 |
| Future Medical Care: | $ | 257,295.28 |
| Past Pain & Suffering: | $ | 45,000.00 |
| Future Pain & Suffering: | $ | 100,000.00 |
| Total: | $ | 683,171.83 |

Accordingly, it is

**ORDERED:**

The Clerk of the Court is **directed** to enter **JUDGMENT** in favor of Richard A. Triolo in the amount of **$683,171.83**. The Clerk is further directed to terminate all pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville, Florida this 22nd day of March, 2022.

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record

51